UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | In a Proceeding Under |
| | : | Section 304 of the |
| PARMALAT FINANZIARIA S.p.A. et al., | : | Bankruptcy Code |
| | : | |
| Debtors in a Foreign Proceeding. | : | Case No. 04 -14268 (RDD) |
| | : | (Jointly Administered) |

-------------------------------------------------------------------x

| | | |
|---|---|---|
| ABN AMRO BANK N.V., | : | |
| | : | |
| Appellant | : | District Court |
| | : | Case No. 07-cv-07413 (PKC) |
| - against - | : | |
| | : | |
| PARMALAT FINANZIARIA S.p.A. et al., | : | |
| | : | |
| Appellees. | : | |
| | : | |

-------------------------------------------------------------------x

---

## RESPONSE BRIEF OF APPELLEES
## PARMALAT FINANZIARIA S.p.A. et al.

---

Marcia L. Goldstein, Esq. (MG 2606)
Howard B. Comet, Esq. (HC 4353)
Scott E. Cohen, Esq. (SC 8784)
WEIL, GOTSHAL & MANGES, LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Appellees*
Parmalat Finanziaria S.p.A. et al.

## FED. R. CIV. P. 7.1 DISCLOSURE STATEMENT

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Appellees hereby certify that (i) none of the corporate Appellees have parents, except that some of the Appellants were parent entities for other Appellees, and (ii) no publicly held corporation owns 10% or more of their stock. Pursuant to a plan of reorganization under Italian law, most of the corporate Appellees transferred their assets to a newly-formed company named Parmalat S.p.A., which is publicly held.

Dated: November 9, 2007
　　　 New York, New York

WEIL, GOTSHAL & MANGES LLP

By: _____
Marcia L. Goldstein, Esq. (MG 2606)
767 Fifth Avenue
New York, New York  10153
(212) 310-8000

*Attorneys for Appellees*
Parmalat Finanziaria S.p.A. et. al.

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ............................................................................1

II.   STATEMENT OF FACTS ...............................................................................3

    A.    Events Leading to the Collapse of Parmalat ....................................3

    B.    The Commencement of the Italian Insolvency Proceedings and the
U.S. Section 304 Case..........................................................................4

    C.    The ABN AMRO Guarantee Claim and the Data Certa Rule ......................6

    D.    Entry of the Composition and Request for Entry of the Permanent
Injunction in the Section 304 Case .............................................................9

    E.    ABN AMRO's Objection to the Entry of the Permanent Injunction
by the Bankruptcy Court.............................................................................10

    F.    The Hearing and Decision of the Bankruptcy Court Approving the
Permanent Injunction ..................................................................................10

        1.    The Arguments Presented at the Hearing .........................................11

        2.    The Findings of Fact and Decision of the Bankruptcy Court ...........12

III.  ARGUMENT.............................................................................................13

    A.    Standard of Review.....................................................................................13

    B.    The Bankruptcy Court Properly Concluded the Italian Proceedings
Are Entitled to Section 304 Relief...............................................................14

        1.    Foreign Insolvency Proceedings Are Entitled to a
Presumption of Comity.......................................................................14

        2.    The Bankruptcy Court Properly Concluded that the Foreign
Debtors' Italian Proceedings Are Worthy of Comity ........................17

    C.    ABN AMRO's Appeal Is Without Merit.....................................................18

        1.    ABN AMRO's Argument that the New York Choice of
Law Provision Governs is Procedurally Precluded and, In
Any Event, Without Merit ..................................................................19

        2.    It Is Not the Role of the Bankruptcy Court, or Any U.S.
Court, to Review Whether the Parma Court Properly
Applied Italian Law ...........................................................................26

IV.   CONCLUSION.........................................................................................29

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

In re Adomah, 340 B.R. 453 (Bankr, S.D.N.Y, 2006)........................................................25

Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996 (2d Cir. 1993) ...................16

In re Artimm, S.r.l, 278 B.R. 832 (Bankr. C.D. Cal. 2002)..........................................18

In re Artimm, S.r.l., 335 B.R. 149 (Bankr. C.D. Cal. 2005)........................................16

Authentic Hansom Cabs, Ltd. v. Nisselson, No. 03-9468, 2004 U.S. Dist. LEXIS 25969
    (S.D.N.Y. December 22, 2004), aff'd, 159 Fed. Appx. 221 (2d Cir. 2005) ....................20

In re Axona Int'll Credit & Commerce Ltd., 88 B.R. 597 (Bankr. S.D.N.Y. 1988)....................27

BT/SAP Pool Assocs., L.P. v. Coltex Loop Cent. Three Partners, L.P., 203 B.R. 527
    (S.D.N.Y. 1996), aff'd, 138 F.3d 39 (2d Cir. 1998)........................................14

In re Brown, 346 B.R. 868 (N.D. Fla. 2006) ...............................................24

In re Bird, 222 B.R. 229 (Bankr. S.D.N.Y. 1998) ........................................16

Can. S. Ry. v. Gebhard, 109 U.S. 527 (1883)............................................23

In re Chateaugay Corp., No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130
    (S.D.N.Y. May 10, 1993)................................................................25

In re Culmer, 25 B.R. 621 (Bankr. S.D.N.Y. 1983) ....................................28

Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard), 773 F.2d 452 (2d Cir. 1985)......16, 23

DaimlerChrysler Fin. Servs. Americas LLC v. Quick (In re Quick), 371 B.R. 459 (10th
    Cir. B.A.P. 2007) .....................................................................24

Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V., 108 F. Supp. 2d 349
    (S.D.N.Y. 2000), aff'd, 2 Fed. Appx. 80 (2d Cir. 2001) ....................................17

In re Enercons Va.,Inc.,  812 F.2d 1469 (4th Cir. 1987) ...................................... 17-18

Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240 (2d. Cir. 1999)..........................28

Guilbert v. Gardner, 480 F.3d 140 (2d Cir. 2007) .......................................19

**Page**

Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.2d 1384 (2d Cir. 1990) ...............................................................14

Hanover Nat'l Bank v. Moyses, 186 U.S. 181 (1902)..................................................25

In re Hughes, 281 B.R. 224 (Bankr. S.D.N.Y. 2002) ...................................................14

Int'l Bank Ltd . v. Treco (In re Treco), 240 F.3d 148 (2d Cir. 2001)................................13, 15, 18

JP Morgan Chase Bank v. Altos Hornos De Mex., S.A. de C.V., 412 F.3d 424 (2d Cir. 2005) ............................................................................................................17, 26

Knox v. Salinas, 193 F.3d 123 (2d. Cir. 1999) ...........................................................13

In re Koreag, Controle et Revisions S.A., 961 F.2d 341 (2d Cir. 1992)........................................16

Kroger v. Legalbill.com LLC, No. 04-2189 (ESH), 2005 WL 4908916 (D.D.C. April 7, 2005) ............................................................................................................29

LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), No. 02-6271, 2004 U.S. Dist. LEXIS 17575 (S.D.N.Y. September 1, 2004), aff'd, 144 Fed Appx. 900 (2d Cir. 2005)........................................................................14

LTV Corp. v. Miller (In re Chateaugay Corp.), 109 B.R. 613 (S.D.N.Y. 1990)............................13

In re McCann, Inc., 318 B.R. 276  (Bankr. S.D.N.Y. 2004)............................................25

In re Nichols, 440 F.3d 850 (6th Cir. 2006)...............................................................25

Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.), 209 F.3d 125 (2d Cir. 2000) ........25

In re Papeleras Reunidas, S.A., 92 B.R. 584 (Bankr. E.D.N.Y. 1988)........................................18

Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 109 F.3d 850 (2d Cir. 1997)..................28

In re  Rosacometta, S.r.l., 336 B.R. 557 (Bankr. S.D. Fla. 2005)..................................18

In re Schimmelpenninck, 183 F.3d 347 (5th Cir. 1999) .................................................17

