# Exhibit 1

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2
                                    .   Section 304
3    IN RE:                         .
                                    .   Case No. 04-14268 (RDD)
4    PARMALAT FINANZIARIA, S.P.A.,  .   (Jointly Administered)
     et al,                         .
5                                   .   New York, New York
     Debtors in a Foreign Proceeding .  Thursday June 21, 2007
6    . . . . . . . . . . . . . . . . .  2:04 p.m.

7
              TRANSCRIPT OF HEARING TO CONSIDER ENTRY OF
8                    A PERMANENT INJUNCTION
               BEFORE THE HONORABLE ROBERT D. DRAIN
9                  UNITED STATES BANKRUPTCY JUDGE

10   APPEARANCES:

11   For the Debtors:          Marcia L. Goldstein, Esq.
                               Howard B. Comet, Esq.
12                             Scott E. Cohen, Esq.
                               WEIL, GOTSHAL & MANGES, LLP
13                             767 Fifth Avenue
                               New York, New York 10153
14
                               L.P. Harrison, III, Esq.
15                             CURTIS, MALLET-PREVOST, COLT
                                & MOSLE, LLP
16                             101 Park Avenue
                               New York, New York
17
     (Appearances Continued)
18

19
     Audio Operator:           Electronically Recorded
20                             by Court ECRO Frances F.

21   Transcription Company:    Rand Transcript Service, Inc.
                               80 Broad Street, Fifth Floor
22                             New York, New York 10004
                               (212) 504-2919
23                             www.randtranscript.com

24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

```
1    APPEARANCES:   (Continued)

2    For Bank of America, et al:    Bryan Krakauer, Esq.
                                    Bojan Guzina, Esq.
3                                   David A. Hall, Esq.
                                    SIDLEY AUSTIN, LLP
4                                   One South Dearborn
                                    Chicago, Illinois 60603
5
     For the Ad Hoc Committee
6    Of Noteholders:               Edward G. Perrault, Esq.
                                    BINGHAM MC CUTCHEN, LLP
7                                   One State Street
                                    Hartford, Connecticut 06103
8
     For ABN AMRO Bank, N.V.:      Lawrence L. Ginsburg, Esq.
9                                  Christopher J. Caruso, Esq.
                                   MOSES & SINGER, LLP
10                                 406 Lexington Avenue
                                   New York, New York 10174
11
     For Grant Thornton
12   International:                Marisa J. Brahams, Esq.
                                   STROOCK & STROOCK & LAVAN, LLP
13                                 180 Maiden Lane
                                   New York, New York 10038
14
     For the Lead Securities
15   Class Action Plaintiffs:      Mark D. Silverschotz, Esq.
                                   ANDERSON, KILL & OLICK, P.C.
16                                 1251 Avenue of the Americas
                                   New York, New York 10020
17
     For the Pension Benefit
18   Guaranty Corporation:         Vincente M. Murrell, Esq.
                                   PENSION BENEFIT GUARANTY
19                                  CORPORATION
                                   1200 K Street NW, Suite 340
20                                 Washington, D.C. 20005

21   For Israel Discount
     Bank of New York:             David M. Banker, Esq.
22                                 LOWENSTEIN SANDLER, P.C.
                                   1251 Avenue of the Americas
23                                 New York, New York 10020

24

25
```

1      (Proceedings commence at 2:05 p.m.)

2           THE COURT:  All right.  <u>Parmalat Finanziaria</u>.

3           MS. GOLDSTEIN:  Marcia Goldstein, Weil, Gotshal &

4      Manges, on behalf of Parmalat S.p.A. and the foreign debtors.

5      With me today are my partner Howard Comet, also, Scott Cohen,

6      and I would like to introduce to Your Honor Mr. Nicola

7      Palmieri, who is the general counsel of Parmalat S.p.A.

8           Your Honor, it has taken us quite a while to get

9      here; three-and-a-half years after the collapse of Parmalat

10     in one of the biggest financial scandals ever, and almost a

11     year since we filed this specific motion for a permanent

12     injunction.

13          The entry of the permanent injunction in the 304

14     case would bring to a conclusion a very critical component in

15     the largest Italian restructuring to occur to date.  The

16     permanent injunction will support Parmalat's global

17     reorganization and ensure the orderly determination of claims

18     and the administration of assets in a centralized forum.

19          Your Honor, we have submitted, I think, numerous

20     pleadings that support the proposition that this Italian

21     proceeding satisfies the requirements of Section 304 of the

22     Bankruptcy Code, specifically Section 304(c).  It's warranted

23     under all of the facts and circumstances of this case, and

24     the factual predicates for the requested relief are set forth

25     in the lengthy record before this Court in great detail.  And

1    I would, subject to Your Honor's views, dispense with going

2    through and reciting the procedural history before this

3    Court, as well as the procedural history of this case in

4    Italy.

5        We believe that satisfaction of all of the factors

6    under 304(c) have been established in our briefs, but I think

7    at this juncture, I would just summarize that and proceed to

8    deal with the objections.

9        THE COURT:  All right.  I generally agree with you

10   about not having to go through the procedural history, but I

11   think it would be helpful for the record just to summarize

12   the notice that was given here, particularly since we had an

13   original hearing on a preliminary injunction and then a

14   fairly long hiatus between that hearing and this hearing.

15       MS. GOLDSTEIN:  Your Honor, in terms of that

16   history, the preliminary injunction was extended numerous

17   times.  We had a variety of status conferences.  At the

18   conclusion of each conference, this Court extended the

19   preliminary injunction notice to all of the parties and set

20   additional hearings.

21       We also had a hearing set for May 2nd, which was

22   noticed in accordance with the order of this Court.  That was

23   adjourned at the request of both Parmalat and Bank of America

24   to today.  Notice was given of today's hearing to all of the

25   parties on the service list, and this hearing was simply

1    postponed from the original ten o'clock time to two o'clock

2    by order of this Court, and that notice was also served on

3    all parties, and the objectors that we were aware of were

4    called as well with respect to the two o'clock hearing today.

5              THE COURT:  And the original hearing on the

6    permanent injunction, notice was given to all --

7              MS. GOLDSTEIN:  All creditors.

8              THE COURT:  -- all known creditors and by

9    publication, as well as actual notice?

10             MS. GOLDSTEIN:  Yes, Your Honor.

11             THE COURT:  Okay.  Thank you.

12             MS. GOLDSTEIN:  Your Honor, just moving forward with

13   a bit of a summary as to the satisfaction of the 304(c)

14   factors, the first and most important consideration is

15   comity.  And in considering the 304(c) factors, many Courts,

16   including the Second Circuit in the Treco case, have observed

17   that comity is the ultimate consideration in determining

18   whether to provide relief under Section 304.

19             And every case that has reviewed and considered an

20   Italian bankruptcy proceeding, at least the ones that we

21   could find, the Rosacometta case, the Artimm case, which were

22   two bankruptcy cases, and also the Farinacci decision in the

23   Fourth Circuit all agreed that the Italian bankruptcy

24   insolvent -- the Italian bankruptcy law and the Italian

25   insolvency system were worthy of comity.  In fact, the Fourth

1    Circuit noted that it would extend comity to the Italian

2    bankruptcy proceeding basically because it comported with

3    fundamental United States concepts of justice.  That case was

4    not a 304 case, but a case in which the Court deferred to the

5    jurisdiction of the Italian Bankruptcy Courts and extended

6    comity.

7        Overall, in terms of all of the cases considering

8    Section 304, the U.S. Courts have consistently recognized the

9    policy of favoring the interests of a foreign country in

10   winding up the affairs of its own business entities.  And as

11   stated in the Bird case, decided in this district, a Section

12   304 case ancillary to a foreign proceeding that was in the

13   United Kingdom, it is the foreign tribunal that is in the

14   best position to assess where and when and how claims should

15   be liquidated so as to conserve resources and also maximize

16   the assets available to the estate for distribution.

17       Parmalat's Italian proceeding certainly fits within

18   these criteria, is worthy of comity, and also satisfies the

19   other elements of Section 304(c).  304(c)(1) speaks in terms

20   of the just treatment of creditors.  And in analyzing whether

21   a foreign proceeding affords just treatment under the

22   standard of 304(c)(1), Courts consider whether the proceeding

23   provides a comprehensive procedure leading to the uniform

24   administration of creditors' claims consistent with the

25   Bankruptcy Code.

1          The Parma Court has administered all aspects of this

2    proceeding in Italy:  The adjudication of claims objections,

3    the development of procedures for voting on the composition,

4    the tabulation of votes in connection with the composition,

5    and, ultimately, the review and approval of the composition.

6          In this context, no one has asserted that the Parma

7    Court hasn't provided a fair forum for the adjudication of

8    claims, or other matters that have come before it, or that

9    the insolvency laws or the distribution provisions of those

10   laws are not in accordance with U.S. law or similar to U.S.

11   law.

12          Notably, in terms of the fairness of the Parma

13   Court, that Court has both sustained and rejected the claims

14   objections asserted by Dr. Bondi, including the admission of

15   certain Bank of America claims over the objection of Dr.

16   Bondi.

17          So that takes us to 304(c)(2), which relates to

18   whether the foreign proceeding causes prejudice or

19   inconvenience to U.S. creditors.  In considering whether a

20   foreign proceeding causes prejudice or inconvenience to U.S.

21   creditors within the meaning of Section 304(c)(2), Courts

22   analyze primarily whether the foreign proceeding affords

23   sufficient procedural safeguards to U.S. creditors, and

24   whether U.S. creditors are suffering any particularized harm

25   due to the requirement that they have to file and proceed

1    with their claims in the foreign proceeding.

2          With respect to these requirements, again, the

3    Italian proceeding has satisfied them.  There has been

4    sufficient notice of all material events in that proceeding

5    to creditors of the foreign debtors, including U.S.

6    creditors.  No creditor has complained of a lack of due

7    process, of a lack of notice, or a lack of other procedural

8    safeguards.  In fact, there is no basis to conclude that U.S.

9    creditors have suffered any particular prejudice or

10   inconvenience under the standard of Section 304(c)(2).  The

11   fact that they have to file their claims and pursue their

12   claims in Italy is not a basis on which to assert they have

13   been prejudiced in any way.

14          In fact, both Bank of America and ABN AMRO, who are

15   -- Bank of America being the primary objector today, and ABN

16   AMRO also objecting today, they filed their claims and are

17   pursuing their claims in the Italian Court.

18          No party has asserted that the Parma Court is

19   treating U.S. creditor claims differently than non-U.S.

20   creditors.  In this instance, the objecting banks, and I'll

21   just refer to them in that way at this point in time, are

22   sophisticated institutions, they knowingly invested or

23   extended credit to an Italian-based enterprise, and, Your

24   Honor, with that comes the understanding that if you have to

25   enforce your claim in an Italian bankruptcy case, that you

1    would be having to go to the Italian Court.  And so it could

2    not be viewed as prejudicial simply to have to litigate your

3    claim in that court.

4            Now Bank of America talks a lot in its papers about

5    Sections 304(c)(1) and (2).  It does not complain that U.S.

6    creditors generally are being treated improperly or different

7    from non-U.S. creditors.  Rather, it talks about itself being

8    allegedly singled out by Dr. Bondi.  Why?  Because Dr. Bondi

9    has chosen to object to Bank of America's claims, in addition

10   to pursuing a multi-billion-dollar recovery action against

11   Bank of America.  The objections and the recovery action all

12   relate to the same set of transactions.

13           The fact is, Your Honor -- and I'll get back to the

14   Bank of America objection and back to the ABN objection --

15   the fact is that the Italian insolvency law shares many

16   fundamental similarities with corresponding provisions of

17   United States insolvency law, including provisions that are

18   designed to prevent fraudulent or preferential disposition of

19   property.

20           And, frankly, the distribution of proceeds under the

21   composition and the distribution scheme of Italian bankruptcy

22   law is substantially in accordance with the priorities

23   prescribed by Title 11, and all are in compliance with

24   Sections 304(c)(3) and (c)(4).

25           As I will discuss in greater detail later, Your

1  Honor, the Italian law, which the objectors talk so much

2  about in their pleadings and of which they complain, Article

3  2704 of the Italian Civil Code, which is known as "*data*

4  *certa*," is not a provision of Italian bankruptcy law.  It is

5  a provision of the Italian Civil Code.  It applies both in

6  and out of bankruptcy, a fact which is acknowledged by Bank

7  of America in its own submissions.  In fact, they've argued

8  in Italy that it doesn't even apply in a bankruptcy case.

9  And it can be easily complied with to ensure the

10  enforceability of claims against third parties.

11         So in that light, the conclusion is inescapable that

12  the Italian proceedings are worthy of 304 relief.  We are not

13  aware of any case in which 304 relief has been denied based

14  upon a provision of a foreign jurisdiction's non-bankruptcy

15  law, such as *data certa*, which was known to the parties, and

16  which was simple to comply with.

17         This is not a case, like <u>Papeleras</u> on which Bank of

18  America relies, in which 304 relief was denied because of a

19  lack of procedural fairness and procedural safeguards, or

20  like <u>Treco</u>, where the bankruptcy priority scheme was found to

21  be repugnant to U.S. bankruptcy law.

22         This is a case different from those.  It involves

23  Italian bankruptcy laws in which the notice procedures and

24  the fundamental fairness cannot be complained of.

25         During the course of these bankruptcy -- of the

1    Italian bankruptcy proceedings, this Court has provided a

2    forum for a variety of creditors to express concerns and

3    raise issues relating to the Italian proceedings.  During

4    this period, the foreign debtors have resolved almost all of

5    those matters and continue to both litigate and resolve

6    creditors' claims in Italy.  The claims process in Italy

7    continues to move forward.  The Court continues to render

8    decisions both for and against Dr. Bondi with respect to

9    those claims objections.

10        And so, at this juncture, we really have only two

11   creditors, Bank of America and ABN AMRO, who have objected to

12   the entry of the relief requested.  We will also address,

13   Your Honor, at the conclusion, the issues raised by the PBGC.

14   It's not really an objection to the permanent injunction.

15        We would view Bank of America as the primary

16   objector today.  As I mentioned, it is also a defendant in a

17   multi-billion-dollar recovery action commenced by Dr. Bondi,

18   and which is pending before Judge Kaplan in the District

19   Court.  In that action, Dr. Bondi asserts that Bank of

20   America's alleged criminal conduct contributed to the fraud

21   that caused the Parmalat collapse.

22        In many respects, Your Honor, we have to step back

23   and assess what Bank of America is trying to accomplish in

24   its attack or -- on the permanent injunction.  It is our view

25   that it is largely motivated by its larger fight with the

1  foreign debtors in the District Court, and also in the civil

2  and criminal courts in Italy.

3          Your Honor, putting that aside for a moment, a

4  number of the points made by Bank of America were also made

5  on behalf of its affiliate BankBoston, and were made by ABN

6  AMRO, subsets of these points.  And so I would like to turn

7  to the specifics of the Bank of America objection, but I

8  don't want to lose sight of the fact that we believe that in

9  light of Judge Kaplan's withdrawal order, that the claims of

10  Bank of America, particularly the Bank of America, N.A., and

11  the Bank of America securities claims are the subject of the

12  partial withdrawal before Judge Kaplan.  We do not believe

13  objections relating to those claims are properly before this

14  Court.  And we will get to that.  But we thought, given that

15  there is some overlap, we'd address the merits of the

16  objections first.

17          I mentioned the *data certa* principle.  We do not

18  believe that there is any merit to the argument that the

19  assertion of that principle or the existence of that

20  principle should in any way make this particular bankruptcy

21  case unworthy of Section 304 relief.

22          Again, I have already said that we can't find any

23  304 case where a Court determines that injunctive relief is

24  inappropriate because a non-bankruptcy law provision is

25  repugnant to U.S. bankruptcy law, and this provision isn't

1    repugnant to U.S. law generally, I should say.  And, you

2    know, *data certa* is a provision of Italian law that is

3    applicable to a number of commercial transactions, both in

4    and outside of bankruptcy; and, yet, Bank of America premises

5    its argument on repugnancy of the Italian bankruptcy law on

6    the applicability of the *data certa* provision.

7         Just as an aside, Your Honor, in the litigation in

8    Italy with respect to the Bank of America/BankBoston claims,

9    the issue as to the applicability of *data certa* in a

10   bankruptcy case at all has been raised by Bank of America.

11   The fact that it is harsh has been raised by Bank of America.

12   And even the fact that it might be unconstitutional under

13   Italian law, which, obviously, we don't necessarily agree

14   with these things, these are points being raised by Bank of

15   America in the Italian Courts.  So they are litigating the

16   entire issue of the applicability of *data certa* in the

17   Italian Court, chose to do so, and it just seems incongruent

18   to come here and say that they need relief here because this

19   is repugnant to U.S. bankruptcy law.

20        But just to remind the Court, the Italian Civil Code

21   provision we're talking about, Article 2704, provides as

22   follows.  And this is a translation:

23        "The date of a private writing in which the

24         signature has not been authenticated, is not

25         certain, and cannot be asserted against third

1          parties, except from the day on which the writing

2          was registered, or from the date of death or

3          supervening physical incapacity to sign of the

4          person or persons who signed it, or from the date on

5          which other circumstances occur which establish with

6          equal certainty that the writing was drawn up

7          previously.  The date of a private writing

8          containing unilateral declarations which are not

9          directed to any specific person can be ascertained

10         through any kind of evidence."

11         The objectors who raise this point are all

12    sophisticated parties that either expressly knew or should

13    have known about *data certa*.  This is a matter of Italian

14    commercial transaction law.  Indeed, Bank of America's own

15    filings indicate their awareness of the requirement.

16         And the statute provides very simple means for

17    satisfaction which these parties knowingly decided not to

18    comply with.  Notwithstanding that, they still have an

19    opportunity in the Parma Court to argue, through evidentiary

20    submissions, that *data certa* has been satisfied.  And

21    Parmalat, as a litigation adversary, has the opportunity, and

22    has argued to the contrary.  That's a normal litigation

23    process.

24         The objecting parties conducted business with a

25    foreign entity.  They need to comply with local law in order

1    to enforce their agreements.  This is not a foreign concept

2    in the United States.

3         I'll give you an example.  If these banks entered

4    into a loan agreement in the United States that says it is

5    governed by New York law, and ABN raises this issue, but

6    where the collateral happens to be real estate in the state

7    of Louisiana, the lenders had better go and get local counsel

8    and figure out the proper way to record the mortgage in the

9    local parish.  If they don't do that, the lien will not be

10   enforceable against a third party.  Well, that's what *data*

11   *certa* is about, enforcing a contract against a third party.

12        So the fact that the Italian law results in the

13   inability to assert the claim against a third part is really

14   no less arbitrary than the case in which the U.S. lender

15   whose security interest is voided for a failure to perfect

16   locally ends up as an unsecured creditor, and as Your Honor

17   knows in many cases, that can be a worthless claim compared

18   to the claim it would have had as a secured creditor.

19        So Bank of America has made an effort to refute the

20   various examples that we've provided in our papers of

21   procedural requirements in the United States.  You know, that

22   effort, frankly, misses our point, our point being that these

23   procedural rules are not alien to U.S. law.  No one has to

24   prove that there is an exact provision in U.S. law.  I mean,

25   frankly, 304 talks about comporting with bankruptcy law.  And

1    so that removes this even further.

2         But, you know, a party who misses a filing deadline

3    in a lawsuit, or who allows a statute of limitation to lapse

4    before bringing a claim is going to be deprived of equitable

5    recourse, just as a creditor whose claim is barred by *data*

6    *certa* requirements, or barred by a bar date.

7         State law governing wills is incredibly stringent.

8    Failure to follow those technical rules can render a will

9    invalid.

10         And, finally, Your Honor -- not finally, violation

11   of New York's usury law, even if unwitting, will void a loan

12   in its entirety, and that's been the law the New York Court

13   of Appeals -- I don't think this one was cited in our brief,

14   so I'll give it to you, which is <u>Szerdahelyi</u>, S-z-e-r-d-a-h-

15   e-l-y-I, <u>v. Harris</u>, 67 N.Y. 2d 42.  I mean, these are all

16   examples of situations where failure to comply has a serious

17   consequence.

18         And let me just give one more example because it

19   relates to banking, and so the Bank of America will certainly

20   be familiar with this.  When a bank refuses to pay an attempt

21   to draw on a letter of credit, U.S. Courts for decades have

22   consistently applied the rule of law that specifically

23   upholds the bank's right to insist on strict compliance with

24   the letter of credit, no matter how trivial.  And U.S.

25   Courts, as a matter of law, for decades, have consistently

1    rejected the arguments made that substantial compliance will

2    be sufficient.

3         So, you know, if Bank of America wants to quibble

4    with the ins and outs of these rules requiring compliance in

5    order to enforce claims, that's fine.  But it doesn't change

6    the fact that even in the U.S., a failure to comply with that

7    kind of rule will leave a party out in the cold, or,

8    certainly, make it difficult to enforce rights.

9         Now Article 2704, in contrast to the some of the

10   U.S. laws I've just mentioned, or views of U.S. Courts I've

11   just mentioned, is not as stringent.  It provides the Parma

12   Court with the flexibility to consider evidence of the pre-

13   bankruptcy execution of a written agreement.  This is what's

14   being argued by Bank of America/BankBoston in Italy.  You

15   know, the fact is that Dr. Bondi may argue that the evidence

16   that they wish to put in is not appropriate, but they're in

17   litigation and he's asserting his position.

18        But no matter what each side argues, at the end of

19   the day, Your Honor, the facts, the evidence, and legal

20   arguments of each of those parties will be evaluated by the

21   Parma Court fairly and in due course, and no one has asserted

22   that the Parma Court will not act fairly.

23        None of the objectors have really denied that

24   they've been, or have asserted that they've been denied an

25   opportunity to litigate these issues in the Parma Court in an

18

1    effort to prove their claims over Parmalat's objection.

2            So what's Bank of America complaining about?

3    They're complaining about Dr. Bondi's conduct in pursuing

4    these objections.  Well, but in raising objections to claims,

5    Your Honor, Dr. Bondi is fulfilling an obligation.  He is

6    ensuring that creditors submit proper documentary evidence

7    required under the *data certa* requirement so that the Parma

8    Court can take the opportunity evaluate the proofs of claim

9    and make rulings.

10           You know, that the foreign debtors, and I've said

11   this before, as litigation adversaries, particularly Bank of

12   America, have vigorously prosecuted claims objections, you

13   know, doesn't mean that the underlying law is improper, it

14   doesn't mean the conduct is improper, and doesn't mean that

15   there will not be a fair hearing before the Parma Court.

16           As I mentioned earlier, a number of claims have been

17   admitted over Dr. Bondi's objection, and so the Court cannot

18   be accused of being unfair.

