**Exhibit 2**

**Exhibit A**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――x
| | | |
|---|---|---|
| **In re** | : | In a Proceeding Under |
| | : | Section 304 of the |
| **PARMALAT FINANZIARIA S.p.A. et al.,** | : | Bankruptcy Code |
| | : | |
| Debtors in a Foreign Proceeding. | : | Case No. 04 -14268 (RDD) |
| | : | (Jointly Administered) |

―――――――――――――――――――――x

**MODIFIED BENCH RULING ON REQUEST FOR**
**PERMANENT INJUNCTION**

I have before me the motion by the Parmalat Finanziaria S.p.A., et al, foreign debtors, all of which are debtors in proceedings for extraordinary administration that have been pending in the Civil and Criminal Court of Parma, Italy since, at least in the case of Finanziaria S.p.A., December 24, 2003, through the extraordinary commissioner appointed for those debtors, Dr. Enrico Bondi, for the entry by this Court of a permanent injunction under Section 304(b)(1) of the Bankruptcy Code as in effect when the foreign debtors filed their ancillary proceedings here on June 22, 2004.

The record of these cases is one, generally, of a fairly brief hearing, pursuant to which I entered a preliminary injunction under Section 304(b)(1), and frequent extensions of that injunction, some of which were contested, in part, but usually which were not contested. During that time, or during much of that time, Dr. Bondi pursued the formulation and approval of a composition with the foreign debtors' creditors. That composition was approved by the Parma Court on October 1, 2005. It's essentially the equivalent of a chapter 11 plan of reorganization for most of the foreign debtors, although a few are being liquidated separately.

One significant element of the composition is the continued pursuit of substantial litigation by the reorganized debtors and Dr. Bondi, both in Italy and here, in the multi-district litigation before District Judge Kaplan, as well as in New Jersey, on various matters related to Parmalat's demise and the alleged frauds involved in its financial transactions, as well as, in Italy, with respect to more traditional avoidance or recovery litigation under Italian insolvency law.

As discussed by Ms. Goldstein, there's been quite extensive notice of the foreign debtors' request for a permanent injunction, and the record, in connection with any objection that parties wanted to make to that request, has had ample time to be developed. It turns out that, at this point, there are three remaining objections to the issuance of the permanent injunction and, in fact, two of those objections are limited. In essence, Bank of America, Bank of America Securities and BankBoston, as well as ABN AMRO, seek to condition the Court's issuance of a permanent injunction on the restriction of Dr. Bondi's ability to pursue a certain type of claim objection under Italian law. Additionally, the Pension Benefit Guaranty Corporation seeks to be relieved of the injunction entirely.

Initially, Bank of America/BankBoston had other objections to the proposed permanent injunction, going to the extent of that injunction, i.e., (a) whether it would be applied outside of the United States; (b) whether it would exceed the foreign debtors' rights under their composition or under applicable Italian law, including in respect to the liquidating debtors; and (c) whether and to what extent it would restrict creditors' rights, if any, against non-debtor subsidiaries and affiliates of the foreign debtors; and finally (d) -- and this would go just for Bank of America and B of A Securities -- how the

2

proposed injunction would relate to or intersect with District Judge Kaplan's order partially withdrawing the reference of the Section 304 cases in connection with the multi-district litigation.

I believe all of those issues, though -- issues (a) through (d), as I've listed them -- have been resolved on the record of this hearing based on the back and forth with counsel for the foreign debtors and changes to the language of the proposed order, or the clarifications of the order; and my ruling assumes that those clarifications will be made. I don't believe I need to go over them again. I think the record reflects them. I also think the parties understand the changes to be made. In any event, I will give them my notes, so they can compare those to their own notes; and ultimately I'll go over the order that's to be submitted to assure myself that it conforms with what was set forth on the record.

So that leaves, therefore, the three remaining objections previously noted. Before turning to those objections, however, let me address first the foreign debtors' objection to Bank of America's and Bank of America Securities' standing to object to the permanent injunction.

