**EXHIBIT 8**

# THE LAW OF INTERNATIONAL INSOLVENCIES AND DEBT RESTRUCTURINGS

### Editors

**James R. Silkenat**
*Arent Fox PLLC*
*New York, New York*

**Charles D. Schmerler**
*Fulbright & Jaworski LLP*
*New York, New York*

## Oceana Publications

A Division of Oxford University Press, Inc.

# Chapter 23

# Multinational Insolvency Forum Shopping

*Anthony J. Smits* and *Ilia M. O'Hearn*
Bingham McCutchen LLP
Hartford, Connecticut

## I. Introduction

Restructuring the distressed multinational corporation presents unique challenges. While technology continues to make our world smaller and to bring us ever closer to the goal of a global village, insolvency laws struggle to keep pace. Differences among the insolvency laws of various states cause conflicts and delays that oftentimes prevent successful restructurings of multinational companies. The sudden collapse of a multinational corporation that operates in multiple countries and employs scores of people can have serious repercussions, not just in the various countries affected, but throughout the world's capital markets.[1] Recognizing this problem, over the last decade, individual countries, the United Nations and the European Union have each sought to develop a system for efficiently dealing with multinational insolvencies. Unfortunately, as with the development of most laws, governmental action moves slowly. In the meantime, it is left to insolvency practitioners and the judiciary to craft creative and innovative solutions using existing legal tools, sometimes with surprising and unintended consequences.

To date, the ability to craft creative and innovative insolvency solutions depends, in large part, upon whether the restructuring of the multinational is taking place in

---

[1]  By way of example, the collapse of Parmalat and the Italian government's subsequent heavy handed treatment of non-Italian institutional investors have had a negative impact on the ability of Italian corporations to access the capital markets. Similarly, the threatened collapse of Yukos in Russia had a direct impact on the global price of crude oil.

a common law or civil law jurisdiction.[2] Common law jurisdictions, most notably the United States of America (the "United States"), Canada and the United Kingdom (the "U.K.") have for many years been at the forefront of developing creative solutions to complex multinational cross-border restructurings. Numerous examples of cross-border insolvency cooperation among these three countries attest to the fact that their legal professionals and judiciary have adopted a pragmatic view to solving the challenges raised by multinational insolvencies.[3] In general, civil law countries have struggled to keep pace because the absence of a statutory basis has rendered their judiciary and legal professionals powerless to act. Historically, the result of this legal dichotomy between civil and common law jurisdictions has been to create something akin to a legal barrier to the restructuring of a multinational that spans both civil and common law systems. From an insolvency practitioner's perspective, such barriers have generally been insurmountable, often leading to a failure of the enterprise.

The challenge of restructuring a multinational corporation is further complicated by the strategic and tactical options available to distressed companies in different jurisdictions. The hypothesis is that a distressed multinational corporation, if given the option, will always seek out a jurisdiction with insolvency laws that offer it the most protection from its creditors coupled with the greatest flexibility and power in negotiating with its creditors. The best common law example of a debtor-friendly jurisdiction is the United States. The United States has an expansive view of personal jurisdiction and applies its law with extra-territorial effect to creditors and assets of the multinational corporation wherever located.[4] In addition, and virtually unique to the United States, management is permitted to stay in control of the restructuring process during the insolvency proceeding without the supervision of a court appointed liquidator or administrator. Conversely, it is gen-

---

2   Although greatly oversimplifying thousands of years of legal tradition, the major difference between common law jurisdictions (primarily the former English colonies, including the United States of America) and civil law jurisdictions (the rest) is that in common law jurisdictions judges are permitted to authorize an action unless the law specifically limits such authority, whereas in civil law jurisdictions judges cannot authorize an action unless the law specifically permits such authority. All references to a restructuring in this chapter assume the use of a formal court supervised insolvency proceeding, as opposed to an out-of-court restructuring.

3   Although too numerous to mention them all, examples include Maxwell Communications (U.S.-U.K.), Loewen (U.S.-Canada), Cenargo (U.S.-U.K.), AT&T Canada (U.S.-Canada), Everfresh (U.S.-U.K.), 360 networks (U.S.-Canada), Laidlaw (U.S.-Canada). Protocols between the U.S. and other countries include Nakash (U.S.-Israel) and Commodore (U.S.-Bahamas).

4   Various provisions of the United States Bankruptcy Code, most notably the automatic stay in §362 and the effect of a debtor's discharge in § 524, have been held by courts in the United States to have extra-territorial effect. While not recognized as such by most countries, because most of the world's financial institutions and large corporations have contacts with the United States, these financial institutions and large corporations are forced to take notice because they are often subject to the personal jurisdiction of courts in the United States.

erally the case that creditors of a distressed multinational corporation prefer a predictable creditor-friendly jurisdiction in which management is divested of control of the business, creditors' rights are strictly enforced, and distributions are made to creditors as quickly as possible.[5] As a result of the widely disparate laws between nations, the choice of forum for a particular multinational corporation's court assisted restructuring often results in a clash between the interested stakeholders.

In what often turns into a global rush to the courthouse, distressed multinational corporations, with the help of creative lawyers, will usually try to find ways to commence insolvency proceedings in debtor-friendly havens before creditors can force them into proceedings in creditor-friendly jurisdictions. This "forum shopping" has been the subject of much media and academic debate following several recent high profile cases. Ironically, with the enactment of the European Insolvency Regulation in May of 2002 (the "Regulation"), "forum shopping" has now spread to Europe, with distressed European multinationals seeking ways to restructure in flexible and predictable insolvency systems in Europe, most frequently in the U.K. With the gradual adoption of the Model Law on Cross-Border Insolvency (the "Model Law") by individual countries, and, in particular, the adoption of the Model Law by the United States in 2005, it is expected that such forum shopping will take a new twist with global cooperation between courts, particularly common law and civil law countries. The adoption of the Model Law by UNCITRAL, the U.S. and other countries marks the beginning of a new phase in the evolution of forum shopping.[6]

This chapter will briefly examine the issue of forum shopping in international insolvency law and practice. It will first review two recent failed ad hoc forum shopping attempts involving the United States. Next, the focus will shift to the European Union and the dawn of coordinated forum shopping in Europe following the enactment of the Regulation with a focus on the definition of a corporation's "center of main interests" or "COMI." Finally, the Model Law and chapter 15 of the United States Bankruptcy Code (the "Code") will be discussed, along with some initial predictions as to the likely impact that chapter 15 and the Model Law will have on international forum shopping.

---

5    While generally true, creditor groups may from time-to-time prefer management to remain in control of the business and continue to run it in order to preserve the going concern value of the business, and as a consequence preserve value for the creditors.

6    The United States has adopted the UNCITRAL Model Law as chapter 15 of the Bankruptcy Code, which became effective on October 17, 2005. *See* footnote 31 *infra*. Because the United States has the world's largest economy, the hope is that major trading partners of the United States will quickly follow suit.

