# EXHIBIT 9

**EUROPEAN UNION**
  **THE COUNCIL**

**Brussels, 3 May 1996**

**6500/96**

**LIMITE**

**DRS 8 (CFC)**

NOTE

Subject:   Report on the Convention of Insolvency Proceedings

Delegations will find attached the above text, as finalized by the Legal Linguistic experts' working party.

_____

**ANNEX**

REPORT

on the Convention on Insolvency Proceedings ([1])

by Miguel VIRGOS:

Professor, Universidad Autonoma of Madrid

(who contributed the background and general introduction and the comments on Articles 1 to 26, 43 to 46, territorial application and Article 48)

and Etienne SCHMIT:

Magistrate, Deputy Public Prosecutor, Luxembourg

(who contributed the comments on Article 3(2) to 3(4) and Articles 27 to 42, 47 and 49 to 55)

---

[1]  The text of the Convention on insolvency proceedings was published in Official Journal No L . The Convention, open for signature in Brussels on 23 November 1995, was signed on that day by the Plenipotentiaries of the following twelve Member States: Belgium, Denmark, Germany, Greece, Spain, France, Italy, Luxembourg, Austria, Portugal, Finland and Sweden.

CONTENTS

Page

I.    BACKGROUND TO THE CONVENTION                                      6

II.   GENERAL INTRODUCTION TO THE CONVENTION                            9

      A. Scheme of the Convention                                       9
      B. Reasons for the Convention                                     10
      C. Scope                                                          12
      D. The main and secondary model of insolvency proceedings        13
      E. The main insolvency proceedings                               14
      F. Protection of local interest within the main proceedings      17
      G. Local insolvency proceedings: "independent" and
         "secondary" territorial proceedings                           19
      H. Functions of the local proceedings                            22
      I.  Coordination of local insolvency proceedings                 23

III.  ANALYSIS OF THE PROCEEDINGS                                       26

      A. Preamble                                                       26

Page

B. Chapter 1:  General Provisions                                                32

Article 1:   Scope                                                              32
Article 2:   Definitions                                                        42
Article 3:   International jurisdiction                                          50
Article 4:   Law applicable                                                     63
Article 5:   Third parties' rights in rem                                       70
Article 6:   Set-off                                                            76
Article 7:   Reservation of title                                               78
Article 8:   Contracts relating to immovable property                           79
Article 9:   Payment systems and financial markets                              81
Article 10:  Contracts of employment                                            83
Article 11:  Effects on rights subject to registration                          84
Article 12:  Community patents and trademarks                                   86
Article 13:  Detrimental acts                                                   87
Article 14:  Protection of third-party purchases                                90
Article 15:  Effects of insolvency proceedings on lawsuits pending              91

C. Chapter II:  Recognition of Insolvency Proceedings                           92

Article 16:  Principle                                                          92
Article 17:  Effects of recognition                                             95
Article 18:  Powers of the liquidator                                           99
Article 19:  Proof of the liquidator's appointment                             104
Article 20:  Return and imputation                                             106
Article 21:  Publication                                                        111
Article 22:  Registration in a public register                                 114
Article 23:  Costs                                                              115
Article 24:  Honouring of an obligation to a debtor                             116
Article 25:  Recognition and enforceability of other judgments                 117
Article 26:  Public Policy                                                      125

6500/96                                    MO/kjf                                    EN
(ANNEX)

C:\DOCUME~1\COMET\LOCALS~1\TEMP\NOTESFFC280\VIRGOS   AND   SCHMIT   REPORT   ON   THE   CONVENTION   ON   INSOLVENCY
PROCEEDINGS_#411316.DOC                    3

Page

D. Chapter III:    Secondary Insolvency Proceedings                                130

   Article 27:    Opening of insolvency proceedings                               130
   Article 28:    Applicable law                                                  138
   Article 29:    Right to request the opening of proceedings                     138
   Article 30:    Advance payment of costs and expenses                           139
   Article 31:    Duty to cooperate and communicate information                   140
   Article 32:    Exercise of creditors' rights                                   143
   Article 33:    Stay of liquidation                                            148
   Article 34:    Measures ending secondary insolvency proceedings                151
   Article 35:    Assets remaining in the secondary proceedings                   154
   Article 36:    Subsequent opening of the main proceedings                      155
   Article 37:    Conversion of earlier proceedings                               155
   Article 38:    Preservation measures                                          158

E. Chapter IV:    Provision of Information for creditors and lodgement of their claims    159

   Article 39:    Right to lodge claims                                          160
   Article 40:    Duty to inform creditors                                        162
   Article 41:    Content of the lodgement of a claim                            163
   Article 42:    Languages                                                      164

Page

F.  Chapter V:    Interpretation by the Court of Justice of the European Communities    166

Article 43:    Jurisdiction of the Court of Justice    166
Article 44:    Preliminary ruling proceedings    168
Article 45:    Proceedings brought by a competent authority    171
Article 46:    Reservations    172

G.  Chapter VI:    Transitional and Final Provisions Territorial Application    174

Article 47:    Applicability in time    175
Article 48:    Relationship to other Conventions    178
Article 49:    Signature, ratification and entry into force    180
Article 50:    Accession to the Convention    180
Article 51:    Notification by the depositary    181
Article 52:    Duration of the Convention    181
Article 53:    Revision or evaluation of the Convention    181
Article 54:    Amendment of the Annexes    182
Article 55:    Deposit of the Convention    184

IV.  LIST OF PARTICIPANTS

C:\DOCUME-1\COMET\LOCALS-1\TEMP\NOTESFFC280\VIRGOS    AND    SCHMIT    REPORT    ON    THE    CONVENTION    ON    INSOLVENCY
PROCEEDINGS_#411316.DOC                    5

I. BACKGROUND TO THE CONVENTION

1. The absence of a Convention on insolvency proceedings within the framework of the Community is viewed as a shortcoming in the completion of the internal market. It seems hard to accept that undertakings' activities are increasingly being regulated by Community law while national law alone continues to apply in the event of the failure of an undertaking. This consideration prompted Community Ministers for Justice, meeting informally in San Sebastian from 25 to 27 May 1989, to express the wish that a solution be found and to relaunch the negotiations on a Convention on this matter between the Member States and to give instructions to that effect to an ad hoc Working Party on the Bankruptcy Convention set up within the Council of the European Communities, as it then was.

   A number of national experts (see the list in Annex 1) was therefore designated. The ad hoc Working Party met from 1991 until the conclusion of the definitive text of the Convention in 1995. Dr Manfred Balz (from Germany) was nominated chairman of the committee of experts. He was also the main author of the various drafts discussed during the negotiations.

2. A limited number of bilateral conventions do indeed exist between some Member States (see Article 48 of the Convention); however, Member States should be linked by a multilateral convention which, through mutual recognition of proceedings opened in each of the Member States, would permit coordination of the measures to be taken regarding an insolvent debtor's assets. To date, attempts to draw up a suitable instrument have been unsuccessful.

3. Bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings were excluded from the scope of the Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, signed in Brussels on 27 September 1968 and revised for the accession of new Community Member States in 1978, 1982 and 1989 (see OJCE No C 189 of 28 July 1990) hereafter referred to as the "1968 Brussels Convention".  Regarding those proceedings, a committee of experts met, under the auspices of the Commission of the European Communities, between 1963 and 1980 to draw up a first, and subsequently (following the Community's enlargement as from 1973) a second, draft Convention (see Bulletin of the European Communities, Supplement 2/82, containing both the Draft Convention and the explanatory report).  The latter Convention was studied by an EC Council Working Party from 1982 until 1985, when work was suspended for lack of sufficient consensus.

That draft Convention provided for single proceedings (with exclusive competence to decree bankruptcy conferred on the Courts of State in which the debtor's centre of administration was located) which would be recognized in the other Contracting States, and parallel local proceedings were not permitted in those other States.  The principles of "unity" (a single proceeding for the whole territory of the Community) and "universality" (the proceedings comprise all debtor's assets, wherever located) which governed the proceedings were therefore scrupulously followed in this text.

4. In the meantime, negotiations had been initiated within the Council of Europe which culminated in the adoption of a "European Convention on Certain International Aspects of Bankruptcy", opened for signing in Istanbul on 5 June 1990 hereafter referred to as the "1990 Istanbul Convention" (see the Convention and its explanatory report in Council of Europe, International aspects of bankruptcy, Strasbourg 1990).

It must be pointed out, however, that it is not certain that any Member State will ratify the 1990 Istanbul Convention. Moreover, Article 40 thereof allows scope for reservations on either Chapter II (Exercise of certain powers of the liquidator) or Chapter III (Secondary insolvency proceedings), which involves a serious risk of disparity as between Contracting States.

Notwithstanding, the text of the 1990 Istanbul Convention remains important since it introduced more flexibility into the underlying principles of unity and universality.

5.  The earlier Community draft ran into a number of obstacles. The principles of unity of the bankruptcy proceedings, on which it was based, led in particular to some complex provisions needed to take account of safeguards and privileges existing only in one or other Member State. Those provisions included the possibility of forming national "sub-estates" with regard to security interests, privileges and priority claims. Overall, the system proved to be too complicated and ambitious.

For that reason, the new Community Convention on insolvency proceedings offers solutions which are as simple and flexible as possible. Above all, it is based on the principle of the universality of the proceedings limited, however, by the possible opening of one or more sets of secondary proceedings the effects of which are confined to the Member State or Member States in which they were opened.

The parallelism between the main proceedings (recognized elsewhere) and the secondary proceedings (enabling creditors in another Contracting State to invoke a local instrument in order to safeguard their interests) has made it possible to avoid over-rigid centralization, which hitherto appeared to be unacceptable to some Member States. Mandatory rules of coordination with the main proceedings guarantee the needs of unity in the Community.

II. GENERAL INTRODUCTION TO THE CONVENTION

A. Scheme of the Convention

6.  The Convention is divided into six Chapters with a total of 55 Articles.  A Preamble, which contains important information about the scope and character of the Convention, and three Annexes, which form an integral part of it, complement its provisions.

Chapter I (Articles 1 B 15) defines the scope of application of the Convention (Articles 1 B 2), lays down the rules of direct international jurisdiction (Article 3), and determines the national law applicable through uniform conflict of laws rules (Articles 4 B 15).

Chapter II (Articles 16 B 26) addresses the recognition and enforcement of insolvency proceedings opened in other Contracting States and the recognition of the liquidator's powers.

Chapter III (Articles 27 B 38) contains the rules on secondary proceedings and on their coordination with the main proceedings and with other secondary proceedings.

Chapter IV (Articles 39 B 42) introduces several uniform rules on the right to lodge claims, the duty to provide information and the language to be used.

Chapter V (Articles 43 B 46) confers jurisdiction to interpret the Convention on the Court of Justice of the European Communities.

Chapter VI (Articles 47 B 55) contains the transitional and final provisions, including those regarding the applicability in time of the Convention (Article 47), its relationship to other Conventions (Article 48) and the procedures to amend the Annexes (Article 54), which list the insolvency proceedings to which the Convention applies and the persons who or organs which may be recognised as liquidator under the Convention.

B. Reasons for the Convention

7. To date, from a Private International Law perspective, the situation in the Community in the field of insolvency has been far from encouraging. There was a conflict of laws at both the internal level, with divergent national substantive rules, and the international level, with different Private International Law solutions.

Unlike contracts, insolvencies do not form an area of the law where private spontaneous cooperation can compensate for the lack of a common legal framework at the international level. Institutional co-operation is needed to provide a certain legal order to avoid incentives for the parties to transfer disputes or goods from one country to another, seeking to obtain a more favourable legal position ("forum shopping"), or to realise their individual claims independently of the costs which this may entail for the creditors as a whole or to the going-concern value of the debtor's firm.

Only a multilateral Convention among all the Member States may discourage the opportunistic conduct of debtors or creditors from taking place and allow for the efficient administration of the financial crisis of firms and individuals within the Community. The Convention on insolvency proceedings provides such a mandatory legal framework of intra-Community cooperation.

