# EXHIBIT 4

# COLLIER INTERNATIONAL BUSINESS INSOLVENCY GUIDE

## VOLUME 3–*Insolvency Laws of Selected Nations*

RICHARD F. BROUDE
*Law Offices of Richard F. Broude*
*New York, New York*

DANIEL M. GLOSBAND
*Goodwin Proctor LLP*
*Boston, Massachusetts*

ADAM C. ROGOFF
*Cooley Godward Kronish LLP*
*New York, New York*

ALAN N. RESNICK
HENRY J. SOMMER
COLLIER EDITORS-IN-CHIEF

LAWRENCE P. KING
COLLIER EDITOR-IN-CHIEF, 1974-2001

2007

## QUESTIONS ABOUT THIS PUBLICATION?

For questions about the **Editorial Content** appearing in these volumes or reprint permission, please call:

Edward Leung, Esq. at ........ 1-800-252-9257 (ext. 2524)
Email: ........ edward.leung@lexisnexis.com
Kent Hanson, Esq. at ........ 1-800-252-9257 (ext. 2247)
Email: ........ kent.hanson@lexisnexis.com

For assistance with replacement pages, shipments, billing or other customer service matters, please call:

Customer Services Department at . . . . . . . . (800) 833-9844
Outside the United States and Canada, please call . . . . . . . . (518) 487-3000
Fax Number . . . . . . . . (518) 487-3584
For information on other Matthew Bender publications, please call
Your account manager or . . . . . . . . (800) 223-1940
Outside the United States and Canada, please call . . . . . . . . (518) 487-3000

Library of Congress Card Number: 99–046502

ISBN: 0–8205–3900–7

**Library of Congress Cataloging-in-Publication Data**
Collier international business insolvency guide / Richard F. Broude . . . [et al.]
p. cm.
Includes index
ISBN 0-8205-3900-7
1. Bankruptcy 2. Conflict of laws—Banktupcy 3. Banktupcy—United States I. Broude, Richard F., 1936-
340.9'78 21-dc21
99-046502

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher is not engaged in rendering legal, accounting, or other professional services. If legal advice or other expert assistance is required, the services of a competent professional should be sought.

LexisNexis, the knowledge burst logo, and Michie are trademarks of Reed Elsevier Properties Inc, used under license. Matthew Bender is a registered trademark of Matthew Bender Properties Inc.

Copyright © 2007 Matthew Bender & Company, Inc., a member of the LexisNexis Group.
2000
All Rights Reserved.

No copyright is claimed in the text of statutes, regulations, and excerpts from court opinions quoted within this work. Permission to copy material exceeding fair use, 17 U.S.C. § 107, may be licensed for a fee of 25¢ per page per copy from the Copyright Clearance Center, 222 Rosewood Drive, Danvers, Mass. 01923, telephone (978) 750-8400.

Editorial Offices
744 Broad Street, Newark, NJ 07102 (973) 820-2000
201 Mission St., San Francisco, CA 94105-1831 (415) 908-3200
www.lexisnexis.com

MATTHEW BENDER

# CHAPTER 43

# European Union Regulation on Insolvency Proceedings

**IAN F. FLETCHER***
**Professor of International Commercial Law**
**University College London**
**Bentham House**
**Endsleigh Gardens**
**London WC1H 0EG**
**United Kingdom**
**PHONE: 44-207-679-1417**
**FAX: 44-207-916-8539**
**i.f.fletcher@ucl.ac.uk**

SYNOPSIS

¶ 43.01. Executive Summary of the European Union Regulation on Insolvency Proceedings
[1] Background and Rationale: the Essential Characteristics of the EU and its Legal Order
[2] Structure and Objectives of the Regulation
[3] The Interface Between the Regulation and the National Insolvency Laws of the Member States
[4] Overview of the Course of Proceedings Under the Regulation
[5] The Role of the European Court of Justice
[6] Relevance of the Regulation for Parties and Interests Outside the European Union
¶ 43.02. Scope of Application of the Regulation
[1] Material Application: What Types of Proceedings Are Affected?; Articles 1, 2
[2] Personal Application: What Types of Debtors Come Within the Scope of the Regulation?

* Professor Fletcher also practices as a barrister, specializing in bankruptcy and insolvency law, from Chambers at 4-5 Gray's Inn Square, London.

