**EXHIBIT 5**

Westlaw.

70 AMBKRLJ 485                                                                 Page 1
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Ⓒ American Bankruptcy Law Journal
Fall, 1996

International Law Symposium

**\*485** THE EUROPEAN UNION CONVENTION ON INSOLVENCY PROCEEDINGS

Manfred Balz [FNa1]

Copyright (c) 1996 by the National Conference of Bankruptcy Judges; Manfred Balz

Insolvency is a universal economic fact of life common to all economies that regulate the interaction of economic subjects through markets, and not through a plan. In substance, the concept of insolvency denotes one and the same economic reality in all legal systems no matter how seemingly different it is defined for legal purposes-the fatal inability of a market actor to survive in a system which is based on credit in the broadest possible sense of this term, that is on the market's confidence in one's ability to pay one's debts and to perform one's legal obligations as they come due. Whether we use the concept of an act of bankruptcy as in some common law jurisdictions, the balance sheet test of overindebtedness (insolvency) as in the German law of companies, [FN1] or the illiquidity test (inability to pay mature debt) as in French law, [FN2] we all mean essentially the same thing when we say someone is bankrupt. We know it when we see it-much as in the case of obscenity as Justice Stewart once put it [FN3]-even without a precise definition.

In broad terms, all legal systems of free countries react in much the same way to the fact of insolvency. Enforcing the market exit of inefficient firms as well as reorganizing ailing firms that can be saved under a market standard evidently requires similar legal requirements in any economy which relies on markets for ensuring the efficient deployment of productive resources. Little wonder, therefore, that the emerging market economies of the former Communist bloc attach particular weight to the enactment of modern insolvency **\*486** laws. [FN4]

Insolvency creates what social scientists term a common pool problem. [FN5] This is a situation in which efficiency requires collective rather than individual action by creditors and other claimants, some measure of dispossession of the debtor or its management, and some measure of outside control through an independent trustee or liquidator, in most instances through a court or some other public authority. While the general principles of insolvency law reflect time-honored and polished economic reason, the concrete rules of insolvency law and the practice of bankruptcy are rooted deeply in national traditions of individual jurisdictions. This has to do with the specifically hybrid character of bankruptcy law as both procedural and substantive, on the one hand. On the other hand, it is due to the character of insolvency as a "meta-law" which modifies or supersedes practically all other branches of national legal systems. Insolvency is intertwined with many types of local sustantive law such as real estate law, the law of secured credit, tax law, and labor law, all of which are relevant to bankruptcy cases. Moreover, national traditions, such as the etatistic spirit of French law or the liberal approach of English law, to market and professional self-regulation have their bearing on the national insolvency laws, no less than tenets of everyday economic philosophies, such as the preference of enterprise or employee interests over creditor rights, the preference of labor protection over short-term economic efficiency, or the preference for reorganization over liquidation.

For these reasons, bankruptcy has particularly strong ties with the culture of individual legal systems. Few practitioners can claim to have a sufficient understanding of more than one bankruptcy system. The creation and administration of a common pool of assets for all creditors is greatly complicated when an insolvency has a cross-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

border character; *i.e.*, when a case has links with more than one jurisdiction. In a modern world economy with free flow of capital, services, and labor, and with general free establishment of business enterprises, such cases become more and more frequent. Individuals own real estate in foreign countries. Companies with headquarters in one country open branch offices or subsidiaries in other countries. Carriers may have trucks, ships, or airplanes in foreign countries when bankruptcy hits them in their home country.

Part I of this Article describes the existing state of the law in Europe relating to cross-border cooperation. Then, in Part II, this Article explains the regional attempts at harmonization undertaken in Europe so far. A detailed**487** discussion of the European Union Convention on Insolvency Proceedings follows in Part III. The Article concludes with an outlook on the implementation of the Convention and on its influence on world-wide harmonization efforts. It will be seen that the approach of the Convention is in line with broad policies in international insolvency law.

## I. THE ABSENCE OF AN INTERNATIONAL MINIMUM STANDARD OF CROSS-BORDER COOPERATION

When it comes to respecting the impact of foreign bankruptcies and the administration of insolvencies, the philosophies of national bankruptcy laws vary greatly. Some countries, like Germany, adhere to the principle of universality and recognize a bankruptcy case opened by a foreign jurisdiction. [FN6]**488** Other countries mitigate this principle by a requirement of reciprocity or, more liberally, by a requirement of comity. [FN7] Many others still adhere to the theory that bankruptcy has only territorial effects in the jurisdiction where proceedings have been opened and that a foreign liquidator should have no powers abroad. [FN8] Some countries, like the United States with its cases ancillary to foreign proceedings, [FN9] or Switzerland with her parallel bankruptcies (*Hilfsverfahren*), [FN10] have taken an intermediate position between the principles of universality and territoriality. They allow for local bankruptcies once a foreign bankruptcy case has been opened in order to protect certain local interests while at the same time taking account of and accommodating some **489** legitimate interests of the foreign bankruptcy forum. [FN11]

So far, no international consensus has been reached on common principles of cooperation in the bankruptcy area. This is all the more astonishing, as the fact of insolvency and the essential legal responses to this fact are almost universal to modern states. Creative approaches to the legal questions have frequently been barred by a fruitless debate on abstract principles such as universality or territoriality. [FN12]

This is especially true for the civil law systems. [FN13] These systems have a tradition of dealing with the recognition of foreign insolvencies in an "all-or-nothing" manner. [FN14] Traditionally, either all effects and incidents of a foreign proceeding are viewed as extending to another state's territory or none of these effects and incidents is recognized. In civil law systems, legislatures have generally opted for one or the other of these choices. Judges generally have no discretion to embark upon legally unstructured communications with foreign judges in order to delineate each other's jurisdiction and relief powers in a protocol, as it was practiced in the *Maxwell Communication* case. [FN15] None of the European documents on international insolvency has, therefore, addressed the issue of enabling judges of several jurisdictions to cooperate in areas which are uncharted by the written law. Generally, the notion that bankruptcy courts are courts of equity with special powers to grant relief when the equities of a case so require [FN16] is alien to civil law legal thinking.

## II. REGIONAL ATTEMPTS AT HARMONIZATION IN EUROPE

The Convention on Insolvency Proceedings of the European Union (EU) [FN17] has developed from a history of false starts since 1960. Both a longdebated**490** and never accepted proposal by the Commission of the European Economic Community (EEC) and a Council of Europe [FN18] Convention failed to establish a minimum standard of cooperation in insolvency matters for Europe-the former because it was too ambitious and the latter because it was not ambitious enough.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07413-PKC    Document 17-6    Filed 06/03/2008    Page 4 of 41

70 AMBKRLJ 485                                                                    Page 3
70 Am. Bankr. L.J. 485
**(Cite as: 70 Am. Bankr. L.J. 485)**

## A. THE EEC COMMISSION DRAFT

A functioning bankruptcy system is essential to any economy that aspires to achieve the freedoms of establishment of business and the free flow of goods, labor, services, and capital, [FN19] and to integrate national markets into a unitary internal market. This, in addition to the widely recognized need for a certain measure of protection for failing debtors, may have prompted the Fathers of the American Constitution to entrust bankruptcy law to Congress and the administration of bankruptcy cases to federal judges. Little wonder that the European Community, on its way to establishing a community-wide internal market, attempted at an early stage to achieve a minimum harmonization of bankruptcy laws and to organize the administration of cross-border insolvencies.

The difficulties encountered were much more formidable than those experienced**491** in the American States. Even in the original Community of Six, [FN20] there were fundamental differences in legal culture and in the basics of insolvency law and adjacent branches of the law, especially in the areas of real estate law, the law of secured credit, labor law, and tax law. The differences within the EEC deepened in 1973 with the accession of the United Kingdom and the Republic of Ireland (two countries with a common law system) and Denmark (whose law is part of the Scandinavian group of legal systems). [FN21]

Obviously, harmonization of bankruptcy and all the branches of the law that intertwine with bankruptcy appeared impossible for quite some time if, indeed, it would ever be possible. The philosophies and structures of national bankruptcy laws vary greatly within the EEC. There are differences, for example, in views on the role and weight to be attributed to creditor versus debtor interests, the survival of viable economic entities versus optimal creditor protection, and the protection of labor versus economic efficiency. When it comes to respecting the impact of foreign bankruptcies, the full array of conceivable policies can be found in Europe. Most European countries, moreover, have recently experienced a wave of bankruptcy reform. While these reforms tend to stress the reorganization element of bankruptcy law, they do so in widely differing fashions, some preferring the enterprise over creditors (like the French reform of 1985) [FN22] and others subjecting the debtor's fate completely to the creditors' self-interest (like the German reform of 1994). [FN23]

**\*492** Under these circumstances, it was a very ambitious objective for the EEC Commission to prepare, starting in 1960, a Convention [FN24] which would guarantee that bankruptcies would be mutually recognized by Member States (principle of universality) and that a bankruptcy proceeding opened in one State would bar all other States from opening proceedings (principle of unity). The negotiations produced a first proposal in 1980 (EEC Draft) [FN25], and revised proposals in 1982 and 1984. [FN26] Given the diverse laws regarding security interests and priorities in EEC countries, the principle of unity had serious loopholes; for the purpose of paying secured and priority creditors, local assets were to be treated virtually as a separate estate. [FN27] Under the principle of unity, one liquidator would have to administer the estate under-possibly-the full range of different legal systems, and an animal capable of discharging such a task was yet to be bred. The principle of unity soon came under heavy attack from practitioners, [FN28] but the EEC Draft lingered on until 1984, before it became obvious that it was unrealistic.

## B. THE ISTANBUL CONVENTION OF THE COUNCIL OF EUROPE

Immediately following the failure of the EEC Draft, the Council of Europe (with its-then-twenty Member States) [FN29] espoused the idea of a European Bankruptcy Convention which was completed and opened for signature in Istanbul in 1990 (Istanbul Convention). [FN30] Much less ambitious **\*493** in its content, the Istanbul Convention provides:

(1) for the mutual recognition, not of foreign proceedings as such, but only of certain powers of the liquidator (essentially the powers to collect assets from all Member States and to sue and be sued in such States); and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07413-PKC    Document 17-6    Filed 06/03/2008    Page 5 of 41

70 AMBKRLJ 485                                                                                                    Page 4
70 Am. Bankr. L.J. 485
**(Cite as: 70 Am. Bankr. L.J. 485)**

(2) for secondary bankruptcies which can be opened in other Member States where the debtor has substantial assets, and which serve to pay secured and priority creditors, local employees, local tax authorities, and creditors whose claims arose from the local operations of the debtor. [FN31]

The Istanbul Convention covers only collective insolvency proceedings which lead to the appointment of a liquidator and which may entail the liquidation of the debtor's assets; *i.e.*, essentially to classical liquidation proceedings.

Article 4 of the Istanbul Convention regulates international jurisdiction to open insolvency proceedings. It does so indirectly (in the sense of the French parlance of *compétence internationale indirecte*), [FN32] as the right of States to make divergent rules on international jurisdiction is not affected. Jurisdiction for universal (or ubiquitous) proceedings, as opposed to secondary proceedings, is attributed to States where the debtor has the center of its main interests. [FN33]

In a modest approach, namely to accord the foreign main liquidator certain powers, but not to bring about a wholesale exportation of the effects of a main bankruptcy proceeding to other jurisdictions, the liquidator is given some limited rights in foreign jurisdictions. In any Contracting State the liquidator may take provisional and protective measures legally possible under the laws of that State. [FN34] If she wishes to take other measures, especially to remove assets from a foreign Contracting State to the State of the bankruptcy forum, she must first publish the essential elements of the decision nominating her in the foreign Contracting State where the assets are **\*494** situated. [FN35] For a period of two months after this publication, secured and priority creditors, as well as creditors with a public law (*e.g.*, tax) claim, especially local employees, with a claim originating from business activity in the foreign State, may continue to bring their individual actions or enforce their judgments against the debtor. [FN36] After a lapse of two months, the foreign liquidator may exercise all the powers and rights which she has under the law of the bankruptcy forum. [FN37] Most importantly, she may then remove assets from a foreign Contracting State to the forum State.

The powers of the liquidator may not be exercised in a Contracting State where a bankruptcy or a proceeding aimed at preventing bankruptcy has been opened or, in the case of proceedings opened in a third-party State, recognized. [FN38] Also, the liquidator may not take any action within the territory of a Contracting State which would impair rights *in rem* or other security interests of third parties created or recognized as valid under the laws of that Contracting State. [FN39]

Secondary proceedings are meant to safeguard the interests of secured and priority creditors and of employees and other local creditors of foreign establishments of the insolvent debtor, while making available any surplus obtained from the liquidation of the secondary estate to the main estate. Thus, the notion of unity was discarded and the principle of universality reduced in scope. A complex system of reservations allows Contracting States to opt to participate in the entire Convention, for the recognition of foreign liquidators' powers only, or for secondary bankruptcies only. For this, the Istanbul Convention was sometimes dubbed in the negotiations as a "Convention *à la carte*."

## III. ANALYSIS OF THE EUROPEAN UNION CONVENTION ON INSOLVENCY PROCEEDINGS

When soon it became evident that most EEC countries would never ratify the Istanbul Convention, the EEC Council of Ministers, in quite a singular procedure, [FN40] set up a Working Group on Bankruptcy (Working Group). This was done in late 1989. By 1995, the Working Group had produced a **\*495** Convention on Insolvency Proceedings (Convention) [FN41] which is likely to become effective one or two years from now. [FN42]

The objectives of this fresh attempt at harmonization, as set out in the mandate of the Working Group, were, among other things, to:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                      Page 5
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

(1) retain the principle of universality to the extent practicable;

(2) create a unitary system (without reservations) binding on all Member States;

(3) adapt the system of secondary bankruptcies so as to make it compatible with maximum universality;

(4) allocate jurisdiction directly (rather than indirectly as did the Istanbul Convention) among Member States, both for main and for secondary bankruptcies;

(5) harmonize certain conflict rules that bear on the administration of bankruptcies;

(6) take proper account of the introduction of rehabilitation (or reorganization) proceedings into the laws of some Member States; and

(7) create a more efficient and closely-knit system of legal cooperation within the emerging European internal market than did the Istanbul Convention.

The Working Group struggled with this mandate in regular sessions from 1990 to 1995, meeting generally at least once every quarter. Its work product meets the goals set forth by the Council. The Convention introduces a uniform regime for cross-border insolvencies to the internal market of the EU. This uniform regime will have to be accepted as a basis for negotiations by all those Central and Eastern European States that are eager to become members of the EU. [FN43] The Convention is the first multinational European treaty on insolvency since the 1933 Nordic Convention on Bankruptcy for Denmark, Finland, Iceland, Sweden, and Norway. [FN44] Judging from the sheer **496** territorial scope of its application, the Convention is *the* most important international document yet written in the area of international insolvency law.

