# EXHIBIT 14

# THE EC REGULATION ON INSOLVENCY PROCEEDINGS

## A Commentary and Annotated Guide

EDITED BY
GABRIEL MOSS QC IAN F. FLETCHER LLD
STUART ISAACS QC

OXFORD

# 4

# CHOICE OF LAW RULES

| | |
|---|---|
| A. **Preliminary** | 4.01 |
| B. **General Principles** | 4.02 |
| *Renvoi* | 4.04 |
| C. **The Basic Choice of Law Rule (Article 4): *Lex Concursus*** | 4.05 |
| Transaction avoidance | 4.08 |
| D. **Exceptions to the Basic Rule (Articles 5–15)** | 4.11 |
| Exception I: third parties' rights in rem (Article 5) | 4.12 |
| Exception II: set-off (Article 6) | 4.22 |
| Exception III: Reservation of title (Article 7) | 4.27 |
| Exception IV: contracts relating to immoveable property (Article 8) | 4.31 |
| Exception V: payment systems and financial markets (Article 9) | 4.32 |
| Exception VI: contracts of employment (Article 10) | 4.33 |
| Exception VII: rights subject to registration (Article 11) | 4.35 |
| Exception VIII: community patents and trade marks (Article 12) | 4.37 |
| Exception IX: protection of third-party purchasers (Article 14) | 4.38 |
| Exception X: effects on pending lawsuits (Article 15) | 4.41 |

## A. Preliminary

**4.01** This chapter provides an overview of the uniform rules of choice of law which are applicable to all proceedings governed by the EC Regulation. These rules are contained in Articles 4–15 inclusive. Commentary on the individual Articles is supplied in chapter 8 below.

## B. General Principles

**4.02** Articles 4–15 amount to a miniature code of uniform conflicts rules which are integral to the Regulation's operation. Because the member states' domestic insolvency laws remain unharmonized at present, it is essential that there should be clear, and uniform, rules to determine which state's law is to be applicable to issues which will typically be encountered during the course of insolvency proceedings. This enables affected parties to calculate in advance the legal risks inherent in their relationship with a debtor whose circumstances bring it within the ambit of the

Regulation in the event of insolvency. The uniform rules indicate, as between various member states and also third states whose laws may potentially be applicable in a given situation, which state's law shall in fact govern. In most cases, the rules contemplate a choice only as between the laws of different member states. In certain situations however the drafting of the relevant provision clearly allows for the possibility that the law of some third state may be applicable, if the specified connecting factor leads to that result in the circumstances of a given case. Those instances are noted below in discussing the contents of Articles 5–15.

**4.03** Apart from the instances just mentioned, however, the Regulation is so drafted as to confine the scope of the uniform choice of law rules to cases where the relevant contacts give rise to a choice between the laws of different member states. Consequently, where the facts of a case raise the issue of the potential application of the law of a non-EU state, it is left for each member state to resolve the conflict according to its own rules of private international law. As is emphasized in paragraph 44 of the *Virgos-Schmit Report*,[1] in relation to the equivalent provisions embodied in the 1995 version of the Convention, the choice of law provisions are deliberately limited to regulating the 'intra-Community effects' of insolvency proceedings: where non-member states are concerned it is the responsibility of each member state to define the appropriate conflict rules. This is, unfortunately, a recipe for instability and uncertainty, particularly where the assets to which the alternating conflicts rules are to apply are mobile, and therefore capable of being subject to different rules according to their whereabouts at the relevant time. Variability of outcome will therefore remain a possibility for cases where the potentially applicable law is that of some third state, as the choice of law rules of different member states could give rise to the application of different laws in cases with identical material facts. The crucial question will therefore be which member state's courts have jurisdiction, according to the rules described in chapter 3 above. This is a factor to be borne in mind when calculating the effects of the Regulation's choice of law rules on such important matters as agreements for the effecting of security, reservation of title agreements, interests in property which is subject to public registration, contracts of employment and contracts relating to immoveable property, and on the rights and obligations of parties operating in regulated financial markets.[2]

*Renvoi*

**4.04** An important general point about the choice of law provisions in the Regulation

[1] See also para 93 of the Report, and also M Balz, 'The European Union Convention on Insolvency Proceedings' (1996) 70 American Bankruptcy LJ 485 at 507. On the *Virgos-Schmit Report* to the former EC Convention project, and its status as an aid to interpretation of provisions contained in the Regulation on Insolvency Proceedings, see para 1.06 above, n 10 and text thereto.

[2] See section D below.

is that wherever they make reference to 'the law', this denotes the substantive, domestic law of the member state concerned. The complexities—not to say inconsistencies—of the doctrine of *renvoi* are not intended to form part of the approach to be followed under the Regulation. In modern treaties which embody uniform conflicts rules, it is quite often the case that a specific provision is included to the effect that references to the law of a state or country are not to be interpreted as including a reference to the choice of law rules which are in force there.[3] Indeed, to allow recourse to *renvoi* would defeat the very objective of seeking to harmonize choice of law rules by means of such an international agreement. The EC Insolvency Regulation is intended to follow this approach, although no express provision to that effect was incorporated into the actual text.[4]

## C. The Basic Choice of Law Rule (Article 4): *Lex Concursus*

**4.05** Article 4 expresses the basic principle that the law of the member state in which proceedings are opened according to the Regulation (referred to as 'the state of opening') is to be applied to those proceedings, and shall determine their effects, except in so far as the Regulation expressly provides to the contrary. The matters which are to be governed by the law of the state of opening (the *lex concursus*) are mentioned in a non-exhaustive list in Article 4(2), while the particular exceptions to the regime of the *lex concursus* are contained in Articles 5 to 15. The opening words of Article 4(2) supply a broad proposition to the effect that the law applicable to insolvency proceedings and their effects shall be that of the member state within the territory of which such proceedings are opened. Paragraph (2) of the Article further declares that the law of the state of the opening of proceedings shall determine the conditions for the opening of those proceedings, their conduct and their closure. Under this formula, many matters of substance are determined by the law of the state of opening, as well as all matters of a procedural nature which, in conformity with accepted principles of conflict of laws, are governed by the *lex fori*.

