*oggetto di concordato*" di cui al paragrafo 3.7 del Programma di Ristrutturazione intitolato "*Garanzie*" (pag. 95):

| €mnl | Loan e derivati | Bond | Private placement | Promissory notes | Altri | Totale |
|---|---|---|---|---|---|---|
| Parmalat S.p.A. | 1.430,7 | 5.966,1 | 1.045,6 | 826,7 | 373,9 | 9.679,0 |
| Parmalat Finanziaria S.p.A. | 191,0 | 723,3 | - | - | 190,7 | 1.105,0 |
| Eurolat S.p.A. | - | - | - | - | 93,4 | 93,4 |
| Lactis S.p.A. | - | - | - | - | 0,2 | 0,2 |
| **Totale** | **1.621,7** | **6.689,4** | **1.045,6** | **826,7** | **658,3** | **10.877,7** |

In particolare, dalla tabella di cui sopra emerge che Parmalat SpA aveva in essere alla data del 23 dicembre 2003 garanzie per un valore complessivo di **9.679 milioni di Euro, di cui 826,7 a garanzia di "*Promissory notes*" (quindi anche a garanzia di finanziamenti concessi da terzi).** Dal confronto dei dati aggregati di cui a tale tabella e di cui ai conti d'ordine del bilancio di Parmalat SpA al 31 dicembre 2002, risulta quindi che il valore aggregato delle garanzie rilasciate da Parmalat SpA alla data della sua insolvenza è diverso (e maggiore di 4.407 milioni di Euro) rispetto al valore aggregato delle garanzie al 31 dicembre 2002. **Tale valore di 4.407 milioni di Euro corrisponde pertanto al valore delle garanzie emesse di Parmalat SpA dopo il 31 dicembre 2002 e fino alla data di riferimento del Programma di Ristrutturazione (valore delle garanzie emesse quale avvalorato e confermato dallo stesso Dott. Bondi sulla base delle indagini dallo stesso effettuate).**

Dallo stesso Programma di Ristrutturazione, risulta anche che (a) il valore aggregato delle garanzie rilasciate da Parmalat SpA è stato definito sulla base dei calcoli della società di revisione Price Waterhouse Coopers S.p.A. (nel seguito, *PWC*) che era stata incaricata dal Commissario Straordinario di effettuare "*il ricalcolo della posizione finanziaria netta consolidata sulla base delle risultanze contabili e finanziarie al 30 settembre 2003; la revisione di alcune transazioni con soggetti e parti correlate; la raccolta e messa in*

*sicurezza di informazioni e dati*" (cfr. doc. 11, pag. 61) e (b) il debito delle società del Gruppo Parmalat nel perimetro del concordato è stato rilevato considerando come **data di riferimento la "*data del decreto di ammissione* [di ciascuna società] *alla Procedura (ad es., per Parmalat S.p.A. le ore 0.00 del 24 dicembre 2003* [...])" (doc. 11, pag. 70).

Lo scostamento tra il valore aggregato delle garanzie di Parmalat SpA in essere alla data dell'insolvenza di Parmalat SpA ed il valore aggregato delle garanzie di Parmalat SpA in essere al 31 dicembre 2002 (4.407 milioni di Euro), dimostra che **il Commissario Straordinario (e PWC che ha effettuato il ricalcolo della posizione finanziaria consolidata al 30 settembre 2003 e sulla base del cui lavoro il Commissario Straordinario ha evidentemente determinato i valori espressi nel Piano di Ristrutturazione) ha avuto accesso a documenti ed evidenze che contenevano la specifica indicazione delle garanzie rilasciate da Parmalat SpA (se non addirittura alle garanzie stesse) ed è pervenuto alla indicazione nel Programma di Ristrutturazione che il dato aggregato delle garanzie di Parmalat SpA in essere alla data di insolvenza (e quindi aventi data certa in epoca anteriore alla stessa).

Come dimostra la tabella sopra riportata, il Commissario Straordinario ha potuto addirittura indicare nel dettaglio il genere e la fonte delle obbligazioni garantite da Parmalat SpA** e da altre società del gruppo ("*Loans e derivati*", "*Bonds*", "*Private Placements*", "*Promissory Notes*") e ciò certo non sarebbe stato possibile se il Commissario Straordinario non avesse avuto a disposizione le evidenze documentali che gli consentissero di calcolare l'ammontare delle garanzie in essere alla data di insolvenza di Parmalat SpA e di suddividerle per tipo di credito garantito. E' inoltre evidente come il comportamento del commissario in sede di predisposizione del Piano di Ristrutturazione non possa non avere ai fini del presente giudizio efficacia confessoria.

B. Prima che PWC fosse incaricata dal Commissario Straordinario di ricalcolare la posizione finanziaria netta consolidata del Gruppo Parmalat alla data dell'insolvenza, la società di revisione che aveva accesso alle scritture contabili di Parmalat SpA (al fine di verificarne e certificarne la correttezza dei bilanci e la veridicità) era Grant Thornton S.p.A. (oggi Italaudit S.p.A) (nel seguito, *Grant Thornton*). L'ultima attività svolta da Grant Thornton per il Gruppo Parmalat è stata la verifica dei documenti contabili di Parmalat SpA in occasione della relazione contabile semestrale consolidata al 30 giugno 2003 da parte della capogruppo Parmalat Finanziaria S.p.A. (doc. 12 allegato alla memoria ex art. 184 c.p.c.).

