**EXHIBIT 10**

Westlaw.

[2005] 1 W.L.R. 3966                                                                                       Page 1
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

*3966 Shierson v. Vlieland-Boddy
[2005] EWCA Civ 974

Court of Appeal

CA (Civ Div)

Chadwick, Longmore LJJ and Sir Martin Nourse

2005 April 18; July 27

` Bankruptcy--Jurisdiction--Centre of main interests--Debt incurred in England where debtor having centre of main interests--Creditor presenting bankruptcy petition--Debtor claiming centre of main interests transferred to Spain--Time at which centre of main interests to be determined--Extent to which debtor free to change centre between date of debt and opening of proceedings--Relevance of creditor's perception as to centre--Whether court having jurisdiction to open insolvency proceedings--Council Regulation (EC) No 1346/2000, art 3

In February and May 2003 the debtor made attempts to set up individual voluntary arrangements which were necessarily based on his centre of main interests being in England and Wales; those proceedings continued until October 2003. In January 2004 a bankruptcy petition was presented against the debtor in respect of costs incurred in the individual voluntary arrangement proceedings. The debtor asserted that since the commencement of those proceedings Spain had become his centre of main interests and that he had no establishment in England, accordingly, the High Court had no jurisdiction to hear the bankruptcy petition. By article 3(1) of Council Regulation (EC) No 1346/2000 jurisdiction to open main insolvency proceedings was conferred on the courts of the member state within the territory of which the debtor's centre of main interests was situated. The courts of another member state had jurisdiction under article 3(2) to open territorial insolvency proceedings but only if the debtor possessed an establishment within the territory of that other state. On the hearing of the petition the registrar held that the debtor's centre of main interests was England for the purposes of article 3(1) of the

Regulation. The registrar also concluded that, in any event, the debtor had an establishment in the jurisdiction for the purposes of opening territorial insolvency proceedings under article 3(2) of the Regulation. He made a bankruptcy order. On the debtor's appeal, the judge held that the registrar had taken the date when the bankruptcy debt had been incurred as the date at which to assess the centre of main interests, and in doing so had erred. The judge considered the matter afresh and concluded that the petitioner had not established that the centre of the debtor's main interests was England for the purposes of article 3(1) of the Regulation and that the debtor had not possessed an establishment at the relevant time for the purposes of article 3(2), accordingly, he set aside the bankruptcy order.

On the petitioner's appeal-

Held, allowing the appeal, that the debtor's centre of main interests was to be determined at the time that the court was required to decide whether to open insolvency proceedings in the light of the facts as they were at the relevant time for determination which included historical facts which had led to the position as it was at that time; that in making its determination the court had to have regard to the need for the centre of main interests to be ascertainable by third parties, in particular, creditors and potential creditors; that it was important, therefore, to have regard not only to what the debtor was doing but also to what he was perceived to be doing by an objective observer, and to have regard to the need for an element of permanence; that the place where the debtor lived and had his home was likely to be relevant to a determination of where he conducted the administration of his interests; that there was no principle of immutability and a debtor had to be free to choose where he carried on those activities which fell within the concept of administration of his interests; that it was a necessary incident of the debtor's freedom to choose where he carried on those activities, that he might choose to do so for a self-serving purpose, for example, in order to alter the insolvency rules which would apply to him in respect of existing debts; that in those circumstances, the court would need to scrutinise the facts which were said to give rise to a change in the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                                Page 2
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

centre of main interests and to be satisfied that the change in the place where the activities which fell within the concept of quotadministration of his interestsquot were carried on which was said to have occurred was based on substance and not an illusion and that it had the necessary element of permanence; that the judge had been entitled to reach the conclusion that the debtor's centre of main interests had moved to Spain; that, therefore, the jurisdiction to open main insolvency proceedings had not been established under article 3(1) of the Regulation; but that, in the circumstances, the debtor had an establishment for the purposes of the territorial insolvency jurisdiction specified in article 3(2); and that, accordingly, the bankruptcy petition would be restored (post, paras 39, 43, 55-56, 68-69, 70, 73, 75-76, 81).

*Quaere.* (i) Whether the point of time a creditor has to prove that the debtor's centre of main interests was situated in England is the date of service of the bankruptcy petition or the date of the hearing of the petition (post, paras 39, 71, 75).

(ii) Whether the debtor's centre of main interests has to be proved on the balance of probabilities (post, paras 72, 75).

Decision of Mann J [2004] EWHC 2752 (Ch) reversed.

The following cases are referred to in the judgments:

Canada Trust Co v Stolzenberg (No 2) [1998] 1 WLR 547; [1998] 1 All ER 318, CA; [2002] 1 AC 1; [2000] 3 WLR 1376; [2000] 4 All ER 481, HL(E)

Ci4net.com Inc, In re [2004] EWHC 1941 (Ch); [2005] BCC 277

Daisytek-ISA Ltd, In re [2004] BPIR 30

Dresser UK Ltd v Falcongate Freight Management Ltd [1992] QB 502; [1992] 2 WLR 319; [1992] 2 All ER 450, CA

Eurofoods IFSC Ltd, In re [2004] IESC 45; [2005] IL Pr 2

Long v Farrer & Co [2004] EWHC 1774 (Ch); [2004] BPIR 1218

Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran [1994] 1 AC 438; [1993] 3 WLR 756; [1993] 4 All ER 456, HL(E)

Skjevesland v Geveran Trading Co Ltd [2003] BCC 209; [2002] EWHC 2898 (Ch); [2003] BCC 391

No additional cases were cited in argument.

APPEAL from Mann J

By an order made by Mr Registrar Rawson on 13 July 2004, the debtor, Clive Vlieland-Boddy, was adjudged bankrupt pursuant to a creditor's petition presented by Malcolm Brian Shierson. By a judgment dated 26 November 2004 Mann J allowed the debtor's appeal from that decision on the grounds that the petitioner had not proved that when the insolvency proceedings were opened the debtor's centre of main interests was in England and Wales, nor had he proved that the debtor possessed an establishment in England and Wales; accordingly, there had been no jurisdiction under article 3 of Council Regulation (EC) No 1346/2000 to hear the bankruptcy petition.

By an appellant's notice dated 17 December 2004 and pursuant to permission granted by the Court of Appeal (Jonathan Parker LJ) the petitioner appealed on the grounds that the judge had (1) misunderstood the reasoning of Mr Registrar Rawson; (2) made an error of law in his *3967 construction of article 3 of EC Regulation 1346/2000; (3) given too much weight in deciding the quotcentre of main interestsquot of the debtor to the place of the debtor's residence at the date of the hearing; and (4) given the word quotestablishmentquot in article 3 (2) of the Regulation an unduly strict meaning.

The facts are stated in the judgment of Chadwick LJ.

*Gregory Mitchell QC* for the petitioner.

*Jane Giret QC* and *Stephen Tudway* for the debtor.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                     Page 3
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

*Cur. adv. vult.*

27 July. The following judgments were handed down.

## CHADWICK LJ

1 On 27 February 2004 a petition was presented to the High Court by Mr Malcolm Shierson, an insolvency practitioner and the trustee in bankruptcy of Mr Martin Vlieland-Boddy, for a bankruptcy order to be made against Mr Clive Vlieland-Boddy. Mr Martin Vlieland-Boddy and Mr Clive Vlieland-Boddy are twin brothers. In this judgment references to quotthe debtorquot are to Mr Clive Vlieland-Boddy.

2 Article 3(1) of Council Regulation (EC) No 1346/2000 of 29 May 2000 (*OJ 2000 L160, p 1*) on insolvency proceedings provides, so far as material: quotThe courts of the member state within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings.quot Article 3(2) provides:

> quotWhere the centre of a debtor's main interests is situated within the territory of a member state, the courts of another member state shall have jurisdiction to open insolvency proceedings against that debtor only if he possesses an establishment within the territory of that other member state. The effects of those proceedings shall be restricted to the assets of the debtor situated in the latter member state.quot

Proceedings opened under article 3(1) are referred to as quotmain insolvency proceedingsquot. Proceedings opened under article 3(2) are referred to as quotterritorial insolvency proceedingsquot. The provisions of article 3 are incorporated in the Insolvency Act 1986 by section 265(3) of that Act, as amended by regulations 3 and 14 of the Insolvency Act 1986 (Amendment) (No 2) Regulations 2002 (SI 2002/1240).

3 This appeal raises the questions: (i) whether, on the facts found by the bankruptcy court in this case, the centre of the debtor's main interests was within the territory of the United Kingdom at the relevant date and (ii), if not, whether the debtor possessed an establishment here, so as to found jurisdiction in respect of territorial insolvency proceedings.

*The background*

4 The circumstances which led to the presentation of a bankruptcy petition against the debtor in February 2004 are set out in paras 3 and 4 of the judgment delivered by Mr Registrar Rawson on 13 July 2004:

> quot3. On 3 October 1997, the Co-operative Bank plc was defrauded of £2m by Dexter Ltd ('Dexter'), a company of which Mr Shierson is now administrative receiver. Claims were pursued by Dexter and the bank **\*3968** against Martin Vlieland-Boddy. In the course of the trial of these claims in November 2002 Martin Vlieland-Boddy decided that he no longer wished to defend and judgment was given against him for£2m with an interim order for the payment of £300,000 [on account of costs]. In May 2001, the debtor commenced proceedings against the petitioning creditor in his capacity as trustee in bankruptcy of Martin Vlieland-Boddy, claiming the recovery of funds from his estate. In April 2002, on the second day of a three-day trial, the debtor discontinued those proceedings. The costs of Mr Shierson, which were ordered to be paid by the debtor, were assessed at £127,905-odd. A certificate in respect of these costs was issued on 20 January 2004 ...
> quot4. In February 2002, proceedings were commenced against the debtor claiming that he had assisted in the fraud on the bank, had benefited from part of the proceeds of it and was also liable for repayment of the £2m. He sought to have these proceedings struck out as an abuse of process.

