# EXHIBIT 11

Case 1:07-cv-07413-PKC    Document 21-12    Filed 06/04/2008    Page 1 of 10



[2006] B.C.C. 589
2005 WL 4829622 (Ch D), [2006] B.C.C. 589
**(Cite as: [2006] B.C.C. 589)**

Page 1

*589 Re Parkside Flexibles SA

Chancery Division (Newcastle-upon-Tyne District Registry)

Ch D

His Honour Judge Langan Q.C. (sitting as a deputy High Court judge)

Judgment delivered February 9, 2005

Administration--Jurisdiction--Centre of main interests--Group of companies-- Group based in England--Polish subsidiary--Registered office of Polish subsidiary in Poland--Application in England for administration order over Polish subsidiary--Whether Polish subsidiary's centre of main interests in England or in Poland--Tests to be applied for establishing centre of main interests--Matters finely balanced--Whether administration order should be granted--Insolvency Act 1986, Sch.B1, paras 3, 11; EC Insolvency Proceedings Regulation 1346/2000, Recital (13), Art.3(1).

This was an application to the English court by the directors of a company registered in Poland for an administration order where the application was not opposed and the main issue for the court was whether the company had its centre of main interests in this country under Art.3(1) of the EC Insolvency Proceedings Regulation 1346/2000 so that the court had jurisdiction to make the order sought.

The company was incorporated and registered in Poland in 1995 and traded from the address of its registered office. In 2002 the company was acquired by a company, "PIL", registered in England and Wales. There were three other companies in the group, all incorporated in England and Wales. In November and December 2004 administrators were appointed to all the companies in the group except the company. The directors of the company applied for an administration order in relation to the company. By virtue of the Insolvency Proceedings Regulation 1346/2000 the English court had jurisdiction to grant the order only if the company's centre of main interests was in this country. Under Art.3(1) of the Regulation, the centre of main interests of a company was presumed to be the place of its registered office in the absence of proof to the contrary. Recital (13) of the Regulation stated that the centre of main interests should correspond to the place where the debtor conducted the administration of its interests on a regular basis and was therefore ascertainable by third parties. Major factors as to where the centre of main interests of the company was located such as the proportions of trading activity, both purchases and sales, were so evenly balanced between England and Poland as to provide no useful signpost in either direction. Minor factors such as compliance with accounting regimes in both jurisdictions and the company maintaining both English and Polish websites, likewise cancelled each other out.

Of more definite indicators, in favour of the centre of main interests being in England were that (1) while the management board of the company was evenly divided between English and Polish residents, the supervisory board consisted entirely of people who were permanently resident in the United Kingdom; (2) ultimate control of the company resided in England: at all times up to the making of the administration order in respect of PIL, the directors of PIL could, at their pleasure, have expanded the operations of the company, shut down the business of the company or adopted any intermediate position; (3) that control was manifested in the appointment of the present managing director of the company and of the person who was shortly to replace him; and (4) that control was also demonstrated by reserving to PIL the making of all strategic decisions about the business of the company, including the approval of budgets and of items, sometimes quite modest in terms of money, of capital expenditure. The factors which pointed to Poland as the centre of main interests were that (1) the manufacturing activity, which was the raison d'etre of the company, was conducted exclusively in Poland; (2) apart from the managing director, all employees of the company were recruited in Poland and there was no interference from England in this aspect of the business of the company; and (3) the *590 banking and borrowing activities of the company were carried

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

on exclusively with Polish institutions in Poland, although guarantees were given by the English companies to Polish institutions and the fact that group directors in England were active both in the initiation and subsequent conduct of the company's main Polish bank account.

*Held*, declaring that the company's centre of main interests was in England and making the administration order:

1 The above factors in relation to the company's centre of main interests were evenly balanced. The remaining factors were the statutory presumption that the place of a company's registered office was its centre of main interests (Poland), and, against that, the place to which the creditors of the company were having recourse since the other group companies went into administration (England). The creditors to a considerable extent looked to the group in England rather than to Poland for reassurance. Further, such reassurance as the company's bankers in Poland required had to come from England and not the home country. This last factor, that the creditors needed to know where to go to contact the debtor, concluded the matter in favour of England being the centre of main interest. (Dicta in Re Daisytek-ISA Ltd [2003] B.C.C. 562 applied.)

