**EXHIBIT 13**

Printing Content


## Judgments

Judgment Title: Flightease Ireland Limited -v- Companies Act

Neutral Citation: [2005] IEHC 274

High Court Record Number: 2005 72 COS

Date of Delivery: 27/07/2005

Court: High Court

Composition of Court: Murphy J.

Judgment by: Murphy J.

Status of Judgment: Approved

2005 IEHC 274

# THE HIGH COURT

[2005 Rec. No. 72COS]
IN THE MATTER OF FLIGHTLEASE IRELAND LIMITED
(IN VOLUNTARY LIQUIDATION)
AND IN THE MATTER OF THE COMPANIES
ACTS, 1963 TO 2003
AND IN THE MATTER OF AN APPLICATION FOR DIRECTIONS
PURSUANT TO SECTION 280 OF THE COMPANIES ACT, 1963

**Judgment of Mr. Justice Murphy dated the 27th day of July, 2005.**

### 1. Background
Swissair was the holding company of Flightlease (the Company) now in voluntary liquidation.
Société d'Explotiation OAM Air Liberté (Air Lib) was formed in summer 2001, to take on the activities of several insolvent companies.
Swissair agreed to pay Air Lib's holding company, Holco, certain monies. Following the attacks of September 11, 2001 and the effects thereof on the international airline industry, Swissair discontinued those payments. Air Lib was placed in liquidation on 17th February, 2003 and joint liquidators were appointed.

On 8th November, 2001, within a month of the events of September 11th, proceedings were initiated in France by Air Lib and Holco against a number of defendants, including the Company, for the sum of €503 million approximately (the claim).

In the liquidation of the Company, creditors' claims amount to €290 million in respect of which there is available assets of €13 million. The liquidator rejected the proof of claim of Air Lib on 24th January, 2005.

Air Lib requested a stay on the liquidation of the Company. The Company opposed that request and indicated its wish to proceed with and determine the liquidation.

The Company, whose centre of economic interest is in Ireland, initiated these proceedings.

## 2. Issues

The parties had agreed and Laffoy J. directed that the following issues of interpretation arising from the provisions of Council Regulation 1346/2000 on insolvency proceedings (the Regulation) require to be determined by the court:

1) Does article 4 of the Regulation require the claim made by the liquidators of Societé d'Explotiation OAM Air Liberté (Air Lib) in the winding-up of the Company to be determined by the Irish Court in accordance with Irish law governing the lodging, verification and admission of claims in insolvency proceedings?

2) If the answer to 1) is "yes", what steps must now be taken by the liquidators of Air Lib in relation to their appeal against the Notice of Rejection of Proof dated 24th January, 2005, delivered by the liquidators of the Company?

3) Does article 15 of the Regulation require that the effect of the winding-up of the Company on certain proceedings before the courts in France, in which Air Lib is a plaintiff and the Company is a defendant, be governed by the law of France?

4) If the answer to 3) is "yes", what are the consequences for the conduct of the winding-up of the Company in the claim of the liquidators of Air Lib in that winding-up? (The court was informed that this does not yet arise and, accordingly, is not a matter in relation to which the court needs to concern itself in this application.)

In relation to the issues, Air Lib submitted that the answer to the first issue was in the negative and that the answer to the third issue was in the affirmative. Flightlease, on the other hand, submitted that the answers be reversed: yes to issue one and no to issue three.

## 3. Council Directive 1346/2000

3.1 The background and objective of the Regulation is given in the recitals 2, 3, 6, 12 and 22 to 24.

> "The proper functioning of the internal market requires that cross-border insolvency proceedings should operate efficiently and effectively and this Regulation needs to be adopted in order to achieve this objective which comes

within the scope of judicial co-operation in civil matters within the meaning of article 65 of the Treaty. (2)

The activities of undertakings have more and more cross-border effects and are therefore increasingly being regulated by Community law. While the insolvency of such undertakings also affects the proper functioning of the internal market, there is a need for a Community act requiring co-ordination of the measures to be taken regarding an insolvent debtor's assets. (3)

...

In accordance with the principle of proportionality this Regulation should be confined to provisions governing jurisdiction for opening insolvency proceedings and judgments which are delivered directly on the basis of the insolvency proceedings and are closely connected with such proceedings. In addition, this Regulation should contain provisions regarding the recognition of those judgments and the applicable law which also satisfy that principle. (6)

...

