Case 1:07-cv-07413-PKC   Document 26-3   Filed 06/30/2008   Page 1 of 3

A questo riguardo, la giurisprudenza di legittimità ha consolidato alcuni principi assai rilevanti in relazione all'oggetto del presente studio:

*a)* la competenza per la dichiarazione di fallimento spetta al tribunale del luogo in cui l'imprenditore ha la *sede effettiva* dell'impresa, senza che possano rilevare trasferimenti di detta sede nell'imminenza o successivamente alla dichiarazione di fallimento.

In particolare assume decisivo rilievo, ai fini dell'individuazione del giudice competente, la situazione in atto al momento della presentazione della domanda di fallimento, e non svolge alcuna influenza sul radicarsi della competenza un trasferimento della sede sociale posteriore al deposito dell'istanza di fallimento, con due conseguenze importanti: *a1.* che, in base al principio della *perpetuatio iurisdictionis*, diviene irrilevante ogni successivo spostamento di sede; e *a2.* che la presunzione di coincidenza della sede legale con la sede effettiva dell'impresa è superata quando si prova che il trasferimento della sede legale nell'imminenza della dichiarazione di fallimento non abbia avuto alcun seguito concreto ed effettivo (⁴).

Detto più chiaramente, la competenza a dichiarare il fallimento spetta al tribunale del luogo ove l'impresa ha la sua sede principale, ove, cioè, promuova sul piano organizzativo i suoi affari, e tale luogo, di regola, si deve presumere coincidente con quello della sede legale. Tuttavia, siffatta presunzione di coincidenza può essere vinta dalla prova del carattere fittizio o formale della sede legale, restando irrilevanti in ogni caso i trasferimenti della sede stessa non accompagnati dal reale trasferimento del centro propulsore dell'impresa o contestuali alla effettiva cessazione dell'attività dell'impresa medesima (⁵).

*b)* un più remoto precedente precisa che il difetto di giurisdizione del giudice italiano, in ordine alla istanza di fallimento di una società con sede all'estero e priva di stabile rappresentanza in Italia, non può essere escluso in relazione al fatto che la società abbia operato in Italia, ivi stipulando contratti, dato che il luogo in cui si svolge l'attività negoziale dell'impresa non può identificarsi con quello della sua sede, da intendersi come *centro degli interessi* e della effettiva attività amministrativa e direttiva (⁶);

*c)* con riferimento, poi, alla disciplina fissata dalla Convenzione italo-francese del 3 giugno 1930 sull'esecuzione delle sentenze civili e commerciali, è stato precisato che il principio secondo il quale gli effetti del fallimento, dichiarato in uno dei due Stati, si estendono al territorio dell'altro

---

(⁴) V., da ultime, Cassazione, 18 luglio 2001, n. 9753; Cassazione, 6 dicembre 2001, n. 15474; Cassazione, 1° settembre 1999, n. 9199.
(⁵) In termini v. la recente Cassazione, 21 marzo 2003, n. 4206, ord.; nello stesso senso Cassazione, 14 giugno 2001, n. 8023.
(⁶) Cassazione, sez. un., 4 luglio 1985, n. 4049.

Stato, riguarda anche la cosiddetta forza attrattiva della competenza del tribunale fallimentare nei confronti di tutte le azioni connesse col fallimento, e comporta, pertanto, per il caso in cui il debitore sia stato dichiarato fallito in Francia, che il giudice italiano difetti di giurisdizione in ordine alle pretese del creditore, ivi comprese quelle dirette al conseguimento di provvedimenti cautelari, come l'istanza di autorizzazione e di convalida di sequestro conservativo su beni del debitore medesimo (⁷).

La giurisprudenza della Cassazione guarda, dunque, alla *sede effettiva*, più che a quella «legale» come il punto di imputazione – si direbbe il «criterio di collegamento» – tra l'impresa insolvente e la giurisdizione fallimentare, ed al «*centro (prevalente) di interessi*» come criterio di individuazione della ridetta sede effettiva.

Ciò che ha condotto i giudici di legittimità ad escludere la rilevanza degli spostamenti artificiosi e strumentali di sede nell'imminenza della dichiarazione di fallimento («*quando c'è in giro aria di fallimento*»), al fine di dissuadere le parti dal trasferire «armi e bagagli» da una sede all'altra con il solo scopo di ottenere una migliore situazione giuridica, ovvero – per usare un'espressione assai cara alla terminologia comunitaria – al fine di limitare i fenomeni di *forum shopping* (da un posto all'altro del territorio della Repubblica, ovvero da uno Stato all'altro) (⁸).

Il criterio della prevalenza della sede effettiva su quella legale apparitiene, per altro verso, alle ragioni profonde della civiltà processuale di un ordinamento, ancorché recenti indirizzi legislativi sembrino accordare preferenza al diverso profilo della sede societaria intesa in senso meramente formale (⁹).

