timo inciso dell'art. 9 della legge fallimentare, nella parte in cui fa salve le previsioni contenute nelle Convenzioni internazionali [22].

Del resto, la normativa interna, a parte quanto previsto dall'art. 9 della legge fallimentare, non conosceva – prima del Regolamento n. 1346 del 2000 – regole di portata generale volte a disciplinare il «fallimento comunitario» sul piano dei conflitti di giurisdizione, ed, in particolare, non contemplava una disciplina «compiuta» degli effetti nell'ordinamento dalle procedure di insolvenza che si svolgono all'estero.

È corretto dire «conoscevas», in quanto il Regolamento comunitario all'esame – che recepisce quasi integralmente il contenuto della Convenzione per la disciplina del fallimento transfrontaliero, stipulata nell'ambito dell'Unione europea il 23 novembre 1995 [23] – trova la propria base giuridica nel Titolo IV del Trattato CE, come modificato dal Trattato di Amsterdam, e si inquadra nel contesto di quella «cooperazione giudiziaria in materia civile», che – essendo stata assunta a pieno titolo nel «terzo pilastro comunitarizzato» – ha consentito al legislatore comunitario di adottare lo strumento regolamentare per introdurre con efficacia diretta nell'ordinamento le nuove regole in materia di insolvenza transfrontaliera.

Va, infatti, ricordato che, ai sensi dell'art. 65 del Trattato CE, gli stru-

---

[22] esecutività (ad esempio in caso di decisione contraria all'ordine pubblico, ovvero resa nella contumacia involontaria di una delle parti, o contrastante con altra decisione emessa tra le medesime parti nello stesso o in altro Stato membro).

Si pensi, sotto questo riguardo, alla «daticosa» decisione di Cassazione, sez. un, 19 dicembre 1990, n. 12031, in *Foro it.*, 1991, I, 1482, con nota di F. CASO; e in *Giur. comm.*, 1992, II, 22, con nota di G. CANALE, che, con riguardo alla controversia, promossa dal curatore del fallimento di imprenditore italiano, nei confronti di società con sede nella confederazione elvetica, per conseguire declaratoria d'invalidità od inefficacia di pagamenti di crediti verso il fallito, ottenuti dalla convenuta in esito a procedure esecutive su beni siti in detto stato estero, ed altresì per conseguire condanna al risarcimento del danno, in relazione ad illeciti assertivamente commessi in tale stato estero dalla convenuta medesima, deve essere dichiarato il difetto di giurisdizione del giudice italiano, tenuto conto, quanto alla prima domanda, che la materia fallimentare si sottrae alla disciplina della convenzione italo-svizzera del 3 gennaio 1933 (resa esecutiva con legge 15 giugno 1933, n. 743), e che il curatore, il quale intenda acquisire il risultato utile della esecuzione individuale su beni del fallito situati all'estero, deve attivarsi davanti al giudice del *forum rei sitae*, alla stregua dell'imprescindibile relazione fra ubicazione dei beni ed esecuzione forzata ad essi inerente, ed inoltre, con riguardo alla seconda domanda, che la giurisdizione italiana può essere riconosciuta, ai sensi dell'art. 4, n. 2, cod. proc. civ. (nel testo poi abrogato dalla legge n. 218 del 1995), solo se in Italia si sia verificato il fatto dannoso. Il suddetto difetto di giurisdizione non resta escluso, sotto il profilo della accettazione tacita della giurisdizione italiana a norma dell'art. 4 n. 1 cod. proc. civ., dalla circostanza che la società straniera abbia insinuato i propri crediti nel fallimento, in considerazione della non coincidenza dell'oggetto di tale domanda con quello della pretesa formulata dalla curatela.

[23] In *Riv. dir. int. priv. e proc.*, 1996, pag. 661 segg., e, a commento, C. DORDI, *La Convenzione dell'Unione europea sulle procedure di insolvenza*, ivi, 1997, pag. 333 segg.

