bro, legittimata ad aprire una procedura di insolvenza o a prendere decisioni nel corso di questa.

Il fenomeno non è sconosciuto neppure all'ordinamento italiano, se si pone mente, a tacer d'altre, alle procedure di amministrazione e/o di liquidazione delle banche (pure escluse dal raggio di applicazione del Regolamento) previste dal testo unico bancario [25], ove la decisione in ordine all'apertura della procedura è affidata all'autorità amministrativa (Ministro dell'economia su proposta dell'organo di vigilanza), nonché all'amministrazione delle grandi imprese in stato di insolvenza di cui al d.lgs. n. 270 del 1999, dove il decreto di ammissione alla procedura viene emanato dal Ministro delle attività produttive, sia pure a seguito di dichiarazione di insolvenza da parte del tribunale [26].

Essendo le procedure concorsuali che non prevedono l'intervento di un'autorità giurisdizionale – sia in fase di apertura che di gestione dell'insolvenza – per lo più intese ad un obiettivo di carattere conservativo, il ricorso a strumenti ed interventi di tipo amministrativo ha consolidato l'idea che il risanamento, di per sé, non può essere, in senso stretto, considerato un compito dell'autorità giudiziaria, né può essere istituzionalmente affidato ai tribunali, che «non possono essere per loro natura le cliniche delle imprese» [27].

6.3.  *Curatore*. – Del pari, quanto alla figura del «curatore», il Regolamento (art. 2, lett. *b)*) rinvia ad un allegato l'individuazione delle singole figure nei diversi Stati membri, accomunate dalla circostanza di essere «persone o organi» la cui funzione è di amministrare o liquidare i beni dei quali il debitore è spossessato o di sorvegliare la gestione dei suoi affari.

Per l'ordinamento italiano si fa riferimento al «curatore» o al «commissario».

Si segnala, per completezza di informazione, che la lettera del Regolamento non esclude che il «curatore» possa essere un soggetto diverso dalla persona fisica.

Il Regolamento ammette, dunque, implicitamente che l'ufficio di curatore sia attribuibile non soltanto a persone fisiche, ma anche a persone giuridiche aventi idonee strutture ed adeguata organizzazione, al limite inseriti in un albo tenuto presso i singoli tribunali, per modo che la gestione dei fallimenti (specie quelli di più elevata complessità) sia affidata a soggetti in grado di svolgerla in tempi più ristretti rispetto ad oggi [28].

7.  *Competenza giurisdizionale*. – La competenza (o, come sarebbe più corretto dire, la giurisdizione [29]) è individuata in capo al «giudice» – nel senso tutto particolare che assume tale termine ai sensi dell'art. 2, lett. *d)*, del Regolamento – dello Stato membro nel cui territorio è situato il centro degli interessi principali del debitore.

Per le società e le persone giuridiche, il centro di interessi principale si presume, fino a prova del contrario, quello della sede legale (art. 3, comma 1). Non altrettanto è previsto per gli imprenditori individuali, in relazione ai quali si deve, di conseguenza, ritenere che il Regolamento non ponga alcuna presunzione in ordine alla corrispondenza tra centro di interessi e sede legale e che, piuttosto, sia l'autorità che apre la procedura a dover allegare la sussistenza, all'interno del territorio dell'ordinamento cui essa appartiene, del centro di interessi di un imprenditore individuale.

La formulazione della norma lascia, peraltro, all'interprete di ogni singolo Stato membro l'individuazione dei criteri alla luce di quali individuare il «centro degli interessi principali del debitore» e, soprattutto, non esclude l'individuazione, da parte del giudice, della «sede effettiva» della società, nel senso, prima illustrato, in cui la intende, ad esempio, la giurisprudenza italiana [30].

Anzi, la lettera del Regolamento autorizza la conclusione che il «giudice» debba comunque verificare d'ufficio se il centro degli interessi principali della società coincida con il luogo della sede statutaria [31].

