Case 1:07-cv-07413-PKC    Document 26-6    Filed 06/30/2008    Page 1 of 3

sufficiente constatare che la decisione sia stata pronunziata da un giudice di Stato membro ritenuto internazionalmente competente.

Lo Stato membro può, però, rifiutarsi di riconoscere una procedura di insolvenza aperta in altro Stato membro quando ciò possa produrre effetti «palesemente» contrari all'ordine pubblico, in particolare ai principi fondamentali o ai diritti e alle libertà sanciti dalla Costituzione (art. 26).

La decisione di apertura di una procedura d'insolvenza produce in ogni altro Stato membro i medesimi effetti che produce nello Stato di apertura (art. 17) ed estende in essi i poteri del curatore, il quale può, ad esempio, esercitarvi ogni azione revocatoria che ritenga nell'interesse dei creditori (art. 18, paragrafo 2).

È dubbio, infine, se la revoca e/o la chiusura della procedura principale trascini anche le procedure «secondarie» e quelle «territoriali». La risposta dovrebbe essere negativa in entrambi i casi, in quanto:

a) la procedura secondaria può essere aperta senza l'accertamento dello stato di insolvenza, ancorché non ci si nasconda il timore che, una volta aperta la revoca e/o chiusura della procedura «principale», vi siano ancora creditori da soddisfare e beni da liquidare, con conseguente possibile lesione della par condicio creditorum;

b) la procedura «territoriale» è, in se stessa, autonoma, può, cioè, anche prescindere da quella «principale» ed essere aperta anteriormente alla stessa.

12. L'attivo concorsuale e le regole della distribuzione del ricavato. – Il Regolamento all'esame aspira a convogliare idealmente il ricavato della procedura principale e di quelle secondarie in un'esatta di unico attivo oggetto di distribuzione, secondo le regole del concorso tra i creditori delle diverse procedure ed indipendentemente dal luogo di residenza degli stessi (53).

In particolare:

a) ogni creditore può insinuare il proprio credito nella procedura principale ed anche in tutte le procedure secondarie (art. 32, comma 1), tanto da godere di un diritto ad essere informato dell'apertura delle varie ulteriori procedure dai rispettivi curatori (art. 40). Le condizioni di ammissione del credito al passivo non potranno che essere, per le ragioni dette, quelle stabilite dalla lex fori;

b) il creditore che, dopo l'apertura di una procedura principale, abbia recuperato al di fuori di essa (cioè con azioni esecutive individuali) in tutto o in parte il credito con beni del debitore situati in altro Stato membro, de-

(53) V. R. Caponi, op. cit., pag. 226.

ve restituire al curatore ciò che ha ottenuto, se non vanta si di essi un diritto reale o una riserva di proprietà (art. 20, comma 1);

c) il creditore che in una procedura di insolvenza abbia recuperato una quota del proprio credito partecipa ai riparti effettuati in un'altra procedura soltanto allorché i crediti dello stesso grado e della stessa categoria abbiano ottenuto in tale altra procedura una quota equivalente (art. 20, comma 2).

Tale regola, nota nel diritto anglosassone come hotchpot rule, realizza, peraltro, una par condicio soltanto tendenziale, atteso che un creditore considerato privilegiato in un ordinamento e chirografario in un altro, dopo aver recuperato parte del credito nel primo, potrà soddisfarsi per la residua parte nel secondo, ma dovrà attendere che, in esso, si siano soddisfatti tutti i creditori privilegiati (54);

d) a richiesta del curatore della procedura principale e nell'interesse dei creditori di questa, il giudice che ha aperto la procedura secondaria sospende in tutto o in parte le operazioni di liquidazione per un periodo massimo di tre mesi. La richiesta di sospensione può essere respinta soltanto se vi è una mancanza manifesta di interesse da parte dei creditori della procedura principale (art. 33, comma 1).

