# EXHIBIT B

# International Conflict of Laws for the Third Millennium

## Essays in Honor of Friedrich K. Juenger

Edited by Patrick J. Borchers and Joachim Zekoll

Supplied by The British Library - "The world's knowledge"

# International Conflict of Laws for the Third Millennium

## Essays in Honor of Friedrich K. Juenger

Edited by Patrick J. Borchers
and Joachim Zekoll

BRITISH LIBRARY
DOCUMENT SUPPLY CENTRE

2 4 MAY 2002

m82/.28521



Transnational Publishers, Inc.
Ardsley, New York

Supplied by The British Library - "The world's knowledge"

### C. Territorial Proceedings

The assumption that lies behind the provisions of Article 3(1), (2) and (3) of the Convention is that main proceedings will be opened first and that secondary (territorially limited) proceedings will only be opened subsequently. Article 3(1) also assumes that the insolvency law of the State of the debtor's main interests permits the opening of proceedings, which it may not necessarily do. To cater for the latter situation it is provided that when insolvency proceedings under Article 3(1) cannot be opened because of the conditions laid down by the Contracting State in which the "centre" of the debtor's main interests is located, "territorial proceedings" may be opened in the Contracting State in which the debtor has an establishment despite the fact that no main proceedings are (or can be) opened.[87] Furthermore, the Convention recognizes that certain creditors merit special protection in the sense that their connections with the Contracting State in which the debtor has an establishment justify the opening of territorial proceedings even though no main proceedings have yet been opened.[88] Thus the Convention provides that territorial proceedings may be opened before main proceedings if the opening of the former kind of proceedings is requested by a creditor who has his domicile, habitual residence or registered office in the Contracting State in which the debtor's establishment is situated or where a creditor's claim arises out of the operation of the establishment.[89] These independent territorial proceedings may be either winding-up proceedings or re-organization proceedings.[90] But once main proceedings are opened (if such be the case) these territorial proceedings become secondary proceedings.[91]

### IV. CHOICE-OF-LAW RULES

### A. Background and General Principles

At the stage where it is necessary to determine the law applicable to particular insolvency proceedings it is, of course, necessary to

---

[87] European Union Convention on Insolvency Proceedings, art. 3 (4)(a). Examples include the case where a debtor cannot be declared insolvent because he is not a trader. REPORT, ¶ 85(1).

[88] REPORT, ¶ 84.

[89] European Union Convention on Insolvency Proceedings, art. 3(4)(b). A creditor's claim may arise from the operations of the establishment, e.g., where it is a claim by an employee working there or where it is a claim by a tax or social security authority of the State where the establishment is located or where it is a claim by a creditor arising out of a contract to be performed in the State where an establishment is located. REPORT, ¶ 85(2).

[90] European Union Convention on Insolvency Proceedings, Annexes A and B.

[91] *See id.*, arts. 36 and 37.

Supplied by The British Library - "The world's knowledge"

consult the choice-of-law rules that are applied in the country in which those insolvency proceedings are brought. In England the general rule, both in the context of corporate insolvency and individual bankruptcy, is that English law applies, both to matters of substance and procedure.[92]

The general principle of the Convention follows the same line. Except where the Convention specifically provides a different rule as to the applicable law, the law applicable to insolvency proceedings and their effects is to be the law of the Contracting State in which the proceedings are opened.[93] This will be the case regardless of whether the proceedings are main proceedings,[94] secondary proceedings,[95] or independent territorial proceedings.[96]

Article 4 (2) fleshes out the general principle established in Article 4(1). The law of the Contracting State in which the proceedings are opened determines the conditions under which they may be opened, the conduct of the proceedings, and their closure. Sub-paragraphs (a)–(m) of Article 4(2) provide a list of issues which "in particular" (i.e., the list is not exclusive) should be governed by the *lex fori* as the applicable law. The issues involved are as follows:[97]

