right "recorded in a public register and enforceable against third parties under which a right in rem within the meaning of paragraph [5(1)] may be obtained, shall be considered a right *in rem*."

Despite the relatively clear advice on characterization contained in the Report so far, Article 5(2) does appear to give some independent definitional content to the concept of right *in rem* by indicating that the concept shall mean "in particular":[115]

> (a) the right to dispose of assets or have them disposed of and to obtain satisfaction from the proceeds of or income from those assets, in particular by virtue of a lien or mortgage; (b) the exclusive right to have a claim met, in particular a right guaranteed by a lien in respect of the claim or by assignment of the claim by way of a guarantee; (c) the right to demand the assets from, and/or to require restitution by, anyone having possession or use of them contrary to the wishes of the party so entitled; and (d) a right *in rem* to the beneficial use of assets.

This seems to introduce a different dimension to the problem of definition in so far as it appears to give a "Convention meaning" to the concept of right *in rem* or at least to suggest that an autonomous definition of the concept should be developed, in stark contrast to the earlier advice in the Report that the Convention does not define it and leaves the definition to national law. The matter becomes murkier when one reads in the Report that the "rationale of article 5 imposes certain limits to national qualification of a right *in rem*. An unreasonably wide interpretation of the national concept of a right *in rem* to include, for instance, rights simply reinforced by a right to claim preferential payment . . . would make the Convention meaningless, and such a wide interpretation is not to be attributed to it."[116] So, apparently, national law is *not* the sole definitional arbiter and there *is* a Convention dimension to the process of definition. This view is reinforced by the opinion offered in the Report that Article 5(2) is a list of the types of rights that are "normally considered by national laws to be rights *in rem*."[117] This might be thought to suggest that national characterisation should not liberally construe rights as rights *in rem* with a view to protecting local holders of such rights, but should be tempered by a European norm of which the rights listed in Article 5(2) are "common" examples, that norm

---

[115] The right must be created *before* the proceedings are opened. Art. 4 of the Convention applies to rights created *after* the proceedings have been opened. REPORT, ¶ 95.

[116] REPORT, ¶ 102.

[117] REPORT, ¶ 103.

perhaps being derived from what is "common" in the national laws of Contracting States. Do these rights *in rem* have any common characteristics? It is said, first, that a right can only be a right *in rem*, for the purposes of Article 5 if it exists (i.e. has been created) prior to the opening of insolvency proceedings.[118] Secondly a right *in rem* is characterized by its direct and immediate relationship with the asset it covers, and by the absolute nature of the allocation of the right to the holder enabling the holder to resist the alienation of the asset to which it relates to a third party, to assert the right *erga omnes*,[119] and to resist individual enforcement by third parties.[120]

It can be deduced from the foregoing that the characterisation process will be something of a hybrid: a mixture of national law principles, subject to "safeguards" imposing outer limits on the boundaries of national law which are contained within Article 5(2) and the injunction in the Report.[121]

Even if created before the opening of insolvency proceedings, a right *in rem* in favor of a particular creditor or third party could constitute an act detrimental to all the creditors. In such a case the rules of the Convention concerned with actions for voidness, voidability or unenforceability of acts detrimental to all the creditors come into play.[122]

## C. Set-Off

According to Article 4(2)(d), the law of the State of the opening of proceedings determines the conditions under which set-offs may be invoked. Thus, for example, if insolvency proceedings are opened in England, English law will determine the availability of a set-off, i.e. the case will be governed by Rule 4.90 of the Insolvency Rules 1986.[123] Article

---

[118] REPORT, ¶ 103.

[119] Subject to protection of *bona fide* purchasers.

[120] REPORT, ¶ 103.

[121] The impression is given that Contracting States might unduly extend, in national law, the concept of right *in rem* to protect local holders of rights in assets claimed by the liquidator in the main proceedings. Whether such a development would have been likely must be extremely doubtful. It hardly accords with the spirit of the principle of "community trust" (*cf.* REPORT, ¶s 79, 202, 220) for Contracting States to "cook" their national laws with a view to outwitting a significant basis of the Convention.

[122] *See* European Union Convention on Insolvency Proceedings, art. 4(2)(m), and art. 13, discussed *infra* text accompanying notes 147–153. *See* REPORT, ¶ 106.

[123] Rule 4.90 is mandatory in an English liquidation: *Re Bank of Credit and Commerce International S.A.* (No. 10) [1997] Ch. 213. Rule 4.90 provides that where before the commencement of the insolvency there have been mutual credits or debts between the insolvent debtor and any creditor claiming for a debt in the proceedings, an automatic, self-executing set-off takes places by operation of law.

