# EXHIBIT C

2004 NRTN-ASBL PT II § B  
2004 Ann. Surv. of Bankr. Law Part II § B

Page 1

**Norton Annual Survey of Bankruptcy Law**  
**Database updated October 2004**  
**Part II. International Bankruptcy Law**

§ B. THE EUROPEAN REGULATION ON INSOLVENCY PROCEEDINGS: INTRODUCTION AND LEGAL PERSPECTIVES

By Lars Westpfahl and Jochen Wilkens [FN1]

- I. ECONOMIC AND HISTORIC BACKGROUND OF THE REGULATION
    - A. Economic Necessity for 'Common Ground' in Transnational Bankruptcy Proceedings
    - B. The Drafting of the Regulation and Its Precursors
- II. KEY ASPECTS OF THE REGULATION
    - A. Scope of Applicability of the Regulation
    - 1. Proceedings Covered
    - 2. Territorial Scope
    - a. The General Concept and Its Uncertainties
    - b. The Debtor's 'Center of Main Interests'
    - B. International Jurisdiction and Mutual Recognition
    - 1. The Basic Principle
    - 2. Limits to the Concepts of Universality and Unity
    - C. Uniform Conflict of Law Rules--Applicable Law
    - 1. The General Rule of Art. 4--The lex concursus
    - 2. Exceptions to the Basic Rule
    - a. Third Parties' Rights in rem
    - b. Set-Off
    - c. Transaction Avoidance
    - D. Coordination of Multiple Proceedings
    - 1. Allocation of Assets
    - 2. Filing of Claims and Distribution of Dividends
    - 3. Powers of and Cooperation Between the Liquidators
    - a. Powers of the Liquidators
    - b. Cooperation Between the Liquidators
- III. THE REGULATION IN PRACTICE
    - A. General Acceptance of the Regulation by the Courts
    - B. Testing the 'Frontiers'
    - 1. 'Exterritorial' Application of the Regulation
    - 2. Consolidated Insolvency of Affiliated Groups of Companies
    - a. *Crisscross Telecommunications*
    - b. *Daisytek*--A European Odyssey
- IV. FUTURE PROSPECTS
    - A. Prominent Unresolved Issues
    - 1. Clash of Jurisdictions
    - 2. Insolvency Proceedings of Alien Companies: Corollary Problems
    - a. Eligibility of the Debtor
    - b. [In-]Voluntary and Mandatory Filings
    - c. Liability for 'Wrongful Trading'
    - d. Shareholders' Loans

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-07413-PKC     Document 26-9     Filed 06/30/2008     Page 3 of 9

2004 NRTN-ASBL PT II § B                                                                 Page 2
2004 Ann. Surv. of Bankr. Law Part II § B

- B. Movable Center of Main Interests--Forum Shopping
- C. Rescue Culture
- 1. Single-Entity Business Structures
- 2. Affiliated Groups of Companies
- D. Center of Main Interests: A General Solution to Transatlantic 'Jurisdictional Clashes'

## I. ECONOMIC AND HISTORIC BACKGROUND OF THE REGULATION
### A. Economic Necessity for 'Common Ground' in Transnational Bankruptcy Proceedings

Historically, the supreme authority to enact laws related to bankruptcy proceedings has always been located at the highest legislative unit of one unified economic community. The most prominent example and proof of this assertion is the United States of America, which, as early as in the Constitution of 1789, anchored the legislative power to pass "uniform laws on the subject of bankruptcy throughout the United States" at federal level [FN2] and, later on, conferred the administration of bankruptcy cases to federal judges. [FN3] The concept of basing the liquidation or, if feasible, reorganization of a commercial entity on a uniform body of law is of crucial importance to the handling of the entire cause of action under the auspices and supervision of one single court or other public authority. This, in turn, is the essential prerequisite to complying with a most basic rule of every bankruptcy proceeding: The equal treatment of all (unsecured) creditors, which is also referred to as the principle of par condicio creditorum.

