Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 1 of 10

2004 NRTN-ASBL PT II § B                                                                Page 9
2004 Ann. Surv. of Bankr. Law Part II § B

at the situs of the collateral. Hence the liquidator of the main proceedings or some other qualified party may have the opportunity to avail itself of these consequences, i.e. an automatic stay and the like, if the debtor has an establishment in the relevant Member State.

### b. Set-Off

As with security interests, there are different schools of thought in the Member States with regard to the operation of set-off in the event of the debtor's bankruptcy. [FN90] The basic rule as to whether the set-off of cross-claims is permissible in the bankruptcy environment is established in Art. 4(2), subparagraph (m) with the effect that it is for the lex concursus to determine the conditions under which rights of set-off may be invoked. An exception to this rule is contained in Art. 6(1), which allows set-off irrespective of its permissibility under the lex concursus if "such a set-off is permitted by the law applicable to the insolvent debtor's claim." [FN91] This opaque phrase is considered to earmark "the applicable law to the claim where the insolvent debtor is the creditor in relation to the other party." [FN92]

Most notably, the exception in Art. 6(1) referring to the laws applicable to the debtor's claim includes no restraint on the laws of the Member States so that the law of a third country may furnish the basis for the creditor's right to set-off his claims. With this in mind, the parties, where they are in a position to choose the applicable law, may find it beneficial to implement an express choice referring to the laws of a country whose rule concerning set-off provides for a legal treatment best tailored to their needs. [FN93]

Here again, the extended possibilities to retain the right to set-off are subject to the avoidance powers and the provisions on fraudulent transfers under the laws of that Member State where bankruptcy proceedings are pending. [FN94]

### c. Transaction Avoidance

The potential for impeachment of an insolvent debtor's pre-bankruptcy transactions, and likewise of any acts or dispositions of property carried out after the opening of the proceedings, is one of the key aspects of the bankruptcy process but again is subject to crucial variations as between different jurisdictions. [FN95] Therefore, the importance of Art. 4(2), subparagraph (m), which establishes the basic rule that the lex concursus shall be applied to determine the validity of the debtor's legal acts detrimental to the general body of creditors, cannot be underestimated. This provision is particularly far-reaching in its effect, because it is intended not merely to determine what procedural steps must be taken to bring about the invalidation or avoidance of such transactions, but also to displace any law which might otherwise have been applicable to govern the transaction had bankruptcy not supervened. [FN96] However, this general rule is subject to Art. 13 of the Regulation, which provides that the targeted transaction or act is not susceptible to any avoidance powers granted under the lex concursus if the person who benefited from an act detrimental to all the creditors proves (1) that the respective act is subject to the law of a Member State other than that of the Opening State, and (2) that the act would not be liable to challenge under that Member State's law.

### D. Coordination of Multiple Proceedings
### 1. Allocation of Assets

Since secondary proceedings will cover only the assets of the debtor located within the borders of the Member State in the territory of which the said proceedings are commenced, it is necessary to determine the proper location of the debtor's assets. [FN97] Art. 2(g) provides some assistance to determine this location in the case of three particular kinds of property, namely tangible property, registrable property, and 'claims.' Unsurprisingly, tangible property is considered to be located at the place where it is physically situated. In the case of property and rights for which public registration is required, the situs is in the Member State under the authority of which the respective register is kept. Harder to detect is the general situs of a 'claim.' Claims are deemed to be located in the Member State where the third party required to meet them has its COMI, to be determined in accordance with the test employed under Art. 3(1). [FN98]

### 2. Filing of Claims and Distribution of Dividends

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 2 of 10

2004 NRTN-ASBL PT II § B                                                                                     Page 10
2004 Ann. Surv. of Bankr. Law Part II § B

To ensure the equal treatment of unsecured creditors, the Regulation establishes several safeguards. The foundation for this objective is the immediate and non-discriminative notification to all creditors that the debtor is subject to an insolvency proceeding within the ambit of the Regulation. To achieve this goal, Art. 40(1) obligates either the court having jurisdiction or the liquidator appointed by it to communicate this information to all known creditors who have their habitual residence, domicile, or registered office in the other Member States. [FN99] The so-defined 'foreign creditors' are explicitly entitled to file their claims in any pending insolvency proceeding irrespective of whether the proceeding is a main proceeding or a secondary proceeding. [FN100] In addition, Art. 39 explicitly extends to each Member State's taxation and social security authorities the right to lodge claims in foreign proceedings, thereby eliminating the traditional rule against the enforcement of foreign revenue debt. [FN101]