Shoppers World Cmty. Ctr. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.), No. 01-CV-3934 (SAS), 2001 U.S. Dist. LEXIS 14755 (S.D.N.Y. September 20, 2001)............25

Singleton v. Wulff, 428 U.S. 106 (1976)........................................................... 19-20

**Page**

In re Taddeo, 685 F.2d 24 (2d Circ 1982) ...................................................................25

U.S. v. Sec. Indus. Bank, 459 U.S. 70 (1982)..............................................................25

Vesta Fire Ins. Corp. v. New Cap Reins. Corp. Ltd., 244 B.R. 209 (S.D.N.Y. 2000), aff'd,
        238 F.3d 186 (2d Cir. 2001).............................................................................17

Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B., 825 F.2d 709 (2d Cir. 1987).................16, 17, 24

## FEDERAL STATUTES

11 U.S.C. §101(23) & (24) ..........................................................................................14

11 U.S.C. §304.............................................................................................. *passim*

## FEDERAL RULES

Fed. R. Bankr. P. 8013 .................................................................................................14

Fed. R. Civ. P. 44.1 ......................................................................................................29

## MISCELLANEOUS

H.R. Rep. No. 95-595 (1977).........................................................................................15

S. Rep. No. 95-989 (1978) ............................................................................................15

# I.

## PRELIMINARY STATEMENT

The Bankruptcy Court, after careful consideration, has concluded that the Foreign Debtors' Italian Proceedings provide both a comprehensive process for the uniform administration of creditors' claims and the procedural safeguards required for recognition under Section 304 of the Bankruptcy Code. Accordingly, the Bankruptcy Court authorized Section 304 relief and entered the Permanent Injunction. ABN AMRO does not (and could not seriously) challenge the Bankruptcy Court's findings that the Italian Proceedings are consistent with principles of due process and worthy of comity.

Instead, ABN AMRO complains about the facts and circumstances surrounding the denial by the Parma Court of the proof of claim that ABN AMRO has submitted. But the ABN AMRO proof of claim was denied by the Parma Court because it did not comply with the Italian law rule of *data certa* – a rule to which ABN AMRO acknowledges it is subject and that it does not challenge. ABN AMRO has also appealed the Parma Court's ruling to the Italian appellate court and that appeal is pending. In essence then, by its appeal to this Court, ABN AMRO improperly seeks to have this Court intervene in the Italian claims process and review (either as a surrogate appeals court or by *sub silentio* collateral attack) whether the Parma Court properly applied the Italian legal principle of *data certa*.

At the heart of the proceedings here is the indisputable fact that ABN AMRO purchased notes allegedly subject to a guarantee by an Italian corporation that on its face did not satisfy *data certa*. That purchase necessarily reflects a failure of ABN AMRO's own diligence or internal compliance process. Now, ABN AMRO is struggling to satisfy the *data certa* rule through other forms of evidence (as it is authorized to do under Italian law). But ABN AMRO's

unhappiness with the Italian claims process does not alter the fact that all creditors in the Italian

proceedings (Italian and foreign, including U.S. creditors) have every opportunity to prove their

claims and, if the Parma Court rejects those efforts, the right to appeal.  The enforcement of a

creditor claim against an Italian entity in pending Italian bankruptcy proceedings is the

quintessential matter best left to the foreign court in its administration of a debtor's bankruptcy

case.

As the Italian legal system offers ample due process rights and protections (as the

Bankruptcy Court found and ABN AMRO does not dispute), neither this Court, nor any U.S.

court should be asked to interpret the Italian bankruptcy laws applicable in an Italian claims

process – especially where ABN AMRO has not exhausted its remedies in Italy and is pursuing

them simultaneously in the Italian courts.

In addition, ABN AMRO argues, for the first time on appeal, that Section 304

relief must be denied because it is repugnant to U.S. law for a foreign bankruptcy court to apply

its own bankruptcy laws to the enforcement of an agreement that contains a New York choice of

law clause.  This argument was not briefed in the Bankruptcy Court and ABN AMRO thus may

not now raise this matter.

It is no wonder that ABN AMRO did not brief this argument in the Bankruptcy

Court – as the notion that bankruptcy law, foreign or domestic, cannot limit a creditor's right to

recover on a contract claim is completely antithetical to fundamental bankruptcy principles.

Bankruptcy and the laws attendant thereto routinely alter contractual rights, regardless of the

state law governing the contract.  For example, the failure of a creditor to submit a claim by a

court-imposed bar date will result in a denial of the claim regardless of a state law statute of

limitations.  Similarly, by approval of a plan of reorganization, the obligation to repay

2

contractually-related obligations and debts is often reduced significantly – or wiped out entirely. Certainly, no contractual provision governed by any state law sanctions these results – yet such results are commonplace in bankruptcy. Insolvency laws would be completely undermined if contracting parties could block the application of bankruptcy laws merely by adopting choice of law clauses in their contracts.

ABN AMRO's appeal therefore has no merit and should be denied.

## II.

## STATEMENT OF FACTS

### A.    Events Leading to the Collapse of Parmalat

Parmalat Finanziaria S.p.A. ("Finanziaria"), an entity incorporated under Italian law, and its affiliates (collectively, "Parmalat") operated diverse businesses in the food and beverage industry, including the production, packaging, and sale of milk under the "Parmalat" brand name. (R. 4, ¶¶4-5.)[1]

In late 2003, concerns about Parmalat's finances were voiced by various media outlets and the financial community began expressing doubts as to whether Parmalat would be able to repay upcoming bond maturities. (R. 4, ¶8.) On December 9, 2003, Parmalat acknowledged, among other things, that its debt was materially misstated on its financial statements. (R. 4, ¶9.) In response to this crisis, Parmalat retained turnaround specialist Dr.

---

[1] Citations to documents included in the record on appeal, as set forth in ABN AMRO Bank N.V's Designation of Record on Appeal and Statement of Issues to be Presented [Docket No. 2], are referenced herein as "R. ___." ABN AMRO's brief is incorrectly captioned, so as to make it appear that Parmalat Finanziaria S.p.A. is the only appellee on this appeal. ABN AMRO's notice of appeal indicated that it was appealing the Permanent Injunction with respect to all of the Foreign Debtors. Furthermore, Parmalat S.p.A., rather than Parmalat Finanziaria S.p.A., is the alleged signatory to the Guarantee that ABN AMRO seeks to enforce. Accordingly, this brief is captioned to indicate that all of the Foreign Debtors are appellees.

Enrico Bondi to formulate a restructuring package to save 36,000 jobs in 30 countries. (R. 4, ¶9.) On December 16, 2003, Dr. Bondi replaced Calisto Tanzi as the chairman and chief executive officer of Parmalat S.p.A. (R. 4, ¶9.) Shortly thereafter, Parmalat disclosed on December 19, 2003 that a bank account of its wholly-owned, Cayman Islands-incorporated subsidiary, which supposedly held 3.96 billion euros (US $4.9 billion), did not exist. (R. 4, ¶9.)

Following these events, Calisto Tanzi and several other executives were named in a criminal fraud investigation by the Milan court and placed in Italian jails. (R. 4, ¶10.)

**B.    The Commencement of the Italian Insolvency
        Proceedings and the U.S. Section 304 Case**

To address the profound liquidity crisis resulting from the massive fraud orchestrated by Parmalat's previous management and their accomplices at various banking institutions and accounting firms, Dr. Bondi filed bankruptcy petitions in late 2003 and early 2004 on behalf of Finanziaria and certain other Parmalat entities (the "Foreign Debtors"), seeking admission into "extraordinary administration" proceedings under Italian law (the "Italian Proceedings") in the Civil and Criminal Court of Parma (the "Parma Court"). (R. 4, ¶11.) The Parma Court appointed Dr. Bondi as "extraordinary administrator" (a position similar to a chapter 11 trustee) of the Foreign Debtors' bankruptcy proceedings. (R. 4, ¶11.)