19           One other point I'd like to make on this.  Again, I

20   think even some of Bank of America, N.A.'s claims, I think I

21   already mentioned this, have been admitted over Dr. Bondi's

22   *data certa* objections, sort of underscores that there is no

23   lack of fairness in the Parma Court.  Dr. Bondi may say that

24   was unfair, but, certainly, Bank of America couldn't.

25           And it's also a bit misleading for Bank of America

1   to infer that the Parmalat Pacific objection to the Cur

2   Holdings claim -- and now I'm getting a little more specific

3   on the facts here -- is simply based on *data certa*.  Your

4   Honor, the pleadings in that litigation over that claim are

5   really about the nature of the claim, the fraud that

6   permeated the collapse, and the fraud that related very

7   specifically to that claim.

8          So we shouldn't assume that that claim is a, quote,

9   *"data certa* issue."  It comes up because there was an

10  assignment of that claim by Cur Holdings, which was partially

11  owned by an employee of Bank of America, assigned to Bank of

12  America, and there is a *data certa* issue regarding the

13  assignment.  But that is not the only element to that

14  objection.

15         And the same can be said about the Bank of America

16  securities claim, or, again, it's really a Bank of America,

17  N.A. claim with the underlying claim against the Brazilian

18  entity; much more to it than a *data certa* objection.

19         All right.  So coming back to Dr. Bondi, he's filed

20  objections to these claims.  There have been allegations of

21  bad faith because he filed objections to these claims.  But

22  that doesn't constitute bad faith, Your Honor.  He has an

23  obligation to assert the objections that he believes are

24  consistent with maximizing the value of the estate.  And

25  raising a *data certa* objection is really no different from

1    raising claims objections of all kinds, including perfection,

2    statute of frauds, anything that a bankruptcy trustee or

3    debtor-in-possession would look to to object to a claim in a

4    U.S. Chapter 11 case.

5            Finally, Your Honor, even if there is any kind of

6    proper allegation of bad faith, and we obviously disagree

7    with that, where should that be litigated?  It doesn't mean

8    that we don't have a permanent injunction.  If something is

9    going wrong in Italy, if there is a claim that is being made

10   improperly for any reason, that is something that the Italian

11   Court should be deciding, not this Court.

12           I'd like to turn to standing as we conclude this

13   discussion of *data certa*.  As I mentioned, the *data certa*

14   arguments have also been raised by ABN AMRO and raised on

15   behalf of BankBoston.  But we believe that the specific

16   objections relating to the Bank of America, N.A. claim and

17   the Bank of America securities claims should not be heard in

18   this court, in light of Judge Kaplan's withdrawal order and

19   his related rulings.

20           Judge Kaplan authorized Bank of America to assert

21   counterclaims in the District Court, and that directly

22   undermines its objections in this Court.

23           THE COURT:  But just compulsory counterclaims,

24   right?

25           MS. GOLDSTEIN:  I'm sorry?

1          THE COURT:  Just compulsory counterclaims?

2          MS. GOLDSTEIN:  Compulsory counterclaims, Your

3    Honor.  But the Bank of America, N.A. and the Bank of America

4    securities claims arise out of the very same transactions

5    that are the subject of the litigation in Judge Kaplan's

6    court.  And we quoted in our pleadings the colloquy between

7    Judge Kaplan and Mr. Krakauer regarding those claims.  They

8    chose to assert those claims in Italy.  They could have,

9    pursuant to Judge Kaplan's order, also asserted them in the

10   District Court case.

11         So if you enter the permanent injunction, whether

12   they object to it or not, they still have the opportunity to

13   assert those counterclaims, those claims in the District

14   Court case.

15         THE COURT:  So you're saying as a practical matter,

16   the only claims they have would be compulsory counterclaims?

17         MS. GOLDSTEIN:  These claims.  I don't know what

18   other claims they have.  The claims they're complaining about

19   here, which are claims under loan documents which Dr. Bondi

20   has challenged.  They arose out of the very same transactions

21   Bank of America claims and the counterclaims already asserted

22   before Judge Kaplan that they were fraudulently induced to

23   make those very claims.

24         Dr. Bondi has claimed that their actions in

25   connection with those claims were part of the fraud that led

1    to the collapse of Parmalat.  That's his recovery action.  I

2    mean, there's a lot more to his recovery action than that,

3    but as it relates to those claims.

4            And so they've asserted what they call -- you know,

5    they've asserted tort claims, but there are contract claims

6    that are for the same amounts relating to the same loans,

7    Your Honor.  So Judge Kaplan recognized that.  He was quite

8    clear on that.  And I don't believe Mr. Krakauer disabused

9    him of that notion.

10           And so --

11           THE COURT:  And then they also -- B of A and BASL

12   also say that they have direct claims against non-debtor, or

13   non-Italian-debtor foreign subsidiaries that would be

14   enjoined by this proposed injunction, at least I thought

15   that's what they were saying

16           MS. GOLDSTEIN:  No.  No.  Direct claims against --

17   we have never asserted that their claim against the Brazilian

18   entity is enjoined by this injunction, and we don't believe

19   that the current form of injunction does that, as an example.

20   Also, claims against Wishaw we know haven't been enjoined.

21   Claims against the Cayman entities,  I mean, direct claims.

22   The injunction -- sort of this moves to a different issue,

23   but insofar as it enjoins --

24           THE COURT:  Let's save that for later because I had

25   some questions about that.

1          MS. GOLDSTEIN:  Okay.

2          THE COURT:  But they do have -- let me make sure I

3   understand this point, though.  B of A and BASL do have what

4   could be termed as independent claims against foreign subs?

5          MS. GOLDSTEIN:  Yes.

6          THE COURT:  Okay.

7          MS. GOLDSTEIN:  And the claims that really they are

8   complaining about here are the guarantee claims.  Those are

9   the claims that Dr. Bondi has objected to in the Italian

10  case.

11         THE COURT:  Okay.  And then I guess, similarly --

12  well, maybe it's not similar, but I assume it's similar.

13  Another aspect of B of A's objection is that their reading of

14  the proposed injunction is that it prevents them from going

15  against property outside of the United States in respect of

16  their claims.  And I guess --

17         MS. GOLDSTEIN:  In respect of their claims against

18  the foreign debtors, not against the Brazilian entity, not

19  against Wishaw, as two examples.

20         THE COURT:  Okay.  All right.

21         MS. GOLDSTEIN:  Anyway, Your Honor, getting back to

22  the standing issue, just to summarize what I think I have

23  already said, the claims that are being complained of here,

24  which are the claims being asserted in Italy, which are the

25  guarantee claims that relate to the claims against other

1  entities, which no one in this proceeding has ever sought to

2  interfere with, those are the claims that arise, as do the

3  underlying claims, from the same set of transactions that are

4  before Judge Kaplan, and as to which he has said

5  counterclaims can be brought, and certain counterclaims,

6  compulsory counterclaims, have already been asserted.

7          Now Bank of America has asserted in its surreply

8  that Judge Kaplan ruled at his October 26th, 2006 conference

9  that Parmalat's entitlement to a permanent injunction under

10  Section 304 must be decided by the Bankruptcy Court.  And,

11  obviously, Your Honor, you're here.  You must decide the

12  permanent injunction.  But that doesn't completely and

13  properly characterize Judge Kaplan's ruling with respect to

14  Bank of America.

15          Judge Kaplan said that any new injunctive relief,

16  and that would be this permanent injunction, under 304 should

17  first be addressed by this Court with respect to the 304

18  relief.  But Judge Kaplan has been consistent that anything

19  relating to the Bank of America claims and that District

20  Court action, anything that he has withdrawn, has to be

21  determined by him.  And so those claims are not part of this

22  request for a permanent injunction.

23          Now just to be clear, that is not the case with

24  respect to the BankBoston claims.  They are not subject to

25  Judge Kaplan's withdrawal.  And the fact that these claims

1    have not been admitted, the arguments made with respect to

2    *data certa*, they're pretty much the same as the Bank of

3    America arguments, and we believe we've already argued that

4    the application of *data certa* to the BankBoston claims is not

5    at all repugnant to U.S. law.

6         BankBoston -- and again, we learned this through the

7    evidentiary submissions made by Bank of America -- clearly

8    knew that its claims could be subject to the *data certa*

9    requirement, but they chose not to comply with it.

10        And BankBoston has further acknowledged that the

11   Clawback counterclaim, or Clawback claim of Dr. Bondi, should

12   be litigated in Italy so that even if the *data certa*

13   objection were overcome or withdrawn, BankBoston would still

14   not be entitled to a distribution unless it prevailed in the

15   Clawback litigation before the Parma -- excuse me -- before

16   the Parma Court.

17        And again, BankBoston, like Bank of America, and

18   specifically BankBoston, has argued in the Italian Court

19   against the application of *data certa* for a variety of

20   reasons.  They're entitled to make evidentiary submissions to

21   satisfy it, but they've also argued it's inapplicable,

22   they've argued it's unreasonable and not valid, and,

23   basically, making the same arguments they're making here.

24   So, again, they thought this was an issue that could be

25   resolved by the Italian Court and it should be resolved by

1    the Italian Court.

2          I'd like to come back to another point raised

3    specifically by Bank of America.  And this goes to the issues

4    regarding the just treatment of creditors, any particularized

5    harm to U.S. creditors.  As I pointed out, Bank of America is

6    not talking about creditors generally, but itself.

7          And they have also claimed that they've been treated

8    unfairly vis-a-vis other creditors because Dr. Bondi has

9    chosen to settle with some creditors, but not with them.

10   Every claim, every objection is different.  It's no different

11   than a U.S. Chapter 11 situation.  As to Bank of America, I

12   think it's fairly clear that they are different from every

13   other creditor.  They certainly don't have -- well,

14   certainly, Dr. Bondi does not have an obligation to settle

15   all disputed claims, to settle with one party on the same

16   terms that he may have settled with another party.  There are

17   always differences between the parties.

18         And in the case of Bank of America, we're talking

19   about a litigation adversary.  And litigation adversaries

20   prosecute whatever they can, just as Bank of America has done

21   whatever it can to object and further its objection in this

22   proceeding.

23         So, Your Honor, the claims litigation between Dr.

24   Bondi and Bank of America, even the objection to claims, is

25   all about who was the cause of the fraud.  It's a fundamental

1  issue in the Italian case.  And, frankly, that's the reason,

2  and I come back to the standing issue, that at least as to

3  Bank of America's specific claims, they belong in front of

4  Judge Kaplan.

5         So despite all the noise and moving back to the

6  general issue of *data certa*, which isn't unique to Bank of

7  America, we do not believe that any of the objectors who

8  raised the *data certa* issue have been persuasive that this is

9  a provision that makes Italian bankruptcy law unworthy of

10  comity, that this is a provision that is repugnant to U.S.

11  bankruptcy law.  It's not even, as I said, a provision of

12  Italian bankruptcy law.

13         I think that what we have here, particularly in the

14  case of ABN AMRO and also with respect to Bank of America,

15  lenders complaining that they haven't had their claims

16  admitted.  They're still pending.  The Parma Court may very

17  well admit them, or they may not.  But the issue of

18  unfairness, of a repugnant provision of law, of any

19  inappropriate conduct on the part of Dr. Bondi just isn't

20  there.

21         Your Honor, should we discuss Bank of America's

22  objections to the form of injunction, or should I talk about

23  the PBGC?  I can go -- we can do it in either order.  And I

24  also wanted to bring the Court up to date on the status of

25  the settlement with the Bingham noteholders.

1          THE COURT:  Okay.  Why don't we stick with the form

2     of injunction first?

3          MS. GOLDSTEIN:  Okay.

4          THE COURT:  Because I had some questions on that,

5     too.

6          MS. GOLDSTEIN:  Okay.

7          THE COURT:  And then go back to the other objectors.

8          MS. GOLDSTEIN:  Sure.

9          THE COURT:  I expect you're going to get to this

10    anyway, but in light of the standing -- the position of Dr.

11    Bondi on standing, what is the -- explain to me the rationale

12    for not including in the injunction a paragraph dealing with

13    B of A and BASL that is along the same lines as Paragraph 8

14    that deals with Grant Thornton.

15         MS. GOLDSTEIN:  Your Honor, I think the injunction

16    already excludes everything that is subject to the withdrawal

17    order.  But there have been --

18         THE COURT:  But doesn't that order apply equally to

19    Grant Thornton?

20         MS. GOLDSTEIN:  No.  There's a general withdrawal

21    order.  And then with respect to Grant Thornton, I think

22    there were specific orders entered as to what could be

23    asserted in that case.

24      (Counsel confer.)

25         MS. GOLDSTEIN:  The language proposed by Bank of

1    America includes things that have not been ruled on,

2    including impleader, for example, by Judge Kaplan.  He hasn't

3    determined that any parties could be -- any impleaders could

4    be made with respect to Bank of America, and he's already

5    decided on a counterclaim.  But I think, Your Honor, if we

6    keep exactly --

7         THE COURT:  But I guess maybe this is a way to get

8    back to the standing issue, then.  As long as that's still an

9    open issue and that's still sought to be enjoined, don't they

10   have standing to complain?

11        MS. GOLDSTEIN:  Well, they haven't asked for that

12   here, to my knowledge.  I think -- no, Your Honor --

13        THE COURT:  But what I'm saying is that, you know --

14        MS. GOLDSTEIN:  Well, Judge Kaplan has basically --

15        THE COURT:  In other words, Judge Kaplan's orders

16   don't deal with every potential issue B of A could have, or

17   else there wouldn't be any issue with putting in similar

18   language to the Grant Thornton paragraph.

19        MS. GOLDSTEIN:  His orders cover everything that

20   they could raise, but he hasn't decided everything.  So if

21   you look at what B of A has proposed, it's as though Judge

22   Kaplan has decided that they're entitled to those things.  He

23   hasn't.

24        But if they wanted to assert anything in connection

25   with the District Court action, that request would have to go

1    to Judge Kaplan.  He has an injunction in effect, other than

2    what he's allowed.

3         THE COURT:  But doesn't this Grant Thornton just

4    apply only to assertion, assertion of these things?

5         MS. GOLDSTEIN:  He's allowed them to assert those

6    things.  He has not allowed Bank of America to assert all of

7    the same things.  So they -- if they were to make a motion --

8    like when they sought to have --

9         THE COURT:  But maybe this is where I'm not

10   following you.  Are they precluded from making such a motion?

11        MS. GOLDSTEIN:  They can make a motion to do

12   anything with respect to their claims before Judge Kaplan.

13        THE COURT:  So they can make a motion to assert an

14   impleader action beforehand?

15        MS. GOLDSTEIN:  They'd have to seek to modify the

16   injunction as it exists before him.  He has the injunction in

17   place, but for --

18        THE COURT:  But what injunction has he issued?

19        MS. GOLDSTEIN:  He relies on your injunction, Your

20   Honor.  I mean, if you read his --

21        THE COURT:  But that would be this injunction,

22   right?  That would be this permanent injunction.

23        MS. GOLDSTEIN:  But we exclude his withdrawal.  All

24   matters subject to his withdrawal.

25        THE COURT:  But you're still saying they would have

1  to seek relief from this permanent injunction to then go ask

2  him for something?

3          MS. GOLDSTEIN:  No, I don't believe they have to

4  come back to you, Your Honor, because he's already -- this

5  permanent injunction cannot affect anything that's before

6  him.  So it can't affect -- that's why I said, Your Honor,

7  they could go assert these claims.

8          THE COURT:  Well, that's why it seemed to me that

9  going with the same language in Paragraph 8 would clear up

10 any confusion about that.

11         MS. GOLDSTEIN:  Your Honor, that --

12         THE COURT:  You know, maybe you spent hours going

13 through this and there's something more specific about it,

14 but it just seemed to me that that way people wouldn't have

15 to parse through this transcript and they'd have one simple

16 paragraph that would make it clear that in that litigation

17 they're free to ask for or assert subject to his

18 determination of whether it should be asserted or not.

19         MS. GOLDSTEIN:  Well, maybe we have to add

20 additional language.  The Grant Thornton matter is before

21 him.  Each matter has different motions in it.  But

22 everything having to do with the Grant Thornton litigation or

23 the Bank of America litigation is subject to that partial

24 withdrawal.

25         And we have in the permanent injunction order -- let

1   me just make sure I have the right paragraph here.

2       (Counsel confer.)

3       MS. GOLDSTEIN:  I mean, if you look at Paragraph 8,

4   it's all about Grant Thornton.  All the specific cites of his

5   rulings are specific to Grant Thornton.  So if we want to

6   list rulings that are specific to Bank of America, we could

7   put in a Bank of America paragraph.  But it's not the same.

8       THE COURT:  Well, you just -- instead of the

9   italicized references to civil proceedings involving Grant

10  Thornton, you can put in the italicized references to civil

11  proceedings involving B of A in front of Judge Kaplan.

12      MS. GOLDSTEIN:  Right.  But except that in the B of

13  A situation he has allowed only the assertion of defenses and

14  compulsory counterclaims.

15      THE COURT:  So you're saying he specifically allowed

16  in any manner the assertion of defenses, counterclaims,

17  cross-claims or impleader actions or any other actions?

18      MS. GOLDSTEIN:  In the Grant Thornton orders, yes,

19  Your Honor.

20      THE COURT:  They have complete freedom to do

21  anything?

22      MS. GOLDSTEIN:  Just what it says here in their

23  litigation.

24      THE COURT:  So he's made sort of a blanket ruling

25  that they can assert anything?

1          MS. GOLDSTEIN:  Your Honor --

2          MR. COMET:  Your Honor, can I just interject

3    something?  The major difference between what is in here

4    regarding Grant Thornton and what Bank of America proposed is

5    that the paragraph regarding Grant Thornton begins by saying,

6    "To the extent the District Court has withdrawn --"

7          THE COURT:  No, I'm saying if you do the same

8    language completely, including that to the extent --

9          MR. COMET:  I think that may well be doable, Your

10   Honor.  But that was not what Bank of America proposed.

11         MS. GOLDSTEIN:  Right.

12         MR. COMET:  They proposed --

13         THE COURT:  Well, that's what I read their objection

14   as saying, we want the same language as Paragraph 8.

15         MS. GOLDSTEIN:  Well, the language they gave us,

16   Your Honor, is not the same.

17         MR. COMET:  But that wasn't the specific language

18   they proposed.  They proposed language that said -- and this

19   is Howard Comet, Your Honor.  They proposed language that

20   said that -- made no reference to the withdrawal of the

21   reference.  It simply said, notwithstanding any provision of

22   the permanent injunction they can assert whatever they want.

23         THE COURT:  Okay.  Well, that's a different point.

24   But as far as if you just stuck with the language of

25   Paragraph 8, but, instead of the litigations with Grant

1  Thornton in the title, you put the ones that were B of A's,

2  that would be okay?

3          MS. GOLDSTEIN:  I think we -- as long as we replace

4  the reference to the Grant Thornton orders with the Bank of

5  America orders so it's specific to them.

6          THE COURT:  Okay.  I mean, Mr. Krakauer can tell me

7  if that's sufficient or not for him.  But at least that will

8  help him understand the standing issue.  Okay.

9          MR. KRAKAUER:  And, Your Honor, I'm not even

10  understanding what they just agreed to.  I think --

11          THE COURT:  They agreed to the same language as 8,

12  except instead of referring to Grant Thornton, it would refer

13  to B of A and BASL.

14          MR. KRAKAUER:  Okay.  I didn't hear them say, but if

15  that's what you heard, that's fine.

16          THE COURT:  I think that's what Mr. Comet said,

17  right?

18          MR. COMET:  Yes, sir.

19          THE COURT:  Okay.  All right.

20          MS. GOLDSTEIN:  Okay.  I'm sorry, Your Honor.

21          Then on the form of the order, you wanted to talk

22  about the applicability of the injunction to direct claims

23  against non-debtors?

24          THE COURT:  Yes.  There are -- as I read it, there

25  are five provisions of the order that deal with non-debtors.

1    And I read three of them as being quite broad.  But what you

2    said this afternoon suggests maybe they shouldn't be.

3         Let me deal, first, with the ones that I think are

4    not problematic at all, and those are -- if you turn to Page

5    8.

6         MS. GOLDSTEIN:  Okay.

7         THE COURT:  And, by the way, for the record, as part

8    of the pretrial procedures for this hearing, I instructed

9    Parmalat to file and serve the proposed order, now several

10    months ago, so that everyone interested would see the

11    specific relief that was being sought, and that's the

12    proposed order that I'm working off of here.

13         MS. GOLDSTEIN:  Yes, Your Honor.  We have not made

14    any changes to that, but for the date.

15         THE COURT:  Okay.  So if you go to Page 8 --

16         MS. GOLDSTEIN:  Your Honor, are you working with the

17    order that was attached to our memorandum that we filed?

18         THE COURT:  Well, we'll know in a second.

19         MS. GOLDSTEIN:  Okay.

20         THE COURT:  I think so.

21         MS. GOLDSTEIN:  Okay.  And could --

22         THE COURT:  Page 8, Paragraph 3(d) says that the

23    injunction goes to commencing or continuing any action or

24    legal proceeding against the composition debtors or their

25    successor reorganized Parmalat.  And then it says:

```
 1              "-- or any of their subsidiaries or affiliates or

 2              any of their property or proceeds thereof:" --

 3              And then let me skip down to Roman (ii) and (iii).

 4              MS. GOLDSTEIN:  Okay.

 5              THE COURT:  Which, again, I don't think are -- which

 6    are quite narrow, I think, and subject to being convinced

 7              otherwise, are within the Schimmelpennick and Garcia

 8    Avila holdings, where it says:

 9              "-- that arises in relation to or in connection with

10              the implementation of the composition, including,

11              without limitation, each and every liability in

12              respect of a claim that is subject to the

13              composition where such action would interfere with

14              the Italian proceedings in granting full force and

15              effect to the composition."

16              So, there, you're enjoining actions against subs

17    where it's on account of -- or arises in connection with

18    implementation of the composition.  So people are basically

19    trying to blow up the composition by going against the

20    subsidiaries.

21              MS. GOLDSTEIN:  Right.

22              THE COURT:  And that, to me, would certainly fall

23    within the definition of, "included within the foreign

24    proceeding."

25              And then (iii) says:
```

1          "-- in respect of any claim or cause of action,

2          which may arise out of the construction or

3          interpretation of the composition, or out of any

4          action taken or omitted to be taken by any other

5          composition debtors in connection with the

6          administration of the composition."

7      So, again, it goes to channeling these actions

8  basically back to the Italian Court, which implemented the

9  composition in the first place.