As the proposed injunction has been clarified on the record of this hearing, it appears to me, as a practical matter, that the permanent injunction will have no practical effect on B of A and BASL. However, going into the hearing, it wasn't clear to me -- and I believe it wasn't clear to them -- that this was the case, based on a fair reading, at least, of the proposed order. So I conclude that they did have standing to address the Court on their issues, including issues (a) through (d) that I previously described.

I have less of a sense that they have standing on the "data certa" point because of the clarification of the order specifically covering the litigation involving them, and, of

3

course, the provisions of the order referring to Judge Kaplan's partial withdrawal of the reference, but, as a practical matter, they're represented by the same counsel as BankBoston, which does clearly have standing going forward on its objection on data certa.

In any event, I have treated, for purposes of this hearing, Bank of America and Bank of America Securities as creditors that have standing to be heard, given their economic stake in, at a minimum, clarifying the terms of the proposed order.

Section 304 of the Bankruptcy Code, which has subsequently been repealed although it is still in effect for purposes of these Section 304 cases, allows a bankruptcy court to enjoin any proceeding or action against a foreign debtor with respect to the debtor itself and property "involved in such foreign proceeding," as well as to grant other appropriate relief under Section 304(b).

In determining whether to grant such relief, the Court "shall be guided by what will best assure an economical and expeditious administration of the foreign debtor's estate," consistent with five factors which are relevant here: "just treatment of all holders of claims against or interest in such estate; protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding; prevention of preferential or fraudulent dispositions of property of the estate; distribution of proceeds of such estate substantially in accordance with the order prescribed by this title [that is, title 11 of the Bankruptcy Code]; and comity."  11 U.S.C. § 304(c)(1)-(5).

The factors that I quoted are designed to give the Court maximum flexibility and to permit the Court to make appropriate orders under all of the circumstances of each

case, rather than being constrained by inflexible rules. See H.R. Rep. No. 95-595 at 324, 325 (1977), as well as In re Treco, 240 F.3d 148, 156 (2d Cir. 2001), which discusses the general inquiry to be made by the Court, stating, first, that comity is the ultimate consideration, although also noting, again, that the Court should make a case-by-case determination and that comity itself does not require blind deference to a foreign proceeding and that generally comity takes into account the other four factors; that is, although one factor -- even the general principle of comity -- may support granting a permanent injunction, another may compel the opposite conclusion in the appropriate circumstance as the Court weighs all of the facts of the particular case.

Let me note further that -- as made clear in the case law, as well as by Congress in the legislative history -- section 304 is consistent with the general policy of U.S. law to recognize the importance of centralizing the administration of bankruptcy cases and estates in the home jurisdiction and assisting, consistent with appropriately protecting the rights of U.S. creditors against unfair treatment or unfair discrimination, the home court to conduct the debtor's reorganization, and also assisting the home court, as is requested here, to implement the debtor's reorganization.

Generally speaking, as I said, there is no objection to the issuance of a permanent injunction to implement these foreign debtors' composition and the liquidation of the liquidating debtors, except as far as the PBGC is concerned, and I will address the PBGC's objection at the end of my ruling. This is consistent with how the U.S. courts have treated Italian compositions: they have uniformly recognized that compositions under Italian law, and the Italian courts' administration of such compositions and bankruptcy cases, are entitled to be accorded comity, and that, generally speaking, Italian

5

bankruptcy law is fair on its face, as well as how it's applied. See, for example, In re Rosacometta, S.r.l., 336 B.R. 557 (Bankr. S.D. Fla.), and In re Artimm, S.r.l., 278 B.R. 832 (Bankr. C.D. Cal. 2002), as well as In re Enercons Virginia, Inc., 812 F.2d 1469 (4th Cir. 1987), which, although not a Section 304 case, recognized the fundamental fairness of the Italian bankruptcy law and process, both as drafted and as applied.