## II. United States Cases on International Forum Shopping

Chapter 11 of the Code provides various debtor-friendly safeguards and powers, including, among others, liberal venue provisions, "cramdown" and the extraterritorial application of its "automatic stay."[7] Those rights, coupled with the ability of management to stay in control during the restructuring process as a "debtor in possession," have proven irresistible to many distressed multinationals, including those with tenuous ties to the United States. As a result, multinational corporations often seek to initiate their court-assisted restructurings in the safe harbour of the Bankruptcy Courts in the United States.

There are numerous examples of multinational corporate restructurings involving multinationals that were engaged in simultaneous insolvency proceedings in the United States and other common law countries. Historically, in such cases, courts in the United States have used § 304 of the Code and the common law principles of comity to cooperate with foreign courts to try efficiently to coordinate cases and maximize recovery for creditors. While challenging, these multi-jurisdictional restructurings have generally been successful.[8] Problems arise where the United States court is asked to exercise jurisdiction over a multinational that has few if any legitimate ties to the United States. Such companies are usually facing dire circumstances and hope to utilize the powers provided by the chapter 11 "automatic stay" (and the threat of sanctions if it is violated) as a way to maintain control in a crisis. In such cases, United States courts face the challenge of exercising jurisdiction and entering judgments that may not be enforceable beyond U.S. borders. The cases discussed below illustrate the complexity of these issues.

---

7    § 109 of the Code authorizes any person or corporation that "resides or has a domicile, a place of business, or property in the United States" to be a debtor under the Code. Courts have held a bank account or even a legal retainer to constitute sufficient property for the purposes of § 109. 28 U.S.C. § 1408 governs federal court venue for a chapter 11 case and requires that the debtor have its "domicile, residence, principal place of business in the United States, or principal assets in the United States. . ." § 1129(b) of the Code allows for the imposition of a restructuring plan on dissenting creditors provided certain conditions are met and provided at least one class of creditors votes in favour of the restructuring plan. § 362 of the Code imposes an automatic stay of almost all creditor action against a chapter 11 debtor upon the commencement of a chapter 11 case. Case law has interpreted this stay to be extraterritorial in effect to prevent creditor action against the assets of the debtor wherever located. Violation of the stay can lead to sanction of the creditor by the Court which means in practice that where a creditor is subject to the personal jurisdiction of the U.S. courts it will be extremely wary of exercising remedies against foreign assets of the debtor.

8    E.g., Evan D. Flaschen & Ronald J. Silverman, *The Role of the Examiner as Facilitator and Harmonizer in the Maxwell Communication Corporation International Insolvency*, in CURRENT DEVELOPMENTS IN INTERNATIONAL AND COMPARATIVE CORPORATE INSOLVENCY LAW 621 (Jacob S. Ziegel ed., 1994). *See also In re Maxwell Communication*, Bankr. S.D.N.Y. Jan. 15, 1992, Case No. 91 B15741, and the High Court of Justice, Chancery Division, Companies Court, Case No. 0014001 of 1991, Dec. 31, 1991; *In re Loewen Group*, Bankr. Del. June 30, 1999, Case No. 99-1244, and Ontario Superior Court of Justice, Toronto, Case No. 99-CL-3384, June 1, 1999.

## A. Cenargo International plc[9]

The *Cenargo* case is a good example of a multinational corporation that sought the safe harbour of a United States court notwithstanding the fact that it was a U.K. incorporated entity with minimal ties to the United States. Cenargo is the English parent of a predominantly English and European ferry operating company. The primary creditors of Cenargo were holders of $175 million of public secured bonds issued by Cenargo to United States institutional lenders. Cenargo's cashflow position deteriorated to the point where in January 2003, Cenargo and various of its subsidiaries filed for chapter 11 in the United States Bankruptcy Court for the Southern District of New York. Cenargo's only stated connection to the United States was a bank account opened to fund legal fees, and the fact that the majority of the holders of Cenargo's $175 million bond debt where based in the United States. One of Cenargo's main creditors, Lombard, sought to commence an administration proceeding against Cenargo in the U.K. and applied to the English Court for the appointment of joint provisional liquidators ("JPLs"). The U.K. Court, finding that it had personal jurisdiction over the U.K. entity, and unconstrained by the "automatic stay," opened administration proceedings and appointed the JPLs. The JPLs, at the behest of Lombard, immediately sought an injunction preventing Cenargo's directors and agents from further prosecuting the chapter 11 proceeding. Immediately, Cenargo, as debtor in possession in the United States, obtained an injunction against the JPLs preventing the JPLs from taking any further action in the administration. Additionally, Cenargo, as debtor in possession, sought sanctions against both Lombard and the JPLs, for violating the "automatic stay" by commencing the U.K. administration.

The net result was a perfect stalemate. A jurisdictional dispute followed with allegations of contempt in both the U.K. and the United States proceedings. The United States Bankruptcy Court ultimately determined that the "center of gravity" for Cenargo was properly in the U.K. and suspended the chapter 11 proceedings in deference to the English administration proceedings. The United States Bankruptcy Court found that the debtor's "center of gravity" was in England for a variety of reasons. First, Cenargo's main office was in England. Second, the parent company and most of its subsidiaries were organized under English law and conducted their business primarily in England, Ireland and other parts of the world. Third, none of the Cenargo debtors conducted any business in the United States. Although the United States Bankruptcy Court found that Cenargo's bank account in the United States, which had been opened in anticipation of the chapter 11 filing, and certain shares previously pledged to Deutsche Bank, provided sufficient nexus for Cenargo to file for chapter 11,[10] the United States Bankruptcy Court ultimately determined that England was the proper jurisdiction to adjudicate Cenargo's insolvency proceedings. In reaching its conclusion, the United States

---

9    *In re Cenargo International, Inc.*, (Chapter 11) Bankr. S.D.N.Y. Jan. 14, 2003 ("*Cenargo*").

10   Pursuant to § 109 of the Bankruptcy Code.

Bankruptcy Court was guided by principles of comity and frankly, common sense. Absent Judge Drain's pragmatic approach in reaching the right decision, the courts would have remained deadlocked to the potential detriment of all stakeholders. Interestingly, the application of new chapter 15 to the facts of this case would almost certainly have resulted in the same outcome following a determination of Cenargo's "center of main interests" ("COMI") discussed in more detail below.