The Convention implements Article 220 of the Treaty establishing the European Community (hereafter referred to as the "EC Treaty") and complements the 1968 Brussels Convention. It also confers on the Court of Justice of the European Communities jurisdiction to rule on the interpretation of its provisions. But, unlike the 1968 Brussels Convention, it also contains conflict of law rules. There are important grounds which justify this difference.

8. Insolvency proceedings are collective proceedings. Collective action needs clearly determined legal positions to provide for an adequate bargaining environment. This is true not only once the insolvency proceedings have been opened, but also before they have been opened (when the debtor is already in economic difficulties), as the rights "in bankruptcy" will influence negotiations for a possible "pre-bankruptcy" reorganization.

Furthermore, international insolvency proceedings can be effectively conducted only if the States concerned recognize the jurisdiction of the courts of the State of the opening of the proceedings, the powers of their liquidators and the effects of their judgements. They may accept it only if the rules on conflict of laws are also harmonized, because harmonized conflict of law rules prove a degree of certainty that, in the event of insolvency, rights created or granted in their jurisdictions will be recognized throughout the Contracting States.

C.    Scope

9.    The Convention applies to collective insolvency proceedings which entail the partial or total divestment of a debtor and the appointment of a liquidator. Two Annexes to the Convention determine the national proceedings covered by the Convention. These Annexes form an integral part of the Convention.

10.    Insurance undertakings, credit institutions, investment undertakings holding funds or securities for third parties and collective investment undertakings are all excluded from the scope of the Convention. Community discussions are under way regarding reorganization and winding-up proceedings for these entities.

11.    The Convention deals only with the intra-Community effects of insolvency proceedings. It applies only when the centre of the debtor's main interests lies within the territory of a Contracting State (i.e. the Community). Even then, the Convention does not regulate the effect of the proceedings vis-à-vis third States. In relation to third States, the Convention does not impair the freedom of the Contracting States to adopt the appropriate rules.

D.   The main and secondary model of insolvency proceedings

12.  The Convention tries to provide a "neutral mechanism" for international cooperation,
     honouring the basic expectations of the parties, independently of the Contracting State in
     which they are situated. For this purpose, it follows a combined model of the existing
     principles of regulation of international bankruptcies (universality or territoriality of effects
     and unity or plurality of proceedings).

     The idea of a single exclusive universal form of insolvency proceedings for the whole of
     the Community is difficult to implement without modifying, by the application of the law of
     the State of the opening of proceedings, pre-existing rights created before insolvency
     under the different national laws of other Contracting States.  The reason for this lies in the
     absence of a uniform system of security rights in Europe, and in the great diversity of
     national insolvency laws as regards criteria for the priority to be given to the different
     classes of creditors.

13.  In this legal context, the Convention seeks to reconcile the advantages of the principle of
     universality and the necessary protection of local interests.  This explains why a combined
     model has been adopted which permits local proceedings to coexist with the main
     universal proceedings.

14.  Insolvency proceedings may be opened in the Contracting State where the debtor has the
     centre of his main interests.  Insolvency proceedings opened in that State will be main
     proceedings of universal character; "main", because if local proceedings are opened, they
     will be subject to mandatory rules of coordination and subordination to it, and "universal",
     because, unless local proceedings are opened, all assets of the debtor will be
     encompassed therein, wherever located.

Single main proceedings are always possible within the Community but the Convention does not exclude the opening of local proceedings, controlled and governed by the national law concerned, to protect those local interests. Local proceedings have only territorial scope, limited to the assets located in the State concerned. To open such local proceedings it is necessary that the debtor possesses an establishment in the territory of the State of the opening of proceedings (hereafter referred to as the "State of the opening"). In relation to the main proceedings, local insolvency proceedings can only be "secondary proceedings", since the latter are to be coordinated with and subordinated to the main proceedings.

E.    The main insolvency proceedings

15.    The "main insolvency proceedings" can be opened only in the Contracting State where the debtor has established the "centre of his main interests" (hereinafter "F1 State"). Normally it will be the place of the registered office in the case of legal persons. There can be only one main set of insolvency proceedings.

16.    The main insolvency proceedings may be winding-up or reorganization proceedings, as listed in Annex A to the Convention.

17.    The law of the State of the opening (lex fori concursus) is generally applicable to the insolvency proceedings. It governs the opening of the proceedings, their conduct and their closure.

18.    Some aspects are regulated directly by the Convention, which provides a uniform system of individual notification, lodgement of claims and use of language:

(a) Creditors abroad must be duly informed of the opening of the proceedings. An individual notice must be sent to all known creditors domiciled in other Contracting States;

Where necessary, a notice of the opening of the proceedings shall be published in other Contracting States in accordance with their national publication procedures (F2 laws). Contracting States within the territory of which the debtor has an establishment may demand mandatory publication.

(b) Creditors who have their habitual residence, domicile or registered office in a Contracting State may participate in the main proceedings, whatever the nature (public or private) of their claims.

19. Main proceedings are always universal. This has a number of important legal consequences:

(a) Assets located outside the State of opening are also included in the proceedings and sequestrated as from the opening of proceedings on a world-wide basis;

(b) All creditors are encompassed;

(c) Proceedings opened in one Member State will produce effects throughout the whole territory of the Contracting States (i.e. the Community). The recognition of the effects of the proceedings in other Contracting States is automatic, by force of law, without the need for an exequatur, and is independent of publication;

However, enforcement of judgments will require prior limited control by the national courts, through an exequatur. If the conditions set out by the Convention are satisfied, the national Courts are obliged to grant it.

The Convention follows the model of "extension" to the other States (to F2, F3, etc.) of the effects laid down by the national law of the State where the main proceedings have been opened (F1).

(d) The liquidator appointed in the main proceedings has authority to act in all the other Contracting States, without the need for an exequatur. He may remove assets from the State in which they are located. In exercising these powers (granted by F1 laws), the liquidator must comply with the laws of the State concerned (F2). This is particularly the case if coercion is necessary to gain control of the assets (he must then request the assistance of the local authorities);

(e) Individual execution is not possible against the assets of a debtor located in any Contracting State;

(f) There is a legal duty to surrender to the insolvency proceedings the proceeds recovered by individual execution or obtained from the debtor's voluntary payment out of assets located abroad.

20. Local insolvency proceedings opened in accordance with the Convention limit the universal scope of the main proceedings. Assets located in the Contracting State where a court opens local insolvency proceedings are subject only to the local proceedings. However, the universal character of the main proceedings reveals itself through the mandatory rules of coordination of the local proceedings with the main proceedings, which include some specific powers of intervention given by the Convention to the liquidator of the main proceedings (see points 36(3) and 38) and the transfer of any surplus in the local proceedings to the main proceedings.

F.    Protection of local interest within the main proceedings

21. The application by the State of the opening of proceedings of its law and the automatic extension of the effects of those proceedings to all Community Member States may interfere with the rules under which local market transactions are carried out in other States. For this reason, in the provisions governing the main proceedings, the Convention gives due attention to important local interests: protection of legitimate expectations and security of transactions.

22. To this end, the Convention excludes certain rights located abroad from the effects of the main proceedings or declares that those effects must be decided by the insolvency laws of the States concerned, and not by the law of the State of the opening of the proceedings.

23.  1.  Exclusion from the effects of the main proceedings:

    (a) The opening of insolvency proceedings will not affect pre-existing rights in rem of creditors or other third parties over assets situated in a different State at the time of the opening of the proceedings.  The same rule is also applicable to reservations of title.  Firms may obtain credit under conditions which could not be offered without this kind of guarantee.

        If the law of the State in which the security is located permits these rights to be affected, the liquidator (or any authorized creditor) has to request the opening of local insolvency proceedings to achieve this result.  The position of the secured creditors will then be the same as in a purely domestic bankruptcy.  Only security rights which are in the legal form of a "right in rem" qualify for this benefit.

    (b) Set-off rights governed by the law of a Contracting State other than the State of the opening receive a solution parallel to that of rights in rem.

  2.  In other cases, the Convention amends the rule that the law of the State of opening (F1) is applicable and provides that the law of the State concerned (F2) shall govern certain specific effects of the insolvency.  In this way, the effects in a given State of insolvency proceedings opened in another Contracting State will be the same as in a domestic case.

    (a) To protect the local systems of registration of property rights, the admissible effects of the insolvency proceedings on rights of the debtor in respect of immovable assets, ships or aircraft subject to registration are determined by the bankruptcy laws of the State of registration.

(b) Furthermore, in order to protect bona-fide third-party purchasers the Convention provides that the law of the Contracting State in which the assets are situated applies in the case where the debtor disposes for consideration of immovable assets after the opening of insolvency proceedings in another Contracting State. In the case of aircraft, ships or securities subject to registration, the law of the State of registration applies.

(c) To avoid disruptions in payment systems and financial markets, which may be protected by national law against the normal rules of insolvency law, the effects of the insolvency proceedings are determined by the law of the State the law of which governs the payment system or financial market.

(d) The effects of the insolvency proceedings on contracts conferring rights to make use of or acquire immovable property, and on employment contracts and relationships are governed respectively by the laws of the State in which they are situated and by the law applicable to the contract.

G.    Local insolvency proceedings: "independent" and "secondary" territorial proceedings

24.    Local insolvency proceedings may be opened in the Contracting State where the debtor has an establishment. The effects of local proceedings are limited to the assets located in that State. Local insolvency proceedings are always "territorial".

25.    The Convention permits the opening of local proceedings both before and after main proceedings have been opened in the Member State where the debtor has his centre of main interests.

Local insolvency proceedings are considered as "independent" territorial insolvency proceedings in the first case (since there are as yet no main proceedings to which they are subordinated) and as "secondary" territorial insolvency proceedings in the latter case.

Independent proceedings become secondary proceedings once main proceedings have been opened, subject to some special rules (see points 31, 37 and 38).

26.  Both types of proceedings are subject to rules of coordination with the main proceedings (in the case of independent territorial proceedings, after the opening of the main proceedings) and with other local proceedings.

27.  The law of the State of the opening of the local proceedings is applicable to the local insolvency proceedings (see point 17).

The right to participate in local insolvency proceedings is not limited to local creditors. Once local proceedings have been opened, all creditors (whether local or not) may participate directly or through the liquidator in the main proceedings.  This openness guarantees respect for the principle of equal treatment of creditors throughout the Community.  As the Community forms an internal market, there can be no restrictions on participation in local proceedings based on the place of origin of the creditor's claim, or on the place of residence of the creditor.

28.  The Convention does not restrict the right of any creditor to demand the opening of secondary territorial insolvency proceedings.

29. Secondary territorial insolvency proceedings may only be winding-up proceedings (see also point 31).

30. The right to request the opening of independent territorial proceedings is limited to local creditors and creditors of the local establishment or to cases where main proceedings cannot be opened under the applicable law. The purpose of these restrictions is to avoid the existence of parallel local proceedings which are not coordinated in the framework of the main Community proceedings.

    Such limitations would not impair the individual rights of the creditors to recover debts: if no collective insolvency proceedings are opened, they may resort to individual enforcement measures.

31. Independent territorial proceedings may be winding-up or reorganization proceedings as listed in Annex A or Annex B to the Convention.

    In the case of reorganization proceedings, the subsequent opening of the main proceedings makes them subject to the possibility of conversion into winding-up proceedings, if the liquidator in the main proceedings so requests. If such a conversion is not requested, the local proceedings may continue as reorganization proceedings.

H.   Functions of the local proceedings

32.  The first function of local proceedings is the "protection of local interests".  Creditors may request the opening of local territorial proceedings to protect themselves against the effects of the law of another Contracting State.  They can thus be certain that, even if the debtor's centre of interests is located in another Contracting State, their legal position will be the same as in domestic proceedings.  This possibility makes sense for creditors who cannot rely on the recognition of their rights (or their preferential rank) in proceedings in another Contracting State.  Further, it also makes sense for creditors who cannot count on the application of the law of another Contracting State (for instance, small creditors who participated only in domestic transactions with the local establishment of an undertaking of another Contracting State, etc.).