[3] Territorial Application of the Regulation

[4] Time of Entry into Force; Articles 43, 47

¶ 43.03. Rules of International Jurisdiction

[1] Main Proceedings; Article 3(1)

[2] Territorial (Including Secondary) Proceedings; Article 3(2)

¶ 43.04. Choice of Law Rules

[1] The Basic Rule; Article 4

[2] Exceptions to the Basic Rule; Articles 5-15

[a] Third Parties' Rights In Rem (Real Security); Article 5

[b] Set-off; Article 6

[c] Reservation of Title; Article 7

[d] Contracts Relating to Immoveable Property; Article 8

[e] Payment Systems and Financial Markets; Article 9

[f] Contracts of Employment; Article 10

[g] Rights Subject to Registration; Community Patents and Trade Marks; Articles 11 and 12

[h] Protection of Third-Party Purchasers; Article 14

[i] Effects of Insolvency Proceedings on Lawsuits Pending; Article 15

¶ 43.05. Recognition of Insolvency Proceedings and their Effects

[1] Automatic Recognition; International Effects; Articles 16-26

[2] Limits of Recognition

¶ 43.06. Creditors and Claims Under the Regulation

[1] Provision of Information to Creditors; Articles 40-42

[2] Creditors' Right to Lodge Claims; Article 39

[3] Concurrent Proceedings; Secondary Insolvency Proceedings

[a] Chapter III of the Regulation; Articles 27-38

[b] *Hotchpot Rule;* Article 20

¶ 43.07. Interpretation of the Regulation

[1] The Role of the European Court of Justice

[2] The Role of the National Courts in Dispute Resolution

[3] Review and Revision of the Regulation


## ¶ 43.01 Executive Summary of the European Union Regulation on Insolvency Proceedings.

### [1] Background and Rationale: the Essential Characteristics of the EU and its Legal Order.

The European Union (hereinafter referred to as the "EU") is the convenient term of reference nowadays for a complex structure of interlocking organizations, based upon a series of multilateral treaties concluded among a steadily expanding group of European states. The original nucleus of membership was formed among

provisions apply under Chapter III of the Regulation (Articles 27 to 38 inclusive). It is further stated in Article 3(3) that these secondary proceedings must be winding up proceedings, a term which is specially defined in Article 2(c) as meaning insolvency proceedings within the meaning of Article 2(a), involving realizing the assets of the debtor, including where the proceedings have been closed by a composition or other measure terminating the insolvency, or closed by reason of insufficiency of the assets. Proceedings which qualify as winding up proceedings for the purposes of the Regulation are listed in Annex B.[9]

The effect of the mandatory requirement that secondary proceedings must be winding up proceedings is somewhat uncertain at this stage. Potentially, it could destabilize any efforts to achieve a cross-border rescue because creditors in any state in which the debtor has an establishment would be in a position to provoke the winding up of that part of the business. Alternative strategies may be possible however, even where the objective is to avert liquidation.[10] This may enable the Regulation's provisions for concurrent (main and secondary) proceedings to be workable even in cases where rescue is attempted. In liquidation cases, the chief interest is in the operation of the provisions for coordination between the main and secondary proceedings.[11]

## ¶ 43.04. Choice of Law Rules.

As already observed, a harmonization of the domestic insolvency laws, and related procedures, of the EU Member States is not currently practicable. This is likely to be the case for the foreseeable future. In the absence of uniformity among national systems, the Regulation supplies a uniform code of choice of law rules for the cases to which it applies. In this way,

[9] The proceedings listed in Annex B in the case of the United Kingdom are: winding up by or subject to the supervision of the court; creditors' voluntary winding up (with confirmation by the court); and bankruptcy or sequestration. This can be contrasted with the more extensive list in Annex A of proceedings in the UK which qualify as "insolvency proceedings." *See* ¶ 43.02[1] *supra.* Annex A and B, *reprinted in* App. B *supra.*

[10] For example, in the U.K. an appointment of provisional liquidators could be resorted to as a means of imposing a moratorium to facilitiate a rescue plan: the proceedings would qualify as "winding up" proceedings for the purposes of the Regulation although, if the plan were successful, the process of liquidation would not ultimately take place.