The philosophy of the Convention is influenced more by the civil law of the continent of Europe than by the common law systems of England and Ireland. The Convention aims at implementing the principle of universality or the complete cross-border extension of one Member State's bankruptcy proceedings into the territories of other Member States. Insolvency proceedings of all types, including compositions, arrangements, and reorganizations, which are opened by a main forum will be recognized automatically without judicial or administrative involvement, *i.e.*, without *exequatur* and even without publication in other Member States. [FN45]

Unlike the 1982 EEC Draft, [FN46] however, the Convention does not necessarily associate universality (mutual recognition) with the ideal of unitary proceedings (principle of unity). In many cases, unity of proceedings will indeed be possible. In other cases, and in recognition of certain local interests which may warrant local proceedings of a limited scope, the Convention allows for secondary proceedings in all those Member States where the debtor has an establishment. [FN47] These secondary proceedings must, however, be liquidations. [FN48] The ideal of maximum universality in such a system requires that secondary proceedings should be coordinated and, to some extent, subordinated to the function and requirements of the main proceedings. To this end, the liquidator appointed in the main proceedings is accorded a set of influence and veto rights in secondary proceedings, the most important of which is the right to demand a temporary stay of the secondary proceedings. [FN49] The underlying disassociation of the notion of universality from the ideal of unity and the acceptance of certain local interests has been called modified, or mitigated, universality. [FN50]

In consequence, only a unitary Community-wide main proceeding or main proceedings, combined with one or more secondary proceedings, are permitted. Courts cannot craft individual forms of relief for a foreign liquidator while withholding recognition of certain of the liquidator's powers. The court is not, for example, able to prevent a recognized liquidator who has brought an avoidance action in a foreign forum from repatriating assets located in foreign states until certain local classes of creditors are paid or adequate provision is made for their fair treatment. If a secondary proceeding is opened, the local judge may not tailor the proceedings to one the court perceives**497** as achieving the fair or economic administration of the international bankruptcy. The court must accept the system established by the Convention "as is." This may seem rigid and unnecessarily formalistic to judges in courts of equity under a common law system. It is fully in harmony, however, with the civil law traditions of most EU Member States, where judges are called upon to enforce the laws with only modest discretionary powers and do not generally weigh the equities of a case or engage in justice or economy-driven social engineering. Predictability of what judges will do is valued more than the perfect *ex post factum* balance of the equities of a case.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Convention has six Chapters: Chapter I (General Provisions), Chapter II (Recognition of Insolvency Proceedings), Chapter III (Secondary Insolvency Proceedings), Chapter IV (Information on Creditors and Lodgement of their Claims), Chapter V (Interpretation by the European Court of Justice), and Chapter VI (Territorial and Final Provisions). There follows a discussion, respectively, of 1) the territorial scope of application of the Convention and the types of international proceedings to which it applies; 2) the allocation of insolvency jurisdiction among Member States of the EU, both for main and for territorial proceedings; 3) the uniform conflict rules; 4) the principle of recognition of foreign insolvency proceedings and of the powers of a foreign liquidator; 5) secondary insolvency proceedings and their relationship with main proceedings; 6) the rules on creditor access to insolvency proceedings; and 7) the jurisdiction of the European Court of Justice.

## A. SCOPE OF APPLICATION

### 1. *Territorial Scope: Intra-Community Cases*

The Convention deals only with intra-Community cooperation in insolvency matters, not with the cooperation of Member States with third countries. [FN51] This is a truism under principles of general international law. [FN52] The problem is in determining what makes an insolvency case intra-Community. Here, the Convention is silent. It is, however, understood that the Convention applies only when the debtor has the center of its main interests in a Member State; [FN53] in other words, when a main proceeding could be opened in the EU. If the debtor has its center of main interests outside the EU, but *498 several establishments or places of business in the EU, both the interaction of a foreign main proceeding with proceedings concerning an EU establishment and the relationship between proceedings concerning several EU establishments will be outside the scope of the Convention. [FN54]

The United Kingdom, which has numerous insolvency arrangements with Member States of the Commonwealth of Nations, [FN55] took a special interest in excluding cooperation with third parties from the scope of the Convention. While many legal systems in Europe may be expected to use the Convention rules to a greater or lesser extent in their relations with non-EU Member States, courts in the United Kingdom will likely continue to adhere to traditional principles in cases which have foreign links only with such non-Member States.

### 2. *Types of Proceedings Covered*

#### a. Rehabilitations and Liquidations

While all European States have structurally similar liquidation proceedings, their approach to enterprise rehabilitation and reorganization varies greatly. A wave of law reforms in the 1980s brought rather more diversity than any degree of harmonization, even in basic principles. [FN56] In the past, most jurisdictions had some sort of composition (reorganization) proceedings as an alternative to liquidation and certain rules providing for the termination of an ongoing liquidation proceeding through a creditor vote on a composition. [FN57] Both types of compositions (compositions alternative to liquidation and compositions ending liquidation proceedings) have as essential elements the exclusive right in the debtor to propose a settlement, payment in full of secured and privileged (priority) claims, and a majority vote by general creditors on a restructuring of unsecured and nonpriority debt which results in a revaluation of existing equity's interest in the debtor. In composition proceedings opened as an alternative to liquidation, the debtor generally remains in possession, usually under the supervision of a court appointed curator. [FN58] A composition can generally be confirmed only if it is in the best interests of the *499 general body of creditors, *i.e.*, if creditors fare not clearly worse than they would fare in a liquidation. [FN59]

Over the last decade or so, this more or less unitary traditional rehabilitation repertoire was replaced or superseded in some countries by a motley array of new types of proceedings. The reforms focused on a great number of different issues, with varying political and economic emphasis. Some countries, such as France and Italy,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

vindicated a political and macroeconomic interest in the rescue of insolvent enterprises. This was to be done even, if need be, at the expense of creditors by installing debtor-protective proceedings, by taking the liquidation route only after a failed rehabilitation attempt or after a certain observation period, and by leaving the decision on whether to liquidate to the court rather than to the parties in interest. Another issue was the involvement of all creditors, including holders of secured and privileged debt, in the proceedings, in the governance of the insolvent debtor, and eventually in a debt restructuring. Some countries, like Germany and to some extent Finland, drew their inspiration largely from Chapter 11 of the United States Bankruptcy Code with its concept of absolute priority, [FN60] which, in principle, may allow equity to share in the overall financial restructuring of the debtor, but may also result in wiping out equity or the swapping of debt for equity. In 1994, Germany introduced insolvency plans, which very much resemble Chapter 11 reorganization plans. Within the framework of a "neutral" unitary proceeding, insolvency plans leave it entirely to claimants with valuable entitlements to decide whether to choose a straight liquidation, a sale of the debtor's business as a going concern, a liquidating plan, or a reorganization of the debtor. [FN61] Some countries, moreover, have voluntary and even informal proceedings which do not technically require insolvency under any of the usual tests. These include the United Kingdom, with its widespread practice of receiverships generally triggered by a bank as holder of a floating charge and certain other voluntary proceedings under the Companies Act, and France, with its informal and confidential, debtor-triggered but court-administered preinsolvency "amicable settlement" (*règlement amiable*).

With insolvency reforms of all kinds burgeoning, and no common outlook let alone effective harmonization in sight, one of the thorniest issues in the *500 debate over a European Convention was whether rehabilitation proceedings were to be included, and, if so, which ones. From inception, the Working Group took classical straight liquidations as its point of departure. For liquidations, it accepted the principle of mutual recognition of main insolvencies, mitigated by the right of establishment States to open territorial insolvency proceedings. Later, time-consuming debates were, however, conducted over how such mitigated universality could be adjusted to suit rehabilitation proceedings.

It was obvious that the mutual recognition of main rehabilitation proceedings, coupled with the possibility of local rehabilitation or liquidation proceedings in one or several States where the debtor owned one or more establishments, posed problems quite different from the neutral recognition of main liquidations. For instance, the rehabilitation in the main proceeding might be hampered if important foreign assets were subjected to separate proceedings, especially to a separate foreign liquidation. Some States, therefore, advocated reducing the possibility of secondary proceedings in the case of main rehabilitation proceedings, or, at least, allowing only secondary local rehabilitation proceedings (as opposed to secondary liquidation proceedings). Other States were concerned that mutual recognition of main rehabilitation proceedings commenced elsewhere might negatively affect local interests and make local creditors pay for the protection of employment and other public interests in foreign States. These States insisted on generously allowing secondary liquidations as a sort of local emergency brake on foreign rehabilitation proceedings.

Consensus was reached easily on the inclusion of unitary insolvency proceedings, such as the German, which allow the conversion of a liquidation to a plan or a composition and which protect the liquidation value of individual dissenting creditors under a "best interests of creditors" test. Subsequently, a more difficult discussion focused on the reverse issue of whether only those rehabilitation proceedings whose failure necessarily leads to liquidation proceedings should be included. This was not accepted, *inter alia*, by the Netherlands which has a rehabilitating procedure, *surséance von betaling*, a sort of trustee supervised temporary moratorium which may be terminated by dismissal without a subsequent liquidation. In the end, a compromise was reached. Automatic conversion of an unsuccessful rehabilitation to a liquidation is not required for the inclusion of rehabilitation proceedings of a given State within the scope of the Convention. In exchange for this concession by a majority of delegations, proponents of the inclusion of rehabilitation proceedings of the Dutch type had to accept that secondary proceedings under the Convention must necessarily be liquidation (winding-up), and cannot be rehabilitation, proceedings. In other words, a recognized rehabilitation proceeding opened in one State may trigger liquidations in any other State where *501 the debtor owns an establishment. This avoids a series of complex problems in main rehabilitation proceedings, such

Case 1:07-cv-07413-PKC    Document 17-6    Filed 06/03/2008    Page 9 of 41

70 AMBKRLJ 485                                                                Page 8
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

as deciding who (the debtor or the foreign liquidator) should have the right to choose which type of insolvency proceeding should be opened in the secondary forum. It also avoids the impracticality of attempting to couple a main liquidation proceeding with a secondary rehabilitation.

The Convention covers "collective insolvency proceedings which entail the partial or total divestment of the debtor and the appointment of a liquidator." [FN62] The Convention does not define the concept of insolvency. It refers to the national laws of Member States and to a common understanding which includes elements both of illiquidity and of insufficiency of assets, the latter to be established by a balance sheet test. [FN63] The word "divestment" is a term of art which denotes any restrictions on the debtor or its management in the administration of its business and in the right to dispose of assets. [FN64] Partial divestment denotes systems where the debtor remains essentially in possession but requires the consent or co-signature of a liquidator for certain transactions (typical of most European composition proceedings). Consequently, the "liquidator" is defined as "any person or body whose function it is to administer or liquidate assets of which the debtor has been divested, or to supervise the administration of his affairs." [FN65] There is no requirement that all elements of insolvency proceedings be present at the moment of opening. For instance, if a liquidator is generally appointed after the opening of proceedings, the Convention applies to such proceedings from their inception. [FN66]

Classical liquidation proceedings, unitary rehabilitation proceedings such as the German, and most rehabilitation proceedings known by EU Member States are within the scope of the Convention. These include, *inter alia*, the French *redressement judiciaire*, the English *administration*, the Italian *amministrazione straordinaria* and *amministrazione controllata*, and the Dutch *surséance von betaling*. However, preinsolvency proceedings, such as the French *règlement amiable*, are excluded. The Convention also applies to voluntary creditor proceedings, such as the creditors' voluntary winding-up of a company under English and Irish law. The Convention provides that "court" means not only judicial bodies, but also "any other competent body of a Member State." [FN67] This includes shareholders who pass a resolution on a creditors' voluntary winding-up.

In order to facilitate the application of the Convention, all recognized *502 kinds of proceedings are mentioned in a list (Annex A); all proceedings that qualify for secondary proceedings as winding-up proceedings are included in another list (Annex B); and, all recognized kinds of liquidators are included in yet another (Annex C). The definition of insolvency proceedings in Article 1(1) [FN68] will be needed only for subsequent modifications of the Annexes (that is, for deciding, *inter alia*, which new proceedings qualify for inclusion in the Convention), but not for the day-to-day application of the Convention. An exception to this statement must be made for certain proceedings, such as the English and Irish creditors' voluntary winding-up of a company or the Spanish *suspensión de pagos* which may be used both as an insolvency and as a pre-insolvency proceeding. In these proceedings, the opening court must specify that the proceedings in question are based on insolvency. [FN69]

It will be interesting to see whether a proceeding analogous to reorganization under Chapter 11 of the Bankruptcy Code will be eligible for inclusion in Annex A if a Member State chooses to introduce such a system. As Chapter 11 does not require a showing of insolvency by the debtor, a court certification of insolvency on a case-by-case basis would certainly be required. Another problem would be created by the absence of a liquidator in most Chapter 11 cases. The Convention appears to assume that the term "liquidator" *can* mean the court, however, and at least two States (Austria and Denmark) have listed the bankruptcy court as a "liquidator" in Annex C. But, it would certainly be questionable whether the role of a United States bankruptcy court in a Chapter 11 case (in the context of executory contracts or in the treatment of adequate protection for secured creditors and the treatment of cash collateral, for example) could be considered tantamount to a partial divestment of the debtor. This author believes that the Convention should not be applied to Chapter 11-type reorganization proceedings.

b. Exempt Industries

The Convention does not apply to "insurance undertakings [insurance carriers], credit institutions [banks], and investment undertakings which provide services involving the holding of funds or securities for third parties, or to

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 9

collective investment undertakings [securities firms, investment funds]." [FN70] The Convention, with these rather odd translations of French terms, obviously refers to existing definitions in existing Community directives dealing with these industries. [FN71]

**\*503** The exemption for banks was controversial for many months and delayed the completion of the Convention for a very long time. [FN72] The proponents of including banks in the Convention, notably Germany and the United Kingdom, wanted to make sure that secondary proceedings concerning foreign establishments of EU banks would be possible. The opponents of such inclusion, most notably Belgium, wanted to preclude this possibility because they adhere to full universality and unitary proceedings in the case of banks. [FN73]

### c. Parent-Subsidiary Insolvencies

The Member States of the EU have widely divergent views on the legal consequences of parent-subsidiary relationships, especially on the liability of the parent for debts incurred by the subsidiary and the possibility of piercing the corporate veil. Most countries tend to protect a subsidiary against a spill-over of the insolvency of the parent and many rate the interest of the subsidiary to survive above the parent's interest. Therefore, joint insolvency proceedings, administered by a single court and/or liquidator, let alone consolidated parent-subsidiary proceedings, are not possible in most jurisdictions. Separate insolvency proceedings of two legal but related entities incorporated in different jurisdictions would, as such, in the thinking of most European jurisdictions, not raise issues of international bankruptcy law. [FN74]

For all these reasons, the Convention has no specific rules on parent-subsidiary relationships in the case of the insolvency of both entities. It deals only with the cross-border effects of proceedings concerning a single legal entity which may have assets or creditors outside the jurisdiction where it is registered, headquartered, or incorporated. If an EU Member State, however, has jurisdiction over two affiliated entities, it is, of course, free to consolidate**\*504** the respective insolvency proceedings and have them treated as one main proceeding by other European jurisdictions also.