**4.06** Further to this general proposition, thirteen particular matters are singled out for special mention in Article 4(2) as being for determination by the *lex concursus*. These are:

(a) against which debtors insolvency proceedings may be brought on account of their capacity;

[3] See eg EC Convention on the Law Applicable to Contractual Obligations (the Rome Convention) of 19 June 1980, Art 15 (which has the heading 'Exclusion of *renvoi*'): 'The application of the law of any country specified by this Convention means the application of the rules of law in force in that country *other than its rules of private international law*' (emphasis added).

[4] See *Virgos-Schmit Report* (n 1 above), para 87.

(b) the assets which form part of the estate and the treatment of assets acquired by or devolving on the debtor after the opening of the insolvency proceedings;

(c) the respective powers of the debtor and the liquidator;

(d) the conditions under which set-offs may be invoked;[5]

(e) the effects of insolvency proceedings on current contracts to which the debtor is party;[6]

(f) the effects of the insolvency proceedings on proceedings brought by individual creditors, with the exception of lawsuits pending;[7]

(g) the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings;

(h) the rules governing the lodging, verification and admission of claims;

(i) the rules governing the distribution of proceeds from the realization of assets, the ranking of claims and the rights of creditors who have obtained partial satisfaction after the opening of insolvency proceedings by virtue of a right in rem or through a set-off;[8]

(j) the conditions for and the effects of closure of insolvency proceedings, in particular by composition;

(k) creditors' rights after the closure of insolvency proceedings;

(l) who is to bear the costs and expenses incurred in the insolvency proceedings;

(m) the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to all the creditors.[9]

**4.07** Although many of the matters referred to in paragraphs (a) to (m) above are largely self-explanatory, some comments are appropriate here. Paragraph (a) is particularly significant in view of the wide diversity between the insolvency laws of the fifteen EU member states concerning the types of debtors to which the different kinds of insolvency proceedings are applicable.[10] Variations also occur with regard to the treatment of after-acquired property, the composition of the estate available for distribution among creditors, and the extent to which certain assets

[5] See however section D below, in relation to the effect of Art 6 (Exception II).

[6] See section D below, in relation to Art 8 (Exception IV).

[7] See section D below, in relation to Art 15 (Exception X).

[8] See section D below, in relation to Arts 5 and 6 (Exceptions I and II).

[9] The provision in Art 4(2)(m) is given precedence over the special rules in favour of the application of some law other than the *lex concursus*, in Arts 5, 6, and 7: see Arts 5(4), 6(2), and 7(3). However, paragraph (m) is expressly prevented from applying in cases which fall within Art 13 (acts detrimental to all the creditors).

[10] As stated in para 3.19, above, at n 14, under the laws of Belgium, France, Greece, Italy, Luxembourg, Portugal, and Spain, respectively, insolvency proceedings cannot take place in relation to debtors who are not classified as traders (*commerçants*). In the case of Italy, Art 2083 of the Civil Code also excludes small-scale traders (*piccoli imprenditori*) from the operation of the bankruptcy law.

are exe (b) brir (g), (h). openin includi post-co admissi of divid proof fc forcem followe graph (their po referenc

Transac

The poi tions, ai opening Moreov jurisdict basic rul wise of provisio to deter or avoid erwise h vened.[12] Article 4 rule of t is to occ creditor ber state does not thereby tion wh unimpe the inso

[11] See l

[12] *Virg*

[13] *Virg*

are exempt from forming part of it. These are among the issues which paragraph (b) brings under the control of the *lex concursus*. The importance of paragraphs (g), (h), and (i) should also be noted, since they ensure that the law of the state of opening is determinative of each stage of the process of distribution of the estate, including the matter of what debts are, and are not, provable; the treatment of post-commencement claims against the estate; all aspects bearing upon proof and admission of claims; and the vital question of the ranking of claims for purposes of dividend, and also the treatment of partly-secured creditors who wish to lodge proof for the balance of any claim which has been partly recouped through the enforcement of in rem security or the operation of set-off. The basic approach to be followed in relation to set-off is also that of the state of opening by virtue of paragraph (d), so that parties' expectations of how the doctrine of set-off will affect their position in the event of their debtor's insolvency are primarily determined by reference to the law of the state where insolvency proceedings can be opened.[11]

**Transaction avoidance**

**4.08** The potential for impeachment of an insolvent debtor's pre-bankruptcy transactions, and likewise of any acts or dispositions of property carried out after the opening of proceedings, is one of the key aspects of the insolvency process. Moreover, the relevant rules are subject to crucial variations as between different jurisdictions. Hence the importance of Article 4(2)(m), which establishes the basic rule that the *lex concursus* shall be applied to determine the validity or otherwise of the debtor's legal acts detrimental to the general body of creditors. This provision is particularly far-reaching in its effect, because it is intended not merely to determine what procedural steps must be taken to bring about the invalidation or avoidance of such transactions, but also to displace any law which might otherwise have been applicable to govern the transaction, had bankruptcy not supervened.[12] However, Article 13 superimposes a rule whose effect is to disapply Article 4(2)(m) in certain circumstances, with the consequence that the avoidance rule of the *lex concursus* is displaced in favour of the rule of some other state. This is to occur where the person who benefited from a legal act detrimental to all the creditors provides proof that: (i) the act in question is subject to the law of a member state other than that of the state of opening of proceedings; and (ii) that law does not allow any means of challenging that act in the relevant case. Protection is thereby given to parties who have reasonably relied upon the validity of a transaction whose governing law happens to be that of a member state, and which is unimpeachable under the concrete circumstances of the case according to both the insolvency law and the general law of that state.[13]

---

[11] See however Art 6, discussed in section D below.

[12] *Virgos-Schmit Report* (n 1 above), para 90. See also Balz (n 1 above)at 511–12.

[13] *Virgos-Schmit Report*, paras 135–9.

**4.09** A further notable effect of Article 4(2)(m) is that it has been designed to surmount one of the controversial aspects of the application of transaction avoidance rules in cases of conflict of laws, namely the possibility of cumulative application of the rules of more than one system in order to decide whether the transaction is valid. The rule supplied by paragraph (m) ensures that under most circumstances only a single avoidance rule—that of the *lex concursus*—is applicable. This greatly simplifies the task of the liquidator in seeking to bring about the avoidance of such transactions. However, in the special situation covered by Article 13 the other party to the transaction with the debtor is effectively allowed to interpose, by way of defence to any attack based upon the avoidance rule of the *lex concursus*, the fact that it is valid and unimpeachable according to the law by which it is properly governed.