Posto che, come è noto, la redazione e la successiva certificazione di una relazione contabile semestrale consolidata si basa, tra l'altro, sui bilanci delle società incluse nel perimetro del consolidamento e sulle carte di lavoro delle relative società di revisione, **nelle carte di lavoro di Grant Thornton,** sulla base delle quali Deloitte, società di revisione della capogruppo, ha certificato la relazione contabile semestrale della capogruppo al 30 giugno 2003 è **certamente contenuta l'indicazione dettagliata delle garanzie rilasciate nel periodo dal 1 gennaio 2003 al 30 giugno 2003** (periodo in cui è stata rilasciata la Garanzia oggetto della presente causa). Le carte di lavoro di Grant Thornton sono state acquisite dalla Procura della Repubblica presso il Tribunale di Milano nell'ambito delle indagini preliminari del procedimento penale R.G. 12473/04 e sono state successivamente trasmesse nel fascicolo del dibattimento attualmente in corso.

C. L'esibizione *ex* art. 210 c.p.c. delle carte di lavoro di Grant Thornton, di PWC e del Commissario Straordinario risulta indispensabile per stabilire con certezza l'anteriorità della Garanzia alla dichiarazione di insolvenza di Parmalat SpA. **Infatti, (i) il prospetto contabile consolidato di Parmalat Finanziaria S.p.A. al 30 giugno 2003 ha infatti senza dubbio data certa ai sensi dell'art. 2704 c.c. in quanto pubblicato presso la**

23

Borsa Italiana S.p.A. e comunicato alla Consob ai sensi degli artt. 81 e 97 Regolamento Consob n. 11971 ed (ii) il programma di ristrutturazione delle società partecipanti al concordato è un documento proveniente dallo stesso Commissario Straordinario: la specificazione da parte del Commissario Straordinario della data anteriore all'ammissione di Parmalat SpA alla procedura di amministrazione straordinaria alla quale risultavano in essere le garanzie emesse da Parmalat SpA (il 23 dicembre 2003) ha valore confessorio dell'anteriorità della Garanzia all'ammissione di Parmalat SpA alla procedura di amministrazione straordinaria, posto che, per giurisprudenza costante (cfr. per tutte Cass. 2 settembre 2004, n. 17691, in *Foro it.*, 2005, I, 2769; Corte d'Appello di Brescia 10 marzo 2004, edita sul sito internet www.ilcaso.it), l'eccezione di data certa è nella disponibilità del Commissario Straordinario.

Anche tale istanza è stata respinta da codesto Ill.mo Giudice che con ordinanza del 9 gennaio 2007 ha ritenuto l'istanza irrilevante ai fini della decisione in quanto "*la presenza della garanzia in un elenco nulla potrebbe dire sull'effettiva data di formazione della stessa*".

Al riguardo questa difesa osserva che ancora una volta la osservazione pare connotata da eccessiva frettolosità.

Infatti:

A.  I documenti dei quali ABN ha chiesto l'esibizione rappresentano un caso di scuola di fatti equipollenti ex art. 2704 c.c. a dare la prova dell'anteriorità del rapporto sul quale è fondato il credito: la Suprema Corte ha sempre ritenuto idonea ad attribuire data certa ad un documento la circostanza che lo stesso sia stato allegato, menzionato o utilizzato per la redazione di un ulteriore documento di carattere pubblico (avente come tale data certa) (cfr. Cass. 8 novembre 2006, n. 23793 in relazione all'allegazione di fideiussione ad istanza di fallimento depositata in Tribunale; Cass. 26 maggio 1997, n. 4646 in relazione

alla menzione di fideiussione nei libri contabili di una società regolarmente vidimati da pubblico ufficiale; Cass. 24 marzo 1979, n. 1701 relativa all'annotazione di un titolo nei documenti allegati al bilancio di un istituto di credito depositato presso la Banca d'Italia; Corte d'Appello di Milano, 9 gennaio 1987, in *Giur. comm.* 1988, II, 110 in relazione alla estrazione di copie da documenti contabili depositati presso la cancelleria delle società commerciali o presso altri uffici pubblici);

**B.** **tutti i documenti di cui ABN ha chiesto a codesto Ill.mo Tribunale di ordinare l'esibizione sono manifestamente rilevanti nel presente giudizio perché da essi si ricava con certezza, come osservato, l'anteriorità della data delle Garanzie rispetto alla dichiarazione di insolvenza di Parmalat SpA.**

**C.** **Tutti i presupposti di legge per ordinare l'esibizione dei documenti richiesti sono presenti nella fattispecie.** Come è noto, per l'ordine di esibizione la legge richiede (*ex* artt. 210 c.p.c. e 94 disp. att. c.p.c.): (i) l'istanza di parte; (ii) la specifica individuazione del documento (o della cosa) di cui è richiesta l'esibizione e, se necessario, l'offerta della prova che la parte o il terzo li possiede; (iii) che l'ordine non arrechi grave danno alla parte o al terzo e non li costringa a violare uno dei segreti previsti negli artt. 351 e 352 c.p.p.; e (iv) la necessità dell'acquisizione ai fini della prova dei fatti di causa.