[2005] 1 W.L.R. 3966                                                                Page 4
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

This application was rejected by Lloyd J on 25 July 2002 and the debtor's appeal against that decision was dismissed by the Court of Appeal on 24 January 2003 which gave directions for the future conduct of those proceedings. The trial was due to have started in June [2004] but was then postponed until after the determination of this petition.quot

*The debtor's connection with the United Kingdom*

5 The debtor is a qualified accountant of some 25 years standing. For many years he practised as such, and as an insolvency practitioner, formerly (until October 1993) from offices at 1 The Centre, Gillingham, Dorset and latterly from offices at Abacus House, Poole, Dorset. He lived with his wife and sons at Milland House, Shaftesbury.

6 On 27 January 2001 the debtor and his wife entered into an agreement, described as a deed of separation, for the division between them of the quotfamily assetsquot. Those assets, as shown in the agreement, included Milland House and a flat at 8 Ongar Road, Fulham (which were to be taken by Mrs Vlieland-Boddy) and Unit 2A, Sunrise Business Park, Blandford Forum, Dorset (also known as Millennium House) and a share in Abacus House (which were to be taken by the debtor).

7 Notwithstanding that apparent division of family assets, on 22 August 2001 the debtor and his wife took a lease of property known as First Floor Flat, 137 Westminster Bridge Road, London SE1 for a term of 125 years from 1 January 2001. The consideration for the grant of the lease was £185,000. The address of both the debtor and his wife was shown, in that lease, as Milland House.

8 On 4 September 2002 the debtor and his wife charged Unit 2A, Sunrise Business Park (quotMillennium Housequot) to Millennium Investment International Ltd, a company incorporated in the British Virgin Islands with an address in Jersey, to secure liabilities under a facility agreement of the same date. The legal charge contained a recital that the debtor was entitled to the entire beneficial interest in the property charged.

9 On 12 October 2002, the debtor and his wife transferred the leasehold interest in the flat at 137 Westminster Bridge Road to Millennium Investment International Ltd for no consideration. *3969*The 2003 insolvency proceedings

10 On 3 February 2003 the debtor swore an affidavit in support of his application to the High Court for an interim order, pursuant to sections 252 and 253 of the Insolvency Act 1986, pending approval of his proposals to creditors for an individual voluntary arrangement. In that affidavit he gave as his main place of residence an address in Malaga, Spain. In his proposals, a copy of which was exhibited to that affidavit, he stated that he was quotcurrently living in rented accommodation in Malaga where I have recently been able to find employmentquot. The only asset disclosed in the statement of affairs as at 31 January 2003, annexed to the proposals, was Unit 2A, Sunrise Business Park, which was shown as subject to a charge in favour of Millennium Investment International Ltd to secure £245,000.

11 That application came before Mr Registrar Baister on 13 February 2003, under reference 24-IO-2003. It was adjourned to 27 February 2003 on the debtor's undertaking to make and file a witness statement confirming that his centre of main interests was in the United Kingdom. Although there is no witness statement to that effect in the papers before this court, the application proceeded on the basis that that undertaking had been met. The chairman's report of a meeting of creditors held on 14 March 2003 records: quotThe EC Regulation will apply and will be the main proceedings [sic].quot When, after adjournments on 27 February and 13 March 2003, the application for an interim order came back before Mr Registrar Baister on 20 March 2003, he took the view that no valid meeting of creditors had been held and so made no order.

12 On 3 April 2003 the nominee under the proposals of February 2003 applied to the High Court under section 262 of the Insolvency Act 1986. That application was, I think, for directions under subsection (4)(b) of that section for the summoning of a further meeting. The application was opposed by Mr Shierson, as administrative receiver of Dexter Ltd and as trustee in bankruptcy of Mr Martin Vlieland-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                    Page 5
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

Boddy. The application was dismissed by the registrar on 1 May 2003 and the order was made final on 18 July 2003.

13 On 6 June 2003 Dexter Ltd, acting by Mr Shierson as administrative receiver, presented a bankruptcy petition against the debtor on the basis of the order for costs (£8,500) made in this court on 24 January 2003. It was alleged in that petition that the debtor's centre of main interests had been in England and Wales and that the bankruptcy proceedings would be main proceedings for the purposes of article 3 of the EC Regulation. In a witness statement dated 17 July 2003 the debtor took the point, I think for the first time, that his centre of main interests had changed. He said:

> quotHaving now settled permanently in Spain, it is now my 'centre of interest' in accordance with the provisions of (EC) No 1346/2000. Having no establishment', as defined in article 2(h) of (EC) No 1346/2000, within the United Kingdom, there are no grounds for secondary or territorial proceedings.quot

It appears from a witness statement made on 15 April 2004 by a solicitor acting for Mr Shierson in the current proceedings that that petition was subsequently withdrawn on the debt being satisfied in full by the debtor's wife.

14*3970 Notwithstanding his assertion (in his witness statement of 17 July 2003) that there was no longer jurisdiction to open insolvency proceedings, the debtor appealed from the order of 18 July 2003. Dexter Ltd and Mr Shierson served a respondents' notice. It appears that the debtor raised the question whether that notice had been served in time. On 27 August 2003 that question came before Mr Registrar Rawson. He resolved the question in favour of the respondents and ordered the debtor to pay the costs of that hearing, assessed at £1,200.

15 The appeal from the order of 18 July 2003 came before Mr Roger Kaye QC, sitting as a deputy judge of the Chancery Division, on 24 October 2003. He dismissed the appeal. He ordered that the debtor pay the costs of the appeal, which he assessed, summarily, at £7,889.10.

16 On 10 November 2003 the debtor wrote to his creditors in these terms, so far as material:

> quotRe my IVA and the creditors meeting of 14 March 2003. I must first apologise for the considerable time that has elapsed since I made my proposals to my creditors back in March of this year. Regretfully, the nominee made several mistakes and these were not able to be rectified by the court even by me making an appeal which was eventually heard some ten days ago. The position therefore is that I am not in a voluntary arrangement but feel that my creditors who overwhelmingly supported me should not lose out and I do not intend to turn my back on them. However, now living and working in Spain, my ' centre of main interest' is Spain and as such precludes me from making any further application under UK insolvency law ...quot

*The 2004 insolvency proceedings*

17 The bankruptcy petition presented to the High Court in February 2004 was based on the debtor's failure to comply with a statutory demand served on 5 January 2004 for the sum of £9,305.45. That was the aggregate of the sums due in respect of costs under the orders of 27 August 2003 and 24 October 2003, made in the IVA proceedings to which I have referred, and accrued interest. The debtor was described in the petition as having an address at Malaga, in Spain; but as carrying on business as quotshareholder, company secretary and director of Sinclair Research Ltd whose registered office is at 1 The Centre, The High Street, Gillingham, Kent [sic]quot and, lately, as quotjoint proprietor of multi-let business premises at Unit 2A, Sunrise Park, Higher Shaftesbury Road, Blandford Forumquot. The petition alleged, at para 1, that the debtor had had an establishment at 1 The Centre, Gillingham, and at Unit 2A, Sunrise Park, Blandford Forum; and that the insolvency proceedings would be territorial proceedings as defined in article 3 of the EC Regulation.

[2005] 1 W.L.R. 3966

2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr. 12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974

**(Cite as: [2005] 1 W.L.R. 3966)**

Page 6

**18** An application for leave to serve the petition on the debtor out of the jurisdiction was made to Mr Registrar Rawson on 27 February 2004. In granting leave the registrar made a declaration that the EC Regulation applied to the proceedings and that they were territorial proceedings within article 3.

**19** On 16 March 2004 the debtor made a witness statement in opposition to the bankruptcy petition. He asserted, as he had done in his witness statement of 17 July 2003 in opposition to the earlier petition, that *3971 Spain was his centre of main interests for the purposes of the EC Regulation and that he had no quotestablishmentquot in the United Kingdom. He went on to say:

> quotMy wife and I formally separated last year. I moved to live permanently in Spain last summer. The administrative receiver of Dexter, M B Shierson, who is also the trustee of the estate of M R Vlieland-Boddy, in a witness statement to the court in the appeal of IO 24 of 2003, heard in the High Court in October 2003, stated that he accepted that my centre of main interest was Spain and that as such the appeal under section 262 Insolvency Act 1986 for the meeting of creditors to be valid should not be allowed as I was no longer entitled to [any] assistance under the UK insolvency laws.quot

The latter allegation is not accurate. Whatever may or may not have been said to the judge at the hearing of the appeal on 24 October 2003 (as to which the evidence of Mr Shierson's solicitor, in the witness statement of 15 April 2004 to which I have already referred, is that the issue was not raised before the judge), the relevant paragraph of Mr Shierson's witness statement of 7 October 2003 was in these terms:

> quotI believe the court ought also to be aware that [the debtor] has confirmed in a witness statement dated 17 July 2003 that having apparently moved to Spain where he suggests he has now settled permanently, he considers Spain as his centre of interest for the

purpose of relevant insolvency legislation ...quot

It was plainly appropriate for Mr Shierson to draw to the attention of the court hearing the appeal from the order of 18 July 2003 that the debtor was contending that his centre of main interests was no longer within its jurisdiction; but, in doing so, Mr Shierson cannot be taken to be accepting that contention.