2 The court thus had jurisdiction to consider the application for an administration order. The company was in serious arrears with its suppliers and an increasing number of suppliers had withdrawn credit terms. It was only being kept afloat by substantial advances by way of accelerated payment for goods supplied and unsecured lending from the administrators of the other companies in the group. A purchaser was willing to acquire the assets and business of the company, but only if an administration order was made in England and if the administrators ratified the sale by the management board of the company. On a liquidation of the company there would be a deficiency as regards creditors of the company but on the sale to the proposed buyer all creditors would be paid and there would be a surplus to be returned to PIL as shareholder.

3 As was required under Sch.B1, para.11 to the Insolvency Act 1986 the company was unable, or likely to become unable to pay its debts and the administration order was reasonably likely to achieve the purpose of administration. That purpose, under Sch.B1, para.3(1)(b) was that the company was likely to achieve a better result for the company's creditors as a whole than if the company were wound up without first being in administration. In so far as the court has a discretion whether or not to make an administration order, without hesitation this was a case in which an order should be made: the prospects both of discharging in full the indebtedness of the company and of maintaining the employment of those now working for the company combined to demonstrate that no other order could possibly be justified.

**The following cases were referred to in the judgment:**

BRAC Rent-A-Car International Inc, Re [2003] EWHC 128; [2003] B.C.C. 248; [2003] 1 W.L.R. 1421.

Ci4Net.Com Inc, Re [2004] EWHC 1941 (Ch); [2004] B.C.C. 277.

Daisytek-ISA Ltd, Re [2003] B.C.C. 562.

Eurofood IFSC Ltd, Re [2004] B.C.C. 383.

**Representation**

Hugo Groves (instructed by Cobbetts, Leeds) for the applicants.

**JUDGMENT**

Judge Langan Q.C.:

**Introduction**

1 There is before the court a directors' application for the making of an administration order in respect of Parkside Flexibles S.A. ("the company"). The company is incorporated under the laws of Poland, and the applicants are the members of the management board of the *591 company. What I may call the merits of the case are such that, absent any foreign element, I would without hesitation have made the order sought at the conclusion of the hearing. The application did, however, raise a

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

question of jurisdiction, which seemed to require some independent analysis by me, particularly as the application was not opposed. Accordingly, I reserved judgment until this afternoon.

2 Article 3 of Council Regulation (EC) No.1346/2000 (*[2000] O.J. L160/1*) on Insolvency Proceedings ("the EC Regulation"), is at the heart of this case. The EC Regulation has been, since the accession of Poland to the European Union, determinative as between the courts of England and Wales on the one hand and the courts of Poland on the other hand as to the proper forum for insolvency proceedings.

Paragraph 1 of Art.3 is in these terms:
"The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings. In the case of a company or legal person the place of the registered office shall be presumed to be the centre of its main interests in the absence of proof to the contrary."

3 The registered office of the company is in Poland. Mr Groves, who has appeared for the directors, has submitted that the presumption to which Art.3 gives rise has, on the whole of the evidence before the court, been rebutted and that the centre of the main interests of the company is in England. In this judgment my principal task is to examine that submission and to decide whether or not it is correct.

**The law**

4 In interpreting and giving effect to Art.3, the courts in this country have taken account both of certain of the recitals to the EC Regulation and of the *Report on the Convention on Insolvency Proceedings*, by Professor Miguel Virgos and Etienne Schmit (Council Doc. 6500/ 96) ("the Virgos-Schmit Report") EU Council document 6500/96DRS8(CFC) (see Re BRAC Rent-A-Car International Inc [2003] EWHC 128; [2003] B.C.C. 248; [2003] 1 W.L.R. 1421). It is, I think, worth setting out, as I did in an earlier judgment on Art.3, two of those recitals and a passage from the Virgos-Schmit Report.