This Regulation enables the main insolvency proceedings to be opened in the Member State where the debtor has the centre of his main interests. These proceedings have universal scope and aim at encompassing all the debtor's assets. To protect the diversity of interests, this Regulation permits secondary proceedings to be opened to run in parallel with the main proceedings. Secondary proceedings may be opened in the Member State where the debtor has an establishment. The effects of secondary proceedings are limited to the assets located in that State. Mandatory rules of co-ordination with the main proceedings satisfy the need for unity in the Community. (12)

...

This Regulation should provide for immediate recognition of judgments concerning the opening, conduct and closure of insolvency proceedings which come within its scope and of judgments handed down in direct connection with such insolvency proceedings. Automatic recognition should therefore mean that the effects attributed to the proceedings by the law of the State in which the proceedings were opened extend to all other Member States. Recognition of judgments delivered by the courts of the Member States should be based in the principle of mutual trust. To that end, grounds for non-recognition should be reduced to the minimum necessary. This is also the basis on which any dispute shall be resolved where the courts of the two

> Member States both claim competence to open the main insolvency proceedings. The decision of the first court to open proceedings shall be recognised in the other Member State without those Member States having the power to scrutinise the court's decision. (22)
>
> This Regulation should set out, for the matters covered by it, uniform rules on conflict of laws which replace, within their scope of application, national rules of private international law. Unless otherwise stated, the law of the Member State in the opening of the proceedings should be applicable (*lex concursus*). This rule on conflict of laws shall be valid both for the main proceedings and for local proceedings; the *lex concursus* determines all the effects of the insolvency proceedings, both procedural and substantive, on the persons and legal relations concerned. It governs all the conditions for the opening, conduct and closure of the insolvency proceedings. (23)
>
> Automatic recognition of insolvency proceedings to which the law of the opening State normally applies may interfere with the rules under which transactions are carried out in other Member States. To protect legitimate expectations and the certainty of transactions in Member States other than that in which proceedings are opened, provisions should be made for a number of exceptions to the general rule. (24)"

3.2 The parties agree that the liquidation proceedings of both Air Lib and the Company are insolvency proceedings for the purpose of the Directive.
3.3 Article 3 gives jurisdiction to the course of the Member State where the centre of the debtor's main interest is situate and recognises secondary winding-up proceedings.
Article 4, in relation to the applicable law, provides as follows:

> "1. Save as otherwise provided in this Regulation, the law applicable to insolvency proceedings and their effects shall be that of the Member State within the territory of which such proceedings are opened, hereafter referred to as the 'State of the opening of proceedings'.
>
> 2. The law of the State of the opening of proceedings shall determine the conditions for the opening of those proceedings, their conduct and their closure. It shall determine in particular (*inter alia*):
>
> ...
>
> (f) the effects of the insolvency proceedings on

> proceedings brought by individual creditors, with the exception of law suits pending;
> (g) the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings;
> (h) the rules governing the lodging, verification and admission of claims."

**Third parties' rights *in rem***
(1) The opening of insolvency proceedings shall not affect the rights *in rem* of creditors or third parties in respect of tangible or intangible, moveable or immoveable assets – both specific assets and collections of indefinite assets as a whole which change from time to time – belonging to the debtor which are situated within the territory of another Member State at the time of the opening of proceedings.
(2) The rights referred to in paragraph 1 shall in particular mean:

> (a) the right to dispose of assets or have them disposed of and to obtain
> satisfaction from the proceeds of or income from those assets, in particular by virtue of a lien or a mortgage;
> (b) the exclusive right to have a claim met, in particular a right guaranteed by a lien in respect of the claim or by assignment of the claim by way of a guarantee;
> (c) the right to demand the assets from, and/or to require restitution by, anyone having possession or use of them contrary to the wishes of the party so entitled;
> (d) a right *in rem* to the beneficial use of assets.

(3) The right, recorded in a public register and enforceable against third parties, under which a right *in rem* within the meaning of paragraph 1 may be obtained shall be considered a right *in rem*.
(4) Paeagraph 1 shall not preclude actions for voidness, voidability or unenforceability as referred to in Article 4(2)(m).