Il Regolamento comunitario n. 1346 del 2000 – che rappresenta il superamento delle convenzioni bilaterali in materia fallimentare esistenti tra gli Stati membri (¹⁰) – consente ora di aprire una procedura *principale* di insol-

---

(⁷) Cassazione, sezioni unite, 6 febbraio 1984, n. 879, in *Foro it.*, 1984, I, 1890.
(⁸) Non è un caso che il «Considerando» n. 4 del Regolamento n. 1346 del 2000 indichi la dissuasione delle parti da fenomeni di *forum shopping* come uno degli obiettivi dichiarati della normativa comunitaria di nuova introduzione.
(⁹) Soltanto incidentalmente, sia consentito osservare che l'art. 25, comma 1, del neonato d.lgs. 17 gennaio 2003, n. 5, contenente la disciplina del processo societario, individua la competenza per i procedimenti camerali in materia societaria nel «*tribunale del luogo dove la società ha la sede legale*»: il che potrebbe implicare – soprattutto quando si confronta con l'applicazione pratica di strumenti di densa portata sistematica ed di notevole incidenza pratica – che lo spostamento *ad hoc* della sede societaria legale a centinaia di chilometri di distanza possa, in via di fatto, inibire l'attivazione di importanti strumenti giudiziali di controllo societario (si pensi, soltanto per fare un esempio, al procedimento camerale con il quale il singolo socio chieda al tribunale di accertare il verificarsi della causa di scioglimento ai fini della liquidazione di società di capitali ai sensi del rinnovato art. 2485, secondo comma, cod. civ.).
(¹⁰) Tali convenzioni sono singolarmente individuate dall'art. 44 del Regolamento, al fi-

venza nello Stato membro nel quale è situato il «*centro degli interessi del debitore*», titolare di un'impresa *transnazionale*, con effetti in tutti gli Stati membri (principio di universalità); ma anche una o più procedure *secondarie* (e/o *territoriali*) in parallelo con la procedura principale nello Stato membro dove il debitore ha una dipendenza (¹¹), e con effetti limitati ai beni situati in tale Stato (¹²).

In sostanza, al principio di libera circolazione dei provvedimenti concorsuali nel territorio dell'Unione, si affianca il principio di libera attuabilità della procedura di insolvenza *ratione loci*. Esso dà forza all'idea che i giudici (ovvero le autorità investite dei relativi poteri) non si debbano «fermare» per carenza di giurisdizione allorché l'imprenditore insolvente abbia la sua sede in un diverso Stato dell'Unione (¹³).

L'asse problematico si sposta allora dalla necessità di individuare la giurisdizione investita del potere di aprire (più o meno unilateralmente, più o meno autoritativamente) la procedura, all'opportunità di assicurare adeguate discipline di coordinamento tra procedura principale e procedure secondarie (e/o territoriali): diventa, cioè, una problematica di «cooperazione giudiziaria» in senso proprio.

3. *Self execution a livello comunitario della decisione di apertura della procedura di insolvenza e problematiche applicative per il giudice italiano.* – Poste le premesse di cui sopra, l'art. 9 della legge fallimentare – su cui, come si è detto, ha inciso il Regolamento comunitario, sostituendone il contenuto normativo con riferimento al territorio dell'Unione – va ulteriormente situato nel contesto della legislazione sopravvenuta, ed in particolare della legge 31 maggio 1995, n. 218, di riforma del diritto internazionale privato, al confronto con la quale la norma dettata dal legislatore interno nel 1942 già usciva ulteriormente ridimensionata sotto almeno due profili:

*a*) per la circostanza che l'art. 7 della legge del 1995 disciplina l'ipotesi della litispendenza internazionale, prevedendo che se nel corso di un giudizio sia eccepita la previa pendenza tra le stesse parti di domanda avente il

---

(¹¹) V. *infra*, §§ 8 e 9.
(¹²) V. G. OLIVIERI, op. cit., pag. 3.

medesimo oggetto ed il medesimo titolo dinanzi a giudice straniero, il giudice italiano sospende il giudizio, se ritiene che il provvedimento possa produrre effetto per l'ordinamento italiano (¹⁴);

*b*) per la connessa circostanza che l'art. 64 della medesima legge prevede una sorta di «delibazione automatica» delle sentenze straniere nell'ordinamento italiano al ricorrere di certe «garanzie» processuali minime (sussistenza della giurisdizione, rispetto del contraddittorio, assenza di ulteriori rimedi ordinari interni, non contrarietà all'ordine pubblico italiano).