---

menti della cooperazione giudiziaria in materia civile comprendono il miglioramento e la semplificazione delle procedure di riconoscimento delle decisioni giudiziarie nei Paesi membri, nonché la promozione della compatibilità delle regole applicabili negli Stati membri ai conflitti di legge e di competenza giurisdizionale [24].

5. *Per un concetto «aggiornato» del principio di universalità.* – L'obiettivo dichiarato del Regolamento è quello di porre le basi per una normativa uniforme dell'insolvenza transfrontaliera a livello comunitario, agendo principalmente su tre fronti: l'individuazione dell'autorità competente ad aprire una procedura di insolvenza, l'individuazione del diritto applicabile, il co-

---

[24] Non è questo il luogo per affrontare la complessa problematica dell'evoluzione storica che ha condotto alla previsione in ordine alla possibilità di porre in essere strumenti normativi comunitari di efficacia diretta nell'ordinamento degli Stati membri nell'ambito della cooperazione giudiziaria in materia civile. Ci si limita, pertanto, ad osservare che il nucleo originario – ed allo stato ancora preponderante – della normativa comunitaria (sia di quella dei Trattati istitutivi, che di quella contenuta nelle fonti da essi derivate, in particolare dai regolamenti e dalle direttive) non incide sul terreno processuale, essendo in prevalenza inteso a creare le condizioni per la creazione di un mercato economico unico e per la libera circolazione all'interno di esso di persone, capitali e cose. Con l'accrescimento del peso politico delle Comunità – che, a seguito del Trattato di Maastricht, sono divenute ufficialmente un'Unione – l'ambito delle competenze del diritto comunitario si è notevolmente accresciuto e, a partire proprio dal Trattato di Maastricht, ha investito gli aspetti – oltre che della cooperazione giudiziaria in materia penale e di polizia – anche della cooperazione giudiziaria in materia civile. Il Trattato di Maastricht del 1992 aveva per la prima volta preso in considerazione la politica della cooperazione in materia di giustizia e affari interni (cd. «terzo pilastro dell'Unione europea»), considerando, tra l'altro, la cooperazione giudiziaria in materia civile come una «questione di interesse comune» agli Stati membri. Tuttavia, esso prevedeva che in tale settore si dovesse intervenire con gli strumenti tradizionali della cooperazione tra Stati, e cioè con le convenzioni – sottoposte, come tali, alla ratifica dei parlamenti nazionali – piuttosto che con i tipici strumenti normativi del diritto comunitario, che fossero (regolamenti) o non (direttive) direttamente applicabili nei singoli ordinamenti giuridici. Questa prospettiva è stata rovesciata dal trattato di Amsterdam del 1997, che ha introdotto importanti innovazioni in materia di cooperazione nel campo della giustizia e degli affari interni, che attengono, oltre che ai contenuti della cooperazione, anche alla collocazione sistematica della materia, ora collocata all'interno del Trattato istitutivo e, dunque, normalmente anche con strumenti di efficacia diretta.

Infatti, il trattato di Amsterdam ha, come si suole dire, «comunitarizzato» – con importanti conseguenze anche in termini di strumenti normativi e procedure utilizzabili ai fini del raggiungimento dei relativi obiettivi – alcuni settori del «terzo pilastro», tra i quali proprio la *cooperazione giudiziaria in materia civile*. In relazione a quest'ultima, il trattato indica come obiettivi, tra gli altri, il miglioramento e la semplificazione delle notificazioni transnazionali di atti giudiziari ed extragiudiziari, la cooperazione nell'assunzione dei mezzi di prova, il riconoscimento e l'esecuzione delle decisioni, anche extragiudiziarie, in materia civile e commerciale, la promozione di regole di compatibilità delle norme relative ai conflitti di leggi e di giurisdizione ed, in genere, di procedura civile applicabili negli Stati membri.

mune riconoscimento negli Stati membri della decisione di aprire una procedura di insolvenza presa nell'àmbito di uno di essi [25].