Il che non esclude l'apertura, da parte di un «giudice» di uno Stato membro, di procedure di insolvenza – ricadenti nel raggio di applicazione del Regolamento – di società aventi la sede statutaria all'esterno del

---

[25] D.lgs. 1° settembre 1993, n. 385, e successive modifiche ed integrazioni; v., in specie, artt. 70 segg.

[26] Il percorso storico-normativo ed i vari passaggi che hanno contraddistinto negli ultimi trenta anni la vicenda delle procedure concorsuali in Italia è ben ricostruita da A. JORIO, *La procedura concorsuale tra tutela del credito e salvaguardia dei complessi produttivi*, in *La crisi d'impresa. Il fallimento*, in Trattato di diritto privato a cura di G. IUDICA e P. ZATTI, Milano, 2000, pagg. 1-92.

[27] Così A. CAVALAGLIO, *Nuove regole per le crisi dell'impresa tra giurisdizione e amministrazione e soluzioni stragiudiziali*, in *Nuove regole per le crisi d'impresa* a cura di A. Jorio. Milano, 2001, pag. 252 op. cit., pag. 257.

[28] La problematica si inserisce nel più ampio contesto del dibattito *de iure condendo* intorno alla cd. «privatizzazione» delle procedure concorsuali ovvero di alcuni particolari momenti delle stesse. Nel senso di una visione marcatamente privatistica del fallimento, cfr., tra gli altri, gli autorevoli interventi di P. SCHLESINGER e di B. LIBONATI, ivi, rispettivamente pag. 156 e pag. 333.

[29] V. il § 2.

[30] V. ancora il § 2.

[31] R. CAPONI, op. cit., pag. 223, ed ivi riferimenti alla dottrina tedesca.

territorio dell'Unione, ma il centro principale degli interessi all'interno dello stesso.

Per contro, l'apertura di procedure di insolvenza da parte del giudice di uno Stato membro a carico di soggetti aventi il centro principale degli interessi al di fuori del territorio dell'Unione, ma la sede legale al suo interno, resterà interamente regolata dal diritto interno di quello Stato e dagli eventuali accordi internazionali che esso abbia stabilito con l'ordinamento dove il soggetto per il quale si procede abbia il centro principale degli interessi.

8. *Ancora sui concetti di procedura «principale» e procedura «secondaria».* – È ora giunto il momento di affrontare *ex professo* alcune problematiche legate al significato dei termini procedura «principale», procedura «territoriale» e procedura «secondaria», ed al loro coordinamento.

La procedura di insolvenza aperta, ai sensi dell'art. 3, comma 1, da un «giudice» nello Stato dove il debitore ha il centro principale dei suoi interessi assume il rango di procedura «principale».

Il Regolamento consente di risolvere in via implicita – attraverso il ricorso al criterio della priorità temporale – il possibile conflitto tra giudici di Stati membri diversi, ciascuno dei quali si ritenga competente ad aprire una procedura principale, sul presupposto che il debitore abbia nel proprio Stato il centro principale dei suoi interessi.

Infatti, l'apertura di una procedura «principale» in uno Stato membro impedisce – secondo un principio di stretta priorità temporale – l'apertura di altre procedure «principali» in altri Stati membri. Tale conclusione è il portato del principio – espressamente evidenziato nel «Considerando» n. 22 – dell'immediato riconoscimento in ciascun Stato membro delle decisioni relative all'apertura, allo svolgimento ed alla chiusura di una procedura di insolvenza; nonché del principio – altrettanto icasticamente evidenziato nel medesimo «Considerando» – secondo il quale «la decisione del giudice che apre per primo la procedura dovrebbe essere riconosciuta negli altri Stati membri, senza che questi ultimi abbiano la facoltà di sottoporre a valutazione la decisione del primo giudice».