La tutela dell'interesse dei creditori della procedura principale è, in questa ipotesi, preponderante, in quanto da un lato la finalità della sospensione è palesemente quella di identificare con chiarezza i creditori della procedura principale ed evitare i rischi di duplicazione nella soddisfazione dei creditori (55), dall'altro i creditori della procedura principale verranno, di fatto, a soddisfarsi con precedenza temporale rispetto ai creditori della procedura secondaria che è sospesa. Per questa ragione, pur riguardando il provvedimento di sospensione – che in Italia ricadrà nelle competenze del tribunale e non del giudice delegato – la sospensione delle sole operazioni di liquidazione e non della procedura secondaria come tale, non sembra che ai creditori della procedura secondaria possa essere negato il diritto di impugnare il provvedimento per cassazione ai sensi dell'art. 111, settimo comma, della Costituzione, siccome assertamente lesivo dei propri diritti (56);

e) se la liquidazione dell'attivo della procedura secondaria consente di

(54) Sul punto v. S. Di Amato, op. cit., pag. 702.
(55) G. Olivieri, op. cit., pag. 16 seg.
(56) Non si condivide, su questo punto, la tesi di G. Olivieri, op. cit., pag. 17 seg., il quale la potenziale attitudine di tale provvedimento ad incidere su diritti è comprovata anche da quella parte del paragrafo 1 dell'art. 33, dove si dispone che il giudice può esigere dal curatore della procedura principale misure atte a garantire gli interessi dei creditori della procedura secondaria ed taluni gruppi di creditori, cioè, negli esempi fatti dallo stesso autore citato, che tali creditori siano stati ammessi al passivo della procedura principale, ovvero

*Il diritto fallimentare delle società commerciali*

soddisfare tutti i crediti ammessi in questa procedura, il curatore ad essa preposto trasferisce senza ritardo il residuo dell'attivo al curatore della procedura principale (art. 35).

13) *Fa vera gloria?* – Resta a questo punto da chiedersi se il Regolamento n. 1346 del 2000 sia realmente uno strumento idoneo a realizzare l'uniformità di disciplina intracomunitaria delle insolvenze transfrontaliere.

Esso rappresenta indubbiamente un notevole sforzo elaborativo e sistematico, che tiene conto di realtà normative sovente tra loro assai diverse, se non addirittura opposte.

Possono, tuttavia, avanzarsi alcune riflessioni, che in parte attutiscono la valenza «uniformante» dello strumento normativo all'esame, senza per questo svilirne la portata tecnica e le indubbie conseguenze sistematiche che esso comporta sulle legislazioni degli Stati membri.

In primo luogo, il Trattato istitutivo assegna un ruolo fondamentale di garante della uniforme interpretazione ed applicazione della normativa comunitaria alla Corte di Lussemburgo, che, ai sensi dell'art. 234 del Trattato CE, è investita in via pregiudiziale del rinvio cosiddetto «in interpretazione» delle disposizioni dettate dagli organi comunitari. Il rinvio pregiudiziale *può* essere sollevato da una «giurisdizione» di uno Stato membro, e *deve* essere sollevato allorché avverso le decisioni di tale «giurisdizione» non possa proporsi un ricorso giurisdizionale di diritto interno.

La Corte di Lussemburgo ha chiarito – anche con un notevole sforzo estensivo – che per «giurisdizione» agli effetti dell'art. 234 del Trattato deve intendersi un organo indipendente avente origine legale e carattere permanente, che applica norme giuridiche, la cui giurisdizione sia obbligatoria e si svolga secondo un procedimento contraddittorio (²⁷).

L'art. 2 del Regolamento – che, come si è detto, ai sensi dell'art. 249 del Trattato è direttamente applicabile negli Stati membri – fa, tuttavia, riferimento a «qualsiasi autorità competente» a fini del radicarsi del potere di aprire una procedura principale, includendo anche le autorità amministrative, che non possono considerarsi «giurisdizione» agli effetti del Trattato e, dunque, non possono sollevare dinanzi alla Corte CE il rinvio in interpretazione, con evidenti riflessi sull'uniforme applicazione della normativa.