(a) whether a particular debtor may be subject to insolvency proceedings at all (e.g. the debtor is an individual who is not a trader), it being recognized that the answer to this question may be different under the law governing main proceedings to that which is found under the law governing secondary proceedings;
(b) the assets which form part of the debtor's estate and the treatment of assets acquired by the debtor after opening of the proceedings;
(c) the respective powers of the debtor and the liquidator;[98]
(d) the conditions under which set-offs may be invoked;[99]

---

[92] Corporate insolvency: *Re English Scottish and Australian Chartered Bank* [1893] 3 Ch. 385; *Re Suidair International Airways Ltd* [1951] Ch. 165; DICEY AND MORRIS, *supra* note 59, at 1130–33. Individual bankruptcy: *Ex p. Melbourn* [1870] L.R. 6 Ch. App. 64; *Ex p. Holthausen* (1874) L.R. 9 Ch. App. 722; DICEY & MORRIS, *supra* note 59, at 1169–1170.
[93] European Union Convention on Insolvency Proceedings, art. 4 (1).
[94] REPORT, ¶ 89.
[95] *Id.* and European Union Convention on Insolvency Proceedings, art. 28.
[96] REPORT, ¶ 89.
[97] The lettering in what follows corresponds to the lettering used in the sub-paragraphs of article 4(2) of the European Union Convention on Insolvency Proceedings.
[98] *But see id.*, art. 14, discussed *infra* text accompanying notes 165–68.
[99] *But see id.*, art. 6, discussed *infra* text accompanying notes 123–127.

Supplied by The British Library - "The world's knowledge"

Despite the emphasis on the *lex fori* in Article 4, the Convention goes on to identify various issues which are subject to special choice-of-law rules involving possible departure from the *lex fori*. These are discussed in the following paragraphs.

### B. Third Parties' Rights *in rem*

Article 5 of the Convention creates a special choice-of-law rule designed to protect third parties who hold rights *in rem* from having those rights swallowed up in the insolvency proceedings as a result of the application of the *lex fori* under Article 4. According to Article 5(1) the "opening of insolvency proceedings shall not affect the rights in rem of creditors or third parties in respect of tangible or intangible movable or immovable assets belonging to the debtor which are *situated within the territory of another Contracting State* at the time of the opening of proceedings."[109]

Accordingly, where a right *in rem* is located in a Contracting State[110] other than that in which proceedings are opened, that right will be protected from the operation of the insolvency proceedings, but only to the extent that the law of the Contracting State in which the right is located affords this protection. If that law does not protect that right it will be possible to open secondary proceedings in the Contracting State of location with a view to realising the asset concerned.[111]

What then are rights *in rem* for these purposes? According to the Report, Article 5 does not define rights *in rem*.[112] The intent of the Convention is to acknowledge the interest of each Contracting State "in protecting its market's trade, in the form of respect of rights *in rem* acquired over assets of the debtor located in that country under the law that is applicable before the opening of insolvency proceedings. For this reason, the characterization of a right as a right *in rem* must be sought in national law which, according to the normal pre-insolvency conflict-of-law rules, governs rights *in rem* (in general the *lex rei sitae* at the relevant time). In this sense, the Convention adopts a '*lege causae*' characterisation."[113] Only one exception to this apparently national law characterization is admitted in the Report.[114] This is found in Article 5(3) according to which a

---

[109] Emphasis added.

[110] Where the right *in rem* is located in a non-Contracting State, art. 5 of the Convention does not apply. REPORT, ¶ 94.

[111] REPORT, ¶ 98. However, if the value of the asset subject to the right *in rem* is greater than the value of the claim represented by the right *in rem*, the creditor is obliged to surrender to the estate of the debtor any surplus of the proceeds of sale. REPORT, ¶ 99.

[112] REPORT, ¶ 100.

[113] *Id.*

[114] REPORT, ¶ 101.

Supplied by The British Library - "The world's knowledge"