Supplied by The British Library - "The world's knowledge"

Case 1:07-cv-07413-PKC    Document 26-8    Filed 06/30/2008    Page 3 of 8

4(2)(d) thus covers the applicability of "insolvency set-off" and, if such set-off is available under the *lex fori*, a problem really arises.[124] However, set-off can also arise by way of contract or by way of an equity which attaches to the plaintiff's claim against the debtor, and the question which then arises is whether such set-offs can be invoked if no insolvency set-off is available and what law will determine, in a transnational context, whether such set-offs arise. According to Article 6 of the Convention the "opening of insolvency proceedings shall not affect the right of creditors to demand the set-off of their claims against the claims of the debtor, where such a set-off is permitted by the law governing the insolvent debtor's claim." This appears to mean that if the liquidator sues a solvent party for a sum allegedly due to the insolvent debtor, then the solvent party can invoke any set-off available under the law that governs the insolvent debtor's claim against that party. The theory is that the solvent party has acquired a right prior to the opening of the insolvency proceedings. If that right cannot be invoked under the *lex fori*, by virtue of insolvency set-off, it should nonetheless be capable of being invoked if available under the relevant applicable law.[125] A particular difficulty that may arise, however, is in the operation of set-off where both main and secondary proceedings are opened. Presumably, the law applicable to the main proceedings will generally determine the availability of set-off according to Article 4(2)(d), and Article 6 will be applied where relevant. But if the claims are located in the Contracting State where the secondary proceedings are opened,[126] then rights of set-off are governed by that State's law and, when relevant, by Article 6. The potential conflict between the two legal regimes may make the outcome somewhat difficult to predict.

Even if set-off is available, that is without prejudice to the possibility of an action for voidness, voidability or unenforceability as laid down in Article 4(2)(m).[127]

### D. Reservation of Title

Article 7(1) appears to establish that if insolvency proceedings are opened against the purchaser of an asset, the seller's rights based on reservation of title are unaffected if at the time of the opening of

---

[124] REPORT, ¶ 109.

[125] REPORT, ¶ 107.

[126] Claims are located in the Contracting State in which the third party required to meet them has its centre of main interests as determined by European Union Convention on Insolvency Proceedings, art. 3(1): *id.*, art. 2(g). It seems likely that such claims will be located in the State where secondary proceedings are opened if the solvent party has its centre of main interests there.

[127] *Id.*, art. 6(2).

Supplied by The British Library - "The world's knowledge"

252 • *International Conflicts of Laws for the Third Millennium*

proceedings the asset is situated in a different Contracting State.[128] One question that arises from this formulation is whether the attempt to reserve title must comply with the forum's rules of private international law on that question.[129] Is it enough that the reservation of title is effective under the *lex situs* of the asset? How do provisions in a retention of title arrangement, which give the seller rights to the proceeds of a sale of an asset, fit in? If the purchaser has sold an asset but is holding the proceeds of sale on the seller's behalf, are the proceeds the relevant asset?[130] Or is all of this provision capable of being given an autonomous interpretation by the European Court? The Report states that the remarks made in relation to Article 5 apply *mutatis mutandis* in relation to Article 7,[131] which suggests that a national law approach is to be adopted, although the reality may be that a more hybrid approach is contemplated.[132] Article 7(2) contains a uniform substantive law rule[133] dealing with the situation in which the seller of an asset becomes insolvent after the delivery of the asset. In such cases the opening of insolvency proceedings will not constitute grounds for rescinding or terminating the sale and will not prevent the purchaser from acquiring title where, at the time of opening of the proceedings, the asset is situated in a Contracting State other than that in which proceedings are opened. The Report states that if the buyer continues to make payments he shall acquire title at the end of the period set out in the contract.[134] Most of the questions raised in relation to Article 7(1) above are relevant here as well.

Consistent with Articles 5 and 6, Article 7(3) provides that actions for voidness, voidability and unenforceability may be brought against such reservations of title.[135]

### E. Contracts

The effect of the opening of insolvency proceedings on current contracts to which the debtor is a party will normally be governed by the

---

[128] If the location of the asset changes after the proceedings have been opened, the application of the provision is unaffected. REPORT, ¶ 113.