However, this model is coming up against limiting factors when there is no political authority corresponding to an existing commercial marketplace, which is increasingly the case in the contemporary world. While markets have been determined and limited by national borders for a rather long time, the economic reality has changed dramatically over the last two decades. Companies with primarily national markets have converted into multinational "global players" seeking market share and profits in numerous established or emerging markets all over the world. During the process of transformation, these companies have often established an extensive web of subsidiaries or branches under the governance of various jurisdictions, providing a major beneficial impact on innumerable national economies with respect to employment and tax revenues. Hence unified or at least consistent procedures with regard to bankruptcy proceedings are not merely important to the aforementioned rule of equal creditors' treatment, but even more so to the preservation of these resources, which can only be accomplished by affording reliable remedies for the restructuring of these companies in the event that they are encountering financial distress.

In addition, the more that the boundaries in international trade disappear, the greater the number, size, and complexity of cases in which companies, or, even worse, affiliated groups of companies, are embroiled in bankruptcy proceedings with close ties to several jurisdictions. Although these scenarios increasingly encroach upon the daily work of bankruptcy practitioners, there is frequently no obvious answer to fundamental legal issues, such as which country can claim international jurisdiction for the proceedings, which substantive bankruptcy law has to be applied, and how the different legal frameworks interact.

The necessity for recognized international rules on these issues is reflected by several projects initiated in order to facilitate the administration of cross-border bankruptcy cases as well as to strengthen the cooperation between national authorities involved in the legal process. Within NAFTA, the initiative has come from the private sector, in the form of the Transnational Insolvency Project of the American Law Institute (ALI). This project culminated in May 2000 with the approval of a statement of principles and legislative recommendations for a closer cooperation in transnational bankruptcies among NAFTA members. [FN4] In Africa, 16 states organized within in OHADA [FN5] have established a Uniform Act to achieve very similar goals. [FN6]

More unlimited in its territorial scope, the UNCITRAL Model Law on Cross-Border Insolvencies, [FN7] adopted by the UN General Assembly in December 1997, is primarily focused on basic aspects such as the recognition of foreign proceedings, judicial cooperation, and the access of an officeholder administering a foreign bankruptcy to the courts of another country. Because of the rather unlimited scope of addressees who presumably have

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-9   Filed 06/30/2008   Page 4 of 9

2004 NRTN-ASBL PT II § B                                                                                    Page 3
2004 Ann. Surv. of Bankr. Law Part II § B

significantly different attitudes towards insolvent entities in general as well as towards collaboration with authorities appointed by foreign jurisdictions in particular, the Model Law is only considered an exemplification of a national bankruptcy law but is neither an attempt to promulgate unified substantive law nor is it compulsory in nature. Nevertheless, inspired by the Model Law, several countries have taken legislative action to improve their national laws on multinational bankruptcy proceedings. [FN8]

### B. The Drafting of the Regulation and Its Precursors

The necessity for the introduction of common rules on cross-border bankruptcy proceedings has been recognized in Europe from the outset of the European Community [FN9] and was underlined when the internal market was established in 1993. Although the free flow of goods and services and the concomitant increased transnational activity of commercial undertakings throughout the entire EU highlighted the urgent need to establish at least a minimum standard of cooperation in bankruptcy matters for Europe, the process of its creation proved to be rather protracted. Since bankruptcy law is closely intertwined with almost every other area of substantive law, not only were the widely varying philosophies and structures of national bankruptcy laws to be overcome, [FN10] but also the fundamental differences of adjacent branches of the law, especially in the areas of real estate law and the law of secured credit, as well as labor and tax law.

Against this adverse background, the preparation of a convention, [FN11] which not only provided for bankruptcy proceedings to be mutually recognized by all other acceding states (principle of universality) but would also have barred all other states from opening even auxiliary proceedings (principle of unity), was far reaching and ambitious. The negotiations, starting in 1960, generated a first proposal in 1970 and a second proposal in 1980. [FN12] Given the multitudinous and sweeping divergences with regard to security interests and priorities even in the original community of six, [FN13] severe deviations from the principle of unity were necessary. In addition, the appointed officeholder was obligated to create a separate sub-estate for the assets located in any affected member state that had to be administered and distributed in accordance with the relevant national laws and rules of the respective state. Revised proposals lingered on until 1984 when this general concept was abandoned as being too convoluted and impractical.