Another safety measure ensuring the equal distribution of dividends is Art. 32(2). This provision allows all claims against a particular debtor to participate in every bankruptcy case pending throughout all Member States by entitling any liquidator to file all claims that have been filed in 'his' proceedings in any other bankruptcy proceeding instituted under the Regulation. [FN102]

While all this relates to the filing of claims, Art. 20(2) is the main tenet pertaining to the distribution of dividends. This provision establishes a 'hotchpot rule,' which is, in broad terms, a procedure that ensures equal distribution of dividends to the creditors regardless of the number of jurisdictions in which they have lodged their claims. [FN103] Despite all these efforts, there still might be an incentive for preferred creditors to institute secondary proceedings in their home country if a significant amount of the troubled debtor's assets is located in that locality. This is because the priority of claims is determined by the lex concursus [FN104] and, therefore, a particular creditor, e.g. a national tax authority enjoying preferential status under domestic laws but likely to be classified as an ordinary unsecured creditor in the other Member State's proceedings, is obviously benefiting from the commencement of secondary proceedings. [FN105]

### 3. Powers of and Cooperation Between the Liquidators
#### a. Powers of the Liquidators

Powers of the liquidators are primarily those of the liquidator appointed to administer the estate of the debtor in the course of the main proceedings (hereinafter referred to as the 'main liquidator') to whom a significant influence over the conduct and the closing of any pending secondary proceeding is granted.

According to Art. 18(1), a key and very sensitive effect of the recognition of the effects of main proceedings lies in the exercise of the main liquidator's powers bestowed according to the lex concursus in other Member States. [FN106] In particular, he is entitled to remove the debtor's assets from the territory of another Member State. [FN107] While these extraterritorial powers of the main liquidator extend to the territory of all other Member States, they obviously collide with the authority of a liquidator appointed in secondary proceedings (hereinafter referred to as 'secondary liquidator'). To avoid this discord, the main liquidator loses powers with regard to a Member State where subsequent proceedings are actually commenced or where they are irreconcilable with a preservation measure that has been taken there in relation to the debtor's assets following the taking of steps to open secondary proceedings. [FN108]

While the powers of the secondary liquidator are generally confined to the extent necessary to protect the integrity of 'his' proceedings, [FN109] all liquidators are compelled to establish their appointment by certified copy of the original decision evidencing their position as a liquidator, which may be required to be translated in the official language of that Member State in which he is about to exercise his powers. [FN110]

To ensure suitable notice of the commencement of bankruptcy proceedings to the interested public, any liquidator may request that both the opening decision itself and, where appropriate, the decision appointing him, be published in any other Member State in accordance with the publication procedures provided for in that Member State. [FN111] Furthermore, the liquidator may request that the court order opening the bankruptcy proceedings be entered in the land register, the trade register, and any other public register kept in the other Member State. [FN112]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 3 of 10

2004 NRTN-ASBL PT II § B                                                                 Page 11
2004 Ann. Surv. of Bankr. Law Part II § B

#### b. Cooperation Between the Liquidators

In the event that more than one bankruptcy proceeding is pending within the boundaries of the Member States, there is a palpable call for the coordination of the proceedings and cooperation between the officeholders to ensure speed and efficiency with regard to the liquidation or rehabilitation of the debtor's business, respectively.

The provision within the Regulation addressing this issue is Art. 31. According to paragraph (1) of this rule, all appointed liquidators are obligated to communicate information to each other. They are especially compelled to pass on pieces of information relevant to the other proceedings immediately. [FN113] This communication process among liquidators is supplemented by a comprehensive duty to cooperate, endorsed in paragraph (2).

While the aforementioned provisions make use of very unspecific and broad terminology, they are accompanied by an array of more precise specifications of these general obligations. In accordance with Art. 32(3), each liquidator is empowered to participate in any other proceeding on the same basis as a creditor. In particular, by entitling the liquidators to attend creditors' meetings in foreign proceedings, the presence of creditors and the expression of their interests through the liquidator is ensured. [FN114]

The Regulation places emphasis on the harmonization of pending bankruptcy proceedings with regard to their ultimate objective, e.g. the liquidation or rehabilitation of the debtor, by recognizing the primacy of the main proceedings and the attendant grant of several powers to the main liquidator. Under Art. 33, he is entitled to request a stay of any liquidation measure taken in the course of secondary proceedings. [FN115] The foreign court presiding over the relevant secondary proceedings may turn down the request only if "manifestly of no interest to the creditors in the main proceedings," a criterion justifiable in wholly exceptional cases only. However, it may require the main liquidator to provide for the adequate protection of the creditors' interests because the concomitant delay in liquidating the assets may well undermine their economic position. [FN116] The stay is limited to a maximum period of three months but an unlimited number of three-month extensions is permitted.