On June 22, 2004, Dr. Bondi, as foreign representative of the Foreign Debtors, commenced ancillary cases to the Italian Proceedings (the "Section 304 Case") pursuant to Section 304 of the Bankruptcy Code in the Bankruptcy Court.[2] See 11 U.S.C. § 304; (R. 1; 2). The Foreign Debtors requested injunctive relief under Section 304(b) to bar actions against the Foreign Debtors that would interfere with their ability to restructure their financial obligations, to

---

[2]  Section 304 of the Bankruptcy Code was repealed by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, effective October 17, 2005. Because the Section 304 Case was commenced prior to October 17, 2005, however, Section 304 remains applicable.

4

prevent the premature "piecing out" of the Foreign Debtors' estates, and to ensure the orderly and consistent determination of claims and administration of assets in a centralized, foreign proceeding.  (See R. 5, pp. 17-24; R. 11, p. 9.)

Following the initial hearing in the Section 304 Case, on June 24, 2004, the Bankruptcy Court entered a temporary restraining order (R. 8) and, subsequently, on July 2, 2004, the Bankruptcy Court entered a preliminary injunction, which precluded the commencement or continuation of U.S. litigation against the Foreign Debtors on account of pre-bankruptcy claims and required creditors to assert their claims with the Parma Court in the Italian Proceedings, subject to certain limited exceptions.  (R. 15, p. 4.)

In addition to the commencement of insolvency proceedings in Italy and in the U.S., Dr. Bondi filed several multi-billion dollar recovery actions against certain banking institutions and accounting firms, alleging that improper conduct by the parties contributed to the fraud that led to Parmalat's collapse.[3]  (R. 24, p. 5.)  Dr. Bondi has alleged that employees at these banks and accounting firms conspired with corrupt Parmalat employees to embezzle millions of dollars from Parmalat, which was then funneled to the personal accounts of the corrupt employees and also used to pay exorbitant fees, interest payments and other amounts to the banks issuing the fraudulent loans.  (R. 25, Ex. A at ¶¶188-225.)  One of the principal conduits for this activity was Wishaw Trading S.A. ("Wishaw"), a Uruguayan shell entity controlled by the family of Calisto Tanzi and created specifically for the purpose of siphoning off huge amounts of money from Parmalat.  (R. 25, Ex. A at ¶210.)

---

[3] Certain recovery actions commenced in the U.S. were consolidated by the Judicial Panel on Multidistrict Litigation with a securities class action pending in the United States District Court for the Southern District of New York (Kaplan, J.).

C.    The ABN AMRO Guarantee Claim and the *Data Certa* Rule

ABN AMRO Bank N.V. is the holder of a promissory note (the "Note") issued by Wishaw, the Tanzi fraud conduit. (Appellant's Br. 5.) The principal amount due under the Note is $9,999,999.91. (Id.) ABN AMRO alleges that the Note was guaranteed by Parmalat S.p.A., one of the Foreign Debtors, pursuant to a guarantee (the "Guarantee") dated March 27, 2003 that was signed by Calisto Tanzi (who also allegedly signed as a witness to the execution of the Note). (Id.) Both the Note and the Guarantee include choice of law provisions stating that the instruments are to be governed by New York law. (See R.23, Exs. A, B.)

ABN AMRO submitted a proof of claim (the "Guarantee Claim") with the Parma Court asserting a claim pursuant to the Guarantee for the principal amount of the Note. (R. 23, ¶17.) The Foreign Debtors objected to the Guarantee Claim in the Parma Court proceeding, stating that the Guarantee and related supporting documentation did not satisfy the *data certa* (date certain) requirement set forth in Article 2704 of the Italian Civil Code because (i) the Guarantee lacked a certification of a public notary and (ii) ABN AMRO did not provide other evidence sufficient under Italian law to demonstrate that the Guarantee was issued on a "date certain" prior to the Foreign Debtors' commencement of the Italian Proceedings.[4] (R. 23, ¶21.)

---

[4] Article 2704 provides:

> Date of private writing as to third persons. The date of a private writing in which the signature has not been authenticated is not certain and cannot be asserted against third parties, except from the day on which the writing was registered or from the date of death or supervening physical incapacity to sign of the person or persons who signed it, or from the date on which the contents of such writing are reproduced in public acts . . . or from the date on which other circumstances occur which establish with equal certainty that the writing was drawn up previously.

> The date of a private writing containing unilateral declarations which are not directed to any specific person can be ascertained through any kind of evidence.

By way of background, the "date certain" or *data certa* rule is a well-known, long-standing requirement of Italian law, codified in its current form in 1942. *Data certa* requires a creditor who is asserting a claim arising under either a promissory note, or a guarantee thereof, to present written proof (satisfactory under Italian law) certifying that the instrument was executed prior to the commencement of the obligor's (or guarantor's) insolvency proceedings. *Data certa* must be satisfied by a creditor in order to enforce its claim against a third party, such as a bankruptcy trustee like Dr. Bondi or other creditors.

Data certa is generally satisfied once evidence is produced that the obligation or guarantee has a "certified date." This can be demonstrated through any number of means under Italian law, including a notary public certification, public registration of the document, death of one of the executing parties pre-bankruptcy, or other evidence deemed sufficient to certify the existence of the guarantee prior to the bankruptcy. Obviously, it is advisable for parties to have guarantees by Italian entities notarized at the time of execution to ensure compliance with *data certa* in the event of bankruptcy – but other documentary evidence demonstrating the existence of the claim pre-bankruptcy may be accepted by an Italian court. A creditor seeking to rely on a written instrument bears the burden of proof.[5]

---

The court, according to the circumstances of the case, can allow the introduction of any kind of evidence to ascertain the date of release of a debt.

(R. 25, Ex. F.)

[5] Not only is *data certa* a long-standing requirement under Italian law, but the record shows that parties doing business with Parmalat were well aware of the *data certa* rule. For example, a legal opinion issued to a noteholder that was submitted to the Bankruptcy Court had the following statement:

However, we would advise that each of the [contract documents] should bear an indisputable date (which may be established by having such agreement notarized in accordance with applicable laws of the jurisdiction in which such agreement is executed

Since the purpose of *data certa* is to prevent fraudulent claims based on false evidence, it has special significance in the Foreign Debtors' insolvency proceedings, which were precipitated by one of the largest corporate frauds in history, with numerous participants who were not Parmalat officers or employees. Dr. Bondi made every effort to conduct a thorough review of all claims for consideration by the Parma Court and asserted objections where he deemed it proper to protect legitimate creditors from fraudulent or otherwise meritless claims submitted by would-be creditors. In raising *data certa* and other objections, Dr. Bondi ensured that Italian and non-Italian creditors submitted proper documentary evidence to enable the Parma Court to determine the sufficiency of proofs of claim consistent with applicable principles of the Italian legal process. (See generally R. 13, Ex. A.)

As noted, it is advisable (and quite easy and routine) for parties conducting business in Italy to have debt instruments certified by a public notary upon issuance or immediately thereafter in order to ensure satisfaction of the *data certa* rule. However, even though the ABN AMRO Guarantee was not notarized at the time of issuance or thereafter, under Italian law ABN AMRO is permitted to submit additional documentary evidence (in accordance with the Italian rules of evidence) to establish the date certain of the Guarantee. Following Dr. Bondi's *data certa* objection to the ABN AMRO Guarantee Claim, ABN AMRO did submit additional evidence to the Parma Court in an attempt to demonstrate that the Guarantee was issued on a "date certain" prior to the Foreign Debtors commencement of the Italian Proceedings. (R. 23, ¶¶ 20-22.) But after considering that evidence, the Parma Court

---

and delivered) <u>in order to be enforceable against any third party including any receiver appointed in the event of Parmalat's bankruptcy.</u>

(R. 12, Ex. G at ¶3.) (emphasis added)

determined that ABN AMRO had not satisfied the *data certa* requirement and refused to admit the Guarantee Claim.  (R. 23, ¶23.)