10     But if you look at Roman (i) there, to me it seems

11 to simply enjoin any cause of action against a subsidiary or

12 affiliate, a non-debtor subsidiary or affiliate, in respect

13 of a claim or cause of action -- well, I'm sorry.  This is

14 all in connection with the implementation of the composition.

15 So that would be a no-brainer, too.  I'm sorry.  Let me focus

16 back, then, on the ones that I thought were problematic

17 because I just didn't understand -- or I thought the language

18 was somewhat ambiguous.

19     If you look at 7, and this somewhat similar language

20 is on 6 also -- let's go to 6.  3(a), "enjoins the

21 commencement of any action or legal proceeding against --"

22 and you go down about halfway down that paragraph -- "against

23 any of their subsidiaries or affiliates."

24     MS. GOLDSTEIN:  Your Honor, which paragraph are we

25 on?

1          THE COURT:  3(a) on Page 6.

2          MS. GOLDSTEIN:  Okay.  Mine doesn't have page

3    numbers.

4          THE COURT:  Enjoins actions against subsidiaries or

5    affiliates, non-debtor subsidiaries or affiliates.

6              "-- if such action or proceeding asserts a claim

7              that is subject to the composition, or otherwise

8              subject to the foreign debtors' insolvency

9              proceedings."

10         And I just -- what do you mean by the phrase

11   "subject to"?  Maybe I could give you an example.  If someone

12   has asserted a guarantee claim against one of the composition

13   debtors, but the primary obligation is of a foreign debtor,

14   would this prevent the --

15         MS. GOLDSTEIN:  No, we do not believe so, Your

16   Honor, because that primary obligation is not the subject of

17   the composition.

18         THE COURT:  Okay.

19         MS. GOLDSTEIN:  So what we're really trying to

20   address here is a collateral attack in some way on a claim or

21   -- you know, or some action that really perhaps should have

22   been brought against the composition debtors, but is being

23   brought and -- against a non-debtor.  And I think that by

24   saying, "subject to the composition," we intended to exclude

25   a direct claim against a non-debtor affiliate.

1          THE COURT:  Okay.

2          MS. GOLDSTEIN:  Now if we can clarify that in a

3    better way, we'd be happy to.

4          THE COURT:  Well, I guess in my mind that leaves

5    another issue, which is where you have "joint and several

6    liability."  And I guess that's the PBGC's issue.

7          MS. GOLDSTEIN:  Uh-huh.

8          THE COURT:  And how does this -- I mean, if you --

9    and I don't know whether there are any contractual claims

10   like that, that B of A or BASL has, but as far as enforcing

11   the injunction, I think this -- I would like to clear up any

12   ambiguity on that so that people would know if they did have

13   joint and several liability claims whether this would enjoin

14   them from proceeding against a non-debtor entity or not.

15         MS. GOLDSTEIN:  Well, clearly, the -- can we use the

16   PBGC as an example?  Clearly, they have a -- well, they have

17   a contingent claim against the -- the basis for the claim is

18   Parmalat USA confirmed their Chapter 11 plan, their pension

19   plans are still in place, and so, at this point, if there

20   were a termination of the plan, that results in a potential

21   claim against the parent.  And that claim is really what the

22   PBGC is talking about here.

23         There is -- we do not believe that this provision

24   stops them from proceeding directly against Parmalat USA.

25         THE COURT:  Okay.

1          MS. GOLDSTEIN:  But if they were to proceed against

2    Parmalat S.p.A. --

3          THE COURT:  That would be subject to the Italian

4    proceeding.

5          MS. GOLDSTEIN:  -- that's subject to this

6    injunction, and they would have to proceed in Italy, if they

7    ever have a claim.  And that's no different, Your Honor, than

8    if this happened outside of a 304 or a Chapter 11.

9          THE COURT:  So, just to use another example, if

10   someone entered into a loan agreement with one of the

11   composition debtors and one of the non-debtor subs, and they

12   were both jointly and severally liable for that loan, this

13   injunction would enjoin them from proceeding against the

14   parent because the parent is in the -- that claim is dealt

15   with in the composition.  But they could still proceed

16   against the sub?

17         MS. GOLDSTEIN:  My view, Your Honor, is yes, because

18   a joint and several obligation, at least my understanding is

19   that that creates a direct claim against both entities.  I

20   think if it helps, I mean, we can, you know, put a

21   parenthetical in that this is not intended to enjoin a direct

22   claim against these affiliates.

23         THE COURT:  All right.  Well, let me ask you one

24   last question.

25         MS. GOLDSTEIN:  Okay.  I didn't mean to cut you off,

1    Your Honor.

2            THE COURT:  I'm not sure that "direct" solves it

3    all, because what if you have a -- made a loan to one of the

4    composition debtors that has been guaranteed by one of the

5    non-debtor subsidiaries?

6            MS. GOLDSTEIN:  That's a direct claim, too.  Go

7    ahead.

8            THE COURT:  Well, the -- obviously, the claim

9    against the composition debtor would be enjoined.  You

10   wouldn't be able to enforce that claim as that claim against

11   the non-debtor sub.  But I'm assuming you could enforce the

12   guarantee against the non-debtor sub.

13           MS. GOLDSTEIN:  You could enforce the guarantee,

14   which creates an independent claim.

15           THE COURT:  Well, so maybe the language is an

16   "independent" obligation as opposed to a derivative or veil-

17   piercing or some other type of obligation, which I think

18   would clearly be subject to the foreign proceeding.

19           MS. GOLDSTEIN:  Right.  That was, Your Honor, what

20   we were trying to get at by saying it was subject to the

21   composition.  But we could make it clear that an independent

22   claim against --

23           THE COURT:  Right.

24           MS. GOLDSTEIN:  -- the non-debtor affiliates is not

25   intended to be covered.

1    THE COURT:  Okay.  So, again, if they're trying to

2  get at the affiliate on a veil-piercing theory, or something

3  like that, or simply saying that it's liable for the

4  obligations of the parent on a non-independent basis, then

5  this would be enjoined --

6    MS. GOLDSTEIN:  This would be enjoined.

7    THE COURT:  -- but, otherwise, they'd be free to

8  pursue it.

9    MS. GOLDSTEIN:  Yes.

10    THE COURT:  Okay.  And I'm assuming that's the same

11  with regard to 3(b) on Page 7, which says:

12    "If the enforcement of such judgment, assessment,

13    order, or award is based on a claim that is subject

14    to the composition."

15    It's the same concept there.

16    MS. GOLDSTEIN:  Yes.  Yes.  And we can make that

17  clarification.

18    THE COURT:  Okay.  Okay.  All right.

19    MS. GOLDSTEIN:  Your Honor, there are other

20  provisions, I think, which Bank of America objected to -- let

21  me just go to my notes -- which deal with asserting setoffs.

22  You know, again, as to Bank of America, that's dealt with in

23  the District Court action.  They can and have asserted

24  setoffs.  No other creditor is complaining about that

25  provision, and we don't see a basis to change that.

1      And also, I think their other issue was trying to

2  limit the extraterritorial aspect of this order.  And it just

3  seems to me that this order, the Bankruptcy Code does not

4  limit this Court's jurisdiction to enter orders that have

5  extraterritorial effect.  And it would seem to me incongruous

6  to enter a permanent injunction, but then a creditor that is

7  subject to the jurisdiction of this Court can then go and

8  feel free to assert a claim anywhere else.  The local court

9  will decide whether this Court's order has extraterritorial

10  effect, and I know that there's some risk to that.  But the

11  concept of channeling the claims to Italy and the provision

12  that we have put in our order with respect to the effect of

13  this order work together.

14      If Bank of America or some other creditor went and

15  tried to pursue the foreign debtor's assets in Spain, for

16  example, why shouldn't we be able to assert that this

17  injunction precludes that?  The Spanish court may say, no,

18  sorry.  But that risk is there, it's always there.  It's just

19  like the question of the automatic stay.

20      But this Court has jurisdiction over these

21  creditors, and I think that to accomplish the objective of

22  this 304 case and the permanent injunction, that provision is

23  necessary; the ability to promote and further the channeling

24  of these claims to the Italian Court.  It's not inconsistent

25  with the powers of this Court.

1          THE COURT:  Well, let me -- I have some question

2     about that.  First, based on my reading of the Italian law

3     and also the case out of Florida that you mentioned earlier

4     that had an analysis of the Italian law for purposes of 304

5     relief, there is a worldwide stay under Italian law, right?

6          MS. GOLDSTEIN:  Yes, Your Honor.

7          THE COURT:  So ...

8          MS. GOLDSTEIN:  But then, Your Honor, we wouldn't

9     need this proceeding if we could rely entirely on that

10    worldwide stay.

11         THE COURT:  Well, but with regard to any creditor

12    where -- over whom I'd have jurisdiction, such as B of A, if

13    B of A violated that Italian stay, wouldn't the foreign

14    debtors have suitable relief here, which is they could come

15    to any court in the United States and say that that result or

16    that conduct should be sanctioned here; either there's a

17    judgment first in Italy that should be enforced here for

18    breach of that stay, or that it should be declared to be in

19    breach here, the district courts here or the New York courts

20    should grant comity and enforce that determination of the

21    Italian law and court?  It just seems to me that there is

22    some risk to have an ancillary court, such as this one is,

23    granting a worldwide injunction that then -- where it's not

24    the home court, particularly where the home court has one to

25    be enforced.

1        I'm thinking, for example, of -- I don't know

2   whether this is the case, but I assume that if I granted a

3   worldwide injunction as to U.S. parties, or parties that I

4   have personal jurisdiction over, that would prevent them

5   from, for example, pursuing claims, that might be subject to

6   the composition, pursuing them in the <u>Eurofoods</u> bankruptcy in

7   Ireland, there would be quite an outcry.

8        MS. GOLDSTEIN:  I think we -- but, Your Honor, we've

9   already --

10        THE COURT:  Well, I'm just using that as a

11   hypothetical.

12        MS. GOLDSTEIN:  Yeah.

13        THE COURT:  I mean I'd be, in essence, treading on

14   another court's toes when I wasn't even the main court.

15        MS. GOLDSTEIN:  Well, you're --

16        THE COURT:  And the other concern I have is this:

17   Obviously, I have jurisdiction over a lot of the creditors

18   here; on the other hand, I don't have jurisdiction over all

19   of the creditors.  So it seems to me there's a risk here that

20   if I do enter an injunction that purports to have worldwide

21   effect, I'm disadvantaging the creditors -- the U.S.

22   creditors or those who do business here, as against those who

23   don't, which is, you know, a corollary effect to the main

24   concern I have, which is the type of concern that underlies

25   anti-suit injunctions, generally.

1          I mean, if you could show me that basically everyone

2    was here, then -- or almost everyone was here, or that it

3    would be necessary because of the type of business that the

4    debtor had -- for example, a worldwide shipping business

5    where you would need immediate relief, because if a vessel is

6    arrested it kills the business, such a worldwide injunction

7    might make sense, even though I wasn't the home court.

8          But here, it seems to me, particularly given that

9    Italy has a worldwide injunction, and it is subject to the

10   E.U. scheme, so there's a lot of coordination anyway, and I

11   would have no problem, and I don't think other U.S. Courts

12   would have any problem enforcing -- if there was a breach of

13   an Italian injunction -- through principles of comity,

14   something here; that it seems to me that that's a safer way

15   to go than just sort of generally issuing a worldwide

16   injunction.

17          MS. GOLDSTEIN:  Your Honor, I would --

18          MR. KRAKAUER:  Your Honor, can I just say, on all

19   these points; all the scope points as well as the *data certa*,

20   I obviously have a number of things to say.  Should I save

21   them all to the end or -- I mean, because we are --

22          THE COURT:  Well, I mean we're kind of covering this

23   one now, so if you have anything more to add, you should

24   chime in.

25          MR. KRAKAUER:  I --

1    THE COURT:  And I've read your papers, I've thought

2  about the issues, but ...

3    MR. KRAKAUER:  Yeah.  Well, let me address a few of

4  the -- I mean, as far as extraterritorial relief, I mean

5  there's a few points which are directly on point.

6    I mean, one is all the <u>China Trade</u> --

7    THE COURT:  The anti-suit injunction cases.

8    MR. KRAKAUER:  Yeah.  I mean, you basically have a

9  very high --

10    THE COURT:  Stand up.

11    MR. KRAKAUER:  Oh, I'm sorry.

12    You have a very high legal standard and very

13  stringent test to even consider an injunction outside the

14  United States.  And there's a recent case, I think it's

15  called "<u>Sea Carriers</u>," which basically applied <u>China Trade</u> in

16  a 304 context.  There is no factual basis here -- I mean,

17  there is none at all, in terms of a factual presentation on

18  the need for a foreign injunction.  That's one point.

19    Second is some of the things we're talking about

20  here, in terms of scope issues relating to issues related to

21  non-debtor subsidiaries, relating to counterclaims, setoffs -

22  - which we'll get to -- and such, are not what the plan in

23  Italy provides.  You have a situation where you have a plan

24  that says one thing, and there's a set of Italian laws that

25  say one thing, and the debtor is coming in to this court and

1    saying, you know, there's something else I'd really like to

2    have, even though I didn't ask for it or get it anywhere

3    else.

4        THE COURT:  Well, but as far as the worldwide scope,

5    isn't it the case, though, that under Italian law there is

6    worldwide protection?

7        MR. KRAKAUER:  I agree.  I don't think there's any

8    need whatsoever for worldwide scope here.  I think the

9    Italians certainly intend that their orders would apply

10    extraterritorially.  There are certainly E.U. procedures,

11    E.U. regulations and such, which deal with how Italian

12    procedures deal in other places around Europe, where most of

13    these -- probably a lot of these would wind up coming up.

14        You know, we litigated -- you know, Bank of America

15    and Parmalat were the two entities, along with the trustee,

16    and a receiver in Ireland who liquidated the Eurofoods case

17    up to the E.C.J., and it dealt with -- one of the issues it

18    dealt with is how you deal with all these issues of one set

19    of laws in one place and differences within the E.U.

20        You don't -- you know, for the U.S. Court to get in

21    the middle of that, and if we have something coming up in the

22    future that's -- you know, pick a country; France, England,

23    whatever, and you have an English court that sits there and

24    tries to figure out, okay, I had a U.S. judge tell me he's

25    issuing an order that's supposed to have extraterritorial

1    effect, I have an Italian Court that has issued something

2    completely different, and then we have our set of laws and

3    E.U. regs in whatever country we're in, I mean, it's a

4    horrible mess.  There's no reason for it whatsoever, I mean

5    none.  And why you would -- why they would suggest --

6            THE COURT:  Well, I could see instances where there

7    would be a reason for it, but --

8            MR. KRAKAUER:  Not this one.

9            THE COURT:  -- but I'm not sure here, particularly

10   where I think we would, in the U.S., assist -- if someone did

11   breach the Italian discharge or injunction, we would assist

12   them, we would assist the reorganized debtors in enforcing an

13   order on -- you know, that would sanction that breach.  But

14   anyway ... okay.

15           MR. KRAKAUER:  And on these other scope points, I'll

16   wait until the end, if you want.

17           THE COURT:  Well, I think -- well, on the -- we

18   spent some time clarifying the provisions of the proposed

19   order that deal with non-debtor subsidiaries.  And having

20   heard the clarification, and I guess subject to seeing the

21   language which covers -- I think we decided -- or excludes

22   independent obligations, is there any remaining issue there?

23           MR. KRAKAUER:  Well, certainly clarification that it

24   excludes all direct obligations, independent obligations, is

25   very helpful.  But truthfully, I don't understand why this

1  Court gets into that issue at all in the following sense:

2            First, the Italian proceeding did not provide any

3  protection for non-debtor subsidiaries as a matter of Italian

4  law or pursuant to their plan.

5            Second, there are no present U.S. subsidiaries of

6  Parmalat.  There was one, Parmalat U.S.A. and Farmland to

7  name two, were entities that Parmalat was affiliated with

8  when this case started.  They both went through their

9  separate reorganizations, and Parmalat no longer is

10  affiliated with those companies.  They basically were

11  transferred over to -- their ownership to the creditors.  So

12  there is not even any subsidiaries in the United States for

13  this Court to deal with.  So what we're doing here --

14            THE COURT:  Well, but let me just test that.

15            MR. KRAKAUER:  Sure.

16            THE COURT:  What if Judge Kaplan determines that

17  someone in the MDL defrauded, not only one of the composition

18  debtors, but also one of the subs, and they have to pay a sub

19  -- I guess originally the check is here, someone could

20  assert, you know, a lien on that right here.  I mean,

21  shouldn't they get that protection from -- or creditors

22  generally, shouldn't they be enjoined from latching on to

23  that litigation receivable here, asserting that, well, we

24  have a claim against that sub, too, because it was all one

25  big fraud case?

1          MR. KRAKAUER:  Well, none of the subs -- the only

2     subs that are parties -- the only Parmalat-related subs that

3     are parties to the MDL litigation at this point are the

4     foreign debtors; none other are.  So what your hypothesizing

5     is not --

6          THE COURT:  Well, I --

7          MR. KRAKAUER:  -- what's occurring.  It's a

8     hypothetical off in the future, not based upon any facts.

9          But I guess the real point is, you know, I have

10    problems of it wasn't provided for in Italy, I have problems

11    of why we're dealing with this --

12         THE COURT:  Well, let's turn to that latter point.

13    And I think this is basically -- well, when you say it's not

14    provided for in Italy, I don't think you have to provide for,

15    you know, worldwide relief, necessarily, in your plan because

16    it's just a function of the law.

17         MR. KRAKAUER:  Well, it's not as a matter of Italian

18    law --

19         THE COURT:  I mean, you don't actually have to put

20    in a Chapter 11 plan that the debtor is getting a discharge.

21    It just happens by operation of law.  And 524 is out there to

22    protect Chapter 7 debtors without there being -- so, you

23    know, if Italian law provides for it, I don't think there's

24    any reason not to provide for an injunction here, too.

25         MR. KRAKAUER:  Your Honor, one of the things that I

1  suggested to deal with this point early on in the discussions

2  with Weil Gotshal is just we made clear that there was

3  protection for non-debtor subsidiaries to the extent provided

4  under Italian law.  Then we're not creating additional

5  rights.  And that, together with the clarification on

6  independence really, frankly, solves our problem.  I mean, I

7  still don't know why we're getting into it, but that does

8  solve the issue.

9        Because what I don't understand is why we would

10  create new substantive rights in this court.  It makes no

11  sense in this particular context.  There's just no basis for

12  it.

13        THE COURT:  Well, I guess I'm just -- on the

14  particular point on the foreign subs, the non-debtor subs --

15        MR. KRAKAUER:  Right.

16        THE COURT:  -- I guess I don't see why it doesn't

17  comply with Italian law.

18        MR. KRAKAUER:  I don't -- and my basic problem with

19  it is, frankly, illustrated by what you --

20        THE COURT:  I mean, it's just a basic -- I'm sorry

21  to interrupt you.

22        MR. KRAKAUER:  You're not, no ...

23        THE COURT:  But it's a basic principle that if one

24  court has dealt with a claim, it seems perfectly appropriate

25  to me to enjoin you as creditors or creditors here from

1    trying to go around that adjudication by, in essence,

2    asserting the same claim against another entity that is here.

3          I understand -- I've agreed with you on the point

4    about --

5          MR. KRAKAUER:  Right.

6          THE COURT:  -- about the extraterritorial effect.

7    But as long as it's here, it seems to me it's perfectly

8    consistent with 304 to say, I'm not going to get into that

9    exercise of someone trying to go around the Italian Court's

10   determination of a claim or adjudication of a claim by

11   letting you say, well, I'm asserting it derivatively here

12   against Company X.

13         MR. KRAKAUER:  Yeah.  Well, I -- I understand the

14   point.  I mean, if you're talking about -- you used the

15   instance of a veil-piercing, where you're really suing

16   derivatively.  The problem -- I guess the basic problem I

17   have at this point with the language, with these

18   clarifications, is I guess illustrated by the colloquy you

19   had with Ms. Goldstein for ten minutes.  It's very difficult

20   to understand what the heck the language really means.

21         THE COURT:  But I think that's now been -- I mean,

22   my sense is it's been clarified.  We had this same issue in

23   Refco.  I mean Refco is a big fraud case.  Everyone in the

24   case said that every debtor was liable for my claims because

25   you couldn't trace where the money went.  The creditors very

1    sensibly put in the plan a provision that said, no, we're not

2    going to have that type of claim, we're just having direct

3    claims against our own debtors.  That's basically -- and it's

4    just sort of a common sense -- the way it's been worked out

5    on the record, I think, is a proper way to resolve it.

6            MR. KRAKAUER:  Well, Your Honor, I --

7            THE COURT:  But can I turn to --

8            MR. KRAKAUER:  Go ahead.

9            THE COURT:  -- your other point?

10           MR. KRAKAUER:  Right.

11           THE COURT:  Which is related.  Your point about --

12   and when I say "your," it's probably best leaving aside

13   anything on the standing issue, you're just wearing your

14   BankBoston hat for a second -- is the point on setoffs,

15   liens, et cetera.

16           MR. KRAKAUER:  Right.

17           THE COURT:  Your point is that I shouldn't be

18   enjoining something that's permitted under Italian law?

19           MR. KRAKAUER:  Well, on that I have at least three

20   separate points:

21           One is that it's permitted under Italian law, and

22   it's been conceded on the record.

23           Second, under Treco, I think Treco says that if you

24   have a right of setoff, if somebody comes after you and you

25   have a counterclaim that you want to assert for purposes of

1  setoff, you have the ability -- that's treated as a secured

2  claim and you can't destroy that right.

3         THE COURT:  Well, in Treco they actually had a lien.

4         MR. KRAKAUER:  Well, but I think a setoff right is a

5  lien; it is under 506.  I mean, you're creating -- I don't

6  think there's a distinction -- a legal distinction between

7  that.  If somebody has the ability to say, you sue me for

8  $1,000 and I have the ability to counterclaim because you owe

9  me $1,000 at the same time, I think Treco absolutely stands

10  for the proposition that you can't destroy that right.  So

11  that's what -- so you got Treco.

12         You got the fact the Italian Courts, it undisputed,

13  and Italian law doesn't prohibit it.

14         And then the third thing is you have the fact that

15  Judge Kaplan in this district has specifically ruled on the

16  issue in connection with his litigation.  He said basically

17  that he agrees that a defendant who Parmalat sues has a right

18  to counterclaims and setoff.

19         Now, obviously, that applies for this present

20  litigation.  But from what they -- given that that's what you

21  have at least one district court judge determining the law

22  is, on what basis do you say that if somebody gets sued --

23  and you asked me to put on my BankBoston hat -- if BankBoston

24  gets sued six months from now, that we don't have the right

25  to do exactly what Judge Kaplan said the defendants in the

1    MDL had the right to do, which is to assert a counterclaim

2    for setoff purposes.