I, too, find that, on a general basis, the foreign proceedings in Parma provide for a comprehensive procedure for the orderly and equitable distribution of the foreign debtors' assets and the just treatment of creditors. I find that generally U.S. claimholders are not discriminated against or unduly prejudiced or inconvenienced in the Italian proceedings, that, analogous to U.S. law, the Italian law provides for the prevention of preferential or fraudulent dispositions (indeed, that is a primary purpose of these debtors' composition), and, generally, that the distribution of proceeds of the foreign debtors' estates is substantially in accordance with the order prescribed by title 11.

Of course, as the U.S. courts have ruled, the last provision quoted requires only "substantial" compliance, as opposed to complete compliance, and that requirement has been interpreted to mean that the difference between U.S. law and the home court's law, as far as the distribution of proceeds is concerned, must be such that we would find it to be "repugnant" to U.S. notions of either substantive or procedural law and justice for it not to be "substantially in accordance" with U.S. law. See In re Ephedra Prods. Liab. Litig., 349 B.R. 333 (S.D.N.Y. 2006), and In re Bd. of Dirs. of Telecom Argentina, S.A., 2006 Bankr. LEXIS 483, at *23 (Bankr. S.D.N.Y. Feb. 24, 2006), aff'd, 2006 U.S. Dist. LEXIS 85274 (S.D.N.Y. Nov. 17, 2006), as well as the discussion of comity in JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A., 412 F.3d 418 (2d Cir. 2005).

6

As I noted, the B of A/BankBoston objection, as well as the ABN AMRO objection, focuses not on how the Italian law is drafted generally or on the way that the Italian Court has generally applied it, but, rather, on a particular provision of Italian law, the so-called "data certa" provision of Italian law, which is found at Section 2704 of the Italian Civil Code (not in the Italian insolvency law). That provision states: "Date of private writing as to third persons. The date of a private writing in which the signature has not been authenticated is not certain and cannot be asserted against third persons, except from the day on which the writing was registered or from the date of death or supervening physical incapacity to sign of the person or persons who signed it, or from the date on which the contents of such writing are reproduced in public acts, or from the date on which other circumstances occur which establish with equal certainty that the writing was drawn up previously."

As applied, or as sought to be applied by Dr. Bondi, in the foreign debtors' cases before the Parma Court, this provision of the Italian Civil Code would invalidate guaranties obtained by B of A, BankBoston and BASL from one or more of the foreign debtors, because, it is asserted by Dr. Bondi, the date of such guaranties cannot be established, for purposes of the data certa provision, as having occurred before the insolvency proceedings commenced. He contends that third parties are implicated by the assertion of the guaranties, since the successful assertion of the guaranties would dilute third parties' recovery as creditors, and, therefore, he has put BankBoston/B of A/BASL and ABN AMRO, as well as many others, to the test of proving, for purposes of Section 2704, the date of their guaranties.

BankBoston, Bank of America and BASL and ABN AMRO raise a number of

7

objections to the issuance of the requested injunction without some carve-out to preclude Dr. Bondi from pursuing this "data certa" litigation further. The first point they make is that the data certa law itself is repugnant to fundamental notions of United States law. I'll note that because it is a provision extraneous to the Italian bankruptcy law, and more akin to a U.S. domestic law requirement for authenticating a mortgage or the like, that I have some real question as to whether Section 304(c)(4) of the Bankruptcy Code is directed to this objection at all; but I believe, given the catch-all "comity" provision of Section 304(c)(5), that I should consider it in light of general principles of comity. That is, I don't think that B of A, BankBoston, BASL and ABN AMRO are precluded from making their data certa argument under Section 304(c), only that they need to rely on Section 304(c)(5) instead of 304(c)(4), which ultimately, however, is a distinction with very little if any difference.

Contrary to the objections, however, the data certa statute, on its face, does not appear to be so foreign to basic concepts of U.S. law that it would be denied comity out of the box. I say that for a number of reasons. The first is the very wording of the statute. It does permit, as I quoted its catch-all provision, other ways to establish, with equal certainty, that the writing was drawn up before the date of insolvency.