### B. Yukos Oil Company[11]

Yukos Oil Company ("Yukos") is incorporated in Russia and is one of the world's largest producers of oil. In late 2004, Yukos was placed into bankruptcy proceedings in Russia as a result of massive outstanding tax obligations owed to the Russian government. Facing a piecemeal auction of its assets by the Russian government, in December 2004, Yukos sought protection under chapter 11 in the Bankruptcy Court for the Southern District of Texas. Yukos' nexus with the United States was, to say the least, thin, and was limited to a single employee, a recently opened Houston bank account set up to pay attorney's fees related to the chapter 11 filing, and holdings by United States institutional investors of approximately 15% of Yukos' shares. Nevertheless, the Texas Bankruptcy Court found that it had jurisdiction over the Yukos case pursuant to Code § 109(a), under which courts have only required minimal amounts of property to be located in the United States. According to the Texas Bankruptcy Court, there are 'virtually no formal barriers' to having federal courts adjudicate foreign debtors' bankruptcy proceedings.[12] The Court concluded that the Houston bank account was a significant asset providing nexus and, therefore, Yukos had standing to be a chapter 11 debtor in Texas. The Texas Bankruptcy Court then issued a temporary restraining order to halt a December 19, 2004, auction in Russia for the sale of the debtor's interest in its subsidiary.[13] It was suspected that Yukos only sought United States Bankruptcy Court protection in order to utilize the "automatic stay" to stop foreign banks from financing buyers at Yukos' auction in Europe. The "automatic stay" would have such an effect because most of these foreign banks have branches in the United States and, consequently, were subject to sanctions if they violated the "automatic stay."

The issues in Yukos were about jurisdiction and propriety of venue. After a close analysis of the relevant facts, the Texas Bankruptcy Court dismissed the case. It reached this conclusion on a number of grounds. First, the Court found that

---

11   *In re Yukos Oil Company*, 43 BCD 278 (Bankr. S.D. TX Dec. 16, 2004) (*"Yukos"*).

12   Citing *In re Globo Comunicacoes E Participacoes S.A.*, (Chapter 11) Bankr. S.D.N.Y. Dec. 11, 2003.

13   For its request of a temporary restraining order, Yukos argued that the Russian government had wrongfully assessed $27.5 billion in taxes against Yukos and had violated Russian law by moving forward with the auction despite a pending appeal in Russian courts.

Yukos' "center of main interests" was in Russia because its primary business and financial activities occurred there and such activities required the continued participation of the Russian government (as regulator of production of oil from Russian lands). Second, absent consent, the Russian government could not be subjected to the jurisdiction of any court in the United States and therefore it could ignore the "automatic stay" and any judgments the Court issued. Finally, the Court apparently reconsidered its initial finding of jurisdiction and determined that the opening of the Houston bank account by Yukos in order to create jurisdiction in the United States did not create a sufficient nexus. Ultimately, the Court recognized that Yukos could not effectively reorganize under chapter 11 because it required the nonexistent cooperation of the Russian government, given that most of Yukos' assets were oil and gas reserves within Russia. As a result, the Court dismissed the case, holding that cause existed for dismissal due to the minimal contacts that Yukos had with the United States.

*Yukos* is a good example of defensive forum shopping by a multinational. Yukos was desperate to stave off its own dismemberment as part of the Russia bankruptcy filing and therefore attempted to create a nexus with the United States sufficient to impede the auction process. For a variety of reasons, including COMI-type issues and sovereign immunity obstacles, Yukos' efforts ultimately failed. As with *Cenargo*, had chapter 15 been in force at that time, and assuming a foreign proceeding in Russia, the attempted forum shopping by Yukos would likely not have been possible because the Texas Bankruptcy Court would almost certainly have found Yukos' COMI to be in Russia and would not have accepted jurisdiction of the case.

### III. The European Union Regulation on Insolvency Proceedings

The European Union Regulation on Insolvency Proceedings[14] (the "Regulation") represents the European Union's first successful attempt to address the challenge of cross-border insolvencies within Europe.[15] among other things, the Regulation attempts to address the issue of forum shopping.[16] The Regulation became effective on May 31, 2002, without any retroactive effect and applies to all European Union member states, except Denmark.[17] Pursuant to the European Community Treaty, the Regulation binds member states in its entirety (meaning that member states cannot introduce national legislation that would modify or conflict with the legal effects of the Regulation).

---

14    Council Regulation (EC) No. 1346/2000.

15    A prior attempt to implement a procedure substantially similar to the Regulation in the form of an EU treaty failed.

16    Fourth recital of the Regulation.

17    Denmark opted out of the Regulation but will enact similar legislation.

The Regulation applies only to those proceedings wherein the management of the debtor loses its powers of administration and control over the debtor's business, an office holder[18] is appointed, and the debtor's COMI is located within a European Union member state. Accordingly, the Regulation excludes any type of insolvency proceeding that leaves the debtor's management in control of the business, such as a debtor-in-possession under the Code.[19] The types of insolvency proceedings that are subject to the jurisdiction of the Regulation are listed by country in Annex A to the Regulation.[20]

The Regulation's requirement that a debtor's COMI be located within a European Union member state impacts debtors' and creditors' ability to forum shop. Notwithstanding where a debtor was formed, has assets, employees, accounts or operations, if such activity does not rise to the level of the debtor's COMI, the Regulation does not apply. *In Re Brac Rent-A-Car International Inc.*, 2003 EWHC Ch. 128, is an example of a case in which an English court ruled that a United States company can have its COMI in England and therefore be subject to the provisions of the Regulation.[21] In *In Re Brac*, the company was incorporated in Delaware with operations conducted almost entirely in England. English law governed the company's primary contracts and franchise agreements. The company filed for chapter 11 bankruptcy protection in the United States but needed to restructure its European operations. The debtor recognized that, notwithstanding the purported extraterritorial application of the "automatic stay" under the Code, European creditors were unlikely to abide by the stay. Accordingly, in order to restructure the European operations of the debtor, the company petitioned the English High Court for an administration order in England. Certain creditors, fearing that they would be negatively affected by the U.K. administration, objected to the initiation of proceedings in England on the ground that English courts did not

---

18    The office holder is the person responsible for administering the insolvency proceedings. Office holders are referred to in the Regulation as "liquidators." The Regulation defines a "liquidator" as any person or government body whose function is to administer or liquidate the debtor's assets or to supervise the administration of the debtor's affairs. The authorized persons or governmental bodies are listed in Annex C to the Regulation.

19    In addition, because the insolvency proceedings covered by the Regulation must be collective insolvency proceedings, the Regulation would not apply to those proceedings that are commenced by one creditor for its sole benefit. Likewise, the Regulation does not apply to administrative receiverships or its foreign equivalents. Other areas have been specifically excluded from the Regulation because they are subject to special regulatory regimes under national laws. Those areas are: insurance undertakings; credit institutions; investment undertakings holding funds or securities for third parties; and collective investment undertakings.

20    Examples of insolvency proceedings subject to the Regulation are: (1) winding up by, or subject to the supervision of, the court proceedings; (2) creditors' voluntary winding up (with confirmation by court); (3) administration proceedings; (4) voluntary arrangements under insolvency legislation (both company and partnership voluntary arrangements); and (5) bankruptcy and sequestration proceedings.