33.  The second function of local proceedings is to serve as "auxiliary proceedings" to the main proceedings.

The liquidator in the main proceedings may request the opening of secondary proceedings when the efficient administration of the estate so requires.  This may be, for instance, the case where the estate of the debtor is too complex to administer as a unit, where differences in the legal systems concerned are so great that difficulties may arise from the extension of effects deriving from the law of the State of the opening to the other States where the assets are located.  It will be always the case where the liquidator in the main proceedings seeks to affect the rights in rem of creditors or other third parties in respect of assets situated in another State at the time of the opening.

I.    Coordination of local insolvency proceedings

34.  Parallel main and local insolvency proceedings represent an intermediate stage between the individual actions undertaken by the creditors and the "collective action" in the full sense of the term, represented by single universal proceedings. Cooperation is made easier, since the liquidators' role of intermediary limits the number of parties, reducing the overall complexity.

However, the method of coordination established between the local proceedings is as important as their existence.  In order to encourage cooperation, the Convention permits all creditors, irrespective of the State of origin of their claims, to participate in the local proceedings (local proceedings are not reserved for local creditors).

35.  Secondary insolvency proceedings are subject to coordination with the main proceedings in a number of ways to ensure that due attention is given to the interests of the main insolvency without encroaching on the specific functions of the secondary proceedings. Some of these rules of coordination apply also to secondary proceedings inter se (see points 36(1), (2) and (5)).

36. 1. The Convention imposes a duty of reciprocal cooperation and exchange of information on all liquidators in both the main and secondary proceedings.

2. All liquidators are empowered to:

(a) lodge in other proceedings the claims already lodged in the proceedings for which they have responsibility; this power is very important for small creditors, whose claims may thus be lodged in proceedings in another Contracting State without great expense, and also for the liquidator in the main proceedings, since it can reinforce his powers to influence the secondary proceedings;

(b) participate in those proceedings.

3. The liquidator in the main proceedings is, as such, empowered to:

(a) request the opening of secondary insolvency proceedings;

(b) make proposals with a view to the winding-up or other use of the assets in the secondary proceedings;

(c) propose any rescue plan, composition or comparable measure in the secondary proceedings or require such arrangements to be subject to conditions, his consent being in principle required to that effect;

(d) request a stay on the liquidation of the assets in the secondary proceedings. Such request may be rejected by the local court only if it is manifestly of no interest to the creditors in the main proceedings. The reason behind this is a desire to provide time for a reorganization or composition to be concluded in the main proceedings, or for the sale of the whole undertaking or establishment.

4. Any assets remaining after winding-up and distribution in local proceedings pass to the main proceedings.

5. Any creditor may keep what he has obtained in secondary proceedings but may not participate in the distribution of the estate in the main insolvency proceedings until the other creditors with the same ranking (according to the law of the main proceedings) have obtained, in percentage, an equivalent dividend. The same rule is applicable when the creditor seeks to participate in other secondary proceedings. A consolidated account of dividends must be drawn up for all of the Contracting States (i.e. the Community.)

37. Independent territorial insolvency proceedings also become "subordinated" proceedings as soon as main proceedings are opened within the Community. In this case, the same coordination rules to which secondary proceedings are subject apply to the extent that the progress of the independent proceedings so permits. After the opening of main proceedings, local insolvency proceedings may therefore continue not as independent proceedings but as secondary proceedings.

---

38. In addition, the liquidator in the main proceedings has the specific right to request the conversion of the previously opened independent territorial proceedings of a reorganizational nature (see points 31, 86 and 210) into winding-up proceedings (with a view to easier coordination with the main insolvency proceedings).

39. The Convention does not address the exceptional situation of two parallel independent territorial proceedings taking place at the same time in the Community, without main proceedings having been opened in the Contracting State where the debtor has his centre of main interests. It should be possible to apply, by analogy, the same conventional rules which serve to coordinate secondary insolvency proceedings inter se (see points 36(1),(2) and (5)).

III. ANALYSIS OF THE PROVISIONS

A. PREAMBLE

40. The preamble to the Convention contains several important items of information regarding the role of the Convention within the Community system.

41. The first concerns the legal basis of the Convention. The preamble cites Article 220 of the EC Treaty as that basis.

Consequently, the characteristics of the Convention on insolvency proceedings are as follows:

B  all Member States must ratify the Convention,

B  powers to give rulings on interpretation are conferred on the Court of Justice of the
European Communities.  Unlike the 1968 Brussels Convention and the Rome
Convention of 19 June 1980 on the Law applicable to Contractual Obligations,
hereafter referred to as the "1980 Rome Convention", these powers are granted in the
text of the Convention itself and not in additional protocols,

B  there can be no reservations, except as regards the conferral of powers on the Court
of Justice of the European Communities (see Article 46) (see points 57 et seq.).

42.  The Convention on insolvency proceedings complements the system of international
jurisdiction and recognition and enforcement of judgments set up in the 1968 Brussels
Convention, which is also based on Article 220 of the EC Treaty.

However, the Convention on insolvency proceedings goes beyond the scope of the 1968
Brussels Convention, since it not only governs international jurisdiction and the
recognition of judgments but also contains rules on conflicts regarding the law applicable
to the proceedings and effects thereof.  A Convention on the mutual recognition of
insolvency proceedings would not be possible without the guarantee of respect for
acquired rights offered by a uniform system of rules on conflict of laws.  Harmonized
conflict of law rules guarantee acquired rights so that, in the event of insolvency, rights
created in each state will be recognized in other Contracting States.

43. The Convention on insolvency proceedings does not contain any explicit provision regarding its interpretation. In the same way as in the 1968 Brussels Convention and the 1980 Rome Convention, two principles should be followed when interpreting its provisions: the principle of respect for the international character of the rule, and the principle of uniformity.

The Convention is a self-contained legal structure, and its concepts cannot be placed in the same category as concepts belonging to national law. The Convention must retain the same meaning within different national systems. Its concepts may not therefore be interpreted simply as referring to the national law of one or other of the States concerned.

When the substance of a problem is directly governed by the Convention, the international character of the Convention requires an autonomous interpretation of its concepts. An autonomous interpretation implies that the meaning of its concepts should be determined by reference to the objectives and system of the Convention, taking into account the specific function of those concepts within this system and the general principles which can be inferred from all the national laws of the Contracting States.

However, the Convention itself may require the meaning of a concept to be found in the applicable national law, when it does not wish to interfere with the national laws or when the function of a specific provision of the Convention so requires. This is the case, for example, with the concept of insolvency in Article 1 or the concept of rights in rem as laid down in Article 5 of the Convention.

Uniformity of interpretation is required in order to ensure equality in the rights and obligations derived from the Convention for the Contracting States and for the persons concerned irrespective of the Contracting State in which they are located. To this end, the Convention confers powers of interpretation on the Court of Justice of the European Communities.

44. The second important piece of information concerns the territorial framework of the Convention, which covers only the "intra-Community effects" of insolvency proceedings. The Convention governs only internal conflicts of the Community, with two further limitations:

(a) the Convention does not govern all intra-Community conflicts. It covers only cases where the centre of the debtor's main interests is located in a Contracting State. When the centre of the debtor's main interests is outside the territory of a Contracting State, the Convention does not apply. In such a case, it is up to the private international law of Member States to decide whether insolvency proceedings may be opened against the debtor and on the rules and conditions to be applied;

This holds true regardless of whether the debtor has assets or creditors in other Member States and whether the question of the effects of such proceedings in other Member States is raised (see point 82);

(b) Even when the centre of a debtor's main interests is in a Contracting State and the Convention is applicable, its provisions are restricted to relations with other Contracting States. Where non-Member States are concerned, it is the responsibility of each Member State to define the appropriate conflict rules.

Hence, for example, Article 8 governs the effects of insolvency proceedings on contracts relating to the immovable property of the debtor, as an exception to the general applicability of the law of the State of the opening (ex Article 4), but is applicable only when the immovable property is located in a Contracting State. If the asset in question is situated in a non-Contracting State, the Convention does not govern the case. It is for the State opening the proceedings to decide whether or not an exception to the general applicability of its law is advisable, and under what terms.

45. As the Convention provides only partial (intra-Community) rules, it needs to be supplemented by the private international law provisions of the State in which the insolvency proceedings were opened.

When incorporating the Convention into their legislations, the Contracting States will therefore have to examine whether their current rules can appropriately implement the rules of the Convention or whether they should establish new rules to that end. In this respect, nothing prevents Contracting States from extending all or some of the solutions of the Convention unilaterally on an extra-Community basis, as part of their national law.

46. The third important item of information relates to the relations between this Convention and Community law. The Convention represents the general framework of intra-Community cooperation in the area of insolvency proceedings. However, as in the 1968 Brussels Convention (Article 57(3)) and the 1980 Rome Convention (Article 20), the principle of the primacy of secondary Community law is explicitly enshrined in it. For this reason, the preamble stresses that the Convention does not affect the possible application of the provisions of Community law, or of national law harmonized in accordance with those provisions, which govern insolvency proceedings in particular areas.

This principle does not prevent certain rules of the Convention from directly amending the solutions contained in previous Community acts (see Article 12).

47. The fourth item of information concerns the binding nature of the Convention, the provisions of which, including the rules on conflicts of law, should be applied by the court of its own motion even if they are not invoked by the parties concerned.

Although there is no specific mention of this point in the Convention, this was the solution adopted in the 1968 Brussels Convention. Substantial grounds for the binding nature do exist in the Convention on insolvency proceedings, since it deals with collective proceedings which by their very nature are likely to affect multiple interests and individuals. This binding nature is necessary to strengthen the legal protection of individuals established in the Community, since the Convention represents the basic guarantee of their rights vis-à-vis insolvency proceedings opened in other Contracting States.

However, it is for the national law to determine whether the judge is himself bound to establish the facts or whether it is for the interested parties to establish them (see Schlosser Report on the 1968 Brussels Convention, point 22).

## B.  CHAPTER I: GENERAL PROVISIONS

### Article 1
### Scope

48.  Article 1(1) defines the scope of the Convention by means of the concept of "collective insolvency proceedings".  Given that it has to encompass widely differing national proceedings, Article 1 restricts itself to providing a very broad framework. Paragraph 1 defines this framework, requiring four cumulative conditions, which will be described below.

It should be pointed out here that, for the Convention to be applied, it is not sufficient that the proceedings in question meet these conditions in a generic way.  Under Article 2(a) and (c), for insolvency proceedings to be covered by the Convention the proceedings concerned must also have been expressly entered by the State concerned in the lists of proceedings in the Annexes, which form an integral part of this Convention.  Only those proceedings expressly entered in the list will be considered "insolvency proceedings" as covered by the Convention and will be able to benefit from its provisions.  In an area where national laws differ considerably, the lists are aimed at providing legal certainty regarding the proceedings to which the Convention may be applied.

In short, Article 1(1) lays down the conditions which enable proceedings to be added to the lists in the Convention by Contracting States, and only when the proceedings are included in the appropriate list will the Convention be applicable (see Article 2 (a) and (c)).

49. Article 1(1) defines the proceedings to which the Convention applies on the basis of four fundamental conditions:

(a) proceedings must be "collective", i.e. all the creditors concerned may seek satisfaction only through the insolvency proceedings, as individual action will be precluded;

(b) the proceedings must be based on the debtor's "insolvency" and not on any other grounds.

The Convention is based on the idea of financial crisis, but does not provide its own definition of insolvency. It takes this from the national law of the country in which proceedings are opened.