[11] These provisions are described in ¶ 43.06[3] *infra.*

the existing variables caused by the differing contents of domestic laws will not be further complicated by the traditional practices of courts in different Member States in their approach to the task of selecting the law to govern a particular issue in international cases over which they take jurisdiction. This should enable parties to calculate more precisely the legal and commercial consequences of their debtor's insolvency. The choice of law provisions which the courts of all Member States are required to apply are contained in Articles 4 to 15 inclusive. They may be conveniently classified as establishing a basic rule (Article 4), which is the subject of a series of special exceptions (Articles 5–15). These will be considered in turn.

### [1]—The Basic Rule; Article 4.

The general principle, established by Article 4, is that the law applicable to insolvency proceedings and their effects shall be that of the Member State in which the proceedings are opened (the "state of the opening of proceedings", alternatively referred to as the *lex concursus*). This reaffirms the widely accepted rule that the *lex concursus* determines the effects of insolvency proceedings, both procedural and substantive, on the persons and legal relations concerned, and also governs all conditions for the opening, conduct and closure of the insolvency proceedings.[1] In the interests of clarity and certainty, Article 4(2) contains, in paragraphs (a) to (m), a list of thirteen specific matters which are determined by *lex concursus*. These are:

(a) against which debtors insolvency proceedings may be brought on account of their capacity;

(b) the assets which form part of the estate and the treatment of assets acquired by or devolving on the debtor after the opening of insolvency proceedings;

(c) the respective powers of the debtor and the liquidator;

(d) the conditions under which set-offs may be invoked;[2]

**¶ 43.04**

[1] Art. 4(1), (2), *reprinted in* App. B *supra. See also* Recital (23), *reprinted in* App. B *supra.*

[2] *See* Art. 6, *reprinted in* App. B *supra,* for a supplementary rule. *See* ¶ 43.04[2] *infra* for discussion.

(e)  the effects of insolvency proceedings on current contracts to which the debtor is party;[3]

(f)  the effects of the insolvency proceedings brought by individual creditors, with the exception of lawsuits pending;[4]

(g)  the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings;

(h)  the rules governing the lodging, verification and admission of claims;

(i)  the rules governing the distribution of proceeds from the realisation of assets, the ranking of claims and the rights of creditors who have obtained partial satisfaction after the opening of insolvency proceedings by virtue of a right in rem or through a set-off;

(j)  the conditions for and the effects of closure of insolvency proceedings, in particular by composition;

(k)  creditors' rights after the closure of insolvency proceedings;

(l)  who is to bear the costs and expenses incurred in the insolvency proceedings; and

(m)  the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to all the creditors.

It will readily be apparent that the combined effect of the above rules is that the ability to anticipate the venue of insolvency proceedings, as determined by means of the jurisdictional rules in Article 3 already considered, is of crucial importance in any attempt to calculate the consequences of a debtor's insolvency. This applies not only to the process of analyzing the effects of main proceedings, but also to the evaluation of the impact of any local (territorial) proceedings which may be opened in a Member State in which the debtor possesses an establishment.[5]

Most of the matters comprised within the terms of paragraphs (a) to (m) of Article 4(2) are self-explanatory, but special mention may be made

---

[3] *See* Art. 8, *reprinted in* App. B *supra*, for an exception in the case of immovable property. *See* ¶ 43.04[2] *infra* for discussion.

[4] *See* Art. 15, *reprinted in* App. B *supra*, for the rule concerning lawsuits pending. *See* ¶ 43.04[2] *infra* for discussion.

[5] *See* ¶ 43.03[2] *supra*, and ¶ 43.06[3] *infra*.

of the rule in paragraph (m). This has the effect of making it a basic rule that the avoidance rules of the *lex concursus* shall apply to determine the validity or otherwise of legal acts detrimental to the general body of creditors. Such is the importance of this rule that it is also introduced as a balancing proviso in several of the subsequent provisions which establish exceptions to the basic rule under Article 4.[6] However, there is a special, over-arching rule in Article 13 whereby Article 4(2)(m) is precluded from applying where the person who benefited from an act detrimental to all the creditors provides proof that: (a) the act in question is subject to the law of a Member State other than that of the State of the opening of proceedings, and (b) that law does not allow any means of challenging that act in the relevant case. This exception to the dominant force of the *lex concursus* operates for the benefit of a party who has reasonably relied upon the validity of a transaction whose governing law is that of another EU State, and which is unimpeachable under both the insolvency law and the general law of that State in the concrete circumstances of the case.[7] It is also noteworthy that the rule in Article 4(2)(m) is intended to result in the application of a single avoidance rule, namely that of the selected system, rather than to allow the possibility of cumulative application of the avoidance rules of more than one system having links to the parties or the transaction.