### B. INTERNATIONAL JURISDICTION

The Istanbul Convention introduced a system of *compétence indirecte*. [FN75] Because most EEC Member States felt this was unsatisfactory, the Convention has rules on *compétence directe*.

These rules distinguish between proceedings with cross-border, or universal, international jurisdiction (*compétence*), and territorial proceedings which do not reach out to assets situated outside the opening State. Universal proceedings, or "main proceedings," may be opened only by the State in whose territory the debtor has the "center of its main interests." [FN76] Territorial proceedings may be opened by States where the debtor owns an establishment, *i.e.*, a branch without a separate legal personality. [FN77] The latter proceedings are called secondary insolvency proceedings when a main proceeding has been or is subsequently opened [FN78] and will be referred to as "independent territorial proceedings" for so long as a main proceeding has not been opened. In its opening decision, the court must specify whether its jurisdiction is based on the debtor's center of main interests or merely on the presence of an establishment. [FN79]

The rules of the Convention do not specify which court within a State with international jurisdiction is competent to make decisions locally. National law itself determines local or territorial jurisdiction within a given State.

### 1. *Main Insolvency Proceedings*

The concept of the center of a debtor's main interests has been transplanted from the Istanbul Convention.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN80] Here, as there, this term is not defined, but is an entirely artificial term without precedent in any one State's national laws. It denotes, in the case of individuals, the domicile or habitual residence; in the case of sole business proprietors or partnerships, the principal place of business; and, in the case of corporations, until proof to the contrary, the place of the registered office. [FN81] In the case of a mere mailbox registration, the headquarters will be treated as the center of main interests. [FN82]

Logically, there can be only one center of main interests. The Convention*505 is silent with respect to the situation where two or more States claim to have the center of the debtor's main interests. [FN83] But, the Report accompanying the Convention [FN84] draws an analogy to Article 28 of the Brussels Convention, [FN85] according to which Member States may not question the jurisdiction of a State where judgment was first entered. Accordingly, the State which first opens a proceeding based on the center of main interests will prevail over other States.

## 2. *Territorial Proceedings*

The Convention ended a long debate over whether jurisdiction for territorial proceedings should be based on the presence of assets or on the existence of an establishment in a given territory by opting for the latter. This limitation on the basis of territorial jurisdiction was prompted by concerns of some States with strong universalist tendencies who feared a burgeoning number of small bankruptcies concerning real estate, bank accounts or gold deposits in Member States.

Territorial proceedings, however, affect only those assets which are situated in the Member State. [FN86] The Convention defines "establishment" very broadly as any "place of operations where the debtor carries out a non-transitory economic activity with human means and goods." [FN87] A medical office, a law office, or the office of a representative of a foreign business firm operating in a leased location with leased inventory would all be considered establishments.

Whenever the Convention is applicable, *i.e.*, when the debtor's center of main interests is in a Member State, only other Member States in whose territory the debtor has an establishment can open insolvency proceedings. [FN88] And, in these cases, the establishment State can only open territorial proceedings, *i.e.*, proceedings which do not affect assets outside the establishment State. [FN89] If the Convention is not applicable because the debtor has the center of its main interests outside the EU, States may do as they like. The United *506 Kingdom, especially, was interested in maintaining its traditional bankruptcy jurisdiction based on assets for cases where the debtor's center of main interests is outside the EU.

## 3. *Independent Territorial Proceedings*

It is considered undesirable that a debtor be declared bankrupt and insolvency proceedings opened in a State where it has only an establishment (the secondary forum), when the State where the debtor has the center of its main interests (the main forum) has not taken judicial action. Ideally, the main forum should be competent to determine when a debtor should be considered insolvent in any Member State. Given the different standards of insolvency, a debtor might be considered insolvent in the State of the establishment and still solvent in the main forum. Promising negotiations for an out-of-court workout in the main forum might be disrupted by such an uncoordinated foreign proceeding. On the other hand, secondary fora may see a need for a local proceeding when the debtor is illiquid and has stopped making payments there, irrespective of the debtor's assumed solvency in the main forum.

The Convention strikes a balance between the ideal of granting opening precedence to the main forum and considering the practical needs of secondary fora by reducing the number of independent territorial proceedings considerably. A secondary forum may open an independent territorial proceeding only when the debtor is not subject to insolvency proceedings in the main forum, [FN90] or when territorial proceedings are requested by a party which has its domicile, habitual residence, or registered office in the secondary forum, or whose claim arose from the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                    Page 11
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

operation of an establishment there. [FN91]

## C. UNIFORM CONFLICT RULES

In addition to the rules defining the Convention's scope of application and the rules on international jurisdiction, Chapter I of the Convention has a number of important uniform conflict rules on insolvency related issues. [FN92] As harmonization of substantive insolvency law is not possible in the EU, such harmonization of conflict rules clearly is a realistic second best.

The purpose of these rules is to delineate the issues which are properly governed by insolvency law from those that should be treated as nonbankruptcy issues because nonbankruptcy policies should prevail, and then to determine the law applicable to such insolvency law situations. As is the general practice in treaties which attempt to harmonize conflict rules, the *507 provisions refer to substantive rules of Contracting States' parties only, exclusive of a party's set of conflicts rules. In other words, *renvoi* is excluded. By focusing on insolvency related issues where no community-wide single conflicts approach can be found, the Convention produces legal certainty. It also leads to the application of the same law no matter which Member States' courts are dealing with the case (international decision harmony, in German legal parlance), thus reducing the incentives for forum shopping.

The uniform conflicts rules of the Convention apply to all insolvency proceedings opened by a Member State, *i.e.*, to universal and territorial proceedings alike. [FN93] They deal with conflicting laws among Member States only. [FN94] Conflicts between the laws of third parties and those of a Member State are not covered by the Convention. This is unfortunate. It was argued in the Brussels negotiations that a full harmonization of the conflicts rules of Member States, including conflicts with laws of third parties, would have been possible, and it certainly would have been useful to exclude the possibility of a split conflict regime in Member States.

Several of the most important of these conflict rules are explained below.

### 1. *Scope of Insolvency Law*

Article 4 specifies that the insolvency proceedings themselves and their effect shall be governed by the law of the Member State in the territory in which proceedings are opened (which this Article will call the "opening State" for the sake of brevity). [FN95] The following is a nonexhaustive list of issues to be governed by the law of the opening State (*lex concursus*). It includes, *inter alia*:

      (1) the opening requirements (the "trigger" criterion);
      (2) who may file;
      (3) who may be a debtor;
      (4) which assets (*e.g.*, after-acquired property) form or are exempted from the estate;
      (5) the status and powers of the insolvent debtor and of the liquidator;
      (6) the right to set off claims against claims of the insolvent debtor;
      (7) executory contracts;
      *508 (8) the effects on creditors (such as the stay);
      (9) the allowability of claims and the treatment of post-opening claims;
      (10) the formalities of lodging, filing, verifying, and admitting (allowing) claims;
      (11) priorities, and the treatment of creditors who have been paid partly from the sale of collateral or through a setoff;
      (12) the conditions for closing the proceedings, *e.g.*, after a composition;
      (13) the rights of creditors after closing (or the discharge of the debtor);
      (14) rules on the validity, avoidance or unenforceability of acts detrimental to the body of creditors (avoidance powers and fraudulent conveyances); and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(15) costs. [FN96]

Most of these issues may seem rather self-evident. Some of them, however, eliminate doubts created by uncertain doctrines and an insufficient body of case law in some European countries. For instance, it has long been argued by some that the law governing the debtor's obligations (*lex contractus*) should be applied to the issue of discharge, [FN97] at least cumulatively, *i.e.*, in addition to the law of the opening State. Article 4 now clarifies that only the law of the opening State will govern.

Other conflicts rules, however, limit the scope of insolvency law in certain situations with foreign links. They are of great practical importance and are discussed below.

*2. Security Interests*

The most important of these additional conflict rules is found in Article 5 which provides that security interests (rights *in rem*) of third parties in assets of the debtor which are situated in a Member State other than the opening State at the time of the opening of proceedings (foreign situated collateral) will not be affected by the proceedings. [FN98] Reservation of title, whereby title *509 to goods remains with the seller until the price is paid in full, which is used routinely in the sale of goods in some countries (most notably Germany), is equated to a security interest for the purposes of the Convention. [FN99] However, these rules do not immunize security interests against the rules on avoidance which may be applicable under certain circumstances. [FN100]

As a consequence, the holder of a security interest in foreign situated collateral may proceed as if there were no insolvency of the debtor. The secured party may, for example, sell collateral or foreclose a mortgage under the conditions set out by the general law of the situs. These creditors are not affected by a stay issued in connection with foreign insolvency proceedings, and they may not be impaired by a plan.

Secured credit is obviously of special sensitivity for the financial markets in any market economy. Quite obviously it would not have been possible to subject security rights in foreign situated collateral entirely and unconditionally to the insolvency law of the opening State. European laws take quite different approaches to the treatment of secured creditors in insolvency proceedings. Some procedures, like the French *redressement judiciaire*, tend to substantially interfere with the general civil law rights of security holders and inflict considerable losses on secured creditors for the benefit of the debtor and its rehabilitation. Other insolvency laws leave secured creditors largely unaffected. This is true of all systems that adhere to the composition paradigm of enterprise rescue which aims at a rescheduling of unsecured and nonpriority debt only.

Whether security holders with foreign situated collateral should be subjected to the insolvency law of the State where the collateral is located (*lex res situs*), at least in cases where the law of the opening State provides for some effect of insolvency on the rights of secured creditors, was debated at some length. Allowing the law of such an opening State to govern might have assisted the administration of the estate and a possible rescue of the debtor without imposing upon security holders unexpected and incalculable insolvency interference. Such an approach was rejected, essentially because considerable complexity would have been created by combining the effects of two insolvency laws and also because liquidators might be at a loss when asked to apply foreign insolvency laws.

If, as may be the case, a main liquidator wants to benefit from the insolvency law of the situs of foreign situated collateral, she may file for secondary *510 proceedings if the debtor owns an establishment in the State of the situs. [FN101] The law of the secondary forum may, for example, include secured creditors in the automatic stay or otherwise subject secured creditors to bankruptcy specific restraints. This possibility mollifies the otherwise cumbersome effects of the choice made by Article 5.

Article 1 provides a special definition of the situs of collateral. [FN102] The situs of movable or immovable tangible property is naturally determined by its physical location; [FN103] tangible or intangible property, such as

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 13

patents and similar, "in which title is conditional upon registration in a public register," by the place where the public register is kept; and, receivables by the place where the account debtor has the center of its main interests. [FN104]

### 3. *Setoff*

In a situation involving the laws of more than one Member State, the right of setoff is viewed and treated much like a security interest. [FN105] If the claim of the debtor (the estate) and the counterclaim of a creditor are governed by the laws of two different Member States, and if setoff is allowed by the law governing the claim of the estate against the creditor, then an insolvency proceeding does not affect the right of setoff. [FN106] It could not, for instance, impose an automatic stay against the creditor's attempt to collect the debt. [FN107] This rule is derived from the accepted European conflicts treatment of setoff. Here again, as with security interests, avoidance powers and the provisions on fraudulent transfers under the law of the opening State remain applicable. [FN108] A creditor who, for example, bought a counterclaim in the period immediately preceding the opening of proceedings, could have its setoff rights avoided.

### 4. *Executory Contracts*

The rules of the opening State on executory contracts (the term includes unexpired leases and other long term contractual relationships) apply, in general, irrespective of the law which governs the contract in question. [FN109] For the social protection of certain contract partners of the debtor, however, an exception is made, and the law governing the contract (*lex contractus*) is applied*511 instead of the *lex concursus*. There is such an exception for labor (employment) contracts; [FN110] a similar rule for consumer transactions was discussed but rejected. Similarly, the assumption or rejection of leases and rentals of real property and contracts for the sale of land is governed exclusively by the *lex situs*, which will generally be identical with the *lex contractus*. [FN111]

With regard to the sale of goods, the Convention introduces an important conflicts rule which supersedes the various rules on executory contracts and the general law of the sale of goods in Member States. Insolvency proceedings against the seller of movable assets delivered to the purchaser under a reservation of title clause do not constitute grounds for a rescission, termination, or rejection of the sale by the seller's liquidator if the asset is situated outside the opening State when proceedings are opened. [FN112]

### 5. *Avoidance and Fraudulent Transfers*

Conflicts arising in the context of avoidance, preferences, fraudulent transfers, and related areas of insolvency law are particularly controversial in a comparative perspective, and they are of great practical importance given the impact of avoidance on the administration and the results of insolvency proceedings. While most European insolvency systems consider avoidance to be governed by the insolvency law of the opening State, Germany and some other countries tend to apply the law governing the challenged transaction or legal act (*lex causae*). [FN113] Moreover, European laws deal in a remarkably diverse way with preinsolvency acts aimed at the fraudulent transfer of assets to third parties, at giving individual creditors priority over the general body of creditors, or at otherwise harming the common interest of creditors. Some laws, notably the French and the French inspired systems, automatically nullify certain acts of such nature when they were performed in a "critical period" (*période suspecte*). In these French and French-inspired systems, other acts are considered to be generally valid, but unenforceable (or *inopposable*) against the estate. Other systems-for example, the common law systems and German law-require action by the liquidator to avoid detrimental acts, and common law jurists speak of the avoidance powers of the liquidator. The exercise of these powers in some States requires a lawsuit by the liquidator or by a creditor on behalf of the estate (sometimes called *actio Pauliana* in systems with a Roman law background); others, like the German, treat avoidance as a part of the substantive law of restitution and do not require court action. As a matter of policy, the relative weight given to the interest of creditors on the one hand, and to legal certainty and the reliance interest

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

of *512 innocent third parties on the other hand, varies greatly. Germany, for instance, with its very elaborate land registry (*Grundbuch*), protects third parties who acquired title or another interest in land in reliance and in good faith against the effects of insolvency generally, including protection against avoidance.

Generally, the law of the opening State governs avoidance and related insolvency issues. [FN114] In view of the foregoing, however, the Community-wide exportation of foreign avoidance systems needed to be limited in some circumstances. After long and eventually abortive discussions which attempted to specify categories worthy of special protection against avoidance, such as transactions concerning land or registered assets (*e.g.*, vessels, airplanes), a general conflicts rule was introduced. [FN115] This rule provides for a limited cumulation of the law of the opening State (*lex concursus*) and the law governing the challenged act or transaction (*lex causae*) if the latter is different from the law of the opening State. The defendant in an avoidance action can block avoidance if she proves that the challenged act or transaction cannot be challenged under the law which governs the act or transaction (*lex causae*) under any legal theory. This requires that the act be valid and unobjectionable in its entirety in every possible legal aspect, not only under the avoidance rules of the *lex causae*. Otherwise, the avoidance rules of the opening State will be applied without restriction. Given the great diversity of avoidance systems, such a partial cumulation of two regimes, with preference for the law of the opening State regarding all technical aspects, avoids a great many technical problems which would be associated with classical cumulation, *i.e.*, the parallel application of both the *lex concursus* and the *lex causae*.