**4.10** The above account of the dominant role accorded to the *lex concursus* serves to emphasize the substantial benefits which accrue from the opening of proceedings within the scope of application of the EC Regulation. The basic choice of law rule established by Article 4 applies both to main proceedings within Article 3(1) and to territorial proceedings (whether secondary or freestanding) within paragraphs (2) to (4) of that Article.[14] This supplies one of the main reasons for parties to avail themselves of any opportunity to bring about the commencement of secondary insolvency proceedings under the Regulation, since this will result in the application of the law of that member state, instead of the law of the state in which the main proceedings have been opened, to the process of administering and distributing the assets located within the state in which the secondary proceedings take place.

## D. Exceptions to the Basic Rule (Articles 5–15)

**4.11** Article 4 opens with the significant words of exception: 'Save as otherwise provided in this Regulation . . .'. The primary rule in favour of the application of the *lex concursus* is therefore subject to displacement under specified circumstances. The provisions which establish the particular cases of exception are contained in Articles 5 to 15 inclusive. These will be examined in turn.

**Exception I: third parties' rights in rem (Article 5)**

**4.12** The first major exception to the *lex concursus* rule of Article 4 is provided by Article 5, whose purpose is to confirm the rights of parties to enter into transactions under which proprietary interests are created in favour of a creditor by way of se-

[14] See Recital (23) to the Regulation. On the distinction between main and territorial (secondary) proceedings, and the criteria for opening them, see ch 3, section C above.

curity for the debt or obligation due from the debtor. In practice, the essential purpose of such forms of security is that it enables the secured party to have direct recourse to the collateral in the event that the debtor does not pay or perform—and especially where this occurs by reason of the debtor's insolvency. For this purpose to be achieved, it is vital that the laws of every concerned jurisdiction should fully accept that the right in rem is valid and enforceable even in the event of the debtor's insolvency. The possibility which has to be confronted in a cross-border case is that the location of the collateral, either at the time of opening of proceedings or at some other material time, may be in a different state from that in which insolvency proceedings are opened. In that event, given the variations between national laws concerning real security and the impact of insolvency upon such arrangements, there is a very real prospect that different conclusions as to the secured creditor's rights may be reached under the *lex concursus* and the *lex situs*. Such uncertainty is a commercial anathema, and has serious repercussions for the stability and cost of transactions concluded in a transnational context. Also of concern to a secured creditor is the extent to which, even if the right in rem is recognized, its enforcement or realization may be inhibited in some way which may erode its economic value, for example through the application of a comprehensive stay and moratorium during the course of a reorganization procedure.

**4.13** Article 5 supplies a rule which significantly reinforces the position of the secured creditor whose collateral is situated, at the time of opening of proceedings, in a different member state from that in which insolvency proceedings take place. To the extent that the *lex situs* upholds the rights of the secured creditor, and allows him to enforce those rights over the collateral, for example through sale or foreclosure, in spite of the debtor's insolvency, such rights are to be respected even if this is contrary to the effects that would be produced according to the *lex concursus*.[15] Article 5(1) states:

> The opening of insolvency proceedings shall not affect the rights in rem of creditors or third parties in respect of tangible or intangible, moveable or immoveable assets (both specific assets and collections of indefinite assets as a whole which change from time to time) belonging to the debtor which are situated within the territory of another member state at the time of the opening of proceedings.

It should be noted how widely the terms of this provision are drawn in relation to the types of assets to which it can have application. All types of property are capable of being affected, including such commercially important items as book debts and other receivables, and assets that are of a future character at the time the security interest is created but which have come into existence by the time that insolvency proceedings are opened. However, an asset is only within the ambit of this Article if it is located within the territory of one of the member states at the time

[15] See Recital (25) to the Regulation.

of opening: where the *situs* of the asset at the relevant time is in some third state, Article 5 is not applicable and it is left to the *lex concursus* alone to determine to what extent, if at all, rights which are dependent on the law of the *situs* can be respected or in some way taken into account.

*The situs of property*

**4.14** There is an obvious need for certainty with regard to the method of identifying the location of an asset for the purposes of applying the rule in Article 5. Some assistance is provided by Article 2(g), which defines the expression 'the Member State in which assets are situated' in the case of three particular kinds of property, namely tangible property, registrable property, and 'claims'. In the case of tangible property, the physical location of the property is, somewhat prosaically, identified as the *situs*. In the case of property and rights to which there attaches a requirement of public registration, the *situs* is in the member state under whose authority the register is kept. In the case of 'claims' (in the sense of liabilities that are enforceable by the insolvent debtor against some other party), these are declared to be situated in the member state in which the obligated party has his centre of main interests, to be determined according to the test employed under Article 3(1).[16] Consequently, the place at which a debt is expressed to be payable, or at which the debtor expressly agreed to be sued in the event of non-payment, does not constitute the *situs* of the debt for the purposes of Article 5.

*The time factor*

**4.15** The relevant time at which the situation of an asset is to be determined, according to the terms of Article 5(1), is the opening of insolvency proceedings. This could give rise to difficulties if the asset is of a moveable nature and its location has changed between the time at which the right in rem was created and the time when proceedings are opened. The rule could work to the disadvantage of the supposedly secured party if the asset happens to be located at the relevant time in a jurisdiction whose law does not afford protection to the security interest in question. Conversely, it would be a cause for concern as far as the interests of unsecured parties are concerned if it should transpire that the consequence of such a relocation is that the asset in question has been removed from the territory over which the *lex concursus* is applicable, with the possibility that the rights of the secured creditor are less susceptible to impeachment than they would otherwise have been. This contingency is countered by the provision in Article 5(4), which preserves the applicability of the actions for avoidance of antecedent transactions that form part of the *lex concursus*, as laid down in Article 4(2)(m). Conversely, a creditor who takes security over moveable property on the basis that the law of its current *situs* confers satisfactory protection in the event of the debtor's insolvency,

[16] On the centre of main interests, see ch 3, section C above.

m
st
at
as
It
fec
to
are
up
the
nat
to
law
for
its
rig
sub
mir
to tl
to p
the
ousl
proc
duty
danc
*Mea*
The
in re
be at
sive
senti
right
fac
a li
[17] S
credit
Garrid
Credit

must consider the possibility that the asset may be moved to another member state, or to some third state, and thereby become subject to a different legal regime at the relevant time. If possible, the terms of the transaction should be so designed as to minimize the consequent risks of such relocation.