**D.** Non è possibile negare l'esistenza dei documenti di cui si è chiesta l'esibizione ed il loro contenuto in quanto:

(i) senza i documenti contenenti il dettaglio di ogni singola garanzia il Commissario Straordinario non avrebbe mai potuto ricostruire il valore aggregato (e distinto per categorie di obbligazioni) delle garanzie rilasciate da Parmalat SpA ed in essere al 24 dicembre 2003 riportato alla tabella n. 3.26 del Programma di Ristrutturazione;

(ii) l'attività di certificazione del bilancio consiste, tra l'altro, nel controllo della ricostruzione contabile effettuata dagli amministratori nella redazione del bilancio e, in particolare, nel controllo che i valori aggregati iscritti in bilancio corrispondano agli atti effettivamente posti in essere dalla società, il che non può essere effettuato senza conoscere il dettaglio dei singoli atti la cui somma ha determinato l'iscrizione a bilancio di un determinato valore aggregato; e

(iii) l'esistenza di tali documenti non è mai stata contestata da controparte.

E.    La prova del possesso dei documenti di cui si chiede l'esibizione ex art. 210 c.p.c. può essere logicamente dedotta da altri elementi noti, come ha espressamente affermato la Corte di Cassazione in una fattispecie analoga all'odierna (in tale caso, una parte chiedeva al giudice l'ordine di esibizione delle carte di circolazione di veicoli inventariati nell'attivo fallimentare, la Suprema Corte aveva ritenuto che l'indicazione dei veicoli nell'inventario dell'attivo fallimentare fosse idonea prova *"congetturale"* dell'esistenza nei documenti della Procedura delle carte di circolazione dei veicoli stessi): *"deve ritenersi che, in base ai principi generali, la prova suddetta* [cioè, **la prova che la parte o il terzo nei cui confronti si chiede l'ordine di esibizione possiedano il documento**] *possa essere anche di tipo congetturale, e quindi essere desunta da altri fatti noti, come conseguenza ragionevolmente possibile della loro esistenza, secondo un criterio di normalità. E nel caso in esame è palesemente gratuita, oltre che priva di plausibile fondamento, l'ipotesi formulata dai giudici d'appello che la curatela fallimentare potesse non essere in possesso delle carte di circolazione dei veicoli inventariati nell'attivo fallimentare"* (Cass. 4 aprile 1997, n. 2935, in *Giust. civ. Mass.*, 1997, 553).

F.    La circostanza, evidenziata da controparte, che il bilancio di Parmalat Finanziaria S.p.A. al 13 dicembre 2002 sia stato dichiarato falso con sentenza del Tribunale di Parma n. 681 del 2004 nella causa tra la CONSOB e Parmalat Finanziaria è del tutto irrilevante in

26

quanto (al di là del fatto che nel caso di specie si tratta del bilancio di Parmalat SpA non della capogruppo Parmalat Finanziaria SpA) ciò non toglie che il Commissario Straordinario (e PWC) abbia certamente avuto modo di analizzare il dettaglio delle garanzie rilasciate da Parmalat SpA a favore delle società dalla stessa controllate al fine di effettuare la ricostruzione che appare nel Piano di Ristrutturazione. Quanto rileva in questa sede non è certo la veridicità del bilancio, ma il fatto che al fine di redigere il bilancio (veritiero o falso che fosse) si siano analizzate evidenze che dimostrano che a quella data (anteriore alla sottoposizione alla procedura concorsuale) la garanzia di Parmalat SpA era stata prestata.

G.   Parimenti irrilevante al fine di escludere l'efficacia confessoria delle affermazioni contenute nel Piano di Ristrutturazione è il fatto che il Commissario Staordinario (dopo aver dettagliatamente ricostruito l'ammontare delle garanzie rilasciate da Parmalat S.p.A. in essere alla data dell'insolvenza indicando anche esattamente la natura del debito garantito) si sia premurato di affermare che tale ricostruzione non avrebbe valore di riconoscimento o accertamento di debiti dovuti da società del Gruppo Parmalat nei confronti di terzi.