**20** The debtor made a further witness statement on 18 April 2004. He said:

> quotI live in Spain and have done so for the past nine months. I have not lived in the United Kingdom for the past nine months. I have separated from my wife. Formal financial settlement was made with her some three years ago and a copy of this was passed to the petitioner over 15 months ago. This states that we equally divided our estate with my wife retaining the matrimonial home (Milland House, Breach Lane, Shaftesbury, Dorset). I therefore have no interest in it. My wife and I have not gone for formal divorce proceedings yet, as our two sons are at a very critical stage of their school careers.quot

In a further witness statement, dated 10 May 2004, the debtor said that, since leaving the United Kingdom in June 2003, he had returned to see his children for a few days at a time. He went on:

> quotI have no intention to ever return to live or work in the UK. My wife and I are separated and we have only held back from formal divorce proceedings as this is a critical period for both children's education.quot

Further light was shed on the debtor's marital position by a witness statement made by Mrs Vlieland-Boddy on 11 May 2004. She said: *3972

> quotAs a result of the proceedings brought against Clive by Malcolm Shierson, our marriage has been put under intolerable stress to the extent that we no longer live together. Our marriage has irretrievably broken down and I intend shortly to bring divorce proceedings. This is something I

[2005] 1 W.L.R. 3966                                                                                                    Page 7
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

have agreed with Clive and which I have explained to the children ... In so far as I am aware, Clive has been living abroad for approximately the last year. Up to Christmas 2003, Clive periodically returned to Milland House for a few days to see the children. Since Christmas 2003 he has not been here at all except for two nights in April when I asked that he look after one of our children ... whilst I was abroad.quot

21 The petition came back before the registrar on the first return date (21 April 2004). He gave permission to amend. Para 2, after amendment, was in these terms:

> quotIt is considered that the EC Regulation on insolvency proceedings will apply and either the centre of main interest is in England and these will be main proceedings or alternatively that these proceedings will be territorial proceedings as defined in article 3 of the EC Regulation.quot

*The registrar's decision on jurisdiction*

22 It was in those circumstances that Mr Registrar Rawson had to decide whether the English court had jurisdiction to open insolvency proceedings, either under article 3(1) or under article 3(2) of the EC Regulation. In a judgment delivered on 13 July 2004 the registrar observed, correctly, that the debtor's attempts to set up the voluntary arrangement were necessarily based upon him having his centre of main interests in England and Wales. Proceedings to obtain approval of a voluntary arrangement under Part VIII of the Insolvency Act 1986 are quotinsolvency proceedingsquot for the purposes of the Regulation- article 2(a) and Annex A. It followed, as he thought, that the debtor could not be heard to say that his centre of main interests was in another member state at a time before October 2003 (when the debtor's appeal from the order made by Mr Registrar Baister on 18 July 2003 was dismissed). As the registrar put it, at para 6 of his judgment: quotThere can be no doubt at all that until this time, that is until October 2003, it was in

England and Wales.quot The registrar accepted, at para 16, that the time at which the centre of main interests was to be ascertained was the date of the hearing; but he directed himself that

> quotin order to give effect to the policy of the Convention, the court must, in my judgment, have regard to the time at which the debt is incurred because that is the time at which the creditors need to assess the risks of insolvency.quot

The reference by the registrar to quotthe Conventionquot in that context is, I think, to the Convention on Insolvency Proceedings signed on 23 November 1995 on which Council Regulation (EC) No 1346/2000 is based.

23 That approach, when applied to the facts, led the registrar to conclude that he had to consider quotwhat the debtor's centre of main interests was in the period of approximately eight months between February and *3973 October 2003quot. On that basis, he concluded that the debtor's centre of main interests was within England and Wales. As he put it, at para 19 of his judgment:

> quotif it had been suggested to his creditors at the time the debts were incurred that his centre of main interests was Spain rather than England, they would have been incredulous. I have no doubt at all that in this case the debtor's centre of main interests is England and Wales and that, accordingly, the bankruptcy court has jurisdiction over all his assets, wherever situated.quot

24 The registrar made a bankruptcy order on the basis that he was satisfied quotthat the EC Regulation does apply and that these proceedings are main proceedings as defined in article 3 of the Regulationquot. But, notwithstanding his clear view that the jurisdiction had been established under article 3(1) of the Regulation, he went on to consider whether the debtor had an establishment in England for the purposes of article 3(2). He held that that question, also, should be answered in the affirmative. He said, at para 20:

> quotAgain, I consider that the court

[2005] 1 W.L.R. 3966                                                      Page 8
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

must look at the period when the debts were incurred. At this time the debtor retained his directorship of Sinclair Research Ltd and his interest in Sunrise Business Park. I consider that both of these interests constituted establishments for the purposes of article 3(2) in the sense that they were places where the debtor carried out a non-transitory economic activity with human means and goods.quot

*The appeal to the High Court*

25 The debtor appealed to a judge of the High Court. In his appellant's notice he took the point that the registrar had erred in holding that the relevant time for determining a debtor's centre of main interest was the time when the petition debt was incurred (rather than at the hearing of the petition); and had erred in holding that the underlying policy of the Regulation required the court to have regard to the perception of an individual creditor when determining a debtor's centre of main interests. He took the timing point in relation, also, to the question whether a debtor had an establishment for the purposes of article 3(2). And he challenged the registrar's conclusion that his continuing directorship of Sinclair Research Ltd and his interest in Unit 2A, Sunrise Business Park justified an affirmative answer to that question.

26 The appeal came before Mann J [2004] EWHC 2752 (Ch). He handed down a written judgment on 26 November 2004. He noted, at para 12, that it had become common ground in the course of the hearing that the relevant date for assessing the centre of main interests and the existence of an establishment- or, more accurately, I think, the date by reference to which those matters are to be assessed- was the date of the hearing of the petition or (perhaps) the date of the presentation of the petition. But, as he observed, it was not accepted by the petitioner that (on a true analysis of the registrar's judgment) the registrar had assessed the position as at an earlier date.

27 The judge resolved that issue in favour of the debtor. He pointed out that there was an apparent inconsistency between the third sentence of *3974

para 16 in the registrar's judgment- quotI have to decide now what is his centre of main interestsquot- and the final sentence of para 17- quotI therefore have to consider what the debtor's centre of main interests was in the period of approximately eight months between February and October 2003quot. He concluded that the registrar had quotshifted the focus of his inquiry on the date of the hearing before him back to the earlier date referred to [the date or dates on which the debts were incurred]quot. In that respect the registrar had fallen into error. Accordingly the judge took the view that he had to consider the matter afresh on the matter before him.

28 The judge, at para 23, directed himself that the inquiry as to the debtor's centre of main interest is quotan overall inquiry which takes into account all relevant facts, giving to each of the facts such weight as is appropriate to the circumstances of the particular casequot. He set out, at paras 28-36, the facts of which he was to take account under four heads- work related matters, English residence, Spanish residence and other property interests. He summarised quotthe overall evidential positionquot in these terms, at para 37:

> quotMr Vlieland-Boddy has stated that he has moved his home, his work and his life to Spain. He has backed that up with some documentation. He has, however, left some significant suspicion behind him that that is not the actual position, he has retained interests here which he denies having and that his steps to take himself out of the jurisdiction are somehow a deliberate attempt to remove himself. I do not think that a deliberate attempt to remove oneself from the English jurisdiction is necessarily something undesirable or to be guaranteed against, since a centre of main interests can be changed, there is nothing necessarily wrong or sinister in making a choice to do it. The suspicions, however, remain, and they are strong. Where do they leave the matter?quot

He went on, at para 38, to say:

> quotLooking at the matter as Mr Vlieland-Boddy would like to

[2005] 1 W.L.R. 3966                                                    Page 9
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

present it as at the present date, without delving into the suspicious matters, would tend to demonstrate that Mr Vlieland-Boddy's main centre of interests has indeed become Spain and is not in England and Wales. He apparently lives there and he works there. He does not work in the UK. Whilst he is the joint registered proprietor of the Milland House [the former matrimonial home], he disclaims any interest in it and says he does not live there ... The petitioner challenges this and says that he has not in fact broken the ties in the manner which he claims, and that as a result he should be treated as though his centre of main interests were here ... I think that underlying the petitioner's case is a suggestion that the move is not genuine but has elements of sham about it, and that this is the sort of 'convenient' or non-genuine change that the courts should be astute to guard against.quot

29 The judge observed that he could not hold that the move was other than genuine without disbelieving the debtor's assertions as to his commitment to Spain and his divorce from ties in the United Kingdom. He pointed out that the petitioner had not sought to test those assertions by cross-examination. He held that it would not be fair to disbelieve the debtor without quota proper testing of his evidencequot. And so he came to the conclusion *3975 that the petitioner had not established the existence of jurisdiction under article 3(1). He said, at para 41:

quotThe burden is on the petitioner to establish jurisdiction. While the petitioner has certainly established an English centre of main interests until October 2003, Mr Vlieland-Boddy's evidence, if accepted fully, would show a shift to Spain. I am not in a position in which I can disbelieve his assertions as to what he has done and why he has done it, and in those circumstances the petitioner has not discharged the

burden on him. On the present state of the evidence, Mr Vlieland-Boddy seems to be administering his interests from Spain, and I cannot conclude that this apparent state of affairs is somehow false or temporary. Therefore his centre of main interests appears to be in Spain.quot

30 The judge then went on to consider whether the registrar had been correct to decide (in the alternative) that territorial jurisdiction arose under article 3(2) of the EC Regulation. He identified the two factors relied upon as satisfying the requirement that quotthe debtor possesses an establishment within the territoryquot: (i) the debtor's interest in Sinclair Research Ltd and (ii) his interest in Unit 2A, Sunrise Business Park. The judge reminded himself that quotestablishmentquot was a defined term, in article 2(h), for the purposes of the EC Regulation: quot 'establishment' shall mean any place of operations where the debtor carries out a non-transitory economic activity with human means and goods.quot He held that that relevant time for determining whether the debtor was possessed of an establishment was the date of the hearing before the registrar. The registrar was in error in looking at the position during the period when the debts were incurred.