5 The relevant recitals to the EC Regulation are these:
"(4) It is necessary for the proper functioning of the internal market to avoid incentives for the parties to transfer assets or judicial proceedings from one Member State to another seeking to obtain a more favourable legal position (forum shopping) ...
(13) The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

6 In para.75 of the Virgos-Schmit Report, the authors, commenting on Art.3(1) of the EC Regulation, said this:
"The concept of 'centre of main interests' must be interpreted as the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.

The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction ... be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.

By using the term 'interests', the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities so as to include the activities of private individuals (e.g. consumers). The expression 'main' serves as a criterion for the cases where these interests include activities of different types which are run from different centres ...

*592 Where companies and legal persons are concerned, the Convention presumes, unless proved to the contrary, that the debtor's centre of main interests is the place of his registered office. This place normally corresponds to the debtor's head office."

7 Mr Groves cited three cases in the course of his submissions. These were Re Eurofood IFSC Ltd, a judgment of Kelly J. in the Irish High Court, which was delivered on March 23, 2004, and is reported in [2004] B.C.C. 383; Re Ci4Net.Com Inc [2004] EWHC 1941 (Ch); [2005] B.C.C. 277, a decision of mine in the Leeds District Registry, handed down on June 2 last year; and Re Daisytek-ISA Ltd, a decision of His Honour Judge McGonigal, also in the Leeds District Registry, the judgment being delivered on May 16, 2003, and reported in [2003] B.C.C. 562.

I think that I can put the first and second of these cases to one side. In Re Eurofood IFSC the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

arguments in favour of Ireland rather than Italy, those being the competing jurisdictions, were so overwhelming that the judge was able to dispose of the relevant question in a single paragraph (see p.398C-D). Ci4net.Com Inc was unusual in that it dealt with companies which had ceased to trade. Re Daisytek-ISA is, I think, by far the most useful guide, because Judge McGonigal was there dealing with what is probably the most common situation which will give rise to an Art.3 question. The situation to which I refer is that of a company which is trading in the country in which it is registered but which is, to a greater or lesser degree, controlled from a head office elsewhere. Such is the position in the case which is before me.

8 One passage from the judgment in Re Daisytek-ISA Ltd should be set out at some length. Having had regard both to Recital (13) to the EC Regulation and to the passage which I have quoted from the Virgos-Schmit report, Judge McGonigal said at paras 14-16:

"14 ... In my view the identification of 'the debtor's main interests' requires the court to consider both the scale of the interests administered at a particular place and their importance and then consider the scale and importance of its interests administered at any other place which may be regarded as its centre of main interests, whether as a result of the presumption in Art. 3(1) or otherwise.

15. The requirement in Recital (13) that, as a result of the administration of its interests at a particular place, the fact that such place is the centre of the debtor's main interests must therefore be 'ascertainable by third parties' is very important. In Geveran Trading Co Ltd v Skjevesland [2003] BCC 209 Registrar Jaques stated (at p.223A) that:

'It is the need for third parties to ascertain the centre of a debtor's main interests that is paramount, because, if there are to be insolvency proceedings, the creditors need to know where to go to contact the debtor ...'

16 In my view the most important 'third parties' referred to in Recital (13) are the potential creditors. In the case of a trading company the most important groups of potential creditors are likely to be its financiers and its trade suppliers."

9 One other matter emerges from Judge McGonigal's judgment. As is apparent from his examination of the evidence, the identification of a company's centre of main interests involves what would nowadays be called a facts-sensitive decision. All relevant material must be weighed up and placed in the balance, and the court must then see on which side the scales have come down. One highly relevant matter is, of course, the presumption for which provision is made by Art.3, but as I said in my judgment in Ci4Net.Com Inc, there seems to be no reason to suppose that this presumption is a particularly strong one. It is, rather, just one of the factors to be taken into account with the rest of the evidence which is before the court.