The other relevant article to the issues is article 15 which deals with the effects of insolvency proceedings on lawsuits pending. It provides as follows:

> "The effects of insolvency proceedings on a lawsuit pending concerning an asset or a right of which the debtor has been divested shall be governed solely by the law of the Member State in which that lawsuit is pending."

Article 16 provides that any judgment opening insolvency proceedings handed down by a court of a Member State which has jurisdiction according to article 3 shall be recognised in all the other Member States from the time that it has

become effective in the state of the opening of the proceedings and also refers to secondary proceedings.

Article 25 in the context of that background, provides for recognition and enforcement ability of other judgments as follows:

> "1. Judgments handed down by a court whose judgment concerning the opening of proceedings is recognised in accordance with article 16 and which concerns the course and closure of insolvency proceedings, and compositions approved by that court shall also be recognised with no further formalities. ...
>
> [This] shall also apply to judgments deriving directly from the insolvency proceedings and which are closely linked with them. Even if they are handed down by another court. [and] shall also apply to judgments relating to preservation measures taken after the request for the opening of insolvency proceedings."

Article 25 allows direct enforceability of such judgments. The Brussels Convention originally excluded insolvency matters.

### 4. Submissions on behalf of Air Lib

Mr. Hennessy, on behalf of the joint liquidators of Air Lib, submitted that it would be prejudicial to Air Lib to be refused to pursue French litigation initiated by it.

He referred to *Mazur Media Limited and Others v. Mazur Media GmbH and Others* [2004] 1 W.L.R. 2966.

Counsel drew the analogy between the claimant, *Mazur Limited* and Air Lib in the present case and between *Mazur GmbH* and Flightlease in the present case. In the *Mazur* case the English courts correspond with the French courts in the present case and the German courts with the Irish courts.

Accordingly, counsel for Air Lib submitted that the court should answer issue 1 in the negative and issue 3 in the affirmative.

### 5. Submissions on behalf of Flightlease Ireland

5.1 Issue 1

Mr. Ian Finlay S.C., on behalf of the liquidator of Flightlease, referred to the first issue, whether article 4 required Air Lib's claim in the Irish winding-up to be determined by the Irish courts in accordance with Irish law.

He distinguished this from the third issue which was to ask the court to determine what was the effect of Irish insolvency proceedings in the French courts.

He submitted that Irish insolvency proceedings governs the administration of the liquidation of the Company that is the lodging, verification and admission of claims.

In the instant case, the lawsuit pending in France in which the company is one of many defendants, is a lawsuit in which the joint liquidators of Air Lib are seeking

to establish a financial liability on the part of the Company, the lawsuit does not concern a specific asset or a right of which the Company has been divested. Accordingly, issue 3: does article 15 of the Regulation require that the effect of the winding-up of the Company in certain proceedings before the courts in France be governed by the law of France should be answered in the negative.
It follows that issue 4 does not arise. There are no consequences for the conduct of the winding-up of the Company. The proceedings in France are independent of the claim made by the liquidators of Air Lib in the winding-up of the Company. The claim in the winding-up is still governed by Irish insolvency rules. In this regard, the general provisions of article 4 as they apply to claims made in the insolvency are paramount. Irish law is applicable in terms of "the claims which are to be lodged against the company" and "the rules governing the lodging, verification and admission of claims".
It was submitted that neither the liquidators of the Company, nor the court was obliged to await the outcome of the proceedings in France before making an adjudication on the claim in the winding-up.

### 6. Decision of the Court

6.1 The historical background to the Regulation was the perceived need to reform domestic laws so as to facilitate international co-operation and co-ordination. International trade required the abandonment of legislative and nationalist attitudes of the 1970s and 1980s. The United Nations Committee on International Trade Law (UNCITRAL) Model Law and Cross-border Insolvency was published in 1997 together with a guide. Three years later the E.C. Regulation on insolvency proceedings (1346/2000) was promulgated. Two years later the principles of co-operation in transnational insolvency cases among the members of the North American Free Trade Area (NAFTA) was agreed upon in 2002.
The US, Canada, Australia, New Zealand and South Africa were one of the first to adopt the model law which, in its provisions, overlaps with the E.C. Regulation.
The model law was primarily intended to prevent local realisation of assets in situations where there were insolvency proceedings within a specific country and the company forming the subject matter of those proceedings had assets throughout the world.
The framework of E.U. private international insolvency law now encompasses the Brussels Convention (Regulation 44/2001); the European Insolvency Regulation, 1346 of 2000, which came into force on 31st May, 2002; the Insurance Undertakings Directive, 2001 (entry into force on 20th April, 2003); Credit Institutions Directive, 2001 (entry into force 5th May, 2004) and some further securities and financial directives.
The Insolvency Regulation applies to the intra-E.U. effects of insolvency proceedings. It does not regulate the position as between Member States and Non-Member States. It applies to insolvency proceedings opened after 31st May, 2002 and replaced ten bilateral or multi-lateral conventions between Member States and replaces the Council of Europe Convention of Istanbul, 1990.
The main insolvency proceedings can only be commenced in the Member State where the debtor's centre of main interest (COMI) is located – article 3.1. The