La doppia previsione trova(va) nel processo (giurisdizionale) che conduce alla dichiarazione di fallimento un suo terreno di elezione, se è vero che – come di recente ha avuto modo di precisare la Cassazione (¹⁵) – il vecchio principio secondo il quale le sentenze straniere dichiarative di fallimento sono assoggettate (qualora manchi una convenzione internazionale che ne disciplini il riconoscimento con criteri di speditezza e semplicità) all'ordinario procedimento di delibazione di cui agli abrogati artt. 796 e seguenti cod. proc. civ., deve ritenersi applicabile tutte le volte in cui l'atto introduttivo del giudizio innanzi al giudice italiano, nel quale la sentenza straniera dovrebbe esprimere i suoi riflessi, risulti antecedente alla data di entrata in vigore della legge n. 218 del 1995 (e, cioè, anteriore al 31 dicembre 1996), normativa che ha, invece, introdotto, in mancanza di contestazioni, il diverso criterio dell'efficacia automatica della sentenza straniera in Italia.

Il Regolamento comunitario ha assestato, per così dire, il «colpo di grazia» al sistema dell'art. 9 della legge fallimentare, introducendo (artt. 16 e

---

(¹⁴) A questo riguardo, la Cassazione ha precisato che: *a*) la pendenza davanti ad un giudice francese della causa di divorzio fra cittadini italiani non esclude la giurisdizione italiana sulla causa di separazione personale fra i medesimi coniugi, atteso che tra le due cause non ricorrono i requisiti della identità di *petitum* e di *causa petendi* che costituiscono, insieme con l'identità dei soggetti, presupposti indispensabili perché possa applicarsi la disciplina della litispendenza di cui all'art. 7 della legge 31 maggio 1995, n. 218 (Cassazione, 20 luglio 2001, n. 9884); e *b*) il provvedimento con il quale il giudice adito nega la sospensione del procedimento, richiesta per eccepita litispendenza internazionale, ai sensi dell'art. 7, legge 31 maggio 1995 n. 218, non è impugnabile con istanza di regolamento di competenza, per le medesime ragioni per le quali non è ammissibile l'impugnazione avverso il diniego di sospensione della causa ai sensi dell'art. 295 cod. proc. civ., e cioè perché l'art. 42 cod. proc. civ. non consente un'interpretazione estensiva, né analogica, essendo norma eccezionale, e perché soltanto il provvedimento che sospende il processo, incidendo sul diritto delle parti alla decisione, giustifica la deroga al principio della non impugnabilità dei provvedimenti ordinatori, separatamente ed anticipatamente dalla sentenza, con l'ulteriore conseguenza che invece il provvedimento che nega la sospensione del processo non viola gli artt. 3 e 24 della Costituzione (Cassazione, 15 dicembre 2000, n. 15843). Sull'argomento, cfr. l'ampia indagine di R. MARTINO, *La giurisdizione italiana nelle controversie civili transnazionali*, Padova, 2000.

(¹⁵) V. Cassazione, 10 gennaio 2001, n. 283.

17) il principio dell'effetto automatico in tutti gli Stati membri della decisione di apertura di una procedura di insolvenza transfrontaliera [16], ancorché «(s)temperato» dalla possibile coesistenza e/o sopravvenienza di procedure territoriali. Esso fa sì che:

*c)* la decisione di apertura della procedura di insolvenza da parte di un giudice di uno Stato membro sia riconosciuta in tutti gli altri Stati membri non appena essa *produce effetto* nello Stato in cui la procedura è aperta [17];

*d)* tale decisione produca in ogni altro Stato membro, senza ulteriori formalità, gli effetti previsti dalla legge dello Stato di apertura, fino a quando nello stesso non sia aperta una procedura secondaria (e/o territoriale), circostanza in relazione alla quale sorge l'esigenza del coordinamento.

Processualmente parlando, allorché pervenga al giudice italiano – il quale abbia acquisito, su istanza di parte ovvero officiosamente, gli elementi per far luogo all'apertura di una procedura concorsuale, e, caso più ricorrente, alla dichiarazione di fallimento – la notizia dell'apertura in altro Stato membro di una procedura di insolvenza, possono verificarsi le seguenti ipotesi:

*e)* il fallimento (ovvero un'altra procedura concorsuale) non sia stato ancora dichiarato. In questo caso, l'istanza (ricorso) di fallimento (di uno o più creditori, del pubblico ministero e dello stesso debitore) [18] diventa improcedibile in quanto procedura concorsuale principale, ma potrebbe convertirsi in una dichiarazione di procedura concorsuale secondaria e/o territoriale, con effetti limitati ai beni del debitore che si trovano in Italia. L'art. 27, paragrafo 1, del Regolamento, prevede, infatti, che la preventiva apertura di una procedura principale in uno Stato membro permetta di aprire in altro Stato membro una procedura secondaria, anche a prescindere dalla valutazione della sussistenza del presupposto dell'insolvenza;

*f)* il fallimento (ovvero un'altra procedura concorsuale) sia stato già di-

---

[16] V. anche il successivo § 11.