In pratica, il Regolamento persegue un obiettivo di «universalità» della procedura di insolvenza aperta in uno Stato membro: essa colpisce i beni del debitore dovunque essi si trovino nel territorio dell'Unione e produce negli altri Stati membri i medesimi effetti previsti nello Stato in cui essa è aperta, accentrando presso un solo giudice la cognizione di tutte le ragioni di credito verso il fallito [26].

L'intento di fondo, dichiarato al n. 4 dei «Considerando» del Regolamento, è quello di evitare che le parti siano incentivate dalla difformità di disciplina a spostare beni o procedimenti giudiziari da uno Stato membro all'altro per migliorare la propria situazione giuridica (forum shopping).

Sotto questo punto di vista, parrebbe un'attenuazione del principio di universalità la possibilità, prevista dal Regolamento (art. 3, paragrafo 2), di aprire procedure di insolvenza territoriali, i cui effetti sono limitati ai beni situati nel territorio dello Stato membro in cui tali procedure sono aperte.

In realtà, a ben vedere, nell'ottica comunitaria, la previsione di procedure di insolvenza territoriali deve considerarsi un rafforzamento e non una deroga al principio generale di universalità. Il «Considerando» n. 19 precisa, a questo riguardo, che le procedure secondarie possono avere come scopo quello di tutelare gli interessi dei creditori locali, ma la loro esigenza può nascere anche dal fatto che il patrimonio del debitore sia troppo complesso da amministrare unitariamente o che le divergenze tra gli ordinamenti giuridici interessati siano così rilevanti che possono sorgere difficoltà all'estensione degli effetti della procedura di insolvenza dallo Stato che le ha aperta agli altri Stati membri.

Emerge qui una visione aggiornata del principio di universalità, in cui la tradizionale idea della «primazia» di un'unica giurisdizione nell'apertura e nella gestione di una procedura di insolvenza cede il passo, ancora una volta, ad un obiettivo di cooperazione tra Stati, che – all'interno di una procedura tendenzialmente unitaria – prevede il coordinamento tra la procedura principale e quelle territoriali e/o secondarie [27].

Ne sono, tra le altre, indubbia riprova:

a) la regola per la quale il curatore della procedura principale può chiedere l'apertura di una procedura secondaria (art. 29, lett. a));

b) la regola per la quale il curatore della procedura principale ed i curatori delle procedure secondarie hanno il «dovere» della cooperazione reciproca e devono rispettare l'obbligo di informazione reciproca, con particolare riguardo alla situazione circa l'insinuazione e la verifica dei crediti (art. 31, paragrafi 1 e 2) [28];

c) la regola per la quale il curatore della procedura principale può presentare proposte riguardanti la liquidazione o qualsiasi altro uso dell'attivo della procedura secondaria (art. 31, paragrafo 3);

d) la regola per la quale ogni creditore può insinuare il proprio credito nella procedura principale ed in qualsiasi procedura secondaria (art. 32, paragrafo 1);

e) la regola per la quale i curatori della procedura principale e di quelle secondarie possono insinuare nelle altre procedure i crediti già insinuati nelle procedure cui sono preposti (art. 32, paragrafo 2) [29];

f) la regola per la quale il curatore della procedura secondaria può chiedere al giudice che ha aperto la procedura secondaria di sospendere, in tutto o in parte, le procedure di liquidazione (art. 33, paragrafo 1).

6. *Problematiche di glossario*. – Il Regolamento sconta gli effetti della diversità di impostazione delle discipline concorsuali dei diversi Stati membri, che si riflettono, tra le altre, su alcune problematiche preliminari di glossario, la cui reciproca «comprensibilità» costituisce tradizionalmente uno dei punti più ardui del dialogo tra i formanti dei diversi ordinamenti.