In ogni caso, dal punto di vista del diritto interno italiano, non sembra potersi escludere la facoltà di esperire impugnazione per motivi di giurisdizione, quando si vuole far valere la carenza di potere del giudice italiano a dichiarare l'apertura di una procedura «principale», allorché sia stata già dichiarata l'apertura di altra procedura principale in altro Stato membro dell'Unione (42).

(42) Non sarà possibile, per contro, l'esperimento né del regolamento di giurisdizione (che ha carattere preventivo), né del regolamento di competenza (che concerne la ripartizione della *potestas iudicandi* all'interno della medesima giurisdizione). Peraltro, incidentalmente è

È, infatti, ben chiaro che l'insindacabilità del provvedimento di apertura della procedura principale sussiste per i giudici di altri Stati, ma non per i giudici, appartenenti al medesimo ordinamento, di grado superiore a quello che ha emanato il provvedimento stesso, i quali ben potrebbero accogliere l'impugnazione e revocare il provvedimento (43).

Il Regolamento non risolve, invece, l'eventualità del conflitto negativo, che ricorre quando più giudici di diversi Stati membri si dichiarino incompetenti ad aprire una procedura principale. In tal caso, esperiti infruttuosamente i diversi rimedi interni, il conflitto resta irrisolto, residuando la sola possibilità di apertura di procedure territoriali.

La procedura di insolvenza «secondaria» ha necessariamente, ai sensi dell'art. 3, comma 3, carattere liquidatorio ed è tale perché aperta successivamente a quella principale, tenuto conto che – ai sensi dell'art. 1, lett. f) – il «momento» di apertura della procedura di insolvenza coincide con quello in cui la decisione di apertura, sia essa definitiva o meno (cioè opugnabile o meno), comincia a produrre effetto.

È chiaro, dunque, che è soltanto il principio della priorità temporale – e non quello dell'importanza quali-quantitativa (ad esempio, la valutazione dell'attivo fallimentare) – a radicare la procedura «principale», facendo «degradare» quella successivamente aperta a rango di procedura «secondaria», avente carattere esclusivamente liquidatorio e con effetti limitati, secondo quanto dispone l'art. 27, ai beni del debitore situati nello Stato membro che la apre.

Legittimati a chiedere l'apertura di una procedura secondaria sono il

il caso di ricordare che, sul punto, la giurisprudenza italiana è abbastanza larghegiante, se è vero che avverso la sentenza dichiarativa di fallimento è proponibile non soltanto l'opposizione ex art. 18 della legge fallimentare, ma anche, qualora si contesti esclusivamente la competenza del tribunale fallimentare, il regolamento facoltativo di competenza (Cassazione, 24 luglio 1999, n. 8031). Il rimedio del regolamento di competenza è, peraltro, ammissibile solo a condizione che, al momento della proposizione del regolamento medesimo, lo stesso ricorrente non abbia optato per la diversa possibile alternativa dell'opposizione ex art. 18 legge fallim., ivi eccependo anche l'incompetenza del giudice che ha dichiarato il fallimento. Ove, invece, quest'ultimo procedimento sia stato già radicato, resta preclusa, in forza del principio di alternatività, l'esperibilità dell'istanza di regolamento facoltativo ad opera della stessa parte. Tuttavia, nel caso in cui l'istanza di regolamento di competenza e l'atto di opposizione risultino essere stati notificati nella stessa data, la situazione di incompatibilità logica e di consequente necessaria alternativa tra i due procedimenti è da risolvere in favore del regolamento ex art. 43 cod. proc. civ., per la prevalenza che il legislatore ha inteso dare al regolamento di competenza, ove esperito, rispetto agli altri possibili mezzi di impugnazione ordinari della stessa sentenza (Cassazione, 22 febbraio 1996, n. 1404).

(43) Sul punto v. G. SAMORÌ, *Conflitto di competenza nell'apertura delle procedure concorsuali*, Napoli-Roma, 2002, pag. 293; sul successivo problema del conflitto negativo C. PUNZI, op. cit., pag. 1016.

curatore della procedura principale e qualsiasi altro soggetto a ciò legittimato dalla legge dello Stato membro in cui l'apertura è richiesta (art. 29).