In secondo luogo, la procedura principale si individua in base al criterio della priorità temporale di apertura della procedura e non di richiesta della

---

---

*Parte I - Dottrina*

stessa, anche in presenza di procedure di diversa tipologia, ad esempio conservative (concordato preventivo) o demolitorie (fallimento).

La circostanza che la procedura capofila rivesta carattere demolitorio può ingenerare qualche dubbio sulla effettiva utilità di una procedura territoriale conservativa e viceversa.

Il criterio della priorità può lasciare, inoltre, qualche residuo margine operativo a fenomeni di *forum shopping*, soprattutto nella scelta di una tipologia di procedura a preferenza di un'altra.

Ancora, il primo comma dell'art. 25 – nell'atto in cui stabilisce un principio di *self execution* in tutto il territorio dell'Unione delle decisioni relative allo svolgimento ed alla chiusura di una procedura di insolvenza – richiede, al contempo, la messa in opera di un meccanismo di delibazione giudiziale per la produzione di effetti esecutivi delle predette decisioni, esclusi, come tali, dalla «presa» del principio di automaticità. Il meccanismo cui si fa rinvio è quello previsto dalla Convenzione di Bruxelles del 1968, ora assorbito nel citato Regolamento n. 44 del 2001, la cui delibazione è affidata, in Italia, alla Corte di appello (artt. 38-58) (²⁸).

In pratica, il principio di sovranità delle giurisdizioni statuali – che apparentemente regredisce a fronte del recepimento «automatico» degli effetti dichiarativi e/o costitutivi delle decisioni di giudici appartenenti ad altri ordinamenti – risorge per intero allorché si tratta del recepimento degli effetti più concretamente «*vero* delle decisioni, e cioè quelli esecutivi.

Con precipuo riferimento all'ordinamento italiano, la disposizione pone, dunque, almeno due problemi:

*a)* gli effetti esecutivi di una procedura di insolvenza aperta in altro Stato dell'Unione verranno delibati in Italia da un giudice diverso da quello (funzionalmente) investito della competenza in materia di procedure consimili in forza della *vis attractiva concursus* di cui all'art. 24 legge fallim.;

*b)* posto che, a norma dell'art. 16, paragrafo 1, del richiamato Regolamento n. 44 del 2001, il giudice dello Stato richiesto per la dichiarazione di esecutività «può, su istanza della parte contro la quale è chiesta l'esecuzione, *sospendere il procedimento se la decisione straniera è stata impugnata, nello Stato d'origine, con un mezzo ordinario o se il termine per proporre l'impugnazione non è scaduto; in quest'ultimo caso il giudice può fissare un termine per proporre tale impugnazione*», ne deriva che un giudice di altro Stato dell'Unione può sospendere gli effetti, ad esempio, di una sentenza dichiarativa di fallimento pronunziata in Italia ed opposta (²⁹), laddove l'art. 18, quarto comma, legge fallim. espressamente stabilisce che la proposizione

---

---

dell'opposizione non sospende l'esecuzione della predetta sentenza dichiarativa di fallimento[60].

Per altro verso, infine, il Regolamento comunitario introduce principi normativi che non potranno, anche nel breve periodo, non riverberare positivi effetti sull'interpretazione della legislazione interna.

Il riferimento più eloquente è, in questo senso, rappresentato dall'art. 24, paragrafo 1, del testo all'esame, che libera colui che in uno Stato membro adempie un obbligazione a favore del debitore assoggettato a una procedura di insolvenza aperta in un altro Stato membro, anziché a favore del curatore della procedura, «se non era informato dell'apertura della procedura»[61].