[129] For a discussion of the English position on this matter, see BENJAMIN'S SALE OF GOODS (A.G. Guest et al. eds., 5th ed. 1997), ¶¶ 25-118-25-126; C.G.J. Morse, *Retention of Title in English Private International Law*, 1993 J. BUS. L. 168. The commentary in the report is regrettably brief.

[130] If the purchaser holds the proceeds in trust for the seller (*cf.* Kruppstahl A G v. Quittmann Products Ltd., 1982 I.L.R.M. 551), does this give the seller a "right *in rem* to the beneficial use of assets" so that art. 5 of the Convention becomes relevant?

[131] REPORT, ¶ 112.

[132] *See supra* text accompanying notes 109–122.

[133] REPORT, ¶ 112.

[134] REPORT, ¶ 114.

[135] *Cf.* Insolvency Act, 1986, Ch. 45, § 10(1)(b),(4) (Eng).

Supplied by The British Library - "The world's knowledge"

law of the forum pursuant to Article 4(2)(e).[136] However, two species of contract are exempt from this general rule, namely contracts relating to immovable property and contracts of employment.

### 1. Contracts Relating to Immovable Property

Article 8 provides that the effect of insolvency proceedings on a contract conferring the right to acquire or make use of immovable property shall be governed solely by the law of the Contracting State within the territory of which the immovable property is situated. The justification for this special rule results from the fact that in the law of the Contracting States, contracts concerned with immovable property are subject to special rules of jurisdiction and choice of law which reflect the interests of the parties to the contract and the interests of the State in which the immovable property is located.[137] The effect of Article 8 is, thus, to apply the *lex situs* (including its rules of insolvency law[138]) to contracts falling within its terms.

It is important to note that this provision, as drafted, is confined to *contracts* conferring the right to make use of or to acquire immovable property.[139] The effect of insolvency proceedings on actual proprietary rights in immovable property are dealt with under Article 5, so far as third parties are involved. Article 3(1) of the Rome Convention[140] enables parties to choose the law to govern a contract, even a contract concerning rights in immovable property. But if a law other than the *lex situs* has been chosen in the contract itself, the *lex situs* will nonetheless govern the effects of insolvency proceedings.

### 2. Contracts of Employment

Article 10 establishes that the effect of insolvency proceedings on employment contracts or relationships shall be governed solely by the law of the Contracting State applicable to the employment contract. The purpose of the Article is to protect employees from the application of a law different from that which governs the employment relationship. However, the scope of this protection is rather limited. According to the Report, the effects of insolvency proceedings on the continuation or termination of the employment relationship and the rights and obligations

---

[136] The rules contained in the Rome Convention on the Law Applicable to Contractual Obligations 1980, *supra* note 16, are thus displaced in the event of the opening of insolvency proceedings. See REPORT, ¶ 117.
[137] REPORT, ¶ 118.
[138] *Id.*
[139] This includes leasing contracts and contracts for the sale of an immovable: REPORT, ¶ 119.
[140] *See supra* note 16.

Supplied by The British Library - "The world's knowledge"

of each party to that relationship are to be determined by the law applicable to the contract discovered by reference to rules of the conflict of laws.[141] However, "insolvency questions other than those relating to the impact of opening of proceedings on contract and employment relationships remain subject to the competence of the law of the State of opening. . . . Thus, for instance, the following would be covered [by the law of the State of opening], the question of whether or not workers' claims arising out of their employment shall be protected by a privilege, the prescribed amount protected and the rank of privilege if any, etc."[142] This appears to mean that an employee will not be able to rely on more generous provisions in these respects which might prevail under the law applicable to the employment contract.[143]

F.   Rights Subject to Registration

As a further exception to Article 4, Article 11 of the Convention provides that the "effects of insolvency proceedings on the rights of the debtor in immovable property, a ship or an aircraft subject to registration in a public register shall be determined by the law of the Contracting State under the authority of which the register is kept." Systems of registration of property play an important role in promoting legal certainty and protecting trade.[144] Accordingly, an exception to the general applicability of the *lex fori* was justified in such cases. The scope of Article 11 is not, however, entirely clear. The provision does not submit the effects of insolvency proceedings *solely* to the law of the Contracting State under the authority of which the register is kept. "This means that the general applicability of the law of the State of the opening in accordance with Article 4 is not displaced. Hence a sort of cumulative application of both laws is necessary."[145] The precise meaning of this is open to interpretation, but what is probably envisaged is that where the law of the State of opening and the law of the State of registration are inconsistent, the law of the State of registration shall prevail.[146]

---

[141]   REPORT, ¶ 125. The relevant conflict of laws rules are those contained in Articles 6 and 7 of the Rome Convention, *supra* note 16. REPORT, ¶ 126.
[142]   REPORT, ¶ 128.
[143]   *Cf.* Employment Rights Act, 1996, Ch. 18, § 196(2) (3) and (7).
[144]   REPORT, ¶ 130.
[145]   *Id.*
[146]   This seems a likely explanation of obscure passages in ¶ 130 of the REPORT. It should be noted that Community patents and trademarks are the subject of specific treatment in art. 12 of the Convention. These matters are not dealt with in this paper.