As soon as the ultimate failure of the EEC Convention became inevitable, the Council of Europe [FN14] promoted a less comprehensive concept of a "European Convention on Certain International Aspects of Bankruptcy," which was presented and opened for signature in Istanbul in June 1990. This modest approach essentially only covered classic liquidation proceedings; assured a very limited mutual recognition, not of foreign proceedings as such, but solely of certain powers of the liquidator; and allowed secondary proceedings to be opened in Member States where the debtor has substantial assets to safeguard the interests of local creditors and employees. [FN15] On top of this, an intricate system of reservations permitted the contracting states to opt out of substantial parts of the convention. [FN16]

As soon as it became apparent that the Istanbul Convention was not popular among the proposed signatories, the EEC Council of Ministers set up a Working Group on Bankruptcy [FN17] in late 1989, which came up with a Convention on Insolvency Proceedings in 1995 (the 'Convention'). On November 23, 1995, the day on which the Convention opened for signature, 12 Member States signed the accord right away. All other Member States joined within the prescribed time frame [FN18] with the exception of the UK. The latter declined to accede due to territorial concerns over Gibraltar, as well as unrelated political controversies, and thus the Convention failed to receive the required unanimous support, [FN19] although its legal substance was apparently acceptable to all 15 Member States.

After this series of failures, the EU Council of Ministers, under the consecutive presidencies of Germany and Finland, revived the project that was ultimately adopted as the Regulation on Insolvency Proceedings (the 'Regulation') on May 29, 2000 and came into force on May 31, 2002. [FN20] It is the first successful attempt to address the issue of cross-border bankruptcy proceedings on a multinational basis in Europe for a long time, [FN21] as both the Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters ("Brussels

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Convention") and its successor, the Council Regulation on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters, [FN22] explicitly exclude from their scope bankruptcy proceedings relating to the winding-up of insolvent companies or other legal persons, judicial arrangements, compositions, and similar proceedings. [FN23] Thus the Regulation fills a salient blind spot of European legislation and replaces various bilateral treaties between the Member States. [FN24]

In large parts, the Regulation replicates the content of the Convention [FN25] but obviously was promulgated in a different legal form. [FN26] Being a Regulation, it is directly applicable in all Member States without any need for approval or specific implementing legislation, with the exception of Denmark. Denmark does not participate in the Regulation but has indicated that it will introduce parallel legislation. [FN27]

## II. KEY ASPECTS OF THE REGULATION

In broad terms, the Regulation struggles for an appropriate compromise between the ultimate objective, which is the establishment of one unitary bankruptcy proceeding covering all affairs of a particular debtor irrespective of its location within the limits of the EU, and a legal reality, comprised of widely differing substantive laws among the Member States. [FN28] Therefore, the Regulation seeks to introduce uniform conflicts of law rules on cross-border bankruptcy proceedings and connected judgments within the European Union based on principles of mutual recognition and cooperation. It does not, however, seek to harmonize substantive law or policy as between different EU countries. [FN29] Unlike all other European conventions or statutes, the Regulation combines several international procedural and conflict of laws rules in one act.

### A. Scope of Applicability of the Regulation

To understand the scope of operation of the Regulation, it is necessary to understand the interplay between the provisions in Art. 1, which define the Regulation's ambit in terms of covered types of proceedings, and those of Art. 3, which prescribe the rules of international jurisdiction for all cases that fall within the Regulation's sphere of application.

#### 1. Proceedings Covered

According to Art. 1(1), the Regulation applies to 'collective insolvency proceedings which entail the partial or total divestment of a debtor and the appointment of a liquidator' instituted after the Regulation came into force. [FN30] 'Divestment' is a legal term that denotes any restriction on the debtor or its management in the administration of its business and the right to dispose of assets. Although 'partial divestment' suffices, there must be some degree of loss of the debtor's powers of administration and control over his affairs, whatever form this may take, [FN31] thereby excluding any type of insolvency proceedings that, though of a collective nature, leave the debtor in full control of his estate and business. [FN32] But simply meeting the aforementioned criterion is insufficient to come under the umbrella of the Regulation, since the term 'insolvency proceedings' as used in Art. 1(1) is specifically defined in Art. 2(a), which essentially refers to Annex A. Annex A, an integral part of the Regulation, contains a list of those proceedings, as contained in the laws of each Member State, which are thereby brought within the ambit of the Regulation. It should be pointed out that proceedings that, although complying with the definition set out in Art. 1(1), have not been expressly included in Annex A, are not affected by the Regulation. [FN33]