Under Art. 34(1), the main liquidator is empowered to propose a rescue plan, a composition, or a comparable measure where the law applicable to the secondary proceedings permits them to be terminated without liquidation. [FN117] This right is assisted by Art. 31(3), which requires the secondary liquidator to grant the main liquidator an early opportunity to submit proposals on the liquidation or use of the assets in the secondary proceedings.

While the Regulation gives detailed guidance on collaboration among appointed officeholders, it is entirely silent on cross-border assistance between bankruptcy judges. This is remarkable, since the mechanism of cooperation at the level of the courts has proved to be invaluable in several major cases. [FN118]

### III. THE REGULATION IN PRACTICE
#### A. General Acceptance of the Regulation by the Courts

Although the Regulation has as yet been in force only for approximately two years, there have been numerous cases that rely on the Regulation's provisions. [FN119] Out of the roughly 60 judgments and orders dealing with the Regulation, and having attained public interest, the relative majority by number was rendered by UK courts, followed by German and Dutch courts. Naturally, Art. 3 of the Regulation has been the center of interest because determining the international jurisdiction of a court is the starting point for almost every bankruptcy case. In the vast majority of cases, the courts have utilized this provision to justify assuming jurisdiction rather than declining it. [FN120] Examples of this approach are the insolvency proceedings in relation to *Enron Directo Sociedad Limitada*, [FN121]*Interrexx Enterprises Ltd.*, [FN122]*Vierlander Bau Union Ltd*, [FN123]*Eurofood IFSC Ltd.*[FN124] EMBIC Garantie Versicherungs-Vertrieb GmbH, [FN125] Hettlage AG & Co. KG, [FN126] and Mliekotej s.r.o. [FN127]

In relation to the universality of proceedings, the bankruptcy court of Duisburg, Germany, acknowledged that

Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 4 of 10

2004 NRTN-ASBL PT II § B                                                                Page 12
2004 Ann. Surv. of Bankr. Law Part II § B

main proceedings opened in accordance with Art. 3(1) of the Regulation encompass all of the debtor's assets wherever located in the Member States. [FN128] Other decisions have focused on the determination of the applicable law under the governance of Art. 4 of the Regulation. [FN129]

Even though the majority of cases deals with the straightforward application of the rules set out in the Regulation, some of them have had a major impact on its interpretation and have set off a considerable debate among European courts, practitioners, and academics. Some of these cases shall be introduced and discussed in some detail in the following part.

### B. Testing the 'Frontiers'

The concept of the debtor's COMI is not only the linchpin for the Regulation's applicability in general but also the cornerstone for the grant of international jurisdiction among the courts of the Member States. Since the legal implications of this concept sometimes are elusive, it is rather unsurprising that the two major lines of precedent have evolved around and are based on this subject. One focuses on the applicability of the Regulation to companies incorporated outside the Member States, the other centers on the issue of consolidated insolvency proceedings of affiliated entities.

#### 1. 'Exterritorial' Application of the Regulation

As already indicated, the Regulation's sphere of applicability is founded on the economic realities rather than the legal formalities, i.e. the place of incorporation, of a certain debtor. Therefore it was a mere question of time until the first case of a company incorporated in a Non-Member State would evolve. The waiting period proved to be rather short.

Although the first proceeding pertaining to this issue seems to be the [unpublished] case of the *Enron Finance and Energy Trading Corp*, a US company registered in Delaware, [FN130] the seminal case on this question was *Budget Rent-A-Car International* ('BRAC') that followed only one month later.

BRAC was incorporated and had its registered address in Delaware but, in fact, it had never traded there. Its commercial operations were almost entirely carried out in the UK where the company for some time had been registered as an overseas company according to the English Companies Act of 1985. Until recently, it formed part of the Budget Group of car rental companies in which BRAC was responsible for the operations in Europe, the Middle East, and Africa. Together with other (former) members of the Budget Group, it was subject to a reorganization process under Chapter 11 of the US Bankruptcy Code, instituted in July 2002. Creditors of BRAC had obtained an Italian arbitration award exceeding one million UK pounds and had already procured an interim charging order over BRAC's property in England. Since the moratorium effect of Sec. 362 of the Bankruptcy Code ('automatic stay') does not have direct effect in the UK, the need was felt to launch administration proceedings in the UK in order to gain protection against these judgment creditors.