ABN AMRO appealed the Parma Court's decision on January 27, 2005.  (R. 23, ¶24.)  The appeal remains pending before the Italian courts.  (R. 23, ¶24.)

**D.    Entry of the Composition and Request for Entry**
**of the Permanent Injunction in the Section 304 Case**

Concurrent with the claims litigation process, the Foreign Debtors submitted a restructuring plan to the Parma Court for approval.  (R. 15, p. 5.)  The restructuring plan included a Composition with Creditors (as amended, the "Composition"), which is similar to a plan of reorganization under U.S. bankruptcy law.  (R. 15, p. 5.)  The Composition provides for creditor recoveries and post-bankruptcy corporate governance with respect to the sixteen Foreign Debtors that were not liquidated.  (See R. 10, p. 3.)  All prepetition claims against the Foreign Debtors are to be treated in accordance with the Composition's terms, which are binding on all creditors. (See R. 10, pp. 3-4.)  Pursuant to the Composition, the holders of unsecured claims fully admitted by the Parma Court receive shares of common stock in "Reorganized Parmalat," a new entity organized under Italian law.  (See R. 10, pp. 13-14.)  On October 1, 2005, following receipt of the requisite creditor vote, the Parma Court issued a decree approving and giving effect to the Composition.  (R. 15, pp. 8-9.)

Following approval of the Composition in Italy, the Foreign Debtors sought entry of a permanent injunction (the "Permanent Injunction") in the Section 304 Case as the next phase in their global restructuring efforts.  (R. 15.)  By the Permanent Injunction, the Foreign Debtors sought recognition of the restructuring pursuant to the Composition approved in the Italian Proceedings and sought to channel any outstanding claims against the Foreign Debtors to the

Parma Court for disposition in accordance with the terms of the Composition.  (R. 15, p. 2; R.19,

Attach. 1 at 5; R. 24, p. 2.)

**E.     ABN AMRO's Objection to the Entry of the
        Permanent Injunction by the Bankruptcy Court**

ABN AMRO opposed the Foreign Debtors' request for injunctive relief under

Section 304.  (See R. 18; R. 22; R. 27.)  ABN AMRO argued that the Parma Court's denial of its

Guarantee Claim was prejudicial and repugnant to U.S. notions of due process and that the

Bankruptcy Court should not, under the factors set forth in Section 304, extend comity to the

Italian Proceedings.  ABN AMRO's objections adopted by reference and joined in arguments

raised by Bank of America, the primary objector to the entry of a Section 304 permanent

injunction.  (See R. 22, p. 5; R. 27, p. 2.)

ABN AMRO did not argue in the Bankruptcy Court that Section 304 relief must

be denied because it is repugnant to U.S. law for a foreign bankruptcy court to apply its own

bankruptcy laws to an agreement that contains a New York choice of law clause.  ABN AMRO

therefore failed to preserve any such argument for appeal.  See infra pp. 19-21.

**F.     The Hearing and Decision of the Bankruptcy
        Court Approving the Permanent Injunction**

A hearing to consider entry of the Permanent Injunction was held before the

Bankruptcy Court on June 21, 2007.  (See generally R. 30.)  Prior to the hearing, the Foreign

Debtors resolved most of the objections filed to the requested relief.  The hearing centered on

Bank of America's allegations, adopted by ABN AMRO, that the application of *data certa* by

the Parma Court and Dr. Bondi rendered the Italian Proceedings unworthy of comity.[6]

---

[6] The Pension Benefit Guaranty Corporation also objected to the entry of the Permanent
Injunction on unrelated grounds.  (R. 26.)  The Bankruptcy Court rejected the PBGC's objections
and the PBGC did not appeal that decision.  (R. 31, Ex. A at 14.)

### 1.     The Arguments Presented at the Hearing

At the hearing, Bank of America argued that the Permanent Injunction should not be entered because the application of *data certa* by Dr. Bondi and the Parma Court with respect to its claims was "fundamentally inconsistent with what [Section] 304 requires in terms of just treatment" of creditors.  (R. 30, p. 70:2-9.)  ABN AMRO, in turn, asserted that the Permanent Injunction should not be entered because its Guarantee Claim was "not being treated fairly" and was "being treated differently" by Dr. Bondi and the Parma Court than it would be treated "in any court in the United States."  (R. 30, p. 107:11-17.)

Under questioning by the Bankruptcy Court, however, Bank of America admitted that:  (i) *data certa* is not necessarily inconsistent with the Bankruptcy Code, (ii) the Parma Court rejected many of the *data certa* objections asserted by Dr. Bondi and admitted most of Bank of America's claims, and (iii) Italian law gives Dr. Bondi the discretion to object to evidence submitted by creditors that he believes is insufficient to equal the certainty of the enumerated forms of proof listed in the *data certa* statute.  (R. 30, pp. 70:10-16; 72:16-20; 73:15-19; 101:18-20.)  Likewise, ABN AMRO admitted that (i) the existence of the choice of law provisions in the Guarantee did not prevent the Bankruptcy Court from "granting comity to a foreign court in its claims procedures;" and (ii) ABN AMRO was (and still is) litigating the question of whether its Guarantee Claim should be admitted in the Italian Proceedings.  (R. 30, pp. 104:13-22; 105:24-106-:11.)

11

### 2.    The Findings of Fact and Decision of the Bankruptcy Court

At the conclusion of the hearing, the Bankruptcy Court read its findings of fact and its decision from the bench.[7] The Bankruptcy Court began by stating it would consider the five relevant section 304(c) factors when determining whether to issue the Permanent Injunction as required by the Bankruptcy Code. (R. 31, Ex. A at 4-5.) The Bankruptcy Court then applied each factor and concluded that it would enter the Permanent Injunction and overrule Bank of America and ABN AMRO's objections.

Specifically, the Bankruptcy Court found that the Italian Proceedings, in accordance with the section 304(c) requirements, provided "a comprehensive procedure for the orderly and equitable distribution of the Foreign Debtors assets," and guaranteed "the just treatment of creditors." (R. 31, Ex. A at 6.) The Italian Proceedings also ensured that U.S. claimholders "are not discriminated against or unduly prejudiced or inconvenienced in the proceeding." (R. 31, Ex. A at 6.)

Addressing the application of *data certa* by the Parma Court in the Italian Proceedings, the Bankruptcy Court held that the Parma Court had applied *data certa* in a manner "that was consistent with U.S. notions of due process and fundamental fairness." (R. 31, Ex. A at 9.) In support of this conclusion, it found that the Parma Court had, on multiple occasions, ruled in favor of creditors asserting claims despite the presence of the Foreign Debtors' *data certa* objections. (R. 31, Ex. A at 10.) It also found that in "instances where the [creditors] lost . . . the matter is on appeal" in the Italian courts. (R. 31, Ex. A at 9.) The Bankruptcy Court concluded that it would be "inappropriate" for it to "predict how the Italian courts would

---

[7] The Bankruptcy Court subsequently issued a Modified Bench Ruling On Request for Permanent Injunction, which is annexed to the Permanent Injunction. (R. 31, Ex. A.) A copy of the hearing transcript (R. 30) and modified bench ruling are appended hereto as Exhibits 1 and 2.

conclude the litigation in the first place" or "predict whether they would conclude [the appeals] .

. . in a way that is fundamentally unfair and contrary to U.S. notions of due process and

fairness." (R. 31, Ex. A at 13.)