3            THE COURT:  All right.

4            MR. KRAKAUER:  How do you --

5            THE COURT:  No, I -- okay.  I'm somewhat confused

6    about the debtors' position on this point.  Is Dr. Bondi

7    looking literally simply to channel setoff claims to the

8    Italian Court, or is he looking to just prevent any claim

9    ever being asserted?

10            MS. GOLDSTEIN:  Your Honor, this injunction is a

11    channeling injunction.  It cannot -- the words do not

12    preclude setoff; they enjoin it.  But if a party wishes to

13    assert it in Italy, this would not be applicable.  This is

14    channeling claims to Italy.

15            THE COURT:  Okay.  It's not clear to me from the

16    language that that's what it does.

17            MS. GOLDSTEIN:  I mean, even in the U.S. --

18            THE COURT:  I mean, I think that is --

19            MS. GOLDSTEIN:  -- the Court has to allow the setoff

20    at some point, so ...

21            THE COURT:  If you had -- it would seem to me that

22    if you were to do that, then you'd actually -- when you're

23    talking about creating, perfecting, or enforcing any liens,

24    setoff, garnishment, et cetera, you'd put in a proviso that

25    such injunction shall not exceed the relief accorded to the

1   foreign debtors under the composition or the law governing

2   the liquidating debtors' liquidations, and that you're -- and

3   then I think later, at the end of all this, I might add a

4   proviso to make it clear -- this is right before -- at the

5   end of Paragraph 3, which would say:

6            Provided in each instance, in respect to this

7   Paragraph 3, such injunction shall not apply to any action to

8   enforce such claim, lien, setoff, garnishment, or attachment,

9   or any other right pursuant to the terms of the composition,

10  or, you know, the law governing the liquidating debtors'

11  liquidations.

12           MS. GOLDSTEIN:  In Italy, Your Honor?

13           THE COURT:  In the Italian Court or in the foreign

14  court.

15           MS. GOLDSTEIN:  All right.  Now we have in Paragraph

16  7 of the order a provision currently that says nothing in

17  this order is intended to limit the jurisdiction of the Parma

18  Court.

19           THE COURT:  I know, I know.  But I think it's kind

20  of -- I'd rather have it said twice, so that people know that

21  the injunction is subject to that.

22           MS. GOLDSTEIN:  Okay.  Okay.  And we can do that,

23  and --

24           MR. KRAKAUER:  Your Honor, just to be clear.  What

25  Judge Kaplan ruled in his case is that when Parmalat comes

1  over to the United States and sues somebody here, that

2  defendant here in the United States has the ability to assert

3  a right of setoff and to assert its counterclaims in the U.S.

4  Court as a defense of that or in response to that

5  counterclaim.  So I think what this has to provide is that

6  this happens if any situation like that happens in the

7  future; that this same -- that any defendant has a right to

8  seek the same rights that the defendants were given before

9  Judge Kaplan.  I mean, how can -- that's the law -- I mean,

10  that's what Judge Kaplan said the law was in this district,

11  and I --

12           THE COURT:  Well, he's not alone.

13           MR. COMET:  Your Honor --

14           THE COURT:  If Grant Thornton hadn't moved to

15  withdraw the reference, that's what I would have held, too.

16           MR. KRAKAUER:  Well, but that's -- but all I'm

17  saying is this -- I think that's appropriate.  But this order

18  should be clear that it doesn't prevent that.  That's --

19           MR. COMET:  Your Honor, this is Howard Comet.  That

20  is not an accurate characterization of what Judge Kaplan

21  ruled.  He ruled under the circumstances of the specific case

22  before him.

23           THE COURT:  No, but what I'm saying, there should be

24  an opportunity for judicial economy to have it not only in

25  Italy, but also here.  It depends on the circumstances.

1          MR. COMET:  I agree, Your Honor.  I thought Mr.

2   Krakauer was saying this would be a blanket rule.

3          THE COURT:  No.  I think in the first instance you'd

4   go to Italy, but you would have leave to ask the U.S. Court

5   here to do it as far as -- I mean, the normal rule is you

6   liquidate claims in the home court.  But for purposes of

7   judicial economy, courts frequently will say, look, if I'm

8   going to be liquidating one claim here and this is closely

9   related -- on the other hand, if it's a cross-claim that's

10  already being liquidated in Italy or halfway through being

11  liquidated, most courts will say, no, I'm not going to haul

12  it over here.  So there should be some flexibility there.

13         I think my take -- and again, you're covered on

14  compulsory counterclaims -- my take is that, for things that

15  are not compulsory, the rule should be you're directed to

16  Italy, but free to seek relief here in the U.S. from that

17  direction.

18         MR. KRAKAUER:  Okay.  So this order would make clear

19  that the U.S. Court has the ability to give you that relief.

20         THE COURT:  Well, to relieve you of the injunction's

21  channeling you to Italy.

22         MR. KRAKAUER:  Yes.

23         THE COURT:  Yes.

24         MR. KRAKAUER:  Okay.  Which it doesn't now.

25         THE COURT:  I understand.

1          MR. KRAKAUER:  Okay.

2          THE COURT:  Well, actually, the way -- that's not

3   true.  The way it was worded in Paragraph 7, I think you

4   could have read it to say that there was that level of

5   flexibility.  But I kind of threw a monkey wrench into it by

6   wanting it to be clearer here in Paragraph 3, and that led to

7   our last colloquy.  But I think that the record is clear on

8   what it should say.

9          MR. KRAKAUER:  Yeah.  I mean, Paragraph 7 does not

10  refer to the U.S. Court; it refers only to the Italian Court.

11         THE COURT:  No.  But it also doesn't say you must go

12  to Italy; it doesn't say that, either.  It just says nothing

13  interferes with the Italian Court's jurisdiction, so ... this

14  is going to be a little clearer, in that you're channeled to

15  the Italian Court, but with leave to -- as far as cross-

16  claims, counterclaims, et cetera, to seek --

17         MS. GOLDSTEIN:  It would be to seek relief, Your

18  Honor --

19         THE COURT:  To seek relief from the injunction.

20         MS. GOLDSTEIN:  -- in a court where the foreign

21  debtors --

22         MR. KRAKAUER:  From the U.S. Court.

23         MS. GOLDSTEIN:  -- have commenced an action.

24         THE COURT:  Correct.

25         MS. GOLDSTEIN:  No other court.

1          THE COURT:  Where the foreign debtors have commenced

2    the action.

3          MR. KRAKAUER:  Right.

4          THE COURT:  Yeah.

5          MR. KRAKAUER:  That's --

6          THE COURT:  Yeah.  And I expect that any U.S. Court

7    would apply the law that says. generally, you have claims

8    liquidated in the home bankruptcy court, but for principles

9    of judicial economy and convenience, et cetera, you may have

10   them all heard together under the right circumstances.  Okay.

11         MS. GOLDSTEIN:  Okay.  I'm sorry, Your Honor.  I

12   have to go back to where we were.  I think we've covered the

13   issues regarding the form of the injunction, at least as far

14   as I recall them.

15         THE COURT:  I think you have, although I had a

16   couple of questions on the form of it.

17         MS. GOLDSTEIN:  Yes.  Okay.

18         THE COURT:  I think you have covered these issues.

19         MS. GOLDSTEIN:  I have covered the Bank of America

20   issues.

21         THE COURT:  Right.  There's a footnote on Page 7,

22   Footnote 2 there.  Is that accurate, still?  Because it's

23   something I'm supposed to be saying in the order.

24         MS. GOLDSTEIN:  That is still accurate, Your Honor.

25         THE COURT:  Okay.

1          MS. GOLDSTEIN:  Amazing as that may seem.

2          THE COURT:  Okay.  And then if you turn to Page 9,

3   Paragraph 5, Paragraph 6, and Paragraph 7 I take it are all

4   agreed-to paragraphs with the parties who are referred to in

5   this -- in each of these paragraphs?  Does this reflect sort

6   of an agreed-to formulation?

7          MS. GOLDSTEIN:  Yes.

8          THE COURT:  In the first case --

9          MS. GOLDSTEIN:  I think this is the language we've

10  always had.

11      (Counsel confer.)

12          MS. GOLDSTEIN:  Yes.  Your Honor, I think this

13  language has been agreed to in connection with perhaps prior

14  orders, as well.

15          THE COURT:  Okay.  And I guess maybe this is as good

16  a time as any:  Paragraph 7 refers to the Noteholders?

17          MS. GOLDSTEIN:  Yes.

18          THE COURT:  I don't see --

19          MS. GOLDSTEIN:  No, you don't see anyone --

20          THE COURT:  -- their counsel here today, which --

21          MS. GOLDSTEIN:  That's good news.

22          THE COURT:  -- I have to say I'm rather pleased

23  about, although it's nice to seem them in a non --

24          MS. GOLDSTEIN:  I'm sure somebody is here --

25          THE COURT:  -- a non-court setting.

63

1          MS. GOLDSTEIN:  -- but just a different face, Your

2     Honor.

3          THE COURT:  Oh, okay.  All right.  Not Mr. Flaschen,

4     anyway.

5        (Laughter.)

6          THE COURT:  I'm happy to see Mr. Flaschen out of

7     court, but I'm glad he's not here today, since I assume that

8     means you've reached some sort of agreement with the

9     Noteholders.

10         MS. GOLDSTEIN:  Yes, actually -- yes.  Bingham still

11    represents the Noteholders; it's just different -- as I said,

12    a different face.  But we have finalized all the settlement

13    discussions with the Noteholders, with respect to the

14    conditional claims.  The documentation is complete.  We

15    expect full execution of the documents by the parties by the

16    end of the month.

17         And, Your Honor, just to be clear, we don't expect

18    any issues.  But if any problem comes up, but which requires

19    this Court's attention, then we jointly will seek an

20    appropriate hearing, but we do not expect that to happen.

21         THE COURT:  Okay.  And as far as the order is

22    concerned, this language in Paragraph 7 is -- you're not

23    objecting to it.

24         MS. GOLDSTEIN:  No.  No, they are not -- yes.  In

25    fact, this was requested by the Noteholders, so they're not

1   objecting to it, and I guess you should hear --

2           THE COURT:  Okay.

3           MS. GOLDSTEIN:  One other point, Your Honor, before

4   that.  The list of notes that are covered by this settlement,

5   which is on an exhibit that we have filed, and we filed with

6   this Court on prior occasions, there is one change, which is

7   that certain yen notes that were on the list have been taken

8   off because it turns out they had been satisfied under the

9   plan, so they're not part of the agreement any longer.

10          THE COURT:  Okay.  So is that "Schedule 1" that's

11  referred to here?

12          MS. GOLDSTEIN:  Yes, that's the Schedule 1.

13          THE COURT:  Okay.  All right.

14          MR. PERRAULT:  Yes, Your Honor.  Just to confirm.

15  Edward Perrault, Bingham McCutchen.  We are still

16  representing the Noteholders.  What Ms. Goldstein indicated

17  is correct.  We have a settlement with the conditional

18  claimholders.  All of the conditional claimholders are

19  finalizing their settlement agreements.  We don't expect any

20  issues with those settlements, we expect them to be

21  implemented soon, the distribution of shares, within the next

22  couple of months.

23          We are still representing the Article 2363

24  claimholders, the sole shareholders.  At this point, our

25  clients are still pursuing those claims in Italy.  We're

1    facing some strenuous objections that have been challenging,

2    to say the least, but we are pursuing those in Italy.

3        And as Ms. Goldstein indicated, to the extent there

4    are issues, we would like to reserve rights to come back to

5    your court jointly.  And I think that the order contemplates

6    that.

7        MS. GOLDSTEIN:  Yeah.  And, Your Honor, I just want

8    to make sure that we're in agreement that it's issues with

9    respect to the conditional claims settlement that the 2362

10   litigations is just proceeding in Italy.

11       MR. PERRAULT:  It is proceeding in Italy --

12       THE COURT:  All right.

13       MR. PERRAULT:  -- but of course, we'd like to

14   reserve our rights, as contemplated by the order, in case

15   circumstances change egregiously; on an equitable basis, we

16   would like to be able to come back.  I think that's

17   contemplated by Paragraph 9 of your proposed permanent

18   injunction order.  And our hope, Your Honor, is that we do

19   not have to come back.

20       THE COURT:  Okay.  All right.

21       MS. GOLDSTEIN:  Your Honor, we have no issue with

22   Paragraph 9.

23       THE COURT:  All right.  I understand.  So you're not

24   pressing the objection today.

25       MR. PERRAULT:  No, not at all.

1          THE COURT:  Okay.  And the PBGC, I saw their counsel

2    earlier.  I guess the colloquy on the record about how the

3    PBGC's rights were not being affected by this injunction

4    resolved the PBGC's objection?

5          MS. GOLDSTEIN:  Well, Your Honor, we -- I assume we

6    should hear from the PBGC.  But we do not agree with the

7    language that they have proposed --

8          THE COURT:  No, I understand.

9          MS. GOLDSTEIN:  Yeah.  Okay.

10          THE COURT:  I understand that.  But again, as I

11    understood it, the PBGC was concerned that this injunction

12    would preclude it from asserting a control group claim if in

13    fact there was -- which is now contingent -- if in fact there

14    was a deficiency in the U.S.A. debtors' pension plan.  Is

15    that right?

16          MR. MURRELL:  Well, Your Honor, we actually are more

17    concerned, Your Honor, with the fact that there are these

18    releases that are being given out to everybody willy-nilly

19    against the pension plan.

20          THE COURT:  But see, that's why we went through this

21    colloquy on the record about the scope of the injunction.  As

22    I understood it, the non-debtor entities, the non-foreign-

23    debtor entities, claims against them are not being enjoined

24    if they are independent or direct; so that, for example, if

25    some Brazilian subsidiary had control group liability under

1    U.S. pension law, and it was a non-debtor entity, this

2    injunction would not enjoin the PBGC from pursuing a claim

3    against that Brazilian subsidiary for the under-funding of

4    the pension plan if it ended up being under-funded.

5          It would enjoin the pursuit here in the U.S. of any

6    of the foreign debtors in respect of their potential control

7    group liability; in essence, it would provide that the PBGC,

8    like every other creditor of the foreign debtors, would have

9    to pursue its rights through the foreign composition.

10         MR. MURRELL:  Yes, Your Honor.  I guess that's where

11   the PBGC sort of has a big issue, in that the -- it's not so

12   much really even the control group members, Your Honor, but

13   more that the release is being given to non-debtors here, as

14   well.

15         You know, as we point out in our brief, Your Honor,

16   the professionals and everyone else, it's sort of identical

17   language, Your Honor, as to what happens to the releases that

18   were given in the bankruptcy of Parmalat Finanziaria's former

19   U.S. subsidiaries and --

20         THE COURT:  But I don't -- you have to point to --

21   what releases?

22         MR. MURRELL:  Well, Your Honor, we think that the

23   language that's used in -- you know, that's used in the

24   order, you know -- for example, Your Honor, as we point out -

25   - as we point out in our brief, we think if you look at the -

1  - and I'm working off of the order that was -- that was filed

2  at the time we filed our brief.

3          THE COURT:  Right.

4          MR. MURRELL:  But certainly, Your Honor, we think

5  that -- you know, that some of the release language, if you

6  look at Paragraph 3 and 9 of -- you know, of the proposed

7  permanent, you know, injunction order, give, you know,

8  releases to non-bankrupt -- you know, non-bankrupt entities,

9  affiliates, different people, Your Honor.

10          And our concern is that, Your Honor, we have not --

11          THE COURT:  I just don't -- but you're going to have

12  to be more specific than that.  I don't see any release in

13  here.  I do see an injunction of the composition debtors -- I

14  mean protecting the composition debtors and the liquidating

15  debtors, which are both subject to the Italian Court process;

16  and thirdly, subsidiaries and affiliates.  But we talked

17  about the subsidiaries and affiliates, and I think you're --

18          MR. MURRELL:  Well, Your Honor --

19          THE COURT:  -- there's no injunction of your claims

20  there, as far as the subsidiaries and affiliates are

21  concerned.

22          MR. MURRELL:  And about any professionals or any

23  other persons, Your Honor --

24          THE COURT:  Well, where does it say that?

25          MR. MURRELL:  Well, this, Your Honor, we're just

1    concerned that the --

2        THE COURT:  No, but you -- I don't -- you have to

3    point me to the specific language that's concerning you.

4        MR. MURRELL:  Your Honor, I apologize, Your Honor.

5    It's been awhile since we filed.

6        THE COURT:  Okay.

7        MR. MURRELL:  We filed this back in August of 2006 -

8    -

9        THE COURT:  Well, I'll tell you what.  Why don't I

10   hear from Mr. Krakauer on the B of A/BankBoston parties'

11   objections, and you can look for that language and then come

12   back to it.

13       MR. MURRELL:  Okay, Your Honor, and I'll --

14       THE COURT:  Okay.  That's fine.

15       MR. MURRELL:  Okay.

16       MR. KRAKAUER:  I'll move up here.

17       THE COURT:  Okay.

18       MR. KRAKAUER:  First, I want to thank you on the

19   scope issues.  I think we've gotten very, very far addressing

20   the concerns that we had, so I think there's not a need for

21   me to further address those, so I'll confine myself to the

22   *data certa* issues, which were the first part of our brief.

23       And with -- and for both -- if you aggregate Bank of

24   America and BankBoston, together these banks have in excess

25   of $266 million of claims which are presently in dispute, and

1  which were the subjects of this particular objection to this

2  304 relief.  And we believe that the manner in which the

3  foreign debtors have used the Italian principle of *data certa*

4  to seek disallowance of the banks' claim in the foreign

5  proceedings just is fundamentally inconsistent with what 304

6  requires, in terms of just treatment, that we not be subject

7  to prejudice or inconvenience in the processing of the

8  claims, and that distribution of proceeds to creditors be

9  substantially in accordance with what Title 11 provides.

10        And this is -- this is not, I should say, a broad-

11  based attack on *data certa*, saying that we're asking you to

12  find that *data certa*, as a principle, is necessarily

13  inconsistent with the Bankruptcy Code.  We're looking to how

14  it's been applied in this particular case, in these

15  particular circumstances by Mr. Bondi and the courts in

16  Italy.

17        And to give you just one graphic example -- and I'll

18  get to some others -- the foreign debtors are presently

19  asserting in the U.S. MDL proceeding before Judge Kaplan, as

20  they themselves admit, that they are challenging the banks'

21  loans to Parmalat and asserting that there was something

22  untoward about those loans, and therefore they're entitled to

23  large amounts of damages.  At the very same time in Italy,

24  the same foreign debtors are asserting that there's no proof

25  that the very same loans were in fact made prior to the

1    filing of their extraordinary administration proceeding.  And

2    that's not a case of asserting alternative legal theories;

3    it's a case of asserting in one forum affirmatively that Fact

4    A exists, and then going across the Atlantic and saying to

5    another court, we have no proof that Fact A exists, and we

6    think you should disallow this claim under that --

7              THE COURT:  But why should I get involved in that

8    dispute?  I mean, why don't you raise that issue with Judge

9    Kaplan in terms of judicial estoppel, for example, or with

10   the Italian Courts as saying that Mr. Bondi should be subject

11   to an equivalent doctrine there?  I mean, particularly since,

12   as Ms. Goldstein says, this isn't really a bankruptcy law

13   principle, per se, but a matter of general Italian civil law?

14             MR. KRAKAUER:  Well, let me address the Italian

15   question first, then I'll get to Judge Kaplan.  I mean, the

16   reason that you're required to look at it is because of what

17   304(c) says, in terms of the requirements that the debtor has

18   a burden of showing to come before it to get an injunction.

19   They have to show that we were given just treatment, and they

20   have to show that the processing of our claims is without

21   prejudice.

22             And what Treco says is you got to do a searching

23   analysis of what has actually transpired, and you have to

24   reach a decision of, was it a fair process, are they

25   proceeding in good faith or not.  Because there are numerous

1    courts which have also held that good faith is an essential

2    element of granting a 304 injunction.

3         So if they're doing things -- if they're handling a

4    proceeding with respect to the processing of our claim in a

5    way that is just fundamentally inconsistent with how we would

6    be treated under U.S. law, then it does implicate 304.  I

7    mean, that's what the statute says.  I mean, the real

8    question is:  What does this statute mean, and does it mean

9    what it says?  Because what it says is you don't grant a

10   304(c) injunction unless the debtor satisfies these elements.

11        THE COURT:  Well, but which elements are you

12   referring to?

13        MR. KRAKAUER:  I'm referring first to the just

14   treatment of our claims; just treatment in Italy.  And I'm

15   also referring to lack of prejudice and distribution.

16        THE COURT:  But as far as the just treatment is

17   concerned, you have taken positions and are taking positions

18   in the Italian Courts that you've won on and that you --

19   things that you haven't won on, you hope to win on.  I just -

20   - what things are the Italian Courts doing that are not just?

21        MR. KRAKAUER:  Well, no, I -- that's a fair

22   question, and I think Treco addresses that, too.  It's not

23   just a question of whether the Italian Courts give us due

24   process and procedures to make our arguments; it's also a

25   question of whether the Italian substantive law as it may be

1    applied in the case accords us just treatment and isn't

2    prejudicial to us.

3          What they are -- let me give you an example, just to

4    show you what they're arguing.

5          We have, in the case of what's referred to as the

6    "Cur transaction," the bank advanced more than $90 million,

7    and it was advanced through an entity called "Cur" and then

8    on to the debtor.  And that -- and it is not in dispute, they

9    don't dispute, either here or in Italy, the fact that that

10    advance was made.  What they are asserting is that because

11    the loan --

12          THE COURT:  Well, I want to focus first on the

13    Italian Courts.  Has the Italian Court ruled on *data certa*

14    with regard to the Cur transfer?

15          MR. KRAKAUER:  In the case of the Cur situation, the

16    Italian Court agreed with us in the first instance, in their

17    equivalent of the bankruptcy court -- it's not called a

18    "bankruptcy court" there, but the judge sitting in the first

19    instance in the extraordinary administration.  And then what

20    happened next is Bondi, through his affiliate, appealed that

21    --

22          THE COURT:  Okay.  But I want to focus first on the

23    Italian Courts and applying the law.

24          MR. KRAKAUER:  Okay.

25          THE COURT:  I mean, it seemed to me that your

1   argument prevailed on the Cur transaction.

2         MR. KRAKAUER:  It did prevail in the first instance,

3   that's correct.

4         THE COURT:  Okay.  So you're just mad that he's

5   appealed it.

6      (Laughter.)

7         MR. KRAKAUER:  We're here because we have an Italian

8   principle that's not the same as the U.S. principle.