It also is analogous to other relatively rigid requirements of U.S. law, both U.S. non-bankruptcy law and bankruptcy law. We spent quite a bit of time talking about that at oral argument, but it appears to me that U.S. bankruptcy law, in permitting, for the benefit of the entire estate, the avoidance of a lien or a mortgage that has not been perfected pursuant to the applicable requirements of non-bankruptcy law, either under the UCC, or applicable mortgage recordation statutes, or applicable automobile title statutes,

8

or the Ship Mortgage Act, or Louisiana oil and gas law, can have quite a rigid and equally confiscatory effect, which would not apply (as I don't believe this "data certa" law would apply) if it were just a case of a dispute between the issuer of the guaranty and the foreign debtor's or, in the analogous case of a dispute between the issuer of the unperfected mortgage and a U.S. debtor, but would apply when third parties are involved, such as creditors in a bankruptcy case.  There are, in a civil context, few more chilling statements than Justice Holmes' terse opinion in Moore v. Bay, 284 U.S. 4 (1931), regarding the consequences in a bankruptcy case of not complying with the requirements of lien perfection, even to the benefit of third parties who provided credit after the date of the procedurally defective mortgage.

It also appears to me that the data certa law has been applied by the Italian courts in a way that is consistent with U.S. notions of due process and fundamental fairness. Indeed, in certain circumstances the Italian courts have ruled in favor of the B of A objectors, and not because they believed that the objectors did, in fact, have their documents timely notarized, but, at least in one instance which I've quoted during oral argument, because Dr. Bondi took a contrary position as to the existence of the guaranty in other litigation.  Moreover, in all instances where the present objectors lost in the Parma Court, the matter is on appeal.

It is argued by the objectors that the Parma Court improperly excluded certain types of evidence in connection with its determinations on the merits of the data certa issue, but I have two things to say in response to that argument.  The first is that I do not believe that the requirement of fundamental fairness and due process requires the admission of all requested evidence, particularly where such evidence would arguably be

9

irrelevant in light of the statute. Secondly, based on the record, in particular the translated rulings by the Parma Court, it appears to me that the evidence that was offered, but that the Parma Court declined to accept, was oral evidence, e-mails and the debtors' -- that is, the pre-insolvency debtors' -- documents, all of which a court reasonably could consider excluding, particularly in a case where considerations of an underlying massive fraud by the pre-insolvency-proceeding debtors are so prominent.

More troubling is the objectors' suggestion that, notwithstanding the one ruling that I quoted, where the Parma Court denied Dr. Bondi's objection on what appears to me to be an estoppel principle, the Parma Court is letting Dr. Bondi run roughshod over it and the claimants by taking a position that he knows is untrue as a matter of fact. It does not appear to me, however, from the Parma Court's rulings and the affidavits submitted to me by the objectors that this is, in fact, the case. There is no discussion by the Parma Court in any of the rulings that I've been shown in which it appears that the Parma Court has disregarded such an argument, i.e. that the Parma Court has considered and disregarded the argument that Dr. Bondi has admitted elsewhere that the relevant guaranty was entered into before the insolvency proceeding began. Indeed, just the opposite appears to be the case. The only time I've seen an instance where that argument was made, the Parma Court accepted it in allowing the claims. See Exhibit 17 to the Second Krakauer Declaration.

Finally, it is argued that Dr. Bondi's own use of the data certa statute -- not the Parma Court's use of it and not the statute itself, but his own use of it -- is in bad faith or repugnant to basic notions of fairness and due process. It has not been argued, but I think it could be argued, in the proper circumstance, also, that if a foreign representative or a

10

foreign debtor has unclean hands or is acting inequitably, he should not be able to seek injunctive relief, which, of course, is an equitable remedy.