21    *Re Brac Rent-A-Car International Inc.*, 2003 EWHC Ch. 128.

have jurisdiction over the company. The English High Court concluded that the Regulation gives jurisdiction to the courts of a member state to open insolvency proceedings in connection with a company incorporated outside the European Community if the company's COMI is in that member state. Consequently, the English court entered an administration order; parallel insolvency proceedings were conducted contemporaneously in the United States and England.

The COMI not only determines whether the Regulation applies to the insolvency proceeding, but also determines the locality where the main proceeding can be opened. The COMI is the place where the debtor conducts the administration of its interests on a regular basis, which is, therefore, a place ascertainable by third parties.[22] The Regulation establishes a rebuttable presumption that the debtor's COMI is the place of the debtor's registered office.

The Regulation provides for two kinds of insolvency proceedings: the main proceeding and secondary proceedings. There can only be one main proceeding and it must take place in the member state where the debtor has its COMI. In theory, only the court of the member state where the debtor's COMI is located has jurisdiction to open a main insolvency proceeding. Secondary proceedings run in parallel to the main proceeding and may occur in one or more member states where the debtor has an "establishment." The Regulation defines an "establishment" as any place of operations where the debtor carries out a non-transitory activity with human means and goods. Main proceedings have universal scope, encompassing all the debtor's assets and affecting all creditors, wherever located. Secondary proceedings, on the other hand, are territorial in nature and may be used only to wind up the debtor's activities and assets.

Under the Regulation, the governing law for the insolvency proceedings is the law of the state where the main proceeding is commenced. However, there are some exceptions. Insolvency matters that are always governed by the law of the state where the main proceeding is commenced include setoffs, proof of debts, powers of liquidators, distribution of assets, and avoidance of antecedent debt. This general rule does not apply in secondary proceedings to matters involving a creditor's *in rem* rights, rights under contracts of employment, certain setoff rights, and reservation of title clauses. It is interesting to note that the Regulation is silent as to which law applies in order to determine a director's liability although under general choice of law principles this would usually be governed by the law under which the corporation is organized.[23]

---

22  The Regulation does not define COMI. But Recital 13 of the Preamble to the Regulation, written by the Council of the European Union, suggests that the "center of main interests should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

23  *See, e.g., Personal Liability Ltd. Germany,* BHG, 14 March 2005 (ILZR/03). In this case, a creditor brought an action for personal liability against the directors of an insolvent private

Creditors have the right to lodge claims from wherever they are domiciled in the European Union and in any and all proceedings related to a debtor. Such rights extend to a state's taxation and social security authorities.[24] In addition, the office holder in the main proceeding may lodge the claims filed in the main proceeding in a secondary proceeding. The Regulation allows creditors the ability to lodge claims in all proceedings because assets and priorities may be different in each proceeding and such differences are not completely compensated for by the "hotchpot" provision in Article 20(2). The "hotchpot" rule provides that, with regard to the distribution of a debtor's assets, dividends are paid equally to creditors regardless of the number of jurisdictions in which they have lodged claims. Claims lodged in the secondary proceedings are paid first, according to local priority rules, from the local assets of the debtor. Any remaining assets are sent to the main proceeding. Article 20(2) limits the dividends that a creditor who had lodged claims in both main and secondary proceedings may receive. Not surprisingly, a creditor who received a distribution in one proceeding, may not receive a distribution in another proceeding until other creditors with the same priority have received an equivalent distribution.[25]

The office holder in the main proceeding may apply for a stay of a secondary proceeding on the basis that such secondary proceeding affects the interests of the creditors in the main proceeding. Such a stay may last for up to three months, but multiple extensions are possible. The office holder in the main proceeding would typically request a stay of a secondary proceeding where the liquidator is attempting a reorganization, a rescue, or a sale of the business or assets of the debtor as a whole, and needs to prevent the liquidation of the assets of the debtor in the secondary proceeding. The stay suspends the liquidation of the assets in the secondary proceeding but does not entitle the liquidator in the main proceeding to dispose of such assets.

Main proceedings *must* be recognized in other member states, except when contrary to public policy. The office holder may, subject to provisions regarding reservation of title and certain rights *in rem*, remove assets and bring claims or the

---

limited company incorporated under British Company Statutes and doing business in Germany. The German Supreme Court ruled that the British Company Statutes, and not German law, applied to the action against the directors.

24    Consequently, the Regulation eliminates the traditional rule against enforcement of foreign revenue debts.

25    Local creditors, especially preferential or priority creditors like taxing authorities, have an incentive to open secondary proceedings where they have provable claims under local law if the debtor has significant assets in that locality because in secondary proceedings such creditors would preserve their priority rights in relation to the local assets. This may reduce recovery for non-local creditors because the priority rules of the member state where the secondary proceedings are held would apply to the distributions. According to Article 4(2)(i), the law of the state of the opening of the proceedings governs the question of whether distributions will take place and will also determine the ranking and treatment of claims.

company as a going concern. The ensuing rush to enforce remedies by individual creditors in multiple jurisdictions usually triggered the collapse of the company. Over the past few years, European multinationals have used the Regulation to push the envelope in determining their COMI to establish jurisdiction in the common law of the United Kingdom in order to take advantage of the flexible and predictable English administration proceeding to restructure their European operations. Even German and French companies—despite centuries of conflict, warm beer and mad cows—have sought out English law. These multinationals have used the Regulation, not only to restructure a parent, but also to try to sweep up all of their European subsidiaries under one COMI and one main proceeding. While European legislators no doubt ponder the desirability of restructuring German and French companies under English law notwithstanding the fourth recital to the Regulation, insolvency practitioners in Europe have generally embraced this added flexibility and, as a result, these liberal interpretations of COMI are likely to continue.

## IV. The Model Law on Cross-Border Insolvency

The Model Law on Cross-Border Insolvency, adopted in May 1997 by the United Nations Commission on International Trade Law ("UNCITRAL"), while not as far reaching as the Regulation, provides guidelines for the resolution of cross-border insolvency proceedings that are currently outside the ambit of the Regulation. Unlike the Regulation, the Model Law does not have the force of law until adopted by a country as part of its domestic law. Moreover, to the extent that the Model Law conflicts with a treaty, the treaty will still prevail. Mexico was the first major country to adopt the Model Law as part of its domestic insolvency legislation in May of 2000. South Africa followed by enacting the Model Law as domestic legislation in November of 2000. Japan, Poland, Romania, Eritrea, Serbia and Montenegro have also adopted the Model Law as part of their domestic insolvency laws.[26] The United States has just adopted the Model Law in the form of chapter 15 of the Code and it is expected that the U.K. will follow in 2006. The hope is that more countries will quickly follow, including countries in Western Europe.[27]

---

26  New Zealand is currently contemplating adoption of the Model Law as part of its Insolvency Law Reform Bill.

27  Because the Regulation does not deal with cross-border insolvency matters extending beyond European Union member states, the Model Law would offer EU member states "a complimentary regime of considerable practical value that addresses the many cases of cross-border cooperation not covered by the [Regulation]." (*Guide to Enactment of The UNCITRAL Model Law on Cross-Border Insolvency*, ¶ 19 at http://www.uncitral.org/english/texts/insolven/insolvency.htm). However, EU member states seeking to adopt the Model Law as part of their domestic legislation would need to take into consideration the effect of the Regulation, which is overriding as European Community law.