There is no test of insolvency other than that demanded by the national legislation of the State in which proceedings are opened. Thus, if a national law is based on the occurrence of an act of bankruptcy listed in the bankruptcy law or on the evidence that the debtor has ceased to pay his debts, it is sufficient for one of these facts to be established in order that insolvency proceedings be opened and the Convention applied.

By way of exception, it may happen that one of the forms of proceedings listed in Annex A or Annex B to the Convention is not confined to bankruptcy law but serves several purposes.  Such a proceeding falls within the scope of the Convention only if it is based on the debtor's insolvency (where appropriate the 1968 Brussels Convention will be applied).  This is the case with winding-up proceedings under British and Irish law (see points 55 et seq. of the Schlosser Report to the 1968 Brussels Convention).

Thus, States which list proceedings which can be used for purposes other than insolvency, must provide sufficient means of identification of the proceedings to facilitate the application of the Convention.  For instance, requiring their courts or competent bodies to specify clearly the grounds on which the decision to open proceedings is based, so that these can then be used as an identification "label";

(c) the proceedings must entail the total or partial divestment of the debtor, that is to say the transfer to another person, the liquidator, of the powers of administration and of disposal over all or part of his assets, or the limitation of these powers through the intervention and control of his actions.  It should be remembered that partial divestment, whether of his assets or his power of administration, is sufficient.  The legal nature that such divestment may take, depending on the national legislation applicable, has no bearing on the application of the Convention to the proceedings in question;

(d) the proceedings should entail the appointment of a liquidator. This requirement is directly linked to the previous condition. The concept of liquidator used by the Convention is, once again, a very broad concept. Under Article 2(b) it includes any person or body whose function is to administer or realize the assets or supervise the management of the debtor's business. The court itself may fulfil this role. The persons or bodies considered to be liquidators by the Convention are set out in the list in Annex C to the Convention.

50. All the proceedings listed in Annex A have two ultimate consequences: the total or partial divestment of the debtor and the appointment of a liquidator. However, distortions would arise if the Convention were to apply only from the time when these consequences occur. The initial stages of insolvency proceedings could be excluded from the Convention's system of international cooperation. These consequences are necessary for proceedings to appear in the lists in Annex A. However, once the proceedings have been included, it is sufficient to open proceedings in order that the Convention should apply from the outset.

51. Article 1(1) of the Convention does not include in its final version the condition that the proceedings may entail the realization of the debtor's assets.

Limiting the application of the Convention to winding-up proceedings would have had the advantage of simplifying the resulting rules. The disadvantage would have been that it would have excluded from European cooperation very important proceedings in bankruptcy practice in certain Contracting States, such as the "suspensión de pagos" in Spain or the "surséance van betaling" in the Netherlands.

Economic analysis shows that retaining the option between two possibilities in insolvency law (winding-up or reorganization) is in itself a sound decision. The same should hold true in the international arena. There is no economic reason to justify the exclusion of reorganization proceedings from international cooperation. The Convention also contains sufficient mechanisms to protect creditors' interests (e.g. the possibility of opening territorial insolvency proceedings in accordance with local law). For some Contracting States the exclusion of reorganization proceedings would therefore be unjustified.

The outcome of the negotiations was a compromise to extend the Convention system to insolvency proceedings the main aim of which was not winding-up but reorganization.

As part of this compromise, however, local territorial proceedings opened after the main proceedings may only be winding-up proceedings (see points 83 and 86). If opened before, local territorial proceedings are subject to conversion into winding-up proceedings if the liquidator of the main proceedings so requests. The complications of compatibility and coordination between secondary reorganization proceedings (of which there could be several, if the debtor was based in several different Contracting States) and the main proceedings have led to restriction.

52. The Convention is drawn up on the basis of insolvency proceedings conducted by the courts. This will be the general rule.

However, Article 1 does not require the proceedings necessarily to involve the intervention of a judicial authority (or of an authority with an equivalent role). They must be proceedings (comprising a minimum number of acts and formalities as set down in law) which are officially recognized and legally effective in the State in which the proceedings are opened and which fulfil the four conditions set out in Article 1(1).

The requirement of intervention by a judicial authority was deliberately excluded to allow the Convention to be applied to ordinary non-judicial collective proceedings in countries such as the United Kingdom and Ireland (especially the creditor's voluntary winding-up). These proceedings offer sufficient guarantees (including access to the courts, for the legality of the proceedings to be supervised and for any questions which may arise to be settled) in order that they be brought under the Convention. Their practical significance justifies this: they represent an important percentage of all corporate insolvency cases. Once again, the Convention has enough mechanisms to defend the positions of the creditors (the possibility of secondary proceedings, public order exceptions, safeguard of acquired rights, etc.) to enable these proceedings to benefit from the Convention system.

The fact that non-judicial proceedings are covered in the Convention does not mean that they are dealt with as if they were judicial proceedings or that the decisions adopted in the course of these proceedings are regarded as having the effect of a court ruling. It simply means the rules of the Convention must be applied with flexibility taking into account that they were drawn up on the basis of proceedings conducted by a court.

From this point of view, the Convention guarantees a positive answer to two essential questions:

1. these proceedings have to be recognized as collective insolvency proceedings pursuant to Article 1. Once proceedings have been opened in a Contracting State in accordance with Article 3, the creditors must seek payment of their debts through these collective proceedings, even if they are not conducted by the courts. Any question relating to the conduct of the proceedings or the decisions taken in the course of those proceedings, should be referred to the courts of that State;

2. the appointment of the liquidator and the powers conferred on him by the law of the State where proceedings were opened must be recognized in other Contracting States. However if the liquidator wishes to exercise his powers in another Contracting State, it is necessary for the Contracting States having proceedings of this type (the United Kingdom and Ireland) to introduce into their national legislation a system of confirmation by the courts of the nature of the proceedings and the appointment of the liquidator. This condition is shown in the list in Annex A which contains the proceedings designated by each country. In both cases these are termed proceedings "with confirmation of or by a court".

53. Finally, Article 1(1) does not require that a debtor have a particular status. The Convention applies equally to all proceedings, whether these involve a natural person or a legal person, a trader or an individual (see comments on Article 4).

54. Article 1(2): The Convention does not cover insolvency proceedings concerning insurance undertakings, credit institutions, investment undertakings which provide services involving the holding of funds or securities for third parties, or collective investment undertakings.

Contracting States subject these entities to prudential supervision through national regulatory authorities in order to minimize the risk to the relevant industries and to the financial system as a whole. All these entities are subject to specific Community regulations in the exercise of freedom of establishment and freedom to provide services, which are founded on the principle of control by the authorities of the State of origin of the entity in question. Negotiations are under way for Directives on reorganization measures and winding-up proceedings for credit institutions and insurance undertakings and Directives concerning insolvency proceedings relating to other entities described in this point are expected to follow. It has been agreed, therefore, that insolvency proceedings relating to the aforementioned entities should be excluded from the scope of this Convention.

55. The exclusion of credit institutions and insurance undertakings was agreed to by all Member States only after a statement by the Council and the Commission regarding the need to step up work on insolvency proceedings involving institutions and undertakings referred to in Article 1(2).

56. The excluded entities and undertakings are defined not in the Convention but by other instruments of Community law. The provisions currently applicable are mentioned in points 57 to 60.

    The entities and undertakings which fall under the definitions given by the relevant Community Regulations and Directives are excluded from the Convention. Once an entity or an undertaking falls under the said definitions, the fact that the specific rules laid down by those Community Regulations or Directives are not, for any other reason, applicable to them does not alter this rule.

57. An "insurance undertaking" is any entity covered by the First Council Directive 73/239/EEC of 24 July 1973 on the coordination of laws, regulations and administrative provisions relating to the taking up and pursuit of the business of direct insurance other than life assurance as last amended by Directive 95/26/EC and by the First Council Directive 79/267/EEC of 5 March 1979 on the coordination of laws, regulations and administrative provisions relating to the taking up and pursuit of the business of direct life assurance, as last amended by Directive 95/26/EC.

58. A "credit institution" is any entity covered by the definition in the First Council Directive 77/780/EEC of 12 December 1977 the coordination of the laws, regulations and administrative provisions relating to the taking up and pursuit of the business of credit institutions as last amended by Directive 95/26/EC, which is an enterprise whose activity consists of receiving deposits or other reimbursable funds from the public and granting loans on its own account.

59. An "investment undertaking" is any entity covered by the definition in Council Directive 93/22/EEC of 10 May 1993 on investment services in the securities field as amended by Directive 95/26/EC (Article 1); in other words, any enterprise which regularly carries out a professional activity consisting of supplying third parties with an investment service concerning securities (and money-market instruments). Examples of an investment service are: the receiving, transfer and buying or selling of securities on behalf of another person, dealing in these securities on one's own behalf, management on a discretionary and individualized basis of investment portfolios of securities in accordance with a mandate given by the investors.

60. A "collective investment undertaking" is any undertaking covered by the definition set out in Council Directive 85/611/EEC of 20 December 1985 on the coordination of laws, regulations and administrative provisions relating to undertakings for collective investment in transferable securities (UCITS) as last amended by Directive 95/26/EC; in other words, any body whose sole aim is the joint investment of securities from capital collected from the public, whose operations are subject to the principles of risk sharing, and the shares of which are, on the bearer's request, bought or paid back, directly or indirectly, from the assets of those bodies.

## Article 2

### Definitions

61. Article 2 provides definitions of a series of concepts which appear throughout the Convention.

62. Article 2(a) indicates that, for the purposes of the Convention, "insolvency proceedings" refer to proceedings which meet the conditions in Article 1(1) and are included in Annex A to the Convention which forms an integral part thereof.  Hence only the proceedings included in the Annex may benefit from the system of recognition in the Convention.

    Contracting States may amend the list of their proceedings by using the revision mechanism laid down in Article 54.

63. Article 2(b): the concept of "liquidator" is understood in a broad sense, to encompass any person or body who or which is appointed to administer or realize the bankrupt's assets, or to supervise the management of the debtor's affairs (the full or partial divestment of the debtor being one of the pre-conditions if the proceedings are to fall under the Convention).

The identification of those persons or bodies of national law who or which may be characterized as "liquidator" for the purposes of the Convention is established by means of their inclusion in the list of Annex C of the Convention.

When the court itself performs, according to the national law, functions of administration of the debtor's assets, it may qualify as "liquidator" within the meaning of the Convention. It is, however, necessary that the State in question states in Annex C of the Convention that its courts may act as liquidator.

64. Article 2(c): the concept of "winding-up proceedings" aims to define the type of proceedings acceptable as secondary proceedings.

For the reasons given in point 51, only insolvency proceedings within the meaning of Article 1 which, in addition, may entail the realization of the debtor's assets can be secondary proceedings after the main proceedings have been opened.

The fact that winding-up proceedings may be brought to a close through agreement with the creditors, or in some other way, thus putting an end to the debtor's insolvency, does not alter this qualification if the essential aim of the proceedings is to proceed with winding-up.

The Contracting States must enter in the list in Annex B those proceedings which serve as secondary proceedings.  If a State fails to include specific proceedings in the list in Annex B, these proceedings may not then benefit from the provisions of the Convention. All Contracting States must include at least one type of proceedings in the list in Annex B.

65. The Convention does not restrict the types of proceedings which can serve as independent territorial proceedings opened before the main proceedings in accordance with Article 3(4).

These proceedings may be those included in Annex A (including reorganization proceedings) or Annex B (only winding-up proceedings). However, once the main proceedings are opened, the liquidator in the main proceedings is empowered to request the conversion of any local insolvency proceedings opened in accordance with Article 3(4) into winding-up proceedings listed in Annex B.

66. Article 2(d): the expression "court" is taken in a very broad sense.  It covers not only the judiciary or an authority which plays a role similar to that of a court or public authority (as was the case with earlier versions of the draft), but also a person or body empowered by national law to open proceedings or make decisions in the course of those proceedings (see point 52).