Attention is drawn to the significance of Article 4(2)(i), whose purpose is to ensure that the insolvency law provisions of the *lex concursus* will control the process of distribution of the debtor's estate. This is expressly stated to include the question of ranking of claims and the treatment of partly-secured creditors who seek to lodge proof for the unsatisfied balance of their claims after enforcing their security or exercising any right of set-off in the post-bankruptcy period. The domestic laws of the Member States of the EU follow divergent policies towards preferential claims in bankruptcy. In some states, such as Germany, Denmark and Sweden, the effect of recent insolvency law reforms has been to eliminate (or greatly reduce) the categories of preferential claims, with the consequence that all unsecured creditors rank equally as one class. Other states, including

[6] *See* Arts. 5(4), 6(2) and 7(3), *reprinted in* App. B *supra. See* ¶ 43.04[2] *infra* for discussion.

[7] On the subject of the choice of avoidance rules in international insolvency, *see* J.L. Westbrook, 65 Am. Bankr. L.J. 475, 464–466 (1991), and 17 Brook. J. Int. L. 499 (1991).

France, Italy and, for the time being, Spain, have retained their traditional approach, whereby an extensive range of claims are accorded some degree of preference, with a hierarchy of priority as between different categories of such claims. A mid-way position is maintained in such states as the United Kingdom and the Irish Republic, whereby preferential status is accorded to a number of claims of a fiscal character and also to employees' claims for unpaid wages or salary up to a prescribed maximum amount per individual, but all preferential claims constitute a single class so that these claims abate among themselves in accordance with the *pari passu* principle.[8] In view of the generally high levels of taxation and also of employers' social security contributions prevalent in the European states, the sums involved in any claim by the public authorities for unpaid taxes or contributions can be of a significant magnitude. This can ensure that, when employees' salary claims are included, the prior satisfaction of preferential claims usually results in there being little or no money available to pay dividend upon the claims of non-preferential, unsecured creditors.

### [2]—Exceptions to the Basic Rule; Articles 5-15.

The basic rule prescribed by Article 4(1) is preceded by words of exception, to the effect that the *lex concursus* shall apply "save as otherwise provided in this Regulation . . ." The next sixteen articles (5–15 inclusive) provide for a different approach to the determination of the applicable law in certain, specific cases. The salient features of these provisions are as follows:

#### [a]—Third Parties' Rights In Rem (Real Security); Article 5.

Article 5(1) embodies a rule to the effect that the rights in rem of creditors or third parties with respect to tangible or intangible, moveable or immoveable, assets belonging to the debtor which are situated within the territory of another Member State at the time of the opening of proceedings shall continue to be determined by the law of the *situs*, and shall not be affected by the *lex concursus*. This is qualified, however, by the provision in 5(4) that this shall not preclude actions for the avoidance or adjustment of transactions as referred to in Article 4(2)(m). The

[8] For the principal provisions concerning preferential debts under United Kingdom law, *see* Insolvency Act 1986 §§ 40, 175, 328-329, and 386-397, together with Schedule 6.

justification for the rule in 5(1) is that it complements the underlying purpose of the taking of real security, namely, that it shall afford the secured party the possibility of recourse to the property comprised in the security in the event of default by the debtor, and especially in the event of the latter's insolvency. Where such arrangements are effected in compliance with the formal and substantive requirements of the *lex situs*, it would introduce an unwelcome element of instability if the creditor had to factor in the possibility of the debtor's insolvency opening under the law of some other state whose policy and provisions are materially at variance with those of the *situs*.[9]