## 6. Pending Lawsuits

Member States have widely differing rules on the impact of insolvency proceedings on pending litigation to which the insolvent debtor is a party. This issue is closely linked with the rules of procedure applied by the courts in which the cases are pending. Therefore, the Convention provides that the law of the litigation forum governs the effects of insolvency on pending lawsuits. [FN116]

The law of the litigation forum may stay the litigation, interrupt it until notice by the foreign liquidator, or similar, and may determine what future roles should be played by the liquidator and the debtor in the case. Very complex situations can arise. For instance, the law of the opening State may provide that all commercial litigation to which the debtor is a party should be removed from the litigation forum and transferred to the bankruptcy court, *513 while the law of the litigation forum may forbid such removal from taking place. On the other hand, in the inverse situation where the law of the litigation forum provides for concentration of all debtor litigation in the bankruptcy court, the litigation forum could certainly not impose general litigation on a foreign bankruptcy court if the latter's law would not allow it, or *vis attractiva concursus* as it is called in European doctrine. This example demonstrates why this conflict provision of the Convention should be read as referring *only* to the effects insolvency proceedings may have on lawsuits within the jurisdiction where litigation is pending.

## 7. Payment Systems and Financial Markets

In international payment systems and in financial markets it would be unfortunate if the laws of several nations could be applicable to a large number of standardized transactions; unfortunate, for example, if claims and counterclaims were subject to different regimes, if more than one legal system were to govern setoff and netting operations, or if the framework of multiple transactions could be fragmented by applying different sets of rules on executory contracts. The Convention, therefore, makes the insolvency law of the State where the payment system or capital market is operating the exclusive law applicable to the rights and obligations of parties to a payment system or participants in a financial market. [FN117] This includes the avoidance rules of the applicable insolvency regime. [FN118] As a consequence, no matter where insolvency proceedings are opened, only one insolvency law applies to the operations of a payment system or a financial market, namely, the insolvency law of the Member State where the system or market is in operation. [FN119]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

D. RECOGNITION OF INSOLVENCY PROCEEDINGS

1. *Automatic Recognition*

Chapter II of the Convention deals with the cornerstone of this instrument, namely, the reciprocal recognition of insolvency proceedings by Member States. Any insolvency proceeding opened by a court of a Member State with international jurisdiction [FN120] will be recognized in the territories of all other Member States automatically, without any court intervention, authorization, *exequatur*, or any other formality. [FN121] Such recognition does not, however, bar a Member State where the debtor has an establishment from *514 opening a territorial secondary proceeding. [FN122]

The opening decision must be effective in the opening State, but not necessarily final. [FN123] Recognition may not be refused on the grounds that the debtor would not be considered insolvent in another Member State or that it would not be subject to insolvency proceedings in such other State. [FN124] For instance, if a French attorney whose law offices are in Germany were declared bankrupt in Germany, France would have to recognize the bankruptcy even though an attorney (not a trader-*commerçant*-in France) would not be subject to insolvency proceedings in France. [FN125] Both proceedings opened by the main forum where the debtor has the center of its main interests and territorial proceedings opened by States where the debtor has only an establishment are subject to recognition. But, recognition means different things for the two categories of proceedings.

In the case of main proceedings, recognition means that the proceedings will produce the same effects in other Member States as in the opening State, unless the Convention makes specific provision to the contrary, and so long as territorial proceedings are not opened in those other Member States where the debtor has establishments. [FN126] In other words, the Convention exports the full effects of a main proceeding from the opening State to the territories of all other Member States. [FN127] The foreign liquidator may exercise all her powers in a Member State. These powers are not translated into the powers a liquidator would have in such a State; they may be broader or narrower than those of a local liquidator. She may, above all, possess assets of the debtor and remove them to the main forum (with the exception of assets which are encumbered by a security interest or a reservation of title), [FN128] so long as no territorial insolvency proceeding has been opened in the respective other Member State and no preservation measures of a preliminary nature have been taken in the other Member State to further a request for the opening of a territorial proceeding. [FN129]

In the case of territorial proceedings, recognition means that the territorial*515 effects of the proceedings may not be challenged in other fora. [FN130] A liquidator has, *inter alia*, access to the courts of other Member States and may, for instance, claim assets of the estate which were removed from the forum after the opening of proceedings. [FN131] The liquidator may also bring an avoidance action. [FN132] A territorial proceeding cannot operate as a stay of creditor action, nor discharge the debtor from creditor claims, with regard to assets outside the territory of the State opening such proceedings. [FN133] And, similarly, a composition or reorganization approved in a territorial proceeding will be recognized with respect to assets situated in the State opening such a territorial proceeding only. [FN134] If a plan impairs the rights of creditors with respect to assets situated in other States, such a plan will be recognized only if all impaired creditors have consented to it individually. [FN135]

2. *Limits to Recognition*

The universality of a recognized foreign main proceeding is restricted, and the effects of such a proceeding will be superseded, in Member States where a territorial proceeding is opened or has been opened previously and a local liquidator is appointed. [FN136] The powers of the foreign main liquidator may also be limited by contrary preliminary protective orders issued in furtherance of an application for the opening of a territorial proceeding. [FN137]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Further, it is almost self-evident that a foreign main liquidator may not exercise her powers in a way which would be contrary to the general law of the Member State where she wants to act; she has to observe the local non-insolvency law. [FN138] Most importantly, the liquidator may sell debtor assets only in accordance with the procedures provided by the local law. [FN139] This is of particular importance in the case of real estate. [FN140]

Even if a liquidator would be entitled to use coercion (as for example, against an uncooperative debtor) or to resolve disputes under the law of the opening State, she will not have such rights in other Member States. [FN141] If the law of the opening State authorizes the liquidator to access the debtor's *516 mail and telecommunications, she does not enjoy these powers in other Member States, unless, of course, a local court grants authorization. [FN142]

### 3. *Proof of the Powers of the Liquidator*

A foreign liquidator, whether appointed for main or territorial proceedings, may prove the appointment by presenting a certified copy of the appointing decision or by any other certificate of the appointing jurisdiction. [FN143] Other Member States may require an official translation of the document, but no other formality (such as the *apostille* under the 1961 Hague Convention), [FN144] before recognizing the liquidator. [FN145] If the powers of the liquidator are challenged, the liquidator bears the burden of proof. [FN146]

In most countries, such as Germany, courts may research foreign law on their own or request *amicus curiae* briefs from experts on the foreign law. In the past it has often been standard practice in jurisdictions which were universalist for liquidators to present explanations of their powers under the laws of their home State, and this will likely continue in the future. The Convention does not expressly mandate that courts of Member States cooperate for this and other purposes, but one may certainly expect some degree of judicial collegiality and comity among jurisdictions of Member States.

### 4. *Other Effects of Recognition of Insolvency Proceedings*

Because recognition is automatic and not necessarily published, it may happen that creditors will obtain payment on their claims in places outside the opening State despite the stay in the foreign main proceedings, perhaps by action of the debtor, through the enforcement of a judgment, or possibly through self-help. In such a case, the creditor must return the value of what it obtained to the liquidator of a recognized main proceeding. [FN147] This rule does not apply to creditors who realized payment from the sale of collateral situated outside the opening State. [FN148] Moreover, a creditor that obtained a partial payment in any EU insolvency proceeding need not return it. [FN149] Such a creditor will, however, share in any distribution made in other EU insolvency proceedings only when, and insofar as, other creditors of the same class obtained an equivalent dividend. [FN150] This principle is inspired by § 508(a) of *517 the United States Bankruptcy Code [FN151] and the similar "hotchpot" rule of English law. It applies no matter where the creditor first received a payment, be it in a main or in a territorial proceeding. The author believes it should be applied with respect to several territorial proceedings also. [FN152] The rule presupposes that a creditor may lodge the full amount of its claim in all existing proceedings, and that the allowable claim will not be reduced in one proceeding after partial payment in another, so long as the creditor does not receive more than the full amount of its claim.

### 5. *Publication of Insolvency Proceedings*

Generally, the liquidator has the option of officially publishing outside the opening State the opening of insolvency proceedings, be they main or territorial, and the appointment of a liquidator. [FN153] States in which the debtor has an establishment may, however, in their national legislation, require mandatory publication of foreign main insolvency proceedings. [FN154] In any event, neither the publication nor the noncompliance with mandatory publication affect the duty of Member States to recognize each other's proceedings, or generally the effect of the proceedings on the rights and duties of private parties, notably the debtor and its creditors.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                          Page 17
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

The only legal consequence of publication is in the context of whether third parties who make payments to the debtor in a Member State other than the opening State may be validly discharged from their obligations. Before publication, the third party is presumed to be unaware of the proceedings and will receive a valid discharge unless knowledge of the proceedings is proved by the liquidator. [FN155] After publication, the third party is presumed to have been aware of the proceedings, and it has the onus of proving the contrary. [FN156]

The Working Group discussed the merits of introducing a central insolvency register in the EU which would no doubt increase legal certainty for private parties, the liquidators, and the national courts. No consensus could be reached on such a register. Most States were reluctant to link the function of the Convention to the operations of such an institution, which might be costly and difficult to set up within the existing structures of the EU bureaucracies. It may be expected, however, that private investors will attempt*518 to set up an information system on EU insolvencies on a commercial basis.

### 6. Recognition and Enforcement of Other Insolvency Related Decisions

The EU has long had a very successful Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters (Brussels Convention). [FN157] However, the Brussels Convention excluded bankruptcies, compositions, and similar proceedings from its scope. [FN158] The European Court of Justice (ECJ) has given a very broad reading to this exception, excluding not only decisions by the bankruptcy courts, but also other insolvency related decisions of other courts. Typical decisions of this nature are judgments in avoidance cases or in cases of shareholder liability. [FN159] Preliminary protective orders issued by bankruptcy courts before the formal opening of proceedings were also excluded from the Brussels Convention. [FN160]

One purpose of the Convention was to close the recognition and enforcement gap left by the Brussels Convention. Provision needed to be made, therefore, for a great variety of decisions, other than the opening decisions, that may be handed down in the course of insolvency proceedings, both by the bankruptcy courts and by other courts. Thus, the Convention [FN161] provides for the automatic recognition of any judgment (decision) by a bankruptcy court whose opening decision is recognized under the Convention which judgment concerns the course and closure of insolvency proceedings. [FN162] This would include the confirmation of a composition or a plan, a decision of discharge, orders enjoining the debtor or a creditor from certain acts, decisions on applying or lifting an automatic stay, avoidance judgments, and the like. Similarly, judgments of other courts deriving directly from the insolvency proceedings and closely linked with such proceedings will be recognized automatically. [FN163] This rather vague language makes sense only if one recalls that any decisions which the ECJ formerly excluded from the scope of the Brussels Convention should now come within the scope of the new Convention. Finally, judicial preservation measures taken after the request for the opening of insolvency proceedings will also be recognized *519 automatically. [FN164]

The relevant Articles [FN165] of the Brussels Convention are the provisions applicable to enforcement of insolvency related decisions. [FN166] The Brussels Convention allows for a very speedy summary judicial enforcement order, and the courts in the Member State where enforcement is sought may neither question the foreign court's jurisdiction nor the substance (correctness) of its judgment. [FN167]

### 7. Public Policy

Like similar European instruments, the Convention's rules on recognition contain a general reservation which defers to the public policy (*ordre public*) of Member States. A State may refuse to recognize both insolvency proceedings and insolvency-related decisions and, as the case may be, the enforcement of such decisions, where the effect of such recognition and enforcement would be manifestly contrary to that State's public policy. The fundamental principles and the constitutional rights and liberties of the individual are listed as elements of a Member

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 18

State's public policy. [FN168]

Based on such considerations, however, States may not, of course, refuse to recognize the consequences and effects which flow directly from express provisions of the Convention. For example, a Member State could not refuse to recognize foreign insolvency proceedings against a debtor who would not be subject to such proceedings in the State where recognition is sought.

## E. SECONDARY INSOLVENCY PROCEEDINGS

### 1. In General

Recognition of main (universal) proceedings, as was noted, means the wholesale exportation of the effects of insolvency proceedings into other Member States. [FN169] This may conflict with local interests, which the Convention recognizes as worthy of protection and which needed to be protected in order to make a system based on recognition acceptable to Member States at the present stage of their economic integration and legal unity. Local creditors, such as local employees or the local fiscal authorities, for instance, may enjoy a privilege (priority) in another Member State where the debtor has significant assets, which priority would not be recognized in the main forum. Other local creditors may have claims which would be allowed in a local insolvency proceeding but not in the foreign main proceedings. Small local *520 creditors will often find it inconvenient and costly to lodge their claims in a foreign proceeding. Finally, the main foreign proceedings may affect creditor rights negatively when the law of the main forum prefers rehabilitation of the debtor and the social and macroeconomic interest in preserving existing economic entities over creditors' interests. As was noted, [FN170] the possibility of secondary proceedings was viewed, in a European environment with widely differing views on rehabilitation policies, as a necessary, precondition for the inclusion of rehabilitation and reorganization proceedings in the scope of application of the Convention and their recognition by other Member States. Secondary insolvency proceedings, to which the Convention devotes its Chapter III, thus mitigate or modify the principle of universality and mutual recognition of main proceedings for the sake of individual or public local interests.

It should not be overlooked, however, that secondary proceedings may also serve the interests of the foreign main estate and enrich the menu of options the foreign liquidator will have. Recognition of foreign main proceedings does not affect, as indicated, [FN171] the rights of secured creditors who have a security interest in collateral situated outside the opening State. However, insolvency proceedings opened by the Member State where the collateral is situated may, and often will, affect secured creditors, as for example, subjecting them to an automatic stay. The opening of a secondary proceeding in the State where collateral is situated thus may benefit the estate and the liquidator of the main proceedings. In another situation, avoidance rules in a secondary forum may be broader than those in the main forum, and the main liquidator may be able to avoid a transaction in a secondary forum which would be unavoidable under the rules of the main proceedings. In these and other situations, secondary proceedings clearly benefit not only local creditors and the State of the secondary forum, but also the foreign liquidator.

The introduction of secondary proceedings is the most far-reaching innovation of the Convention when compared with the former drafts by the EEC Commission. That Commission aspired to full unity of insolvency proceedings [FN172] which was then perceived of as a necessary corollary of the principle of universality.