**4.16** It should also be noted that the rule in Article 5(1) is so drafted as to confine its effects to cases where the subject-matter of the security is situated within the territory of another member state at the time of opening of proceedings: where assets are situated in a third state, the effect of the opening of insolvency proceedings upon the rights of the secured party is not determined by Article 5. In such cases, the law of the state of opening of proceedings, including its rules of private international law, will primarily determine the rights of any parties which are amenable to the jurisdiction of the *lex concursus*. However, according to standard conflict of laws principles, the *lex situs* (at the material moment of time) may be referred to for the purpose of determining the validity of the security interest as at the time of its creation, and also for assessing the effect of insolvency proceedings on the rights of the secured party. Conversely, the rights of any parties which are not so subject to the authority of the law of the state of opening will in practice be determined by the extent to which the *lex situs* is prepared to recognize and give effect to the foreign insolvency proceedings. If the rights of the secured creditor are held to prevail over the claims of the liquidator appointed in the foreign proceedings, the secured creditor may be able to retain the fruits of exercising the rights previously bargained for, unless it proves necessary to participate in the insolvency process in respect of any unsecured balance of claim. In such circumstances, the duty to account for the fruits of the enforcement of security will arise, in accordance with the principle of hotchpot.

*Meaning of 'rights in rem'*

**4.17** The Regulation does not supply an exhaustive definition of the expression 'rights in rem'. However, Article 5(2) and (3) furnish some indication of the meaning to be attributed to the expression, while supplementary guidance, albeit of a persuasive character only, can be found in the *Virgos-Schmit Report*.[17] Article 5(2) is essentially concerned to describe the nature and content of rights which qualify as rights in rem within paragraph (1). It states that they shall, in particular, mean:

> (a) the right to dispose of assets or have them disposed of and to obtain satisfaction from the proceeds of or income from those assets, in particular by virtue of a lien or a mortgage;

[17] See n 1 above, at paras 94–106 inclusive. For critical discussion of the treatment of secured creditors under the substantially identical provisions of the proposed EC Convention of 1995, see J Garrido, 'Some Reflections on the EU Bankruptcy Convention and its Implications for Secured Creditors' (1998) 7 International Insolvency Rev 79. See further in ch 6 below.

(b) the exclusive right to have a claim met, in particular a right guaranteed by a lien in respect of the claim or by assignment of the claim by way of a guarantee;
(c) the right to demand the assets from, and/or to require restitution by, anyone having possession or use of them contrary to the wishes of the party so entitled;
(d) a right in rem to the beneficial use of assets.

**4.18** The above list of attributes that are associated with various kinds of rights in rem is intended as a guide to the task of characterization, which however remains a matter for the state where the assets are located. The Regulation, following the policy adopted by the draftsmen of the former Convention text of 1995, has deliberately refrained from imposing its own definition of a right in rem which could result in assets having to be classified in a way which is in conflict with the approach followed by the law of the *situs*.[18] Nevertheless, a more *dirigiste* approach is taken by Article 5(3) in respect of rights which are recorded in a public register and enforceable against third parties, whereby a right in rem may be obtained. Such a right is to be considered a right in rem throughout all member states, irrespective of any contrary conclusions to be derived from the provisions of national law.[19] The *Virgos-Schmit Report* to the Convention emphasized that the provisions of Article 5 only protect pre-existing rights which were created before the insolvency proceedings were opened.[20] Therefore, creditors who have not succeeded in perfecting their right to be treated as secured under the law of the *lex situs* before the time of opening of insolvency proceedings in another member state, are subject to the effects of the *lex concursus*, in accordance with the basic principle of Article 4. This would be the case, for example, with creditors who have commenced such processes as distress or execution which are incomplete at the time of opening of insolvency.[21]

*Floating charge security, etc*

**4.19** In the absence of an exhaustive definition of 'rights in rem' for the purposes of Article 5, or more generally, particular interest arises in relation to the status of certain types of security, such as the floating charge, in the context of this important exception to the regime of the *lex concursus*. Since this form of security is recognized under the laws of only a minority of the member states—notably the United Kingdom and Ireland—the possibility of conflicting classifications by courts in states belonging to the civil and common law traditions respectively is an issue of no little practical importance. Similar conflicts of characterization may occur in relation to other kinds of security devices developed in recent times, such as the practice of creating a fixed charge over future book debts, which can be analysed as

[18] *Virgos-Schmit Report* (n 1 above), para 100.
[19] ibid, para 101.
[20] ibid, paras 96, 103.
[21] See eg Insolvency Act 1986, ss 130(2), 183, 184, 346, and 347.

purporting to create a present right in rem without either surrender of possession or even an existing subject-matter to which the right can attach.

**4.20** Paragraph 104 of the *Virgos-Schmit Report*[22] (written with reference to the proposed Convention of 1995) attempted to clarify the position as follows:

> A right in rem may not only be established with regard to specific assets but also with regard to assets as a whole. Security rights such as the 'floating charge' recognized in United Kingdom and Irish law can, therefore, be characterized as a right in rem for the purposes of the Convention. Likewise, rights characterized under national law as rights in rem over intangible assets or over rights are also included.

The above passage supplied the inspiration for the insertion of an additional phrase into Article 5(1) during the process of converting the Convention text of 1995 into that of the Regulation adopted on 29 May 2000 by the EC Council. Although very few substantive changes were made to the text as settled in 1995, the following words were inserted:

> both specific assets and collections of indefinite assets as a whole which change from time to time

The extra words are primarily intended to remove any uncertainty as to whether Article 5 applies to floating charge security. It is submitted that they can also apply to those cases where, under the approach followed in the common law systems of the UK and the Republic of Ireland, a fixed charge is created in relation to receivables, present and/or future, whose precise contents will also change from time to time.