H.   **Questo stesso Tribunale di Parma, nell'ambito del procedimento di verifica dei crediti da insinuare allo stato passivo, aveva autorizzato una richiesta sostanzialmente identica di ABN, anche con riferimento al credito oggetto della presente causa, che la Procedura ha intenzionalmente lasciato inevasa (docc. 14, 15, 16 allegati alla memoria ex art. 184 c.p.c.).** L'ordine di esibizione dei documenti contenenti il dettaglio delle garanzie rilasciate da Parmalat SpA nel 2003 costituirebbe infatti null'altro che **la reiterazione**, nell'ambito del presente giudizio di opposizione allo stato passivo, **dei provvedimenti del 7 settembre 2004 con cui questo stesso Tribunale** (su istanza di ABN e Banco ABN AMRO Real S.A. ed in relazione al credito oggetto di

27

causa), **ha ordinato alla Procedura di consentire l'accesso alla documentazione contabile della stessa Procedura contenente il dettaglio delle garanzie rilasciate da Parmalat SpA**, ordine che è stato totalmente disatteso dal Comissario Straordinario (a seguito dell'emissione dell'ordine, infatti, i creditori istanti si sono trovati di fatto impossibilitati ad accedere a tale documentazione a causa della mancata collaborazione della Procedura ed hanno chiesto al Commissario Straordinario di attestare che tra i documenti reperiti presso gli uffici di Parmalat SpA non esistesse alcun documento contabile, ufficiale o non ufficiale, da cui risultasse l'elenco dettagliato delle singole garanzie/fideiussioni prestate da Parmalat SpA tra il 2000 e il 2003, ma il Commissario Straodinario, in ragione dell'inopportunità di affermare formalmente il falso, non vi ha mai ovviamente proceduto, cfr. doc. 17 allegato alla memoria ex art. 184 c.p.c.).

Considerati i provvedimenti del 7 settembre 2004 ed il comportamento del Commissario Straordinario, **risulta incomprensibile per quale ragione questo stesso Tribunale, dopo aver ritenuto necessario, nella fase dell'accertamento del passivo, ordinare l'accesso ai documenti della Procedura** al fine di accertare l'anteriorità all'insolvenza di Parmalat SpA delle Garanzie oggetto di causa (e malgrado gli istanti non vi siano riusciti per il comportamento ostativo del Commissario Straordinario), **nell'ambito del presente giudizio di opposizione, abbia ritenuto di non emettere il medesimo provvedimento, affermando che sarebbe irrilevante l'esibizione degli stessi documenti.**

\* \* \*

Le vicende relative ai provvedimenti del 7 settembre 2004 illuminano inoltre sull'atteggiamento del tutto pretestuoso e strumentale tenuto dal Commissario Straordinario nell'ambito dell'odierno giudizio e che risulta confermato dalle ulteriori seguenti circostanze.

Come già osservato da ABN nella memoria istruttoria, con uno strabiliante (sarebbe meglio dire sfrontato) *"revirement"* il Commissario Straordinario, **in sede di predisposizione del bilancio di Parmalat SpA in AS al 31 dicembre 2003** (cfr. doc. 13 allegato alla memoria ex art. 184 c.p.c. pagg. 115 e 149), **ha ritenuto lecito disattendere totalmente il valore delle garanzie in essere al 23/24 dicembre 2003** (9.679.000.000,00 Euro) **in precedenza dallo stesso ricostruito e confermato sulla base della contabilità di Parmalat SpA rinvenuta nella società** (ed oggetto del lavoro di PWC) **e posto alla base del Programma di Ristrutturazione** (cfr. doc. 11 pag. 96).

**Nel bilancio di Parmalat S.p.A. la 31 dicembre 2003 il Commissario Straordinario ha infatti abbattuto di oltre <u>9,1 miliardi</u> (sic!) di Euro il valore aggregato delle garanzie risultante dal Piano di Ristrutturazione** (e di oltre 4 miliardi di Euro il valore risultante dal bilancio al 31 dicembre 2002), **ritenendosi legittimato a far ciò utilizzando strumentalmente la norma sulla data certa di cui all'art. 2704 c.c.** (il Commissario Straordinario ha affermato che lo scostamento sarebbe l'*"effetto [...] delle procedure concorsuali in corso"*: cfr. doc. 13 pag. 149).

Ciò è del tutto prestestuoso ed inaccettabile: il Commissario Straordinario non dovrebbe certo essere equiparabile ad un disinvolto privato legittimato a perseguire con ogni mezzo i propri interessi, **ma è invece organo di una procedura concorsuale le cui finalità sono quelle del perseguimento dell'interesse dei creditori e dell'impresa insolvente.**

Sia consentito del resto segnalare al riguardo una recente pronuncia della Corte Costituzionale (Corte Costituzionale 28 aprile 2006 n. 174), la quale, richiesta di una pronuncia in merito alla legittimità costtituzionale dell'art. 146, comma 3, del D.P.R., 30 maggio 2002, n. 115 (Testo Unico delle disposizioni legislative e regolamentari in materia di spese di giustizia) in riferimento agli artt. 3 e 36 della Costituzione nella parte in cui non prevede che sono spese anticipate dall'Erario le "spese ed onorari" al curatore, ha definito

29

il curatore (nel nostro caso Commissario Straordinario) quale *"organo ausiliare della giustizia"*, confermando la funzione pubblicistica svolta dalla stesso.

Il dovere di diligenza in base al quale il Commissario dovrebbe conformare i propri comportamenti nello svolgimento delle funzioni che per legge gli competono è del resto espressamente codificato all'art. 38 L. fall. riguardo al curatore, ed è applicabile al Commissario Straordinario in forza del generale rinvio operato dall'art. 8 del D.lgs 347/2003, c.d. "Decreto Marzano", alla legge 270/99, la quale, all'art. 15, comma 3, richiama l'art. 38 L.Fall..