31 The judge seems to have accepted that, at the relevant time, the debtor was a director and the company secretary of Sinclair Research Ltd and that he held shares in that company. But he held, at para 44, that none of those matters quoteither separately or in combinationquot involved the debtor (as distinct from the company) carrying out quota non-transitory economic activity with human means and goodsquot. As he put it, at para 44: quotHolding that sort of office does not seem to me to come within the wording or the concept of ' establishment' within the Regulation.quot

32 The judge then turned to the property at Blandford Forum, Millennium House, Unit 2A, Sunrise Business Park. He said, at para 45:

quotAs at the date of the hearing before the registrar this property was not owned by Mr Vlieland-Boddy. It was owned by

[2005] 1 W.L.R. 3966                                                                                         Page 10
2005 WL 1860174 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

Millennium. Unless Millennium was a sham and in effect a front or nominee for Mr Vlieland-Boddy, it was that company that was carrying on the activity of letting it and (presumably, though there was no evidence about this) managing it. Even if Mr Vlieland-Boddy is interested in Millennium to the extent of being its beneficial owner, I cannot ignore the corporate structure (in the absence of nomineeship) so Mr Vlieland-Boddy was not carrying out those activities himself. Accordingly he does not fall within the definition in article 2 and this building is not an establishment of his in this jurisdiction. This conclusion makes it unnecessary for me to consider the extent to which owning and running a building which is fully let would fall within the rest of the wording of the definition, and I make no findings in that respect.quot

33*3976 Accordingly, the judge allowed the appeal. By his order dated 26 November 2004 he set aside the bankruptcy order of 13 July 2004 and he dismissed the petition presented on 27 February 2004. He ordered Mr Shierson to pay the debtor's costs of the appeal and before the registrar.

*This appeal*

34 The petitioning creditor, Mr Shierson, appeals to this court. He does so with the permission of this court granted on 17 December 2004. In granting permission for what is a second appeal Jonathan Parker LJ observed that the grounds of appeal raised questions of general importance as to the approach the courts should adopt to the interpretation and application of article 3 of Council Regulation (EC) No 1346/2000.

35 There are four grounds of appeal set out in the appellant's notice; but, on analysis, they reduce to three, which may be summarised as follows. First, in holding that the registrar had quotshifted the focus of his inquiry on the date of the hearing before him back

to the earlier date (when the debts were incurred)quot, the judge misunderstood the registrar's reasoning. He failed to appreciate that the registrar had understood, correctly, that the situation of the centre of the debtor's main interest had to be decided at the date of the hearing; but had held that, in making that decision it was appropriate to look back at all the circumstances and, in particular, at what the creditors would have believed to be the centre of main interest at the time of giving credit.

36 Second (but set out under grounds 2 and 3), the judge erred in his own construction of the Regulation. Instead of approaching the question quotwhere is the centre of the debtor's main interestquot by considering all of the historical facts relating to the debtor, giving particular importance to the perception of the creditors at the time of giving credit (as the registrar had done), the judge gave too much weight to the debtor's current residence at the time of the hearing and so failed to give proper effect to the policy against quotforum shoppingquot which, it is said, lies behind the Regulation.

37 Third, the judge's approach to the meaning of quotestablishmentquot was unduly strict. In particular the judge was wrong to hold that a debtor may divest himself of an asset by making a transfer of that asset to a corporate body which he controls.

38 It is convenient to consider the first two of those grounds together. The issue on which each may be said to turn is, I think, the same: what weight should be given to the perception of creditors as to the debtor's centre of main interest at the time that credit is extended. In particular, how ready should the court be to accept that the debtor is free to change his centre of main interest between the time at which credit is extended and the opening of insolvency proceedings. It is a striking feature of the present case that the petition debt, itself, arises from costs orders made in proceedings in which the debtor was invoking the insolvency jurisdiction of the High Court on the basis that his centre of main interests was in the United Kingdom.

*Centre of main interests*

39 There is not, I think, any doubt as to the date in relation to which the debtor's centre of main interests falls to be determined for the purposes of the

[2005] 1 W.L.R. 3966                                                                                          Page 11
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

Regulation. Jurisdiction to open insolvency proceedings is conferred, *3977 under article 3(1), on the courts of the member state quotwithin the territory of which the centre of main interests is situatedquot. The quottime of the opening of proceedingsquot means quotthe time at which the judgment opening proceedings becomes effective, whether it is a final judgment or notquot, article 2(f). quotJudgmentquot, in that context, includes the decision of any court empowered to open such proceedings: article 2(e). The judge was correct to take the view that, before it could assume jurisdiction to open main insolvency proceedings, the court of a member state must be satisfied that, at the time that it did so, the debtor's centre of main interests was situated within the territory of that state. That, too, had been the view of the registrar, as appears from the third sentence of para 16 in his judgment, quotI have to decide now what is his centre of main interestsquot.

40 The matter on which the judge differed from the registrar was as to the weight to be given to historical fact; or, as I have already put it, how ready should the court be to accept that the debtor is free to change his centre of main interests between the time at which the debts are incurred and the opening of insolvency proceedings. The judge summarised the contentions advanced on behalf of Mr Shierson at paras 18 and 19 of his judgment:

> quot18. I will deal first with the manner in which [counsel] says I should approach the construction and operation of the Regulation. He points out that recital 4 to the Regulation confirms that there is a policy behind the Regulation to prevent 'forum shopping'. He says it would be 'astonishing' if debtors could forum shop by moving from country to country. In that way they could avoid important safeguards such as the English rights to challenge transactions under sections 339 and 423 of the Insolvency Act 1986 (transactions at an undervalue and transactions intended to defraud creditors). The Regulation should not be applied so as to enable debtors to effect an objectionable transaction and then move to a jurisdiction which makes

the recovery of assets subject to such transactions more difficult or even impossible. These sort of considerations should inform the construction and application of article 3(1), and the key was to take a proper view of the concept of 'the centre of his main interests'. The test must be an objective one. [Counsel] accepted that that centre might in some exceptional cases change but it would usually remain 'fixed over time' in the jurisdiction in which a person has his most real and substantial connection. The court must look at the way in which the debtor involved has organised his affairs, where the relevant debts were incurred, where his emotional ties are and so on. Just as a person domiciled in one country cannot easily change his domicile by 'fleeing' to another country, 'so a person cannot change what objectively is the centre of his main interests'. The centre is not fixed by transitory questions such as where that person is currently living, but by the way in which the individual has conducted his life. A court should be slow to decline jurisdiction on the basis that a person has given up his centre of main interests merely on the basis of residence abroad ...
> quot19. At times [counsel's] submissions came close to a submission that the centre of main interests is in essence fixed at the place where it was when his debts were incurred.quot

41*3978 If counsel had gone so far as to submit that the centre of main interests was fixed at the place where it was when the debts were incurred, the judge was plainly right to reject that submission for the reasons which he gave. To hold that the centre of main interests was fixed by some past event would be inconsistent with the language of article 3(1). The article requires the court to look at the position as it is at the date of the decision to assume (or decline) jurisdiction, not at the position as it was at some

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                              Page 12
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

earlier date. Further, to fix the centre of main interests at the place where the debts were incurred quotwould be illogical and unworkablequot. As the judge put it, at para 19:

> quotIf it is possible to change a centre of main interests, why should it be fixed by reference to certain debts? If it is to be so fixed, by reference to which debts is it to be fixed?quot

42 quotCentre of main interestsquot is not included amongst the terms and expressions defined in article 2 of the Regulation. But guidance as to the meaning of the concept is given in recital (13):

> quotThe 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.quot

The judge observed, correctly in my view, that there is nothing in that concept which prevents a debtor's centre of main interests from being changed from time to time. He went on to say, at para 19:

> quotthe only question which is going to arise in any particular case is whether or not it has in fact changed. [Counsel] is obviously right in saying that the test to be applied is an objective one, but it does not follow from that that the debtor has no choice in the matter. If a centre of main interests is changed it is obviously because of the subjective choices of the debtor in question; he chooses where he is going to carry on his commercial, domestic and emotional activities, but it is then an objective question as to whether or not the change in those activities has brought about a new centre of main interests.quot

43 Save that I would question (i) whether a concept based on conduct of quotthe administration of his interests on a regular basisquot really invites an inquiry into the debtor's centre of main interests, other than to the extent that where he lives and has his home is likely to be relevant to a determination of where he conducts the administration of his interests,

and (ii) whether quotthe only questionquot which will arise in any particular case is whether or not the debtor's centre of main interests has changed, I would not quarrel with the judge's analysis in that paragraph. He was plainly correct, if I may say so, to appreciate that the place in which a debtor carries on whatever activities fall within the phrase quotthe administration of his interestsquot is for the debtor to choose. In that sense, it is a matter of subjective choice. And he was correct to appreciate that, although the debtor may choose where he carries on activities which fall within that phrase, the question quotwhere does he conduct the administration of his interests on a regular basisquot remains an objective question. The place where the debtor conducts the administration of his interests on a regular basis must be ascertainable by third parties (recital (13) to the Regulation) and by the court (article 3(1)).