**Background to the application**

10 The company was registered on April 25, 1995, in a commercial register kept by the District Court in Pila. The registered office of the company is at ul Za Dworcem 8, 77-400, Zlotow. It trades from the same address. The business of the company consists of the *593 manufacture and sale of flexible packaging of various kinds, particularly wraps and packages for the food industry, and also bag-making equipment, nappies and feminine hygiene products. About 130 people are employed, and as the factory is in a rural area the presence of the company must be a valuable economic and social asset for the local community.

11 The company was previously registered under the name BP Chemicals Olimpflex SA, and was part of the British Petroleum group. In the year 2002, the company was acquired by Parkside International Ltd ("PIL") of which it is now a wholly-owned subsidiary. PIL is a company incorporated in England and Wales, with its registered office being in Barnsley, South Yorkshire. Besides the company and PIL there are three further companies within what is known as the Parkside group. These other companies are also incorporated in England and Wales. The Parkside group operates from three factories: they are at Darton, Barnsley, at Normanton, Wakefield, and through the company at Zlotow.

12 On dates in November and December 2004 administrators were appointed in relation to all the member companies in the Parkside group apart from the company. The administrators are three licensed insolvency practitioners in PricewaterhouseCoopers LLP. The directors of the company now wish to have the two of these three persons and one other appointed as administrators of the company.

**Evidence relevant to jurisdiction**

13 Several witness statements have been filed on behalf of the directors. So far as the question of jurisdiction is concerned, the applicants rely principally on what is said by Mr Michael Geoffrey Stewart. He is a director of each company in the Parkside group and is a member of the management board of the company. He has been concerned in the affairs of the company since it was acquired by PIL from British Petroleum in 2002.

14 At the time of the acquisition, the local managing director of the company was a Polish national called Slawek Petchin. After the acquisition, Mr Stewart directed that the company must use certain of the Parkside group's suppliers, for example, Sun Chemical for its ink. He impressed upon Mr Petchin that his, Mr Stewart's, vision for the future of the company was to service the Parkside group's pan-European customers. He made it clear to Mr Petchin that the company would be strategically managed from the United Kingdom. Mr Petchin left the company around September 2003.

15 Mr Petchin was replaced by the present managing director, Janusz Kukula. It was Mr Stewart who appointed Mr Kukula as managing director to replace Slawek Petchin. Mr Kukula has both United Kingdom and Polish nationality. He resides with his wife in Barnsley when he returns to this country from Poland. The bulk of Mr Kukula's remuneration is paid to him in the United Kingdom by PIL, although his contract of employment is with the company.

16 The company has both a management board and a supervisory board. In general terms, the management board is the executive body dealing with daily issues, while the supervisory board is a non-executive body which does not manage the business of the company but supervises the management board and the activities of the company in general. The same person cannot be a member of both boards.

17 The management board at present consists of five people. They are Mr Stewart, Mr Jessop, who is group commercial director of the Parkside group, Mr Kukula, Mr Andrzej Blachowicz and Mr Marek Szindler. Two of those five persons are permanently based in the United Kingdom, and two are permanently based in Poland. Of the latter, one is responsible for finance and the other for production. Mr Kukula, as I have indicated, moves between the two countries.

18*594 The supervisory board consists of three people, Mike O'Neill, Brian Wall and Paul Marsden. All are directors of companies in the Parkside group and all are permanently based in the United Kingdom.

19 Mr Stewart summarises the division of responsibility between England and Poland in the following way. PIL has not, as Mr Stewart puts it, "micro-managed the company", but all significant decisions relating to its operations have to be approved by PIL. These include group strategy and business planning, the approval of budgets, the approval of capital expenditure, the monitoring of financial performance, the making of arrangements with banks and finance companies, the recruitment and appointment of the two boards, staffing levels, arrangements with group suppliers, sales to customers of the Parkside Group and decisions as to corporate image and marketing. The management board, by contrast, is responsible for overseeing the day-to-day operation of the factory in Poland. It therefore is responsible for the planning of production, for purchases, for sales to customers in Poland and for such financial matters as dealing with debtors, creditors, daily banking, the payment of wages and other outgoings. The management board is likewise responsible for employment issues, for vehicles and transport, for utility supplies and for local compliance with health and safety and environmental regulations and the like.