main insolvency proceedings, once commenced, are to be automatically recognised across all Member States and the law of that Member State will govern the proceedings – articles 4 and 28.

The applicable law – *lex forum concursus* – governs the effects of the insolvency proceedings, both procedural and substantive.

The purpose of the Regulation, is to ensure that the creditors of an insolvent company domiciled within the Union are entitled to be treated equally in terms of their participation in the distribution of assets of the insolvent company. This is brought about by the universal application under article 4 of the law of the State of the opening of the insolvency in the treatment of such claims save in the limited application of secondary insolvency proceedings.

Uniformity of application of the law of the State of the opening of the insolvency proceedings is required in order to ensure that all claims in the insolvency proceedings are treated in the same manner. If any one claim were to be dealt with in accordance with the law of a State other than that of the opening of the proceedings, different provisions in terms of priority etc. might apply, thereby leading to inequality of treatment as between creditors.

Such an interpretation is supported by chapter 4 of the Regulation entitled Provision of Information for Creditors and Lodgement of their Claims (articles 39 to 42) which introduces several uniform rules on the right to lodge claims, the duty to provide information and the language to be used.

**6.2** Article 4 provides that the law applicable to insolvency proceedings should be that of the Member State within the territory of which such proceedings are opened. It follows that in the present case the Irish courts should determine in particular:

> 4(2) "(f) The effect of the insolvency proceedings on proceedings brought by individual creditors with the exception of lawsuits pending;
> (g) the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings;
> (h) the rules governing the lodging, verification and admission of claims."

Subject to "lawsuits pending", it follows that litigation elsewhere is not relevant. The claim has been lodged. Irish and not French rules of verification apply. The reservation of lawsuits pending in article 4(2)(f) is in the context of the limited scope of article 15 which refers to a lawsuit concerning an asset or a right of which the debtor had been divested being governed solely by the law of the Member State in which that lawsuit is pending. Litigation in France is in respect of a money claim and does not concern an asset of which the debtor has been divested.

**6.3** Although the heading to article 15 reads "effects of insolvency proceedings

on lawsuits pending", it is clear that article 15 only deals with lawsuits pending "concerning an asset or a right of which the debtor has been divested". Article 15 does not have general application to lawsuits pending. It is submitted that the effect of article 15 is to make it clear that in cases where there is a lawsuit pending in a court in a Member State, other than the State in which the insolvency proceedings have been instituted, which concerns an asset or a right of which the insolvent company has been divested, these proceedings shall be governed solely by the law of the Member State in which that lawsuit is pending. There is no suggestion, however, that in the case of other proceedings (i.e. proceedings other than those which concern an asset or a right to which an insolvency company has been divested) that a similar principle applies.

The law of the State of the opening of proceedings determines all the effects of the insolvency proceedings, both procedural and substantive, on the persons and legal relations concerned.

The exception referred to in article 4(2)(f), that the effects of the proceedings on lawsuits pending remain subject to the law of the contracting State where the lawsuit is pending is dealt with in article 15. The Convention distinguishes between the effects of insolvency on individual enforcement proceedings and those on lawsuits pending. The effects on individual enforcement actions are governed by the law of the State of the opening (see article 4(2)(f)) so that the collective insolvency proceedings may stay or prevent any individual enforcement action brought by creditors against the debtor's assets.