[17] Si tratta, ovviamente, di un riconoscimento *sui generis*, atteso che dovrebbe più correttamente parlarsi di un recepimento *ipso jure* della decisione all'interno dei singoli ordinamenti, secondo la formula adoperata dalla legge n. 218 del 1995, che, all'art. 64, prevede che – al ricorrere delle condizioni ivi elencate – la sentenza straniera «è riconosciuta in Italia senza che sia necessario il ricorso al alcun procedimento» (di delibazione). Non a caso, si è parlato, a questo riguardo, di un effetto di recepimento «automatico» (M. FUMAGALLI, *Il regolamento comunitario sulle procedure di insolvenza*, in *Riv. dir. proc.*, 2001, pag. 702), ovvero di un fenomeno di estensione in ogni altro Stato membro degli effetti della dichiarazione di insolvenza (C. PUNZI, *op. cit.*, pag. 1019).

[18] In caso di fallimento d'ufficio, la giurisprudenza individua la pendenza del procedimento nella data del provvedimento con cui si dispone la comparizione del debitore in camera di consiglio: v. Cassazione, 18 luglio 1995, n. 7798, in *Fallimento*, 1996, pag. 366; Cassazione, 14 marzo 1985, n. 1980.

---

chiarato. In questo caso, al fine di stabilire il criterio della prevenzione, occorre far riferimento alla data di *produzione degli effetti* della sentenza italiana [19], che non può non essere quella della pubblicazione del provvedimento attraverso il deposito in cancelleria (art. 132 e 133 cod. proc. civ.), non già la deliberazione in camera di consiglio, che è momento interno all'organo decidente privo di effetti immediati e diretti [20]). Se, pertanto, la decisione di apertura di una procedura principale adottata in altro Stato membro abbia prodotto effetto (secondo la legge o la giurisprudenza di quello Stato) dopo il deposito in cancelleria della decisione italiana, il giudice interno dovrà ritenere, ai sensi del Regolamento comunitario, come *principale* la procedura aperta in Italia; in caso contrario (quando cioè gli effetti della decisione straniera si siano prodotti prima del deposito della decisione italiana), la decisione italiana potrà valere come apertura di una procedura secondaria e/o territoriale, con effetti limitati ai beni situati in Italia.

### 4. *Efficacia diretta dello strumento normativo comunitario e definitivo eclissarsi del criterio interno di radicamento della giurisdizione concorsuale.*

– Sempre per completare il quadro di riferimento della normativa interna antecedente all'entrata in vigore del Regolamento n. 1346 del 2000, va detto che le procedure di insolvenza erano escluse dal campo di applicazione della Convenzione di Bruxelles del 1968 (ora in larga parte confluita nel Regolamento 44/2001 [21]), il che ha reso sempre assai rara l'applicazione dell'ul-

---

[19] Infatti, l'art. 2, lett. *f*), del Regolamento individua espressamente il «*momento in cui è aperta la procedura di insolvenza*» in quello in cui la decisione di apertura, sia essa definitiva o meno, comincia a produrre effetti.

[20] In tal senso v. Cassazione, 7 marzo 2000, n. 2546, in *Fallimento*, 2001, pag. 381, con osservazioni di R. TROIANO; Cassazione, 11 marzo 1994, n. 2382.

[21] Regolamento CE n. 44/2001 del Consiglio del 22 dicembre 2000, concernente la competenza giurisdizionale, il riconoscimento e l'esecuzione delle decisioni in materia civile e commerciale (G.U.C.E. L 12 del 16 gennaio 2001). Il Regolamento – che assorbe, nei rapporti tra gli Stati membri, la Convenzione di Bruxelles del 27 settembre 1968, concernente la competenza giurisdizionale e l'esecuzione delle decisioni in materia civile e commerciale – enuncia il principio fondamentale in base al quale qualsiasi decisione in materia civile e commerciale emessa in uno degli Stati membri è riconosciuta automaticamente di pieno diritto negli altri Stati membri, senza alcun procedimento particolare. In caso di contestazione, qualsiasi parte interessata può avvalersi di una procedura specifica per ottenere una dichiarazione relativa alla esecutività della decisione emessa da un altro Stato membro. Sulla base di tale procedura, unilaterale in primo grado, il giudice o l'autorità competente designati da ciascuno Stato membro per l'esame delle domande (l'elenco è contenuto nell'allegato del regolamento), effettua solo un controllo formale dei documenti che accompagnano le stesse. In nessun caso la decisione straniera può formare oggetto di un riesame del merito. Successivamente le parti possono presentare ricorso dinanzi agli organi giurisdizionali indicati nell'allegato del regolamento, che verte unicamente sull'esecuzione della decisione. Sono, a questo riguardo, indicati in modo esplicito i casi in cui il giudice può negare o revocare la dichiarazione di