6.1. «*Insolvenza*» e «*procedura di insolvenza*». – Opportunamente il Regolamento – superando ogni rischio di divergenti interpretazioni all'interno dei singoli Stati membri – non offre una definizione di «insolvenza» ovvero di «procedura di insolvenza»: si fa esclusivamente un rinvio di carattere «operativo» ad un Allegato al Regolamento in cui sono elencate, per ciascuno Stato membro, le procedure alle quali si applica il Regolamento stesso,

---

[25] Cfr. i «Considerando» nn. 1 e 6 del Regolamento.
[26] Il dibattito sull'«universalità» delle procedure concorsuali trasfrontaliere è sempre vivo anche all'interno della dottrina italiana, in ordine alla quale si fa rinvio, per tutti, a G.A. MICHELI, *Universalità e territorialità del fallimento nella C.E.E.*, in *Atti del Convegno sui Trent'anni della legge fallimentare: bilancio e prospettive di riforma*, Milano, 1972, pag. 2 segg.; G. BONGIORNO, *Osservazioni in tema di universalità e territorialità del fallimento*, in *Dir. fallim.*, 1974, I, pag. 261; ID., *Universalità e territorialità nel fallimento (problemi antichi ma sempre più attuali)*, ivi, 1991, pag. 667 segg.; C. PUNZI, op. cit., pag. 1001 seg. e 1036 seg.
[27] Non si condivide, pertanto, fino in fondo l'osservazione di S. DI AMATO, *Le procedure di insolvenza nell'Unione europea: competenza, legge applicabile ed efficacia transfrontaliera*, in *Fallimento*, 2002, pag. 701, il quale individua nel coordinamento tra le procedure una sorta di «surrogato» dell'universalità.
[28] Sottolinea C. PUNZI, op. cit., p. 1032, che l'obbligo di informazione è funzionale all'esercizio di poteri di intervento che il curatore della procedura principale può esercitare su tutte le procedure secondarie e/o territoriali.
[29] A norma del paragrafo 3 dell'art. 32, il curatore di una procedura principale o secondaria è legittimato a partecipare a un'altra procedura di insolvenza allo stesso titolo di qualsiasi creditore e in particolare a partecipare all'assemblea dei creditori.

con gli unici elementi comuni che esse debbano essere «concorsuali» e comportare lo spossessamento parziale o totale del debitore e la designazione di un «curatore» (artt. 1 e 2, lett. a)) (30).

Con riferimento all'ordinamento italiano, l'Allegato al Regolamento individua le seguenti procedure siccome soggette alla sua sfera di applicazione: il fallimento, il concordato preventivo, l'amministrazione straordinaria delle grandi imprese in stato di insolvenza (regolata dal d.lgs. n. 270 del 1999), l'amministrazione controllata e la liquidazione coatta amministrativa. Quest'ultima è prevista anche per motivi diversi dall'insolvenza, ed in questi casi si deve ritenere che non possano trovare applicazione le norme del Regolamento.

Per espressa esclusione, la disciplina non si applica alle procedure di insolvenza di enti creditizi, nonché delle imprese ed organismi di assicurazione e di investimento collettivo, ovvero che forniscono servizi che implicano la detenzione di fondi o di valori mobiliari di terzi (art. 1, paragrafo 2), in relazione alle quali il Regolamento lascia intravedere una (futura) disciplina «speciale».

Dichiaratamente, dunque, il Regolamento non ambisce ad introdurre una uniformità di presupposti soggettivi ed oggettivi per l'accesso alle singole procedure, che rimangono interamente regolati dalla *lex fori*: ancora una volta, l'obiettivo del formante comunitario non è quello dell'uniformizzazione, ma del coordinamento.

Ciò si rivela quanto mai opportuno, in quanto, soltanto per fare un esempio, è noto che lo stato di insolvenza nel diritto italiano non coincide perfettamente con la «incapacità di pagare» di cui al § 17 della *Insolvenzordnung* tedesca, che si commisura soltanto alle obbligazioni scadute, mentre quelle di prossima scadenza acquistano rilievo ai fini dell'apertura della procedura di insolvenza unicamente quando l'istanza provenga dal debitore stesso (31).

Pur essendo la «procedura di liquidazione» una procedura di insolvenza che comporta la liquidazione dei beni del debitore (art. 2, lett. c)), non necessariamente la procedura di insolvenza «principale» cui si applicano le norme regolamentari deve approdare alla «liquidazione» dell'attivo. Tale esito, come si vedrà, è un presupposto previsto soltanto in relazione alle procedure secondarie, mentre la procedura principale può anche porsi un obiettivo conservativo della produttività dell'impresa.