È da ritenere, pertanto, che il Regolamento faccia implicitamente salvo il disposto dell'art. 6 della legge fallimentare sul fallimento d'ufficio, che, in quanto procedura secondaria, potrà essere dichiarato anche a prescindere dall'accertamento dello stato di insolvenza.

9. *La procedura «territoriale».* – Il Regolamento lascia individuare – a metà strada tra la procedura «principale» e quella «secondaria» – un *tertium genus*, rappresentato dalla procedura «territoriale».

Quest'ultima si differenzia, come subito vedremo, dalla procedura «principale», in quanto può essere aperta anche in Stati membri dove il debitore non ha il centro principale dei propri interessi; e si differenzia altresì dalla procedura secondaria, in quanto può essere aperta anche precedentemente a quella «principale» ed autonomamente rispetto ad essa.

Il Regolamento, dunque, consente (art. 3, commi 2,4) l'apertura di procedure «territoriali» in Stati membri diversi da quello dove si è aperta la procedura «principale», a condizione che il debitore abbia in essi una «dipendenza», cioè un luogo di operazioni in cui esercita in maniera non transitoria un'attività economica con mezzi umani e con beni (art. 2, lett. *h*)).

Volutamente, il concetto di dipendenza non è stato, pertanto, ancorato a quello della semplice presenza di beni patrimoniali sul territorio: è necessario che ivi si eserciti una vera e propria attività economica.

Il Regolamento non indica espressamente se nel concetto di «dipendenza» si ricomprenda anche la società controllata o collegata, non affronta, cioè, la problematica dell'insolvenza transfrontaliera del gruppo societario.

In accordo con le prime riflessioni compiute sul punto dalla dottrina tedesca (44), forse la risposta da dare al quesito è negativa, atteso che, se fosse vero il contrario, l'apertura di una procedura di insolvenza «principale» a carico della società «madre» consentirebbe l'apertura di una procedura di insolvenza secondaria a carico della società «figlia» anche a prescindere dall'accertamento dell'insolvenza.

Infatti, ai sensi dell'art. 27 del Regolamento, la procedura «principale» aperta da un «giudice» di uno Stato membro e riconosciuta in altro Stato membro permette di aprire, in quest'altro Stato membro, una procedura «secondaria», senza che in esso sia esaminata l'insolvenza del debitore.

In ogni caso, sempre ai sensi dell'art. 27 del Regolamento, se da un lato l'apertura di una procedura secondaria prescinde dall'accertamento del requisito dell'insolvenza, dall'altro deve pur sempre trattarsi di una procedura

(44) Riferita da R. CAVOSI, *ibidem*.

inserita nell'allegato B del Regolamento. Per l'ordinamento italiano, l'allegato fa riferimento, come si è detto, soltanto al fallimento ed alla liquidazione coatta amministrativa, escludendosi, pertanto, atteso il loro carattere conservativo, procedure secondarie di concordato preventivo, amministrazione straordinaria ed amministrazione controllata.

Nondimeno, l'art. 34 consente che se la legge applicabile alla procedura secondaria prevede la possibilità di chiuderla senza liquidazione (ad esempio attraverso un concordato o con piano di risanamento), la chiusura diventa definitiva a condizione che riceva l'assenso del curatore della procedura principale, ovvero, in mancanza, a condizione che la misura proposta non leda gli interessi dei creditori della procedura principale.

Vi sono due casi in cui la procedura secondaria può essere aperta anteriormente a quella principale (art. 3, comma 4), non potendosi, tuttavia, prescindere dall'accertamento dell'insolvenza:

*a)* quando lo Stato membro in cui si trovi il centro di interessi principale del debitore non consente l'apertura di una procedura di insolvenza.