Tale chiaro dato normativo contrasta con il consolidato orientamento della giurisprudenza interna, in base al quale gli effetti della sentenza dichiarativa di fallimento previsti dall'art. 44 legge fallim. debbano decorrere – in forza del carattere di «assolutezza» del principio di tutela dei creditori concorsuali – a far data dalla pubblicazione (id est: dal deposito) della stessa e non dall'affissione (id est: dal momento della conoscenza legale del suo contenuto)[62].

chiarativa di fallimento, ritenendo che la richiamata norma del Regolamento n. 44 del 2001 si applichi soltanto ai primi.

[60] Sul punto, vi è, poi, addirittura un orientamento della giurisprudenza di merito (v., ad esempio, Appello Milano, 22 luglio 1994, in Giur. it., 1995, I, 2, 580) che ritiene inapplicabile, in sede di giudizio di opposizione ex art. 18 legge fallim., la procedura di inibitoria di cui agli artt. 283 e 351 cod. proc. civ.

[61] Il paragrafo 2 del medesimo art. 24 aggiunge che, fino a prova contraria, si presume che colui il quale adempie la propria obbligazione prima che sia data pubblicità alla decisione di apertura della procedura di insolvenza, non ne fosse a conoscenza. Per contro, si presume, sempre fino a prova contraria, che colui il quale abbia eseguito l'obbligazione dopo che delle decisione sia stata data pubblicità, ne fosse a conoscenza.

[62] Cfr., ex multis, Cassazione, 24 marzo 2000, n. 3119, in Fallimento, 2001, pag. 276; Cassazione, 11 marzo 1994, n. 2381, ivi, 1994, pag. 819; Cassazione, 16 aprile 1992, n. 4725; Cassazione, 22 novembre 1991, n. 12573. Come è noto, la Corte Costituzionale – con sentenza del 23 giugno 1998, n. 634 – ha dichiarato non fondata, con riferimento all'art. 3 Cost., la questione di legittimità costituzionale dell'art. 44 della legge fallimentare, nella parte in cui non esclude che gli effetti del fallimento – quanto meno nel periodo intercorrente tra la pubblicazione e l'affissione della relativa sentenza – si riflettano su terzi che, in buona fede, siano stati destinatari degli atti compiuti dal fallito o autori di pagamenti ricevuti dallo stesso. In fatti, secondo la Consulta, nel sistema della legge fallimentare, l'inopponibilità alla massa dei creditori dei pagamenti ricevuti dal fallito dopo la pubblicazione della sentenza dichiarativa di fallimento si ricollega ad un principio generale – secondo cui la dichiarazione di fallimento priva il fallito, dalla data di deposito della relativa sentenza, dei poteri di amministrazione e disposizione del suo patrimonio, trasferendoli all'organo della procedura fallimentare – finalizzato, nella sua assolutezza, ad un efficace e diretta tutela della massa dei creditori. L'irrilevanza, nella parte in cui afferma, agli effetti dell'inopponibilità alla massa dei pagamenti ricevuti dal fallito, dello stato soggettivo di conoscenza del solvens rappresenta il necessario riflesso dell'assolutezza di detto

Il Regolamento comunitario adotta, dunque, il diverso – e, ad avviso di chi scrive, più corretto – principio della non imputabilità al debitore, «legalmente» ignaro dell'apertura della procedura di insolvenza, delle conseguenze dell'adempimento avvenuto direttamente nelle mani di chi è stato assoggettato alla procedura, accordando l'elemento della conoscenza «legale» agli effetti, oggettivamente «certi», dei sistemi pubblicitari.

FRANCESCO DE SANTIS
Prof. straordinario di Dir. proc. civile
nell'Università di Salerno

principio, e la disposizione della legge fallimentare esprime – secondo la Corte Costituzionale – una scelta del legislatore non manifestamente irragionevole, in quanto il differente rilievo che assume lo stato soggettivo di coloro che hanno avuto rapporti con il fallito prima o dopo la dichiarazione di fallimento è giustificato proprio dalla non omogeneità delle situazioni poste a raffronto, caratterizzate, rispettivamente, dalla mancanza e dall'esistenza della sentenza dichiarativa di fallimento.