Supplied by The British Library - "The world's knowledge"

### G. Detrimental Acts

According to Article 4(2)(m), the law of the Contracting State in which insolvency proceedings are opened determines "the rules relating to voidness, voidability or unenforceability of legal acts detrimental to all the creditors." The special rules contained in Article 5 (third parties' rights *in rem*), Article 6 (set-off) and Article 7 (reservation of title) do not preclude the application of rules of the law of the forum which have this effect to the matters dealt with in those articles. Nonetheless, according to Article 13, Article 4(2)(m) shall not apply where the person who benefited from a legal act detrimental to all the creditors provides proof that:

(a) the said act is subject to the law of a Contracting State other than that of the State of the opening of proceedings, and

(b) that law does not allow any means for challenging that act in the relevant case.

The purpose of Article 13 is to permit a "defence" to the application of the law of the State of opening which acts as a "veto" against the invalidity of the act "decreed by"[147] the latter State's law.

For the provision to operate it must first be established by the person who benefited from the relevant act that the relevant act is "subject to" the law of a Contracting State other than the State of the opening. The expression "subject to" appears to equate to "governed by" and might involve a choice of law question, presumably to be determined by the relevant choice-of-law rules of the law of the forum.[148] Second, the person who benefited must prove that the law applicable to the relevant act does not permit the act to be challenged by "any means" in "the relevant case." The former expression is apparently intended to convey the notion that the act cannot be challenged either under the rules of insolvency law or under the general rules of law of the particular system of national law which is applicable to the act.[149] The latter expression is intended to indicate that the act must not be capable of being challenged in the particular circumstances of the case in hand. It is not enough to show that the act could not be challenged "in the abstract."[150]

The purpose of the exception created by Article 13 is the protection of the expectations of creditors and third parties who will have acted

---

[147] REPORT, ¶ 136.
[148] *E.g.*, if the act is a contract, the rules of the Rome Convention, *supra* note 16.
[149] REPORT, ¶ 137.
[150] *Id.*

under the belief (if such proves to be the case) that the relevant act is legally effective under the national law applicable to it.[151] The potentially retroactive nature of a subsequently opened insolvency proceeding should not be allowed to destroy these expectations.[152] It follows from this that Article 13 does not apply to save acts which occur after the opening of insolvency proceedings.[153]

## H. Protection of Third Party Purchasers

Article 13 is only designed to give protection to transactions occurring *before* insolvency proceedings have been opened. However, limited protection is offered to third parties, in relation to certain disposals by the debtor, by Article 14 of the Convention. This Article provides that where by an act[154] occurring after the opening of the insolvency proceedings, the debtor disposes, for consideration, of an immovable asset or a ship or aircraft subject to registration in a public register, or securities whose existence presupposes registration in a register laid down by law, the validity of the act shall be governed by the law of the State within the territory of which the immovable asset is situated or under the authority of which the register is kept.

The opening of insolvency proceedings deprives the debtor of the power to dispose of property. However, third parties may nonetheless acquire property or rights in property *bona fide*. Article 14 is designed to protect such third parties in the rather limited circumstances covered by the provision.[155] Where rights depend on registration, the opening of insolvency proceedings in a country different to that in which the register is kept may not be incorporated into the register. And similar conditions apply to immovable property (title to which is often recorded in a register). The Article recognises the practical need to protect third parties in such situations.[156]

---

[151] REPORT, ¶ 138.

[152] *Id.*

[153] *Id.* Art. 13 of the Convention applies in both main and secondary proceedings: REPORT, ¶ 139.

[154] "Act" includes not only a transfer of ownership, but also the creation of a right *in rem* in relation to the assets. REPORT, ¶ 141.

[155] *Id.*

[156] The text of art. 14 of the Convention refers to the law of *the State*, not the Contracting State in which the immovable asset is located or register kept. The REPORT (¶ 141) appears to make it clear that Contracting State is intended!

Supplied by The British Library - "The world's knowledge"