Closely related to the postulated prerequisite of 'divestment' is the requirement for the appointment of a 'liquidator.' This term is broadly defined in Art. 2(b) as "any person or body whose function is to administer or to liquidate the assets of which the debtor has been divested or to supervise the administration of his affairs." But again, what is decisive is whether the respective person is expressly mentioned in Annex C of the Regulation that sets out all potential officeholders who qualify as a 'liquidator' for each Member State respectively. [FN34]

The Regulation itself does not make any reference as to the legal form of the debtor. Therefore, it is applicable irrespective of whether the debtor is a natural person, legal entity, or other business structure, as long as the national bankruptcy laws of the court furnished with competent jurisdiction under the Regulation allow those persons to occupy the role of the debtor. [FN35]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-9    Filed 06/30/2008    Page 6 of 9

2004 NRTN-ASBL PT II § B                                                                     Page 5
2004 Ann. Surv. of Bankr. Law Part II § B

Art. 1(2) of the Regulation provides a carve-out to its scope by excluding insolvency proceedings concerning insurance undertakings, credit institutions, investment undertakings which provide services involving the holdings of funds or securities for third parties, or to collective investment undertakings. The rationale behind these exclusions is that these business structures are subject both to a separate legal framework at European level [FN36] and to extensive powers of intervention by their national supervisory authorities if they encounter financial difficulties.

### 2. Territorial Scope
#### a. The General Concept and its Uncertainties

Surprisingly, the Regulation itself does not stipulate its territorial scope. Only in the introductory notes to the Regulation is there a clear statement that it is designed to be of assistance only in proceedings where the debtor's center of main interests (hereinafter referred to as the "debtor's COMI" or just "COMI") is located within a Member State. [FN37] This limitation is of considerable importance because it excludes many cross-border bankruptcy proceedings from the ambit of the Regulation, even though interested parties and assets may be located within the EU. [FN38] In these cases, the pre-existing laws of the Member States, including their private international laws, apply separately with regard to both the subject of international jurisdiction over the debtor and the conduct of the proceedings and their international recognition and enforcement. [FN39]

Since the COMI concept is the linchpin of the Regulation's applicability, it is regrettable that this legal term, which is apparently amenable to interpretation, is a newly created phrase that is neither defined in the Regulation itself nor established under other European Law. Thus it is a source of uncertainty that will, particularly in large and complex cases, give rise to disputes.

Even more unresolved is the question whether there are additional prerequisites to be met to fall within the scope of the Regulation. [FN40] Although it seems obvious that bankruptcy proceedings in purely national settings in which the debtor has no connection to a foreign country have no need for coordinating common rules on international jurisdiction as well as applicable law, the Regulation is almost completely silent on the prerequisites which make a case 'transnational.' [FN41] While there surely will have to be a connection to a third country by means of business activity conducted or assets located there, the question of whether this third country has to be among the Member States or if even links to Non-Member States will be sufficient to bring the Regulation into play is not addressed in the Regulation and is thus subject to debate. [FN42] These problems are not merely academic in nature, since the Regulation in its ambit displaces the international bankruptcy laws of the respective Member State. Thus the courts of a particular Member State may be deprived of their competent jurisdiction in these cases, which they would have validly assumed under their 'home law.' [FN43]

#### b. The Debtor's 'Center of Main Interests'

As indicated above, the main body of the Regulation does not include a comprehensive definition of the meaning to be ascribed to the debtor's COMI. Its meaning is merely conveyed by a single sentence in the introductory notes, [FN44] which states that the COMI "should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." Only in the case of a company or legal person is there a presumption favoring the place of its registered office to be its COMI. [FN45] Since this presumption is rebuttable, [FN46] the Regulation is apparently following a substance over form approach. Ultimately, this amounts to a victory for the civil law inspired 'real seat' theory as opposed to the 'state of incorporation' theory traditionally applied by countries associated with a common law tradition. [FN47]