In this setting, a petition for an administration order was presented by BRAC to the High Court of Justice Chancery Division Companies Court (England) on January 7, 2003. In the absence of explicit language in the Regulation indicating whether or not international jurisdiction granted under Art. 3 extends to companies incorporated outside the Member States, the court held that the only test for the application of the Regulation in relation to any given debtor is whether the debtor's COMI is in a relevant Member State and not where a debtor is incorporated. [FN131] In drawing this conclusion, the court relied on a textual interpretation of Art. 3(1) of the Regulation, which defines the scope of its applicability only in terms of the debtor's COMI, the absence of any express language excluding foreign companies, and the consideration that a narrow interpretation of this issue "would allow those who use corporate bodies to arrange that, although their business, assets and operations are based in a Member State, the relevant corporate body is incorporated outside the Community, so that the provisions of the Regulation would not apply to it or its assets."

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC     Document 26-10     Filed 06/30/2008     Page 5 of 10

2004 NRTN-ASBL PT II § B                                                                                                    Page 13
2004 Ann. Surv. of Bankr. Law Part II § B

It should be remembered however that BRAC was already subject to a US Chapter 11 process. A clash of proceedings, or at least an attempt to 'balance the equities,' did not occur as the creditors' committee in the US supported BRAC's petition. Future court cases can surely be expected, especially when the facts are not so self evident or when a creditors' committee in the US would oppose the petition.

### 2. Consolidated Insolvency of Affiliated Groups of Companies?

It is a fact that the majority of businesses, except perhaps for the financial services sector, [FN132] whether they have their registered office in the UK, Germany, or elsewhere in the Community, nowadays conduct their business in other Member States through locally-registered subsidiaries rather than branches or other establishments. [FN133] Ignoring this economic background, the Regulation is completely silent on the insolvency of affiliated groups of companies. [FN134] It furnishes no legal framework for joint or consolidated proceedings of economically-intertwined companies and does not even require special coordination among the relevant courts or appointed liquidators. Rather, it is built on strictly legal notions so that the assessment of a company's COMI has to be done, at least in theory, on a stand-alone basis. [FN135] Thus a locally registered subsidiary will not fall within the definition of an 'establishment' under Art. 3(2) [FN136] but is by itself a debtor with its own COMI, according to Art. 3(1), even if it is totally dependent on the parent company due to a control agreement or an agreement to transfer profits.

Although academics as well as practitioners perceive this silence as a striking omission, a comprehensive address of parent-subsidiary insolvencies, from a realistic point of view, seems to be rather unattainable at the present time. Even in Germany, which has probably the most advanced codified corporate law with regard to affiliated groups of companies ('Konzernrecht'), the national insolvency law fails to address this issue appropriately. Finally, any consolidated insolvency administration of affiliated companies in the transnational context would necessarily have entailed companies not only incorporated but also exclusively operating in another Member State, which presumably was regarded as an intrusion into the sovereignty of the affected Member State.

Based on this general concept, it is possible that, within the same affiliated group of companies, more than one main proceeding is conducted at the same time. In terms of efficiency, this surely is a disadvantage, especially if one takes into consideration that a rehabilitation effort is more likely to be successful if it extends to all entities of an affiliated group in financial distress.

#### a.) *Crisscross Telecommunications*

This perception has been challenged in the case of Crisscross Communications Ltd. In this case, large parts of an affiliated group of companies conducting its business and performing its executive functions predominantly in the UK were put into a insolvency proceeding governed by English law, [FN137] notwithstanding that, because of tax considerations relevant to the financing structure of the group, it had a holding company incorporated in the Netherlands. The outcome of the *Crisscross* proceedings is widely considered a success because a single insolvency practitioner with responsibility for more than 20 different companies sold the assets of the entire affiliated group around Europe to a single buyer. Even though this outcome should be appreciated from an economic perspective, the ultimate result is at least surprising if the introductory remarks on the Regulation's concept are taken into account.

#### b.) *Daisytek*--A European Odyssey

The *Crisscross* proceedings only form the backdrop to the *Daisytek-ISA* case, the insolvency of a pan-European group of electronic office equipment supply companies, which had its origin in the UK but caused major repercussions in Continental Europe.