Finally, the Bankruptcy Court addressed Dr. Bondi's pursuit of *data certa*

objections in the Italian Proceedings. Dr. Bondi, it held, could not be faulted for "pursuing a

technical objection to a guaranty when he would not be faulted for pursuing a technical objection

to a lien under . . . [U.S.] non-bankruptcy law." (R. 31, Ex. A at 13.) Rather, the Bankruptcy

Court concluded that Dr. Bondi properly exercised his discretion in relying on the *data certa*

requirement and in agreeing to settle certain guarantee claims that he previously objected to on

*data certa* grounds. (R. 31, Ex. A at 12.) (noting that Dr. Bondi's decision to settle with certain

claimants should not tie his hands in exercising his discretion with regard to every creditor).

The Bankruptcy Court issued the Permanent Injunction on July 20, 2007. (R. 31.)

ABN AMRO is the only party that has appealed the Bankruptcy Court's order. (R. 32.)

## III.

## ARGUMENT

### A.    Standard of Review

The Bankruptcy Court's decision and order entering the Permanent Injunction

may be overturned only for an abuse of discretion. See Int'l Bank Ltd. v. Treco (In re Treco),

240 F.3d 148, 155 (2d Cir. 2001) ("We therefore review the bankruptcy court's analysis of the §

304(c) factors and its decision to [issue section 304(b) relief] for abuse of discretion"); see also

Knox v. Salinas, 193 F.3d 123 (2d. Cir. 1999) (a permanent injunction may be overturned on

appeal only for an abuse of discretion); LTV Corp. v. Miller (In re Chateaugay Corp.), 109 B.R.

613, 621 (S.D.N.Y. 1990) (applying the abuse of discretion standard to its review of an

injunction issued by a bankruptcy court). Additionally, the findings of fact entered by the Bankruptcy Court in connection with its decision to issue the Permanent Injunction must be accepted as true, unless found to be clearly erroneous. See Fed. R. Bankr. P. 8013; Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.), 896 F.3d 1384, 1388 (2d Cir. 1990); LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.), No. 02-6271, 2004 U.S. Dist. LEXIS 17575, at *6 (S.D.N.Y. September 1, 2004), aff'd, 144 Fed. Appx. 900 (2d Cir. 2005) ("findings of fact of a bankruptcy court are accepted by the district court on appeal unless they are clearly erroneous"); BT/SAP Pool Assocs., L.P. v. Coltex Loop Cent. Three Partners, L.P., 203 B.R. 527, 531 (S.D.N.Y. 1996), aff'd, 138 F.3d 39 (2d Cir. 1998) ("party contesting findings of fact carries the burden of establishing that the findings are clearly erroneous and that no reasonable person could agree with them").

**B.    The Bankruptcy Court Properly Concluded the
        Italian Proceedings Are Entitled to Section 304 Relief**

   **1.    Foreign Insolvency Proceedings Are
           Entitled to a Presumption of Comity**

Section 304 provides a statutory mechanism whereby an authorized "foreign representative" may seek legal recognition in the United States of a foreign insolvency proceeding, for the purpose of aiding in the administration of such "foreign proceeding."[8] See In re Hughes, 281 B.R. 224, 228 (Bankr. S.D.N.Y. 2002) ("[S]ection 304 was intended to enable domestic courts to assist foreign courts, so as to promote a more efficient and economic administration of transnational insolvency proceedings.").

---

[8] The terms "foreign proceeding" and "foreign representative" were defined in Sections 101(23) and 101(24) of the Bankruptcy Code, respectively, prior to the 2005 Amendments. 11 U.S.C. §101(23) & (24).

The fundamental purpose of Section 304 of the Bankruptcy Code is to assist in the administration of a foreign proceeding. In deciding whether to grant relief under Section 304 of the Bankruptcy Code, the statute provides that a court "shall be guided by what will best assure an economical and expeditious administration of [the foreign debtor's] estate," consistent with the Section 304(c) factors.[9] 11 U.S.C. §304(c). Comity is the central factor. See Treco, 240 F.3d at 156 ("comity is the ultimate consideration in determining whether to provide relief under § 304"); see also H.R. Rep. No. 95-595, at 324-25 (1977); S. Rep. No. 95-989, at 35 (1978) ("Principles of international comity and respect for the judgments and laws of other nations suggest that the court be permitted to make the appropriate orders under all of the circumstances of each case.").

Independent of Section 304, the Second Circuit has emphasized the importance of comity whenever a federal court is faced with litigation that could affect a foreign insolvency proceeding:

> [W]e have recognized that comity is particularly appropriate where,

---

[9] The Section 304(c) factors are as follows:

(1) just treatment of all holders of claims against or interests in such estate;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of such estate;

(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;

(5) comity; and

(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. 304(c).

as here, the court is confronted with foreign bankruptcy proceedings.

Allstate Life Ins. Co. v. Linter Group Ltd., 994 F.2d 996, 999 (2d Cir. 1993) (citations omitted).

As discussed in Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.,

> American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings. . . . [I]f all creditors could not be bound, a plan of reorganization would fail.

825 F.2d 709, 713 (2d Cir. 1987) (citations omitted).

Section 304 authorizes U.S. courts to grant several forms of relief, including an injunction barring the commencement or continuation of actions against not only a foreign debtor, but also against "property involved in [the] foreign proceeding." 11 U.S.C. §304(b). U.S. courts regularly find that the overriding purpose of Section 304 is "to prevent the piecemeal distribution of assets [of the foreign debtor] in the United States by means of legal proceedings initiated in domestic courts by local creditors." In re Koreag, Controle et Revisions S.A., 961 F.2d 341, 348 (2d Cir. 1992) (citing Victrix, 825 F.2d at 713-714); see Cunard S.S. Co. v. Salen Reefer Servs. AB (In re Cunard), 773 F.2d 452, 454-455 (2d Cir. 1985).

Comparable to domestic bankruptcy cases, where creditors are required to file their claims with the presiding U.S. bankruptcy court, injunctions under Section 304 typically "channel" the submission of claims to the foreign proceeding because the foreign tribunal is "in the best position to assess where and when claims should be liquidated so as to conserve estate resources and maximize the assets available for distribution." In re Bird, 222 B.R. 229, 233 (Bankr. S.D.N.Y. 1998); accord In re Artimm, S.r.l., 335 B.R. 149, 164 (Bankr. C.D. Cal. 2005) ("Section 304 was designed to ensure the centralization of claims administration in the foreign forum, which is essential to the successful resolution of the foreign insolvency case.").

16

In furtherance of these considerations, there is, in effect, a presumption that comity should be extended to foreign bankruptcy cases. See Vesta Fire Ins. Corp. v. New Cap Reins. Corp. Ltd., 244 B.R. 209, 213 (S.D.N.Y. 2000) ("Section 304 does afford the bankruptcy court significant discretion. However, the direction of this discretion typically points in favor of granting, not denying the relief sought by Section 304 petitioners."), aff'd, 238 F.3d 186 (2d Cir. 2001). Comity should be refused only if a foreign proceeding does not provide for due process protections or otherwise treats claims in a manner that is inconsistent with the U.S. bankruptcy priority scheme or public policy. Victrix, 825 F.2d at 714 ("Under general principles of comity as well as the specific provisions of section 304, federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat claims of local creditors.").[10]

### 2. The Bankruptcy Court Properly Concluded that the Foreign Debtors' Italian Proceedings Are Worthy of Comity

The Bankruptcy Court properly determined that the Italian Proceedings satisfy the Section 304(c) factors and thus, should be accorded comity. (See R. 15, 14-26; R. 30, pp. 3:19-22; 5:12-9:24.) In fact, every U.S. court considering whether Italian insolvency proceedings should be afforded comity has decided that question in the affirmative and has held that Italy's bankruptcy system comports with U.S. standards of fundamental fairness. See e.g., In re

---

[10] Accord JP Morgan Chase Bank v. Altos Hornos De Mex., S.A. de C.V., 412 F.3d 424 (2d Cir. 2005) ("deference to the foreign court is appropriate so long as the foreign proceedings are procedurally fair and . . . do not contravene the laws or public policy of the United States"); In re Schimmelpenninck, 183 F.3d 347, 365 (5th Cir. 1999) ("Foreign proceedings are generally recognized in the United States, so long as the foreign laws comport with due process and treat the claims of local creditors fairly."); Ecoban Fin. Ltd. v. Grupo Acerero del Norte, S.A. de C.V., 108 F. Supp. 2d 349, 352 (S.D.N.Y. 2000) ("In short, comity should be granted to a foreign bankruptcy . . . proceeding as long as fundamental standards of procedural fairness are observed, and state or federal law and public policy are not violated. . . . [N]o exceptions to the exercise of comity are applicable in this case."), aff'd, 2 Fed. Appx. 80 (2d Cir. 2001).