9         THE COURT:  It doesn't have to be the same.

10        MR. KRAKAUER:  Well, no, but it's fundamentally

11  different, and it does have to be fundamentally consistent.

12  If it's contrary to --

13        THE COURT:  Well, but wait.  You're a litigator,

14  right?  I know you're a litigator.  You're fully aware of

15  what the hearsay rule is, for example, the best evidence

16  rules, rules on admission of documents, et cetera.

17        MR. KRAKAUER:  Right.

18        THE COURT:  How drastically different is *data certa*

19  from those rules, when you get down to it?

20        MR. KRAKAUER:  Drastically.  Drastically.  Let me

21  give you -- let me --

22        THE COURT:  Well, when you read it, it says:

23            "From the data on which other circumstances occur,

24            which establish with equal certainty that the

25            writing was drawn up previously."

1          That doesn't sound much different from the

2   exceptions to hearsay.

3          MR. KRAKAUER:  Okay.  Let me tell you how --

4          THE COURT:  The general exception to hearsay.

5          MR. KRAKAUER:  Let me tell you how -- what Bondi

6   says.  Okay?

7          THE COURT:  No, no, I want to focus on --

8          MR. KRAKAUER:  No, no.  It --

9          THE COURT:  -- how the Italian Courts apply this.

10         MR. KRAKAUER:  In this --

11         THE COURT:  Because I think -- I'll let you get to

12  how the debtor is pursuing the objections, but I think the

13  first thing for me to figure out is what, if anything, is

14  wrong fundamentally, if there is something wrong

15  fundamentally, with either how the Italian Courts are dealing

16  with these issues or the statute itself.

17         MR. KRAKAUER:  Okay.  I'll do the best I can, Your

18  Honor.  I'm not an Italian lawyer, and it is much easier for

19  me to focus on what I am familiar with, which is what I've --

20  what the parties in the case have asserted is the law,

21  because --

22         THE COURT:  Well, that -- but that's -- you know,

23  short of Rule 11, people can have very great arguments about

24  what the law is.

25         MR. KRAKAUER:  Well, but that's -- but the law --

1    that's what we're dealing with here, because what we're

2    dealing with is a situation where Mr. Bondi, who's a public

3    official -- I mean, he's not -- in this case, he is appointed

4    by the government, he is asserting -- he's running --

5            THE COURT:  The U.S. Trustee appoints American

6    trustees.

7            MR. KRAKAUER:  In a Chapter 7.  That's correct.

8            THE COURT:  And in an 11, unless there's a -- you

9    know, in consultation with the creditors.

10           MR. KRAKAUER:  Okay.  The reporting, as I understand

11   it, is a little bit different, in that he continues to report

12   to the various -- to the ministry of productive activities

13   through the case --

14           THE COURT:  Okay.

15           MR. KRAKAUER:  -- and has approval for what he does.

16   So it really functions much more as an administrative

17   function, my understanding is.  But here, let me go from what

18   I understand is happening here.

19           First, all witness, live witness testimony is being

20   excluded.  Okay?

21           Second, any bank records that are not notarized are

22   being attempted to be kept out.

23           THE COURT:  Attempted.

24           MR. KRAKAUER:  Well, so -- you know, I can just tell

25   you where this is going.

1           THE COURT:  No, I'm trying to --

2           MR. KRAKAUER:  Right.

3           THE COURT:  Again, there's a distinction between

4    what litigants -- what position litigants take and what the

5    courts are doing.  I think that's very important to me.  I'll

6    give you an example --

7           MR. KRAKAUER:  Yeah.

8           THE COURT:  -- because you want to get to Dr.

9    Bondi's conduct -- from my own experience as a lawyer.

10          We represented a debtor, United States Lines.

11   Prudential Insurance Company had a preferred mortgage on many

12   U.S. Lines vessels for $128 million.  They lent the money.

13   It was clearly intended that it be secured by these vessels.

14   They restated the mortgage.  In every mortgage there was a

15   typo, and instead of saying $98 million, it was $98,000.  As

16   a debtor, given the position of Prudential in the case, we

17   brought an action to avoid the mortgage.  Secured finance

18   lawyers all over the country were screaming, this is an

19   outrage.  But that's what the Bankruptcy Code lets you do.

20          We never knew whether we would win or not because

21   the matter was ultimately settled because there were

22   different views, not only among lawyers, but I imagine even

23   in Judge Buschman's head as to how it should turn out, so it

24   was settled.  So of course there can be different

25   interpretations of a law that may have drastic effects, but

1    that's why I'm trying to focus on how it's actually being

2    determined and applied, first.

3         MR. KRAKAUER:  Okay.  Well, let me give you some --

4    an actuality.  In the BankBoston situation, where the Court

5    did rule against BankBoston on *data certa*, Bank was able to

6    show its records that the loan was in fact made, had copies

7    of all the loan documents.  It had numerous correspondence

8    between the parties showing that the loan and guarantees were

9    made; okay, we attached some of that, that it was produced by

10   the debtor itself from its own records, showing that they

11   were acknowledging that the guarantees were executed.  There

12   were records of wire transfers to show that the loan was made

13   and such.  And all those were presented to the Court, and the

14   Court, notwithstanding that, abided by --

15        THE COURT:  Well, the ruling by the Parma Court only

16   refers to documentation produced by the bank, letters, and e-

17   mails; it doesn't say anything about wire transfers.

18        MR. KRAKAUER:  My belief -- and I -- if you want,

19   I'll check it.  I believe the wire transfers were filed in

20   the first instance, but I'll check that.  I know they're of

21   record.

22        THE COURT:  Okay.  Because again, I mean, this is --

23   as Ms. Goldstein said, this was a -- it hasn't been

24   determined who was involved in the fraud, but I think

25   everyone will agree that there was some significant fraud

1    here.  And so relying on the debtors' own records may not

2    necessarily, in this instance, be that probative.

3              MR. KRAKAUER:  Well, Your Honor, the one thing that

4    they have not said in any of their pleadings in this court is

5    they didn't come forward with an affidavit saying that they

6    have a good-faith belief that these loans may not have been

7    made or these guarantees were not executed.  That's not what

8    this is about.

9              THE COURT:  No, but see that's --

10             MR. KRAKAUER:  I mean --

11             THE COURT:  I understand that.

12             MR. KRAKAUER:  Yeah.

13             THE COURT:  But there's another exhibit here,

14   Exhibit 17 to your second affidavit --

15             MR. KRAKAUER:  Yeah.

16             THE COURT:  -- which is one where Bank of America

17   won.  And on the second page, the Italian Court seems to

18   apply the type of logic that you started out with, which is:

19             "The guarantee granted by Parmalat S.p.A. has a

20             certified date, as it has been expressly referred to

21             both by the trustee in the summons relating to the

22             action brought against Bank of America, and by

23             Pricewaterhouse in its reports.  Bank of America

24             must, therefore, be admitted to the bankruptcy

25             estate."

80

1          So, at least in that instance -- and you know,

2   courts can be wrong sometimes.  But this one, as far as

3   you're concerned, they're right.  So should I throw out an

4   injunction request in an instance where a court accorded you

5   this right and has applied what appears to me to be estoppel,

6   when perhaps -- although it's not clear to me what was

7   presented to the Court -- it was wrong, according to B of A,

8   in another instance?  I mean, it just seems to me that that's

9   really -- I'm really being asked there to step -- almost act

10  like an appellate court over this principle, an Italian

11  appellate court.

12          MR. KRAKAUER:  Okay.  No, I understand.  But let's

13  follow that out.  I mean, we're sitting here now, and one or

14  two things would happen if you let it go forward, right?  I

15  mean, either the Court ultimately agrees with the banks'

16  position, whatever it is, or it doesn't.  And if it doesn't,

17  that means that, notwithstanding the fact that these loans

18  were made, and that tens and, really, in this case, hundreds

19  of millions of dollars were advanced, we get treated in the

20  Italian proceeding on this claim as if we never advanced a

21  dime, and there's no -- because we couldn't prove -- quote,

22  "prove" under Italian jurisprudence that those loans were

23  made.

24          And to say that, okay, the Court may not come to

25  that conclusion, I don't think saves them.  Because the fact

81

1    is, is that it is just fundamentally -- our position is it's

2    just fundamentally inconsistent with 304(c)'s standards for

3    the Court to come to the position against us.  And because

4    that's what's going on, that Mr. Bondi is pursuing these

5    claims, which are not good-faith claims, we're being

6    subjected to that in the process.

7        And with respect to BankBoston, we're being denied

8    the present right to any of the distributions.  With respect

9    to Bank of America, with respect to one of its claims, it's

10   also being denied the right to a distribution; it's being

11   prejudiced by that.  And with respect to the other claim,

12   it's holding onto its shares to see what happens with that,

13   basically holding them in reserve.

14       But this is not something that can be addressed.  We

15   don't have the ability to come back before this Court three

16   years from now or four years from now, whenever it gets

17   decided, if it's decided adverse to us.  This is it.  I mean,

18   this is the 304 --

19       THE COURT:  Well, no.  You do have another option,

20   don't you, besides rolling the dice and litigating all the

21   way through to conclusion, and either winning a hundred

22   percent or losing a hundred percent?  Isn't it reasonably

23   clear to both sides, given the rulings on both sides of this

24   issue -- particularly the one I just quoted, which seems to

25   take the line right out of what you began with here, which is

1    they are asserting the exact opposite position in front of

2    Judge Kaplan --

3           MR. KRAKAUER:  Right.

4           THE COURT:  -- that both sides know that they could

5    lose?  And when both sides know they could lose, they can

6    factor that into all of their other calculations and settle.

7    And isn't that what the law is all about?

8           MR. KRAKAUER:  Your Honor, when this case -- when

9    this particular 304 proceeding started with our first

10   objection, one of the things that came up was the debtor was

11   saying we're trying to settle this.  And so you said, well,

12   I'll take settlement issues -- the settlement issues, I'll

13   make an exception, we'll hear that at the final hearing.

14   Okay.  So we're at the final hearing.

15          On the BankBoston side -- let's not get into Bank of

16   America, let's just -- obviously, that's a much more

17   complicated situation for all parties.  With reference to

18   BankBoston, they represented they were going to make a good-

19   faith effort to settle this thing.  We made a proposal.

20          THE COURT:  Well, I'm not saying they have to accept

21   it.

22          MR. KRAKAUER:  Well --

23          THE COURT:  But I mean, all I'm saying is that

24   there's a mechanism out there for parties to resolve their

25   differences.

1          MR. KRAKAUER:  It hasn't move one iota in this time;

2   that we never got a counter-proposal, they haven't -- they

3   made clear in the deposition, Mr. Chiara (phonetic) did, that

4   they had no intent of giving us one on the BankBoston side.

5   And it has not gone anywhere, other than it continues to be

6   litigated, period.  So there -- it shows no prospect of

7   settlement.  You asked the parties to make an effort to do

8   that; we did, and they have expressed no interest.

9          THE COURT:  Well, it just -- it seems -- it

10  certainly seems counter-intuitive to me that where there are

11  contradictory rulings on an issue, the parties wouldn't

12  consider a settlement at some point and, of course,

13  BankBoston has the recapture issue, so maybe the point isn't

14  now, but later, when that issue becomes more ripe, just like

15  the B of A becomes more ripe.  I don't know where you are in

16  terms of that litigation in front of Judge Kaplan, but it's

17  easier to settle something when you only have one issue.

18          My point was, it is really -- given the different

19  types of rulings that have been attached and the face of the

20  statute, can you really say that it's being applied in a way

21  that is fundamentally repugnant to U.S. notions?

22          MR. KRAKAUER:  Your Honor, I come back to the point

23  of it is fundamentally repugnant to U.S. law and U.S.

24  procedures for our loan claims to be disallowed on the basis

25  that we haven't been able to prove up that that alone, in

84

1   fact, exists, when they, in fact, can't dispute, in good

2   faith, that that's, in fact, the case.

3        I mean, that's what's repugnant.  And I submit that

4   it doesn't make any sense to say because we don't have a

5   final ruling on that case in Italy, we should just not

6   address it now, because if that's the result it is, it is

7   repugnant and that's what this particular debtor is asserting

8   that the results should be, and that's just -- that's not

9   just treatment.  I mean, that's what the statute requires.

10  It's their burden.

11       THE COURT:  But let me -- I mean, we talked briefly

12  about Treco.  If it's about anything, it's about protecting

13  collateral, security interests.  The Second Circuit

14  recognizes that security interests, at least ones like the

15  one in Treco, deserve some special attention.  And yet, a

16  Chapter 7 trustee and a Chapter 11 trustee can void a

17  security interest if you don't do the filing.  There's no

18  equitable exception.  It's gone.

19       MR. KRAKAUER:  And if it's a question -- there are

20  certainly lots of cases which -- and lots of analogies in

21  U.S. law where you talk about whether or not a party should

22  be entitled to a priority over another party, or a lien

23  interest, when other parties don't have a lien interest, and

24  what you have to do in order to give yourself either a

25  priority or a lien interest -- those cases, there's a ton of

1    them, and all sorts of different circumstances.

2              What there isn't, in U.S. law, is a circumstance

3    that anything like this, where one party loans money and the

4    Court says, "we're not going to even give you a claim --"

5              THE COURT:  Well, it's a guaranty, you remember.

6    It's not a loan.  It's a guaranty.  It's a third party

7    putting up its credit separately.

8              MR. KRAKAUER:  Well, but it's the same -- it's the

9    same --

10             THE COURT:  Just like the debtor would put up its

11   collateral to provide extra credit support.

12             MR. KRAKAUER:  Well, but all in the same

13   transaction.  These advances were all done in connection with

14   the guaranties.

15             THE COURT:  What do secured creditors get under the

16   composition?  What percentage?

17             MR. KRAKAUER:  There was -- you'd have to ask Ms.

18   Goldstein.  I don't recall anything with regard to secured

19   creditors, other than many get their collateral, but that may

20   be incorrect.  I have not focused on that.

21             THE COURT:  Do you know, Ms. Goldstein?

22             MS. GOLDSTEIN:  Your Honor, yes.  The secured

23   creditors basically receive the value of their collateral.

24   It's not --

25             THE COURT:  Whatever that is?

1          MS. GOLDSTEIN:  Whatever that is.  And I did want to

2  -- you brought it up before I could, that the fact that the

3  loan was made isn't relevant to the enforceability of the

4  guaranty, and I just wanted to make clear the distinction

5  between saying a loan was made -- all of the claims we're

6  talking about here were the guaranties.

7          THE COURT:  Guaranty claims get six percent?

8          MS. GOLDSTEIN:  Against Parmalat S.p.A., yes.

9  They're treated as an independent claim at the Parmalat

10  S.p.A. level, and not all of the claims of Bank of America

11  that were rejected were rejected on the grounds of *data*

12  *certa*.

13          THE COURT:  Right.  But you can certainly see a

14  situation where being deprived of a lien would deprive you of

15  more value than being deprived of six percent under this

16  composition.

17          MR. KRAKAUER:  Well, the law is not always

18  economics.  I mean, you could always say that if you take

19  away ninety-four percent of somebody's money, it's not as --

20  I mean, it's --

21          THE COURT:  No, I'm just trying to see, you know,

22  whether it's -- first of all, Ms. Goldstein made the

23  argument, which I think is fairly telling, that (c)(4)

24  doesn't really apply here because that refers to

25  "substantially in accordance with the order prescribed by

1    this title," and this is a civil -- it's not a bankruptcy law

2    provision.  So I'm sort of applying general notions of comity

3    to this point.

4           MR. KRAKAUER:  Can I address that, though?  Okay,

5    because I think it basically is a bankruptcy.  My

6    understanding is that is basically a bankruptcy provision.

7    What it is is tantamount to a hypothetical third-party-

8    creditor statute, so it basically says, for *data certa*, that

9    if you have a third party, it can make *data certa* arguments.

10   Much like in this country, obviously, if you have judgment,

11   meaning creditors in a hypothetical --

12          THE COURT:  All right.  But now -- I mean, this

13   isn't on a usual -- it's one of those unusual situations

14   where you're each kind of making the opposite point from what

15   you make in litigation, because as I understand it in the

16   litigation, you're saying that it's not a bankruptcy

17   provision, but it's available to third parties in other

18   contexts, right?

19          MR. KRAKAUER:  Well, there was a question --

20          THE COURT:  And I don't mean you.  I mean the

21   Italian counsel.

22          MR. KRAKAUER:  No, I understand.  There's a question

23   -- the Italian bankruptcy proceeding, with respect to

24   Parmalat is -- was -- is sort of *sui generis*, that it was

25   done under what's known as the Marzano Law, which was a

1   special provision that was enacted, essentially for this

2   case.  So the issue, as I understand it, that was raised in

3   the proceeding was not -- was whether or not, under this type

4   of *sui generis* proceeding, the *data certa* principle would

5   apply.  So it was much more narrow than Ms. Goldstein said.

6          THE COURT:  Okay.  All right.

7          MR. KRAKAUER:  So that was the issue.

8          THE COURT:  Okay.

9          MR. KRAKAUER:  Okay?  But I -- let me come back to

10  the fundamental point.  I mean, there are a number of cases

11  in this Circuit, <u>Multicanal</u> is one, and there's at least one

12  or two others, where they talk about one of the things that

13  has to be tested under 304(c) is the conduct of the trustee

14  or the debtor that's actually running the proceeding, and

15  whether or not that conduct is complying with Section 304(c).

16          So it is not just the question of criticizing, you

17  know, what the Court is doing or -- it's also a question of

18  analyzing their proceedings actually run, and that's right

19  here before us.  I mean, there is nothing -- what is being

20  done by the foreign debtors in this particular instance is --

21  would simply not be allowed under U.S. law.  The kinds of

22  assertions they're making and asserting one thing in one

23  place and making assertions that they've now admitted, for

24  instance, in their deposition, don't have a legal basis,

25  would be grounds in the United States for sanctions.  And for

1    them to -- for this Court, in that circumstance, to give 304

2    relief is just -- it's just not what 304(c) says.

3          Let me give you a perfect example of that.  For Bank

4    of America, when I took the deposition of Mr. Chiara, one of

5    the questions we asked about was his other settlements, and

6    he talked about the Arab Bank settlement.  I said:

7          "Well, on what basis did you approve and go forward

8    with the Arab Bank settlement?"

9          And he said, well, Arab Bank came up with a Centrale

10   Rischi, which is a database that's kept by -- that banks use

11   in Italy, and they submit information on loans into --

12   Centrale Rischi just means central risk.  It's run by the

13   Bank of Italy, and they -- he said they made a filing of

14   their loan with that database, and we determined, and we

15   quote this in our brief, we determined Parmalat, that that

16   legally satisfied *data certa*.  Well, it turns out we made the

17   same filings.  We attached an affidavit of Mr. Ribaldi

18   (phonetic) with those exact filings.

19         So you have an instance where they said --

20         THE COURT:  Has the Italian Court ruled on that yet?

21         MR. KRAKAUER:  The Italian Court has not ruled on

22   it, but in terms of what would be done under U.S. law, which

23   is what we look to in terms of consistency, you ask yourself

24   first the question, is it appropriate where somebody has --

25   knows that a position is not legally correct --

1          THE COURT:  But if that's before the Italian Court,

2     why should I step in on that?  Why should I assume that the

3     Italian Court is going to do something when it hasn't ruled

4     yet?

5          MR. KRAKAUER:  Yeah, in the two -- well, I have two

6     answers to that, but let me at least tell you factually where

7     it is, and there's two different Bank of America credits.  In

8     one case, that filing was made -- excuse me -- the evidence

9     was put into court, so it is before the Court.  In the other

10     circumstance, by the time that the deposition was taken, et

11     cetera, it was too late, I'm told, to supplement the evidence

12     in Italy, and they don't have as flexible rules on

13     supplementation as they might here in the United States.

14          So in one case, it's before a Court.  In the other

15     case, Mr. Bondi hid his legal conclusion under after the

16     evidence was already presented.

17          But here in the United States, it would end it.  You

18     would sanction somebody for continuing to proceed on that

19     basis, under Rule 11, if they admit that they don't have a

20     legal basis to make a contention.  And how -- isn't that one

21     of the more fundamental principles of U.S. law?

22          THE COURT:  Well, there's no such similar principle

23     under Italian law?

24          MR. KRAKAUER:  There's not one that I'm aware of,

25     Your Honor.

1          THE COURT:  But that's a different -- that's under -

2  -

3          MR. KRAKAUER:  That's not one that I'm aware of.  If

4  we thought --

5          THE COURT:  But you're not aware there isn't one,

6  either.

7          MR. KRAKAUER:  Well, I would say this.  I mean, if,

8  on our side, if we knew that this was going to end it in a

9  very straightforward way in Italy, and that it was all going

10  to be over, there would be no reason for me to be here.

11          THE COURT:  Well, I'm not sure I agree with that,

12  frankly.  I'm not unaware of the far more high-stakes

13  litigation that's going on in the District Court, and the

14  leverage that B of A might have in messing up this

15  injunction.  And I'm also not unaware of the fact that there

16  was a lengthy period where, unlike BankArab and the

17  noteholders, there doesn't appear to have been the type of

18  exchange of information between the Italian counsel

19  representing B of A and Dr. Bondi, than as there was with

20  BankArab and the noteholders.

21          I mean, there was a -- one of the reasons this was

22  delayed so long, this hearing, was to -- at my insistence, to

23  try to facilitate a non-judicial resolution of this *data*

24  *certa* issue.  Now, I know in your pleadings you say that you

25  were given the cold shoulder on that and the debtors

1   disagree, but it's really unclear to me who is to blame

2   there.  I mean, was there ever -- there's nothing in

3   evidence, from B of A's side or BankBoston's side, such as a

4   letter to the debtor saying, we can support our *data certa*

5   argument with the following, including the Centrale Rischi,

6   or however -- excuse my pronunciation.

7          I don't see that in the record.  I do see a letter

8   saying you tell us what you need, and then there was a

9   request for depositions, but, you know, it's one thing to

10  settle something before it gets into litigation, particularly

11  when you're a trustee in a fraud case.  It's another thing to

12  settle it after there's been litigation when you're a trustee

13  in a fraud case and you're settling with one of the main

14  targets of your fraud case.  So it's hard for me to really

15  balance who's entirely to blame here.

16         MR. KRAKAUER:  Can I address this point, Your Honor?

17         First, on the injunction point, I just want to be

18  absolutely clear.  We said this in our pleadings and in terms

19  of the relief we're setting here, we're not here trying to

20  up-end the plan or do anything like that.  What we've asked

21  for is very discrete relief.

22         THE COURT:  That's fair.  That is fair.

23         MR. KRAKAUER:  And that they could easily grant, and

24  is not going to harm their plan, so I just want to be clear.