Having made that general observation, however, let me note that there is very scarce law suggesting a broad right of a U.S. Court under Section 304 to limit the reach of a requested injunction because of a litigation strategy chosen by a foreign liquidator or administrator or commissioner -- and with good reason. Thus, while there are statements in the cases that the Court must consider whether the foreign proceeding is being conducted in good faith, the primary focus of the Court's inquiry, I believe, should be on the <u>foreign</u> <u>court's</u> conduct of that proceeding and the underlying law governing that proceeding. See <u>Ecoban Fin. Ltd. v. Grupo Acerero Del Norte, S.A. de C.V.</u>, 108 F.Supp. 2d 349 (S.D.N.Y. 2000), <u>aff'd</u> 242 F.3d 364 (2d Cir. 2001). Indeed, the only instance I've found where the Court had arguably considered the conduct of the foreign administrator or liquidator or commissioner (other than where the foreign administrator played fast and loose with the U.S. court's orders) as a material element of its denial of injunctive relief was the <u>Treco</u> case that I cited earlier. 240 F.3d 148. However, in that case, as described or commented on by Judge Lifland in <u>In re Bd. of Dirs. of Compania General de Combustibles, S.A.</u>, 269 B.R. 104, 109 (Bankr. S.D.N.Y 2001), it is important to note at the outset that the decision was based on an egregious set of facts involving what could be characterized as the "substantial maladministration" by the foreign liquidators of a foreign proceeding. As one could take away from the Second Circuit's opinion in <u>Treco</u>, what Judge Lifland was referring to was essentially a situation where it seemed quite clear that the foreign liquidators, knowing that under Bahamian law their claims came ahead of the secured claim of the objecting creditor, were incurring

11

enormous unwarranted costs and fees that were essentially going to eat up the estate, without any recovery by any other creditors, including the objecting secured creditor.

I simply do not see an analogous situation here.  The statute says what it says, that is, the data certa statute, and it is, I believe, within Dr. Bondi's discretion to pursue the debtors' rights under it.  It certainly is also within his discretion to pursue the debtors' rights under it differently as against entities who are in other litigation disputes with the foreign debtors, such as Bank of America and BASL, as well as potential litigation targets, such as BankBoston, than he would against non-litigation targets.

But even if that were not the case, and I do not believe it's the case with regard to ABN AMBRO -- at least it's not asserted by Dr. Bondi here that ABN AMRO is a potential target -- it's also within a U.S. trustee's discretion to decide when and with whom he or she wants to settle.  Therefore, the fact that Dr. Bondi has settled with other claimants whose guaranty claims he's also objected to on data certa grounds should not tie his hands in exercising his discretion with regard to every creditor.

This is not, therefore, I believe, a situation like <u>Treco</u>.  I also believe it's not a situation like <u>In re Papeleras Reunidas, S.A.</u>, 92 B.R. 584 (Bankr. E.D.N.Y. 1988), relied on heavily by B of A and ABN AMRO, where, in addition to the distinction between Spanish insolvency law and U.S. insolvency law (and again, I point out that the data certa law complained of here is not an Italian insolvency law provision but a general civil law provision governing the validity of Italian guaranties as affecting third parties), there were numerous other factors present in <u>Papeleras Reunidas</u> that led Judge Duberstein to deny injunctive relief, including a lack of notice generally, as well as a lack of notice with regard to sale of the complaining creditor's collateral and the destruction of its lien.

Finally, on this point I note that, as I said before, litigation is continuing in the Italian courts on all of the data certa objections. I believe it would be inappropriate for me to step in, given that that litigation is ongoing, either to predict how the Italian courts would conclude that litigation in the first place, or, even worse, predict that they would conclude it, contrary to everything they generally seem to have done, in a way that's fundamentally unfair and contrary to U.S. notions of due process and fairness, or to step in and regulate Dr. Bondi, the extraordinary commissioner, who is already in front of the Italian Courts, with regard to assertions of sharp practice before the Italian courts or grounds for estoppel.