The Model Law is limited in scope to questions of recognition of "foreign proceedings" and of the rights of a "foreign representative" to obtain access to, and assistance from, the courts involved in the cross-border insolvency proceedings.[28] The Model Law applies to insolvency proceedings where a foreign representative requests assistance or wishes to commence or participate in a local court proceeding. The Model Law also applies when a local court requests assistance from a foreign representative or foreign court, and governs concurrent, domestic, and foreign insolvency proceedings pending simultaneously.

The Regulation and Model Law share many commons features. For example, the Model Law incorporates the Regulation's concepts of main and secondary proceedings and uses the concept of a COMI. As with the Regulation, a main proceeding may be opened only in the country of the debtor's COMI[29], and creates a rebuttable presumption that the place of the debtor's registered office is the location of the debtor's COMI. Like the Regulation, a foreign non-main proceeding may be opened in any country where the debtor has an establishment.[30] Relief and assistance is provided on a discretionary basis, and like the Regulation, the Model Law provides a public policy exception that provides a court with discretion to refuse to take an action governed by the Model Law if such action would be manifestly contrary to the public policy of the country where the proceeding is pending.

Similar to the Regulation, when a foreign proceeding is recognized as a main proceeding, the Model Law provides for an "automatic stay" of proceedings by creditors against the debtor's assets and the suspension of the right to transfer, encumber or otherwise dispose of the debtor's assets. However, unlike secondary proceedings under the Regulation, non-main foreign proceedings do not provide the debtor with an "automatic stay." Under the Model Law, the foreign representative needs to request such a stay from the local court.

---

28  The Model Law defines a "foreign proceeding" as a collective judicial or administrative proceeding in a foreign state, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation. The Model Law defines a "foreign representative" as a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding which would include a U.S. debtor in possession.

29  The Model Law defines a "foreign main proceeding" as a foreign proceeding taking place in the state where the debtor has the center of its main interests.

30  The Model Law defines a "foreign non-main proceeding" as a foreign proceeding, other than a foreign main proceeding, taking place in a state where the debtor has an establishment. Similar to the Regulation, the Model Law defines establishment as the place of operations where the debtor undertakes non-transitory economic activity with human means and goods or services.

In stark contrast to the Regulation, the Model Law recognizes the United States concept of a debtor in possession and does not contain any rules on choice of law. In addition, the Model Law does not impose the insolvency law of the main proceeding on creditors in the non-main proceedings whereas the Regulation provides, with certain exceptions, that the law applicable to all of the insolvency proceedings will be the law of the member state where the proceedings are opened (the *lex concursus*). Lastly, the Model Law does not designate a "supreme" court that would have final say in adjudicating issues of interpretation when, for instance, courts in different countries have issued conflicting opinions affecting the same case.[31] Under the Regulation, the Court of Justice of the European Communities is the supreme court for purposes of determining questions about the validity of the Regulation and the interpretation of its provisions.

## V. New Chapter 15

New chapter 15 of the Code, *Ancillary and Other Cross-Border Cases,* became law on April 20, 2005, as part of the *Bankruptcy Abuse Prevention and Consumer Protection Act of 2005*.[32] Chapter 15 incorporates the Model Law on Cross-Border Insolvencies into United States domestic insolvency legislation and replaces § 304 of the Code, which governed foreign ancillary proceedings. One of the objectives of the new chapter 15, in conformance with the Model Law, is to encourage cooperation in cross border insolvency cases between the United States courts, trustees and debtors, and the courts and other competent authorities of foreign countries involved in these insolvency cases.[33] However, nothing under chapter 15 prevents a court from refusing to take any action governed under chapter 15 if the action would be manifestly contrary to the public policy of the United States (this is the analogous provision to the public policy exception of the Model Law and the Regulation).[34]

Chapter 15 provides guidelines for concurrent proceedings and applies: (1) where a foreign court or "foreign representative" seeks the assistance of United States courts in connection with a "foreign proceeding"; (2) where a United States court seeks the assistance of a foreign court with respect to a pending chapter 11 debtor; (3) where a foreign proceeding and a chapter 11 case are pending concurrently; or (4) where creditors or other interested persons in a foreign country have an inter-

---

31    According to the *Guide to Enactment of The UNCITRAL Model Law on Cross-Border Insolvency*, ¶ 92 at http://www.uncitral.org/english/texts/insolven/insolvency.htm, harmonized interpretation of the Model Law will be facilitated by the Case Law on UNCITRAL Texts ("CLOUT") information system, under which the UNCITRAL publishes abstracts of judicial decisions that interpret conventions and model laws emanating from UNCITRAL.

32    The new chapter 15 generally becomes effective 180 days from enactment, or October 17, 2005, although certain sections have retroactive effect.

33    11 U.S.C. § 1501(a)(1) (2005).

34    11 U.S.C. § 1506 (2005).

est in requesting the commencement of, or participation in, a chapter 11 case in the United States.[35] Chapter 15 follows many of the provisions of the Model Law, including the definitions of "foreign representative", "foreign proceedings", "establishment"; COMI; and the public policy exception. Like the Regulation and the Model Law, chapter 15 establishes a rebuttable presumption that the jurisdiction in which the debtor's registered office is located is the debtor's COMI.[36]

A chapter 15 case is commenced by a "foreign representative" by filing a petition for recognition of a "foreign proceeding."[37] As was the case with § 304, the predecessor to chapter 15, there needs to be a showing that there is already a pending "foreign proceeding" in which the "foreign representative" was appointed.[38] Assuming these initial requirements are met, the court must next determine whether to recognize the foreign proceeding as either a main or non-main proceeding. A foreign proceeding will be recognized as a foreign main proceeding if it is pending in the country where the debtor has its COMI.[39] A proceeding will be a foreign non-main proceeding if the debtor merely has an establishment in the foreign country.[40] The Code contains guidelines for determining the COMI, but it is likely that courts will look for guidance to how COMI has been interpreted under the Regulation. This initial determination has a number of important consequences that follow. First, if the court recognizes the foreign proceeding as a foreign main proceeding, then the foreign representative has the option of commencing an involuntary or voluntary bankruptcy case under the Code, but only if the debtor has assets in the United States.[41] Second, Code § 361 and § 362 automatically apply with respect to the debtor and the debtor's property that is within the territorial jurisdiction of the United States.[42] In particular Code § 362 imposes an "automatic stay" against all creditors and prohibits collection efforts and foreclosure actions of pre-petition debt. Any creditor wishing to take action against the debtor must first seek relief from the stay from the Bankruptcy Court. Additionally, a secured creditor can seek "adequate protection" for the continued use of its collateral.[43] Third, Code §§ 363, 549 and 552 apply to a transfer of an interest of the debtor in

---

35    11 U.S.C. § 1501(b)(1) (2005). *See also* 11 U.S.C. §§ 1529 & 1530 (2005). Both "foreign proceedings" and "foreign representative" are defined in the Code under amended §§ 101(23) and (24), respectively.