This wording brings this Convention close to the concept of "competent authority" in Article 4 of the 1990 Istanbul Convention, where the explanatory report (in point 23) states that the term "competent authority" for the opening of proceedings may include the competent body of a legal person which decides on its own winding-up for reasons of insolvency as is the case in Ireland and the United Kingdom.

67. Article 2(e): "judgment" must be taken in a broad sense to mean "decision", consistent with what is said in point 66.

68. Article 2(f): "the time of the opening of proceedings" is very important, since many questions are settled by reference to it.  The time of the opening of proceedings is deemed to be the time when the decision begins to be effective under the law of the State of the opening of the proceedings.

The Convention does not require the decision to open insolvency proceedings to be final. It is sufficient for it to have effect in the State of opening and for its effects not to have been stayed.

In the case of non-judicial proceedings of the "creditors voluntary winding-up" type, the working party discussed whether, in order to fix the time of opening, the same rule should be used or whether the date of confirmation by the court of the nature of the proceedings and the appointment of the liquidator should be taken as the reference point. Only in order to allow the liquidator to exercise his powers on the territory of another Contracting State would it be necessary to take the date of confirmation by the court as the reference (see point 52). For all other matters, the general rule given above in this point stands.

69. Article 2(g): "the Contracting State in which assets are situated". This definition is important insofar as the main proceedings do not affect certain rights on assets located abroad (see Articles 5 and 7) and territorial proceedings can only affect the assets located in the State in which proceedings are opened. To this extent the Convention must help to determine what criteria regarding location are to be followed. In reality, the Convention does no more than stress traditional solutions of private international law which are well known in all the Contracting States.

Thus, tangible property is considered to be located in the place in which it is physically situated.

Property and rights ownership of or entitlement to which must be entered in a public register are considered to be located in the State under the authority of which the register is kept. This provision is applicable, for example, in the case of ship and aircraft registers, and also extends to intangible property, such as patents or securities. The State under whose authority the register is kept is not necessarily the State in which the register is physically situated (e.g. it may be a consular register or centralized international register).

"Public register" does not mean a register kept by a public authority, but rather a register for public access, an entry in which produces effects vis-à-vis third parties. It also includes private registers with these characteristics, recognized by the national legal system concerned.

In the case of Community patents, trademarks and other similar rights of Community origin, Article 12 states that these can only be included in main proceedings based on Article 3(1) (see point 133).

Finally, claims are deemed to be situated in the State where the debtor required to meet the claim in question (and not the insolvent debtor) has his centre of main interests. The concept of "centre of main interests" is the same as that specified in Article 3(1) (see point 75).

70. Article 2(h): The concept of "establishment" is linked to the basis of international jurisdiction to open territorial proceedings. In this regard, it should be mentioned that Article 3(2), in which the jurisdiction to open such territorial proceedings is dealt with, was one of the most debated provisions throughout the negotiations.

Several Contracting States wished to have the possibility of basing territorial proceedings not only on the presence of an establishment, but also on the mere presence of assets of the debtor (assigned to an economic activity) without the debtor having an establishment.

For the sake of an overall consensus on the Convention, those States agreed to abandon the presence of assets as a basis for international competence provided that the concept of establishment is interpreted in a broad manner but consistently with the text of the Convention. This explains the very open definition given in Article 2(h).

In the Convention, the mere presence of assets (e.g. the existence of a bank account) does not enable local territorial proceedings to be opened. The presence of an establishment of the debtor within the jurisdiction concerned is necessary.

Though defended by one State, the possibility of adopting the same concept of establishment in the Convention as that given by the Court of Justice of the European Communities in its interpretation of Article 5(5) of the 1968 Brussels Convention was ruled out. The majority of States preferred an independent concept to be developed.

Indeed, the Court of Justice of the European Communities emphasized that the special powers laid down in Article 5 of the 1968 Brussels Convention must be strictly interpreted vis-à-vis the general forum of the place of domicile of the defendant. Under these conditions, to import a concept from the 1968 Brussels Convention involved the risk of conveying a possibly restrictive interpretation of the concept of establishment to the Convention on insolvency proceedings, which was precisely the opposite of what most of the working party intended. For this reason, they opted to give the Convention its own definition, which is contained in Article 2.

71. For the Convention on insolvency proceedings, "establishment" is understood to mean a place of operations through which the debtor carries out an economic activity on a non-transitory basis, and where he uses human resources and goods.

Place of operations means a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional.

The emphasis on an economic activity having to be carried out using human resources shows the need for a minimum level of organization. A purely occasional place of operations cannot be classified as an "establishment". A certain stability is required. The negative formula ("non-transitory") aims to avoid minimum time requirements. The decisive factor is how the activity appears externally, and not the intention of the debtor.

The rationale behind the rule is that foreign economic operators conducting their economic activities through a local establishment should be subject to the same rules as national economic operators as long as they are both operating in the same market. In this way, potential creditors concluding a contract with a local establishment will not have to worry about whether the company is a national or foreign one. Their information costs and legal risks in the event of insolvency of the debtor will be the same whether they conclude a contract with a national undertaking or a foreign undertaking with a local presence on that market.

Naturally, the possibility of opening local territorial insolvency proceedings makes sense only if the debtor possesses sufficient assets within the jurisdiction. Whether or not these assets are linked to the economic activities of the establishment is of no relevance.

## Article 3
### International jurisdiction

72. The rules of jurisdiction set out in the Convention establish only international jurisdiction, that is to say, they designate the Contracting State the courts of which may open insolvency proceedings. Territorial jurisdiction within that Contracting State must be established by the national law of the State concerned.

73.  Main insolvency proceedings:

Article 3(1) enables main insolvency universal proceedings to be opened in the
Contracting State where the debtor has his centre of main interests.  Main insolvency
proceedings have universal scope.  They aim at encompassing all the debtor's assets on
a world-wide basis and at affecting all creditors, wherever located.

Only one set of main proceedings may be opened in the territory covered by the
Convention.

74.  Which persons or legal entities may be subject to insolvency proceedings is determined
by national law.  Where the international jurisdiction rule mentions the debtor, this means
the natural persons or legal entity (whether a legal person or not) concerned.

75.  The concept of "centre of main interests" must be interpreted as the place where the
debtor conducts the administration of his interests on a regular basis and is therefore
ascertainable by third parties.

The rationale of this rule is not difficult to explain.  Insolvency is a foreseeable risk.  It is
therefore important that international jurisdiction (which, as we will see, entails the
application of the insolvency laws of that Contracting State) be based on a place known to
the debtor's potential creditors.  This enables the legal risks which would have to be
assumed in the case of insolvency to be calculated.

By using the term "interests", the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to include the activities of private individuals (e.g. consumers). The expression "main" serves as a criterion for the cases where these interests include activities of different types which are run from different centres.

In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.

Where companies and legal persons are concerned, the Convention presumes, unless proved to the contrary, that the debtor's centre of main interests is the place of his registered office. This place normally corresponds to the debtor's head office.

76. The Convention offers no rule for groups of affiliated companies (parent-subsidiary schemes).

The general rule to open or to consolidate insolvency proceedings against any of the related companies as a principal or jointly liable debtor is that jurisdiction must exist according to the Convention for each of the concerned debtors with a separate legal entity.

Naturally, the drawing up of a European norm on associated companies may affect this answer.

77. Article 3(1) gives the courts in the State of the opening of proceedings jurisdiction in relation to insolvency proceedings. However, the Convention contains no rule defining the limits of this jurisdiction.

This is a fundamental question since it raises the issue of the relationship between the Convention on insolvency proceedings and the 1968 Brussels Convention and their respective scope.

Certain Contracting States recognize a "vis attractiva concursus" in their national law, by virtue of which the Court which opens the insolvency proceedings has within its jurisdiction not only the actual insolvency proceedings but also all the actions arising from the insolvency.

Although the projection of this principle in the international domain is controversial, the 1982 Community Draft Convention contained a provision in Article 15 which, according to the Lemontey Report, was inspired by the "vis attractiva" theory. This Article conferred on the courts of the State of the opening of insolvency proceedings jurisdiction over a wide series of actions resulting from the insolvency.

Neither this precept nor this philosophy has been adopted in this Convention. There is no provision in Article 3 of the Convention addressing this problem. However, the Convention's silence on the matter is only partial. Article 25 thereof contains the delimitation criterion between both the 1968 Brussels Convention and this Convention.

This criterion is directly taken from the Court of Justice of the European Communities. It was outlined by the Court of Justice in the interpretation of Article 1(2) of the 1968 Brussels Convention in its Judgment of 22 February 1979 (Case 133/78, Gourdain-v-Nadler [1979] ECR p. 733).

Article 1(2) of the 1968 Brussels Convention excludes "bankruptcy, proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions and analogous proceedings" from its scope. In that Judgment the Court of Justice of the European Communities used the nature of the action taken as the criterion for determining whether or not the jurisdiction rules of the 1968 Brussels Convention applied. According to this criterion, actions directly derived from insolvency and in close connection with the insolvency proceedings are excluded from the 1968 Brussels Convention. Logically, to avoid unjustifiable loopholes between the two Conventions, these actions are now subject to the Convention on insolvency proceedings and to its rules of jurisdiction.

78. The rule on international jurisdiction in Article 3(1) enables the court having jurisdiction to open main insolvency proceedings to order provisional and protective measures from the time of the request to open proceedings.

Preservation measures both prior to and after the commencement of the insolvency proceedings are very important to guarantee the effectiveness of the insolvency proceedings. They may be ordered by the court having jurisdiction according to Article 3(1) irrespective of the Contracting State where the assets or persons concerned (either debtor or a creditor) are located. Such measures may adopt a wide-range of forms, according to the national law of the court ordering them (e.g. interlocutory orders to do or not to do, appointment of a temporary administrator, attachment of assets).

These preservation measures shall be recognised and enforced in other Contracting States, according to the conditions set out in Article 25 of the Convention (see point 198).

Article 3 (1) does not prevent the liquidator, or any other empowered person, from going to the place where the preservation is to be carried out (e.g.the State in which the assets are located) and asking the local courts to adopt provisional measures available under the national law. This possibility presupposes that the courts of that State enjoy jurisdiction to adopt such measures under their national law (as should usually be the case), and the fulfilment of the subject-matter requirements of that law (evidence of a good prima facie case, sufficient urgency, security to cover damages which may be caused, etc.).

These preservation measures are ancillary to the main proceedings. Logically, they remain subordinated to the decisions taken in the course of the main proceedings by the court having jurisdiction under Article 3(1) and which benefit from the system of recognition and enforcement of the Convention. Hence, under Articles 16 and 25, such a court may even stipulate that those preservation measures are to be lifted, modified or continued (see point 198).

The possibility of going to the court of the place where the measures are to take effect is referred to again in Article 38, although with a different purpose. Article 38 empowers the temporary administrator appointed after the request for the opening of main insolvency proceedings, but before such opening, to call directly on the authorities of any other Contracting State to adopt preservation measures provided under the insolvency law of this State for winding-up proceedings on the debtor's assets situated in its territory, as a pre-opening stage of secondary proceedings (see point 262).

79.  The Convention does not provide any express rule to resolve cases where the courts of two Contracting States concurrently claim jurisdiction in accordance with Article 3(1). Such conflicts of jurisdiction must be an exception, given the necessarily uniform nature of the criteria of jurisdiction used.

Where disputes do arise, to solve them, the courts will be able to take account of:

1. the Convention's system according to which:

   (a) each court is obliged to verify its own international jurisdiction in accordance with the Convention;

   (b) the principle of Community trust, according to which once the first court of a Contracting State has adopted a decision, the other States are required to recognize it (see points 202 and 220).

2. the possibility of a request for a preliminary ruling to the Court of Justice of the European Communities, guaranteeing the uniformity of the contents of the criteria for international jurisdiction and its appropriate interpretation in the given case;

3. the general principles of procedural law which are valid in all Contracting States; these principles include those derived from other Community Conventions such as the 1968 Brussels Convention.