Not only do the laws of the Member States differ in many matters of detail in their approach to the treatment of rights of secured creditors in the event of the debtor's insolvency, but also there is a fundamental divergence between those states (which comprise the majority of the current membership) which belong to the civil law tradition, and the two (the United Kingdom and the Republic of Ireland) which represent the common law. The latter have developed forms of non-possessory security which have no present counterpart in the other states, both with regard to the creation of floating security over collections of assets which change from time to time, and with regard to the possibility of creating present, specific security over assets which either do not exist, or which are not in the ownership or possession of the debtor, at the time the security is created, i.e., after-acquired property clauses. These respective types of security are familiar in the U.K. and Ireland in the form of the floating charge securing debentures granted by a company, and in the form of the fixed charge over future book debts (receivables) to be generated in the course of the debtor's ongoing business. The drafting of Article 5(1) has been carefully phrased so that both these types of security are expressly included in its scope. In consequence, if insolvency proceedings are opened in a state whose law does not recognize the type of security in question, the validity of such arrangements is determined by the law of the *situs* of any assets comprised in the security, provided that at the time of the opening of insolvency proceedings the *situs* is in another Member State. Thus, the rule in Article 5 does not apply to any asset which is situated in a third state at the relevant time, nor does it protect the secured party from any adverse consequences of the possible change of *situs* of the asset

[9] *See also* Art. 5(2), *reprinted in* App. B *supra*, for additional provisions specifying the types of rights referred to in paragraph (1).

in question between the time of creation of the security and the time of opening of insolvency proceedings.

### [b]—Set-off; Article 6.

Although Article 4(2)(d) declares that it is primarily for the *lex concursus* to determine whether set-offs may be invoked in insolvency proceedings opened in a particular Member State, Article 6 supplies an additional rule to allow set-off to be claimed by creditors in some circumstances where otherwise they would be denied it. The subject of set-off trenches upon fundamental issues of principle, over which the laws of Member States remain irreconcilably divided.[10] In states belonging to the civil law tradition the availability of set-off is usually restricted to cases where debts and credits arise between the same parties in the context of a single transaction. Any wider right to invoke set-off is resisted on the ground that it would contravene the principle of *pari passu* distribution of the insolvent's estate. In common law jurisdictions, the tradition is diametrically opposite: where there have been mutual dealings between the same parties in the same capacity, the application of set-off to determine the net balance of liability due to or from the debtor's estate is a mandatory and automatic requirement from which parties are not permitted to depart by any means, including contractual terms.

Thus, the issue of whether set-off will be available in a case governed by the Regulation will be determined by the identity of the *forum concursus*. If that happens to be a state whose law allows, or even requires, set-off to apply, the outcome is scarcely likely to be unwelcome to any individual creditor in a position to benefit from that effect. However, if the *lex concursus* happens to deny set-off, Article 6 will permit a creditor, nevertheless, to demand the right to set off its claim against the claim of the debtor, but only where such a set-off is permitted by the law applicable to the insolvent debtor's claim. Therefore, the choice of law rules of the *forum concursus* must be applied to determine the governing law of that obligation which has given rise to a claim *in favor* of the insolvent debtor. Only if, by the law applicable to that claim, set-off is permitted can the

[10] *See, e.g., Re* Bank of Credit and Commerce International SA (No.10) [1997] Ch. 213, for a vivid illustration of the polarized attitudes of the English and Luxembourg laws on set-off. The English law was reviewed and restated by the House of Lords in Stein v. Blake [1996] A.C. 243. *See also* R. Derham, Set-off (2d ed. 1996); P.R. Wood, English and International Set-off (1989).

indebted party set off that liability against the amount for which he or she stands in the role of creditor to the insolvent party. It is noteworthy that Article 6 does not make it a requirement that the claim should be governed by the law of one of the Member States; it could be the law of any country in the world. However, if the law applicable to that claim also happens to deny set-off, the creditor (if solvent) faces the prospect of being compelled to pay one-hundred percent of the debt that is owed to the insolvent estate, while destined only to receive a portion of the amount of the indebtedness for which proof must be lodged along with all other unsecured creditors of the estate. The terms of Article 6 are so worded as to make it irrelevant whether set-off would be permitted according to the law applicable to the claim for which proof is lodged. On the other hand, it may be observed that Article 6 cannot operate against the interest of a creditor who would be entitled to set-off according to the provisions of the *lex concursus*. It merely offers a potential lifeline to a creditor who would otherwise be denied set-off under the basic rule of Article 4(2)(d).