Historically, the concept of secondary insolvencies has a distant lineage leading back to the ancillary proceedings provided for by § 304 of the United States Bankruptcy Code. [FN173] In the Strasbourg negotiations of the Council of Europe, which led to the Istanbul Convention, Germany introduced a discussion*521 model based on § 304 of the Bankruptcy Code. But, it very soon became clear that a flexible system like the American one, which allows the judge to weigh the equities and the requirements of comity in every case and to tailor the scope of ancillary proceedings accordingly, would not be acceptable to the majority of civil law jurisdictions in Europe.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                 Page 19
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

These jurisdictions attach special value to legal certainty and are generally distrustful of wide court discretion and of judicial social engineering. A more rigid and standardized approach was inevitable.

The concept and structure of secondary proceedings in the Convention follows the Istanbul Convention in a great many aspects. The Convention departs, however, from its predecessor in two important aspects, namely, the right of creditors to partake in the distribution of assets in the secondary proceeding and the degree of coordination between main and secondary proceedings.

In order to achieve a liquidation surplus which could then be added to the estate of the main proceeding, the Istanbul Convention allows only some categories of creditors to receive payment in secondary proceedings. [FN174] They are: secured and privileged (priority) creditors, local employees, public law creditors such as local fiscal authorities, and creditors whose claims are connected with the operation of a local establishment. All other creditors may lodge their claims in the secondary proceedings, but will be considered for distributions only from the main proceedings. [FN175] Such a system appeared internationally unbalanced because jurisdictions with a large number and volume of priority claims, notably the French and French-inspired systems, would generally "get more out of" secondary insolvencies than countries with fewer or no priorities. [FN176] On a technical level, limited creditor access to secondary bankruptcies, moreover, created a great many complexities. How was one to treat nonallowable claims which are postopening claims in the secondary proceedings but preopening claims in the main proceedings? What safeguards could be found to make sure that claims ousted from the secondary proceedings would not be outranked by priority claims in the main proceedings, at least with respect to any liquidation surplus transferred from secondary proceedings to the estate of the main proceeding? Finally, the inclusion of rehabilitation proceedings in the EU Convention, which may be more or less unfriendly to creditors, made the Istanbul regime appear unacceptable in the EU context.

The Convention admits to secondary proceedings all creditors whose *522 claims would be allowable in an independent local insolvency proceeding. [FN177] Quite obviously there is a price to be paid for this generosity: the number of situations where a surplus will be achieved in secondary proceedings, which may then be added to the estate of main proceedings, will be rather limited.

While, in light of the foregoing, the secondary proceedings may seem to be a retreat from the principle of universality when compared with the Istanbul Convention, the new Convention takes a big step forward in subordinating secondary proceedings to the needs of the main estate and in better coordinating the course and outcomes of main and secondary proceedings. Under the Convention, secondary proceedings are not a special type of proceeding. They are regular nationwide proceedings to which the general local insolvency law applies unless the Convention specifies otherwise. [FN178] Special Convention rules pertain to international jurisdiction, the eligible types of proceedings, the requirement of insolvency (the trigger criterion), the right to file, and the coordination and interaction of main and secondary insolvency proceedings. [FN179] The general rules of the local law apply to all other aspects of the secondary procedures, such as the effects of proceedings; the selection, appointment, and role of the local liquidator; the treatment of secured creditors; priorities; the closing conditions; and similar. [FN180] The Convention implies that Member States may generally not introduce special insolvency systems for use in secondary proceedings only. [FN181]

### 2. *Jurisdiction*

Secondary proceedings are necessarily territorial proceedings covered by the general rules on jurisdiction. [FN182] They may therefore only be opened by Member States where the debtor has an establishment. [FN183] A Member State cannot protect local interests through secondary proceedings in other situations, as for instance where the debtor owns only a bank account, a private home, or securities in its territory. The Convention does not prescribe the result if a State misreads the concept of establishment and opens secondary proceedings concerning, say, a vacation home where the debtor employs a *523 butler. In the author's opinion, with a view to the general preference for unmitigated recognition of foreign main proceedings (*favor recognitionis*), the main proceedings

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should be recognized and the mistakenly commenced local proceedings disregarded and eventually closed.

3. *Eligible Types of Proceedings*

Secondary proceedings must necessarily be winding-up proceedings and must entail the appointment of a local liquidator. [FN184] Within the general definition of insolvency proceedings they fall in that class of proceedings which "involve realizing the assets of the debtor" by way of a liquidation. [FN185] These liquidation proceedings may end with a composition between the debtor and its creditors or through a plan. [FN186] They may also be ended before the completion of liquidation if there are insufficient assets to cover the costs and expenses of a prolonged administration of the case. [FN187] In addition to classical liquidation proceedings (similar to a Chapter 7 case under the United States Bankruptcy Code), unitary proceedings are also within the definition of winding-up proceedings. [FN188] These are proceedings such as those available under the new German system which allow parties in interest to propose plans which, if successfully put to a vote and confirmed by the court, may end in liquidation. Rehabilitation and composition proceedings, which do not normally aim at a liquidation (even if they allow liquidating plans) and most of which are not automatically converted to a liquidation in case no composition or plan is confirmed, are not winding-up proceedings. Proceedings framed upon the model of a Chapter 11 or a Chapter 13 case under the Bankruptcy Code would not be considered winding-up proceedings. [FN189] States are bound implicitly by the Convention to have at least one type of proceeding which qualifies as a winding-up proceeding.

As previously noted, [FN190] limiting secondary proceedings to liquidations was part of the overall compromise which led to the inclusion of practically all existing insolvency-related rehabilitation proceedings within the scope of the Convention. By opening a local liquidation proceeding, Member States can pull an emergency brake if they feel that unlimited recognition of foreign rehabilitation proceedings is unfair to their (or to their local creditors') interests.

*524 A territorial proceeding which is not a winding-up proceeding and which was opened before the main insolvency proceeding is opened will be converted into a winding-up proceeding on request of the main liquidator if such is, as often will be the case, in the interest of creditors in the main proceeding. [FN191] National law may also give the foreign liquidator the right to demand the termination, or closure, of such proceedings. If the main liquidator does not request conversion, a previously opened territorial rehabilitation proceeding may be continued as a secondary proceeding. But the rules on secondary proceedings apply only insofar as the progress of the territorial proceedings permit, *i.e.*, to the future administration of the case.

4. *Opening Requirements*

Once a main insolvency proceeding has been opened, other jurisdictions may not require a showing of insolvency for the opening of a requested secondary proceeding. [FN192] This accelerates and facilitates the opening of secondary proceedings. It also poses a check on States which may interpret insolvency overly broadly when opening main proceedings or when proposing questionable insolvency proceedings for inclusion in Annex A. Such States, and their debtors, will suffer a certain *ex jure* retaliation by way of possible automatic liquidations covering a debtor's foreign establishments.

5. *Authorized Filers*

Any person or authority authorized to file under the general insolvency law of the State where a secondary insolvency proceeding is sought has the right to request the opening of a secondary proceeding. [FN193] In addition, the foreign main liquidator has this right. [FN194] As was noted, even if no local creditors are interested in secondary proceedings, such proceedings may be useful for the foreign liquidator. [FN195] The debtor also has an unlimited right to file a secondary proceeding under the applicable national law. [FN196] As only winding-up

proceedings qualify as secondary proceedings, there is no risk that the debtor might file precipitously for a secondary rehabilitation merely to forestall a liquidation triggered by the foreign liquidator or a creditor. Frivolous filings which are obviously not based on a legitimate interest of the filing party may be rejected under the general insolvency laws of all Member States. [FN197] The Convention introduces no special legitimacy test for creditor filings, but this had been discussed for some time.

**\*525 6. Coordination Between Main and Secondary Proceedings**

Several provisions deal with the ancillary character of the secondary proceedings. The liquidators in the main and secondary proceedings must exchange any information that might be relevant to the other proceedings [FN198] and must cooperate in the administration of their estates so as to maximize the total value of the debtor's assets, permit a sale of the debtor's business as a going concern, or achieve a rehabilitation of the debtor (to the extent that this is possible in an insolvency proceeding within the scope of the Convention). [FN199] Any creditor has the right to lodge a claim in each of several proceedings where such claim may be allowable under the local general insolvency law. [FN200] In order to relieve creditors from the cost and burden of potentially having to lodge their claims in all the Member States of the EU, liquidators have the right and, if it serves the interest of such creditors, the duty to lodge claims lodged in "their" proceedings in any other proceeding. [FN201] This is so, notwithstanding the right of a creditor generally to withdraw its claim. [FN202]

Most importantly the liquidator in the main bankruptcy has the right to demand a stay of liquidation in the secondary proceedings whenever a stay is in the main estate's interest, particularly when such action permits all or part of the debtor's business to be sold as a going concern or to be reorganized. [FN203] Such a stay may not exceed three months upon a first request and another three months every time a renewed request is made. [FN204] In a distant analogy to the standard of adequate protection under § 361 of the United States Bankruptcy Code, the court may require adequate guarantees for the creditors in the secondary proceeding. [FN205] These may be furnished, not only for secured creditors, but also for the general body of creditors, or for any specific classes of them, such as certain priority creditors. [FN206] The court may also **\*526** order that the existing value of the estate be protected and that the debtor pay the time value of any dividend which creditors might receive automatically which will be delayed following a stay. [FN207] A German judge would certainly demand regular payments of contractual interest and payments compensating for any depreciation to secured creditors (oversecured and undersecured alike). [FN208]

An application for a stay allows the main liquidator to buy time, for example, in order to negotiate a settlement with the creditors of the secondary proceeding which may then allow her to remove the assets of the secondary proceeding to the main forum, use them there for a reorganization or for a sale of the debtor's business as a going concern, and then have the secondary proceedings closed without a liquidation.

A composition (or reorganization) in the secondary bankruptcy-if the applicable national law allows for such measures generally in territorial proceedings concerning an establishment of the debtor-may not be confirmed without the consent of the liquidator in the main bankruptcy, unless it is shown that the creditors in the main bankruptcy are not adversely affected. [FN209] Should a composition or reorganization plan in the secondary bankruptcy entail a discharge of creditors of the debtor with respect to assets that are not part of the secondary estate, the discharge will come into effect only with the consent of all creditors whose rights are affected by the discharge. [FN210]

When all claims allowed in a secondary bankruptcy can be paid in their entirety, the remaining assets must be transferred, in kind or in cash, as the case may be, to the liquidator in the main bankruptcy. [FN211] This may occur when some creditors, or certain large creditors, abstain (perhaps prompted by the liquidator in the main bankruptcy) from lodging their claims in the secondary proceedings.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                   Page 22
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

*7. Preservation Measures in the Secondary Forum*

A provisional liquidator in main proceedings, or a liquidator whose appointment is not yet effective in the main forum, certainly cannot be entitled *527 to trigger a full-blown secondary proceeding. But the Convention allows her to apply for any provisional measures which a secondary forum might take in the period between the filing and the opening of a local territorial proceeding. [FN212]

## F. ACCESS BY CREDITORS: LODGING CLAIMS IN FOREIGN PROCEEDINGS

*1. Nondiscrimination*

Chapter IV deals with the access of creditors to insolvency proceedings in the EU and with certain formalities of this access. The provisions of this chapter apply to all insolvency proceedings opened in the EU, *i.e.*, to main proceedings and territorial proceedings, including secondary proceedings.

Equal access of foreign and domestic creditors is the general standard in Member States. Discrimination among creditors of Member States according to their nationality would be unlawful under Article 7 of the EEC Treaty. [FN213] The Convention goes beyond pre-existing EU law, however, in two ways. *First*, it extends the principles of nondiscrimination to all creditors (even those of third-party nationality) whose domicile, habitual residence, or registered office is in a Member State other than the opening State. *Second*, it grants access to insolvency proceedings to tax authorities and social security authorities of other Member States. [FN214] The latter innovation is by no means minor. [FN215] The tenet that foreign sovereigns may not lodge claims in bankruptcies has a long tradition, and at least certain territories in Europe, for example, the Island of Jersey, still adhere to it. [FN216] It must be noted that the Convention does not extend the principle of nondiscrimination to priorities. All jurisdictions in Europe that have, for example, a fiscal privilege (priority) extended the concept of nondiscrimination only to claims of their own fiscal authorities. This will continue to be the case. The Convention guarantees nondiscriminatory access to the body of general creditors only.

*2. Lodging Claims by Foreign Creditors*

Known creditors which are domiciled or habitually resident, or, in the case of corporations, which have their registered office in the EU, must be individually notified, either by the court or by the liquidator, of the insolvency proceedings and of the deadlines and formalities to be observed by *528 creditors. [FN217] This information need be in the official language or in one of several official languages of the opening State only. [FN218] But a mention of the invitation to lodge claims and of the time limits for doing so must be given in all of the official languages of the EU. [FN219]

A creditor domiciled, for example, in a Member State other than the opening State may lodge a valid claim in the official language of his "home" State. The claim must then bear the heading "Lodgement of Claim" in all EU languages. [FN220] The creditor may later be required to produce a translation. [FN221] For such creditors, the Convention specifies the elements required for a valid lodgement. [FN222]

## G. JURISDICTION OF THE EUROPEAN COURT OF JUSTICE

As in the case of other EU Conventions under Article 220 of the EEC Treaty, notably the parallel Brussels Convention, the ECJ is given jurisdiction to interpret the Convention with binding effect on all Member States. [FN223] The ECJ may be accessed in two different ways: either by the highest national courts adjudicating insolvency matters which request a preliminary ruling in a matter pending before them, [FN224] or, in cases of divergence of national courts from a ruling of the ECJ or one of the highest insolvency courts of Member States, by a competent authority to be established in each Member State. [FN225] This latter possibility is limited to final

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 23

decisions; the ruling of the ECJ will not affect the matter which gave rise to a divergency application to the ECJ. [FN226]

In insolvencies, time is a resource almost as scarce as money. In most situations which create doubt about the proper interpretation of the Convention one cannot wait until the matter comes before the highest national court and the latter seeks a time-consuming preliminary decision of the ECJ. But, in a somewhat longer perspective, the precedents of the ECJ will no doubt play a leading role in the interpretation of the Convention.

### *529 CONCLUSION

### A. OUTLOOK FOR ADOPTION AND IMPLEMENTATION IN LIGHT OF THE UNITED KINGDOM'S REFUSAL TO SIGN

The Convention was finalized by the Council of Ministers (Justice Ministers) on November 23, 1995, and was immediately signed by twelve of the fifteen Member States. Two more States, the Netherlands and Ireland (the latter a common law country), followed suit within the signature period which ended on May 23, 1996. Surprisingly, late in May, 1996, the United Kingdom disclosed that it would refuse its signature to the Convention even though an official study committee of the House of Lords [FN227] and professional organizations had generally received the Convention favorably, albeit not enthusiastically. John Major, the present British Prime Minister, chose to hold the Convention hostage in his battle against the rest of Europe until the Commission lifted an embargo on British beef and cattle. Will the Convention now die of "mad cow disease" (bovine spongiform encephalopathy)? This author does not think so.