**4.21** One final observation may be made with respect to Article 5 and its effects. Although it can provide protection for the secured creditor against the direct disturbance of expectations founded upon the provisions of the *lex situs*, it does not immunize the creditor against the invocation of processes which may be available under that very law in the event of the debtor's insolvency. In order to bring such remedies into operation however it would be necessary for the liquidator in the main proceedings, or some other qualified party, to procure the opening of secondary bankruptcy proceedings under the *lex situs*, and in this way provoke such consequences for the holder of the right in rem as may be available under the insolvency law of that state. Naturally, such secondary proceedings can only be commenced if the debtor has an establishment in that member state.[23]

### Exception II: set-off (Article 6)

**4.22** The laws of the member states diverge sharply over the operation of set-off in the

[22] See n 1 above.

[23] *Virgos-Schmit Report*, (n 1 above) para 98. On the meaning of 'establishment', see ch 3, section C above.

event of a debtor's insolvency. In the United Kingdom, set-off is treated as a mandatory process which must be applied, as a matter of public policy, in both individual and corporate insolvencies in which the necessary requirement of mutuality is present.[24] In most civil law systems, on the other hand, the prevailing view is that insolvency set-off constitutes a violation of the principle of *pari passu* distribution, and that as a matter of public policy it must be confined to the most carefully limited circumstances, as where the cross-liabilities arise out of one and the same contract or obligation. Therefore, in a cross-border insolvency, the outcome for any creditor who is also a debtor to the estate can be drastically affected by the way in which the issue of applicable law is resolved, if the competing laws happen to represent the different schools of opinion with regard to set-off.[25] Particularly in major commercial operations where large sums of money are involved, the ability to predict the applicable law and to take its provisions on set-off fully into account is vitally important in the assessment of risk. Clear, and uniformly applicable, choice of law rules are therefore essential.

**4.23** We have seen above that Article 4(2)(d) establishes a basic rule to the effect that it is for the *lex concursus* to determine the conditions under which set-offs may be invoked. Accordingly, any party to an international transaction who wishes to calculate the consequences of the other party's insolvency in the event that there are subsisting debts or liabilities in both directions must first determine which member state is destined to become the forum for main bankruptcy proceedings, or for any secondary proceedings, involving the other party as the insolvent debtor. It is of course perfectly possible that the mutual dealings between the parties may have as their respective governing laws either the same country's law, or the laws of different countries, and that these may or may not happen to be member states of the EU. The possible variations are therefore very numerous. Under the primary rule of Article 4(2)(d), however, it is entirely a matter for the *lex concursus* to determine whether, in the course of applying its doctrine of set-off, any account will be taken of the fact (if such is the case) that either of the cross-obligations is governed by a foreign law under which a different approach is followed. Clearly, there are latent perils for the unwary, whose assumptions may be founded upon familiar rules of the law of the state in which their own business has been conducted, and of the law or laws by which their contractual relationships are designed to be governed.

**4.24** Although the fate of any creditor who is simultaneously a debtor to the insolvent estate is primarily controlled by the set-off rule of the *lex concursus*, Article 6

[24] See *Stein v Blake* [1996] AC 243 HL. For authoritative accounts of the subject of set-off, see PR Wood, *English and International Set-Off* (1989); R Derham, *Set-Off* (2nd edn, 1996; 3rd edn pending).

[25] For a vivid illustration of this problem, see *Re Bank of Credit and Commerce International SA (No 10)* [1997] Ch 213. For comment on that case, see IF Fletcher [1997] Journal of Business Law 471–6; S Shandro (1998) 7 International Insolvency Rev 63.

establishes one, carefully limited, exception to this. If the result produced by application of the *lex concursus* is that set-off is not applicable to the cross-claims in question, the creditor may have recourse in the alternative to the exception supplied by Article 6(1), which provides that the creditor shall not be deprived of the right to demand the set-off of his claims against the claims of the debtor:

> where such a set-off is permitted by the law applicable to the insolvent debtor's claim.

This somewhat ponderous phrase is intended to denote 'the law applicable to the claim where the insolvent debtor is the creditor in relation to the other party'.[26] To establish the law by which the relevant claim is governed (assuming it to be contractual), a common set of choice of law rules is supplied by the Rome Convention on the Law Applicable to Contractual Obligations, to which all member states of the European Union are, or are destined to become, contracting parties. The Rome Convention, although confined in its application to those states which are members of the EU (whose membership is coextensive with the EC, the two entities having been assimilated within a consolidated framework by the Maastricht and Amsterdam Treaties), is based upon the principle that the governing law of any contract to which its provisions apply may be that of some third state, rather than being limited to the laws of the contracting states themselves.

Significantly, Article 6 of the Regulation on Insolvency Proceedings omits any reference to 'the member states', or their respective laws, in creating the exception in favour of the rule of set-off that is operated by 'the law applicable to the insolvent debtor's claim'. It therefore follows that in this instance the law of some third state could furnish the basis for allowing the creditor to have the benefit of set-off which would otherwise be excluded under the regime of the *lex concursus*. With this possibility in mind therefore, where parties are in a position to choose the law by which their transactions are governed they may well deem it expedient to ensure that a clear, express choice is made in favour of the law of a country whose rule concerning set-off is most suited to their requirements. Article 3 of the Rome Convention gives effect to such an act of choice, which can be made with respect to the whole or to a particular part of the contract.[27] **4.25**

[26] *Virgos-Schmit Report* (n 1 above) para 108. The rationale expressed in that paragraph is epitomized in Recital (26) to the Regulation. Some writers employ the expression 'the passive claim' to denote the insolvent debtor's claim against the proving creditor, to be contrasted with the 'active' claim owed by that creditor to the estate.

[27] Rome Convention of 19 June 1980, Art 3(1). Note also that Art 3(2) allows the parties to agree at any time to subject their contract to a law other than that which previously governed it, whether as a result of earlier choice or by reason of absence of choice as to governing law. There is a proviso to para (2) whose effect is to prevent such subsequent changes of governing law from adversely affecting third parties (such as creditors generally), and it is also the case that any change of this nature would have to be effected prior to the opening of insolvency proceedings.