In una decisione ormai datata il Tribunale di Milano in maniera estremamente chiara e sintetica aveva così descritto il dovere di diligenza dovuto dal curatore in ragione delle funzioni pubblicistiche ricoperte (nel nostro caso Commissario Straordinario): *"Il curatore del fallimento assume la posizione di organo ausiliare dell'amministrazione della giustizia, cui fa carico di adempiere ai doveri dell'ufficio con quella diligenza che può meglio consentire il conseguimento dell'interesse pubblico alla più sollecita composizione degli interessi degli imprenditori commerciali, di modo che tale organo è chiamato a collaborare con gli altri organi della procedura e fornire loro le informazioni più tempestive e complete sullo stato del fallimento, per rendere effettiva la possibilità di esercizio di quei poteri del giudice delegato ed evitare che la procedura fallimentare si attui con ritardo in pregiudizio dei creditori"* (Trib. Milano, 20 maggio 1985, in *Fall.*, 1985, 977).

Alla luce del ruolo e dei doveri che spettano al Commissario Straordinario in base all'ordinamento, è evidente che **la norma dell'art. 2704 c.c. non è finalizzata a consentire al Commissario Straordinario di contestare a suo piacimento l'efficacia ed opponibilità di qualsiasi documento prodotto nei suoi confronti che egli ben sappia, sulla base delle interne evidenze al fine di non ammettere pretestuosamente i crediti**

certi ed esistenti, ma è invece finalizzata alla tutela dell'interesse del ceto della massa dei creditori concorsuali ritenuto rilevante dal legislatore **nelle ipotesi in cui il commissario straordinario non abbia potuto ricostruire l'effettività, o, in ogni caso, nutra fondati dubbi sulla completezza e attendibilità della documentazione esibita dai creditori a terzi** (per cui, a fronte dell'istanza di ammissione allo stato passivo depositata da un creditore per un credito fondato su un documento privo di data certa anteriore all'insolvenza, il commissario staordinario che non trovi riscontro di tale credito nella contabilità e/o documentazione dell'insolvente, e quindi nutra dubbi sull'effettiva anteriorità di tale credito all'insolvenza, sarà legittimato a eccepire la mancanza di data certa del documento, ribaltando sul creditore l'onere di provare l'anteriorità all'insolvenza del credito di cui è chiesta l'insinuazione).

Ma, nella fattispecie, il **Commissario Straordinario di Parmalat SpA in AS ha certamente potuto ricostruire la contabilità di Parmalat SpA per ciò che concerne le garanzie emesse da Parmalat SpA ed in essere alla data della sua insolvenza, come lo stesso Commissario Straordinario ha confermato attestando nel Programma di Ristrutturazione che Parmalat SpA aveva in essere al 23/24 dicembre 2003 garanzie per circa 9,6 miliardi di Euro.**

**La decisione del Commissario Straordinario di disattendere i dati contabili di Parmalat SpA appena ricostruiti e pubblicati e <u>disconoscere garanzie emesse da Parmalat SpA per 9,1 miliardi di Euro</u> è quindi del tutto arbitraria, strumentale, pretestuosa e sconcertante e si fonda su un utilizzo del tutto pretestuoso ed illegittimo della norma dell'art. 2704 c.c.**

Del resto, l'assurdità del comportamento del Commissario e l'assoluta rilevanza dell'emissione di un ordine di esibizione ai sensi dell'art. 210 c.p.c. risultano ancora più evidenti ove si osservi che:

31

(i) nell'ambito del processo penale R.G.N.R. 1345/2006 pendente innanzi al Tribunale di Parma nei confronti dei Signori Massimo Armanini, Carlo Arosio, Giorgio Di Domenico, Marco Pracca, Tommaso Zibordi e Guido Williams per i reati di cui agli artt. 81, co. 2, 110, 112, co. 1, nr. 1 c.p., 217, co. 1, nr. 4 – 224, co. 1, nr. 1, 223, co. 2, nr. 2) R.D. 267/42, 8, D.L. 23.12.2003, n. 347; convertito in L. 18.2.2004, nr. 39; 95 D.L.vo. 8.7.1999, nr. 270 **è stata sottoposta a sequestro una parte delle carte di lavoro della Grant Thornton;**

(ii) **tra le carte di lavoro di Grant Thornton sequestrate nell'ambito del predetto processo penale si trova una sola cartella relativa alla voce** *"rischi, impegni e garanzie"* **(sottovoce della voce** *"conti d'ordine"***) la quale a propria volta contiene soltanto la lista delle garanzie di Parmalat S.p.A. in essere nell'anno 2002;**

<u>il che evidentemente significa che la lista contenente le garanzie rilasciate da Parmalat S.p.A. nell'anno successivo (il 2003) si trova tra le carte sequestrate nell'ambito del processo penale pendente innanzi il Tribunale di Milano (R.G.N.R. 12473/04 + 9538/05).</u>