44*3979 Further, although the judge may have overstated the position when he said that quotthe only question which is going to arise in any particular casequot is whether the debtor's centre of main interests has in fact changed, that is the question, and, in the context of article 3(1), the only question, which arises in the present case. There is no doubt that, on the facts of the present case, the debtor's centre of main interests was in the United Kingdom until his move to Spain in June 2003. The question for the registrar in July 2004 was whether there had been a change between June 2003- or, perhaps, October 2003 when the debtor ceased to pursue his proposals for an individual voluntary arrangement- and the date of the hearing of the bankruptcy petition; on the assumption that that was the earliest date on which it could be said that there was a judgment opening main insolvency proceedings.

45 In addressing that question counsel for the petitioner relies, in this court as he did before the registrar and before the judge, on recital (4) to the Regulation:

> quotIt is necessary for the proper functioning of the internal market to avoid incentives for the parties to transfer assets or judicial proceedings from one member state to another, seeking to obtain a more favourable legal position (forum shopping).quot

It is that objective, with others, that justifies

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                    Page 13
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

quotaction at Community levelquot, recital (5). The objective set out in recital (4) should be read with recitals (8) and (12):

> quot(8) In order to achieve the aim of improving the efficiency and effectiveness of insolvency proceedings having cross-border effects, it is necessary, and appropriate, that the provisions on jurisdiction, recognition and applicable law in this area should be contained in a Community law measure which is binding and directly applicable in member states.quot
>
> quot(12) This Regulation enables the main insolvency proceedings to be opened in the member state where the debtor has the centre of his main interests. These proceedings have universal scope and aim at encompassing all the debtor's assets. To protect the diversity of interests, this Regulation permits secondary proceedings to be opened to run in parallel with the main proceedings. Secondary proceedings may be opened in a member state where the debtor has an establishment. The effects of secondary proceedings are Limited to the assets located in that state. Mandatory rules of co-ordination with the main proceedings satisfy the need for unity in the Community.quot

46 When seen in context, recital (4) to the Regulation provides little, if any, assistance to the petitioner. The need quotto avoid incentives for the parties to transfer assets ... from one member state to anotherquot is met by the Community regime (introduced by the Regulation) which gives to the main proceedings quotuniversal scopequot and the aim of quotencompassing all the debtor's assetsquot. So no advantage is obtained by moving assets from one territory to another. The need quotto avoid incentives for the parties to transfer ... judicial proceedings from one member state to anotherquot-by which, I think, is meant (at least, primarily) the need to avoid forum shopping by the creditor- is met by restricting the courts in which *3980 insolvency

proceedings may be opened. For my part, I do not think that recital (4) is directed to the question in the present case: whether and in what circumstances there could be a change in the debtor's centre of main interests. Recital (4) cannot be read as imposing some restriction on the ability of the debtor to choose where he carries on the activities which fall within the concept quotadministration of his interestsquot; nor to require the court to give some special meaning to the phrase quotwhere the debtor conducts the administration of his interests on a regular basisquot. The most that can be said, as it seems to me, is that the court should look critically at the facts which are said to give rise to a change in the centre of a debtor's main interests in circumstances where there are grounds for suspicion that the debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent in order to alter the insolvency rules which will apply to him in respect of existing debts.

47 Reliance was placed, also, on the Report on the Convention on Insolvency Proceedings (EU Council Document 6500/96 DRS 8) (July 1996) by Professor Miguel Virgos and Dr Étienne Schmidt. As I have said, the Convention, which was opened for signature on 23 November 1995, provides the basis for the Regulation, made on 29 May 2000. The version of the report with which we have been provided is dated 8 July 1996. It is common ground that regard may be had to the report in order to assist in the interpretation of the Regulation. section III, part B, chapter 3 contains a commentary on the general provisions of the Convention, article 3 of which was in the same terms (so far as material) as those later enacted in the Regulation. Para 75 explains what is meant by the concept of 'centre of main interests':

> quotThe concept of 'centre of main interests' must be interpreted as the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties. The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction (which, as we will see, entails the application of the

[2005] 1 W.L.R. 3966                                                                                    Page 14
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

insolvency laws of that contracting state) be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated. By using the term 'interests', the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to include the activities of private individuals (e g consumers). The expression 'main' serves as a criterion for the cases where these interests include activities of different types which are run from different centres. In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.quot

It will be noted that the first sentence of that paragraph has been taken into the Regulation as recital (13).

**48** The petitioner emphasises what is said in the Virgos-Schmidt Report to be the rationale of the rule which confers jurisdiction to open main insolvency proceedings on the courts of the member state in which the centre of the debtor's main interests is situated. It is to enable the legal risks to which creditors will be subject in the event of the debtor's insolvency to be *3981 evaluated in advance on the basis that the legal system which will govern that insolvency is known. A creditor will know, or will be able to assess with some confidence, what will be the centre of the debtor's main interests on the basis of the facts as they are at the time when he extends credit. But it is reading too much into the commentary to conclude that the centre of main interests will not change, if the underlying facts change, between the time that the creditor extends credit and the time when a court is asked to open insolvency proceedings. That could not have been in the minds of the commentators.

**49** The point may be illustrated by an example. Suppose a case in which the debtor incurs debts in

the territory of state A and then (while those debts remain unpaid) relocates his home and business to the territory of state B. He then incurs further debts in the territory of state B and becomes insolvent. It is of as much importance to the creditors in state B to know, or to be able to assess, where the debtor's centre of main interests is situated as it is to the creditors in state A. Seen through the eyes of the creditors in state B the debtor is conducting the administration of his interests on a regular basis in state B. Seen through the eyes of the creditors in state A, at the time when the debts to them were incurred, the debtor was conducting the administration of his interests on a regular basis in state A. But it is a necessary feature of the community regime established by the Regulation that, at the time when a court is asked to open insolvency proceedings, the debtor can have only one centre of main interests within the community. There is nothing in the Virgos-Schmidt commentary which suggests that that should be situated in state A, rather than in state B. In particular, there is nothing in that commentary to suggest that the centre of main interests, once established in state A, remains in state A—notwithstanding the debtor's relocation to state B, until, say, all his debts in state A have been paid.

**50** In my view the commentary does not support any principle of immutability. It does no more than point out the obvious advantages of a scheme under which, so far as possible, a creditor will be able to identify the legal system which will govern his debtor's insolvency at the time he advances credit. But unless the debtor is to be prevented from relocating his home and business, which he may wish to do for perfectly proper reasons unconnected with any threat of insolvency, there is a limit to the extent to which those advantages can be guaranteed.

**51** We were referred to the decision of Judge Howarth, sitting as a judge of the Chancery Division, in Skjevesland v Geveran Trading Co Ltd [2003] BCC 391. In that case the registrar had decided [2003] BCC 209 that the debtor's centre of main interests was situated in Switzerland. On the evidence which was before him it is difficult to see how he could have come to any other conclusion. He summarised that evidence in these terms, at p 223:

> quotI ... have to consider the question referred to in the Virgos-Schmidt report about where his

[2005] 1 W.L.R. 3966                                                        Page 15
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

'commercial, industrial or professional activities [and his] general economic activities' are being carried out. Mr Skjevesland was at pains, without adverting, or referring, to the European Regulation, which he did not know about, to tell me that 90% of his economic activities were carried out in Switzerland. He said that was where his business affairs were. His pension was there; his family *3982 were there ... all his money went through companies with which he was involved in Switzerland and bank accounts which he maintained in Switzerland; and he was a Swiss banker, which was all he had wanted to be, and had always wanted to be for the foreseeable future. It is quite true that he said that he conducted business in Spain. I do not think he told me in his evidence in October that he conducted more business in Spain than anywhere else, although he does tell me that now in his fifth witness statement.quot

The judge agreed. The effect of that decision was that article 3 of Regulation (EC) 1346/2000 did not displace the bankruptcy jurisdiction which (as the registrar found) the High Court would otherwise have under section 265 of the Insolvency Act 1986. I do not, for my part, find anything in the Skjevesland case which assists the appellant in the present case.

52 We were taken also to the decision of Judge McGonigal, sitting in the High Court, in In re Daisytek-ISA Ltd [2004] BPIR 30. The issue in that case was where the centre of main interests of French and German subsidiaries of ISA International plc (quotInternationalquot) was situated for the purposes of article 3(1) of the Regulation. After referring to recital (13) to the Regulation, to the commentary at para 75 of the Virgos-Schmidt Report and to the registrar's decision in Skjevesland v Geveran Trading Co Ltd [2003] BCC 391, the judge said [2004] BPIR 30, para 16:

quotIn my view the most important 'third parties' referred to in recital 13 are the potential creditors. In the case of a trading company the most important groups of potential creditors are likely to be its financiers and its trade suppliers. The evidence in this case is that the financing of the business of the German companies by a factoring agreement was organised for them by International in Bradford and that 70% of goods supplied to the German companies are supplied under contracts made by International in Bradford. It appears that a large majority of potential creditors by value (which I regard as the relevant criterion) know that Bradford is where many important functions of the German companies are carried out.quot

On the basis of that evidence the judge reached the conclusion that Bradford was the centre of main interests of the German companies. Similar evidence led to the same conclusion in relation to the French companies. There is nothing surprising or controversial about that. It was plainly appropriate to ask where potential creditors would think the debtors were conducting the administration of its interests on a regular basis. But the judge in In re Daisytek-ISA Ltd was not faced with the question in the present case: that is to say, the question which arises when the debtor has made (and sought to carry into effect) a deliberate choice to move the place at which he conducts the administration of his affairs on a regular basis from the territory of one member state to the territory of another member state. The decision is not, I think, of any assistance in the present context.