20 Given this allocation of roles, it is hardly surprising that there has been regular and frequent contact between senior executives in the two countries. Thus, it has been the practice of Mr Stewart to visit Poland every three weeks or so, staying for anything between two and three days. In addition to visiting the factory, he has been accustomed to have meetings with the bankers of the company and its local auditors. He has spoken by telephone to Mr Kukula on average two or three times a week. Mr Kukula has also made contact with other directors of the Parkside group, particularly with Mr Paul Marsden, the group sales director. There has been other communication at executive level between individuals in the two countries. In addition, Mr Stewart has received a daily status

report which details new orders secured by the company, orders processed and despatched by it and details of stock and raw material holdings.

**21** The company has, at all material times, held accounts at Polish banks and not at any others. The facilities which have been available to the company from three different Polish financial institutions are these:
 (1) the maintenance of an account at Bank BPH (PBK) SA ("Bank BPH"). This bank has provided the company with a working capital facility of 2 million zloty, about £360,000 in sterling, together with a five-year term loan at 3.5 million zloty, approximately £630,000 in sterling;
 (2) a bank called BA Creditanstadt Leasing Poland SP.ZO.O has provided the company with a five-year sale and lease-back arrangement in respect of its plant and machinery;
 (3) a financial institution called BRE Leasing SP.ZO.O has entered into equipment lease arrangements with the company. These relate to the lease of a new printing press, which was acquired in May 2004.
The company's banking arrangements with Bank BPH were originally negotiated by Mr Stewart together with two of his colleagues from England, Chris Jessop and Paul Below, who is the group finance director of Parkside group. The concerns of the bank in the present situation which faces the company have been dealt with by Messrs Stewart and Below going to Poland to meet the directors of the bank.

**22** Raw material is obtained by the company either internationally or in Poland. Purchases outside Poland are either made from the group's factory at Darton or are negotiated centrally by the group on behalf of the company. Where materials are sourced in Poland, the company itself negotiates directly with its suppliers. About 55 per cent of purchases fall into the international category; about 45 per cent fall into the local category.

**23\*595** Turning from purchases to sales, there is a similar division. The first category consists of sales negotiated for the company by the Parkside group's European sales team or orders which have been procured by the group in England and are transferred to the company in Poland. The members of the sales team are based in England (including the group finance director), France and Germany. Sales falling within this first category come to 53 per cent of the total. The second category, sales negotiated by the company in or from Poland, makes up the balance of 47 per cent.

**24** The company prepares and compiles its accounts in accordance with Polish law. Alongside these, monthly management accounts have been prepared in both local and group reporting formats. PIL, as the United Kingdom holding company, produces consolidated accounts for the parent company and all of its subsidiaries, filing these within this country.

**25** The whole of the Parkside group shares the same corporate branding logo and brochure. The group maintains two websites; one is an English language website, the other is a Polish language website, which provides a link to click on to the English language site.

**26** As I have already mentioned, Mr Stewart, as a director of PIL, was responsible for the recruitment of Mr Kukula, the managing director, and more recently a Mr Robin Hale, who is to replace Mr Kukula. At various times, both Mr Blachowicz and Mr Szindler have threatened to leave the company and on each occasion it has been Mr Stewart who has agreed with Mr Kukula the terms which would persuade them to remain.

**27** PIL is not responsible for the recruitment of the company's main workforce. As one would expect, this function is performed locally in Poland. Nonetheless, the payroll for the company has to be agreed and approved by the board of PIL as part of the annual budgeting process.