The effects of the insolvency proceedings on other proceedings concerning the assets or rights of the estate are governed (ex article 15) by the law of the contracting State where these proceedings are under way. The procedural law of this State shall decide whether or not the proceedings are to be suspended, how they are to be continued and whether any appropriate procedural modifications are needed in order to reflect the loss or restriction of the powers of disposal and the administration of the debtor and the intervention of the liquidator in his place.

To protect legitimate expectations on the certainty of transactions in States other than that in which the proceedings were opened the Convention provides for a number of exceptions to the general rule:

1. In certain cases the Convention excludes some rights over assets located abroad from the effects of the insolvency proceedings (as in articles 5, 6 and 7).

2. In other cases, it ensures that certain effects of the insolvency proceedings are governed not by the law of the State of the opening (f1) but by the law of the State concerned (see articles 8, 9, 10, 11, 14 and 15). In such cases, the effects to be given to the proceedings opened in other contracting States are the same effects contributed to a domestic proceeding of equivalent nature (liquidation, composition, or reorganisation proceedings) by the law of the State concerned (f2).

Article 5 which provides for third parties' rights *in rem* the opening of insolvency proceedings shall not affect the rights *in rem* in creditors or third parties in respect of tangible or intangible, movable or immovable assets ... belonging to the debtor which are situated within the territory of another Member State at the time of the opening of proceedings. The provision of article 5 excludes from the effects of the proceedings rights *in rem* of third parties and creditors in respect of

assets belonging to the debtor which, at the time of the opening of the proceedings, are situated within the territory of another contracting State. Accordingly we are left with a distinction between a third party's right *in rem*; (article 5) an asset or a right of which the debtor has been divested (article 15 and article 4(2)(f)) and proceedings brought by individual creditors. It is only the latter that is subject to the law of the Member State within the territory of which such proceedings are opened.

**6.4** The only relevant claim in *Mazur* was against the assets of the debtor.
In that case the claimants were both in administrative receivership. They claimed against the first named defendant, a German company (in insolvency under the laws of Germany) and the remaining individual defendants. The claim was that they had acted unlawfully in failing, despite requests to do so, to deliver up all recordings previously owned by the first defendant to the claimants. The third defendant was the legal and beneficial owner of all the shares in the first defendant and had sold all the issued shares of the company to the second claimant, an English company, subject to the exclusive jurisdiction of the English courts. The first defendant assigned to the first claimant, its English-owned subsidiary, all the copyright it had in certain sound recordings. The assignment provided that the English courts would have exclusive jurisdiction. The German company was put into provisional insolvency and the claimants brought an action against the defendants in England for the failure to deliver up all the recordings previously owned by the first named defendant.
Later, the third defendant instituted insolvency proceedings against the first named defendant (the German company) in Germany. The German company made an application to the English High Court for a stay on the grounds of the existence of the German insolvency proceedings.
In dismissing the application the court held that the English Insolvency Act applied to the winding-up of a foreign company in England but not to foreign insolvency proceedings. Lawrence Collins J. held that the court had an inherent jurisdiction to stay English proceedings whenever it was necessary to prevent injustice. However, it would require exceptionally strong grounds for the English court to exercise that power. Since none of the factors relied upon by the first defendant in favour of a stay amounted to exceptional circumstances, a stay would not be justified.
The court, at para. 54, referred to the evidence on German law being broadly to the effect that following insolvency proceedings all pending actions in Germany were subject to an automatic stay. Where a claim for damages was lodged in the insolvency proceedings and disputed by the liquidator, the claimant may seek recognition of the claim with the court having conduct of the insolvency proceedings. It was common ground that, in the circumstances of the case, the effect of Council Regulation 1346/2000 ("the Insolvency Regulation") was that it was for English law to determine whether the proceedings against the German company by the claimants should be stayed, and whether the plaintiffs should be required to prove their claims in the German insolvency proceedings. (Para. 54)
Having applied the provisions of the Insolvency Regulation the court held that the position of the claimants was that the court's discretion should be exercised