Ciò che appare – anche dal punto di vista del diritto interno italiano –

---

(30) Cfr. C. PUNZI, op. cit., pag. 1012 il quale valorizza la valenza interpretativa del richiamo all'Allegato.

(31) La calzante osservazione è di R. CAPONI, *Il regolamento comunitario sulle procedure di insolvenza*, in *Foro it.*, 2002, V, 227, nota 60.

perfettamente in linea con le più recenti idee in tema di procedure concorsuali, dopo che all'originaria concezione del fallimento si sono progressivamente affiancate altre concezioni, che – muovendo dalla constatazione che l'eliminazione dell'imprenditore dal mercato non necessariamente sia la soluzione preferibile in termini di efficienza dei traffici e tutela dei creditori – hanno valorizzato la valenza «recuperatoria» piuttosto che «eliminatoria» della procedura concorsuale, intesa, nel senso più lato, come strumento di «regolazione della crisi di impresa» (32).

Muovendo così dalla scarsa diffusione nella prassi degli istituti, già presenti nella legge fallimentare del 1942, del concordato preventivo e dell'amministrazione controllata, intesi a realizzare la finalità del ritorno *in bonis* del debitore, sono in questo contesto affiorate soluzioni legislative ed operative – talora contrassegnate da preoccupazioni, più o meno dichiarate, di politica «sociale» (ad esempio le ricadute a livello occupazionale) (33) – che hanno dato risalto a momenti ed organi di mediazione nella crisi di impresa, la cui natura giuridica sovente attinge a caratteristiche e strumenti propri dell'attività amministrativa piuttosto che giurisdizionale (34).

**6.2. *Giudice***. – Il Regolamento non prefigura procedure di natura esclusivamente giurisdizionale; con qualche imprecisione semantica, nell'art. 2, lett. d), del Regolamento il concetto di «giudice» viene riferito non soltanto all'organo giudiziario, ma a «*qualsiasi altra autorità competente*» – dunque anche un'autorità amministrativa – di uno Stato membro.

---

(32) Così L. GUGLIELMUCCI, *Lezioni di diritto fallimentare*, Torino, 2000, pag. 7.

(33) Il cosiddetto «uso alternativo» delle procedure concorsuali fu al centro di un intenso dibattito sul finire degli anni '70 del secolo scorso, a partire da un intervento di A. GAMBINO, *Sull'uso alternativo della procedura di amministrazione controllata*, in *Giur. comm.*, 1979, I, pag. 237 segg. («La realtà odierna – egli scriveva – postula, rispetto all'interesse dei creditori, una prioritaria e autonoma considerazione dell'interesse dei lavoratori occupati nell'impresa, che sotto il profilo socio-economico non possono più essere confusi con tutti gli altri creditori sia pure come categoria di creditori particolarmente qualificati»), e che registrò le opinioni di studiosi della procedura civile e del diritto commerciale (G. TARZIA, V. COLESANTI, A. MAFFEI ALBERTI, M. LIBERTINI e U. BELVISO, *L'uso alternativo delle procedure concorsuali*, ivi, pag. 274 segg.). Per un quadro di valutazione dei risultati di quella stagione v. M. SANDULLI, *La crisi economica dell'impresa*, ivi, 1986, I, pag. 971 segg., e G. MINERVINI, *Alcune riflessioni in tema di composizione della crisi dell'impresa industriale*, in *Problemi attuali dell'impresa in crisi*, in *Scritti in memoria di G. Ferri*, Padova, 1983, pag. 14 segg., il quale discorre significativamente «d'una sorta di Dunkerque economica contraddistinta da confusione e improvvisazioni».

(34) Sia consentito fare rinvio sul punto a F. DE SANTIS, *Il giudice delegato fallimentare tra «gestione» e «giurisdizione»: tracce per una riflessione de iure condendo*, in *Giur. comm.*, 2002, I, pag. 489 segg.