L'ipotesi si può, ad esempio, verificare allorché il debitore abbia il proprio centro di interessi in Italia, ma non sia un imprenditore commerciale: il Regolamento consente in questo caso l'apertura della sola procedura territoriale a carattere non conservativo in uno Stato membro in cui tale qualifica non è richiesta (45);

*b)* quando l'apertura della procedura «territoriale» è richiesta da un creditore avente residenza, domicilio o sede nello Stato membro nel quale si trova la dipendenza ovvero il cui credito deriva dall'esercizio di tale dipendenza. Si tratta qui di procedure aventi rilievo esclusivamente locale, in cui la liquidazione dell'attivo non assume, almeno tendenzialmente, rilievo transfrontaliero.

In tal caso, la procedura territoriale potrebbe invero anche legittimamente iniziare con uno scopo conservativo (concordato preventivo, amministrazione controllata), ma l'apertura in altro Stato membro dove il debitore ha il centro principale dei propri interessi di una procedura principale fa sì che, ai sensi dell'art. 37 del Regolamento, il curatore di quest'ultima possa chiedere al giudice che ha dichiarato l'apertura della procedura secondaria la conversione di essa in procedura di liquidazione, se tale conversione si rivela utile per gli interessi della massa.

Il Regolamento non regola, infine, in maniera esplicita gli effetti derivanti sulle procedure «secondarie» allorché il provvedimento di apertura della procedura «principale» venga revocato, in sede di impugnazione,

(45) Il «Considerando» n. 9 espressamente chiarisce che ed il presente Regolamento dovrebbe applicarsi alle procedure di insolvenza, chiunque sia il debitore, *commerciante* o *non commerciante.*

Case 1:07-cv-07413-PKC    Document 26-5    Filed 06/30/2008    Page 4 of 4

dal giudice superiore a quello che lo ha pronunziato, ad esempio proprio per carenza dello stato di insolvenza.

Si dovrebbe ritenere che, in quest'ultimo caso, la revoca della procedura «principale» comporti, per carenza del relativo presupposto, anche la revoca delle procedure secondarie ad essa «collegate» [46], che, cioè, non si atteggiano come procedure «territoriali», nei sensi in precedenza individuati.

10. *Legge applicabile.* – Ai sensi dell'art. 4 del Regolamento (il cui contenuto è ribadito, con riferimento precipuo alla procedura secondaria, dall'art. 28), la legge applicabile alla procedura di insolvenza («principale», «secondaria» e «territoriale») è quella dello Stato membro nel cui territorio essa si è aperta (*lex fori concursus*).

La norma indica nel dettaglio gli aspetti che ricadono sotto la *lex fori concursus* che attengono tra l'altro: ai presupposti di apertura della procedura (ad esempio, l'insolvenza), ai debitori assoggettabili ad insolvenza (ad esempio, gli imprenditori commerciali), ai poteri del curatore ed ai diritti del debitore, ai beni spossessabili, agli effetti sui contratti in corso [47] e sulle azioni giudiziarie individuali, all'insinuazione ed alla verifica dei crediti, alla distribuzione del ricavato, alle condizioni di chiusura della procedura, all'impugnativa degli atti pregiudizievoli per la massa.

Il Regolamento individua però alcune eccezioni al principio della *lex fori concursus*, che non si applica, ad esempio, nei seguenti casi: ai contratti di lavoro, che rimangono sottoposti alla legge dello Stato membro ad esso applicabile (art. 10); ai procedimenti pendenti relativi a beni o diritti dei quali il debitore è spossessato, per i quali prevale la legge dello Stato in cui il procedimento è pendente (art. 15); ai diritti reali del creditore istante e del terzo su beni del debitore che si trovano in Stato membro diversa da quello in cui la procedura si è aperta (art. 5) [48]; al diritto alla compensazione del credito, quando è consentita dalla legge applicabile al credito del debitore insolvente (art. 6); al diritto del venditore in caso di vendita con riserva di proprietà, allorché il bene si trovi in uno Stato diverso da quello di apertura della procedura (art. 7) [49]; ai diritti ed agli obblighi dei partecipanti a un sistema di pagamento o di regolamento o a un mercato finanziario di un

---

[46] Cfr. S. DI AMATO, op. cit., pag. 698.