Based on this concept, the Regulation may have a bearing on bankruptcy proceedings involving companies incorporated in the US or a tax haven but which carry on substantial business on a regular basis in the EU and are thereby associated with a particular Member State. In these cases, a Member State court could arguably come to the conclusion that the debtor's COMI is in fact in Europe, rather than within the respective foreign country. [FN48]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-9    Filed 06/30/2008    Page 7 of 9

2004 NRTN-ASBL PT II § B											Page 6
2004 Ann. Surv. of Bankr. Law Part II § B

With regard to natural persons, the Regulation also relies on the COMI concept [FN49] but does not presume a particular one. Hence the determination of a consumer's COMI will be dealt with on a case-by-case basis with the notion of ascertainability as a starting point. Recent case law seems inclined to locate the COMI at their place of habitual residence in cases of non-professionals and at their professional domicile in cases of professionals. [FN50]

Due to the fact that the Regulation is in its early days, case law illuminating the practice of the courts on how to construe the quite elusive COMI concept remains limited. Nevertheless, some decisions provide guidance in considering the two prongs of the recital's definition. Using the presumption contained in Art. 3(1) of the Regulation as a starting point, courts have regarded the location of the company's senior management and decision-making process as a significant factor, effectively akin to a "mind and management" test. [FN51] The second prong of the test, 'ascertainability by third parties,' has been neglected in an early unreported case [FN52] (Enron Directo Sociedad Limitada) where the court apparently focused on a head office test and the location of board meetings only. However, more recent case law shows that courts are more inclined to consider the position of third parties, particularly creditors. [FN53]

Despite the evolving nature of the relevant case law, there are three important points to note about the determination of the COMI. First, no single factor by itself determines the location of a company's COMI. Second, the location of a company's COMI is a question of fact. [FN54] Third, and most importantly, a company's COMI is mobile and can change as the underlying factors used for its determination change. [FN55]

### B. International Jurisdiction and Mutual Recognition
### 1. The Basic Principle

Art. 3(1) confers international jurisdiction to commence insolvency proceedings on the courts of that Member State in whose territory the debtor has its COMI. [FN56] According to the Virgos-Schmit report, [FN57] the rationale for this rule is rather obvious: Bankruptcy proceedings have a major impact on the legal position of the debtor's contractors and creditors. Therefore, their perception, implemented by means of the ascertainability component into the COMI concept, should be decisive with respect to the issue of international jurisdiction and the concomitant determination of the laws applicable to such proceedings. [FN58] Whether this perception is correct or whether this approach rather disservices the creditors' interests is debatable. [FN59]

It should be realized that, within the ambit of the Regulation, the jurisdictional rules contained in Art. 3 supersede all national laws on the same matter and do not generate an additional basis of jurisdiction to operate in parallel with national rules. [FN60] Despite this bright-line legal rule and the fact that any legal and natural person can have by definition only one COMI, there is a risk that the courts of the various Member States may take different views on the meaning of the concept on a similar set of facts, since the concept of the debtor's COMI does not provide a precise determination of this locus. In the absence of any procedure within the Regulation itself, a solution to this intra-community clash of jurisdictions may be twofold: Any inconsistency in interpretation could theoretically lead to a referral to the European Court of Justice (ECJ), the decisions of which would presumably eliminate some uncertainties. [FN61] But since the administration of bankruptcy cases usually demands swift action, this lengthy judicial process and the attendant delays in protecting or dealing with the debtor's estate seem to be incompatible with the needs of bankruptcy practitioners. [FN62] Another solution of this problem may be found in recital (22) of the Regulation [FN63] that establishes a simple priority rule. According to this approach, the Member State that first commences bankruptcy proceedings based on the COMI concept will prevail. [FN64]