This case started with a coordinated administration order by High Court of Justice in Leeds [FN138] in relation to 14 companies: 10 in the UK, three in Germany, and one in France. The court put the four foreign companies into administration since it was satisfied that these companies were either insolvent or likely to become insolvent within a short time and that the assets of those companies would probably be realized for a greater amount in administration than would be the case in the German or French equivalent of liquidation.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 6 of 10

2004 NRTN-ASBL PT II § B                                                                                   Page 14
2004 Ann. Surv. of Bankr. Law Part II § B

With regard to its international jurisdiction, the court referred to Art. 3(1) of the Regulation. The court took as its starting point the presumption in favor of the registered office (of the German companies in Germany), but ultimately rebutted it for several reasons. The court accepted from the evidence presented that the trading companies in Germany and France were part of a larger group of companies managed as a group to a large extent from Bradford, UK. [FN139]

Notably, the court made explicit reference to the ascertainability concept used in recital (13) of the Regulation and emphasized that the creditors of a company are the most relevant 'third parties' in the insolvency setting. Since one of the Bradford-based companies issued guarantees to major suppliers as well as to creditors of the French and German companies, and given the fact that their business was funded by a factoring agreement with an English subsidiary of the Royal Bank of Scotland, the court ruled that a large majority of the potential creditors by value knew that Bradford was the location where many important functions were administered. In addition, the court determined the retail activities of the German and French companies to be of no significance since their customers are far more likely to be debtors than creditors. Therefore, although each company's retail business was almost entirely carried out in France and Germany, respectively, the company's COMI was regarded to be within the UK.

It should be noted that the UK court's decision does not disregard the basic legal notion that each company's COMI has to be determined separately under the Regulation. Instead, the court focused on the close ties within the insolvent group that, in the opinion of the court, relocated the debtor's COMI to the UK where the main corporate functions were administered, although the concerned companies were registered, had their business premises, and were doing their business almost entirely in another Member State. As expected, this comprehensive assumption of transnational jurisdiction did not go unchallenged.

A few days after the decision of the High Court of Justice in Leeds, as mentioned before, a director of the German companies filed for bankruptcy in Dusseldorf, Germany. While the English court rendered the administration order on May 16, 2003, the Dusseldorf court issued the corresponding order instituting temporary bankruptcy proceedings three days later on May 19, 2003. On June 6, 2003, the German court, having in the meantime become aware of the proceedings pending in the UK, addressed the issue of its international jurisdiction in a subsequent court order. Here, the court expressly acknowledged the concept of universality laid down in Art. 3(3) of the Regulation, according to which a 'second' court can only initiate secondary insolvency proceedings, but it continued to deny recognition of the English administration proceedings pertaining to the same debtors. In the order, it was argued that the 'first' court had neither made any reference to the provisions of the Regulation [FN140] nor was it in accordance with the core principles set out in the Regulation, since the debtor was a legally and economically separate entity as opposed to a branch or establishment. Based on these presumptions, the Dusseldorf court regarded itself as being exclusively competent to open main insolvency proceedings. Accordingly, [main] insolvency proceedings were opened on July 10, 2003.

Being subject to an intermediary appeal, the lower court reversed its first decision, recognized the UK proceedings, and reduced the German proceedings to secondary in status.

As in Germany, a French lower court strongly objected to the English court order based on the same legal perceptions employed in Germany, but its decision was ultimately reversed on appeal. [FN141]

The decision of the lower court triggered a fierce debate among German academics with regard to the issue of competing courts and the appropriate method of resolving the associated questions. Although the straightforward approach of the English court was generally perceived to be rather excessive, the prevailing opinion nevertheless called for strict adherence to the principle that any subsequently invoked court should decline to entertain a filing of main insolvency proceedings. [FN142]

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-10    Filed 06/30/2008    Page 7 of 10

2004 NRTN-ASBL PT II § B                                                                    Page 15
2004 Ann. Surv. of Bankr. Law Part II § B

In line with the majority opinion, the local bankruptcy court for the district of Cologne, Germany, in January 2004 acknowledged an administration order of the High Court of Justice in Birmingham, UK, addressed to a company registered and conducting its business in Germany. Following an application by the administrators appointed by the English court, the German court agreed to open secondary proceedings under Art. 3(2) of the Regulation because the business structure of the company fitted the characterization of 'establishment' set out in Art. 2(h) of the Regulation. [FN143]

Inspired by the reasoning employed in the *Daisytek* case, several courts having international jurisdiction to open main insolvency proceedings for the (intermediate) parent company have extended their jurisdiction to insolvent foreign subsidiaries of the parent company. The presumption of Art 3 (1) in favor of the registered office was rebutted in each case in view of the fact that the business conducted on the subsidiaries level was effectively coordinated and administered at the parent company's head office which in effect 'reallocated' the subsidiary's COMI at the parent company's (registered) head office. [FN144] So far as conceivable, the courts competent for the locus of the subsidiaries' registered office have learned their lesson from Daisytek, recognized the decision of the 'first' court, and subsequently opened secondary insolvency proceedings only. [FN145] In view of these precedents it is a fair statement that the Regulation's blind spot on the insolvency of affiliated groups of companies has been addressed by a far-reaching interpretation of the COMI concept developed by the bankruptcy courts. However, it should be noted that this approach does not culminate in a material consolidation of the various main proceedings and, in addition, does not bar the opening of secondary insolvency proceedings at the venue of the subsidiaries' registered office. [FN146]