Enercons Va., Inc., 812 F.2d 1469, 1472-73 (4th Cir. 1987); In re Rosacometta, S.r.l., 336 B.R. 557, 564-65 (Bankr. S.D. Fla. 2005); In re Artimm, S.r.l, 278 B.R. 832, 843 (Bankr. C.D. Cal. 2002).

In ruling that the Italian Proceedings are worthy of comity and that the Foreign Debtors are entitled to the injunctive relief they requested, the Bankruptcy Court made findings of fact that:

> [T]he foreign proceeding in Parma provided for a comprehensive procedure for the orderly and equitable distribution of the foreign debtors assets, and the just treatment of creditors. . . . U.S. claimholders are not discriminated against or unduly prejudiced or inconvenienced in the proceeding, [and] that analogous to U.S. law, the Italian law provides for the prevention of preferential or fraudulent dispositions.

(R.31, Ex. A at 6; see also R. 32, p. 11-12) (concluding that the Italian Proceedings were worthy of comity and differed from the "substantial maladministration" in the cases of In re Treco and In re Papeleras Reunidas, S.A., 92 B.R. 584 (Bankr. E.D.N.Y. 1988), which were relied upon by Bank of America and ABN AMRO). Having concluded that the Italian Proceedings and the approval of the Composition by the Parma Court are worthy of comity, the Bankruptcy Court entered the Permanent Injunction enjoining all claimants from, among other things, asserting and litigating pre-bankruptcy claims against the Foreign Debtors in any forum other than the Italian courts overseeing the Italian Proceedings.

## C.    **ABN AMRO's Appeal Is Without Merit**

ABN AMRO contends that the Bankruptcy Court abused its discretion by granting the Foreign Debtors' request for injunctive relief pursuant to Section 304.

ABN AMRO does not challenge the Bankruptcy Court's findings of fact and conclusions of law that the Italian Proceedings generally are worthy of comity. Rather, it seeks reconsideration of the impact of *data certa* in respect of its Guarantee Claim. In response to this

objection, the Bankruptcy Court addressed the *data certa* issue raised by both Bank of America

and ABN AMRO and concluded that this aspect of Italian law is not "so foreign to basic

concepts of U.S. law that it would be denied . . . comity."  (R. 31, Ex. A at 8.)  The Bankruptcy

Court also concluded that the Parma Court applied *data certa* "in a way that is consistent with

U.S. notions of due process and fundamental fairness."  (R. 31, Ex. A at 9.)

    Nonetheless, ABN AMRO now argues for the first time that Section 304 relief

should have been denied because it is allegedly repugnant to U.S. law for a foreign bankruptcy

court to apply its own bankruptcy laws to an agreement that contains a New York choice of law

clause.  This contention reflects ABN AMRO's misunderstanding of insolvency law.  Both in the

U.S. and in foreign jurisdictions, contractual obligations, regardless of the law governing such

obligations (whether by contract provision, common law or otherwise), are subject to impairment

as a part of the bankruptcy process.  Absent such power, insolvency laws would be of limited

effect.  Moreover, as a procedural matter, ABN AMRO did not assert before the Bankruptcy

Court – and thus failed to preserve – this repugnancy argument.

    Additionally, ABN AMRO's efforts to have the Bankruptcy Court and now this

Court review whether the <u>Parma Court</u> properly applied <u>Italian insolvency law</u> is not a proper

function of Section 304 of the Bankruptcy Code.  Its complaints about the Parma Court's ruling

on *data certa* are already subject to appeal in Italy and are scheduled to be considered by the

Italian appellate court shortly.

   **1.**  **ABN AMRO's Argument that the New York**
      **Choice of Law Provision Governs is Procedurally**
      <u>**Precluded and, In Any Event, Without Merit**</u>

    **a.**  **ABN AMRO Did Not Preserve Its Argument Below**

    It is well-established that an issue raised on appeal for the first time will not be

considered.  <u>See Guilbert v. Gardner</u>, 480 F.3d 140, 146 (2d Cir. 2007) (citing <u>Singleton v.</u>

Wulff, 428 U.S. 106, 120 (1976)).  In its pleadings filed with the Bankruptcy Court, ABN

AMRO did not raise the argument that Section 304 relief should be denied because it is

repugnant to U.S. law for a foreign bankruptcy court to apply its own bankruptcy laws to an

obligation arising from an agreement that contains a New York choice of law clause.  In fact,

except for a single citation in a footnote to the Declaration of Guiseppe Curto, in which Curto

summarizes the arguments made by ABN AMRO before the Parma Court nowhere in its opening

brief to this Court does ABN AMRO even attempt to establish that it raised this argument in the

record below.  (See Appellant's Br. 20, n. 11.)

        Attempting to sidestep this deficiency, ABN AMRO notes, without support, that it

"emphasized" at the hearing before the Bankruptcy Court "the Parma Court's refusal to give

effect to the Guarantee's New York choice of law provision."  (Appellant Br. 10) (emphasis

added).  Courts in the Second Circuit do not consider on appeal arguments that were not

previously briefed, but rather were presented for the first time at oral argument below.  See

Authentic Hansom Cabs, Ltd. v. Nisselson, No. 03-9468, 2004 U.S. Dist. LEXIS 25969, at *15

(S.D.N.Y. December 22, 2004), aff'd, 159 Fed. Appx. 221 (2d Cir. 2005) (holding that an

argument raised by appellant for the first time at oral argument before the bankruptcy court and

not briefed below is not preserved because "[i]ssues not argued in briefs are considered waived

and not addressed on appeal").

        In addition, while ABN AMRO at the hearing referenced the choice of law

provision as a factor to be considered, it did not argue at that time that it is repugnant to U.S. law

for the Parma Court to apply its own bankruptcy laws to the contract.  Indeed, as discussed

below, see infra pp. 21-22, ABN AMRO conceded that the choice of law provision in the

Guarantee did not prevent the Bankruptcy Court from granting comity to the Italian Proceedings

(R. 30, p. 104:13-22).  Because this concession was directly inconsistent with the argument ABN

AMRO is now making, it is clear that, even in the oral argument below, ABN AMRO did not

raise the repugnancy argument it is now asserting.

ABN AMRO, therefore, has failed to sufficiently preserve this argument for the

purposes of raising it on appeal.

### b.     Insolvency Laws Regularly Impair Creditors' Rights, Irrespective of Contractual Choice of Law Provisions

ABN AMRO's argument also lacks merit.  ABN-AMRO asserts that U.S. courts

should deny comity to the Italian Proceedings because the Parma Court is "failing to give effect

to the New York choice of law provision." (Appellant's Br. 14.)  This argument demonstrates a

fundamental misunderstanding of the impact of insolvency laws on contractual rights and of the

impact of local law on the enforcement of bankruptcy claims.

Although a contract may provide that its interpretation is governed by the law of

New York or another jurisdiction, that fact is irrelevant to the rule that a claim for payment from

an insolvent party to that contract may be impacted (and impaired) by applicable bankruptcy law.