25  We've never come in here and said what you ought to do, and I

1  was here where some other people were saying that at the last

2  hearing.  That's not what we're attempting to do.  If we got

3  our relief on *data certa*, we're done with this point, okay?

4         In terms of the settlement, I could tell you, based

5  on my personal experience, one is we did ask them -- we've

6  given them a ton of information.  There's been a ton of

7  information, frankly, filed of record in Italy.  I mean, you

8  can go --

9         THE COURT:  But when?

10        MR. KRAKAUER:  Well, it was done all throughout this

11  thing.  There have been filings -- loads of filings going --

12  and --

13        THE COURT:  But in a litigation context, or in a --

14  I mean, there's really very little here on the record that

15  goes to that issue.

16        MR. KRAKAUER:  But -- I'm sorry.  I didn't mean to

17  interrupt.

18        THE COURT:  No.  I mean, again, I just reiterate

19  that it's easier to settle, when you're a trustee, before

20  things get into court, sometimes, particularly on something

21  like this, it would seem to me.

22        MR. KRAKAUER:  Well, all I could say is, from our

23  standpoint, we gave them a ton of things and we asked them,

24  okay, we've given you all this.  I think it proves, without

25  question, that these loans were made and that we've satisfied

94

1  all your concerns.

2          THE COURT:  Well, but again, it's not really that

3  the loans were made.  It's that the guaranty was obtained by

4  a certain date.

5          MR. KRAKAUER:  Well, I know.  But on that point,

6  too, I mean, we gave --

7          THE COURT:  Okay.

8          MR. KRAKAUER:  -- a ton of documentation and we

9  never got anything back.  What we got back, simply, was what

10  you haven't given us as sufficient, and they never asked for

11  anything other than loans.

12          But let me -- they never said, give us A or B if you

13  have it, other than a notarization.

14          THE COURT:  Well --

15          MR. KRAKAUER:  Can I make one point, because I want

16  to be very clear on something, for Bank of America, because I

17  think there is a misunderstanding.  For the Bank of America,

18  two guaranties.  There was notarization on the actual

19  guaranties that were issued, so that's not what the *data*

20  *certa* is in respect --

21          THE COURT:  But no -- but again, on those two

22  guaranties, you won, right?  I mean, it's on appeal now by

23  Dr. Bondi, as you know.

24          MR. KRAKAUER:  We won one on Cur, and we didn't win

25  the one on the Bank of America loan, Brazil loan.  That was

1    ruled against -- that was ruled against us.  It was not ruled

2    against us on *data certa* grounds.

3         THE COURT:  Yeah.  It was on duplicate claims,

4    right?

5         MR. KRAKAUER:  It was on, basically, a duplicate

6    claim.  That's correct.

7         THE COURT:  So that's --

8         MR. KRAKAUER:  And then they --

9         THE COURT:  So that's clearly not foreign to U.S.

10   law.  I do that every day.

11        MR. KRAKAUER:  Well, it should have been resolved

12   out simply, but then on appeal, Mr. Bondi has pursued these

13   *data certa* claims, as well.  But the point I was making is,

14   it's not -- on these guaranties, these were guaranties.  What

15   Bondi is asserting is that even though the original loan and

16   the guaranties comply with *data certa*, they were transferred

17   along the way.  In one case, they were transferred from this

18   Cur entity over to Bank of America.  In another case, they

19   were transferred by Bank of America to under syndicate

20   members, and then back to Bank of America.

21        And he's taking the position that because of those

22   transfers, he doesn't owe anybody anything on those loans,

23   that that destroyed the right of anybody to recover, even

24   though the original loans complied with *data certa*.  And, I

25   mean, that's his position.

1          THE COURT:  But it hasn't even -- but this hasn't

2    even been -- that point hasn't even been litigated yet,

3    right?

4          MR. KRAKAUER:  Well, it's being litigated right now.

5          THE COURT:  But I mean it hasn't so far.  I mean,

6    this is something that -- it wasn't a basis for the Italian

7    Court to have ruled against you.  They didn't -- they ruled

8    in your -- against you on the one, based on duplicate claim,

9    and they ruled in your favor on the other.

10          MR. KRAKAUER:  Your Honor, I guess on that one you

11    come to the point of whether you measure Mr. Bondi's conduct

12    in determining whether 304(c) is satisfied.  I would agree.

13          THE COURT:  Okay.

14          MR. KRAKAUER:  The Court has not addressed that

15    issue.  It's been briefed, it's been argued, but it has not

16    been determined in Italy.  I would agree with that.

17          THE COURT:  Okay.

18          MR. KRAKAUER:  So my contention is you've got to

19    look at what Mr. Bondi's been doing.

20          And on the other one, the BankBoston, we did have a

21    ruling against us on that issue that we're now appealing, and

22    they have a hundred-and-twenty-some-odd-million dollars of

23    loans that they're not getting any distribution on, even

24    though, you know, they have wire transfers, they have

25    correspondence, they have all those different --

1          THE COURT:  Well, the loans -- again, they're not

2    getting distribution on the guaranty.  They are on the loans.

3          MR. KRAKAUER:  Well, the loans were -- well, they're

4    not on the loans, either, actually.  The loans were down in

5    Brazil, and that entity went -- is also in a proceeding, and

6    there's not been any recovery on it.

7          THE COURT:  Okay.

8          MR. KRAKAUER:  For the most part, that's where they

9    are.  So they haven't seen hardly anything on those loans.

10   So this is their primary -- for most of those loans.  Not a

11   hundred percent, but for most of them, this is their primary

12   source of recovery.

13         So can I get to what Mr. Bondi's -- so I can be

14   clear, for the record, what he is actually asserting in

15   Italy?

16         THE COURT:  Yes.

17         MR. KRAKAUER:  Okay.  I mean, he is -- because I

18   think it goes to all these points.  I mean, he's basically

19   saying that, all right, that you can't have any witness

20   testimony.  You can't use any bank records unless they're

21   notarized.  He's saying that the copies of the loan documents

22   themselves, if they are not -- not to be considered if

23   they're not notarized.  He's saying we filed wire transfer

24   records showing that the loans were made.  He's saying that

25   those should not be allowed.  The correspondence, including

1    from the debtor's files, as well as from the bank's files,

2    that indicate that the loans were done and the guaranties

3    executed, he's also saying should not be considered.

4         They have reports from his own professionals who

5    reviewed those business records.  That's a PwC report that

6    you referred to.  He's saying that those ought not to be

7    considered.  He's also saying that even orders of the

8    Brazilian Court, that found out that these loans were, in

9    fact, made, because when you had a Brazilian proceeding or

10   something, that ought not be considered.

11        I mean, basically, almost everything other than a

12   notarization or a government record he is seeking to exclude,

13   and he's saying if you don't have those, and the fact that

14   you advanced all these monies, you don't get any recovery

15   from me, and our position is that is just patently

16   inconsistent with the U.S. process.  There is no U.S. analogy

17   to that, in connection with that.  And --

18        THE COURT:  So if you were representing a trustee on

19   a lien avoidance action, you would agree to let the parties

20   who are at the closing testify that they meant to perfect,

21   but didn't, and that that should be meaningful?

22        MR. KRAKAUER:  Perfection and priority issues, I

23   think, are treated differently under U.S. law.  They just

24   are.  And those -- clearly, I would have no argument that,

25   dealing with the perfection issue, dealing with the

1    collateral rights issue, under those circumstances, that's

2    what U.S. law provides.  I mean, if you don't perfect, you

3    don't get your collateral.  If you don't do certain things to

4    record, sometimes you lose your priority.  But that's just

5    not true of unsecured claims.  That's just inconsistent.

6          THE COURT:  But in terms of -- I guess the reason I

7    asked it at that point was you were suggesting that he was

8    proceeding in bad faith.  I don't think you'd say that the

9    lawyer who objected to having the people at the closing

10   testify would be proceeding in bad faith by making that

11   objection.

12         MR. KRAKAUER:  I think the lawyer -- that somebody

13   does proceed in bad faith, under U.S. law, where they know a

14   fact is to be true, they assert the fact as not true, and

15   they make contentions that they know just not to be grounded

16   in fact.  I mean, that's what Rule 11 is all about.

17         THE COURT:  But again, it is true that the parties

18   meant, in my hypothetical, to perfect.  They just didn't.  As

19   a legal matter, they didn't do it.  Is his position any

20   different than that, other than the judicial estoppel point

21   you made earlier, which I -- I understand that point.

22         MR. KRAKAUER:  Well, I don't -- it's just not

23   analogous.  I mean, the fact -- there's no analogy, under

24   U.S. law, where somebody is deprived of a claim, just a

25   general, unsecured claim, by failure to go through a hoop.

1    THE COURT:  No.  Again, I'm going beyond the U.S.

2    law versus Italian law point.  I'm really talking about the

3    good-faith point.  I'm having a hard time seeing how he's

4    proceeding in bad faith if he's asserting a reasonable

5    interpretation of the statute.  And then I guess, ultimately,

6    I'm having a hard time seeing whether or why I should step in

7    at this point if he's not, for some reason, given that it's

8    all in front of the Italian Court and you can make the

9    argument there that he's not acting in good faith.

10    MR. KRAKAUER:  Well, Your Honor, I'm not sure that

11    that argument is available to us in Italy.

12    THE COURT:  But again, it's rare that there isn't

13    some sort of equivalent, particularly where someone's at a --

14    in a fiduciary position, under the control of, in this case,

15    a ministry, but appearing in front of a court, that they --

16    and his counsel is certainly appearing in front of the court

17    -- that you don't have some regulations about conduct.

18    MR. KRAKAUER:  Well, but he's not --

19    THE COURT:  They may not have Rule 11, but there's -

20    -

21    MR. KRAKAUER:  But he's not going to court and

22    saying -- in Italy and saying, I acknowledge these loans were

23    made and I acknowledge these guaranties were signed, but

24    because of this particular element, then this person doesn't

25    have a good claim, and the element missing is the lack of

1    notarization.  He's not saying that.  He's basically saying

2    there's no proof that the loan was -- that these documents

3    were actually executed.  That's what he's saying.  He's not

4    raising the narrow legal point that you hypothesized of

5    because somebody didn't perfect.  Now --

6         THE COURT:  Well, where is that in the record?  I

7    don't necessarily see that in the record.  I mean, the key

8    phrase here, and it's an English translation, so it may have

9    a different gloss in Italian, but the key phrase is

10   "establish with equal certainty that the writing was drawn up

11   previously."  So it's more than just establish.  It's

12   establish with equal certainty.  So that calls in all sorts

13   of -- an extra layer of proof than just sort of simple proof.

14        The Italian legislature made a decision, you know,

15   sixty-five years ago that -- for these types of obligations,

16   where they're being asserted against third parties, you need

17   extra proof.

18        MR. KRAKAUER:  Well, and Mr. Bondi has discretion

19   about how -- about circumstances under which he should or

20   should not go forward with that.  Again, I'm not -- I'm not -

21   -

22        THE COURT:  I just -- I'm having a hard time seeing

23   why his exercise of that discretion in this case is the

24   equivalent of the substantial maladministration that occurred

25   in the <u>Treco</u> case.  They just seem to be so far apart from

1  each other.

2          MR. KRAKAUER:  We're being deprived of the ability

3  to share pro rata, which is one of the --

4          THE COURT:  But he's exercising his discretion.  He

5  has discretion to do that, right?

6          MR. KRAKAUER:  But he's exercising it in a way where

7  he's taking a position that he knows is not true.

8          THE COURT:  But that seems to be begging the

9  question, not true under the statute, or not true on some

10  sort of general metaphysical sense?

11          MR. KRAKAUER:  Well, not true as a factual matter.

12  It's not general metaphysical.

13          THE COURT:  No.  I'm saying "not true under the

14  statute?"  Again, as a factual matter, people may think that

15  they intended to perfect the lien, and as between the debtor

16  and them, it is perfected, but as between third parties and

17  them, it's not.

18          MR. KRAKAUER:  But there's an underlying factual

19  predicate.  That's the difference.  I mean, a knowing factual

20  predicate is, was this guaranty and loan documentation

21  executed or not prior to the filing?  And my point is that

22  there's not a good-faith dispute as the underlying factual

23  predicate, and you need that.  And that's what I'm saying, is

24  it doesn't constitute just treatment, and that's why we're

25  being prejudiced, because he's proceeding without a good-

1    faith belief in that factual predicate.

2              And that's why it's also not a broad-based attack on

3    *data certa*.  There may well be situations where a trustee is

4    sitting there, unsure whether or not something is actually --

5    was actually done, and for *data certa* to be applied in that

6    circumstance is in a completely different situation.  But

7    here, that's not our case.  I mean, he doesn't have that

8    factual belief and it just -- we know that because of what

9    he's filed here in the United States, and there's numerous

10   other examples.  It just -- how can he proceed and argue

11   something factually he knows is not the case?

12             THE COURT:  Okay.

13             MR. KRAKAUER:  Thank you, Your Honor.

14             THE COURT:  Yes?

15             MR. GINSBURG:  Larry Ginsburg, Moses & Singer, for

16   ABN AMRO Bank.  We're a relatively small player here, but a

17   purer player.  We have no other gripes with Parmalat.  We are

18   not litigation adversaries.

19             ABN AMRO made a loan in New York for $10 million.

20   It was guaranteed by Parmalat.  The document is a simple,

21   one-page document, virtually identical to other ones, as the

22   Court has seen in these proceedings, most recently the one in

23   favor of Israel Discount Bank.

24             That guaranty provided, in very clear tones, that it

25   was to be governed by the laws of New York, and that the

1    enforcement of disputes under the guaranty were to be held in

2    New York.

3         There is no question -- I don't want to tread over

4    old ground here, but the guaranty itself was signed by the

5    executive of Parmalat.  That signature was witnessed by a

6    separate Italian bank in Italy.  The document was received at

7    ABN AMRO.  It was pressed into the computer system, with the

8    control system, with federal regulatory supervision.

9         The claim was asserted.  All of the proof was

10   provided, both formally and informally, to Parmalat's

11   representatives.  The claim was denied.  Your Honor raised

12   the question as to --

13        THE COURT:  Well, they say that you didn't submit

14   the Centrale Rischi database.

15        MR. GINSBURG:  That may well be the case.  This is a

16   loan made in New York, to be governed by New York law.

17        THE COURT:  But doesn't -- hasn't the Second Circuit

18   been clear for decades that that doesn't matter in a

19   bankruptcy case -- that choice of law, choice of forum

20   provisions don't prevent us from granting comity to a foreign

21   court in its claims procedures?

22        MR. GINSBURG:  Yes, but we think, when it comes to

23   an interpretation of a document, the law that the parties

24   agree to should be the law that governs that interpretation.

25   And the difference between Your Honor's suggestion before,

1  the UCC question, that both sides intended for security to be

2  valid, but that there was avoidance possibility, that

3  avoidance possibility was set forth in a law that both

4  parties would have had knowledge of and it would have been

5  reasonable for those parties to consider that law.  Here, you

6  have an interpretation of contract, a document signed, to be

7  governed by New York law.

8       THE COURT:  No, but the law that really hurts isn't

9  the UCC.  It's 544 of the Bankruptcy Code, because as between

10 the debtor and the reputedly secured party, the debtor is

11 going to be estopped.  It's only where third parties become

12 involved, and you get the good-faith status of a trustee that

13 you're in trouble, so I'm not sure that goes that far.

14      MR. GINSBURG:  Maybe not, but I still think it's

15 fundamentally difficult for this Court to say to ABN AMRO

16 Bank and to other banks that made loans in the United States,

17 based upon documents that called for interpretation under New

18 York law, with no other relationship with third-party

19 witnesses, with computer-generated proof of dating, all of

20 which has been rejected by the Court.  The Court in Parma

21 said that your own -- you may not hire an expert to prove

22 that your computer-generated dating system was valid.  You

23 may not show --

24      THE COURT:  I'm sorry.  I thought your -- isn't your

25 matter still being litigated?

1            MR. GINSBURG:  It is being litigated, but the Court,

2    as I understand it presently, has prevented the bank from

3    proving certain things.  It has prevented the bank from

4    presenting witnesses from the third-party Italian bank that

5    witnessed the signature.  It has prevented the bank from

6    presenting proof of its own internal computer-generated

7    system, and it has prevented the bank from adducing proof

8    from the debtors' records.

9            And yes, it is theoretically true that this action

10   is still pending, but no one believes that it's going to come

11   out any way but in favor of Dr. Bondi.

12            THE COURT:  Okay.

13            MR. GINSBURG:  So again, not to interfere with the

14   statutory scheme, with the compromise, with what Counsel is

15   trying to accomplish in America, we don't see why this Court

16   can't fairly deal with a statutory scheme while prohibiting

17   what is a fundamental, unfair and repugnant result, which is

18   a guaranty signed, dated on its face, independently verified,

19   and subject to independent verification, where the Court,

20   imposing a law, fails to give the type of credibility that

21   any U.S. Court would give.  We don't see why that can't be

22   excluded from the injunction, and why the injunction can't be

23   conditioned upon the disallowance of the *data certa* defense

24   as against ABN and other banks similarly situated.

25            I understand that last time we were here, IDB raised

1   a similar claim, and to some extent ABN adopted its legal

2   arguments.  IDB is not here arguing today.  My assumption is

3   that IDB has made a settlement with Dr. Bondi.  When I asked

4   our Italian counsel to obtain copies of that, they said such

5   things are not filed and are not public.

6            So when the Parmalat situation arose, my

7   understanding is that there were numerous banks in New York

8   similarly situated, which basically loaned against identical

9   instruments.  I can't tell you why ABN is the only bank here

10  today.  I find it quite mystifying, but the documents are

11  identical.  My guess is the proof is identical, and whether

12  it's the bad faith of Dr. Bondi or the lack of due process in

13  the court or both, the unmistakable fact is that a U.S.

14  creditor, ABN AMRO Bank, is not being treated fairly, is

15  being treated differently than it would in any court in the

16  United States if it brought in such a note and guaranty.

17  Thank you, Your Honor.

18            THE COURT:  Okay.

19            MS. GOLDSTEIN:  Your Honor, I don't know if there is

20  anyone else here to object, but I'd like to make a few

21  remarks in response.

22            THE COURT:  Okay.

23            MS. GOLDSTEIN:  ABN -- I'll start with them -- AMRO

24  Bank, N.V., I didn't presume to be a U.S. creditor.  They

25  obviously operate internationally.  Maybe this loan was made

1    from their New York office, and the document said it was

2    governed by New York law, but the fact is, this is a bank

3    that operates all over the world, I have no doubt, makes many

4    loans in Italy.  This provision of Italian law is not unknown

5    in commercial transactions, and Dr. Bondi, in the case of ABN

6    or in the case of B of A, is not taking positions that Dr.

7    Bondi knows to be false.  Dr. Bondi is taking positions

8    consistent with a statute that has to do with the steps

9    required to assure enforceability of a claim against a third

10   party.

11         Neither -- without the notarization, Dr. Bondi is in

12   a position where he is obligated to challenge.  In the case

13   of Arab Banking, there was a -- I can't pronounce it either,

14   central bank, you know, independent verification that was

15   provided, and Dr. Bondi didn't rule.  He determined that it

16   made sense to make that settlement with Arab Banking.  Israel

17   Discount Bank submitted various documents in Italy, all these

18   documents are in Italian, and a settlement was reached.

19         Your Honor, I don't think that --

20         THE COURT:  Has ABN provided Dr. Bondi with the same

21   types of documents?

22         MS. GOLDSTEIN:  ABN has provided documents.  Not the

23   same documents, Your Honor.  Every situation is quite

24   different, but, Your Honor, there are many, many pending

25   objections based on *data certa* and other things that are

1    currently pending before the bank -- before the Parma Court,

2    not just ABN AMRO.  It's not as though they are the only

3    lender out there that has a claim subject to objection, and

4    their claim has not yet been resolved.  There is a process in

5    Italy.  Their counsel comments on -- you know, and I can't

6    comment because I'm not privy to what the Court ruled in

7    terms of admission or non-admission of evidence, but I think

8    that this is a -- it is similar to a perfection statute in

9    that in order to assure enforceability of a guaranty or a

10   claim against a third party.

11         So the guaranties here, if Parmalat hadn't gone into

12   Italian insolvency proceedings, would have been enforceable

13   against Parmalat.  But now we have the equivalent of a

14   trustee acting under 544.  And so you would have had to

15   comply.  And we know, from the record in this case, that

16   various Italian counsel know about this and advise their

17   clients about this.  It's not something that was so difficult

18   to accomplish.  And I don't think that ABN can claim that it

19   was a secret.  I mean, I got that implication.

20         And, you know, to argue, just moving to Mr, Krakauer

21   for a minute, that Dr. Bondi is somehow taking positions that

22   he knows to be untrue, he's taking positions consistent with

23   the requirements of a Civil Code provision.  As to what

24   evidence -- I mean, lawyers and clients -- well, lawyers, for

25   their clients, make objections to evidence all the time as

1   not sufficient under one statutory provision, one evidentiary

2   rule, or another.  This happens to be a statutory provision.

3        And a lot was said about not -- Dr. Bondi admitting

4   that a loan was made.  Well, you know, a loan may have been

5   made, but we're talking about in the largest fraud case,

6   certainly in Europe, that I'm aware of, where the parties who

7   are signatories to all of these have been implicated in the

8   fraud, a situation where compliance may have to be more

9   stringent.  If you're the trustee in a case where parties are

10  putting forth documentation on guaranties which, by the way,

11  in some cases, were a couple of months prior to the collapse,

12  you have to question them, particularly if you have a

13  statutory basis to do so.

14       And by the way, with respect to guaranty claims, in

15  a U.S. bankruptcy case, if there's a fraudulent transfer,

16  avoidance of a guaranty is a fraudulent transfer, that whole

17  claim is gone, so that does happen, and the New York Court of

18  Appeals usury case that I mentioned, where the lender thought

19  they were making a -- thought it was making a loan that was

20  not usurious, but ended up, guess what, it was.  They had no

21  ability to collect that loan, because it didn't comply with

22  New York law, a state law that governed compliance with the

23  loan, or governed compliance and then recovery of the loan.

24       So this is not anything extraordinarily harsh,

25  anything that we would say, "oh, my God" to.  This is a

1    situation, a statutory matter under the Italian Civil Code,

2    which has many analogs, many analogs under U.S. law,

3    particularly state laws that affect property rights, that are

4    respected when you try to assert a claim against a trustee in

5    a U.S. bankruptcy case.