There's been no showing to me that the Italian courts lack the ability to sanction such assertedly frivolous conduct, and I am fairly confident that they do have the ability to control the lawyers who are appearing before them from asserting frivolous or obviously unfounded positions, and that they have the ability ultimately to control Dr. Bondi, if that is indeed what he is doing. I also note that as far as B of A and BASL are concerned, they also have some ability to make that argument, at least as far as judicial estoppel is concerned, if it's not made to and determined by the Italian Courts, in front of Judge Kaplan.

But ultimately it seems to me that this data certa principle is a requirement of having a valid guaranty (as against third parties) under Italian law. A guaranty isn't a lien, but its value may be greater or less than a lien. They're both essentially credit supports, and it seems to me that Dr. Bondi cannot be faulted for pursuing a technical objection to a guaranty when he would not be faulted for pursuing a technical objection to a lien in a U.S. bankruptcy case under, in each case, applicable non-bankruptcy law.

13

And perhaps that should lead into the last point on the data certa issue, which is a point raised by ABN AMRO, which notes that its documents have U.S. choice of law and forum selection provisions. As repeatedly noted by the Second Circuit, however, in regard to a foreign bankruptcy case or where there is a foreign bankruptcy case, such provisions do not override the principles of comity. As stated by the Second Circuit in Altos Hornos, "In other words, regardless of the parties' pre-litigation agreement, once a party declares bankruptcy in a foreign state and a foreign court asserts jurisdiction over the distribution of assets, U.S. courts may defer to the foreign bankruptcy proceeding on international comity grounds. Consequently, JP Morgan's reliance on the loan agreement's forum selection and choice of law clauses is unavailing." 412 F.3d at 429. A similar analysis would apply here.

Finally, let me say that the proposed injunction, Paragraph 9, does permit all of the creditors affected by the injunction to return to this Court, in appropriate circumstances, for relief from the injunction. So that although I am prepared -- fully prepared -- to defer to the Italian Courts' determination of the data certa issue, if, in fact, something occurs which would merit relief from the injunction, the creditors have the right to come back here to the extent that I have the reference from the District Court.

Let me turn, then, to the PBGC's objection. Frankly, this was an objection that was first made at the hearing. The debtors had no chance to prepare to deal with it, unlike the original objection by the PBGC, which was based on language in the first form of proposed order, which was subsequently revised by the debtors so that the current form of order does not provide the type of protection to non-foreign-debtor third parties that the PBGC was concerned about in its written objection.

14

Instead, the PBGC, at the hearing for the first time stated that there should be a general carve out from a 304(b) injunction to permit U.S. governmental agencies to pursue monetary claims against the foreign debtors in the United States. I know of no authority that would provide that such a carve out is required. The case cited by the PBGC, U.S. v. Spelar, 338 U.S. 217 (1949), is inapposite, as it pertains to restrictions on third parties' right to bring claims against the U.S. government, not on the U.S. government's right to bring monetary claims against third parties. Certainly Section 304 doesn't speak of such a carve out, and its legislative history doesn't speak of it either.

The strong policy behind Section 304, as noted by numerous courts, again, is to focus the asset realization and claim liquidation process in the foreign, home court, subject to well-recognized exceptions for judicial convenience and economy and fundamental fairness, and, consequently, I believe that such a carve out would contravene the underlying policy of the statute.

So, therefore, subject to Paragraph 9 of the order, which I think would be particularly applicable if a governmental agency were looking to assert some form of police or regulatory power, rather than trying to collect on a monetary claim, it seems perfectly appropriate to channel the PBGC's monetary claims against the foreign debtors, along with all other creditors' claims against the foreign debtors, through the composition, to the Italian courts. So I will deny the PBGC's objection.

As I beleive I said, I am prepared to enter the permanent injunction with the modifications that I laid out on the record and that were discussed on the record. Again, I'm happy to give you my mark-up of that, although it's not in lawyerese, it's in shorthand; and, given that we have so few objectors, it seems to me that you should just

15

circulate the revision to them, although you're free to circulate it to others, too, if they've had that type of role in the case, and that you don't have to settle the order, but that you should give parties sufficient time to look at your changes before you submit it.