36    11 U.S.C. § 1516(c) (2005).

37    11 U.S.C. §§ 1504 & 1515 (2005).

38    11 U.S.C. § 1515(b) (2005).

39    11 U.S.C. § 1517(b)(1) (2005).

40    11 U.S.C. § 1517(b)(2) (2005).

41    11 U.S.C. §§ 301-303, 1511(a) & 1528 (2005).

42    11 U.S.C. § 1520(a)(1) (2005).

43    11 U.S.C. § 362(d)(1) (2005). Adequate protection means that the bankruptcy estate must maintain the value of the interest in the property while the property is held by the bankruptcy

property that is within the territorial jurisdiction of the United States.[44] Code § 363 governs post-petition use, lease or sale of property of the estate. Code § 549 authorizes the foreign representative to avoid unauthorized transfers of property of the estate, and Code § 552 limits the ability of pre-petition creditors to take a security interest in property acquired post-petition so that such property is available to provide security for post-petition financing or to run the business post-petition. Fourth, unless the court orders otherwise, upon recognition of the foreign main proceeding, the foreign representative may operate the debtor's business, and may exercise the rights and powers of a trustee under and to the extent provided by § 363 and § 552.[45]

If the foreign proceeding is determined to be non-main, then the foreign representative may request that the court grant any appropriate relief, including staying an action or proceeding concerning the debtor's assets, rights, obligations or liabilities; staying execution against the debtor's assets; or suspending the right to transfer, encumber or dispose of any assets of the debtor.[46] However, the court may grant this relief only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected, and may condition such relief on appropriate conditions that may include giving security or filing a bond.[47] Moreover, under § 1517(d), the court may modify or terminate recognition of a foreign proceeding (main or non-main) if it is shown that the grounds for granting recognition were lacking or have ceased to exist. However, when considering any modification or termination of recognition of the foreign proceeding, the court would give weight to possible prejudice to parties that have relied upon the order granting recognition.[48]

In essence, where the debtor's COMI is in the United States, a foreign representative may seek recognition of a foreign non-main proceeding in the U.S. courts, which would allow the foreign representative to open an involuntary case under § 303. If the debtor's COMI is in a foreign country, the foreign representative may seek recognition in the U.S. courts of a foreign main proceeding, and may open either a voluntary or an involuntary case in the United States. Upon commencement of the U.S. bankruptcy case, any relief that the court may have already granted to the foreign representative in the foreign proceeding, whether main or non-main, may be modified or terminated by the court if it is inconsistent

---

estate in order for the interested party to realize no less than the party would have realized had the property been surrendered or liquidated immediately.

44    11 U.S.C. § 1520(a)(2) (2005).

45    11 U.S.C. § 1520(a)(3) (2005).

46    11 U.S.C. § 1521 (2005).

47    11 U.S.C. § 1522 (2005).

48·    11 U.S.C. § 1517(d) (2005).

with the U.S. bankruptcy case.[49] Similarly, where a U.S. bankruptcy case was already pending in the U.S. courts at the time the foreign proceeding is recognized (main or non-main), any relief that the court may grant to the foreign representative pursuant to §§ 1519 or 1521 must be consistent with the relief granted in the U.S. bankruptcy case; in the case of a foreign main proceeding, relief under § 1520, such as the automatic stay, would not apply.[50]

As discussed, where the debtor's COMI is in a foreign country, and an insolvency proceeding is initiated there, the foreign representative may petition the U.S. courts for recognition of a foreign main proceeding in the Unites States. If the debtor also has a U.S. subsidiary, or some other form of establishment in the U.S., and the subsidiary's management files for Chapter 11 in the U.S. courts, the foreign representative may seek dismissal or suspension of the U.S. case under § 305(a)(2). Chapter 15 requires the U.S. court to seek cooperation and coordination between the U.S. courts, the foreign courts, and the foreign representative, which may include abstention under Code § 305.[51] Under § 305, the U.S. court may dismiss the U.S. case, or may suspend all proceedings under the U.S. case, if a foreign proceeding is recognized under chapter 15 and the purpose of chapter 15 would be best served by dismissal or suspension of the U.S. bankruptcy case.

While chapter 15 is a logical extension of former § 304, several new concepts have been introduced. The most important of these is the determination of a debtor's COMI. Where assistance is sought by a foreign representative for a foreign proceeding that is not the main proceeding, the relief available will largely follow that available under old § 304. However, where the foreign proceeding is the main proceeding, the foreign representative now has wide powers, including the "automatic stay," to administer the debtor's United States estate. Chapter 15 also requires cooperation by courts in the United States unless contrary to public policy.

## VI. "The Essence of COMI"—Lessons from the Regulation

Because there has yet to be a single reported court decision dealing with the Model Law and chapter 15 has not yet taken effect, the only available precedent dealing with how courts have defined and interpreted COMI fall under the ambit

---

49    11 U.S.C. § 1529 (2005).

50    Under § 1530, if a chapter 11 case and a foreign proceeding are pending concurrently with respect to the same debtor, relief under § 1520 would not be available to the foreign proceeding if the United States bankruptcy case had already commenced at the time the foreign representative applies for recognition. Additionally, if the United States bankruptcy case commences after the foreign main proceedings have been recognized under § 1517, then relief under § 1520 may be modified or terminated if it is inconsistent with the relief granted under the United States bankruptcy case. In any event, relief under § 1519 or § 1521 must be consistent with the relief granted in the United States bankruptcy case.

51    11 U.S.C. § 1529 (2005).

of the Regulation. It is likely that courts in the United States and other countries will look to decisions under the Regulation for guidance in determining a debtor's COMI given that the language used in the Regulation, the Model Law and chapter 15 is virtually identical.