80.  Local insolvency proceedings

Article 3(2) enables territorial proceedings to be opened in the State in which the debtor has an establishment, as defined in Article 2(h), under the following conditions.

In cases where the debtor's centre of main interests is located in a Contracting State, the courts of other Contracting States have no power to open main insolvency proceedings.

However, any of these Contracting States may open territorial proceedings, the effectiveness of which is restricted to the assets situated in that State, if the debtor has an establishment in the territory of that State.  The mere presence of assets is not sufficient to open territorial proceedings.

Depending on whether or not main proceedings have been opened, the proceedings shall be secondary or independent territorial proceedings.

81.  Article 3(2) does not grant jurisdiction to open territorial proceedings to the courts of a State where the debtor does not have an establishment.  The assets located in that State cannot, therefore, be included in territorial proceedings, but revert to the main proceedings, if such have been opened.

82.  Should the debtor's centre of main interests be located outside the territory of the Contracting States, it is not within the jurisdiction of any Contracting State to open insolvency proceedings within the scope of the Convention.  Article 3(1) and (2) assumes that the centre of main interests is in a Contracting State.

When the centre of main interest does not lie in a Contracting State, national law determines the international jurisdiction of its courts.  The effects of such proceedings are not governed by this Convention (see point 44).

83.  <u>Secondary territorial insolvency proceedings</u>

Article 3(3) requires that after main proceedings have been opened by the competent court within the meaning of Article 3(1), the subsequent proceedings opened by the court of the State where the establishment is located, in accordance with Article 3(2), are secondary proceedings, subject to Chapter III.

In the event of there being a number of establishments located in different Contracting States, several sets of secondary proceedings may be opened.

The secondary proceedings under Article 3(3) may not be reorganization proceedings, rather they must be winding-up proceedings as mentioned in Annex B.  This rule is reaffirmed in Article 27 (see comments re Article 27 (points 211 et seq.)).

84.  Independent territorial insolvency proceedings

Article 3(4) deals with situations which exist prior to the opening of main proceedings. This is the result of efforts to reconcile two essentially conflicting approaches.

In line with the philosophy expressed most particularly in Articles 3(1) and (2) and Article 27, the court of the debtor's centre of main interests is the only one having jurisdiction to open main proceedings. These proceedings should naturally encompass all the debtor's assets regardless of the State in which the property is located.

It is only as an exception to the universal proceedings that territorial proceedings may be opened in advance, in order to satisfy "local" creditors as to the assets present in that State. Indeed, it is difficult to imagine that "local" creditors who hold a favourable ranking in the State where the property is located would want to transfer all the assets to another State where their ranking would be less favourable. It is likewise difficult for States without any creditors holding a preferential ranking to accept the transfer of all the assets abroad.

The other approach involves seeking to protect local creditors by allowing national rules on the opening of proceedings to follow their normal course, even in a State where an establishment is located, and even at all times, prior to and regardless of the opening of proceedings in the State of the centre of main interests. This approach takes into account the insolvency of an establishment and the creditors' interest in territorial proceedings or the general interest in territorial proceedings to reorganize an establishment of social and economic importance within that State, and grants less consideration to the principle of the universality of insolvency proceedings.

85. Article 3(4) adopts the following rule:

The courts of a Contracting State having jurisdiction under Article 3(2) may open, prior to the main proceedings, territorial insolvency proceedings called for this reason independent territorial proceedings, in only two cases:

1. The conditions for opening the insolvency proceedings, as set out by the law of the State where the centre of main interests is located, do not allow main proceedings to be opened.

   That will be the case if, for example, the debtor cannot be subject to insolvency proceedings, e.g. where the applicable law requires the debtor to be a trader, and this is not the case, or where the debtor is a public company which the law of the State of the centre of main interests does not allow to be declared insolvent.

2. A local creditor or a creditor of the local establishment, within the meaning of Article 3(4)(b), requests territorial proceedings be opened.

The protected creditor to whom this right to request the opening of territorial proceedings is granted is one:

(a) whose habitual residence, domicile and registered office is in the State where the establishment is located,

(b) or whose claim arises from the operation of that establishment (e.g. an employee working for that establishment; a person who entered through the establishment into an undertaking which must be performed in that State; the tax authorities and social security bodies).

Outside these two possible cases, the court having jurisdiction to open the territorial proceedings cannot open proceedings prior to the opening of proceedings in the centre of main interests.

86. The territorial proceedings mentioned in Article 3(4) may be winding-up proceedings or reorganization proceedings mentioned in Annex A or Annex B.

In the event of the subsequent opening of the main proceedings, independent territorial proceedings become secondary proceedings, in accordance with the special rules of Articles 36 and 37 of the Convention.

Furthermore, reorganization proceedings as mentioned in Annex A will, at the request of the liquidator in the main proceedings, be converted into secondary winding-up proceedings, in accordance with Articles 36 and 37 (see points 210, 254 to 261). If the liquidator in the main proceedings does not request this conversion, the territorial proceedings may continue as reorganization proceedings.

Article 4

Law applicable

87. The Convention sets out, for the matters covered by it, uniform rules on conflict of laws which replace national rules of private international law.

When these rules on conflict of laws talk of the "applicable law", they refer to the internal law of the Contracting State designated by the rule, excluding its rules of private international law.

88. General rule on conflict of laws

Article 4 lays down the basic rule on conflict of laws of the Convention. This Article determines the law applicable to the insolvency proceedings, the conduct thereof and their material effects: unless otherwise stated by this Convention, the law of the Contracting State of the opening of the proceedings is applicable (lex concursus).

89. This rule on conflict of laws is valid both for the main proceedings and for local proceedings (secondary or independent territorial proceedings).

To avoid any doubts, Article 28 reiterates this solution for the secondary proceedings. Although Article 28 only considers the secondary proceedings, it is clear that the application of the law of the State of the opening of the proceedings operates as the general conflict of laws rule of the Convention and is also valid for independent territorial proceedings.

90. The law of the State of the opening of proceedings determines all the effects of the insolvency proceedings, both procedural and substantive, on the persons and legal relations concerned.

This law governs all the conditions for the opening, conduct and closure of the insolvency proceedings. It stipulates, inter alia, who may be subject to insolvency proceedings, the requirements to open them and who may present the petition; it determines the nature and the extent of the debtor's divestment and the assets covered by it; it outlines the organization of the administration of the estate and regulates the designation of the liquidator and his powers; it decides the admissibility of claims and the rules on distribution and preferences; it governs the closure of the proceedings and its consequences, etc.

The substantive effects referred to the competence of the law of the State of the opening by Article 4, are those typical of insolvency law, i.e. effects which are necessary for the insolvency proceedings to fulfil its aims. To this extent, the law of the State of the opening may displace (unless the Convention provides otherwise), the law normally applicable, under the common pre-insolvency rules on conflict of laws, to the act concerned. This happens for instance when Article 4 makes applicable the law of the State of opening of proceedings to invalidate any act (e.g. a contract) detrimental to all the creditors, even if that act is governed under the general rules on conflict of laws (if a contract, those of the 1980 Rome Convention), by the law of a different State.

91. To facilitate its interpretation, Article 4(2) contains a non-exhaustive list of questions that are governed by the law of the State of the opening.

    (a) whether a particular debtor by virtue of his status (e.g. trader/non-trader, public law company) may be subject to insolvency proceedings (Article 4(2)(a)). This rule is valid for both the main proceedings and for secondary proceedings, where the solution to the case may be different. This paragraph is linked to Article 3(4)(a) and Article 16(2) (see points 85 and 148);

    (b) which assets form part of the estate and the treatment of assets acquired by the debtor after the opening of proceedings;

(c) the respective powers of the debtor and the liquidator. This paragraph is linked to Article 14 (see point 141);

(d) the conditions under which set-offs may be invoked. This paragraph is linked to Articles 6 and 9 (see points 107 to 111 and 120 et seq.);

(e) the effects of the proceedings on current contracts to which the debtor is party (paragraph (e)). To the extent necessary, the law of the State of the opening displaces the law of the contract determined in accordance with the 1980 Rome Convention. This paragraph is linked to Articles 8 and 10 (see points 116 to 119; 125 et seq);

(f) the effects of the insolvency proceedings on executions brought by individual creditors, their suspension or prohibition after the opening of collective insolvency proceedings. However, the effects of the proceedings on lawsuits pending remain subject to the law of the Contracting State where the lawsuit is pending, ex Article 15 (see point 142);

(g) the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings (i.e. claims arising in the administration and management of the assets which in many systems benefit from preferential payment);

(h)  the rules governing the lodging, verification and admission of claims. It must be borne in mind that Chapter IV of the Convention sets out a number of uniform rules on this subject. As regards claims that are admissible, Article 39 acknowledges "iure conventionis" that Contracting States' public law claims can be lodged in insolvency proceedings opened in other Contracting States. This precept expressly stipulates the right of the tax and social security authorities of any Contracting State to submit their claims in insolvency proceedings opened pursuant to the Convention;

(i)  the ranking (privileges, preferences, etc.) and the rules on distribution of the assets realized. As in all main or secondary proceedings the national law of the State of the opening is applicable, the ranking of a claim may vary for each of the proceedings in which it is lodged;

(j)  the conditions and effects of the closure of proceedings, including closure by composition or equivalent measure;

(k)  the rights of the creditors subsequent to the closure of the proceedings, including any possible discharge of the debtor;

(l)  the costs and expenses of the proceedings;

(m) the voidness, voidability or unenforceability of legal acts that may be detrimental to all the creditors. The applicable national law determines whether action must be taken to obtain their invalidation or whether the decision to open proceedings automatically entails invalidation. To the extent necessary, the law of the State of the opening displaces the law normally applicable to the act in question. This paragraph is to be taken in conjunction with Article 13 (see point 135).

In the case of secondary proceedings, the local rules on invalidation of a detrimental act shall be applicable only insofar as damage has been caused to the debtor's assets which are in this State (e.g. to the estate of the secondary proceedings). For instance, the act in question (sale, establishment of a right in rem) involves an asset which was located in this State at the relevant time.

92. Exceptions to the general rule on conflicts of law of Article 4

The application, by the courts in the State of the opening of proceedings, of their national insolvency law and the automatic extension of its effects to all the Contracting States (see Articles 16 and 25) may interfere with the rules under which transactions are carried out in these States.

To protect legitimate expectations and the certainty of transactions in States other than that in which proceedings are opened (for in the latter State all the operators have to count on the application of its laws) the Convention provides for a number of exceptions to the general rule:

1.  In certain cases, the Convention excludes some rights over assets located abroad from the effects of the insolvency proceedings (as in Articles 5, 6 and 7).

2.  In other cases, it ensures that certain effects of the insolvency proceedings are governed not by the law of the State of the opening (F1), but by the law of the State concerned (see Articles 8, 9, 10, 11, 14 and 15). In such cases, the effects to be given to the proceedings opened in other Contracting States are the same effects attributed to a domestic proceedings of equivalent nature (liquidation, composition, or reorganization proceedings) by the law of the State concerned (F2).

93. The exceptions to the application of the law of the State of the opening (Article 4) are referred to in Articles 5 to 15 of the Convention. Apart from Articles 6 and 14, which by systemic arguments must be interpreted in the same way, the exception is made in favour of the law of a "Contracting State".

This does not mean that, by a contrario interpretation, the law of the State of the opening of proceedings is applicable where the State concerned is not a Contracting State. The need to protect legitimate expectations and the certainty of transactions is equally valid in relations with non-Contracting States. The group's intention was simply to regulate these cases in line with the general restriction of the Convention to the intra-Community effect of insolvency proceedings (see point 44). Contracting States are, therefore, free to decide which rules they deem most appropriate in other cases (the same ones as in Articles 5 to 15 of the Convention, or others).

### Article 5
### Third parties' rights in rem

94. This provision excludes from the effects of the proceedings rights in rem of third parties and creditors in respect of assets belonging to the debtor which, at the time of the opening of proceedings, are situated within the territory of another Contracting State.