### [c]—Reservation of Title; Article 7.

The laws of Member States differ in their treatment of the rights of unpaid sellers who have incorporated reservation of title clauses into their contracts of sale. Article 7 contains two special rules for cases involving the insolvency of one of the parties to such a contract. Where insolvency proceedings are opened against the purchaser of an asset, the seller's rights based on reservation of title (ROT) shall be unaffected where at the time of opening of proceedings the asset is situated within the territory of a Member state other than the *forum concursus.*[11] Conversely, where, it is the unpaid seller who becomes the subject of insolvency proceedings after delivery of the asset, Article 7(2) provides that this factor shall not constitute grounds for rescinding or terminating the sale and shall not prevent the purchaser from acquiring title where the asset is situated within the territory of a Member State other than the *forum concursus* at the time of opening of proceedings. This rule, where it operates, can prevent the liquidator from repossessing an asset that may have considerable resale value, while leaving the original buyer the possibly hollow prospect of lodging proof for damages for loss of bargain. Of course, any right to

[11] Art. 7(1), *reprinted in* App. B *supra.*

complete acquisition would involve the original buyer in paying for the item at the agreed price.

### [d]—Contracts Relating to Immovable Property; Article 8.

By way of exception to the rule in Article 4(2)(e), whereby the *lex concursus* is to determine the effects of insolvency on any executory contract to which the debtor is a party, Article 8 provides that in the case of a contract conferring the right to acquire or make use of immoveable property that issue is to be governed solely by the law of the Member State within whose territory the immoveable property is situated. Thus, the exception established by this article in favor of the rule of the *lex situs* does not apply to property whose *situs* is outside the EU, which would be a matter for determination by the conflicts rule of the *forum concursus*.

### [e]—Payment Systems and Financial Markets; Article 9.

The special matter of the effect of insolvency upon executory contracts between parties operating within an organized payment or settlement system, or within a particular financial market, is dealt with by Article 9. This states that, without prejudice to Article 5,[12] such matters shall be governed solely by the law of the Member State applicable to that system or market. Once again, this exception is confined to situations where the applicable law resulting from its operation can only be that of another Member State. Moreover, the matters falling within the scope of Article 8 are the subject of special programs of legal harmonization conducted on an EU-wide basis by means of Directives or Regulations. Therefore, the substantive differences between the potentially applicable laws are destined to be progressively eliminated.[13]

### [f]—Contracts of Employment; Article 10.

Article 10 provides that the effect of insolvency proceedings on employment contracts and relationships shall be governed solely by the law of the Member State applicable to the contract of employment. All Member States are, or are destined to become, parties to the Rome Convention of June 20, 1980, on the Law Applicable to Contractual

---

[12] *See* dicussion above.

[13] *See* Recital (27), *reprinted in* App. B *supra*, which refers to the so-called Finality Directive, 98/26/EC of May 19, 1998; 1998 OJ L 166/45, June 11, 1998.

Obligations. That convention contains rules for determining the governing law of any contract for purposes of any matter over which the courts of the contracting states exercise jurisdiction. Notably, Article 6 of the Rome Convention contains special choice of law rules applicable to individual employment contracts. If, as a consequence of applying the Rome Convention rules, the applicable law is found to be that of another Member State, the rule in Article 10 of the Regulation will apply to displace the equivalent rule of the *lex concursus*. Where the contract of employment is found to be governed by the law of some third state, however, the *lex concursus* is not displaced. It should also be noted that Article 10 merely relates to the question of the effect of insolvency upon the employment contract as such, including the issue of its termination by reason of the insolvency. The article does not govern other issues such as the ranking of employees' claims for unpaid wages or salary, or other entitlements, in the event of the employer's insolvency. Such matters are governed by the *lex concursus* in accordance with the rule of Article 4(2)(h).

### [g]—Rights Subject to Registration; Community Patents and Trade Marks; Articles 11, 12.

Article 11 reflects the widespread practice of requiring rights in immoveable property, or in moveable property of significant value such as a ship or an aircraft, to be recorded in a public register which can then be consulted by other parties potentially interested in the property in question. The article states that the effects of insolvency proceedings on such rights shall be determined by the law of the Member State under the authority of which the register is kept. However, the omission of the vital word "solely" from this provision leaves it open to the *lex concursus* to interact with the law of the state where the register is kept, and for a cumulative application of both laws to take place. The exact nature of this process is unspecified in the text of the Regulation.