Certainly the text of the Convention will not be reopened for debate; it has been initialed by all fifteen governments and is therefore authentic. [FN228] As a Convention under Article 220 of the EEC Treaty, [FN229] the Convention requires signature and ratification by *all* Member States to become effective and that will occur only six months after the last ratification. [FN230] This leaves two practical possibilities. Either the Council of Ministers will reopen the Convention for signature and the United Kingdom will come along when enough British cattle have been incinerated and sufficient EU moneys sunk into British agriculture, or the fourteen Member States will choose to make a normal multilateral insolvency treaty among themselves, outside the scope of Article 220 of the EEC Treaty. What would be lost then are the rules on the European Court of Justice whose jurisdiction can only be created by consent of all Member States. In this author's view the first option will be the one chosen.

### *530  B.  THE  CONVENTION  AS  AUTHORITY  FOR  NATIONAL  AND  INTERNATIONAL HARMONIZATION EFFORTS

The Convention's effective date will no doubt be delayed. In the meantime, the Convention will be of great authority both in the case law and legislation of Member States and in international fora where a minimum standard of international cooperation in cross-border insolvencies is sought. When deliberating the Introductory Provision of the 1994 Insolvency Reform Act (*Insolvenzordnung*), [FN231] the Committee on the Judiciary of the German Parliament announced that it would likely adopt the Convention rules as the German system of international insolvency law. [FN232] Should it do so, the Convention regime would then be applied unilaterally, without reciprocity, *vis-a-vis* non-Member States of the EU.

The United Nations Commission on International Trade Law (UNCITRAL), at the urging of INSOL International, [FN233] has embarked on the development of a set of Uniform Legislative Provisions on Judicial Cooperation and Access and Recognition in Cases of Cross-Border Insolvency (model rules). [FN234] Whilst an instrument aiming at world-wide cooperation in insolvency matters must certainly be less ambitious than a regional Convention for the internal market of the EU, the UNCITRAL draft [FN235] will no doubt be much inspired by the Convention. This is likely to happen with respect to the provisions on access (nondiscrimination) for foreign

70 AMBKRLJ 485                                                                                        Page 24
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

creditors, the notion of distinguishing main and secondary proceedings according to the grounds for jurisdiction for each type of proceeding, the right of foreign representatives to file for secondary proceedings, the protection of security interests in foreign situated assets against the adverse impact of insolvency proceedings, and the "hotchpot" rule on distributions to creditors who obtained a dividend in a concurring proceeding. Automatic recognition of foreign main proceedings, as it has been introduced by the Convention, is likely to be included as one of the choices in the "menu" [FN236] of options the model rules will provide. Recognition may not necessarily mean the wholesale exportation of a foreign *531 bankruptcy's effects but may be limited to certain aspects, such as the right of the foreign representative to request an order of relief from courts and to access courts in the opening State for other purposes, such as avoidance actions. In line with the common law approach, cooperation of judges of several jurisdictions on a case-by-case basis will be much emphasized.

Until nations adopt the future model UNCITRAL provisions, and perhaps beyond that date, courts in jurisdictions not bound by the EU Convention may arrive at similar solutions by drawing on the principles set out and recommended in the Cross-Border Insolvency Concordat prepared by Committee J of the Section on Business Law of the International Bar Association (Concordat). [FN237] The Concordat recognizes the need to establish one forum as the main forum for bankruptcy proceedings concerning a debtor (Principle 1) and to coordinate a plurality of proceedings (Principles 2-4). [FN238] Also, the principle of nondiscrimination is established (Principle 2 D). The notion of limited proceedings where only secured and privileged (priority) claims are to be paid is very similar to secondary proceedings under the Istanbul Convention and departs from the choices made by the EU Convention.

Despite this and similar differences, the Concordat bears testimony, as do the UNCITRAL endeavors and the EU Convention, that a trend toward undogmatic, flexible, and problem-oriented mutual recognition and cooperation in insolvency is sweeping the World. The barren choice of either universality or territoriality of bankruptcy has almost lost its meaning. Intermediate principles and a functional outlook will rule the future of international insolvency.

[FNa1] Partner, Wilmer, Cutler & Pickering, Washington, D.C., London, Brussels, Berlin, heading the firm's Berlin office. The author served as permanent Chair of the EU Council Group on Bankruptcy and authored the draft EU Convention, was the expert for Germany in the Strasbourg negotiations for a Council of Europe Convention on Certain Aspects of Bankruptcy, and helped draft the German Insolvency Law Reform Act of 1994. He now serves, *inter alia*, on the German delegation to the UNCITRAL negotiations on Uniform Legislative Provisions on Judicial Cooperation and Access and Recognition in Cases of Cross-Border Insolvencies. The author is indebted to Ms. Pauline Koskelo of the European Investment Bank for valuable comments on an earlier draft of this Article. This Article is based upon a paper presented at the National Conference of Bankruptcy Judges, San Diego, California, October 16-19, 1996.

[FN1]. For discussion of the recent changes in the German law of insolvency, see Klaus Kamlah, *The New German Insolvency Act: Insolvenzordnung* 70 AM. BANKR. L.J. 417 (1996).

[FN2]. For a discussion of the French law of insolvency, see Richard L. Koral & Marie-Christine Sordino, *The New Bankruptcy Reorganization Law in France: Ten Years Later*, 70 AM. BANKR. L.J. 437 (1996).

[FN3]. Jacobellis v. Ohio, 378 U.S. 184, 197 (1964) (Stewart, J., concurring).

[FN4]. *See* Manfred Balz & Henry N. Schiffman, *Insolvency Law for Economies in Transition*, J. INT'L BANKING & FIN. L. 11, 19-25, 65-72 (1996). *See also* Honorable Samuel L. Bufford, *Bankruptcy Law in European Countries Emerging from Communism: The Special Legal and Economic Challenges*, 70 AM. BANKR. L.J. 459 (1996).

[FN5]. THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 7 (1986).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                      Page 25
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

[FN6]. The German Bankruptcy Act of 1877 (*Konkursordnung* (KO)), which is still in force in the Western territory of the Federal Republic of Germany, does not provide general rules for international insolvencies. It does contain a few provisions relating to certain aspects of cross-border insolvencies (KO §§ 5, 50, 56, 237, and 238), the most important of which are KO §§ 237 and 238. KO § 237 provides that the opening of bankruptcy proceedings in another jurisdiction does not preclude individual execution against the foreign debtor's assets situated in Germany. Under certain circumstances, KO § 238 permits the commencement of bankruptcy proceedings covering only a foreign debtor's assets situated in Germany.

Since many important issues are not dealt with in the German Bankruptcy Act, German courts played an important role in developing rules on international insolvencies. This was true even for the basic issue of whether bankruptcy proceedings have universal or only territorial effect. While German courts acknowledged the principle of universality for bankruptcies opened in Germany, for many years they held that foreign bankruptcy proceedings had only territorial effects, *i.e.* that they did not affect the foreign debtor's assets situated in Germany. It was not until 1985 that the Federal Court of Justice (*Bundesgerichtshof*) departed from these principles by extending the principle of universality to foreign insolvency proceedings and developed rules for the recognition of such proceedings in Germany. *See* Judgment of July 11, 1985, 95 Entscheidungen des Bundesgerichtshofes in Zivilsachen [BGHZ] 256.

In 1991, a special bankruptcy law, the Collective Enforcement Act (*Gesamtvollstreckungsordnung* (GesO)), was adopted in the territory of the former German Democratic Republic (GDR). It had been developed as the law of the former GDR in 1990 in the course of German reunification. GesO § 22 contains a provision dealing with the recognition of foreign bankruptcy proceedings in Germany and the possibility of opening bankruptcy proceedings covering only a foreign debtor's assets situated in Germany. Following the principles developed by the Federal Court of Justice, these rules for the territory of former East Germany were meant to be a temporary compromise between the legislation still in force in the Western part of Germany and the forthcoming new Insolvency Act (*Insolvenzordnung* (InsO)) which is designed to provide uniform legislation for Germany and which is a comprehensive reform of German insolvency law.

On October 18, 1994, the Insolvency Act and an Introductory Act to the Insolvency Act (*Einführungsgesetz zur Insolvenzordnung* (EG InsO)) were promulgated. Both will become effective on January 1, 1999. While the Government Insolvency Reform Bill of March 3, 1992 (*Regierungsentwurf* (RegE InsO)) contained rules for international insolvencies similar in substance to the provisions of the draft of the European Union Insolvency Convention (RegE InsO §§ 379-399), the German legislature did not adopt these rules in view of the expected completion of the work on that Convention. Instead, the legislature inserted Article 102 into the Introductory Act to the Insolvency Act which codifies two general principles of the current rules on international insolvencies developed by the Federal Court of Justice: (i) the recognition of foreign insolvency proceedings; and, at the same time, (ii) the possibility of domestic insolvency proceedings with territorial effect covering only assets situated in Germany. In addition, the Article contains a conflict rule for actions to set aside certain transfers completed prior to the commencement of insolvency proceedings. For the text and legislative materials of the aforementioned laws, see MANFRED BALZ & HANS-GEORG LANDFERMANN, DIE NEUEN INSOLVENZGESETZE [THE NEW INSOLVENCY LAWS] (1995). For a more detailed discussion of German insolvency law, see generally Kamlah, *supra* note 1.

[FN7]. This is the position of, for example, French, Belgian, and Luxembourg law. *See* Hans Arnold, *Internationales Insolvenzrecht [International Insolvency Law], in* GOTTWALD, INSOLVENZRECHTSHANDBUCH [INSOLVENCY LAW MANUAL] § 122 No. 61 (Munich 1990).

[FN8]. These are, for example, Denmark, Sweden, Ireland, and the Netherlands.

[FN9]. Section 304 of the Bankruptcy Code provides:

(a) A case ancillary to a foreign proceeding is commenced by a filing with the bankruptcy court of a petition under this section by a foreign representative.

(b) Subject to the provisions of subsection (c) of this section, if a party in interest does not timely controvert the petition, or after trial, the court may-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1) enjoin the commencement or continuation of-
(A) any action against-
(i) a debtor with respect to property involved in such foreign proceeding; or
(ii) such property; or
(B) the enforcement of any judgment against the debtor with respect to such property, or any act or the commencement or continuation of any judicial proceeding to create or enforce a lien against the property of such estate;
(2) order turnover of the property of such estate, or the proceeds of such property, to such foreign representative; or
(3) order other appropriate relief.

(c) In determining whether to grant relief under subsection (b) of this section, the court shall be guided by what will best assure an economical and expeditious administration of such estate, consistent with-
(1) just treatment of all holders of claims against or interests in such estate;
(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
(3) prevention of preferential or fraudulent dispositions of property of such estate;
(4) distribution of proceeds of such estate substantially in accordance with the order prescribed by this title;
(5) comity; and
(6) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 304 (1994).
[FN10]. *See* Swiss Law on Private International Law [Gesetz über das Internationale Privatrecht], arts. 166-175, SR 291, AS 1988, 1776.

[FN11]. A good overview is offered by Hans Hanisch, *Einheit oder Pluralität oder ein Kombiniertes Modell beim grenzüberschreitenden Insolvenzuerfahren?* [*Unity or Plurality or a Combined Model for Cross-Border Insolvency Proceedings?*], 15 ZEITSCHRIFT FüR WIRTSCHAFTSRECHT [ZIP] 1 (1994).

[FN12]. *Id.*

[FN13]. See Balz & Schiffman, *supra* note 4, for a description of the civil law system in Europe.

[FN14]. See Kurt H. Nadelmann, *Solomons v. Ross and International Bankruptcy* Law, 9 MOD. L. REV.. 154, 168 (1946) and Kurt H. Nadelmann, *Compositions, Reorganizations and Arrangements in the Conflict of Laws*, 61 HARV. L. REV.. 804 (1948) [hereinafter *Compositions*], for a masterly discussion of the various approaches and a criticism of the rigid civil law outlook.

[FN15]. The Maxwell group had substantial assets and subsidiaries both in the United Kingdom and in the United States. Both jurisdictions claimed to open main proceedings. The American judge, Brozman, and the English judge, Hoffmann, agreed to an informal protocol on the administration of this international case and to cooperation between the two jurisdictions. *See* Maxwell Communication Corp. v. Barclays Bank (*In re* Maxwell Communication Corp.), 170 B.R. 800 (Bankr. S.D.N.Y. 1994), *aff'd*, 186 B.R. 807 (S.D.N.Y. 1995), *aff'd*, 93 F.3d 1036 (2d Cir.1996).

[FN16]. *See* 28 U.S.C. § 1651 (1994) (courts of the United States have all writs powers to make orders "necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of the law"). *See also* 11 U.S.C. § 105 (1994).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07413-PKC    Document 17-6    Filed 06/03/2008    Page 28 of 41

70 AMBKRLJ 485                                                                                    Page 27
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

[FN17]. The European Union was established by the Treaty on European Union (Maastricht Treaty), Feb. 7, 1992, 1992 OJ No. C 224/1, 31 I.L.M. 247, by the Member States of the European Communities (European Community for Coal and Steel, European Economic Community, European Atomic Community) with the aim of creating an ever closer union between the peoples of Europe (Article A). It is based on the existing Communities and adds to their structure and competence three "Pillars" of closer cooperation among the Member States (foreign and security policy, justice and internal affairs). While scholars have disputed whether the EU as established by the Maastricht Treaty can be viewed as a separate legal entity (for a comprehensive discussion of this question, see Armin von Bogdandy & Martin Nettesheim, *Die Verschmelzung der Europäischen Gemeinschaften in der Europäischen Union* [*The Merger of the European Communities in the European Union*], 48 NEUE JURISTISCHE WOCHENSCHRIFT [NJW] 2324 (1995)), in this Article the term European Union (EU) is used to mean the European Communities in the structure established by the Maastricht Treaty. When this Article refers to events which took place before the Maastricht Treaty, it uses the term European Economic Community (EEC) to denote the relevant body on the Community level, since the activities relating to insolvency law took place in the legal and institutional framework of the EEC. The EEC was created by the Treaty Establishing the European Economic Community (Treaty of Rome), Mar. 25, 1957, 298 U.N.T.S. 11, which was renamed Treaty Establishing the European Community by the Maastricht Treaty of 1992. At present, the following countries are Member States of the EU: Austria, Belgium, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Luxembourg, the Netherlands, Portugal, Spain, Sweden, and the United Kingdom. The bodies of the EU are the Council of Ministers, the Commission, the Parliament and the Court of Justice.