**4.26** One notable feature of Article 6 of the Regulation is that it can only operate, if at all, in such a way as to allow a set-off to be invoked in circumstances where otherwise it would be excluded: it does not allow a creditor to be denied the benefit of a set-off which is available under the *lex concursus* in accordance with the rule in Article 4(2)(d). Once again, it is to be observed that Article 6(2) preserves the application of Article 4(2)(m) in relation to cases benefiting from the exception created under Article 6(1). Consequently, the avoidance rules of the *lex concursus* continue to be applicable to any challenge to the validity or enforceability of any claim to which the doctrine of set-off may otherwise be applicable by virtue of Article 6(1).

### Exception III: Reservation of title (Article 7)

**4.27** The practice of including a reservation of title clause within a contract of sale, as a means of affording protection to an unpaid seller in the event of the buyer's insolvency, is treated in different ways under the laws of the member states of the European Union.[28] To minimize the uncertainty associated with cross-border cases, special rules are needed. Article 7 provides two such rules, which introduce exceptions to the application of the *lex concursus* in relation to contracts to which the insolvent debtor is a party. The rules deal, respectively, with the insolvency of the buyer or of the seller, and in each instance the relevant factor is the *situs* of the subject-matter of the contract of sale at the time of opening of insolvency proceedings. Where this is in a member state other than the state of opening, the provisions of the *lex concursus* are displaced by the rules respectively contained in Article 7(1) or (2), as the case may be.

**4.28** Article 7(1) applies in a case where insolvency proceedings are opened against the purchaser of an asset for which the price has not been paid in full. It provides that the seller's rights based on a reservation of title ('ROT') clause shall not be affected by the opening of proceedings where the asset in question is at that time situated within the territory of a member state other than the state of opening. Therefore, any provisions within the *lex concursus* whereby the ROT clause is rendered ineffective as against the claims of the liquidator—for example due to lack of formal registration, or on other grounds—would not affect the seller's right to retake the asset provided that such a right is conferred by the *lex situs* under the circumstances existing at the relevant time. The terms of Article 7(1) are such as to make it irrelevant, apparently, whether the asset in question is moved to the territory of some other member state subsequent to the opening of proceedings.[29] However, the exact way in which this provision will operate in practice is far from clear. It is

[28] On the inability of the EU member states to agree on terms of harmonization of their treatment of reservation of title, see G McCormack, *Reservation of Title* (1990) 210–20.
[29] This is the view expressed in the *Virgos-Schmit Report* (n 1 above), para 113.

to be noted that there is no positive provision to the effect that the *lex situs* is to apply: all that is stated is that the opening of proceedings:

> shall not affect the seller's rights based on a reservation of title.

This phrase implies that the determinative factors are the provisions of the contract itself and—of necessity—the law by which it is governed. It seems to be envisaged that these factors will be assimilated into the process of determination under the law of the member state in which the asset happens to be situated, although the details are not explained.

**4.29** Article 7(2) is concerned with the position where it is the seller of an asset who, following its delivery, is the subject of insolvency proceedings. Where, due to the effects of a ROT clause, the seller retains ownership of the asset even after delivery, the consequence might be that the asset is regarded as part of the insolvent estate and thus liable to repossession by the liquidator, leaving the buyer to lodge proof for any damages occasioned through the loss of bargain.[30] The provision in paragraph (2) alleviates the buyer's predicament by declaring that the opening of insolvency proceedings shall not constitute grounds for rescinding or terminating the sale, and shall not prevent the buyer from acquiring title, where at the time of opening the asset sold is situated within the territory of a member state other than the *forum concursus*. This provision is not a choice of law rule, but is a uniform rule of substantive law whose application is confined to specially defined circumstances.

**4.30** Finally, Article 7(3) preserves the application of the avoidance rules of the *lex concursus* in cases falling within the ambit of either paragraph (1) or (2). The fact that in each of those paragraphs reference is made to the *situs* of the asset as being within the territory of a member state necessarily means that Article 7 has no application to cases where the asset is situated in some third state at the relevant time.

**Exception IV: contracts relating to immoveable property (Article 8)**

**4.31** It is usually the case that a liquidator is empowered to elect whether to confirm or to terminate any executory contract to which the debtor is a party at the time of commencement of insolvency proceedings.[31] Article 4(2)(e) asserts the basic principle that the *lex concursus* determines the effects of insolvency upon current contracts to which the debtor is a party. However, Article 8 creates an exception to this rule for cases of contracts conferring the right to acquire or make use of immoveable

[30] Such a claim would of course be subject to deduction of the price due from the buyer.

[31] For analysis of the problems of executory contracts (a neglected topic in the literature of insolvency under UK law), see the writings of authors commenting from the standpoint of American law: JL Westbrook, 'A Functional Analysis of Executory Contracts' (1989) 74 Minnesota L Rev 227; V Countryman, 'Executory Contracts in Bankruptcy' (Parts 1 and 2) (1973) 57 Minnesota L Rev 439 and (1974) 58 Minnesota L Rev 479.

property which is situated within the territory of a member state other than the state of opening. The Article provides that the effect of insolvency upon such contracts will be governed solely by the *lex situs*. The *Virgos-Schmit Report* explains at paragraph 118 that the reference to the exclusive application of the law of the *situs* includes the insolvency law of that state, so that parties to an international contract for the sale of land or the leasing of immoveable property need to inform themselves about the relevant provisions of the insolvency law of the member state in which the property is situated, in order to discover the consequences of the insolvency of the other party. This provision is not applicable to cases where the property is situated in some third state, and it is therefore left to the *lex concursus*, including the conflicts rules of that system, to resolve the issue. However, according to standard principles of conflict of laws it is generally the case that questions concerning rights over, and succession to, immoveable property are referred to the *lex situs*.