<u>Alla luce di tutto quanto precede ABN chiede che codesto Ill.mo Tribunale rimetta la causa in istruttoria accogliendo la domanda di emissione dell'ordine di esibizione ex art. 210 c.p.c. come sopra specificato.</u>

4. LA PROVA TESTIMONIALE.

Fin dall'atto introduttivo ABN ha chiesto a codesto Ill.mo Giudice l'ammissione dei seguenti capitoli di prova testimoniale:

1. Vero che in data 14 marzo 2003 la sig.ra Giorgia Bocchi, dipendente della società Parmalat S.p.A., ha inviato dal proprio *account* di posta elettronica nell'ambito del sistema informatico Parmalat (giorgia.bocchi@parmalat.net) un messaggio e-mail (che si

32

rammostra) alla sig.ra Tamara Cavallucci, all'indirizzo tamara.cavallucci@it.abnamro.com, confermandole l'accettazione da parte di Parmalat S.p.A. del formato della *promissory note* emessa da Wishaw Trading S.A. a beneficio della fornitrice Archer Daniels Midland Company e della relativa garanzia per avallo di Parmalat S.p.A. così come redatti da ABN.

2. Vero che in data 17 marzo 2003 la sig.ra Tamara Cavallucci di Abn filiale di Milano ha inviato dal proprio *account* di posta elettronica nell'ambito del sistema informatico di ABN tamara.cavallucci@it.abnamro.com un messaggio e-mail (che si rammostra) alla sig.ra Margaret Sirovatka Margaret.Sirovatka@us.abnamro.com contenente la traduzione in inglese del messaggio e-mail di cui al capitolo 1.

3. Vero che in data 10 marzo 2003 la sig.ra Angela Noique, di ABN filiale di New York, ha inviato dal proprio *account* di posta elettronica nell'ambito del sistema informatico di ABN (angela.noique@abnamro.com) alle signore Tamara Cavallucci e Loredana Quintadamo agli indirizzi di posta elettronica tamara.cavallucci@it.abnamro.com e loredana.quintadamo@it.abnamro.com e per conoscenza ai signori Terrence Ward, Margaret Sirovatka, John Curch agli indirizzi Terrence.Ward@us.abnamro.com, Margaret.Sirovatka@us.abnamro.com, John.Curch@us.abnamro.com, un messaggio e-mail (che si rammostra) ove veniva comunicato che la signora Margaret Sirovatka aveva ottenuto la conferma da parte di Archer Daniels Midland Company circa la possibilità di richiedere a Parmalat l'inclusione nella formulazione della garanzia per avallo di Parmalat S.p.A. di una parte concernente il "Country Risk Event" e il "New Money Credit Event".

ABN ha indicato come testi sui summenzionati capitoli di prova: la sig.ra **Giorgia Bocchi** domiciliata presso Parmalat S.p.A. in Amministrazione Straordinaria via Oreste Grassi Collecchio (PR), la sig.ra **Tamara Cavallucci** domiciliata presso la filiale di Milano di

33

ABN, via Ludovisi 16 Milano e la sig.ra **Angela Noique** domiciliata presso ABN filiale di New York dipartimento Credit Portfolio Management.

A sostegno dell'amissibilità della prova testimoniale richiesta ABN ha ricordato l'orientamento giurisprudenziale secondo il quale l'art. 2704 c.c. impedisce la prova per testimoni vertente direttamente sulla data del documento **ma ammette, per contro, la prova testimoniale avente ad oggetto <u>i fatti idonei a conferire certezza alla data della scrittura ai sensi dell'art. 2704, c.c., comma 1, seconda parte</u>**.

Tale orientamento è stato applicato dai giudici di merito a fattispecie analoghe alla presente: il Tribunale di Vicenza nella sentenza del 10 marzo 1984 (relativa proprio ad un'ipotesi di richiesta di ammissione al passivo avente ad oggetto un credito derivante da titolo cambiario) ha infatti sostenuto che il divieto di prova testimoniale vertente sulla data di formazione del documento discenderebbe dalla *"norma stessa di cui al secondo comma dell'art. 2704 c.c. che, ammettendo la libertà di prova solo per le scritture contenenti dichiarazioni unilaterali non recettizie, non consente, evidentemente di provare con testimoni la data apparente delle altre scritture private..."*. Ma che, tuttavia, il primo comma della norma stabilisce che la prova della data è la risultante della prova dei fatti indicati dalla legge *"e la caratteristica della prova è che questa in tutti i casi legalmente previsti non riguarda il momento di formazione del documento e tanto meno il suo contenuto, ma la preesistenza del documento ad un determinato evento"*.