53 Of more relevance is the decision of Judge Langan QC in In re Ci4net.com Inc [2005] BCC 277. The judge thought that it was necessary to decide whether two companies, Ci4net.com Inc and DBP Holdings Ltd, had centres of main interests in London, although it is not clear from the report *3983 that there was any other territory within the community with a real claim. He addressed the question of timing at para 18:

quotThere were differences between counsel as to the approach which the court should adopt to a company which ... had its CoMI in England whilst it was active in the market place, but which has ceased

[2005] 1 W.L.R. 3966                                                          Page 16
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

to trade. Mr Clarke [counsel for the companies] would agree with Ms Stonefrost [counsel for the creditor bank] to the extent that the EC Regulation should be applied in a manner which will discountenance attempts by a company to 'forum shop'. It is, both would accept, important that trade creditors should know in what jurisdiction they will be able to pursue the assets of the company if it leaves their debts unpaid. It would, Ms Stonefrost said in her oral submissions, 'be contrary to the policy of the EC Regulation for a company to be able to remove itself from the jurisdiction by ceasing to trade'. This, Mr Clarke said, goes too far. The question of timing is, he said, of importance. Mr Clarke accepts that a more or less cynical removal of the seat of a company's operations from the European Union to a non-EU territory a few weeks or months before the business goes to the wall would not be regarded as working an alteration in the CoMI of the company. There is, however, a great difference between that and a restructuring of the business which is carried out for sound commercial reasons long before the question of insolvency proceedings becomes live. In the latter situation the policy against forum shopping does not raise a bar to a change in the company's CoMI being effected upon the company's ceasing to trade in the European Union.quot

And, at para 19, the judge went on:

quotThe differences between counsel is, I think, one of emphasis rather than of principle ... To the limited extent to which I think there is a material controversy here, I prefer Mr Clarke's approach. In my judgment, Ms Stonefrost comes too close to saying (although she did not in fact say it) that, once a company has a CoMI within the

EU, it is stuck with that CoMI on ceasing to trade, notwithstanding the time at which, or the circumstances in which, that cessation occurs.quot

Nevertheless, the judge accepted that a centre of main interest must have some element of permanence. The sole director of Ci4net.com Inc had given evidence to the effect that, since 2001, the business of that company had been conducted from wherever he happened to be at the time, which would be either in Spain or in New York. The judge found that evidence unimpressive. He said, at para 26:

quotThe notion of the location of a business shifting as its director moves from one country to another does not sit easily with the policy which underlies the EC Regulation. A business must under the EC Regulation have a CoMI and, in my judgment, a CoMI must have some element of permanence.quot

He concluded, at para 30:

quotThe CoMI of [Ci4net.com Inc] was until at least April 2001 in London, and what has occurred since is not sufficient (even if supported *3984 by the presumption in favour of the place of the registered office) to justify a finding that the CoMI is now elsewhere.quot

54 I should add, for completeness, that we were referred to the decision of the Irish Supreme Court in In re Eurofoods IFSC Ltd [2005] IL Pr 20. The Irish court pointed out that there were two elements to be considered under recital (13) to the Regulation: (i) that the centre of main interests should be where the company has conducted the administration of its interests on a regular basis, and (ii) that the centre of main interests must be such as is ascertainable by third parties. But, beyond that, there is nothing which assists on the issues in the present appeal. The Irish court referred questions to the European Court of Justice for a preliminary ruling; but it has not been suggested that those are questions which arise in the present appeal.

55 I have set out the authorities to which we were referred in deference to the arguments which

[2005] 1 W.L.R. 3966                                                        Page 17
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

were addressed to us and in recognition that the point in the present appeal has not previously been before this court. But, as it seems to me, they provide little assistance in the context of the present appeal. The question raised in this appeal must be determined by construing article 3(1) of the Regulation in the light of the Community purpose which the Regulation was intended to promote. I can summarise my own conclusions as follows. (1) A debtor's centre of main interests is to be determined at the time that the court is required to decide whether to open insolvency proceedings. In a case where those proceedings are commenced by the presentation of a bankruptcy petition, that time will normally be the hearing of the petition. But, in a case such as the present, where the issue arises in the context of an application for permission to serve the petition out of the jurisdiction, the time at which the centre of the debtor's main interests falls to be determined will be at the hearing of that application. Similar considerations would apply if the court were faced with an application for interim relief in advance of the hearing of the petition. (2) The centre of main interests is to be determined in the light of the facts as they are at the relevant time for determination. But those facts include historical facts which have led to the position as it is at the time for determination. (3) In making its determination the court must have regard to the need for the centre of main interests to be ascertainable by third parties; in particular, creditors and potential creditors. It is important, therefore, to have regard not only to what the debtor is doing but also to what he would be perceived to be doing by an objective observer. And it is important, also, to have regard to the need, if the centre of main interests is to be ascertainable by third parties, for an element of permanence. The court should be slow to accept that an established centre of main interests has been changed by activities which may turn out to be temporary or transitory. (4) There is no principle of immutability. A debtor must be free to choose where he carries on those activities which fall within the concept of quotadministration of his interestsquot. He must be free to relocate his home and his business. And, if he has altered the place at which he conducts the administration of his interests on a regular basis, by choosing to carry on the relevant activities (in a way which is ascertainable by third parties) at another place, the court must recognise and give effect to that. (5) It is a necessary incident of the debtor's freedom to choose where he carries on those activities which fall within the concept of

quotadministration of his *3985 interestsquot, that he may choose to do so for a self-serving purpose. In particular, he may choose to do so at time when insolvency threatens. In circumstances where there are grounds for suspicion that a debtor has sought, deliberately, to change his centre of main interests at a time when he is insolvent, or threatened with insolvency, in order to alter the insolvency rules which will apply to him in respect of existing debts, the court will need to scrutinise the facts which are said to give rise to a change in the centre of main interests with that in mind. The court will need to be satisfied that the change in the place where the activities which fall within the concept of quotadministration of his interestsquot are carried on which is said to have occurred is a change based on substance and not an illusion; and that that change has the necessary element of permanence.

56 Applying those principles to the facts in the present case, I find it impossible to say that the judge was not entitled to reach the conclusion that he did, that the debtor's centre of main interests had moved to Spain. The judge was clearly aware that there were grounds for suspicion that the move was self-serving and might not be genuine. But, unless he were prepared to disbelieve the debtor's evidence as to what he was doing in Spain and why he was living there, the judge was bound to take that evidence into account. He held that it would not be fair to the debtor to disbelieve that evidence in the circumstances that the petitioner had chosen not to test it by cross-examination. He cannot be said to have erred in taking that view. As Rimer J observed in Long v Farrer [2004] BPIR 1218, para 57:

> quotIt is ... by now familiar law that, subject to limited exceptions, the court cannot and should not disbelieve the evidence of a witness given on paper in the absence of the cross-examination of that witness.quot

That is not, of course, to say that the court is bound to accept untested evidence which is plainly incredible. But the debtor's evidence as to what he was doing in Spain and why he was living there, in contrast to other evidence (for example, his evidence that he had had no connection with Millennium Investment International Ltd), was not of that character.

*Establishment*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                    Page 18
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

57 I turn, therefore, to the remaining issue: whether the judge was wrong to reverse the registrar's decision that the High Court had jurisdiction to open territorial insolvency proceedings under article 3(2) of the Regulation on the ground that the debtor possessed an establishment within the United Kingdom. I should say at once that I do not regard the contention that jurisdiction under article 3(2) can be founded on the unintended failure of the debtor effectively to resign his directorship of Sinclair Research Ltd as seriously arguable. The real issue is whether the debtor retained an interest in Millennium House, Unit 2A, Sunrise Business Park, Blandford Forum and, if so, whether that interest was sufficient to found jurisdiction under article 3(2).

58 It appears from an official copy of the entries at HM Land Registry under title number DT 190634, issued on 13 April 2004, that the registered proprietors of Unit 2A, Sunrise Park were then the debtor and his wife, Mrs Diana Vlieland-Boddy. The property was subject to a charge dated *3986 4 September 2002 in favour of Millennium Investment International Ltd (quotMillenniumquot), whose address is shown in the register as Millennium House, Unit 2A, Sunrise Business Park. The charge of 4 September 2002, as I have said, is executed by both the debtor and his wife and contains a recital that the debtor was then entitled to the entire beneficial interest in the property.

59 In a witness statement made on 10 May 2004 the debtor said:

quotUnit 2A, Sunrise Business Park was sold to Millennium Investment International Ltd in June 2003 for £220,000. Due to a lien on the deeds, this was not actually finalised until January 2004. It has now been registered. Previously Millennium Investment had advanced me moneys totalling £220,000 principally for legal fees and to meet costs which the petitioner had ordered against me.quot

In a witness statement of the same date, 10 May 2004, Mr Robert Freestone, a chartered accountant practising from premises at 1 The Centre, High Street, Gillingham, confirmed that the debtor quotdid

have an investment property at 2a Sunrise Business Parkquot but went on to say that that quotwas sold in June 2003quot. The registrar recorded, at para 9 of his judgment, that on 6 April 2004 the Land Registry received an application to register a transfer of the property to Millennium. The judge accepted, at para 45 of his judgment) that: quotAs at the date of the hearing before the registrar this property [Unit 2A] was not owned by Mr Vlieland-Boddy. It was owned by Millennium.quot He was referring, there, to the hearing of the petition in, I think, May 2004.