**28** The expansion of the company since it was acquired by PIL has been controlled from England and any capital expenditure has had to be approved by PIL. Several examples are given by Mr Stewart in his evidence. I have already mentioned a printing press, which was installed in 2004. It was Mr Stewart who negotiated the purchase of this machine at a cost of £2 million and arranged for operatives from the United Kingdom to travel to Poland to oversee its installation. Each item of capital expenditure for the expansion of the company has had to be approved by PIL whether, as Mr Stewart says, that was the acquisition of the printing press to which I have just

referred or just £5,000 in sterling to change to a mains gas supply. Further, when financial arrangements to facilitate the purchases of equipment and the development of the site have been made with funders in Poland, these arrangements have been negotiated for and guaranteed by PIL.

**29** The last matter with which Mr Stewart deals in his evidence has to do with the creditors of the company.

**30** Mr Stewart begins this part of his evidence by looking at the state of knowledge of creditors and potential creditors as to the nature of the business of the Parkside group, where that business is carried on and how the group may be contacted. He exhibits the letter heading of the company, which, whilst it gives the company's Polish postal address and registered office, describes the company as "a Parkside International company" and provides the name and address of each of the English trading subsidiaries of the Parkside group. Mr Stewart points out that, while the letter heading gives the Polish language website of the company, one can link from that website into the main Parkside group English language website. Mr Stewart goes on to say, on the basis of his own local knowledge, that creditors would undoubtedly be aware that the company is a subsidiary of a United Kingdom group of companies.

**31** Mr Stewart then says that he has recently been contacted by creditors, whom he names, common to the companies in the Parkside group. These creditors have been enquiring about debts owed to them by the company. Mr Stewart exhibits creditor lists made up to December 31, 2004. The total trade creditors come to almost 9 million zlotys. The total of finance creditors came to almost 22 million Zlotys. Mr Stewart says that group creditors, finance creditors, who, as I have said, have the benefit of guarantees from PIL, and inter-group *596 indebtedness represents some 83 per cent of the total indebtedness of the company. He says "I believe that the fact that they", he means certain of these creditors, "have contacted either myself, a fellow International board member or the administrators is evidence of the fact that the majority of stakeholders in the company are aware of the nature of the relationship between it and its UK parent company".

**Decision on jurisdiction**

**32** What I have to identify is the centre of the main interests of the company or, in the words of Recital (13) to the EC Regulation, "the place where the company conducts the administration of its interests on a regular basis and is therefore ascertainable by third parties". Is that place more probably Poland or more probably England?

**33** There are some considerations which do not seem to carry the question any distance at all. Among what might well in other circumstances have been major factors are the proportions of trading activity, both purchases and sales, conducted by the company in or from England and conducted elsewhere. These proportions are, in percentage terms, so evenly balanced as to provide no useful signpost in either direction. Then there are minor factors, such as compliance with two accounting regimes and the maintenance of both Polish and English websites, which likewise cancel each other out. Leaving these matters aside, one gets to more definite indicators.

**34** The factors which tell in the favour of the centre of main interests being in England are these:
 (1) While the management board of the company is evenly divided between English and Polish residents, Mr Kukula being someone with one foot in each countries, the supervisory board consists entirely of people who are permanently resident in the United Kingdom.
 (2) What might be called ultimate control of the company has resided in England. At all times up to the making of the administration order in respect of PIL, the directors of PIL could, at their pleasure, have expanded the operations of the company, shut down the business of the company or adopted any intermediate position.
 (3) That control has been manifested in the appointment of the present managing director of the company and of the person who is shortly to replace him.
 (4) That control has also been demonstrated by reserving to PIL the making of all strategic decisions about the business of the company, including the approval of budgets and of items, sometimes quite modest in terms of money, of capital expenditure.

**35** The factors which point to Poland as the centre of main interests are as follows:
 (1) The manufacturing activity, which is the raison d'etre of the company, is conducted exclusively in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Poland.

(2) It appears that, apart from the managing director, all employees of the company are recruited in Poland and there is no interference from England in this aspect of the business of the company.