to permit them to continue with their claims against the German company. Justice required that result: the English court had a much closer connection with the rights and interests in the masters (sound recordings) than the court in Germany.
It was further held that the court had an inherent jurisdiction to initiate proceedings whenever necessary to prevent injustice. However, the power could not be used in a manner which was inconsistent with the Judgments Regulation. The implementing section provided that nothing in the Act prevented the court from exercising its power to stay, where to do so was not inconsistent with the Brussels or Lugano Conventions. That section had not been amended to refer to the Judgments Regulation, because the Regulation was directly applicable without national legislation. Where the court has jurisdiction under the Judgments Regulation, the power of the court to stay proceedings could not be used simply because another Regulation State is the *forum conveniens*: Dicey & Morris, The Conflict of Laws, 13th ed. (2000), para. 11 – 012.
The decision in *Mazur* made reference to articles 4, 15 and 16 as being part of the submissions made by each party. It would appear that the decision in accepting the claimants' conclusion, although not accepting much of their reasoning, relied on the English Insolvency Act, 1989, (s. 130(2)). The trial judge held as follows:

> "65. It is plain from the authorities that a foreign company (subject to the jurisdictional requirements of the Insolvency Regulation where it applies) may be wound-up in England as an unregistered company under [the Companies Acts] if there is sufficient connection with the jurisdiction. That connection may, but does not necessarily have to, consist of assets within the jurisdiction: (*Re Drax Holdings Limited* [2004] 1 W.L.R. 1049). I hold that the criteria went to the discretion of the court rather than to its jurisdiction."

The court held further at para. 68 as follows:

> "The effect of article 4(2)(f) and article 15 of the Insolvency Regulation is to leave the question whether there should be a stay to the English court in the circumstances in which they apply."

### 6.5 Issue One
The joint liquidators of Air Lib have lodged a claim in the winding-up of a company. That claim has been rejected by the liquidators in accordance with Irish insolvency law and is now subject to an appeal to the High Court.
The primary rule in relation to insolvency proceedings governed by the Regulation is clearly set out in Article 4: the law applicable to these proceedings shall be that of the Member State in which the proceedings have been opened. Furthermore, Article 4(h) specifically states that the law governing the lodging, verification and admission of claims in insolvency proceedings is to be that of the

State in which the proceedings were opened. These rules apply "save where otherwise provided in the Regulation". It has not been shown that the claim made by the liquidators of Société d'Exploitation AOM Air Liberté in the winding up of Flightlease (Ireland) Limited falls within any of he exceptions to this general rule set out in the Regulation. Therefore the claim falls to be determined by the Irish court in accordance with the Irish law governing the lodging, verification and admission of claims in insolvency proceedings, meaning that the answer to the first question is "Yes".

The answer to preliminary issue 1 is "yes": Article 4 of the Regulation requires the claim made by the liquidators of Air Lib in the winding up of the Company to be determined by the Irish courts in accordance with Irish law governing the lodging, verification and admission of claims.

### 6.6 Issue Three

Article 15 provides that the effects of insolvency proceedings on a lawsuit pending concerning an asset or a right to which the debtor has been divested shall be governed solely by the law of the Member State in which that lawsuit is pending. This is an exception to a general provision of article 4 which otherwise provides for the universal application of the law of the State of the opening of the insolvency proceedings.

Article 15 requires that "a lawsuit pending concerning an asset or a right of which the debtor has been divested should be governed solely by the law of the Member State in which that lawsuit is pending". This is a specific exception to the general rule set out in Article 4 and should be interpreted as such,. Since the claim pending in France is for a money sum and does not relate to an asset or right of which the debtor has been divested, the exception clearly does not apply here. Therefore the answer to the third question is "No".

6.7 Accordingly the court would answer the preliminary issues as follows:
(1) Article 4 of the Regulation requires the claim in the amount of €502,742,635.72 made by the liquidators of Societé d'Exploitation AOM Air Liberté (Air Lib) in the winding-up of Flightlease (Ireland) Limited (in Voluntary Liquidation) (the Company) to be determined by the Irish court in accordance with Irish law governing the lodging, verification and admission of claims in insolvency proceedings.
(2) The steps to be taken by the liquidators of Air Lib in relation to their appeal against the notice of rejection of proof dated 24th January, 2005, delivered by the liquidators of the Company was, by agreement between the parties, not required to be dealt with by the court.
(3) Article 15 of the Regulation does not require that the effect of the winding-up of the Company on certain proceedings before the courts in France, in which Air Lib is a plaintiff and the Company is a defendant, to be governed by the law of France.
(4) The issue of the consequences for the conduct of the winding-up of the Company in the claim of the liquidators for Air Lib does not, accordingly, arise.

Back to top of document