[47] Deve ritenersi, a tal riguardo, che la *lex fori concursus* prevalga sulla legge applicabile ai contratti alla stregua della Convenzione di Roma del 1980.

[48] La norma chiarisce che i diritti in questione non, in particolare, quello di liquidare o di far liquidare il bene e di soddisfarsi sul ricavato; quello di recuperare il credito, soprattutto a seguito di cessione o costituzione di pegno; quello di esigere il bene e chiedere la restituzione a chiunque lo detenga; quello di acquistare i frutti del bene.

[49] L'apertura della procedura di insolvenza nei confronti del venditore di un bene dopo la consegna di quest'ultimo non costituisce causa di scioglimento del contratto di vendita,

determinato Stato membro diverso da quello di apertura della procedura (art. 9) [50]; agli atti pregiudizievoli per la massa, se conclusi in uno Stato membro diverso da quello di apertura la cui legge non consente di impugnare tale atto con alcun mezzo (art. 13); agli atti di disposizione a titolo oneroso di beni immobili conclusi dopo l'apertura della procedura di insolvenza, la cui validità è disciplinata dallo Stato nel cui territorio è situato il bene immobile (art. 14).

11. *Il riconoscimento automatico delle decisioni in materia di procedure di insolvenza.* – Si è già detto che la decisione di apertura di una procedura di insolvenza – nonché le decisioni relative allo svolgimento e alla chiusura della stessa e quelle che derivano direttamente dalla procedura di insolvenza e sono ad essa strettamente connesse (ad esempio, le azioni revocatorie) [51] – sono *self executing* – ma soltanto, come si dirà [52], con riferimento agli effetti dichiarativi e/o costitutivi – in tutti gli altri Stati membri dell'Unione (artt. 16 e 25), senza necessità di apposito procedimento di delibazione e senza che tale effetto sia subordinato a forme di pubblicità particolari.

Il curatore può – per esigenze di opponibilità degli effetti dell'apertura della procedura ai terzi, in particolare a quelli che potrebbero adempiere un'obbligazione direttamente in favore del debitore, in quanto non informati dell'apertura di una procedura di insolvenza (cfr. art. 24) – comunque richiedere in ogni Stato membro, ai sensi degli artt. 21 e 22, che si dia corso a forme di pubblicità o all'annotazione in pubblici registri.

L'art. 16 prevede che l'apertura della procedura debba avvenire ad opera di un giudice competente in virtù dell'art. 3. Poiché tra gli Stati membri vige il principio dell'affidamento reciproco («Considerando» n. 22), non occorre alcuna verifica in ordine alla sussistenza della competenza, essendo

---

né impedisce che l'acquirente ne acquisti la proprietà qualora, nel momento in cui è aperta la procedura, esso si trovi nel territorio di uno Stato membro diverso da quello di apertura.

[50] Sono fatte salve le azioni di nullità, di annullamento o di inopponibilità dei pagamenti o delle transazioni in virtù della legge applicabile al sistema di pagamento o al mercato finanziario in questione.

[51] Osserva G. OLIVIERI, op. cit., pag. 14, che «Nel novero delle decisioni derivanti direttamente dalla procedura di fallimento o a esse strettamente connesse (non contemplate dall'art. 4), anche se prese da altro giudice, debbono includersi tutte quelle pronunciate su domanda del curatore (o nei suoi confronti) e i cui effetti sono destinati a prodursi nell'ambito della procedura concorsuale: penserei a tutti quei procedimenti aventi ad oggetto obbligazioni (ad es., le azioni revocatorie), a favore o contro il fallito, diritti di proprietà su beni, azioni di responsabilità, etc.»

[52] V. il § 11.