Art. 16 provides that, once a court furnished with international jurisdiction under Art. 3 of the Regulation has commenced proceedings, the court order opening the proceedings will be recognized in the territories of all other Member States without any formal requirements such as court approvals, public authorization or exequatur of the court's injunction. [FN65] This recognition does not only entail mere acknowledgement of the judgment initiating the bankruptcy proceedings, but the judgment is generally afforded the same legal powers and consequences in any Member State as under the law of the state in which the case commenced. [FN66] The only valid basis to deny the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-9    Filed 06/30/2008    Page 8 of 9

2004 NRTN-ASBL PT II § B                                                                                Page 7
2004 Ann. Surv. of Bankr. Law Part II § B

recognition of a decision handed down in another Member State is, as always in international treaties and agreements, a contradiction of the public policy principle of the country where recognition is sought. [FN67]The fact that a particular debtor would not be considered insolvent or, even more seriously, is not eligible to be subject to insolvency proceedings in the other Member State is not an valid basis for the refusal of recognition. [FN68]

### 2. Limits to the Concepts of Universality and Unity

Notwithstanding this expanded approach, the Regulation does not necessarily associate the mutual recognition of proceedings with an ideal of unitary proceedings. While proceedings instituted under Art. 3(1) are referred to as main proceedings, [FN69] the courts of all Member States are not barred from commencing local proceedings if the particular debtor possesses an 'establishment' within the territory of that other Member State. [FN70]

These local proceedings can occur in two ways: Where proceedings are opened subsequently to main proceedings, Art. 3(2) refers to them as 'secondary proceedings' and determines that these have to be 'winding-up proceedings.' [FN71] Such secondary proceedings can be requested by the liquidator appointed in the main proceedings or by any other person empowered to do so under the law of the state where the additional proceedings are sought. [FN72] These secondary proceedings are established to serve what may seem two mutually incompatible purposes: First, they are designed to shield local interests, the local creditors' interests in the first instance, from the economic impact of the main proceedings. Second, they may support and assist the officeholder in the main proceedings in circumstances where the debtor's estate is too complex to be administered in its entirety. [FN73] According to Art. 28, the law applicable to the proceedings is, in general, the law of that Member State where the secondary proceedings are sought. Therefore, the particular debtor has to be eligible to occupy that role under local law, but there is no requirement to scrutinize the debtor's insolvency. [FN74]

Under even more restricted circumstances, territorial proceedings may also be initiated in advance of any main proceedings. In addition to the requirement of an 'establishment' of the debtor in that Member State, these antecedent proceedings are only permissible if (1) the national laws of the Member State where the debtor's COMI is located do not allow such proceedings or (2) either the requesting creditor has his domicile, habitual residence, or registered office in that Member State in whose territory the establishment is situated, or whose claim arises from the operation of that establishment. [FN75] Although these territorial proceedings are not confined to 'winding-up proceedings' as defined in Art. 2(c) of the Regulation, the subsequently appointed liquidator in the main proceedings may request their conversion if this proves to be in the interest of the creditors in the main proceedings. [FN76]

Unlike main proceedings, which are afforded the fullest benefits under the Regulation and enjoy extraterritorial effects throughout all the Member States by encompassing all of the debtor's assets and creditors, [FN77] territorial/secondary proceedings under Art. 3(2) and (4) are restricted to the territory of the Member State in which they are commenced. However, they are important, in as much as they amount to a localized derogation from the universal effects otherwise enjoyed by main proceedings involving the same debtor.

The key concept pertaining to the opening of local insolvency proceedings, irrespective of whether they are commenced before or after the main proceedings, is the existence of an 'establishment' belonging to the debtor. Art. 2(h) defines the term as "any place of operations where the debtor carries out a non-transitory economic activity with human means and goods." At first glance, this definition seems to be rather elusive and therefore amenable to interpretation. While obviously future case law is necessary to determine the legal denotation to be ascribed to this term, some guidance is already available. Generally speaking, the requirement of an 'establishment' is intended to limit opportunities for local creditors to avail themselves of the personal and technical advantages to be gained by means of secondary proceedings. [FN78] Hence the mere presence of assets, even if of substantial value, is insufficient to constitute an establishment, since the phrase 'place of operations' demands some activity exercised in the market that, in addition, seems to require a minimum level of organization and stability. [FN79] The negative prerequisite, or 'non-transitory' activity, prevents purely occasional and temporary places of operation from being classified as an 'establishment,' although there is no indication within the Regulation as to the minimum length of time after which an activity ceases to be regarded as 'transitory' for this purpose.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-9   Filed 06/30/2008   Page 9 of 9