Despite this developing harmony and comity between the courts, the next controversial bankruptcy case is just evolving between Ireland and Italy with regard to the bankruptcy of Eurofood IFSC Ltd. [FN147]

### IV. FUTURE PROSPECTS
#### A. Prominent Unresolved Issues
#### 1. Clash of Jurisdictions

As already stated, the determination of a debtor's COMI is founded primarily upon whether it is ascertainable by third parties, a fact-based approach that is to a large extent susceptible to interpretation. Against this background, debtors with close administrative and operational connections to more than a single jurisdiction may seem, at first glance, amenable to the jurisdiction of more than one bankruptcy court, although every natural and legal person can logically have only one COMI. As the above-illustrated *Daisytek* case reveals, the problem is even more salient in relation to affiliated groups of companies because, in such a setting, the intra-group relations have to be assessed and weighed against the stand-alone position of the single entity.

Because any efficient administration of the debtor's estate is irreconcilable with protracted disputes on the subject of international jurisdiction, the most straightforward solution to intra-community clashes of jurisdiction is the plain first-in-time rule provided for in recital (22) of the Regulation. Although this solution offers an apparent bright-line rule, its legal validity is ultimately questionable. While the Council Regulation on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters expressly establishes both a strict priority rule (Art. 27) and a clear prohibition on scrutinizing the competent jurisdiction of the court rendering the decision (Art. 35(3)), the body of the Regulation itself is silent on these issues. The recital section is not an integral part of the Regulation but merely serves as a statement of reasons to meet the requirements of Art. 253 of the EC-Treaty. Moreover, Art. 16(1) of the Regulation only demands that judgments opening insolvency proceedings rendered by a court "which has jurisdiction pursuant to Art. 3 shall be recognized." Against that, it could be concluded that the mere contention by a court that it is furnished with international jurisdiction under the Regulation is insufficient to enjoy the benefits of mutual recognition. [FN148] Despite these legal doubts, the vast majority of German academics is in favor of the priority rule [FN149] because it provides certainty where inconsistencies could easily create turmoil with regard to the Regulation's primary objective, which is the expedient allocation of jurisdiction in insolvency situations among the Member States. In Germany, the first-in-time rule was firmly endorsed in formal legislation designed to revise the German international insolvency law in general but also to facilitate the interaction between the Regulation and

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-10   Filed 06/30/2008   Page 8 of 10

2004 NRTN-ASBL PT II § B                                                          Page 16
2004 Ann. Surv. of Bankr. Law Part II § B

the national law. [FN150]

Another conceivable gateway to challenging the jurisdiction of the court that has jurisdiction under the priority rule may be the ordre public reservation set out in Art. 26 of the Regulation. [FN151] This justifies the refusal of recognition if it "would be manifestly contrary to that State's public policy, in particular its fundamental principles or the constitutional rights and liberties of the individuals." As emphasized by the word "manifestly" as well as in the concluding phrases, the exception embodied in Art. 26 is intended to be of restricted application and should only be invoked in cases where there are grave implications for the maintenance of basic rights and freedoms within the recognizing state. Hence public policy considerations are typically [FN152] not a valid basis to refuse recognition of the first court's decision based on an asserted lack of jurisdiction since it is within the competence of the superior courts of the Opening State to review the competent jurisdiction of the lower court which opened the main proceedings in the first place. [FN153]

## 2. Insolvency Proceedings of Alien Companies: Corollary Problems

The COMI approach with its concomitant preference for economic realities over corporate formalities will presumably lead to a significant increase in the number of insolvency proceedings instituted with regard to foreign companies, e.g. companies incorporated in a country different from the Opening State. In this situation, the corporate debtor may be subject to the corporate laws of the country where it is incorporated and to the insolvency laws of the Member State where its COMI is located. Due to this bifurcation of the applicable law, the solution of several urgent and fundamental questions relevant to the bankruptcy of corporate entities seems to be rather protracted, since the lex societatis, i.e. the laws of the state of incorporation, of one country may prove to be irreconcilable with the standards set forth in the lex concursus of the country whose international jurisdiction is invoked under Art. 3(1) of the Regulation. But compliance with any relevant law is essential because most European jurisdictions impose civil and even criminal liability on directors or officers and, in more limited circumstances, on controlling shareholders who do not comply with the relevant insolvency or corporate laws. [FN154]

The questions that have to be resolved in this unclear legal environment pertain to fundamental issues such as, inter alia, the eligibility of the debtor to be subject to insolvency proceedings, the circumstances under which a duty to file for bankruptcy may arise, civil liability and criminal sanctions imposed on the debtor or its directors if a mandatory duty to file for bankruptcy is ignored, and the treatment of shareholders' loans to the debtor in the case of insolvency.