In the U.S., for example, the requirements of the Bankruptcy Code – not state law – govern the

enforcement of bankruptcy claims.  Contrary to ABN AMRO's misconception, the Parma Court

has, in no way, interpreted the terms or conditions of the Note or Guarantee, nor ignored the New

York choice of law provision in any such interpretation.  Rather, the Parma Court has instead

applied Italian insolvency law and enforced the applicable rules governing the enforcement of

creditors claims in Italian bankruptcy proceedings.  ABN AMRO completely misstates the

situation.

In fact, at the hearing to consider entry of the Permanent Injunction, ABN AMRO acknowledged that the Bankruptcy Court was fully authorized to grant comity to the Italian Proceedings in the face of the New York choice of law clause.

| Mr. Ginsburg: | . . . This is a loan made in New York, to be governed by New York law. |
|---|---|
| The Court: | But doesn't – hasn't the Second Circuit been clear for decades that that doesn't matter in a bankruptcy case – that choice of law, choice of forum provisions don't prevent us from granting comity to a foreign court in its claims procedures? |
| Mr. Ginsburg: | <u>Yes</u>, but we think, when it comes to an <u>interpretation</u> of a document . . . |

(R. 30, p. 104: 15-23) (emphasis added).

As the quoted language reveals, ABN AMRO has conceded that the New York choice of law provision is not relevant to the claims process in the Italian Proceedings.  ABN AMRO confuses applicability of the New York law provision to the interpretation of the agreement with the requirements applicable to enforcement of ABN AMRO's claim in an Italian bankruptcy case.

In this respect, the Italian Proceedings are no different than U.S. bankruptcy proceedings.  For example, if Parmalat had commenced a U.S. chapter 11 case and ABN AMRO failed to submit a proof of claim by the court-established bar date deadline to submit claims, ABN AMRO would not be entitled to any distribution.  The fact that a valid guaranty was made under New York law would not matter.  That a loan is made in New York and governed by New York law does not exempt a creditor from the claims procedures of a bankruptcy court or the local requirements for claims enforcement.  Because the Bankruptcy Court correctly concluded that Italian insolvency law is in harmony with U.S. law and the Italian Proceedings should be afforded comity – propositions which ABN AMRO admittedly does not challenge (Appellant's

Br. 12) – ABN AMRO is subject to Italian bankruptcy law irrespective of the governing law of its contractual obligations.

This result should not be surprising inasmuch as ABN AMRO was knowingly doing business with a foreign entity and, therefore, should be prepared to be subject to foreign law. Over one hundred years ago, the Supreme Court in Can. S. Ry. v. Gebhard made clear that:

> [E]very person who deals with a foreign corporation impliedly subjects himself to such laws of the foreign government, affecting the powers and obligations of the corporation with which he voluntarily contracts, as the known and established policy of that government....

109 U.S. 527, 537 (1883). Moreover, the majority in Can. S. Ry. v. Gebhard expressly rejected the dissent's charge that this result will "destroy the contract rights of citizens of the United States." Id. at 542 (Harlan, J. dissenting).[11] To the contrary, the Supreme Court – and the Second Circuit thereafter – recognized that:

> Unless all parties in interest, wherever they reside, can be bound by the arrangement which it is sought to have legalized the scheme may fail. All home creditors can be bound. What is needed is to bind those who are abroad. Under these circumstances the true spirit of international comity requires that schemes of this character, legalized at home, should be recognized in other countries.

Id. at 539; see Cunard, 773 F.2d at 459 (applying Can. S. Ry. v. Gebhard to find that "creditors of an insolvent foreign corporation [are] required to assert their claims against a foreign bankrupt before a duly convened foreign bankruptcy tribunal" and affirming the district court's decision to

---

[11] ABN AMRO's argument on appeal is essentially the same argument made by the dissent in Can. S. Ry. v. Gebhard – namely, that because the contract at issue was governed by New York law, enforcement of the contract should not be impaired by foreign bankruptcy laws. Id. at 548-49 (noting that payments under the contracts were to be made in New York and it was therefore governed by New York law). That argument was rejected by the eight justice majority. Subsequent to the decision in Can. S. Ry. v. Gebhard, the argument asserted by ABN AMRO has been so far outside the realm of acceptable debate that it does not appear to have been mentioned in another judicial opinion.

23

vacate a postpetition lien that a creditor obtained against debtor in violation of the automatic stay imposed in the Sweedish foreign proceeding); Victrix, 825 F.2d at 714 (applying Can. S. Ry. v. Gebhard to hold that under the provisions of Section 304, "federal courts will recognize foreign bankruptcy proceedings provided the foreign laws comport with due process and fairly treat claims of local creditors").

As an international bank doing business globally, ABN AMRO cannot plead ignorance of foreign laws and should not be surprised that it, like all other Italian and non-Italian creditors, is subject to the *data certa* rule. As such, in seeking a guarantee from an Italian corporation, ABN AMRO knew or should have known that the Italian concept of *data certa* would require that the Guarantee bear a date-certain at law in order to be enforceable against any third party, including a receiver if the Foreign Debtors filed for bankruptcy. See supra pp. 7-8, n. 5 (discussing that legal opinions provided to noteholders advised them of the import of the *data certa* rule in enforcing claims in the event of insolvency). Moreover, ABN AMRO could have easily arranged to comply with *data certa's* enumerated requirements.

In applying the *data certa* rule to ABN AMRO's claim, the Parma Court has acted no differently than a U.S. bankruptcy court. "'There is nothing inappropriate about bankruptcy laws affecting a creditor's right to recover under state law'" because generally speaking, creditors' rights are "'curtailed in many ways once a debtor files for bankruptcy.'" DaimlerChrysler Fin. Servs. America LLC, v. Quick (In re Quick), 371 B.R. 459, 465 (10th Cir. B.A.P. 2007) (quoting In re Brown, 346 B.R. 868, 876 (Bankr. N.D. Fla. 2006)). As the Supreme Court observed in U.S. v. Sec. Indus. Bank, the U.S. bankruptcy laws have long been

"construed to authorize the retrospective impairment of contractual obligations." 459 U.S. 70, 74 (1982) (citing <u>Hanover Nat'l Bank v. Moyses</u>, 186 U.S. 181, 188 (1902)).[12]

There are numerous examples in U.S. bankruptcy law where a party's contractual rights can be impaired. For instance, under the Bankruptcy Code, a debtor has the ability pursuant to a plan of reorganization to reduce and discharge all, or a portion, of a creditor's claim that otherwise would be fully recoverable under a contract or state law. <u>See Olin Corp. v. Riverwood Int'l (In re Manville Forest Prods.)</u>, 209 F.3d 125, 129-130 (2d Cir. 2000) (debtor's plan of reorganization discharged creditor's ability to seek indemnification pursuant to subsequent written indemnification agreement for environmental liability incurred by creditor). A debtor may, likewise, assume and assign executory contracts and unexpired leases pursuant to Section 365 of the Bankruptcy Code even when the contract language, or the governing state law, would prohibit assignment of the contract. <u>See Shoppers World Cmty. Ctr. v. Bradlees Stores, Inc. (In re Bradlees Stores, Inc.)</u>, No. 01-CV-3934 (SAS), 2001 U.S. Dist. Lexis 14755, at *16, 43 (S.D.N.Y. September 20, 2001) (the debtor can assign its lease designation rights to a third party despite previously entering into an agreement stating it would only assign lease rights to affiliates or subsidiaries). Further, ipso-facto defaults based upon a party's commencement of bankruptcy proceedings are enforceable under state law, but are rendered ineffective by the Bankruptcy Code. <u>See In re Chateaugay Corp.</u>, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *15-16 (S.D.N.Y. May 10, 1993) (clause in land leases stating it is an event of default if the lessee files for bankruptcy constitutes an ipso-facto clause, not enforceable under Section 365 of the Bankruptcy Code).