6            The -- excuse me, Your Honor.  I don't think I have

7    that much to add on the Cur trans -- the Cur Holdings

8    transaction.  I think that's been fully described in our

9    brief.  Bank of America prevailed with respect to the claim

10   in that case, Parmalat Pacific.  It took an appeal.  Dr.

11   Bondi joined in the appeal.  Bank of America argued that Dr.

12   Bondi -- that the Parmalat Pacific appeal was inappropriate.

13   Italian court took that up and ruled against Dr. Bondi.

14           BankBoston has argued about the good faith of Dr.

15   Bondi in asserting *data certa* because it claims its loans are

16   -- that Dr. Bondi has admitted its loans, via the claw-back

17   action, so those issues of what type of assertion is

18   appropriate are being asserted in the Italian Court.

19           And, Your Honor, in litigation, at least as I've

20   seen it in Bankruptcy Court and outside of Bankruptcy Court,

21   you put forth whatever arguments you have, so long as they're

22   not frivolous, so long as you don't state something that you

23   don't believe to be true, but if you think you have a good

24   argument under a statute, remember, we're talking about the

25   date of the guaranty being proved to be a date certain, and

112

1    it has to be done in certain ways, so even if you admitted

2    that the loan was made, that may not be applicable to the

3    guaranty.

4         And as Your Honor pointed out, and as we would point

5    out ourselves, that the Bankruptcy Court or the Parma Court

6    does take note of matters that are before the courts, that

7    could create judicial estoppel.  And so, to argue that the

8    Court or the process is unfair is refuted by the very

9    evidence that we have in this record.

10        Now, I will tell you that in Treco, that if that

11   were a situation where a secured creditor, a U.S. secured

12   creditor had failed to perfect on collateral in the local

13   jurisdiction, I don't think the Second Circuit would have

14   ruled the same way.  It had a valid, perfected, secured

15   claim, and the priority scheme was upside down, putting

16   administrative creditors ahead of the valid and perfected

17   secured claim.

18        But if that creditor was trying to claim collateral

19   in the Bahamas, I think it was the Bahamas, and they didn't

20   perfect in accordance with the laws of the Bahamas, the

21   Second Circuit wouldn't care.  That would be too bad, because

22   they didn't perfect their collateral interest.  But that's

23   not the Treco case.  If that were the case, it would be more

24   analogous and, you know, if the Second Circuit had thought

25   something was wrong with that, that could be more analogous

1    to this, but it's not.

2          Your Honor, I would just point out that I think this

3    was clear, but I want to make it extra clear, that Dr. Bondi

4    is not in control of the Brazilian insolvency proceeding.

5    That's a long story in and of itself, but how claims are

6    admitted in Brazil is not something in Dr. Bondi's control.

7    BankBoston, I'm not even sure, has claims against the

8    Brazilian entity.  We know they have claims against the

9    Chilean and the African entities, but Dr. Bondi is not

10   interfering with the pursuit of claims against those

11   entities, and if there is recovery, there is and if there

12   isn't, there's not.

13         In the same way that as with ABN AMRO, we had agreed

14   very early in this proceeding that they could proceed to sue

15   Wishaw, the Uruguayan entity, on their primary claim.  I

16   don't know how that turned out.

17         MR. COMET:  And they got a judgment.

18         MS. GOLDSTEIN:  They did get a judgment.  But, Your

19   Honor, those are things that Dr. Bondi is not involved in,

20   and so, I just wanted to make sure that we do not mix up the

21   loan and the Parmalat S.p.A. guaranties.

22         Your Honor, overall, just to conclude, I don't think

23   that anything has been brought to this Court that would

24   indicate that Section 304(c) standards have not been

25   satisfied.  There is nothing in the Italian bankruptcy scheme

1    that is repugnant to U.S. law, the *data certa* principle a

2    non-bankruptcy, Civil Code provision, not that different in

3    how it's applied to U.S. analogs of state law, and even

4    though the statute doesn't even require that, I mean, I think

5    that's something that we did address, and we feel is

6    analogous.

7         And as for the conduct of Dr. Bondi complained of by

8    Bank of America, we really could not follow, to be honest,

9    any situation, or didn't hear any situation identified by Mr.

10   Krakauer, that could rise to the level of sanctions.  This is

11   an advocate.  They don't like his advocacy.  I don't like the

12   Bank of America advocacy, but I'm not complaining and saying

13   that they're acting in bad faith.

14        Mr. Krakauer is an aggressive litigator.  I

15   understand that.  We've been barraged with reams of

16   unnecessary discovery.  We've talked to you about it a number

17   of times, but we didn't say he should be sanctioned.  We

18   didn't say it's bad faith.  And Dr. Bondi is no different.

19        And for the PBGC, I guess we ought to wait to hear

20   more from the PBGC, but I would say that this injunction does

21   not bar any control group claim against Parmalat S.p.A.

22   should one ever arise, but just like every other creditor, it

23   would have to be asserted in the Italian proceeding.

24        THE COURT:  Okay.  Let me just hear from the lawyer

25   for the PBGC.

1          MR. MURRELL:  Thank you, Your Honor.

2          THE COURT:  Sure.

3          MR. MURRELL:  Vicente Murrell, again.

4          Your Honor,  I have to apologize.  I'm looking at

5     this.  I think I was looking at two separate versions of the

6     order and, in fact, when I drafted -- when I drafted and when

7     this was filed, it actually probably references different --

8     probably different paragraphs, so my sincere apologies to

9     Your Honor.

10          THE COURT:  Well, they probably listened to your

11     first objection, so ...

12        (Laughter.)

13          THE COURT:  They probably amended it in light of

14     your first objection, so I think your issues are covered,

15     then?

16          MR. MURRELL:  Well, Your Honor, I guess.  The

17     situation here, Your Honor, the way PBGC looks at it is that,

18     see, there's two issues here.  One is that what PBGC, I guess

19     -- what we look upon as a release and what the debtor called

20     -- you know, calls channeling, and I guess the other would

21     be, you know, the possible -- the 306 language at the end of

22     the order regarding the professionals.

23          Your Honor, although the debtor cleverly couches

24     what they're asking the Court to do as channeling, they're

25     somewhat extraordinary, Your Honor, from our -- you know,

1   from the standpoint we think of U.S. law, in that yes, we're

2   a creditor, a potential creditor, Your Honor.  We have, you

3   know, potential -- we have contingent claims, but unlike all

4   other creditors in this case, we're a government agency, Your

5   Honor, and we're basically -- what the debtor is asking here

6   in this -- you know, in this permanent injunction order, is

7   for the Court -- the Court -- a federal court to tell a

8   federal agency, you bring your claims that arise under U.S.

9   law and your enforcement authority under U.S. law, and go to

10  a foreign court and ask the foreign court to then, you know,

11  to then adjudicate U.S. claims that arise under U.S. law and

12  to enforce United States law.  And to us, Your Honor, that

13  seems, you know, somewhat a -- it seems somewhat

14  extraordinary and it also seems to be vile -- you know, seems

15  to go against established case law.  Now, Your Honor --

16          THE COURT:  What case law?

17          MR. MURRELL:  Well, Your Honor, I apologize.  This

18  is not cited in the brief, but, you know, we think, Your

19  Honor, in the Supreme Court, Your Honor, in U.S. v. Spelar,

20  and I'll give you the cite, Your Honor, because again, I

21  apologize, this has not been a front-burner case of mine, and

22  that's not -- and that's my fault, Your Honor.  That's not

23  the agency.  I take personal responsibility for that.  338

24  U.S. 217, Page 221.  The Supreme Court has said that absent

25  legislation, you know, waiving, you know -- specifically

1  granting or waiving, you know, immunity, that U.S. law --

2  that U.S. liabilities are not to be placed in the hands of,

3  you know, the hands of some foreign -- some foreign entity,

4  and that, Your Honor, is what is happening, you know.  And

5  essentially here -- that's what's happening here, Your Honor.

6  And it's not somewhat -- it's not really just, you know, a

7  hypothetical, when, you know, when we -- when I say this,

8  Your Honor.  Because, I mean, yeah, the claims are

9  contingent.

10       But, Your Honor, if you play it out, Your Honor,

11  what happens?  Let's say a plan, one of the pension -- one of

12  the six pension plans that were formerly in the old Parmalat

13  control group --

14       THE COURT:  No.  I understand there's a possibility

15  of asserting a claim eventually.

16       MR. MURRELL:  Yes.

17       THE COURT:  That's fine.  But I still don't -- I've

18  never seen a case that carved out governmental agencies from

19  an injunction under 304.

20       MR. MURRELL:  Your Honor, you know, maybe I -- you

21  know -- maybe we didn't discover it in our research, but we

22  don't see any -- we have not seen any cases where a federal

23  agency has to go and say -- if the agency decides to debar

24  someone, they can't do any additional federal work where they

25  have to -- you know, where they have to go overseas and go

1    into a foreign court to get -- you know, in order to have

2    that adjudicated.  I mean, certainly there are a number of

3    Internal Revenue cases, Your Honor, where the -- you know,

4    the Service has tax liability -- or asserts tax liability

5    against entities, and they don't go into foreign courts, Your

6    Honor, to -- you know, to litigate, you know, U.S. tax

7    liability that arises under United States law.

8            Similarly here, that's what would happen, Your

9    Honor.  If a plan -- one of the pension plan -- one of the

10   six pension plans fifty million -- it was under funded by $50

11   million, and terminated tomorrow.  Well, Your Honor, let's

12   say we find out that something -- you know, some fiduciary

13   breach has been committed by, you know, Parmalat Finanziaria

14   or one of the entities being released -- being -- you know,

15   that's being released or channeled, as the debtor would have

16   it, channeled over to the Parma Court.

17           Well, Your Honor, what then would we have to do?

18   Instead of normally coming into court where ERISA says we're

19   supposed to, ERISA says that we've -- that PBGC is

20   specifically -- Congress has said that we are to litigate and

21   bring our cases in federal District Court.

22           What would happen then, under -- you know, under

23   this scenario, Your Honor, is that we would then be forced to

24   go to the Parma Court and then bring an action there under --

25   you know, under ERISA, in an Italian Court, you know, to have

1   -- to -- you know, determine what our damages are and to

2   potentially bring an action, say, to either, you know, debar

3   someone, you know, get some extraordinary order against them

4   to say -- or a prohibition against them or a cease and desist

5   order against --

6           THE COURT:  Well, wait, wait, wait.  This is just to

7   pursue claims, right?  I mean, I --

8           MR. MURRELL:  Well, Your Honor --

9           MS. GOLDSTEIN:  Your Honor, this is just the

10  possible monetary claim, and frankly, if there were never a

11  bankruptcy of Parmalat S.p.A., and just a bankruptcy of

12  Parmalat USA, the PBGC would probably have to go to Italy to

13  get jurisdiction over the assertion of a claim against

14  Parmalat S.p.A.  This is not --

15          THE COURT:  Also, Paragraph 9 of this order, if

16  you're actually asserting police power, Paragraph 9 would let

17  you come back to this Court and if you had some concern that

18  the -- you were stayed, you could come back on that grounds.

19          MR. MURRELL:  So far, monetary claims, Your Honor,

20  and just to make a clarification, if Parmalat Finanziaria

21  never went bankrupt, Your Honor, we still could pursue that

22  here in the United States.

23          THE COURT:  Not if they didn't do business here.

24  You wouldn't be able to --

25          MS. GOLDSTEIN:  No.

1          MR. MURRELL:  Well, if they had assets here, Your

2    Honor.

3          THE COURT:  -- get jurisdiction over them.

4          MR. MURRELL:  If they didn't have any presence here

5    at all, we wouldn't be able to.  If an entity has --

6          THE COURT:  I mean, in a way, this gives you an

7    advantage, because you can actually go into their case and

8    actually collect something.

9          MR. MURRELL:  Well, Your Honor, you know, we could

10   have -- what Your Honor is saying -- that yeah, we could be

11   channeled in over there, Your Honor, but if we had -- if, you

12   know, Parmalat Finanziaria owns this piece of property here

13   or has an account, and, you know, what this is ordered is

14   saying that, well, PBGC, you can't touch that until -- you

15   have to go to the Parma Court, as opposed to normally, we

16   would be able to go into federal court, you know, get the

17   plan terminated.

18         THE COURT:  I think I've heard enough of this one.

19         MR. MURRELL:  Okay.  Thank you, Your Honor.

20         THE COURT:  Just briefly.

21         MR. KRAKAUER:  Very brief.  I'll make it very brief.

22         I just wanted to point out one thing, just in

23   response to what Ms. Goldstein said.  She indicated that

24   maybe there was some question on the guaranties, that there

25   was, with respect to the loans.  In the particular footnote

1   that they have to their brief, they quote out of their

2   complaint, and their complaint specifically asserts that the

3   Cur loan was guaranteed by Parmalat S.p.A. That's in their

4   own pleading, own compliant.

5        And then, with regard to the other Bank of America

6   loan, I'll just read you what another pleading before Judge

7   Kaplan is. There's an answer where -- to our counterclaim.

8   The counterclaim assertion is on July 5th, 1996, Bank of

9   America NTSA entered into a note purchase agreement to lend

10   $75 million to Brazil with BAS, LLC acting as agent. The

11   loan was guaranteed by Parmalat, S.p.A. Those are the

12   allegations. And the response, the answer is, Dr. Bondi

13   admits the allegations set forth in the first and second

14   sentence. So these are not matters that there is any

15   question about in the U.S. proceedings.

16        THE COURT: Well, but I guess -- okay. All right.

17        MR. KRAKAUER: I mean, they're their admissions on

18   the record.

19        THE COURT: But this is -- I mean, given that

20   earlier ruling that I quoted from, which relied on evidence

21   scantier than that, don't you have a slam dunk in your

22   litigation, if you ever -- I mean, come on. It's an

23   admission.

24        MR. KRAKAUER: Your Honor, I -- all I could say, I'm

25   not here testifying as an expert on Italian law. I wouldn't

1    do that to you or to myself.  I just -- but what I am saying

2    is you look -- you look at the fact that -- of what's going

3    on over there, and if BankBoston was subject to litigation, I

4    guarantee you'd have the exact same sort of admissions

5    floating around because --

6        THE COURT:  Well, was it apparently given to the

7    Italian Court?  Because the same judge would have ruled, I

8    assume, the same way he ruled on Number 176, that Dr. Bondi

9    be estopped because that's how he ruled on it --

10        MR. KRAKAUER:  Your Honor.

11        THE COURT:  But he didn't rule on that.  He ruled on

12   -- that there were just e-mails and letters submitted.

13        MS. GOLDSTEIN:  Your Honor, just -- may I just

14   clarify that the Cur loan was allowed.

15        THE COURT:  No, I understand.

16        MS. GOLDSTEIN:  Okay.  And then we --

17        THE COURT:  But all I'm saying is that it seems to

18   me that if there's --

19        MS. GOLDSTEIN:  But he's complaining about it as

20   though it were disallowed --

21        THE COURT:  No, I know.

22        MS. GOLDSTEIN:  -- and the Bank of America

23   Securities loan was disallowed, but on grounds of *data certa*.

24        MR. KRAKAUER:  Your Honor, I'll just come back to my

25   fundamental point.  You have to measure not only what the

123

1    Court has done of what Mr. Bondi -- how Mr. Bondi is handling

2    the proceeding, and look and see whether 304(c) really means

3    what it says in terms of just treatment.  And I just submit

4    that what he's doing is just inconsistent with what he knows

5    the facts to be and as I've just read to you what he's

6    admitted the facts to be here in the United States.

7              THE COURT:  Okay.

8              MR. KRAKAUER:  That's my point.

9              THE COURT:  All right.

10             MR. GINSBURG:  Your Honor, may I be even briefer?

11             THE COURT:  All right.

12             MR. GINSBURG:  Just responding to one thing that Ms.

13   Goldstein says, trying to draw the distinction between the

14   guaranty and the note.  I believe, in our case, and I believe

15   proof has been submitted to Parmalat's representatives, the

16   $10 million advanced by ABN went to Wishaw Trading, which was

17   a subsidiary of -- not wholly owned, but an affiliate,

18   certainly, of Parmalat, and was upstreamed to Parmalat.

19             So in this case, at least, there was no distinction,

20   in effect, between -- that Wishaw was used as a device to

21   upstream money to Italy.  I believe that --

22             THE COURT:  I'm not sure that's the best thing for

23   your client, at least based on what I've read --

24             MR. GINSBURG:  Okay.

25             THE COURT:  -- about Wishaw's role in all of this.

1          MR. GINSBURG:  It's what I believe the facts to be.

2          THE COURT:  Okay.  I mean, not for your client on

3    this particular point, but on the general point, which may

4    suggest why Dr. Bondi is pushing this one.  I refer to the

5    fact that at least it's alleged by Dr. Bondi that Wishaw a

6    black box, and sort of at the heart of one of the frauds.

7          Okay.  I have before me the motion by the Parmalat

8    Finanziaria S.p.A., et al, foreign debtors, all of which are

9    debtors in proceedings for extraordinary administration, that

10   have been pending in the Civil and Criminal Court of Parma,

11   Italy since, at least in the case of S.p.A., December 24,

12   2003, through the extraordinary commissioner appointed for

13   those debtors, Dr. Enrico Bondi, for the entry by this Court

14   of a permanent injunction under Section 304(b)(1) of the

15   Bankruptcy Code as, in effect, when the foreign debtors file

16   their ancillary proceedings here on June 22, 2004.

17          The record of these cases is one, generally, of a

18   fairly brief hearing, pursuant to which I entered a

19   preliminary injunction under Section 304(b)(1), and frequent

20   extensions of that injunction, some of which were contested,

21   in part, but generally, which was not contested.  During that

22   time, or during much of that time, Dr. Bondi pursued the

23   formulation and approval of a composition with the foreign

24   debtors' creditors.  That composition was approved by the

25   Parma Court on October 1st, 2005.  It's essentially

1  equivalent of a plan of reorganization for most of the

2  foreign debtors, although a few are being liquidated

3  separately.

4          One significant element of the composition is the

5  continued pursuit of substantial litigation by the

6  reorganized debtors and Dr. Bondi, both in Italy and here, in

7  the multi-district litigation, before District Judge Kaplan,

8  as well as in New Jersey on various matters, related to

9  Parmalat's demise and the alleged frauds involved in its

10  financial transactions, as well as in Italy, more traditional

11  avoidance or recovery litigation under Italian insolvency

12  law.

13          As discussed by Ms. Goldstein, there's been quite

14  extensive notice of the foreign debtors' request for a

15  permanent injunction and the record, in connection with any

16  objection that parties wanted to make to that request, has

17  had ample time to be developed.  It turns out that, at this

18  point, there are three remaining objections to the issuance

19  of the permanent injunction and, in fact, two of those

20  objections are limited.  In essence, Bank of America, Bank of

21  America Securities and BankBoston, as well as ABN AMRO, seek

22  to condition the Court's issuance of a permanent injunction

23  on the restriction of Dr. Bondi to pursue a certain type of

24  claim objection under Italian law.  Additionally, the Pension

25  Benefit Guaranty Corporation seeks to be relieved of the

1    injunction entirely.

2          Initially, Bank of America/BankBoston had other

3    objections to the proposed permanent injunction.  Going to

4    the extent of that injunction, i.e., A, whether it would be

5    applied outside of the United States; B, whether it would

6    exceed the reorganized debtors' rights under their

7    composition or under applicable Italian law, including in

8    respect to the liquidating debtors and; C, whether and to

9    what extent it would restrict their rights, if any, against

10   non-foreign debtor subsidiaries and affiliates, and finally;

11   D, and this would go just for BankBoston -- I'm sorry, this

12   would go just for Bank of America and B of A Securities, how

13   the proposed injunction would relate to or intersect with

14   District Judge Kaplan's order withdrawing the reference,

15   partially in connection with the multi-district litigation.

16         I believe all of those issues, though, A through D,

17   as I've listed them, have been resolved on the record of the

18   hearing, based on the back and forth with counsel for the

19   foreign debtors and changes to the language of the order or

20   clarifications of the order.  And my ruling assumes that

21   those clarifications will be made.  I don't believe I need to

22   go over them again.  I think the order -- I'm sorry.  I think

23   the record reflects them.  I also think the parties

24   understand the changes to be made.  In any event, I will give

25   them my notes, so they can compare those to their own notes

127

1    and ultimately, I'll go over the order that's to be

2    submitted, to assure myself that it conforms with what was

3    set forth on the record.

4            So that leaves, therefore, the three objections.

5    Really, two are on the same grounds, and then the third by

6    the PBGC.  Before turning to those objections, however, let

7    me address first the foreign debtors' objection to Bank of

8    America's and Bank of America Securities' standing to object

9    to the permanent injunction.

10           As clarified on the record, it appears to me, as a

11   practical matter, that B of A and BASL have little or nothing

12   at stake in this hearing because of the clarifications on the

13   record as to the limited extent of the injunction as it

14   pertains to them.  However, going into the hearing, it wasn't

15   clear to me, and I believe it wasn't clear to them, that that

16   was the case, based on a fair reading, at least, of the

17   proposed order.  So I conclude that they did have standing to

18   address the Court on their issues, including Issues A through

19   D that I described.

20           I have less of a sense that they have standing on

21   the *data certa* point, given the clarification of those

22   issues, but as a practical matter, they're represented by the

23   same counsel as BankBoston, which does clearly have standing

24   going forward.

25           In any event, I have treated, for purposes of this

1    hearing, Bank of America and Bank of America Securities as

2    creditors that have standing to be heard, given their

3    economic stake in -- at a minimum, clarifying the terms of

4    the proposed order.

5          Section 304 of the Bankruptcy Code, which has

6    subsequently been repealed, but is still in effect for this

7    case, allows a Bankruptcy Court to enjoin any proceeding or

8    action against a foreign debtor with respect to the debtor

9    itself and property, quote, "involved in such foreign

10   proceeding," as well as other appropriate relief under

11   Section 304(b).

12         In determining whether to grant such relief, the

13   Court, quote:

14              "Shall be guided by what will best assure an

15              economical and expeditious administration of the

16              foreign debtors' estate, consistent with five

17              factors which are relevant here:  Just treatment of

18              all holders of claims against or interest in such

19              estate; protection of claimholders in the United

20              States against prejudice and inconvenience, and the

21              processing of claims in such foreign proceeding;

22              prevention of preferential or fraudulent

23              dispositions of property of the estate; distribution

24              of proceeds if such estate substantially, in

25              accordance with the orders prescribed by this title,

1           that is Title 11 of the Bankruptcy Code; and

2           comity."