Under Article 3(1) of the Regulation, the court of the member state in which the "center of a debtor's main interests" is situated shall have jurisdiction to open insolvency proceedings. Under the Regulation, the concept of COMI is crucial in determining which member state has jurisdiction to open a main insolvency proceeding, and will likewise be crucial under chapter 15 in determining what powers a foreign representative will have. The Regulation, like chapter 15, only provides guidelines to help define what is meant by "center of main interests" and so it has fallen to the individual courts in the EU to interpret what is meant on a case by case basis.[52]

The Regulation's Preamble states that the center of main interests is "the place where the debtor conducts the administration of his interests on a regular basis" and is therefore ascertainable by third parties. Neither the Regulation nor its Preamble defines what constitutes "administration" or "interests." Both the Regulation and chapter 15 create a rebuttable presumption that a debtor's COMI is located in the place of its incorporation. While this is helpful, it is certainly not dispositive because it is not uncommon for companies to incorporate in jurisdictions purely for tax reasons and have no substantive operations or employees in such jurisdictions.

By including the phrase "ascertainable by third parties," the Preamble suggests that a company's COMI should be a place that parties can foresee from their dealings with the company. This implies a level of predictability in determining a debtor's COMI. However, because the COMI is not fixed, it can change, which means that companies can consciously decide to change their COMI over time for valid business reasons or perhaps as part of insolvency planning[53]. That means that creditors under the Regulation can find themselves ultimately subject to the laws of less favourable member states where, for example, setoffs or parent guar-

---

52  In a recent opinion by Advocate General Jacobs of the Court of Justice of the European Communities, in relation to *Eurofood IFSC Ltd.*, Case C-341/04, 27 September 2005, Recital 125, Advocate General Jacobs stated that "in determining the centre of a debtor's main interests, each case manifestly falls to be decided on its specific circumstances." *See also, Sendo Ltd.*, [2005] All ER (D) 356 (Jun), Chancery Division, where a debtor was incorporated in the Cayman Islands, but headquartered in the U.K., the court found that the debtor's COMI was in the U.K. The debtor conducted its management and operational functions from its U.K. headquarters and its primary bank accounts were also in the U.K.

53  *See, e.g., Dentist Changing House*, AG Celle, 18 April 2005 (29 IN 11/05), where a debtor moved his COMI from Germany to the U.K. before filing for insolvency, the court ruled that the debtor's COMI was in U.K., regardless of whether the claims against the debtor had all been incurred in Germany, because the COMI at the time of the insolvency filing determines international jurisdiction for purposes of Article 3 of the Regulation.

antees may not be permitted.[54] Attempts between the debtor and its creditors contractually to agree on a COMI or to covenant as to a COMI, while possibly effective as contractual remedies between the parties to the contract, are not binding on courts within the EU and will not be binding on courts in the United States under chapter 15.

The COMI concept established by the Regulation is more in line with the civil law "real seat" theory of jurisdictional competence (as opposed to the "state of incorporation" theory traditional of common law countries) where functional realities may displace the effects of formal criteria such as the state of incorporation.[55] A debtor's COMI should be a place that is ascertainable to third parties because it is where the debtor conducts the administration of its interests on a regular basis. Consequently, a creditor determining the commercial or financial risk of dealing with a particular debtor needs to consider not only the debtor's place of incorporation, but also the functional realities of the debtor's business affairs; for instance, where is the debtor conducting, on a regular basis, the administration of its company?

Under the Regulation, jurisdictional disputes arise when more than one member country lay claim to the debtor's COMI. This is exactly what happened in *Parmalat Eurofood*. In the *Eurofood* case, the Irish court and the Italian court decided that Parmalat's COMI was located in Ireland and Italy, respectively. Eurofood was incorporated in Ireland, but the Italian administrator of Parmalat argued that the "real seat" of Eurofood was located in Parma, Italy, along with Eurofood's affiliates, which were all in insolvency proceedings in Italy at the time. According to Article 3(1) of the Regulation, only the court of the member state within whose territory the debtor's COMI is located has the authority to open main insolvency proceedings and under Article 16 a judgment opening an insolvency proceeding that is made by a court of a member state with jurisdiction pursuant to Article 3 *must* be recognized in all other member states. The issue in *Eurofood* came down to which court made its decision regarding the COMI first. Due to the gap between the granting of an interim and final order in Ireland, the Italian administrator argued the Italian courts were first to open proceedings. The Supreme Court of Ireland referred the case to the Court of Justice of the European Communities for guidance. In an opinion dated September 27, 2005, Advocate General ("AG") Jacobs of the Court of Justice agreed with the Irish Courts that Eurofood's COMI was Ireland because Ireland was the place of Eurofood's registered office, and it was where Eurofood conducted the administration of its interests on a regular basis, and was therefore a place ascertainable by creditors. AG

---

54   *See Re Bank of Credit and Commerce International SA*, No. 10, 1997, Ch. 213, where the English setoff rule did not apply in the liquidation of an English company that had its COMI in Luxembourg. Note that this case involved the insolvency of a credit institution, which is a proceeding outside the ambit of the Regulation.

55   THE EC REGULATION ON INSOLVENCY PROCEEDINGS 39-40 (Gabriel Moss QC et al. eds., 2002).

Jacobs noted that a parent company's control of a subsidiary does not necessarily determine the subsidiary's COMI. According to AG Jacobs, the Regulation applies to individual companies, and not to a group of companies, and does not regulate the relationship of parent and subsidiary. Consequently, Eurofood's COMI would be determined based on the place of its registered office and where it conducts the administration of its interests on a regular basis in a manner ascertainable by third parties.[56]

*Eurofood* raises an important issue for cases under the Model Law and chapter 15. What happens where courts in two different countries both determine that the COMI is in their own country? According to AG Jacobs, under the Regulation, only the courts of the member state where the debtor's COMI is located have jurisdiction to open main insolvency proceedings and, any court faced with the possibility that insolvency proceedings have been opened in another jurisdiction has to ascertain whether the other court did actually have jurisdiction pursuant to Article 3 because that court is located in the center of the debtor's main interests.[57] AG Jacobs also stated in the *Eurofood* opinion that where the courts of two member states both claim competence to open the main insolvency proceedings, the decision of the first court to open proceedings should be recognized, under the principle of mutual trust, in the other member states without those member states having the power to scrutinize the court's decision, unless the public policy exception of Article 26 is invoked. Therefore, where insolvency proceedings are first opened by a court in the member state in which a company's registered office is situated and in which the company conducts the administration of its interests on a regular basis in a manner ascertainable by third parties, the courts of the other member states do not have jurisdiction to open main insolvency proceedings.[58]

The Model Law does not address this issue and, unlike the Regulation, there is no designated "supreme" international court to resolve any disputes that arise. While in the vast majority of cases a debtor's COMI will be obvious to most third parties, it is a virtual certainty that this issue will arise under the Model Law and chapter 15, particularly where a debtor has recently changed its COMI presumably for the purpose of insolvency planning.