   If the assets are situated in a non-Contracting State, Article 5 does not govern the issue (see points 44 and 93).

95. In order to understand the functioning of Article 5, account should be taken of the fact that main insolvency proceedings based on Article 3(1) have a universal scope. All the assets of the debtor shall be subject to the main proceedings irrespective of the State where they are situated unless territorial proceedings are opened. The law of the State of the opening of the main proceedings shall determine which of those assets shall be regarded as forming a part of the estate in the main proceedings and which shall be excluded (see Article 4(2)(b)).

   A part of those assets may be subject to third parties' rights in rem. The Convention does not make it obligatory for these assets to be included in or excluded from the estate in the main proceedings. The Convention imposes only an obligation to respect third parties' rights in rem over assets located within the territory of a Contracting State different from the State of the opening of proceedings.

The creation, validity and scope of these rights in rem are governed by their own applicable law (in general, the "lex rei sitae" at the relevant time) and cannot be affected by the opening of insolvency proceedings.

This means that although the law of the State of the opening stipulates that all assets are part of the estate, the holder of the right in rem retains all his rights in respect of the assets in question. For instance, the holder of the right in rem may exercise the right to separate the security from the estate and, where necessary, to realize the asset individually to satisfy the claim. On the other hand, the liquidator, even if he is in possession of the asset, cannot take any decision on that asset which might affect the right in rem created on it, without the consent of its holder (see also point 161).

96. Article 5 only applies to the rights in rem created before the opening of proceedings. If they are created after the opening, Article 4 shall apply without exception (without prejudice to Article 14).

97. The fundamental policy pursued is to protect the trade in the State where the assets are situated and legal certainty of the rights over them. Rights in rem have a very important function with regard to credit and the mobilization of wealth. They insulate their holders against the risk of insolvency of the debtor and the interference of third parties. They allow credit to be obtained under conditions that would not be possible without this type of guarantee.

Rights in rem can only properly fulfil their function insofar as they are not more affected by the opening of insolvency proceedings in other Contracting States than they would be by the opening of national insolvency proceedings. This aim could be achieved through alternative solutions which were in fact discussed in the working party. However, to facilitate the administration of the estate the simplicity of the formula laid down in the current Article 5 was preferred by the majority: insolvency proceedings do not affect rights in rem on assets located in other Contracting States.

98. The rule does not "immunize" rights in rem against the debtor's insolvency. If the law of the State where the assets are located allows these rights in rem to be affected in some way, the liquidator (or any other person empowered to do so) may request secondary insolvency proceedings be opened in that State if the debtor has an establishment there. The secondary proceedings are conducted according to national law and allow the liquidator to affect these rights under the same conditions as in purely domestic proceedings.

99. Article 5 states that the proceedings shall not affect rights in rem in respect of assets located in other Contracting States and not that the proceedings shall not affect assets located in another State. As main proceedings are universal (ex. Article 3(1)) they encompass all the debtor's assets.

This is important if the value of the security is greater than the value of the claim guaranteed by the right in rem. The creditor will be then obliged to surrender to the estate any surplus of the proceeds of sale.

Without affecting the economic value of the right or its immediate realisability, it also gives the liquidator the power to decide on the immediate payment of the claim guaranteed, and thus avoid the loss in value that certain assets could suffer when they are realized separately.

100. Article 5 refers to "rights in rem" but does not define what these are.  The Convention does not intend to impose its own definition of a right in rem, running the risk of describing as rights in rem legal positions which the law of the State where the assets are located does not consider to be rights in rem, or of not encompassing rights in rem which do not fulfil the conditions of that definition.

The Convention acknowledges the interest of each State in protecting its market's trade, in the form of respect of rights in rem acquired over assets of the debtor located in that country under the law that is applicable before the opening of the insolvency proceedings.

For this reason, the characterization of a right as a right in rem must be sought in the national law which, according to the normal pre-insolvency conflict of law rules, governs rights in rem (in general, the lex rei sitae at the relevant time).  In this sense, the Convention adopts a "lege causae" characterization.

101. The only departure from the above statement is found in Article 5(3), which for the purposes of Article 5, directly and independently of national law, considers as a right in rem any right entered in a public register and enforceable against third parties, allowing a right in rem to be obtained.

102.  However, the rationale of Article 5 imposes certain limits to the national qualification of a right in rem.  It must be borne in mind that Article 5 represents an important exception as regards the application of the law of the State of the opening and the universal effect of the main proceedings.  It must equally be remembered that secondary proceedings are only possible if the debtor has an establishment in that Contracting State.  The mere presence of assets is not enough in order to open such proceedings.

An unreasonably wide interpretation of the national concept of a right in rem to include, for instance, rights simply reinforced by a right to claim preferential payment, as is the case for a certain number of privileges, would make the Convention meaningless, and such a wide interpretation is not to be attributed to Article 5.

103.  In order to facilitate the application of the Convention and avoid doubts Article 5(2) provides a list of types of rights that are normally considered by national laws as rights in rem.

This list is inspired in two main considerations.  The first, that a right which exists only after insolvency proceedings have been opened, but not before, is not a right in rem for the purposes of Article 5 (which protect pre-existing rights).

The second, that a right in rem basically has two characteristics (see also the concept of rights in rem in the Member States in point 166 of the Schlosser Report on the 1968 Brussels Convention):

(a)  its direct and immediate relationship with the asset it covers, which remains linked to its satisfaction, without depending on the asset belonging to a person's estate or on the relationship between the holder of the right in rem and another person;

(b) the absolute nature of the allocation of the right to the holder. This means that the person who holds a right in rem can enforce it against anyone who breaches or harms his right without his assent (e.g. such rights are typically protected by actions to recover); that the right can resist the alienation of the asset to a third party (it can be claimed erga omnes, with the restrictions characteristic of the protection of the bona fide purchaser); and that the right can thus resist individual enforcement by third parties and in collective insolvency proceedings (by its separation or individual satisfaction).

104. A right in rem may not only be established with regard to specific assets but also with regard to assets as a whole. Security rights such as the "floating charge" recognised in United Kingdom and Irish law can, therefore, be characterized as a right in rem for the purposes of the Convention. Likewise, rights characterized under national law as rights in rem over intangible assets or over rights are also included (see Article 5(1)).

105. This provision is based on non-fraudulent location of the assets.

106. The establishment of a right in rem in favour of a particular creditor or third party could be an act detrimental to all the creditors. In this case, the general rules of the Convention governing actions for voidness, voidability or unenforceability of legal acts are applicable (see Article 4(2)(m), and Article 13).

### Article 6
### Set-off

107. This Article deals with set-off in the same way as Article 5 dealt with rights in rem. When under the normally applicable rules on conflict of laws the right to demand the set-off stems from a national law other than the "lex concursus", Article 6 allows the creditor to retain this possibility as an acquired right against the insolvency proceedings: the right to set-off is not affected by the opening of proceedings.

108. Set-off is a part of the law of obligations governed by the relevant rules of private international law regarding the law applicable to obligations. By including two claims which offset each other, the question arises whether the right to set-off stems from:

   (a) the cumulative application of laws applicable to the two claims or

   (b) the law applicable to the claim of the debtor ("passive" claim in the set-off) against which the creditor intends to set off his counter-claim against the debtor ("active" claim in the set-off).

The Convention opts for this second interpretation when it derives the right to set-off from "the law applicable to the insolvent debtor's claim", (i.e. from the law applicable to the claim where the insolvent debtor is the creditor in relation to the other party).

109. The laws of some Member States altogether restrict or prohibit set-off in insolvency. Article 4 subjects insolvency set-off to the competence of the law of the State of the opening of the insolvency proceedings.

If insolvency proceedings are opened, it falls therefore to the "lex concursus" to govern admissibility and the conditions under which set-off can be exercised against a claim of the debtor.

If the "lex concursus" allows for set-off, no problem will arise and Article 4 should be applied in order to claim the set-off as provided for by the law.  On the other hand, if the "lex concursus" does not allow for set-off (e.g. since it requires both claims to be liquidated, matured and payable prior to a certain date), then Article 6 constitutes an exception to the general application of that law in this respect, by permitting the set-off according to the conditions established for insolvency set-off by the law applicable to the insolvent debtor's claim ("passive" claim).

In this way, set-off becomes, in substance, a sort of guarantee governed by a law on which the creditor concerned can rely at the moment of contracting or incurring the claim.

110. Article 6 covers only rights to set-off arising in respect of mutual claims incurred prior to the opening of the insolvency proceedings.  After this time, Article 4 is applied without exception to decide whether or not the set-off is admissible.
Contractual set-off implies an agreement subject to its own applicable law according to the 1980 Rome Convention.  The same rationale on which Article 5 is based explains that in the event of a contractual set-off agreement covering different claims between two parties, the law of the Contracting State applicable to that agreement will continue to govern the set-off of claims covered by the agreement and incurred prior to the opening of the insolvency proceedings.

111. As in the case of Article 5, any actions detrimental to all the creditors may be corrected by bringing actions for voidness, voidability or unenforceability as set out in Article 4(2)(m).

Article 7

Reservation of title

112. In the same way as Article 5, this provision seeks to protect trade by excluding from the scope of insolvency proceedings the reservation of title on property which, at the time the proceedings were opened, was located in a Contracting State other than the State of the opening.

The remarks made with regard to Article 5 apply here mutatis mutandis. The biggest difference between Article 5 and Article 7 concerns Article 7(2) which contains a uniform substantive rule.

113. The first paragraph governs the insolvency of the purchaser of an asset, by allowing the seller to preserve his rights based on the reservation of title. For this to occur, the asset must be located at the time when the insolvency proceedings are opened in a Contracting State other than the one where the proceedings are opened. If its location changes after the opening of the proceedings, this does not affect the application of the provision.

114. The second paragraph covers the insolvency of the seller of an asset after delivery of the asset, allowing the sale to remain valid. If the purchaser continues to make payments, he shall acquire title at the end of the period set out in the contract. For this rule to be applied, it is also a requirement that at the time the insolvency proceedings are opened the asset is located within a State other than the State of the opening of proceedings.

115. Of course, actions for voidness, voidability or unenforceability, as provided for in Article 4(2)(m) can also be brought against these reservations of title.

### Article 8
#### Contracts relating to immovable property

116. Insolvency law may have an impact on current contracts. Thus, for instance, in the case of mutual obligations pending fulfilment, the liquidator may be empowered to decide either on the performance or termination of the contract. The aim of rules of this kind is to protect the estate from the obligation to perform contracts which may be disadvantageous in these new circumstances.

117. The general rule on conflicts of law is that it falls to the law of the Contracting State of the opening of proceedings to regulate the effects of the proceedings on current contracts to which the debtor is a party (Article 4(2)(e)).

To this extent, the applicable national insolvency law interferes with and overlaps the rules applicable to contracts, which derive from the law applicable under the 1980 Rome Convention.

118. This rule, which overall is positive for the general interests of the creditors may be detrimental to other interests. In all the Contracting States, contracts covering immoveable property are subject to special rules, both of conflict of laws as well as of international jurisdiction, in order to take into account several interests: those of the parties to the contract (e.g. tenants) and the general interests protected by the State in which the immoveable property is to be found.

Protection of these specific interests justify an exception to the application of the law of the State of the opening of proceedings. Hence Article 8 makes the effects of the insolvency proceedings exclusively subject to the law of the Contracting State where the immovable property is located.

Solely means that only the law of the Contracting State of location of the immovable (including its insolvency law), and not the "lex concursus" under Article 4, is applicable to establish these effects.

119. Article 8 not only covers contracts for the use of immovable property (rental, leasing) but also includes contracts covering the transfer of the immovable property (sale).

### Article 9
### Payment systems and financial markets

120. The intention of Article 9 is for any effects on transactions subject to a payment or settlement system or to a financial market of insolvency proceedings opened in another Contracting State to be the same as those in proceedings under national law. By making the effects of insolvency exclusively subject to the law applicable to the payment system and the financial market, general confidence in these mechanisms is protected.