Article 12 is similarly inspired by the fact that arrangements are already in place within the EU governing patents, trade marks, and similar rights such as those of plant breeders, and that these arrangements include provision for the eventuality of insolvency of those having rights of ownership or other interests in such forms of intellectual property. The basic rule for such cases is that a Community right of this nature may be included in the first insolvency proceedings to be opened in one of the EU Member states. However, because of the possibility that, under

the Regulation, local, territorial proceedings can in some circumstances be opened ahead of main proceedings, Article 12 provides expressly that a Community patent, a community trade mark, or similar right may be included only in proceedings opened as main proceedings under Article 3(1). Given the possible commercial value of rights of this kind, this can represent a significant derogation from the rule in Article 3(2) regarding the effects of an insolvency opened on the basis of the existence of an establishment of the debtor in the state in question.[14]

### [h]—Protection of Third-Party Purchasers; Article 14.

Where a debtor, after the opening of insolvency proceedings, wrongfully disposes of property for consideration to a party who acts in good faith and has no actual knowledge of the opening of the proceedings, varying solutions are to be found in domestic insolvency laws ranging from the possibility that the transaction is void *ab initio* to some discretionary power for the court to validate the transaction. Where the property disposed of is of a type which is the subject of some form of public registration, a policy dilemma is posed because the third party may perform the requisite search of the register before it has been possible for the opening of insolvency proceedings to be entered in the record. Public confidence in the integrity of the system of registration would be diminished if there were no possibility of relief for the third party who has done all that the law asks in this matter. Where the register is kept in a different state to that in which insolvency proceedings are opened, it is important to maintain the policy of protecting third parties who have acted in reliance upon the information contained in the register in its unamended state. Article 14 supplies such a rule for cases where the asset disposed of is either immoveable property, or is a ship or aircraft subject to public registration, or consists of securities whose existence presupposes public registration. In all such cases, it is provided that the validity of the debtor's act of disposal shall be governed by the law of the state within whose territory the immoveable asset is situated, or under whose authority the register is kept.[15]

The drafting of Article 14 does not limit the operation of this rule to cases where the state so indicated is a Member State of the EU. On this

[14] *See* ¶ 43.03[2] *supra.*

[15] For an example of protecting third parties in such situations, *see* 11 U.S.C. § 549(c) of the U.S. Bankruptcy Code.

occasion, therefore, the regulation contemplates a non-restrictive application of the rule protecting third party purchasers.

### [i]—Effects of Insolvency Proceedings on Lawsuits Pending; Article 15.

The terms of Article 4(2)(f) expressly exclude the *lex concursus* from determining the effect of the opening of insolvency proceedings upon lawsuits pending. This matter is the subject of varying solutions under national laws. Article 15 supplies a uniform choice of law rule that the effects of insolvency proceedings on a lawsuit pending concerning an asset or a right of which the debtor has been divested shall be governed solely by the law of the Member State in which that lawsuit is pending.

## ¶ 43.05. Recognition of Insolvency Proceedings and their Effects.

In any cross-border insolvency, it is of the utmost importance that the office holder should be able to take speedy and effective action to control and protect the assets of the debtor in every foreign jurisdiction where they may happen to be situated. As the duly appointed representative of the collective interests of all who have claims against the debtor's estate, the office holder should be entitled to receive the assistance of foreign courts and officials with a minimum of attendant formalities. Unfortunately, the historic reality has been largely the obverse of this ideal. Processes for obtaining recognition lack uniformity, but have tended to be cumbersome, slow-moving and costly. By the time the liquidator has gained the necessary recognition of his or her standing to represent the debtor's estate, and has been authorized by the foreign court to take legal steps to defend or take control of any assets locally situated, other parties (notably local creditors able to act without impediment or restraint) may have seized the assets under local process entitling them to repel the liquidator's subsequent attempt to claim them on behalf of the estate. Alternatively, the assets may have been removed from the jurisdiction in which they were located at the opening of insolvency proceedings, so the liquidator's efforts will have been wasted.