[FN18]. The Council of Europe, founded on May 5, 1949, is a relatively loose international organization which promotes the cooperation of European countries, mainly in the area of human rights, justice, and cultural affairs. It is headquartered in Strasbourg, France. Most Eastern European countries, including Russia, are now Members. It is separate from the EU and should not be mistaken for the EU Council of Ministers (formerly the EEC Council of Ministers), which is often also referred to as the European Council.

[FN19]. These are the four fundamental freedoms of the Common Market as established by articles 30-73 of the Treaty of Rome.

[FN20]. The first Member States of the European Economic Community and the Signatories of the Treaty of Rome, *see supra* note 17, were Belgium, France, Germany, Italy, Luxembourg, and the Netherlands.

[FN21]. In comparative law, the legal systems of the Nordic or Scandinavian countries (Denmark, Sweden, Norway, Finland, and Iceland) are generally viewed as a single distinct group or type of legal system, distinct from the common law and the civil law. For historical and political reasons, they share a great many rules and principles, and they have a common style of legal reasoning. They were not influenced significantly by Roman law nor by the common law of England. *See, e.g.,* KONRAD ZWEIGERT & HEIN KöTZ, EINFüHRUNG IN DIE RECHTSVERGLEICHUNG [INTRODUCTION TO COMPARATIVE LAW] (3d ed., Tübingen 1996).

[FN22]. *See* Law Nos. 85-88 and 85-89 of January 25, 1985, subject to decrees 85-1388 and 85-1389 of December 27, 1955. *See also* Koral & Sordino, *supra* note 2, at 441. Recently the French insolvency law has been amended. *See* Law No. 94-475, June 11, 1994, 8440. *See also* Fernand Derrida & Jean-Pierre Sortais, *Reform of the Law on Enterprises in Difficulty*, [1994] CHRONIQUE 267.

[FN23]. *See* Kamlah, *supra* note 1, for a discussion of the German reform. Germany has had, up until now, one of the oldest bankruptcy statutes in force. After an unusually long and intense reform discussion, which started in 1978, in 1994 the German legislature enacted a complete overhaul of the existing insolvency law and created an entirely new insolvency law (*Insolvenzordnung*) which will come into force on January 1, 1999. *See supra* note 6. The legislature drew on an extensive comparative study of existing bankruptcy regimes, and, for the first time in German legislative history, the economic analysis of law and the precepts of institutional economics have had a direct and explicit impact on legislative policy. The philosophy of the new law is that it is not a legitimate function of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

bankruptcy to maintain inefficient firms in operation where this is not in the interest of creditors, to protect the debtor from its creditors, or to replace the rigor of the general private and commercial law by some sort of vague judicial equity. The new law introduced a unitary insolvency proceeding which, unlike the existing dichotomy of bankruptcy and composition (arrangement) proceedings (or Chapters 7 and 11 of the United States Bankruptcy Code), does not distinguish the procedural rules or their influence on the existing rights of claimants according to the expected outcome of the proceedings. All possible ways of dealing with the debtor's estate (especially its piecemeal liquidation, the transfer of viable business units to another entity, and conceivable mixes of these solutions) may be negotiated within a unitary set of rules. The unitary objective of proceedings is to maximize the value of the estate for the benefit of claimants according to their respective priority (the so- called absolute priority rule). This is why the proceedings are entirely creditor-driven and why the debtor has no right to impose its will over the creditors' interest or to "play with the money of creditors." This implies that there is no preference (as exists, for example, in the French law) for reorganization over liquidation. Also, orderly liquidation with a sale of entire business units is not generally preferred over the piecemeal liquidation of the debtor's assets. It is for creditors to decide which solution serves their interests best and to enforce it against the debtor and equity holders.

[FN24]. Based on Article 220 of the Treaty of Rome.

[FN25]. EC Doc. III/72/80, *reprinted in* 11 ZIP 582 (1990).

[FN26]. See GERHARD KEGEL ED., VORSCHLäGE UND GUTACHTEN ZUM ENTWURF EINES EG-KONKURSüBEREINKOMMENS [PROPOSALS AND LEGAL COMMENTS ON THE DRAFT EC CONVENTION ON INSOLVENCY] (Hamburg, 1988), for the full text and a critical evaluation of the proposals made since 1970.

[FN27]. It was called "*sous-masse comptable*" in the French official text.

[FN28]. *See, e.g.,* KEGEL, *supra* note 26, with contributions by, *inter alia,* Ulrich Drobnig, Hans-Jochem Lüer, Axel Flessner, Hans Hanisch, and Jürgen Thieme.

[FN29]. *See supra* note 18. The twenty Member States were Belgium, Cyprus, Denmark, Finland, France, Germany, Greece, Holy See, Ireland, Italy, Liechtenstein, Luxembourg, the Netherlands, Norway, Portugal, Spain, Sweden, Turkey, United Kingdom, and Switzerland.

[FN30]. European Convention on Certain International Aspects of Bankruptcy, *opened for signature* June 5, 1990, Europ. T.S. No. 136. The Istanbul Convention has not yet been ratified by three Member States of the Council of Europe and, thus, pursuant to Article 34, has not yet come into force. This is mostly due to the fact that EU States felt that a greater measure of cooperation is to be expected from the EU Convention.

[FN31]. *Id.,* art. 21.

[FN32]. Especially in the French and French-inspired legal doctrines, two methods of dealing with jurisdiction in international treaties are distinguished. Jurisdiction may be dealt with either directly or indirectly (*compétence directe* and *compétence indirecte,* respectively). In a system of *compétence directe,* jurisdiction is allocated among States in such a way that no other State can claim jurisdiction over a case with respect to which another State is authorized to act judicially. In a system of *compétence indirecte,* the parties agree only on certain conditions for the recognition of each other's decisions. *See* JAN KROPHOLLER, INTERNATIONALES PRIVATRECHT [PRIVATE INTERNATIONAL LAW] 496 (2d ed., Tübingen 1994).

[FN33]. Istanbul Convention, *supra* note 30, art. 4.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 29

[FN34]. *Id.*, art. 8.

[FN35]. *Id.*, art. 9.

[FN36]. *Id.*, art. 11(2).

[FN37]. *Id.*, art. 11(1), para. 1 and art. 10.

[FN38]. *Id.*, art. 14(1).

[FN39]. *Id.*, art. 14(2)(a).

[FN40]. As explained, *supra* note 17, the main bodies of the EEC/EU are the Council, Commission, Parliament, and Court of Justice. Usually all EEC/EU rules are drafted by the Commission and then passed on to the Council as the law-making body of the Communities. Here, the Council embarked on drafting exercises of its own. Also unique is the fact that the Working Group was chaired, not by a government official, but by a private practitioner (the author of this article).

[FN41]. European Union Convention on Insolvency Proceedings, *opened for signature* Nov. 23, 1995, 17 ZIP 976, 35 I.L.M. 1223 (1996).

[FN42]. This estimate is based on the fact that all Member States have to ratify the Convention and, to date, the signature of one Member State, the United Kingdom, is still missing. *See infra* notes 227-30 and accompanying text. Ratification will also require some States to make certain modifications in their bankruptcy laws in order to conform with the system of the Convention. *See* Manfred Balz, *Das Neue Europäische Insolvenzübereinkommen* [*The New European Convention on Insolvency Proceedings*], 17 ZIP 948 (1996).

[FN43]. Convention, *supra* note 41, art. 50.

[FN44]. Nov. 7, 1933, 155 L.N.T.S. [League of Nations Treaty Series] 115.

[FN45]. *See infra* notes 120-121 and accompanying text.

[FN46]. *See supra* notes 24-28 and accompanying text.

[FN47]. *See infra* notes 77-78 and accompanying text.

[FN48]. *See infra* notes 184-191 and accompanying text.

[FN49]. *See infra* notes 203-208 and accompanying text.

[FN50]. *See* Hanisch, *supra* note 11.

[FN51]. This is explained in detail only in the forthcoming Explanatory Report (Report) which was prepared by the two Reporters, Professor Miguel Virgós Soriano of Spain and Etienne Schmit of Luxembourg. The Report was discussed extensively and agreed to by the expert delegates but, unlike the Convention, was not formally approved by the Council of Ministers. Nonetheless, it will have considerable authority for courts in Member States. It will be published shortly by the EU Council Secretariate General. *See* Balz, *supra* note 42, at 948.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 30

[FN52]. The Convention is a multilateral treaty among States which, like any treaty, establishes rights and obligations between the parties only.

[FN53]. This is not spelled out in the Convention, but was the general understanding of delegations which will be reflected in the Report. *See* Balz, *supra* note 42, at 948.

[FN54]. Convention, *supra* note 41, art. 48(3). United States companies with one or more branch offices in Europe will, thus, not be affected. A European subsidiary of a United States company, on the other hand, would be affected.

[FN55]. The Commonwealth of Nations, founded in 1948, is a loose association of States whose territories were formerly part of the British Empire and who owe symbolic allegiance to the British Crown. Members are, for example, Australia, Canada, New Zealand, India, Malaysia, Bangladesh, Ghana, Gambia, Jamaica, the Bahamas, and Trinidad and Tobago. These countries generally have legal systems which are more or less influenced by English common law.

[FN56]. *See, e.g.*, Koral & Sordino, *supra* note 2; Kamlah, *supra* note 1.

[FN57]. For instance, Germany and France. *See* Manfred Balz, *Zur Reform des Französischen Insolvenzrechts* [*The Reform of French Bankruptcy Law*], 4 ZIP 1153 (1983).

[FN58]. Vergleichsordnung von 1935 (Composition Proceedings Act) § 38, 1935 Reichgesetzblatt [RGBI] 321, 356, as amended.

[FN59]. *Id.* § 78.

[FN60]. 11 U.S.C. § 1129(b)(2) (1994).

[FN61]. The German system, however, avoids some features of the Bankruptcy Code which were felt to be overly debtor-protective and which have come under criticism in the United States in recent years. Dean Thomas Jackson, one of the most articulate critics of Chapter 11 of the United States Bankruptcy Code, has mentioned to the author that the new German unitary proceedings, *see supra* note 23, do not give cause for such criticism. Most notably, the new German law does not allow the debtor to preempt a liquidation by filing for relief. The debtor does not have the exclusive right to file a plan for any period of time and the debtor is generally not left in possession. Adequate protection for secured creditors includes regular payments of contractual interest on the secured claim, which is seen as an effective barrier to delay.

[FN62]. Convention, *supra* note 41, art. 1(1).

[FN63]. This will be set out in the Report. *See* Balz, *supra* note 42, at 948.

[FN64]. This is not defined expressly in the Convention but will be explained in the Report.

[FN65]. Convention, *supra* note 41, art. 2(b).

[FN66]. This will be set forth in the Report.

[FN67]. Convention, *supra* note 41, art. 2(d).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                    Page 31
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

[FN68]. *Id.*, art. 1(1).

[FN69]. This will be set out in the Report. *See* Annex A to the Convention, in which the English voluntary proceedings are mentioned as follows: "Creditors' voluntary winding-up (with confirmation by the Court)."

[FN70]. Convention, *supra* note 41, art. 1(2).

[FN71]. Directives 73/239 of July 24, 1973 (OJ No. L 228/3) and 79/267 of March 5, 1979 (OJ No. L 63/1)-insurance companies; Directive 77/780 of December 12, 1977 (OJ No. L 322/30)-banks; Directive 93/22 of May 10, 1993 (OJ No. L 141/27)-securities firms; Directive 85/611 of December 20, 1985 (OJ No. L 375/3).

[FN72]. The Commission is, however, preparing a directive on the liquidation of banks.

[FN73]. The debate was rather pointless, insofar as any future EEC directive can doubtless depart from the Convention and establish a regime of its own for a given industry.

[FN74]. The Convention applies, of course, so long as the subsidiary of an insolvent parent is not subject to insolvency proceedings. The shares of the subsidiary are an asset in the parent's insolvency proceedings. The liquidator of the parent must be recognized as a representative of the parent (for example, in shareholder meetings) and will have standing (for example, in actions to obtain information, etc.). It is, however, for the applicable company law, and not for the law governing the insolvency, to determine whether a liquidator should have special rights in the subsidiary which an ordinary shareholder would not enjoy. Thus, for example, German law allows a liquidator of the parent to sell the shares of the subsidiary without the consent of other shareholders, even if the parent could not sell them without the consent of the other shareholders. From the principle of recognition, it would follow that the applicable local company law may not accord a liquidator from a Member State lesser rights than would be enjoyed by a liquidator of a local parent company. It would have been desirable for the Convention to be more specific on such issues.

[FN75]. *See supra* note 32 and accompanying text.

[FN76]. Convention, *supra* note 41, art. 3(1).

[FN77]. *Id.*, art. 3(2).

[FN78]. *Id.*, art. 27.

[FN79]. *Id.*, art. 21(1).

[FN80]. *See supra* note 33 and accompanying text.

[FN81]. Convention, *supra* note 41, art. 3(1), and explanations in the Report.

[FN82]. This will be set forth in the Report.

[FN83]. The possibility of seeking a preliminary decision by the European Court of Justice (ECJ) under Article 44 is academic in such situations because, under the Convention, only the highest courts of each Member State may access the ECJ. *See infra* notes 224-26 and accompanying text.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                                                    Page 32
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

[FN84]. *See supra* note 51.

[FN85]. The Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters (Brussels Convention), Sept. 27, 1968, 1972 OJ No. L 299/32, last amended by the San Sebastian Convention, May 26, 1989, 1989 OJ No. L 285, on the occasion of the accession of Spain and Portugal to the European Communities, is applicable among EU Member States and governs international jurisdiction as well as the enforcement of judgments in civil and commercial cases.

[FN86]. Convention, *supra* note 41, art. 3(2).

[FN87]. *Id.*, art. 2(h). This definition is broader than the definition used in Article 5(5) of the Brussels Convention.

[FN88]. *Id.*, art. 3(2).

[FN89]. *Id.*

[FN90]. In France and in countries inspired by the French Napoleonic *Code de Commerce* for instance, individuals who are not traders (*commerçants*) are not subject to bankruptcy proceedings, whereas they are in England, Germany, and the Nordic countries.

[FN91]. Convention, *supra* note 41, art. 3(4).

[FN92]. *Id.*, arts. 4-15.

[FN93]. This principle follows from the insertion of these rules in Chapter I (General Provisions). This is provided, of course, that the Convention is applicable because the debtor has the center of its main interests in the European Union. *See supra* notes 53-54 and accompanying text.

[FN94]. This will be set out in the Report. It follows from the fact that the Convention provides that rules, other than rules of bankruptcy law, are rules of Contracting States only.

[FN95]. Convention, *supra* note 41, art. 4.

[FN96]. *Id.*, art. 4(2).

[FN97]. *See* Nadelmann, *Compositions, supra* note 14, at 827. Another version of this doctrine is the rule in some countries that discharge affects only contracts that are governed by the law of the bankruptcy forum. *See* Arnold, *supra* note 7, at § 122.