**Exception V: payment systems and financial markets (Article 9)**

**4.32** An especially sensitive area, in view of its commercial importance, is the effect of insolvency upon executory contracts between parties operating within an organized payment or settlement system, or a particular financial market. In the interest of sustaining confidence in the integrity of the arrangements to which the participants have originally assented upon joining the system or market in question, Article 9(1) imposes a special choice of law rule whereby the effects of insolvency proceedings on the rights and obligations of parties to a payment or settlement system or to a financial market will be governed solely by the law of the member state applicable to that system or market.[32] This rule in favour of the exclusive application of the systemic law is reinforced by the provision in Article 9(2) whereby any action for voidness, voidability or unenforceability of payments or transactions carried out under the system or market in question, and which may be detrimental to creditors generally, is nevertheless declared to be subject to the law applicable to the relevant payment system or financial market. The practice followed in Articles 5, 6, and 7 of the Regulation, of reserving the application of the avoidance rule of the *lex concursus* as referred to in Article 4(2)(m), is here relinquished in favour of the total prevalence of the law which is applicable to the payment system or market, thereby enabling parties to base their expectations

[32] See Recital (27) to the Regulation. Examples of such special markets, whose rules contain provisions for closing out contracts and netting in the event of insolvency of a member, are the London International Financial Futures Exchange (LIFFE); the International Stock Exchange of the United Kingdom and Republic of Ireland; the London Metal Exchange, and the London Commodity Exchange. See Companies Act 1989, Part VII, together with the Financial Markets and Insolvency Regulations 1991, SI 1991/880, and Council Directive (EC) 98/26 (the Settlement Finality Directive [1998] OJ L166/45) as transposed for UK purposes by SI 1999/2979 (the Financial Markets and Insolvency (Settlement Finality) Regulations 1999).

purely upon a single set of rules without having to take into account the various national laws to which counterparties may be personally subject, and by which the insolvency of any of them may happen to be governed. It must be emphasized however that the rules of Article 9 are only applicable in a situation where the system or market is operating under the law of one of the member states. Moreover, there is a special proviso in Article 9(1) to the effect that it is without prejudice to the effect of Article 5, which subjects the protection of rights in rem over assets belonging to the debtor to the law of the *situs*.[33]

**Exception VI: contracts of employment (Article 10)**

**4.33** A further category of executory contracts for which special considerations arise is the employment relationship. Indeed, special rules are already operative under the Brussels Convention[34] and the Rome Convention[35] to regulate jurisdictional and choice of law aspects of contracts of employment.[36] To protect the interests of employees, Article 10 of the Regulation on Insolvency Proceedings stipulates that the effects of such proceedings on employment contracts and relationships shall be governed solely by the law of the member state applicable to the contract of employment.[37] To ascertain the applicable law, the courts of all member states will apply the provisions of the Rome Convention, notably Articles 3, 6, and 7 thereof. If this produces the conclusion that the contract is governed by the law of one of the member states, the rule of Article 10 of the Regulation will apply. If the law of some third state is indicated however, the effects of insolvency will be determined by the *lex concursus*, with reference as appropriate to any provisions of the private international law of that system.

**4.34** It should also be emphasized that Article 10 is confined to the question of the effect of insolvency upon the contract of employment as such, including the issue as to whether the contract is automatically terminated by the insolvency of either party to it, or whether the liquidator has the option to affirm or rescind the contract, subject to specified terms. Article 10 does not purport to regulate other issues such as the ranking of employees' claims for unpaid wages or salary, and the mode of treatment to be accorded to these claims. Such questions remain subject

[33] See Exception I at paras 4.12–4.21 above.

[34] Convention on Jurisdiction and the Recognition and Enforcement of Judgments in Civil and Commercial Matters, originally concluded on 27 September 1968 and several times subsequently amended and expanded. The Brussels Convention has been replaced among 14 of the 15 EU member states (the exception being Denmark) by Council Regulation (EC) 44/2001 [2001] OJ L12/1 with effect from 1 March 2002.

[35] Convention on the Law Applicable to Contractual Obligations, 19 June 1980.

[36] See Brussels Convention (n 34 above) Art 5(1); Regulation 44/2001 (n 34 above) Arts 18–21; Rome Convention (n 35 above) Art 6.

[37] See Recital (28) to the Regulation on Insolvency Proceedings.

to the *lex concursus*, in accordance with Article 4(2)(h).[38] It is also the case that in many states nowadays there is a statutory scheme under which, in the event of their employer's insolvency, employees are guaranteed a measure of payment out of a national fund, with the state then becoming subrogated to the employee in respect of that portion of the latter's claim against the employer. Paragraph 128 of the *Virgos-Schmit Report* asserts that such guaranteed payments, since they are maintained under provisions of the national law of the member state concerned, are subject to the law of that state.

### Exception VII: rights subject to registration (Article 11)

**4.35** National laws usually operate a system of public registration for many kinds of right or interest over immoveable property. Such registration forms an essential aspect of the safeguards for other parties who may have or acquire interests in the same property. Certain kinds of moveable property, including ships and aircraft, are likewise subject to public registration in the state in which they are principally kept, or from which they are operated. Such registers play important roles in the protection of trade and certainty, and in the maintenance of health and safety regulations affecting the assets in question. The casual location of such assets, which may be of very large value, should not be the decisive criterion with regard to the effects of insolvency proceedings upon the rights of the debtor in relation to them. Both with immoveable property and with moveables of this kind, there is the possibility of a conflict between the provisions of the law of the state under whose authority the register is maintained and the provisions of the *lex concursus*.

**4.36** Article 11 provides that, where the register is kept under the authority of a member state, it is the law of that state, and not the *lex concursus*, which shall determine the effects of insolvency proceedings on the rights of the debtor in immoveable property, a ship or an aircraft subject to public registration. However, it should be noted that this choice of law provision does not include the word 'solely', and that this omission is intended to enable the *lex concursus* to continue to play a part in the process of determining the net effect of insolvency upon the rights which are the subject of registration. In the words of paragraph 130 of the *Virgos-Schmit Report*, 'a sort of cumulative application of both laws is necessary'. What appears to be envisaged is that there should be an interaction between the liquidator and the official by whom the relevant register is maintained, to arrange for appropriate entries to be made in the register that will reflect the fact that insolvency proceedings are taking place in a different member state. It will remain a matter for the law of the state of registration to determine what effects this process shall have upon the rights of the debtor in the property concerned.

[38] *Virgos-Schmit Report* (n 1 above) para 128.