Alla luce di tali considerazioni, quindi, il Tribunale di Vicenza ha affermato che:

*"se è vero che la certezza della data può essere data da fatti o accadimenti antecedenti all'avvenimento preso in considerazione (nel caso il fallimento) dai quali si possa desumere in modo ugualmente certo che il documento è stato formato prima del fatto o dell'accadimento stesso, non si vede perché la prova di questo fatto o accadimento non possa essere fornita a mezzo testi. Non lo esclude il 2° comma dell'art. 2704 c.c. che,*

34

*come detto, attiene alla prova della data della formazione del documento e non dei fatti ritenuti dalla stessa norma idonei a conferire certezza alla data dello stesso. Non lo esclude il 1° comma dell'art. 2704 c.c., il quale non richiede circostanze o situazioni il cui accertamento debba essere necessariamente precostituito".*

In altre parole secondo il Tribunale di Vicenza *"la limitazione di cui all'art. 2704 c.c. non riguarda i mezzi di prova, quanto invece, l'oggetto della prova, che è , appunto limitato a quei fatti che stabiliscano in modo egualmente certo l'anteriorità della formazione del documento...si tratta di una qustione di fatto devoluta al giudice di merito al quale è lasciata la libertà di valutare se le circostanze sulle quali verte la prova testimoniale siano idonee a fornire, in modo sicuro e tranquillizzante, la certezza dell'anteriorità della formazione del documento e se i testi siano attendibili"* (Tribunale Vicenza 10 marzo 1984, in *Giur. comm.* 1985, II, 390 e ss).

L'orientamento espresso in tale sentenza è stato pienamente confermato dalla Corte di Cassazione in una fattispecie relativa all'opponibilità di un contratto preliminare di vendita, stipulato con scrittura privata non autenticata, nei confronti del titolare della prelazione (terzo rispetto alla scrittura): *"l'opponibilità di quella data* (della scrittura contenente il contratto preliminare di vendita ndr) *nei confronti dell'avente diritto alla prelazione, in mancanza di una delle situazioni tipiche di certezza contemplate dalla prima parte della citata norma (registrazione, morte od incapacità di un sottoscrittore, riproduzione in atto pubblico) richiede, in applicazione della seconda parte della norma medesima, che si deduca e dimostri un fatto idoneo a stabilire in modo ugualmente certo l'anteriorità della formazione del documento; la suddetta dimostrazione, pertanto, può avvalersi anche di prove per testimoni o presunzioni, se esse evidenzino un fatto munito dell'attitudine sopra specificata, non anche quando tali prove siano rivolte, in via indiziaria ed induttiva, a provocare un giudizio di mera verosimiglianza della data*

35

*apposta sul documento (come nel caso degli elementi evincibili dall'esecuzione del contratto)*" (Cass. 11 ottobre 1985, n. 4945, in *Riv. giur. agr.* 1985, 481, richiamata anche da Cass. 8 novembre 2001, n. 13813 in un *obiter dictum* ove viene dato espressamente atto dell'orientamento giurisprudenziale appena citato; nello stesso senso cfr. inoltre Tribunale di Modena, 10 dicembre 1976 in *Dir. Fall.*, 1977, II, 275; Cass. 28 giugno 1963, n. 1760 in *Foro it.* 1963, I, c. 1902).

**Tale orientamento è stato poi ulteriormente confermato dalla Corte di Cassazione in una recente decisione nella quale la Corte ha espressamente affermato che la norma di cui all'art. 2704 c.c. concerne esclusivamente la prova per presunzioni e testi volta a dimostrare in via diretta la data del documento, mentre non riguarda e quindi non esclude la prova testimoniale e presuntiva di quei fatti (anche atipici) idonei ai sensi della stessa norma a stabilire in modo altrettanto certo l'anteriorità della formazione del documento** (nella specie, alla luce del principio anzidetto, la Corte di Cassazione ha cassato la sentenza del giudice di merito il quale non aveva spiegato perché la circostanza della produzione, nel procedimento promosso per la dichiarazione di fallimento del fideiussore, della scrittura privata contenente la fideiussione non consentisse di ritenere provata l'anteriorità della scrittura privata al fallimento): "*[...] L'art. 2704 c.c. [...] non contiene un'elencazione tassativa dei fatti in base ai quali la data di una scrittura privata non autenticata deve ritenersi certa rispetto ai terzi e lascia al giudice del merito la valutazione, caso per caso, della sussistenza di un fatto, diverso dalla registrazione, idoneo secondo l'allegazione della parte, a dimostrare la data certa (Cass., sez. 1^, 28 giugno 1963, n. 1760, m. 262702). La giurisprudenza, se esclude l'ammissibilità della prova per testi o per presunzioni direttamente vertente sulla data (Cass., sez. 1^, 4 giugno 1986, n. 3742, m. 446622), ammette che la prova per testimoni o per presunzioni possa avere per oggetto i fatti idonei a stabilire in modo certo l'anteriorità della*