60 The judge went on, in a passage which I have set out earlier in this judgment, to say:

quotUnless Millennium was a sham and in effect a front or nominee for Mr Vlieland-Boddy, it was that company that was carrying on the activity of letting it and (presumably, though there was no evidence about this) managing it. Even if Mr Vlieland-Boddy is interested in Millennium to the extent of being its beneficial owner, I cannot ignore the corporate structure (in the absence of nomineeship) so Mr Vlieland-Boddy was not carrying out those activities himself.quot

61 The judge did not, as it seems to me, rule out the possibility that Millennium was a front or nominee for the debtor. It is pertinent to keep in mind that, on 12 October 2002, the flat at 137 Westminster Bridge Road, then registered in the joint names of the debtor and his wife, was transferred to Millennium for no consideration. The judge accepted that that transaction had not been satisfactorily explained. He said, at paras 33 and 34:

quot33. ... An explanation was offered to the registrar. It came in the form of a letter from solicitors who acted in the purchase of the lease. It is addressed to the debtor's current solicitor, and it was prepared and sent in the short period between some reply evidence put in by the petitioner ... and the date of the hearing before the registrar ... The letter explains that the solicitor in question (Mr

[2005] 1 W.L.R. 3966                                                                                    Page 19
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

Copeland of Barfields) was instructed in connection with the conveyancing at the request of the debtor. His initial understanding of the position was that the lease of the *3987 flat would be in the name of the debtor and his wife 'and I proceeded on that basis. Mr Vlieland-Boddy had become aware of this after I had completed registration of the lease and sent him a copy of the land registry entries. He immediately realised that instead of my registering the property in the name of Millennium Investments International Ltd I had in error registered the proprietors as himself and his wife. Directly this error was discovered immediate steps were taken to rectify this situation and Millennium was registered as the proprietors of the property ...'

quot34. This short explanation comes from the solicitor, not from Mr Vlieland-Boddy himself. Since he only knew part of the circumstances, obviously he can only deal with what he knows. However, the letter does raise other matters which require an explanation. This was a transaction in which a new lease was granted. It is to be inferred that the debtor and his wife were required to execute the lease. It must have been sent to them for that purpose, and they must have executed it. If the position was that there was some mistake in the communication of instructions, and the lessee should have been Millennium, why was it not spotted at that point? This factor alone causes one to question the explanation. In addition, it is not at all easy to see how instructions can be given on behalf of the wrong parties when the wrong parties are a husband and wife who are taking care to divide up properties between them. Furthermore, the company

identified (Millennium) is a company which featured several times in Mr Vlieland-Boddy's affairs. He maintained that it is a company in which he is not interested. Why, then was he giving instructions for the property to be transferred to Millennium? More than that, if his case is that he had originally intended that the lease should be put in Millennium's name, why was he acting for Millennium in this transaction if he had nothing to do with this company? In the land registry proprietorship register for the Blandford Forum property the debtor's address is given as this flat, again tending to demonstrate a connection between Mr Vlieland-Boddy and Millennium ... The registrar's suspicions were entirely justified ...quot

62 Those remarks were made in the context of the flat at 137 Westminster Bridge Road. The judge turned to the position in relation to Unit 2A, Sunrise Business Park, at para 36 of his judgment. After observing that no documents had been produced to support the debtor's assertion that that property had been sold to Millennium in June 2003, the judge said:

quotThe entries at HM Land Registry recorded that: 'The price stated to have been paid on 30 January 2004 was £220,000.' Thus he says there was a sale in some sense in June 2003, and the land registry documents show that the price was not paid until the end of January 2004. Then the purchaser apparently delayed registering its transaction until April 2004- [counsel for the petitioner] drew my attention to the fact that this was after the petition was finally served on Mr Vlieland-Boddy. As I have said, Mr Vlieland-Boddy has said that Millennium has nothing to do with him. The directors are a Mr Biggs and the Mr Jones referred to above. The true beneficial owners of the property cannot be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                    Page 20
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

ascertained from *3988 searching out the registry in the BVI. Mr Jones is clearly some sort of associate of Mr Vlieland-Boddy- the first IVA proposals record Mr Jones as helping Mr Vlieland-Boddy with his child's school fees. The circumstances surrounding the flat at Westminster Bridge Road cast very serious doubt on Mr Vlieland-Boddy's evidence that he is not interested in Millennium. If that were the case, why was he giving instructions to solicitors to purchase a flat for it? If the sale [of Unit 2A] were a genuine arm's length sale to a genuine arm's length purchaser, why did it take the purchaser so long to get round to registering the purchase? Once more, a less than convincing story has been told by Mr Vlieland-Boddy.quot

63 One fact, at least, is not open to doubt. The debtor (with his wife) was the legal owner of Unit 2A at the time when the registrar declared, on 27 February 2004, that there was jurisdiction to open territorial insolvency proceedings. That fact (amongst others) was relied upon by the petitioner at the time as a foundation for jurisdiction under article 3(2). Neither the registrar, nor the judge, were satisfied that the debtor was not then the beneficial owner of Unit 2A; nor that he ceased to be the beneficial owner when the title was subsequently transferred to Millennium. It is not necessary to disbelieve the debtor when he says that he is not the beneficial owner of Millennium. But his assertion that he had no connection with Millennium at the relevant time is not credible, for the reasons that the judge gave. He has not provided a credible explanation for the transfer of Unit 2A, nor for the transfer of 137 Westminster Bridge Road, into the name of Millennium, although the facts must be within his knowledge. In those circumstances the judge could not rule out the possibility that Millennium was a front or nominee for the debtor; and he did not do so. In my view he should have gone on to hold that, on the evidence that was before him, the balance of probabilities required a conclusion that that was in fact the position, at least on 27 February 2004 when the registrar assumed jurisdiction to open territorial

insolvency proceedings.

64 In those circumstances the remaining question was whether legal and beneficial ownership of Unit 2A at the relevant date is sufficient to satisfy the requirement that the debtor quotpossesses an establishmentquot within the territory. The judge made no finding on that question. As he said, at para 45 of his judgment, he did not find it necessary to do so.

65 quotEstablishmentquot, for the purposes of article 3(2) of the Regulation is, of course, a defined term. It means quotany place of operations where the debtor carries out a non-transitory economic activity with human means and goodsquot: article 2(h). Virgos and Schmidt observe, at para 70 of their Report, that article 3(2)- and the associated definition- was one of the most debated provisions throughout the negotiations on the Convention. They comment:

quotSeveral contracting states wished to have the possibility of basing territorial proceedings not only on the presence of an establishment, but also on the mere presence of assets of the debtor (assigned to an economic activity) without the debtor having an establishment. For the sake of an overall consensus on the Convention, those states agreed to abandon the presence of assets as a basis for international competence provided that the concept of establishment is interpreted in a broad manner but consistently with the text of the Convention. This explains the very open *3989 definition given in article 2(h). In the Convention, the mere presence of assets (e g the existence of a bank account) does not enable local territorial proceedings to be opened. The presence of an establishment of the debtor within the jurisdiction concerned is essential.quot

66 The commentators go on to say, at para 7: quotFor the Convention on

2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr. 12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
**(Cite as: [2005] 1 W.L.R. 3966)**

insolvency proceedings, 'establishment' is understood to mean a place of operations through which the debtor carries out an economic activity on a non-transitory basis, and where he uses human resources and goods. Place of operations means a place from which economic activities are exercised on the market (i e externally), whether the said activities are commercial, industrial or professional. The emphasis on an economic activity having to be carried out using human resources shows the need for a minimum level of organisation. A purely occasional place of operations cannot be classified as an 'establishment'. A certain stability is required. The negative formula ('non-transitory') aims to avoid minimum time requirements. The decisive factor is how the activity appears externally, and not the intention of the debtor. The rationale behind the rule is that foreign economic operators conducting their economic activities through a local establishment should be subject to the same rules as national economic operators as long as they are both operating in the same market. In this way, potential creditors concluding a contract with a local establishment will not have to worry about whether the company is a national or foreign one. Their information costs and legal risks in the event of insolvency of the debtor will be the same whether they conclude a contract with a national undertaking or a foreign undertaking with a local presence on that market. Naturally, the possibility of opening local territorial insolvency proceedings makes sense only if the debtor possesses sufficient assets within the jurisdiction. Whether or not

those assets are linked to the economic activities of the establishment is of no relevance.quot

67 The judge was prepared to assume that Millennium was carrying on the activity of letting and managing Unit 2A, Sunrise Business Park. The unit was described by the registrar as quota multi-let business premisesquot. It seems to me inevitable that the landlord will need to manage the property (even if that is done through agents, as to which there is no evidence). The evidence, such as it is, suggests that Millennium collects the rent itself.

68 In the circumstances that I have set out, and with the guidance provided by the Virgos-Schmidt Report in mind, I would hold that the owner of Unit 2A, Sunrise Business Park is carrying out a non-transitory economic activity with human means and goods for the purposes of the Regulation. It follows that, if, as I would also hold, the evidence led to the conclusion, on the balance of probabilities, that Millennium was a front or nominee for the debtor at the time the registrar opened territorial insolvency proceedings in February 2004 (if, indeed, there had been a quotsalequot by that date), the requirement in article 3(2) of the Regulation was satisfied.