(3) The banking and borrowing activities of the company are carried on exclusively with Polish institutions in Poland. This factor is of course mitigated by other matters, namely the guarantees which have been given by the English companies to Polish institutions and the fact that Mr Stewart and others from England have been active both in the initiation and subsequent conduct of the company's main Polish account.

**36** Thus far, matters appear to be evenly balanced. There remain two other factors. The first is what might be called the statutory presumption, that the place where a company has its registered office is the centre of its main interests. Against that, I have to place the evidence of Mr Stewart about the place to which creditors of the company have been having recourse now *597 that the Parkside Group is in administration. To a considerable extent, they have been looking to the group in England rather than to Poland for reassurance. Further, and this is a point on which I have touched already, such reassurance as the company's bankers in Poland have required had to come from England and not from the home country. As Mr Registrar Jaques put the matter in a passage cited by Judge McGonigal in Re Daisytek-ISA, "The creditors need to know where to go to contact the debtor". Given the importance which attaches to this aspect of a debate as to the centre of a company's main interests, this last factor is in my judgment the one which, in this case, concludes the matter in favour of England.

**37** The decision of Kelly J. in Eurofood IFSC, seems to me to have been inevitable. The results arrived at in Daisytek and in Re Ci4Net.Com Inc were reached after detailed analysis of the facts, but if I may say so, with respect to Judge McGonigal's decision in the former case and without attempting to parade my own decision in the latter case, they do not, on rereading, appear to be anything other than clearly right. In this case, however, I have reached my decision by the narrowest of margins. If that decision requires fuller justification, I can only add that it has been arrived at on the basis of an analysis of the evidence before the court and not as a mere matter of impression.

**Merits**

**38** Jurisdiction having been established, I can deal shortly with the merits of the application. The evidence of Mr Edward Klempka, one of the proposed administrators, shows that the company has, since the end of December 2004, been in serious arrears with its suppliers and that an increasing number of suppliers have withdrawn credit terms. It has been kept afloat only by substantial advances by way both of accelerated payment for goods supplied and of unsecured lending from the administrators of other companies in the Parkside group. Further, Alcan Packaging Inc is willing to purchase the business and assets of the company, but only if an administration order is made in England and if the administrators ratify the sale by the management board of the company. The outcome statement which is relied upon by Mr Klempka shows that on a liquidation there would be a deficiency as regards creditors of the company, but on a sale to Alcan Packaging Inc all creditors would be paid and there would be a surplus to be returned to PIL as shareholder.

**39** The conditions which must be satisfied before an administration order is made are to be found in Sch.B1 to the Insolvency Act 1986, which was inserted by the Enterprise Act 2002. By para.11 of Sch.B1,

"The court may make an administration order in relation to a company only if satisfied-

(a) that the company is or is likely to become unable to pay its debts, and

(b) that the administration order is reasonably likely to achieve the purpose of administration."

"The purpose of administration" is not a defined term, but it is generally agreed that it is identical with the objective which is referred to in para.3(1) of Sch.B1:

"The administrator of a company must perform his functions with the objective of-

(a) rescuing the company as a going concern, or

(b) achieving a better result for the company's creditors as a whole than would be likely if the company were wound up (without first being in administration), or

(c) realising property in order to make a distribution to one or more secured or preferential

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[2006] B.C.C. 589 Page 9
2005 WL 4829622 (Ch D), [2006] B.C.C. 589
(Cite as: [2006] B.C.C. 589)

creditors."

**40** The evidence which I summarised in para.38 above shows that the company is, or is likely to be, unable to pay its debts and that an administration order *is reasonably likely to achieve a better return* for the creditors as a whole than if the company went into [winding up without first being in] administration. In so far as the court has a discretion whether or not to *598 make an administration order, I conclude without hesitation that this is a case in which an order should be made. The prospects both of discharging in full the indebtedness of the company and of maintaining the employment of those now working for the company combine to demonstrate that no other order could possibly be justified.

(Order accordingly)

(c) Sweet & Maxwell Limited

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.