2004 NRTN-ASBL PT II § B                                                                 Page 8
2004 Ann. Surv. of Bankr. Law Part II § B

### C. Uniform Conflict of Law Rules--Applicable Law

Because the Member States' domestic bankruptcy laws remain unharmonized at present, it is essential that there are unambiguous and uniform rules to determine which Member State's law is applicable to issues typically encountered during the course of bankruptcy proceedings. Against this background, Articles 4 through 15 amount to a miniature code of uniform conflicts rules that are an integral part of the Regulation's operation.

#### 1. The General Rule of Art. 4--The lex concursus

The cornerstone pertaining to the choice of law is Art. 4 of the Regulation. This provision stipulates in paragraph (1) the general approach that bankruptcy proceedings and their effects are governed by the laws of that Member State whose courts or other competent authorities have instituted the relevant proceeding [FN80] ('lex concursus' or 'lex fori concursus'), unless the Regulation states to the contrary. While the first sentence of Art. 4(2) is still vague, only indicating the applicability of the lex concursus with regard to the opening of those proceedings, their conduct, and their closure, the next sentence contains a non-exhaustive enumeration of 13 matters explicitly covered. [FN81] Although most of these topics are self-evident and arguably elementary to the course of bankruptcy proceedings to achieve their objective, some of them, however, eliminate uncertainties created by incoherent doctrines applicable in the various Member States. [FN82] Another important point about the choice of law provisions in the Regulation is that, wherever these provisions refer to 'the law' of a Member State, this only entails a reference to the substantive domestic laws and rules, exclusive of a Member State's set of conflicts rules. Although not explicitly stated in the Regulation, the doctrine of renvoi, [FN83] with its attendant complexities and inconsistencies, is excluded, since any recourse to this dogma would create havoc to the Regulation's very objective of seeking to harmonize choice of law rules. [FN84]

While this rule on conflicts of law is, in principle, valid for both the main proceedings and local proceedings, its significance is revealed with respect to the former only, because local proceedings are limited to the boundaries of that particular Member State anyway.

#### 2. Exceptions to the Basic Rule

Although the text of Art. 4 primarily deals with the annotation and exemplification of the lex concursus, the center of gravity seems to be the introductory phrase "save as otherwise provided in this Regulation" because a comprehensive list of exceptions is attached in Articles 5 through 15 of the Regulation. [FN85] These carve-outs were perceived to be unavoidable due to the automatic extension of the effect of main proceedings in all Member States, which may unduly interfere with the certainty of transactions carried out in these states and the associated legitimate expectations of the parties concerned.

Since the comprehensive illustration of the entire catalogue is far beyond the scope of this article, only three exceptions, which have a major bearing on cases in the commercial context, will be discussed in some detail.

#### a. Third Parties' Rights in rem

One of the most important exceptions to the general applicability of the lex concursus is to be found in Art. 5, which provides that security interests (rights in rem) of creditors or third parties in assets of the debtor that are situated in a Member State [FN86] other than the Opening State at the time of the opening of the proceedings will not be affected by the proceedings. [FN87] This reservation from the basic goal of universality was essential due to the special sensitivity and fundamental importance of secured credit for the financial markets in any market economy. It would not have been possible to subject these security rights to the bankruptcy laws of the Opening State because the Member States take widely differing views on the legal position and the treatment of secured creditors in bankruptcy proceedings. [FN88] In essence, Art. 5 allows the creditor to enforce his rights according to the lex situs over the collateral granted, and, if this law upholds his rights, he may by large proceed as if there were no bankruptcy of the debtor at all, with only two exceptions. First, the application of the lex situs does not supplant the lex concursus with regard to the avoidance of antecedent transactions and fraudulent conveyances. [FN89] Second, the secured creditor is not immunized against the effects of local insolvency proceedings instituted

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.