The following summary will address some of the aforementioned issues from the German legal perspective. It should be noted, however, that any reference hereinafter to the corporate law is not necessarily a reference to the corporate law in force at the foreign company's place of incorporation but may well be a reference to German corporate law because Germany, as a civil law inspired country, generally adheres to the real seat theory. [FN155]

### a. Eligibility of the Debtor

Any debtor willing or forced to commence insolvency proceedings in Germany has to be eligible for these proceedings in two respects: it needs to be incorporated in a legal form explicitly allowed to be subject to bankruptcy proceedings, and, in addition, the financial situation of the debtor has to have deteriorated to a certain level.

Because Art. 4 (2) subparagraph (a) of the Regulation expressly submits to the lex concursus any consideration against which debtors insolvency proceedings can be instituted, German law has to be applied even if the debtor is a foreign company. [FN156] Under Sec. 11 of the German Insolvency Act, insolvency proceedings may be instituted against the assets of an individual or a legal entity. Despite the seemingly all-encompassing nature of this provision, companies organized under foreign corporate laws do not automatically qualify as a 'legal entity' because some courts and academics confine this reference to legal entities incorporated under the governance of German laws. [FN157] However, even if the restricted view prevailed, the admissibility of foreign corporations to German insolvency proceedings could be based on the general notion that every 'business structure' equipped with the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

capacity to be subject to legal rights and duties is, as a corollary, eligible for insolvency proceedings because this is the only way to unwind the financial affairs of this debtor on a collective basis. [FN158]

Unlike under US bankruptcy law, which allows voluntary filings irrespective of the economic situation of the debtor, most European insolvency laws require certain preconditions to be met before a debtor is allowed to file for bankruptcy protection. Under the German Insolvency Act a debtor may file for bankruptcy only if it is fails to meet a cash flow test, [FN159] such situation is imminent [FN160] or, in the case of legal entities, fails to meet a balance sheet test [FN161] . Since Art. 4 (2) of the Regulation subjects 'the conditions for the opening of those proceedings' to the lex concursus, these conditions would have to be satisfied even if a foreign corporation were the petitioner. In the absence of such a financial status, a creditor may seek lower standards in another Member State where the debtor maintains an establishment because the commencement of territorial proceedings preceding main proceedings is expressly permissible under Art. 3 (4) subparagraph (a) of the Regulation.

### b.[In-]Voluntary and Mandatory Filings

Prerequisites for voluntary filings by the prospective debtor itself, as well as involuntary filings by creditors, are laid down in the German Insolvency Act [FN162] and therefore are undoubtedly subject to the lex concursus. [FN163] In brief, each board member with representative authority for a corporate debtor, as well as each general partner of a partnership who are personally liable, may voluntarily file for bankruptcy if the debtor is imminently illiquid. In addition, creditors, under certain circumstances may (involuntarily) file for bankruptcy against the debtor. [FN164]

The question as to whether the lex concursus or the corporate laws of the state of incorporation should govern becomes more protracted, and the ramifications are of deeper impact, when mandatory filing requirements are at issue because non-compliance with these provisions will often entail the imposition of civil liabilities and criminal fines. In Germany, for example, managing directors are required to file for bankruptcy without undue delay, and in any event, at the latest three weeks after the date on which they have become aware of the company's insolvency, i.e. their company fails either the balance sheet test or the cash flow test. [FN165] Taking the director of a UK Ltd. with COMI in Germany, the question is whether the strict German insolvency regime including the obligation to file for bankruptcy or the more relaxed UK insolvency rules apply.

The application of either the lex concursus or the lex societatis in this situation, is subject to a discussion in the German legal community with no obvious majority position having evolved yet. In favor of the latter alternative is the fact that the respective rules are stipulated in the various German company laws but not in the Insolvency Act itself. [FN166] Against this quite formal reasoning, some authors point to inseparable links between mandatory filing events and the bankruptcy process commenced over the estate of legal entities furnished with limited liability because the legislator favored the institution of bankruptcy proceedings on a timely basis to safeguard the interests of the company's creditors. [FN167]

Because of this legal uncertainty presumably prevailing not only in Germany, corporate directors should generally be advised to scrutinize both the allocation of their company's COMI, especially if the inter-company ties may point to a foreign jurisdiction, and the legal rules determining their duties applicable under these foreign bankruptcy laws. Only these comprehensive monitoring efforts may ultimately avoid any legal hazards arising out of non-compliance with mandatory filing requirements.