---

[12]  <u>Accord In re Nichols</u>, 440 F.3d 850, 854 (6th Cir. 2006); <u>In re Taddeo</u>, 685 F.2d 24, 29 (2d Circ 1982); <u>In re Adomah</u>, 340 B.R. 453, 458 (Bankr, S.D.N.Y, 2006); <u>In re McCann, Inc.</u>, 318 B.R. 276, 287  (Bankr. S.D.N.Y. 2004).

Similarly, Italian insolvency law requires that creditors must satisfy *data certa* in order to enforce their claims. ABN AMRO's argument that New York public policy favors the enforcement of the Guarantee's choice of law provision is therefore irrelevant. *Data certa* is no more "prejudicial" or "repugnant to the notion of due process" than the analogous Bankruptcy Code examples cited above, which override bargained for provisions in contracts and state law. In sum, all bankruptcy laws impact the ability of creditors to realize on their claims; that a claim against an Italian entity is impacted by the bankruptcy law of Italy is nothing that should either surprise ABN AMRO or offend Section 304 principles. In fact, there would be no purpose to seeking relief under Section 304 if this were the case. Accordingly, as discussed by the Second Circuit in Altos Hornos:

> [R]egardless of the parties' pre-litigation agreement, once a party declares bankruptcy in a foreign state and a foreign court asserts jurisdiction over the distribution of assets, U.S. courts may defer to the foreign bankruptcy proceeding on international comity grounds. Consequently, <u>J.P. Morgan's reliance on the loan agreement's forum selection and choice of law clauses is unavailing</u>.

412 F.3d at 429 (emphasis added). ABN AMRO's choice of law argument fails on its merits and must be overruled.

### 2. It Is Not the Role of the Bankruptcy Court, or Any U.S. Court, to Review Whether the Parma Court Properly Applied Italian Law

ABN AMRO next argues that Section 304 relief should have been denied because the application by the Parma Court of the *data certa* rule was allegedly improper. In essence, ABN AMRO is seeking redress from U.S. courts regarding the Parma Court's allegedly improper application of Italian law – matters that ABN AMRO has also raised in proceedings now before the Italian appeals court. The Parma Court's application of *data certa* and Italian

26

evidentiary rules, however, is a question of Italian law that can only be resolved by the Italian courts administering the Foreign Debtors' claims process.

As stated above, Section 304 of the Bankruptcy Code requires only that the foreign proceedings provide a comprehensive procedure for the orderly and just treatment of claims in order for U.S. courts to extend comity.  See In re Axona Int'l Credit & Commerce Ltd., 88 B.R. 597, 610 (Bankr. S.D.N.Y. 1988) (stating that comity does not require the laws of different jurisdictions to be identical; instead, "foreign law must abide by standards of fundamental fairness.").  Here, ABN AMRO does not challenge the Italian bankruptcy process as generally failing to comport with U.S. standards of fundamental fairness.  Nor does it challenge the fairness or constitutionality of the *data certa* statute itself.  (Appellant's Br. 23.)[13]

ABN AMRO admits that the Parma Court afforded it the opportunity to appear and attempt to prove that its Guarantee Claim should be admitted over the Foreign Debtors' *data certa* defense.  ABN AMRO also admits that it was allowed to appeal the Parma Court's decision denying its Guarantee Claim and that its appeal remains pending.  ABN AMRO complains only that "the Parma Court's application of *data certa* was unjust and prejudicial." (Appellant's Br. at 22) (emphasis in original).  As of this writing, however, ABN AMRO is seeking to overturn that ruling in the Italian appeals court and also still possesses the opportunity to produce documentation that an Italian court would deem sufficient to satisfy *data certa* and allow its Guarantee Claim.

---

[13]  ABN AMRO alleges that the Bankruptcy Court misconstrued its argument as solely an attack on the *data certa* rule itself.  To the contrary, the Bankruptcy Court expressly considered allegations by Bank of America and ABN AMRO that Dr. Bondi and the Parma Court were applying the *data certa* rule unfairly.  Of note, the Bankruptcy Court (i) observed that the Parma Court admitted many creditors' claims over Dr. Bondi's *data certa* objections (R. 31, Ex. A at 10), and (ii) discussed the creditors' due process appellate remedies under Italian law.  (R. 31, Ex. A at 9.)

As the Bankruptcy Court correctly pointed out, it would be improper for any U.S. court "to sit in effect as an appellate court of the Parma Court" and attempt to either "predict how the Italian courts would conclude the litigation in the first place" or "predict whether they would conclude [the appeal] . . . in a way that is fundamentally unfair and contrary to U.S. notions of due process and fairness" (R. 31, Ex. A at 13). See Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (quoting Pravin Banker Assocs., Ltd. v. Banco Popular del Peru, 109 F.3d 850, 854 (2d Cir. 1997), for the proposition that "'United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries, allowing those acts and proceedings to have extraterritorial effect in the United States'" so long as the foreign court has proper jurisdiction and its enforcements do not prejudice the rights of U.S. citizens or violate U.S. public policy); see also In re Culmer, 25 B.R 621, 629 (Bankr. S.D.N.Y.1983) ("Foreign-based rights should be enforced [in foreign courts] unless the judicial enforcement of such a [right] would be the approval of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense.").

This is especially the case, where, as here, ABN AMRO complains about the application of Italian rules of evidence by the Parma Court. (Appellant's Br. 22-25) Despite its complaints, ABN AMRO had every opportunity to prove its claims in the Parma Court, and when the Parma Court rejected those efforts, it was able to appeal the decision. Accordingly, the question of whether Italian rules of evidence have been properly applied to ABN AMRO's efforts to satisfy *data certa* is the quintessential type of issue best left to the foreign court in its administration of a debtor's claims process.

28

Italy is the appropriate (and only) forum for ABN AMRO to raise any objections it has to the Parma Court's rulings under Italian law.[14]  Because ABN AMRO is actually proceeding in the Italian Courts, its evidentiary objections cannot be considered by this Court.[15]

## IV.

## CONCLUSION

For the foregoing reasons, the Foreign Debtors respectfully request that the Court affirm the Bankruptcy Court's decision to enter the Permanent Injunction.

Dated: New York, New York
       November 9, 2007

/s/ Marcia L. Goldstein
Marcia L. Goldstein, Esq. (MG 2606)
Howard B. Comet, Esq. (HC 4353)
Scott E. Cohen, Esq. (SC 8784)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Appellees

---

[14]  Similarly, ABN AMRO's reliance on the terms of the Rome Convention is equally misplaced. The Rome Convention is applicable in Italy, not the U.S.  See Kroger v. Legalbill.com LLC, No. 04-2189 (ESH), 2005 WL 4908916, at *3 (D.D.C. April 7, 2005) (the U.S. is not a signatory to the Rome Convention).  ABN AMRO's reliance on the Rome Convention is thus merely another attempt to have this Court consider whether or not the Parma Court is properly applying the laws of Italy.  Moreover, even if the Parma Court were interpreting the Guarantee and not simply applying Italian insolvency law to the Guarantee Claim, ABN AMRO would be procedurally barred from raising any argument based upon the Rome Convention because ABN AMRO failed to give written notice in its pleadings below or otherwise, as required by Rule 44.1 of the Federal Rules of Civil Procedure, that it would be raising an issue concerning the law of a foreign country.  See Fed. R. Civ. P. 44.1.

[15]  Finally, ABN AMRO's allegation that the Bankruptcy Court abused its discretion by failing to condition entry of the Permanent Injunction on the Foreign Debtors' withdrawal of the *data certa* defense in the Italian Proceedings incorrectly presumes that ABN AMRO's arguments opposing the Permanent Injunction are valid and that the Foreign Debtors were not entitled to Section 304 relief.  Since those arguments lack merit, there is no basis to limit the scope of the Permanent Injunction.