3       The factors that I quoted are designed to give the

4   Court maximum flexibility and to permit the Court to make the

5   appropriate orders under all of the circumstances of each

6   case, rather than being provided with inflexible rules.  See

7   H.R. Rep. No. 95-595 at 324, 325 (1977), as well as In Re

8   Treco, 240 F.3d 148, 156 (2d Cir. 2001), which discusses the

9   general inquiry to be made by the Court, stating first that

10  comity is the ultimate consideration, although also noting,

11  again, that the Court should make a case-by-case

12  determination that comity itself does not require blind

13  deference to a foreign proceeding and that generally, comity

14  takes into account the other four factors; that is, although

15  one factor, even the general principle of comity may support

16  granting a permanent injunction, another may compel the

17  opposite conclusion in the appropriate circumstance in the

18  Court's weighing of all the factors in light of the

19  particular case.

20      Let me note further that generally, in keeping with

21  the overall policy described in the case law, as well as by

22  Congress and the legislative history, Section 304 is

23  consistent with the general policy of U.S. law to recognize

24  the importance of centralizing the administration of

25  bankruptcy cases and estates in the home jurisdiction, and

1  assisting, consistent with protecting appropriately the

2  rights of U.S. creditors against unfair treatment or unfair

3  discrimination, the home Court to conduct the reorganization,

4  and also assisting it, as is requested here, to implement the

5  reorganization.

6          Generally speaking, as I said, there is no overall

7  objection to the issuance of a permanent injunction to

8  implement the foreign debtors' composition and the

9  liquidation of the liquidating debtors, except as far as the

10  PBGC is concerned, and I will address the PBGC's objection at

11  the end of my ruling.  This is consistent, generally, with

12  how the courts have treated Italian compositions.  They have

13  uniformly recognized that compositions under Italian law and

14  the Italian Courts administering such compositions and

15  bankruptcy cases, are entitled to be accorded comity, and

16  that generally speaking, Italian bankruptcy law is fair on

17  its face, as well as as applied.  See, for example, In Re

18  Rosacometta, S.r.l., 336 B.R. 557 (Bankr. S.D. Fla.) and In

19  Re Artimm, S.r.l., 278 B.R. 832, (Bankr. C.D. Cal. 2002), as

20  well as In Re InterCONS Virginia, Inc., 812 F.2d 1469 (4th

21  Cir. 1987), which although not a 304 case, recognized the

22  fundamental fairness of the Italian bankruptcy law and

23  process, both as drafted and as applied.

24          I, too, find that on a general basis, the foreign

25  proceedings in Parma provide for a comprehensive procedure

1    for the orderly and equitable distribution of the foreign

2    debtors' assets, and the just treatment of creditors

3    generally.  I find that generally, U.S. claimholders are not

4    discriminated against or unduly prejudiced or inconvenienced

5    in the proceeding, that analogous to U.S. law, the Italian

6    law provides for the prevention of preferential or fraudulent

7    dispositions.  Indeed, that is a primary purpose of the

8    composition, and generally, that the distribution of proceeds

9    of the foreign debtors' estate is substantially in accordance

10   with the order prescribed by Title 11.

11          Of course, as the Courts have ruled, the last

12   provision quoted requires substantial compliance, as opposed

13   to complete compliance, and generally speaking, that

14   requirement means that the difference in the law, as far as

15   the distribution of proceeds, must be such that we would find

16   it to be repugnant to U.S. notions of either substantive or

17   procedural law and justice.  See, generally In Re Ephedra

18   Products Liability Litigation, 349 B.R. 333, (S.D.N.Y. 2006)

19   and In Re Board of Directors of Telecom Argentina, S.A., 2006

20   Westlaw 686-867 at 23 (Bankr. S.D.N.Y. 2006), as well as the

21   general discussion in JP Morgan Chase Bank v. Altos Hornos De

22   Mexico, S.A., 412 F.3d 418 (2d Cir. 2005).

23          As I noted, the B of A/BankBoston objection, as well

24   as the ABN AMRO objection focuses not on how the Italian law

25   is drafted generally, or the way that the Italian Court has

applied it, but rather to a particular provision of Italian

law.  The so-called "*data certa*," c-e-r-t-a, provision of

Italian law, which is found at Section 2704 of the Civil Law,

again, not the Bankruptcy Code or the Italian equivalent,

that provision states:

> "Date of private writing as to third persons.  The
>
> date of a private writing in which the signature has
>
> not been authenticated is not certain and cannot be
>
> asserted against third persons, except from the day
>
> on which the writing was registered, or from the
>
> date of death or supervening physical incapacity,
>
> the sign of the person or persons who signed it, or
>
> from the date on which the contents of such writing
>
> are reproduced in public acts, or from the date on
>
> which other circumstances occur, which establish
>
> with equal certainty that the writing was drawn up
>
> previously."

As applied or as sought be applied by Dr. Bondi in

the foreign debtors' cases before the Parma Court, this

provision of the Italian Civil Code would invalidate

guaranties obtained by B of A, BankBoston and BASL from one

of the Italian debtors.  Because it is asserted by Dr. Bondi,

the date of that guaranty cannot be established for purposes

of the *data certa* provision, as having occurred before the

insolvency proceedings commenced.  He contends that third

1    parties are implicated by the assertion of the guaranty,

2    since the assertion of the guaranty and the successful

3    assertion of it would dilute those parties' recovery and,

4    therefore, he has put those creditors, as well as many

5    others, to the test of proving, for purposes of that statute,

6    the date of the guaranty.

7          BankBoston, Bank of America and BASL and ABN AMRO

8    raise a number of objections to the issuance of the

9    injunction, without some carve-out to preclude Dr. Bondi from

10   pursuing this litigation further.  The first point they make

11   is that the law itself is repugnant to fundamental notions of

12   United States law.  I'll note that because it is a provision

13   extraneous to the bankruptcy law, and more akin to a U.S.

14   domestic law requirement for authenticating a mortgage or the

15   like, that I have some real question as to whether Section

16   304(c)(4) is directed to this objection at all, but I

17   believe, given the catch-all provision, that I should

18   consider general principles of comity.  I don't think that B

19   of A, BankBoston, BASL and ABN AMRO are precluded from making

20   the argument.

21          However, the statute, on its face, to me, does not

22   appear to be so foreign to basic concepts of U.S. law that it

23   would be denied out-of-the-box comity.  I say that for a

24   number of reasons.  The first is the very wording of the

25   statute.  It does permit, as I quoted it in the catch-all

1  provision, other ways to establish, with equal certainty,

2  that the writing was drawn up before the date of insolvency.

3        It also is analogous, in my mind, to other

4  relatively rigid requirements of U.S. law, both U.S. non-

5  bankruptcy law and bankruptcy law.  We spent quite a bit of

6  time talking about that at oral argument, but it appears to

7  me that U.S. bankruptcy law, in quite rigidly permitting, for

8  the benefit of the entire estate, the avoidance of a lien or

9  mortgage that has not been perfected pursuant to the

10  applicable requirements of non-bankruptcy law, either under

11  the UCC applicable mortgage recordation statutes, applicable

12  automobile title statutes, the Ship Mortgage Act or Louisiana

13  Oil and Gas Law, can have quite a rigid and equally

14  confiscatory effect, which would not apply, as I don't

15  believe this law would apply if it were just a case of a

16  dispute between the issuer of the guaranty or the issuer of

17  the mortgage, but would apply when third parties are

18  involved, such as creditors in a bankruptcy case.

19        There's, in a civil context, in my experience, fewer

20  chilling statements than Justice Holmes' statements in Moore

21  v. Bay about the consequences of not complying with the

22  requirements of perfection, and the consequences of that.

23        It also appears to me that this law has been applied

24  in a way that is consistent with U.S. notions of due process

25  and fundamental fairness by the Italian Courts.  Indeed, in

1    certain circumstances, the Italian Courts have ruled in favor

2    of the objectors, and not just because they believed that the

3    objectors did, in fact, have their documents notarized, but

4    at least in one instance, which I've quoted during oral

5    argument, because Dr. Bondi took a contrary position as to

6    the existence of the guaranty in other litigation.  In all

7    instances where the objectors lost in the Italian Court, the

8    matter is on appeal.

9           It is argued by the objectors that the Italian Court

10   improperly excluded certain types of evidence in connection

11   with its determination on the merits, but I have two things

12   to say in response to that argument.  The first is that I do

13   not believe that the requirement of fundamental fairness and

14   due process requires the admission of all requested evidence,

15   particularly where such evidence would be irrelevant to the

16   statute.  Secondly, based on the record, in particular the

17   translated rulings by the Parma Court, it appears to me that

18   the evidence that was offered or that the Parma Court

19   considered was oral evidence, e-mails and the debtors, that

20   is the pre-insolvency debtors' documents, all of which a

21   Court reasonably could consider excluding, particularly in a

22   case where consideration of an underlying fraud by the same

23   pre-insolvency debtors or pre-insolvency proceeding debtors

24   was so significant.

25           More troubling is the suggestion that

1   notwithstanding the one ruling that I quoted, where the Parma

2   Court denied Dr. Bondi's objection on what appears to me to

3   be an estopped principle, is the suggestion that the Parma

4   Court is letting Dr. Bondi run roughshod over it and the

5   claimants by taking a position that he knows is untrue, as a

6   matter of fact.  It does not appear to me, however, from the

7   Parma Court's rulings, or their submissions, the affidavit

8   submissions, that that is, in fact, the case.  There is no

9   discussion by the Parma Court in any of the rulings that I've

10  been shown in which it appears that such an argument has been

11  made to the Parma Court, i.e. that Dr. Bondi has admitted

12  elsewhere that the relevant guaranty was entered into before

13  the insolvency proceeding began and denied by the Parma

14  Court.  Indeed, just the opposite appears to be the case.

15  The only time I've seen an instance where that argument was

16  made, the Parma Court accepted it.

17         Finally, it is argued that Dr. Bondi's own use of

18  the statute, not the Parma Court's use of it and not the

19  statute itself, but his own use of it is in bad faith or

20  repugnant to basic notions of fairness and due process.  It

21  has not been argued, but I think it could be argued, in the

22  proper circumstance, also, that if a foreign representative

23  or a foreign debtor has unclean hands, it should not be able

24  to seek injunctive relief, which, of course, in an equitable

25  remedy, ultimately.

1          Having said that, let me note that there is very

2     scarce law suggesting a broad right of a U.S. Court under 304

3     to limit the reach of a requested injunction because of a

4     litigation strategy chosen by a foreign liquidator or

5     administrator or commissioner, and with good reason.  Thus,

6     while there are general statements in the cases that the

7     Court must consider, whether the foreign proceeding is being

8     conducted in good faith, the primary focus of the Court's

9     inquiry, I believe, should be on the Court's conduct of that

10    proceeding and the underlying law of that proceeding.  See

11    Ecoban Finance Limited v. Groupo Acerero Del Norte, S.A., 108

12    F.Supp. 2d 349 (S.D.N.Y. 2000), aff'd 242 F.3d 364 (2d Cir.

13    2001).  Indeed, the only instance I've found where the Court

14    had arguably a consideration of the conduct of the foreign

15    administrator or liquidator or commissioner, as a material

16    element of denying injunctive relief was the Treco case that

17    I cited earlier.  However, in that case, as described or

18    commented on by Judge Lifland in In Re Board of Directors of

19    Compania General de Combustibles, S.A., 269 B.R. 104 (Bankr.

20    S.D.N.Y 2001), it is important to note at the outset that the

21    Treco decision was based on an egregious set of facts

22    involving what could be characterized as substantial

23    maladministration by foreign liquidators of a foreign

24    proceeding.  And as one could take away from the Second

25    Circuit's opinion in Treco, what Judge Lifland was referring

1   to was essentially a situation where it seemed quite clear

2   that the foreign liquidators, knowing that their claims came

3   ahead of the secured claim of the creditors -- of the

4   complaining creditor, were incurring enormous costs and fees

5   that were essentially going to eat up the estate, without any

6   recovery by any other creditors, including the secured

7   creditor.

8           I simply did not see an analogous situation here.

9   The statute says what it says, that is the *data certa*

10  statute, and it is, I believe, within Dr. Bondi's discretion

11  to pursue the debtors' rights under it.  It is also within

12  his discretion to pursue the debtors' rights under it

13  differently against certainly entities who are in other

14  litigation with the foreign debtors, such as Bank of America

15  and BASL, as well as potential litigation targets,

16  BankBoston.

17          But even if that were not the case, and I do not

18  believe it's the case, at least it's not aggressively

19  asserted by Dr. Bondi here that ABN AMRO is a potential

20  target, it's also within a trustee's discretion generally to

21  decide when and with whom he or she wants to settle.

22  Therefore, the fact that Dr. Bondi has settled with other

23  claimants whose guaranty claims he's also objected to on *data*

24  *certa* grounds, should not tie his hands in exercising his

25  discretion with regard to every creditor.

1          This is not, therefore, I believe, a situation like

2   Treco.   I also believe it's not a situation like In Re

3   Papeleras Reunidas, S.A., 92 B.R. 584 (Bankr. E.D.N.Y. 1988),

4   relied on heavily by B of A and ABN AMRO, where, in addition

5   to the distinction between Spanish insolvency law and U.S.

6   law, and again, I point out that the complaint about law here

7   is not an insolvency law provision, but a general civil law

8   provision governing the validity of guaranties, there were

9   numerous other factors present that led Judge Duberstein to

10   deny injunctive relief, including a lack of notice generally,

11   as well as a lack of notice with regard to sale of collateral

12   and destruction of liens.

13          Finally, on this point, I note that, as I said

14   before, litigation is continuing in the Italian Courts on all

15   of the *data certa* objections.  I believe it would be

16   inappropriate for me to step in, given that that litigation

17   is ongoing, either to predict how the Italian Courts would

18   conclude that litigation in the first place, or even worse,

19   predict whether they would conclude it contrary to everything

20   they generally seem to have done, in a way that's

21   fundamentally unfair and contrary to U.S. notions of due

22   process and fairness, or to step in and regulate the

23   commissioner, who is in front of them, with regard to any

24   sorts of assertions as to sharp practice or estoppel.

25          There's been no showing to me that the Italian

1    Courts lack such an ability, and I am fairly confident that

2    they do have the ability to control the lawyers who are

3    appearing before them from asserting frivolous or unfounded

4    positions, or that they lack the ability to ultimately

5    control Dr. Bondi, if that is indeed what he is doing.  I

6    also note that as far as B of A and BASL are concerned, they

7    also have some ability to make that argument, at least as far

8    as judicial estoppel is concerned, if it's not made and

9    determined by the Italian Courts in front of Judge Kaplan.

10            But ultimately, it seems to me that this is a

11   requirement of having a valid guaranty under Italian law.  A

12   guaranty isn't a lien, but its value may be greater or less

13   than a lien.  They're both essentially credit supports, and

14   it seems to me that Dr. Bondi cannot be faulted for pursuing

15   a technical objection to a guaranty when he would not be

16   faulted for pursuing a technical objection to a lien under,

17   in each case, applicable non-bankruptcy law.

18            And perhaps that should lead into the last point on

19   the *data certa* issue, which is a point raised by ABN AMRO,

20   which notes that its documents have U.S. choice of law and

21   forum selection provisions.  As repeatedly noted by the

22   Second Circuit, however, in a foreign bankruptcy case or

23   where there is a foreign bankruptcy case, such provisions do

24   not override the general notions of comity.  As stated by the

25   Second Circuit in <u>Altos Hornos</u>, quote:

1           "In other words, regardless of the parties' pre-

2           litigation agreement, once a party declares

3           bankruptcy in a foreign state and a foreign court

4           asserts jurisdiction over the distribution of

5           assets, U.S. Courts may defer to the foreign

6           bankruptcy proceeding on international comity

7           grounds.  Consequently, JP Morgan's reliance on the

8           loan agreements, forum selection and choice of law

9           clauses is unavailing."

10     A similar analysis would apply here.

11          Finally, let me say that the proposed injunction,

12 Paragraph 9, does permit all of the creditors affected by the

13 injunction to return to this Court, in appropriate

14 circumstances, for relief from the injunction.  So that

15 although I am prepared -- fully prepared to defer to the

16 Italian Court's determination of the *data certa* issue, if, in

17 fact, something occurs which would merit relief from the

18 injunction, the creditors have the right to come back here to

19 the extent that I have the reference.

20          Let me turn, then, to the PBGC's objection.

21 Frankly, this was an objection that was made at the hearing.

22 The debtors had no chance to prepare to deal with it.  The

23 original objection by the PBGC was based on language in the

24 first form of proposed order, which was subsequently revised

25 by the debtors, so that the current form of order does not

1   provide the type of protection to non-foreign-debtor third

2   parties that the PBGC was concerned about in its objection.

3         Instead, the PBGC, at the hearing, stated that there

4   should be a general carve out from a 304(b) injunction, to

5   permit U.S. governmental agencies to pursue monetary claims

6   against the foreign debtors in the United States.  I know of

7   no authority that would provide that such a carve out be

8   required.  Certainly 304 doesn't speak of it, and the

9   legislative history doesn't speak of it.

10         The strong policy behind Section 304, as noted by

11   numerous courts, again, is to focus the asset realization and

12   claim liquidation process in the foreign court, subject to

13   well-recognized exceptions for judicial convenience and

14   economy and fundamental fairness, and consequently, I believe

15   that such a carve out would contravene the underlying policy

16   of the statute.

17         So, therefore, again, subject to Paragraph 9 of the

18   order, which I think would be particularly applicable if a

19   governmental agency were looking to, rather than collect on a

20   monetary claim, assert some form of police or regulatory

21   power, it seems perfectly appropriate to channel true claims,

22   monetary claims, along with all other monetary creditors, to

23   the -- or through the composition and to the Italian Courts.

24   So I will deny the PBGC's objection.

25         So, as I said, I am prepared to enter the permanent

1   injunction with the modifications that I laid out on the

2   record, and that were discussed on the record.  Again, I'm

3   happy to give you my mark-up of that, although it's not in

4   lawyerese, it's in shorthand, and given that we have so few

5   objectors, it seems to me that you should just circulate the

6   revision to them, although you're free to circulate it to

7   others, too, if they've had that type of role in the case,

8   and that you don't have to settle the order, but that you

9   should give parties sufficient time to look at your changes

10  before you submit it.

11          As I remember, the preliminary injunction stays in

12  effect until an order is entered one way or the other on the

13  motion for permanent injunction, or is there a date at the

14  end?

15          MS. GOLDSTEIN:  I think we may have a date, and I

16  would --

17          THE COURT:  Well, if that's the case, I certainly am

18  prepared to extend the preliminary injunction.  There's no

19  reason one wouldn't do so, given the fact that I've approved

20  a permanent injunction.

21          MS. GOLDSTEIN:  Well, Your Honor, we certainly would

22  request that.  We would appreciate your mark-up, as well.  We

23  would hope to be able to get an expedited transcript, so that

24  when we modify the order, we will be able to take, you know,

25  very specifically into account all of the discussion on the

1  record.

2       THE COURT:  Okay.  That's fine.  Before you finish,

3  though, or we finish, I want to go over with you two other

4  comments I had on the order that may be somewhat substantive,

5  and see if you have any problem with them.

6       The first one is Paragraph 10, which is the general

7  306 language, and I had two comments on it.  I had no comment

8  on the first part of it, but if you go down about halfway

9  through it, in addition to saying that nothing that you all

10  have done, to the extent provided in 306, is a waiver, you

11  also say such further orders or taking any actions would be a

12  waiver, and not knowing what those things are, I don't see

13  how I can grant that type of relief.  You see the language

14  I'm talking about?

15       MS. GOLDSTEIN:  It's in the -- I'm just trying to --

16       THE COURT:  That not only what you've done already,

17  but also what you would do in the future would not constitute

18  a waiver, and I can't predict the future.  I don't know what

19  you would do.

20       MS. GOLDSTEIN:  Your Honor, we understand the

21  comment.

22       THE COURT:  Okay.

23       MS. GOLDSTEIN:  I think we just need, probably, time

24  to go through the language.

25       THE COURT:  Okay.  And then, on that same paragraph,

1    I would add a proviso, which is, provided that the

2    effectiveness of this order is conditioned upon such parties'

3    good-faith compliance with the orders of this Court, and to

4    the extent of any withdrawal of the reference of the Section

5    304 cases by the District Court -- the District Court.

6          MS. GOLDSTEIN:  I apologize, Your Honor.  Where --

7    this is additional language?

8          THE COURT:  That's at the end of Paragraph 10, and

9    it's just consistent with 306 --

10         MS. GOLDSTEIN:  Okay.

11         THE COURT:  -- which says that you could condition,

12   under 306, that type of relief on compliance with the Court's

13   orders, and so I would, again, say, "provided that the

14   effectiveness of this order is conditioned upon such parties'

15   good-faith compliance with the orders of this Court and, to

16   the extent of any withdrawal of the reference of the Section

17   304 cases by the District Court, the District Court."

18         MS. GOLDSTEIN:  Okay.  Yes, Your Honor.

19         THE COURT:  And then the last thing, which seemed

20   like a no-brainer to me, but maybe there's a reason why it

21   wasn't here, I added a paragraph.  Maybe it was because it

22   would be Paragraph 13 and people don't like thirteen.  "This

23   Court retains jurisdiction over disputes over the

24   interpretation and enforcement of this order."  It wouldn't

25   be exclusive jurisdiction, but it would be clear that I would

1  have jurisdiction.

2          MS. GOLDSTEIN:  We thought, Your Honor -- we have no

3  problem with the concept.  We thought that that was embedded

4  in Paragraph 9, which says the Court shall retain

5  jurisdiction with respect to the enforcement amendment or

6  modification.

7          THE COURT:  You're right.

8          MS. GOLDSTEIN:  But we could add interpretation.

9          THE COURT:  That's fine.  That's fine.  Okay.  All

10 right.  Is there anything else?

11         MS. GOLDSTEIN:  No, Your Honor.  I think we will

12 just submit an extended preliminary injunction order until we

13 have the opportunity to refine the permanent injunction.

14         THE COURT:  Okay.  Very well.  And my clerk will

15 give you this to Xerox.  You can give it to Mr. Krakauer,

16 too.

17         MS. GOLDSTEIN:  Okay.  Thank you very much, Your

18 Honor.

19         THE COURT:  Thank you.

20     (Proceedings concluded at 6:07 p.m.)

21                         *****

22

23

24

25

1                    <u>CERTIFICATION</u>

2         We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability, except where, as indicated, the Court

6    has modified its bench ruling.

7

8

9

10   _____    July 2, 2007
     Cathryn Lynch, N.J. Cert. No. 565
11   Certified Court Transcriptionist
     For Rand Transcript Service, Inc.

12

13

14

15
     _____    July 2, 2007
16   Jennifer Linnartz, AAERT Cert. No. 339
     Certified Court Transcriptionist
17   For Rand Transcript Service, Inc.

18

19

20

21

22

23

24

25