---

56    AG Jacobs also concluded that the petition to wind up Eurofood presented to the Irish High Court combined with the High Court's appointment of a provisional liquidator constituted a judgment opening insolvency proceedings under Article 16 of the Regulation. Therefore, Ireland was the first member state where an insolvency proceeding was opened. Because Ireland was the first to open an insolvency proceeding with respect to Eurofood and it is also Eurofood's COMI, the Italian courts did not have jurisdiction to open a main insolvency proceeding in Italy.

57    *See Eurofood IFSC Ltd.*, Case C-341/04, Opinion of Advocate General Jacobs, 27 September 2005, Court of Justice of the European Communities, Recital 100.

58.    *See id.* at Recital 105.

Like the Model Law, the Regulation does not address the restructuring of corporate groups. Under the Regulation, a COMI determination needs to be made for each individual company in the affiliated group potentially leading to multiple main proceedings. However, because there are no provisions in the Regulation that provide for any cooperation between the different main proceedings, in practice, this has meant that there has been an incentive for finding a common COMI for an entire affiliated group so that they can be jointly administered under one main proceeding. This is often possible when the corporate affairs of the affiliated group are centralized and conducted at the group headquarters.

There have been a number of cases under the Regulation in which courts have found a common COMI for an entire affiliated group. For example in *Daisytek*, the English courts granted administration orders in respect of several companies in a pan-European group on the basis of determining that each company's COMI was located in England.[59] *Daisytek* involved an English holding company with German and French subsidiaries in which the holding company petitioned the English High Court for an administration order that included the three German subsidiaries and the French subsidiary.[60] The English court found that English courts had jurisdiction to make administration orders with respect to the German and French subsidiaries because the majority of the administration of these subsidiaries was carried out in England and therefore their COMI was in England.[61] Both the local French and German courts upheld this determination when challenged locally by creditors.

Similarly, in *Crisscross Telecommunications Group*, the English High Court decided that the COMI for all the companies was England, even though subsidiaries were incorporated in different countries.[62] The main proceeding was opened in England. In *Cirio del Monte*, the Italian court decided that two Italian companies and a Dutch subsidiary all had their COMI in Rome.[63] In both *Crisscross* and *Cirio del Monte*, the respective insolvency proceedings were placed under the supervision of the same court and same liquidators were appointed for the respective group of companies. As with these Regulation examples, it is likely that the same reasoning will be applied to cases under chapter 15 to restructure multinational corporations and to properly confer jurisdiction on courts in the United

---

59   *In the Matter of Daisytek-ISA Limited*, 2003 B.C.C. 562.

60   The parent of *Daisytek*, together with the United States subsidiaries, had filed for chapter 11 reorganization in the United States.

61   Financial functions operated from England. The companies used English accounting principles. The German companies needed approval from England to make purchases in excess of certain amounts. The contracts were negotiated in England. The corporate identity and branding and daily business strategy were run by England. There were similar circumstances for the French subsidiary.

62   *Crisscross Telecommunications Group*, Unreported, May 2003.

63   *Cirio Del Monte NV*, Civil Court of Rome, Bankruptcy Section, 13 August 2003.

States over foreign incorporated companies, although there first still needs to be a "foreign proceeding" and "foreign representative."

## VII. Conclusion

Cross-border insolvency cooperation stands at the threshold of a new era. What the United States, Canada and the U.K. have been doing for years, and what the Regulation has started to do for Europe, is now becoming available on a global scale through the gradual adoption of the Model Law by countries such as the United States.

It is naïve to think that distressed multinationals and their creditors will no longer forum shop and seek out the most debtor or creditor-friendly jurisdictions. This is the natural tension between debtors and creditors that will presumably continue for all time. However, the evolution and importance of COMI introduces a new level of predictability and order into the rush to the courthouse and provides the global insolvency practitioner with a new set of tools for a global restructuring. For example, had the Model Law been in place in the United States, the U.K. and Russia, the directors of Cenargo and Yukos would likely never have filed in the United States, and instead the "foreign representative" of each would have commenced proceedings under chapter 15, streamlining the end result in each case.[64]

Courts in civil law countries will now be permitted, and in some cases required by domestic law, to recognize and cooperate with courts in common law jurisdictions such as the United States and the U.K. in restructuring distressed multinationals. Careful planning and cooperation in a multinational restructuring can now mean that recalcitrant debtors and creditors, particularly those in civil law jurisdictions, may find themselves forced to go along with a multinational restructuring or face sanction in their own country.

Obviously this optimism assumes that all necessary jurisdictions have enacted a domestic law similar to the Model Law, something that is still just a hope. However, as more countries adopt the Model Law, more opportunities will become available to successfully restructure distressed multinationals. More importantly, from a global economic standpoint, multinational enterprises stand a better chance of being restructured. For example, assuming adoption of the Model Law by Italy, Germany and France, a multinational having its COMI in the United States could file for chapter 11 in the United States and then seek to open non-main proceedings in France and Germany, something that is impossible today. By staying in control of all three proceedings the chance of a coordinated sale or restructuring is enhanced. France and Germany currently do not recognize

---

64    In *Cenargo* the chapter 11 case was commenced before the U.K. administration, but the U.K. court could still have determined that Cenargo's COMI was in the U.K. and the foreign representative could have sought abstention of the United States chapter 11.

chapter 11 and so uncoordinated liquidations typically follow in Germany and France.[65]

Make no mistake, the Model Law and Regulation are no panacea for cross-border insolvencies. They deal with process not substance, and still fail to deal with a whole host of issues, not least of which is the restructuring of a corporate multinational group of companies. The very existence of the Regulation presents a barrier to the adoption of the Model Law because EU law overrides domestic law within the EU member states. Unless the Regulation is amended to allow for the adoption of the Model Law and issues such as the recognition of a COMI outside the EU and a debtor in possession, propagation of the Model Law within Europe may be blocked.

Finally, the liberal jurisdiction requirements of § 109 will continue to draw distressed debtors to the United States. Ironically, chapter 15 may in fact accelerate these filings as debtors seek to preempt a chapter 15 petition by a foreign representative in a main proceeding by filing in the U.S. first. This leaves the foreign representative on the defensive trying to convince a U.S. court to suspend the U.S. chapter 11 in favor of a main proceeding, as was the case in Yukos.

Notwithstanding these shortcomings the Regulation and Model Law represent the next step in global insolvency evolution and provide new tools for global restructurings that should be welcomed and embraced.[66]

Anthony J. Smits
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
Phone: 860-240-2719
Fax: 860-240-2545
E-mail: anthony.smits@bingham.com

Ilia M. O'Hearn
Bingham McCutchen LLP
One State Street
Hartford, Connecticut 06103
Phone: 860-240-2953
Fax: 860-240-2532
E-mail: ilia.ohearn@bingham.com

---

65   The Regulation would not apply because the COMI is in the United States.

66   For recent developments on caselaw involving European Insolvency Regulation, *see* www.eir-database.com.