The aim of this provision is to avoid any modification of the mechanisms for regulating and settling transactions provided for in payment or settlement systems or on the organized financial markets operating in Contracting States, in the event of insolvency of a party to a transaction which would otherwise result if the "lex concursus" applied. The relevant mechanisms include closing out contracts and netting, and insofar as the security is situated in that Contracting State, the realization of securities.

Payment systems and markets involve large-scale transactions and as a consequence have been found to require special rules to guarantee their smooth operation and security. That is why the law governing the particular system or market concerned remains applicable.

A financial market is not defined but is understood to be a market in a Contracting State where financial instruments, other financial assets or commodity futures and options are traded.  It is characterized by regular trading and conditions of operation and access and it is subject to the law of the relevant Contracting State, including appropriate supervision, if any, by the regulatory authorities of that Contracting State.

121. Article 9 means that only the law governing the system or market in question can be applied to the relevant transactions affected by an insolvency and not the "lex concursus" as provided by Article 4.  Thus, the complex problems of potential conflicts of the two laws are avoided and the certainty of transactions is preserved.

122. For the same reason, any possible voidness, voidability or unenforceability of a payment or transaction carried out under this system or market and which may be detrimental to all the creditors, remains subject to the same solution: the law applicable to the payment system or financial market governs these cases.

123. To determine the law applicable to European payment systems account must be taken of the work in progress in the Community on those systems.

124. The reference to Article 5 means that protection of rights in rem of any kind of creditors or third parties over assets belonging to the debtor is always carried out in the same way under the Convention: by reference to the location of the assets, regardless of the type of creditor or institution which may benefit from its function as a guarantee.  Rights in rem affect third parties and uniform treatment of them is essential in order to protect trade.

## Article 10

## Contracts of employment

125. Article 10 derogates from the general application of the law of the State of the opening of proceedings (Article 4) and makes the effects of the proceedings on employment contracts and on labour relations subject to the law of the Contracting State applicable to the contract of employment, including its law on insolvency.

    This Article aims to protect employees and labour relations from the application of a foreign law, different from that which governs the contractual relations between employer and employees.  For this reason, effects of the insolvency proceedings on the continuation or termination of the employment relationship and on the rights and obligations of each party under such relationship are to be determined by the law applicable to the contract under the general conflict of laws rules.

126. The 1980 Rome Convention will determine the law applicable to employment contracts (see, in particular, its Articles 6 and 7).

127. The word "solely" emphasizes that only the law applicable to the employment contract is applied in order to establish these effects and not the "lex concursus" as provided by Article 4.  Any problem regarding possible conflicts between the two laws is therefore avoided.

128. Insolvency questions other than those relating to the impact of the opening of proceedings on contract and employment relationships remain subject to the general competence of the law of the State of the opening, ex Article 4. Thus, for instance, the following would be covered, the question of whether or not workers' claims arising out of their employment shall be protected by a privilege, the prescribed amount protected and the rank of the privilege if any, etc. In the same way as lodgement, verification and admission of claims, all these questions are subject to the law of the State of the opening (Article 4(2)(h)).

Guaranteed payments of workers' claims in cases of insolvency of the employer, ensured by a national institution under a wage guarantee scheme in the event of insolvency governed by the national law of a Contracting State, are subject to the law of that State.

<u>Article 11</u>
<u>Effects on rights subject to registration</u>

129. The application of the law of the State of the opening (F1) to determine the effects of the insolvency proceedings also on the assets of debtors located in another Contracting State may come into conflict with national registration systems, when this law provides for effects or consequences different from or unknown to the system of the State of registration (e.g. a statutory lien of the general body of creditors over the debtor's property).

130. The Convention does not try to modify the systems either of registration or of rights in rem of the Contracting States. The systems for the registration of property play a significant role in protecting trade and legal certainty. General confidence in its contents and consequences should be protected under the same conditions, whether the insolvency proceedings are opened in the State of registration or in another Contracting State.

To preserve these systems, Article 11 establishes an exception to the application of the law of the State of the opening. This exception is, however, more limited than the exceptions contained in Articles 8, 9 and 10 of the Convention. Contrary to these provisions, Article 11 does not submit the effects of the insolvency proceedings "solely" to the law of the Contracting State under the authority of which the register is kept. This means that the general applicability of the law of the State of the opening in accordance with Article 4 is not displaced. Hence, a sort of cumulative application of both laws is necessary.

Under Article 11, the law of the Contracting State of registration will therefore determine the modifications which, required by the law of the State of the opening, may be prompted by the insolvency proceedings and affect the rights of the debtor over immovable property, ships and aircraft subject to registration, the requisite entries in the register and the consequences thereof. In consequence, the law of the Contracting State of registration decides which effects of the insolvency proceedings are admissible and affect the rights of the debtor subject to registration in that State.
However, this rule does have certain disadvantages. While it makes access to different national registers easier, it means that the effects may be different for each Contracting State. The administration of the insolvency proceedings by a liquidator thus becomes more complex, although it increases in certainty. With that in mind, this rule is limited to registers on immovable property, ships and aircraft.

131. Article 11 does not refer to assets but to rights subject to registration in public registers, the purpose of which is to determine who is the holder or which are the rights in rem over the assets. It also includes systems of registration of deeds relating to immovable property to effect priorities such as the Registry of Deeds which exists in Ireland.

Article 11 refers only to the effects on the rights of the debtor over immovable property, ships or aircraft. For rights in rem, whether registered or not, of creditors or third parties acquired before the opening of the insolvency proceedings, see Article 5.

132. For the concept of "public register", see comments on Article 2.

<u>Article 12</u>
<u>Community patents and trademarks</u>

133. The Agreement relating to Community patents (1989 Luxembourg Agreement), Council Regulation (EC) No 40/94 of 20 December 1993 on the Community trademark and Council Regulation (EC) No 2100/94 of 27 July 1994 on Community plant variety rights all create rights which cover the whole territory of the European Community.

This Convention opens up the possibility of insolvency proceedings with universal effect (thus encompassing the whole Community territory) if the debtor's centre of main interests is located in a Contracting State.

However, the Patent Convention contained in the 1989 Luxembourg Agreement (Article 41), the 1993 Regulation on the Community trademark (Article 21), and the 1994 Regulation on Community plant variety rights (Article 25), contain a rule to the effect that a Community right derived therefrom may be included only in the first proceedings (regardless of whether these are main or territorial proceedings) opened in a Contracting State. This rule was logical insofar as common regulations on international insolvency proceedings were lacking. With this Convention it is logical to allocate those Community rights to the main proceedings. Article 12 of the Convention seeks to modify the rule established by the Patent Convention, the Regulation on the Community trademark and the Regulation on Community plant variety rights and to replace it with Article 12.

134. As may be concluded from Article 3(1), Article 12 is operative only when the debtor has his centre of main interests in a Contracting State. In all other cases, i.e. when this centre is located outside the Community, the provisions of the Patent Convention (Article 41), the Regulation on the Community trademark (Article 21) and the Regulation on Community plant variety rights (Article 25) shall be applied.

## Article 13
### Detrimental acts

135. This provision must be taken in conjunction with Article 4(2)(m). The basic rule of the Convention is that the law of the State of the opening governs, under Article 4, any possible voidness, voidability or unenforceability of acts which may be detrimental to all the creditors' interests. This same law determines the conditions to be met, the manner in which the nullity and voidability function (automatically, by allocating retrospective effects to the proceedings or pursuant to an action taken by the liquidator, etc.) and the legal consequences of nullity and voidability.

136. Article 13 represents a defence against the application of the law of the State of the opening, which must be pursued by the interested party, who must claim it.

It acts as a "veto" against the invalidity of the act decreed by the law of the State of the opening. This mechanism is easier to apply than other possible solutions based on the cumulative application of the two laws. It is now clear that all the conditions, content and the consequences of the voidability are borrowed from the law of the State of the opening. The only purpose of Article 13 and the law governing the act concerned is to reject the application of that law in a given case.

137. In this respect, Article 13 provides that the rules of the law of the State of the opening shall not apply when the person who has benefited from the contested act provides proof that:

1. the act in question (e.g. a contract) is subject to the law of a Contracting State other than the State of the opening of the proceedings;

2. the law of that other State does not allow for this act to be challenged by any means. By "any means" it is understood that the act must not be capable of being challenged using either rules on insolvency or general rules of the national law applicable to the act (e.g. to the contract referred to in paragraph (1)).

"In the relevant case" means that the act should not be capable of being challenged in fact i.e. after taking into account all the concrete circumstances of the case. It is not sufficient to determine whether it can be challenged in the abstract.

138. The aim of Article 13 is to uphold legitimate expectations of creditors or third parties of the validity of the act in accordance to the normally applicable national law, against interference from a different "lex concursus".

From the perspective of the protection of legitimate expectations, the operation of Article 13 is justified with regard to acts carried out prior to the opening of the insolvency proceedings, and threatened by either the retroactive nature of the insolvency proceedings opened in another country or actions to set aside previous acts of the debtor brought by the liquidator in those proceedings.

After the proceedings have been opened in a Contracting State, the creditor's reliance on the validity of the transaction under the national law applicable in non-insolvency situations is no longer justified. Thenceforth, all unauthorised disposals by the debtor are in principle ineffective by virtue of the divestment of his powers to dispose of the assets and such effect is recognised in all Contracting States. Article 13 does not protect against such an effect of the insolvency proceedings and it is not applicable to disposals occurring after the opening of the insolvency proceedings.

139. This rule covers both the main proceedings and the secondary proceedings (in each case with regard to the law of the State of the opening of the respective proceedings).

## Article 14
### Protection of third-party purchasers

140. This provision was initially based on the desire to protect the confidence of third parties in the content of property registers when the debtor, after the insolvency proceedings have been opened, disposes for consideration of an asset from the estate, and the opening of proceedings or the restrictions on the debtor have not yet been entered or referred to in the register in question. The final drafting of this Article goes further and covers all acts of disposal concerning immovable assets which take place after the opening of the insolvency proceedings.

To be protected by Article 14, it is necessary that the debtor dispose of the asset for consideration (e.g. not gratuitously).

141. In principle, any act of disposal by the debtor after the proceedings have been opened shall be ineffective in accordance with the law of the State of the opening (as this law deprives the debtor of his powers of disposal).

However, in order to protect trade and reliance on systems of publication of rights in rem, the protection of bona fide third parties should be no different in respect of proceedings in another Contracting State as compared to domestic proceedings.

If the proceedings opened in another Contracting State do not appear in the local register, the only way adequately to protect confidence in the system of publication regarding rights in rem over assets, without any loopholes, is to make the effects of disposal subject to the law of the Contracting State under the authority of which the register is kept or, in the case of immovable property, to the law of the Contracting State where the immovable property is located.

Property covered by this Article means an immovable asset, ships or aircraft subject to registration in a public register and securities the existence of which presupposes registration (see point 69).

An act of disposal must be understood to include not only transfers of ownership but also the constitution of a right in rem relating to such property.

## Article 15
### Effects of the insolvency procedure on lawsuits pending

142. The Convention distinguishes between the effects of insolvency on individual enforcement proceedings and those on lawsuits pending.

The effects on individual enforcement actions are governed by the law of the State of the opening (see Article 4(2)(f)) so that the collective insolvency proceedings may stay or prevent any individual enforcement action brought by creditors against the debtor's assets.

Effects of the insolvency proceedings on other legal proceedings concerning the assets or rights of the estate are governed (ex Article 15) by the law of the Contracting State where these proceedings are under way. The procedural law of this State shall decide whether or not the proceedings are to be suspended, how they are to be continued and whether any appropriate procedural modifications are needed in order to reflect the loss or the restriction of the powers of disposal and administration of the debtor and the intervention of the liquidator in his place.