[FN98]. Convention, *supra* note 41, art. 5(1). Article 5(2) contains a rather elaborate typological explanation (not a precise definition) of what is meant by a right *in rem*, a concept which apparently is not used in a technical sense by English and Irish common law but only in writings of English and Irish analytical jurisprudence. Suffice it to say that liens (judicial, statutory, and contractual), mortgages, pledges, and security interests within the meaning of Article 9 of the Uniform Commercial Code would all be consid ered to be rights *in rem*. It is understood that floating charges which encumber the debtor's assets in their entirety and which arise only on the advent of a debtor's insolvency or some other defined financial crisis qualify as rights *in rem*. Such floating charges are common in England and Ireland and, albeit to a lesser extent, in Sweden and Finland.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 33

[FN99]. *Id.*, art. 7(1).

[FN100]. *Id.*, art. 5(4).

[FN101]. *Id.*, art. 29(a).

[FN102]. *Id.*, art. 1(g).

[FN103]. *See, e.g.,* KROPHOLLER, *supra* note 32, at 460.

[FN104]. Convention, *supra* note 41, art. 1(g).

[FN105]. *Id.*, art. 6(1).

[FN106]. Obviously, this rule is not applicable if the law of the opening State allows setoff under these circumstances. *Id.*, art. 4.

[FN107]. European laws studied by this author do not extend the automatic stay to setoff, as does the United States Bankruptcy Code. *See* 11 U.S.C. § 362(a)(7) (1994).

[FN108]. Convention, *supra* note 41, art. 6(2).

[FN109]. *Id.*, art. 4. *See supra* note 96 and accompanying text.

[FN110]. *Id.*, art. 10.

[FN111]. *Id.*, art. 8.

[FN112]. *Id.*, art. 7(2).

[FN113]. *See, e.g.,* Arnold, *supra* note 7, at § 122 Nos. 118-124.

[FN114]. Convention, *supra* note 41, art. 4. *See supra* note 96 and accompanying text.

[FN115]. *Id.*, art. 13.

[FN116]. *Id.*, art. 15.

[FN117]. *Id.*, art. 9(1).

[FN118]. *Id.*, art. 9(2).

[FN119]. Other conflicts rules of somewhat lesser interest deal with the effect of foreign insolvency proceedings on rights subject to registration (*id.*, art. 11) and with the treatment to be given to Community patents and trademarks (*id.*, art. 12).

[FN120]. *Id.*, art. 3. *See supra* notes 53-54 and accompanying text.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 34

[FN121]. *Id.*, arts. 16(1), 17(1).

[FN122]. *Id.*, art. 16(3).

[FN123]. *Id.*, art. 16(1), para. 1.

[FN124]. *Id.*, art. 16(1), para. 2.

[FN125]. Since under French law, France could not open a secondary proceeding if the debtor had a local branch office in France, the German proceeding would thus enjoy greater universality in France than in such other establishment States where a secondary proceeding might be possible.

[FN126]. Convention, *supra* note 41, art. 17(1).

[FN127]. This rule implies that all proceedings opened by the main forum are universal, *i.e.*, reach out to extraterritorial assets. All proceedings listed in Annex A are now such universal proceedings. One may question whether the Convention binds the Member States to attach such universal effects to all types of proceedings opened by a main forum. This author would answer the question in the negative; but this is a matter for further academic study.

[FN128]. Convention, *supra* note 41, arts. 5, 7.

[FN129]. *Id.*, art. 18(1).

[FN130]. *Id.*, art. 17(2).

[FN131]. *Id.*, art. 18(2).

[FN132]. *Id.*

[FN133]. *Id.*, art. 17(2).

[FN134]. *Id.*, art. 34(2).

[FN135]. *Id.*

[FN136]. *Id.*

[FN137]. *Id.*, art. 18(1).

[FN138]. *Id.*, art. 18(3).

[FN139]. *Id.*

[FN140]. For real estate, all EU Member States have formal and court supervised auctioning proceedings which, under the Convention, will apply if a foreign bankruptcy law entitles the liquidator to use an auction.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

[FN141]. Convention, *supra* note 41, art. 18(3).

[FN142]. In the Report this will be listed as a typical example of coercive powers which are withheld from a foreign liquidator.

[FN143]. Convention, *supra* note 41, art. 19, para. 1.

[FN144]. Hague Convention on the Exemption of Foreign Public Documents, Oct. 5, 1961, 527 U.N.T.S. 189.

[FN145]. Convention, *supra* note 41, art. 19, para. 2.

[FN146]. This follows from a general understanding among Member States about the burden of proof. It will be explained in detail in the forthcoming Report.

[FN147]. Convention, *supra* note 41, art. 20(1).

[FN148]. *Id.*

[FN149]. This is implied in *id.*, art. 20(2).

[FN150]. *Id.*

[FN151]. 11 U.S.C. § 508(a) (1994) contains practically the same rule for cases where a creditor received a dividend in a foreign proceeding and then claims payment in a United States proceeding.

[FN152]. Provided, again, that the debtor's center of main interests is in the EU. In other situations, jurisdictions are free to do what their own law dictates.

[FN153]. Convention, *supra* note 41, art. 21.

[FN154]. *Id.* A similar rule applies for the registration of the insolvency proceedings in public registers, such as the company register or a land register (*id.* art. 22).

[FN155]. *Id.*, art. 24.

[FN156]. *Id.*

[FN157]. *See supra* note 85. For a discussion of the Brussels Convention, see Reports by Paul Jenard and Peter Schlosser, 1979 OJ Nos. C 59/1 and C 59/71. For a discussion of the San Sebastian Convention, see Report by Martinho de Almeida Cruz, Manuel Desantes Real and Paul Jenard, 1990 OJ No. C 189/35; *see also* ALBERT V. DICEY & JOHN H.C. MORRIS, 1 THE CONFLICT OF LAWS Pt. 3, Chs. 11, 14 (12th ed., 1993).

[FN158]. *See* Brussels Convention, *supra* note 85, art. 1(2).

[FN159]. *See e.g.* ECJ, Case 133/78, Gourdain v. Nadler, [1979] E.C.R. 733.

[FN160]. ECJ, Case 143/78, DeCavel v. DeCavel, [1979] E.C.R. 1055.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN161]. Convention, *supra* note 41, art. 25(1).

[FN162]. *Id.*

[FN163]. *Id.*

[FN164]. *Id.*

[FN165]. Brussels Convention, *supra* note 85, arts. 31-51.

[FN166]. Convention, *supra* note 41, art. 25.

[FN167]. Brussels Convention, *supra* note 85, arts. 29, 34.

[FN168]. Convention, *supra* note 41, art. 26.

[FN169]. *See supra* notes 126-129 and accompanying text.

[FN170]. *See supra* notes 46-50 and accompanying text.

[FN171]. *See supra* notes 98-104 and accompanying text.

[FN172]. *See supra* notes 24-28 and accompanying text.

[FN173]. 11 U.S.C. § 304 (1994).

[FN174]. Istanbul Convention, *supra* note 30, art. 21.

[FN175]. *Id.*

[FN176]. In their recent reforms, Austria and Germany abolished priorities for all nonadministrative claims. Similar action has been taken by Denmark, Finland, and Sweden.

[FN177]. Convention, *supra* note 41, art. 32(1).

[FN178]. *Id.*, art. 28.

[FN179]. *See infra* notes 182-212 and accompanying text.

[FN180]. Convention, *supra* note 41, art. 28.

[FN181]. One may question whether this would also be true with respect to who may be a debtor. In the hypothetical, *see* note 125 and accompanying text, a German main insolvency of a French nontrader where France would have to recognize the German proceedings but could not open secondary proceedings to protect its local interests, it might be considered useful and therefore permissible for France to introduce access to general insolvency proceedings for nontraders only in situations where foreign main proceedings are opened concerning a nontrader with an establishment in France. Under Article 7 of the EEC Treaty, France could not, however, discriminate against foreign nontraders.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485
70 Am. Bankr. L.J. 485
(Cite as: 70 Am. Bankr. L.J. 485)

Page 37

[FN182]. *Supra* notes 86-89 and accompanying text.

[FN183]. Convention, *supra* note 41, art. 27.

[FN184]. *Id.*

[FN185]. Convention, *supra* note 41, art. 2(c).

[FN186]. *Id.*

[FN187]. *Id.*

[FN188]. *See* Annex B to the Convention. This will be explained in detail in the Report.

[FN189]. A list of such proceedings (Annex B) and a list of liquidators (Annex C) have been drawn up which are binding, exactly like Annex A, on insolvency proceedings in general, unless modified in a special revision procedure (Article 54).

[FN190]. *See supra* notes 56-69 and accompanying text.

[FN191]. Convention, *supra* note 41, art. 37.

[FN192]. *Id.*, art. 27.

[FN193]. *Id.*, art. 29(b).

[FN194]. *Id.*, art. 29(a).

[FN195]. *See supra* text accompanying note 171

[FN196]. Convention, *supra* note 41, art. 29(b).

[FN197]. This follows from Article 28 of the Convention.

[FN198]. The Convention contains no provisions requiring liquidators in several secondary insolvency proceedings to cooperate. In such situations the liquidator in the main case acts as a clearing house for information relevant to more than one secondary liquidator.

[FN199]. Convention, *supra* note 41, art. 31. The unitary proceeding under the 1994 German Insolvency Reform Act, discussed *infra* note 208, is such a proceeding. It allows for the possibility of a reorganization within a liquidation structure.

[FN200]. *Id.*, art. 32(1).

[FN201]. *Id.*, art. 33(1).

[FN202]. *Id.* Unfortunately, a further rule empowering the liquidator to exercise voting rights of a creditor who

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

abstains from voting in creditors' meetings or committees or on a plan or composition in any other proceeding (which had been contained in earlier drafts of the author) was not adopted. Member States felt such a role to be alien to the normal function of a liquidator.

[FN203]. *Id.*, art. 33. This concept emerged from a discussion between the author and Professor Stefan Riesenfeld of the University of California at Berkeley School of Law.

[FN204]. *Id.*

[FN205]. *Id.*

[FN206]. *Id.*

[FN207]. *Id.*

[FN208]. Under the new German Insolvency Law of 1994, *supra* note 23, even undersecured creditors receive regular contractual interest payments if the stay continues after an observation period of no more than three months (InsO § 169), as well as compensation for any depreciation of the collateral (InsO § 172). The former rule was inspired by Thomas H. Jackson, *Of Liquidation, Continuation, and Delay: An Analysis of Bankruptcy Policy and Nonbankruptcy Rules*, 60 AM. BANKR. L.J. 399 (1986). *See also* Manfred Balz, Logik und Grenzendes Insolvenzrechts [*The Logic and Limits of Insolvency Law*], 9 ZIP 1438, 1441 (1988).

[FN209]. Convention, *supra* note 41, art. 34(1). This idea is faintly similar to the "best interests test" for plan confirmation in a Chapter 11 case. *See* 11 U.S.C. § 1129(7)(A)(ii) (1994).

[FN210]. Convention, *supra* note 41, art. 34(2).

[FN211]. *Id.*, art. 35.

[FN212]. *Id.*, art. 38.

[FN213]. *See supra* note 17.

[FN214]. Convention, *supra* note 41, art. 39.

[FN215]. Germany tied her acceptance of the provisions limiting insolvency jurisdiction for territorial proceedings to establishments (instead of any assets) to the adoption of this rule.

[FN216]. This may keep Jersey from declaring the Convention applicable on the Island. The author is grateful to Mr. Michael Wilkins, Viscount of the Royal Court of Jersey, for this information.

[FN217]. Convention, *supra* note 41, art. 40.

[FN218]. *Id.*, art. 42(1).

[FN219]. *Id.*, arts. 40 and 42(1).

[FN220]. *Id.*, art. 42(2).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[FN221]. *Id.*

[FN222]. *Id.*, art. 41.

[FN223]. *Id.*, art. 43.

[FN224]. *Id.*, art. 44. This procedure is patterned on Article 177 of the Treaty of Rome.

[FN225]. *Id.*, art. 45(1).

[FN226]. *Id.*, art. 45(2).

[FN227]. Chaired by Lord Hoffmann who served as the English judge in the *Maxwell Communication* case. *See supra* note 15.

[FN228]. *See* Vienna Convention on the Law of Treaties, May 23, 1969, art. 10, 1155 U.N.T.S. 331.

[FN229]. Article 220 of the Treaty of Rome provides, *inter alia*:
> Member States shall, so far as is necessary, enter into negotiations with each other with a view to securing for the benefit of their nationals: ... the simplification of formalities governing the reciprocal recognition and enforcement of judgments or courts or tribunals and of arbitration awards.

Treaty of Rome, *supra* note 17, art. 220. The Legal Services held, in accordance with existing EU practice, that an Article 220 Convention requires signature and ratification by all Member States.
[FN230]. Convention, *supra* note 41, art. 49.

[FN231]. *See supra* notes 6, 23.

[FN232]. BALZ & LANDFERMANN, *supra* note 6, at 663.

[FN233]. INSOL International is a world-wide association of insolvency practitioners.

[FN234]. The proposed course of action is to provide States with a menu of more or less equivalent solutions to the basic issues of international insolvencies, such as the recognition of foreign cases, and the access of liquidators and creditors to foreign jurisdictions.

[FN235]. UNCITRAL has held two government conferences so far: Vienna, October 30-November 10, 1995; and New York, April 1-12, 1996. Its documents are of limited distribution and not generally accessible.

[FN236]. The author derived such a menu of functional equivalents both from the (then draft) EU Convention and the Istanbul Convention, which would be suitable for a multitude of jurisdictions with different legal traditions, and presented it in an unpublished discussion paper prepared for a colloquium on "Roads Toward World-Wide Minimum Cooperation in Transborder Insolvencies" held jointly by UNCITRAL and INSOL in Vienna, April 17-19, 1994.

[FN237]. The Concordat was finalized by the International Bar Association at its September, 1995, conference in Paris, France. One United States bankruptcy court has already cited the Concordat as authority for a decision on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

70 AMBKRLJ 485                                                    Page 40
70 Am. Bankr. L.J. 485
**(Cite as: 70 Am. Bankr. L.J. 485)**

cross-border insolvency issues. *See In re Hackett, 184 B.R. 656 (Bankr. S.D.N.Y. 1995)*. For a more detailed discussion of the Concordat, *see* Anne Nielsen et al., *The Cross-Border Insolvency Concordat: Principles to Facilitate the Resolution of International Insolvencies*, 70 AM. BANKR. L.J. 533 (1996). *See also* Mike Sigal et al., *The Law and Practice of International Insolvencies, Including a Draft Cross-Border Insolvency Concordat*, 1994-95 ANN. SURV. BANKR.. L. I.

[FN238]. The Concordat contains no binding and detailed rules but rather broad principles meant to be guidelines for judges sitting on international bankruptcy matters.

70 Am. Bankr. L.J. 485

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.