**Exception VIII: community patents and trade marks (Article 12)**

**4.37** In view of the fact that arrangements are already in force within the European Union to regulate patents, trade marks and the rights of plant breeders throughout the whole territory of the Union,[39] it is appropriate that the Regulation should endeavour to complement the provisions already operative with regard to the treatment of such forms of intellectual property in cases of insolvency of those who own or have interests in the rights concerned. Each of the existing arrangements concluded under EC law contains a rule to the effect that a Community right arising thereunder may be included only in the first proceedings that are opened in a contracting state.[40] Under the provisions of the Insolvency Regulation however, it can sometimes happen that the first proceedings to be opened are not main proceedings under Article 3(1), but are territorial proceedings within the meaning of Article 3(2) and (4).[41] This has necessitated a special rule, contained in Article 12, whereby a Community patent, a Community trademark or any similar right established by Community law may be included only in main insolvency proceedings which are opened under Article 3(1). This provision is operative only when the debtor has his centre of main interests in a member state, for this is an essential condition to the opening of proceedings under Article 3(1). Where the debtor's centre of main interests is located outside the EU, the rules of the individual enactments relating to intellectual property are applicable without modification, with the consequence that the right in question is included in the insolvent estate of the first proceedings to be opened in a member state.[42]

**Exception IX: protection of third-party purchasers (Article 14)**

**4.38** It is usually the case that under the provisions of national law the opening of insolvency proceedings causes the debtor to be deprived of the capacity to deal with or dispose of property to the detriment of the general body of creditors. According to the circumstances of the disposition, such transactions may be declared to be void under all circumstances, or in other instances may be subject to validation by the court at its discretion, or subject to defined conditions.[43]

[39] Community Patent Convention of 15 December 1975 [1975] OJ L17/1, as modified by the Luxembourg Agreement of 30 December 1989 [1989] OJ L401/10; Council Directive 89/104 of 21 December 1988 [1989] OJ L207/44, and Council Regulation (EC) 40/94 of 20 December 1993 [1994] OJ L11/1 on the Community Trademark; Council Regulation (EC) 2100/94 of 27 July 1994 [1994] OJ L227/1 on Community Plant Variety Rights.

[40] Luxembourg Agreement, Art 41; Trademark Regulation, Art 21; Regulation on Plant Variety Rights, Art 25 (all n 39 above).

[41] See ch 3, section C above.

[42] See *Virgos-Schmit Report* (n 1 above) paras 133, 134.

[43] See, for example, Insolvency Act 1986, s 127.

**4.39** However, where the property which is improperly disposed of by the debtor is subject to some form of public registration, a policy dilemma is caused by the possibility that the transaction with the third party may take place before the fact of the insolvency is placed upon the record. Such parties, consulting the record in its unamended state, may be prejudiced by their reliance upon the information thereby obtained. Consequently, in the interest of maintaining confidence in the integrity of the public register, the national law of the state in which the register is maintained may embody a rule to protect a party who has dealt in good faith and for valuable consideration, and in reliance upon the information carried on the face of the register at the time in question. In cases of international insolvency, where the state of opening of proceedings and the state where the register is maintained are separate from each other the interval before the register can be amended may be even longer, thus allowing more time in which such transactions may take place. If the protection to be accorded to the third party is made to depend upon the *lex concursus*, that party may suffer injustice due to reliance that was originally and reasonably placed upon the rule contained in the *lex situs* (in the case of immoveable property), or in the law of the state in which the register is maintained (in the case of ships or aircraft, or of securities whose existence is dependent upon registration). Article 14 of the Regulation accordingly creates a rule to protect third-party purchasers to whom the debtor, other than gratuitously, has disposed of any of these kinds of assets by an act concluded after the opening of insolvency proceedings. The validity of the act of disposal is governed by the *lex situs* in the case of an immoveable asset, and in the case of registrable assets by the law of the state under whose authority the register is kept.

**4.40** The drafting of Article 14 omits any reference to 'member state' in its provision regarding the law to govern the validity of the acts to which it is applicable, and it would therefore appear that the provision can be applied to cases where the *situs* of the immoveable property, or the place where the register is maintained, is located in some third state. However, the *Virgos-Schmit Report*, written with reference to the provisions of the corresponding Article of the 1995 version of the proposed Convention, appears to contradict the indications conveyed by the terms of the Article itself, by consistently referring to 'contracting state' in relation to the scope of its application.[44] Conversely, the scope of Article 14 is widened in another respect by a further statement in the Report that: 'An act of disposal must be understood to include not only transfers of ownership but also the constitution of a right in rem relating to such property'.[45]

[44] *Virgos-Schmit Report* (n 1 above) paras 140, 141.
[45] ibid, para 141.

### Exception X: effects on pending lawsuits (Article 15)

**4.41** The laws of the member states of the European Union differ from one another with regard to the effect of insolvency proceedings on a pending lawsuit to which the debtor is a party. These differences concern not only the forcible interruption of proceedings by virtue of an automatic stay, but also the possible removal of litigation from the civil or commercial court which would normally have jurisdiction, into the exclusive control of the bankruptcy court, under the principle known as *vis attractiva concursus*. This principle is by no means universally, or even uniformly, applied, and there are likewise variations of approach to such matters as the possible lifting of the stay upon proceedings at the discretion of the bankruptcy court. Potentially, much confusion and uncertainty could result in a given case due to the presence of conflicting rules under the *lex concursus* and under the law of the state in which the litigation is pending.

**4.42** Article 15 imposes a uniform choice of law rule in favour of the sole application of the law of the forum in which the lawsuit is pending. The scope of this rule is likely to be of considerable practical importance, and hence the terms of the Article should be noted with some care. First, a distinction is to be made between the effects of insolvency on individual enforcement actions (such as distress, execution, attachment, and sequestration), as opposed to pending lawsuits. The former are governed by the law of the state of opening, as provided by Article 4(2)(f), whereas only the latter are affected by Article 15. The Article refers expressly to:

> a lawsuit pending concerning an asset or a right of which the debtor has been divested.

Accordingly, if the asset happens to be excluded from the effects of insolvency according to the *lex concursus*, it would be unaffected by Article 15.[46] It is also essential to the application of Article 15 that the lawsuit in question be pending in another member state: litigation in third states is not within the ambit of this provision. Where the rule applies, it is for the law of the state where litigation is pending (including the procedural law of that state) to determine whether or not the proceedings are to be suspended or whether they may continue subject to terms or conditions, including any procedural modifications which may be necessary in view of the fact that the debtor has been deprived of the powers of administration and disposal of his property, with the liquidator having been substituted in his place.

[46] For an account of the position under English law concerning property in the ownership of a bankrupt individual which does not vest in the trustee in bankruptcy, see IF Fletcher, *The Law of Insolvency* (3rd edn, 2002) paras 8-036 to 8-059.