36

*formazione del documento (Cass., sez. 3^, 11 ottobre 1985, n. 4945, m. 442318; Cass. 8.11.2001, n. 13813, m. 550082). Nella specie la Corte d'appello nell'affermare che la ricorrente aveva fornito una mera prova indiziaria inidonea a fondare la prova dell'anteriorità della fideiussione all'apertura della procedura concorsuale, non ha preso in espressa considerazione nè la raccomandata di conferma della ricezione della fideiussione del 7.11.1988 nè il deposito di copia della scrittura privata in occasione della presentazione dell'istanza per la dichiarazione di fallimento di Pathè Comunicazioni, documenti che erano stati ritualmente prodotti dalla ricorrente, e non ha spiegato perchè, a suo avviso, quest'ultima avesse fornito una mera prova indiziaria, insufficiente a fondare la prova piena dell'anteriorità della fideiussione al fallimento. La Corte di merito, in particolare, avrebbe dovuto chiarire perchè la produzione della scrittura privata contenente la fideiussione nel procedimento promosso per la dichiarazione di fallimento della società poi fallita, non consentisse di ritenere provata l'anteriorità del documento al fallimento stesso, secondo la previsione dell'art. 2704 c.c., comma 1, ult. parte. Ne deriva che la motivazione della sentenza impugnata è carente per i profili ora accennati, sì che la sentenza va cassata con rinvio ad altra sezione della Corte d'appello di Roma, che pronuncerà anche sulle spese del giudizio di Cassazione."* (Cass. 8 novembre 2006, n. 23793, in *Giust. civ. mass.*, 2006, 11).

Con ordinanza in data 5 ottobre 2006, codesto Ill.mo Giudice ha tuttavia rigettato la prova testimoniale richiesta da ABN, affermando che *"i fatti idonei a stabilire inequivocabilmente la certezza della data di una scrittura privata non autenticata e, quindi, l'anteriorità della formazione del documento, ai fini della sua opponibilità ai terzi non possono formare oggetto di prova testimoniale"* richiamando a sostegno di tale affermazione la sentenza della Corte di Cassazione n. 3742 del 1986.

37

A sommesso parere della difesa di ABN la sentenza della Suprema Corte citata da codesto ill.mo Giudice non risulta per nulla decisiva al fine di individuare correttamente i limiti di ammissibilità della prova testimoniale discendenti dall'art. 2704 c.c. (e quindi per valutare l'ammissibilità dei capitoli di prova formulati da ABN) e ciò da un lato in quanto è del tutto in contrasto con (nonché del tutto superata da) l'orientamento pacifico della Suprema Corte (confermato come osservato anche da una recentissima sentenza del novembre 2006) e dall'altro in considerazione della assoluta opacità e contraddittorietà della stessa.

Nel caso deciso dalla sentenza citata da codesto Ill.mo Giudice la prova testimoniale aveva ad oggetto la circostanza che le cambiali di cui si chiedeva l'ammissione al passivo fossero le stesse cambiali fatte valere dal creditore in sede di esecuzione forzata nei confronti del fallito prima della dichiarazione di fallimento. Al riguardo la S.C. ha da un lato confermato la decisione della Corte d'Appello che aveva ritenuto inammissibile la prova in quanto vertente su fatti che ai sensi dell'art. 2704 c.c. non possono essere oggetto di prova testimoniale, dall'altro, contraddicendo totalmente quanto precedentemente sostenuto, ha espressamente affermato l'ammissibilità della prova testimoniale su fatti idonei ai sensi dell'art. 2704 c.c. a provare con certezza l'anteriorità di un documento. Più in particolare, dopo aver escluso che la prova testimoniale potesse avere ad oggetto l'accertamento dei fatti indicati nell'art. 2704 c.c. in funzione strumentale rispetto all'accertamento della data di un documento, al paragrafo immediatamente successivo la Corte di Cassazione dichiara esattamente il contrario: *"Seppure si può ammettere una prova testimoniale e, quindi, per presunzioni, per dimostrare la data della sopravvenuta impossibilità fisica di uno dei sottoscrittori del documento o la data della registrazione o della morte, quando i pubblici registri siano andati distrutti o smarriti, e tali mezzi di prova possono essere altresì invocati per dimostrare uno degli altri fatti o accadimenti dai quali si possa desumere, in modo ugualmente certo, che il documento è stato formato prima del fatto o*

*dell'accadimento stesso, non e' ammessa la prova per testimoni e, quindi, per presunzioni, per accertare la data della scrittura privata non autenticata di fronte ai terzi* (così testualmente Cass. 28 giugno 1963 n. 1760, in motivazione)."

Dalla lettura della decisione la distinzione (confermata dalla stessa) tra fatti che possono essere oggetto di prova testimoniale e fatti che non possono esserlo, risulta del tutto incomprensibile e certo risulta incomprensibile come sia stata applicata nella concreta fattispecie. E' evidente che le due affermazioni della S.C. sono in plateale contraddizione tra di loro e che quindi dalla sentenza richiamata da codesto Ill.mo Giudice non può certo ricavarsi un principio univoco, idoneo a superare l'indirizzo giurisprudenziale evidenziato da ABN.

**ABN insiste pertanto affinché codesto Ill.mo Giudice voglia rimettere la causa in istruttoria ammettendo i capitoli di prova testimoni dalla stessa formulati.**

\* \* \*

Tutto ciò premesso ABN AMRO Bank N.V., come sopra rappresentata e difesa, insiste per l'accoglimento delle rassegnate conclusioni.

Milano-Parma, 21 dicembre 2007

Avv. Cesare Vecchio

Avv. Stefano Lombrassa

Avv. Umberto Serra