*Conclusion*

69 For the reasons which I have set out I would allow the appeal and restore the bankruptcy order made on 13 July 2004. But, because I would *3990 uphold the judge's finding that jurisdiction to open main insolvency proceedings had not been established under article 3(1) of the Regulation, I would vary that order so as to recite that the proceedings are territorial insolvency proceedings as defined in article 3 of the Regulation.

LONGMORE LJ

*Centre of main interests*

70 I agree with the judgment of Chadwick LJ on the question of the centre of main interests of the debtor but have two caveats. The first caveat relates to the point of time in relation to which, for the purposes of invoking the jurisdiction of the English

[2005] 1 W.L.R. 3966                                                                                      Page 22
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

court, a claimant has to prove that the centre of main interests of the debtor is situated in England. The second caveat relates to the standard of proof that is required.

71 With regard to the time in relation to which the centre of main interests has to be proved to be England, the judge recorded [2004] EWHC 1948 (Ch) at [12] that it was common ground before him that it was the date of the hearing of the petition. Mr Mitchell did not seek to resile from this common ground before us and Chadwick LJ has held in terms, in para 39, that that is the correct date. It seems to me, however, that despite the judge's reference to *Dicey & Morris*, The Conflict of Laws, 13th ed (2000), 4th suppl, p 383 it is not beyond the realm of argument that the correct date is the date of service of the bankruptcy petition on the debtor rather than the date of the hearing of the petition. On this view the quot;judgment opening proceedings;quot; is the judgment exercised by the registrar when he gives permission for the petition to be served outside the jurisdiction. That judgment quot;becomes effective;quot; when it is served, although the defendant debtor has the right to ask the court to set aside that service. So to conclude would have the advantage that the debtor could not rely on acts he might take unilaterally to change his centre of main interests between the date when the petition is served and date when his challenge to the jurisdiction can be heard which might (as in this case) be a period of some months. It would also have the advantage that the phrase quot;the time at which the judgment opening proceedings becomes effective;quot; in recital (f) to article 3 would have the same meaning as the time when a court is first seised of a matter for the purpose of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, enacted into English law by the Civil Jurisdiction and Judgments Act 1982 (now the Lugano Convention): see Dresser UK Ltd v Falcongate Freight Management Ltd [1992] QB 502. On the facts of the present case it makes no difference whether the judgment opening the proceedings was in February or July 2004 and counsel were quite right not to take time arguing an academic point which should await resolution in a case where it matters on the facts.

72 On the standard of proof, the judge approached the question whether the debtor's centre of main interests was England as a matter of fact which, presumably, was to be decided on the balance of probabilities in the usual way. We received no argument that the invocation of the court's jurisdiction pursuant to the Regulation should be treated in the same way as the invocation of the court's jurisdiction pursuant to other Regulations dealing with service out of the jurisdiction. It has long been the case that a *3991 claimant does not have to prove that the jurisdiction requirements, set out for example in RSC Ord 11 (now CPR Pt 6) or the Brussels (now Lugano) Convention have been satisfied on a balance of probabilities but has to show merely that there is a quot;good arguable case;quot; that the jurisdictional requirements exist: see Seaconsar Far East Ltd v Bank Markazi Jomhouri Islami Iran [1994] 1 AC 438 and Canada Trust Co v Stolzenberg (No 2) [1998] 1 WLR 547. This question will also have to be argued on another day and I mention it here only because the judge placed considerable emphasis on the fact that no order had been sought for Mr Clive Vlieland-Boddy to be cross-examined. No doubt the court has jurisdiction to order cross-examination of a defendant who asserts he is not amenable to the jurisdiction of the court. But it is, in my view, a discretion which should be exercised extremely sparingly. In the first place, if the defendant is right that he is not subject to the jurisdiction, it is exorbitant to order his cross-examination at all. In the second place, those judges of the High Court who deal, perhaps more frequently than bankruptcy registrars, with heavily contested jurisdiction applications will quickly find their lists heavily clogged by enthusiastic applications from claimants to cross-examine foreign defendants on the basis that without such cross-examination their case will be held to fail as Mann J has effectively held here. To the extent that the judge accepted the approach of the parties that he had to find that the debtor's centre of main interests was, as a matter of fact, in England, his approach cannot, of course, be faulted but there may need to be argument on another occasion that the correct standard to apply is that of a quot;good arguable case;quot; rather than proof on a balance of probabilities; cross-examination should not then be necessary. I should perhaps add that the decision of Rimer J in Long v Farrer & Co [2004] BPIR 1218, on which junior counsel for the debtor has relied, was not a decision on a jurisdictional application.

*Establishment*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                                                   Page 23
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

**73** I also agree with Chadwick LJ on this part of the case but since we are differing from the judge I will express my own view shortly. Mr Vlieland-Boddy had a lease of premises known as Unit 2A, Sunrise Park, in Blandford Forum in Dorset which he then charged traders for the right to use. This was thus originally a place where he carried out a non-transitory economic activity with human means and goods within definition (h) of article 2 as explained in para 70 of the Virgos-Schmidt Report. Mr Vlieland-Boddy then asserts that a British Virgin Islands company, known as Millennium Investments International Ltd, took a charge on the property on 8 November 2002 in the sum of £245,000; he says that he then sold the property to Millennium in June 2003 but that the transfer of property was not completed until January 2004. Millennium did not register its title until April 2004 after service of the bankruptcy petition on Mr Vlieland-Boddy. Millennium is also said to be the owner of a flat in Lambeth acquired by Mr and Mrs Vlieland-Boddy in their joint names on 22 August 2001. Millennium appear to have acquired that ownership on 12 February 2002 but to have paid no consideration. Mr Vlieland-Boddy has not told the court who owns the shares in Millennium. He says that a director is Mr Spencer Jones who has apparently been helping to pay the school fees for *3992 Mr Vlieland-Boddy's child. I have every confidence that Mr Vlieland-Boddy could say who owns Millennium if he wished to do so. Even on the balance of probabilities, it seems to me that Mr Vlieland-Boddy was in July 2004 using Millennium to carry on business at Unit 2A and accordingly has an establishment for the purpose of the territorial insolvency jurisdiction specified in article 3(2). I would therefore join with Chadwick LJ in allowing the appeal and in upholding the registrar's decision on this aspect of this case.

SIR MARTIN NOURSE

**74** I have had the advantage of reading in draft the judgments of Chadwick and Longmore LJJ.

*Centre of main interests*

**75** I agree with the judgment of Chadwick LJ on the question of the centre of main interests and with the first of Longmore LJ's caveats. As to the second caveat, I would emphasise that this case has been argued throughout on the footing that the standard of proof to be applied is the balance of probabilities and not good arguable case. Moreover, it must be doubtful whether an English court could apply the lower standard to main insolvency proceedings without obtaining a ruling of the European Court of Justice to that effect.

*Establishment*

**76** On the question of establishment, I agree with the judgments of Chadwick and Longmore LJJ.

**77** The position here was that the registrar had decided that the debtor had an establishment within England and Wales for the purposes of article 3(2) of the Regulation. But, as the judge held, that decision, having been based on the erroneous view that the court must look at the period when the debts were incurred, could not be sustained. So the judge had to consider the question afresh.

**78** The judge's decision on this question, in the penultimate paragraph of his judgment, is quoted by Chadwick LJ in para 60 above. I agree with him that the judge did not rule out the possibility that Millennium was a sham and in effect a front or nominee for the debtor. What the judge said was:

> "Even if Mr Vlieland-Boddy is interested in Millennium to the extent of being its beneficial owner, I cannot ignore the corporate structure (in the absence of nomineeship) so Mr Vlieland-Boddy was not carrying out those activities himself."

**79** I think that that passage shows some inconsistency in the judge's reasoning. If the debtor was in reality the beneficial owner of Millennium, the corporate structure would simply be ignored and it would not matter very much whether Millennium was described as a sham or as a front or nominee for the debtor. But that is not the real point. In my opinion the only inference which could reasonably have been drawn from the evidence referred to and considered by the judge earlier in his judgment, in regard not only to Unit 2A, Sunrise Park but also to the flat at 137 Westminster Bridge *3993 Road, was that on 27 February 2004, when the registrar assumed jurisdiction to open territorial insolvency proceedings, Millennium was a front or nominee for the debtor. On that footing, for the reasons given by

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2005] 1 W.L.R. 3966                                                                 Page 24
2005 WL 1860177 (CA (Civ Div)), [2005] B.C.C. 949, [2006] 2 B.C.L.C. 9, [2005] B.P.I.R. 1170, [2006] I.L.Pr.
12, [2005] 1 W.L.R. 3966, 9-26-2005 Times 1860,177, [2005] EWCA Civ 974
(Cite as: [2005] 1 W.L.R. 3966)

Chadwick LJ, I agree that the debtor possessed an establishment within England and Wales on that date.

**80** In elaboration of the view expressed in the preceding paragraph, I would say that the judge's conclusion as to the role of Millennium was against the weight of the evidence. In most cases that would be a strong thing for this court to hold. But it is to be emphasised that in considering the matter afresh this court is doing no more than what the judge himself had to do. We are in as good a position as he was to draw the necessary inferences from the evidence, an exercise in which it is a commonplace that different minds may take different views.

**81** I too would allow the appeal and make the order proposed by Chadwick LJ.

*Appeal allowed.*

### Representation

Solicitors: DLA LLP, Manchester; John A White & Co, Huntingdon.

(Reported by Ken Mydeen Esq, Barrister)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.