### c. Liability for 'Wrongful Trading'

In most European jurisdictions directors of a company have a duty to monitor, on a regular basis, whether the company can continue carrying on its business in light of its financial conditions. Depending on the particular jurisdiction, directors of a company incorporated under one of these laws may incur personal liability if they fail to file for bankruptcy within a legally prescribed time period or if they continue to carry on the business of an insolvent company. For example, in England, a director is exposed to civil liability for wrongful trading if, prior to entering into insolvency, the company continued trading without reasonable prospects of recovery. [FN168] In France, Art.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-10   Filed 06/30/2008   Page 10 of 10

2004 NRTN-ASBL PT II § B                                                                                                          Page 18
2004 Ann. Surv. of Bankr. Law Part II § B

624-3 of the Commercial Code ('Code de Commerce') imposes civil liability on the directors if they are found guilty of misconduct in the management of the company's business ('faute de gestion'). In such cases, the directors may be obligated to pay all or part of the company's debt, either as a result of separate proceedings against them ('action en comblement de passif'), or by way of an extension of the bankruptcy proceedings against the debtor to their personal assets.

In Germany, any managing director who fails to comply with mandatory filing requirements set out above will not only be subject to civil liability for losses incurred by the company and its creditors but is also exposed to criminal sanctions, i.e. fines and imprisonment for up to three years. [FN169]

Again, the question as to which law sets the standards for wrongful trading liability has to be determined. As with the debate over mandatory filing events, there are conflicting views on this issue in Germany. Those who favor deference to the corporate law of the state of incorporation with regard to filing requirements necessarily reach the same conclusion when it comes to the concomitant liability. [FN170] In the same way, their opponents reach the contrary view because any legal duty without accompanying liability is merely a legal 'phantom.' [FN171]

### d. Shareholders' Loans

In a situation of financial distress, loans made by a parent company to subsidiaries or affiliates or loans outstanding from one group company to another may represent a substantial portion of a company's debt. Similarly, a large portion of a parent company's contingent assets may be made up of loans it has made to its subsidiaries or affiliates. As a result, in bankruptcy proceedings, a parent company (and its creditors) may be competing with third party creditors of a subsidiary for the assets of this subsidiary. In this situation, the legal treatment of shareholder loans in the jurisdiction in which the indebted subsidiary has filed for bankruptcy will be a crucial factor in any recovery for the shareholders.

As a general rule, an unsecured shareholder loan to a company in Continental Europe will rank pari passu with unsecured loans of third party creditors. [FN172] Under German law, however, a shareholder loan is deemed an 'equity substitution' if it is made in circumstances where the company lacks adequate financial standing to obtain credit in the market.

In the bankruptcy of the company, all claims for repayment of an equity-substituting loan can only be asserted as subordinated claims ranking behind the unsecured creditors of the debtor and cannot even be filed without special invitation by the bankruptcy court. [FN173] If the loan is collateralized or the extended amount has been repaid, the shareholder is still not safe as the administrator can, within certain timeframes, challenge both the security interest and the repayment under the avoidance powers granted under the German Insolvency Act. [FN174]

Since the ranking of claims and the rules relating to the voidness or unenforceability of legal acts detrimental to all creditors are expressly mentioned in the list in Art. 4 (2) of the Regulation, it seems, at least at first glance, quite clear that the lex concursus will determine the status of shareholder loans, thus leading to the application of the comparatively harsh German rules if main insolvency proceedings are opened in Germany. [FN175] Some academics, however, prefer a differentiating approach according to which the insolvency laws of the Opening State are applied, but the determination of the preceding question, i.e. whether the shareholder loan is to be qualified as a capital substitution, is left to the corporate laws of the state of incorporation. Only if in this jurisdiction the capital infusion were deemed a surrogate for equity would the concomitant rules prevailing in the bankruptcy be applied. [FN176]

### B. Movable Center of Main Interests--Forum Shopping

One of the key objectives of the Regulation is to discourage prospective debtors from transferring judicial proceedings from one Member State to another, in search of a more favorable legal treatment. [FN177] Although this general aim is apparently promoted by the Regulation, it is questionable to what extent this aspiration is

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.