Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 1 of 10

2004 NRTN-ASBL PT II § B                                                    Page 19
2004 Ann. Surv. of Bankr. Law Part II § B

effectively attained because of exceptions contained in the Regulation itself and recent developments in the courts' handling of cases arising within the ambit of the Regulation which provide some attractive gateways for forum shoppers.

Taking Art. 3 (1) of the Regulation as a starting point, the Regulation basically follows a substance-over-form approach by employing the COMI concept to determine both international jurisdiction of bankruptcy courts as well as the applicable law. Because the effective center of business is the pivotal factor in establishing the proper venue of the insolvency proceedings, a prospective corporate debtor can still seek incorporation in a jurisdiction that affords the most sympathetic liquidation regimes just in case the economic undertaking ultimately fails but he will, at least in theory, encounter difficulties in implementing this strategic decision if the core of his business is effectively located and conducted in another Member State. However, the presumption contained in Art. 3 (1) of the Regulation, which militates in favor of the registered office of the corporate debtor being its COMI, contradicts almost all efforts to avoid forum-shopping at least in voluntary filings because the debtor will presumably avoid producing evidence to the contrary which would challenge his choice for the most convenient bankruptcy law. [FN178] Only creditor-driven applications are likely to convey facts about the debtor's business that are suitable to rebut the presumption that the COMI is in the jurisdiction of the registered office.

Another tool of leverage to achieve a more conducive climate for the debtor as well as his creditors is the exceptions to the applicability of the lex concursus set forth in Art. 5 through 15 of the Regulation. Art. 5 of the Regulation in particular provides a major loophole for legally adept and vigilant creditors who can manipulate their legal status simply by moving the portable assets of the debtor used as collateral in loan transactions into the territory of a Member State other than the Opening State before the bankruptcy proceedings are eventually commenced. [FN179]

Based on the uncertainties of the interpretation of the debtor's COMI, a debtor with significant business ties to more than one Member State may be able to choose the insolvency law of one of those jurisdictions by virtue of 'tipping the scales'. This can be done by means of relocating board meetings, the re-allocation of assets and the establishment of a banking relationship all within the territory of the targeted jurisdiction prior to the filing.

Cases like Daisytek, which seem to reveal a general approach in the UK courts towards the bankruptcy of groups of affiliated companies, provide an additional basis for forum shoppers based on the intra-group relations. Particularly if the financing and funding of the entire group is centralized with the parent company by entering into loan, cash-pooling or factoring agreements, there are prospects for the subsidiaries incorporated in another Member State to achieve insolvency proceedings under the jurisdiction within which the parent company's headquarters are located. The rationale for this decision may not only be a more favorable legal treatment but also the achievement of de facto consolidated proceedings which greatly enhance the feasibility of a rehabilitation of the entire group.

Maybe the widest avenue available to the debtor in choosing the applicable law is simply by selecting the court where the application for the institution of insolvency proceedings is filed. Since any court is generally inclined to assume jurisdiction over a particular case rather than to decline it, the debtor can have the justifiable expectation that the approached court will accept the application for the opening of bankruptcy proceedings if the debtor is able to produce coherent evidence to sustain his assertion that his COMI is maintained within the respective court circuit.

Given the automatic recognition of any judgment opening insolvency proceedings as provided for in Art. 16 of the Regulation, coupled with the first-in-time rule stipulated in recital (22) of the Regulation this judgment, even if untenable with regard to the entire business structure of the debtor, is indefeasible unless the 'first' court is willing, and legally able, to back out of the proceedings already commenced.

Because of the possibility of 'opting' for a set of bankruptcy laws, some experts do not consider the Regulation to be a tool to keep forum-shoppers at bay, but rather to be the stepping stone to Europe becoming the capital of forum

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 2 of 10

2004 NRTN-ASBL PT II § B                                                                     Page 20
2004 Ann. Surv. of Bankr. Law Part II § B

shopping. The biggest obstacle to exploiting these opportunities is identified as ignorance of the advisers involved. [FN180]

### C. Rescue Culture

Chapter 11 of the US Bankruptcy Code of 1978 provides for an expedient and efficient procedure for the rehabilitation of corporate debtors. Taking this approach as a model, many European countries have changed their general idea of bankruptcy proceedings from the basic notion of liquidation and distribution of proceeds to reorganization with the attendant preservation of resources with regard to employment and future tax revenues. [FN181] How will the Regulation affect this developing rescue culture?

#### 1. Single-Entity Business Structures

Generally, the reorganization of any commercial business in a transnational context requires a coherent administration of the entire business of the debtor entangled in bankruptcy proceedings. The existence of competing bankruptcy proceedings and the accompanying conflicts with regard to their respective scope is a major problem even in liquidation proceedings; they will likely add up to insurmountable obstacles when the rehabilitation of the debtor is sought.

Despite early uncertainties as described in this article, in the long run, the Regulation can be expected to serve as a facilitator for the reorganization of a single debtor since its core provisions, Art. 3 and 16, are designed to secure a proper allocation of international jurisdiction and a community-wide recognition of the court order opening main proceedings. Therefore clashes of international jurisdiction should be prevented and creditors should be hindered from enforcing their claims and security rights because the automatic stay usually associated with bankruptcy proceedings is in full force in any Member State.

But to the extent that important parts of the debtor's business are located in another Member State and qualify as an 'establishment,' the availability of secondary proceedings with another officeholder being appointed may seriously disrupt the implementation of a rescue plan. Even worse, pursuant to Art. 3 (3) of the Regulation, such secondary proceedings may only be a winding-up process. [FN182]

The only avenue available to the administrator of the main proceedings to still achieve an all-encompassing rehabilitation is to propose an alternative to the liquidation of the debtor's assets according to Art. 34 (1) of the Regulation if the law applicable to the secondary proceedings (lex concursus secundariae) allows for such proceedings to be closed without liquidation. [FN183] Due to the nature of this right of the main administrator of being a mere proposal, the competent institutions of the secondary proceedings have to endorse this proposition. [FN184]

#### 2. Affiliated Groups of Companies

Unlike the common practice in the US, a consolidation or at least a procedural joint administration of bankruptcy proceedings of affiliated companies is unknown in Germany and elsewhere in Europe. [FN185] Rather, the opening of several independent bankruptcy proceedings administered by various unrelated officeholders would be the expected result in this situation. [FN186]

Due to the silence of the Regulation on the insolvency of affiliated groups of companies, it may be inferred that it does not improve the rescue prospects of these business structures (compared with domestic laws). This perception, however, does not take the approach, taken by UK courts especially, into account. As several of the cases referred to above have demonstrated, the COMI concept favored by the Regulation is the foundation for these courts putting the entire group into bankruptcy proceedings under their auspices if at least the parent company or the company which carries out the headquarters function is within their jurisdiction. In combination with a strict application of the priority rule, this attitude seems to be a realistic solution to ensure a coordinated reorganization effort with regard to affiliated groups of companies under the patronage of a single court which, in turn, is able to appoint one single

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 3 of 10

2004 NRTN-ASBL PT II § B                                                    Page 21
2004 Ann. Surv. of Bankr. Law Part II § B

administrator. It appears that the solution offered by the UK courts easily avoids the related problems of uncoordinated bankruptcy proceedings and will have tremendous appeal to legal advisers in restructuring cases if a tenable link to that jurisdiction by the affiliated group of companies can be established.

While this approach taken by UK courts, at least at first glance, seems to be a solution of striking simplicity which may result in an European 'Delaware effect,' irrespective of the fact that this approach is subject to debate, there is still a risk for different sets of rules to apply:

Even if a subsidiary of a parent company cannot be classified as an establishment of the latter, [FN187] the 'real' place of business of the subsidiary itself will arguably fit under the definition of 'establishment' set forth in Art. 2 subparagraph (h) of the Regulation, which would allow the opening of secondary proceedings where the establishment is maintained. [FN188] Although this point of view is not free from doubt because the secondary proceedings would presumably encompass all of the subsidiary's assets, leaving the main proceedings behind as a virtually empty (procedural) shell, this interpretation seems inevitable. If the business operations do not qualify as an 'establishment,' there is no valid basis to open secondary insolvency proceedings [FN189] which would not only deprive the administrator of the main proceedings of a useful tool in managing the estate but would also exempt all secured creditors from the effects of the main proceedings, i.e. the automatic stay of all debt collection and enforcement actions. From the perspective of the main proceedings, the collateral is situated in another Member State and according to Art. 5 (1) of the Regulation not affected at all. [FN190]

Given that any rescue effort is doomed to fail if the secured creditors are not barred from depleting the estate, it is in the main administrator's best interest to open secondary proceedings. If the main administrator applies for them, he will have some influence over their future course [FN191] but will also have to deal with the constraint that these secondary proceedings must be winding-up proceedings.

### D. Center of Main Interests: A General Solution to Transatlantic 'Jurisdictional Clashes'

In the absence of an international treaty or agreement, the outcome of cross-border bankruptcy proceedings is almost unpredictable as some cases occurring in the past have demonstrated. [FN192] Although the Regulation is a crucial legal achievement in eliminating costly uncertainties associated with transnational bankruptcy cases within the boundaries of the European Union, it is a fact that business does not pause at the extended borders of this unified legal environment.

Notably, almost all of the influential cases referred to and discussed above have a connection with the US to some degree. The case of Enron Directo Sociedad Limitada was the first instance where an English court rebutted the presumption in Art. 3 (1) of the Regulation in order to assume international jurisdiction over a company incorporated in Spain. The "internationalization" of the Regulation, e.g. the application of the rules set out in the Regulation to companies incorporated outside the borders of the Member States, once again involved US companies incorporated in Delaware and, in the case of BRAC, the debtor in the European insolvency proceedings was also entangled in bankruptcy proceedings under Chapter 11 of the US Bankruptcy Code. [FN193] While a clash of jurisdictions was circumvented in the BRAC case because creditors in the US were supportive of the proceedings in the UK, such conflict surfaced in the case of Cenargo International ('Cenargo') and its subsidiaries. This group of affiliated companies filed for Chapter 11 protection in the US on January 14, 2003, although Cenargo was incorporated in England, had its banking facilities with an English bank, and had security rights over its assets governed by English law. Cenargo was linked to the US only in that bonds had been issued to US investors. At this stage Lombard, an entity forming part of the Royal Bank of Scotland Group and a creditor of Cenargo, defied the worldwide automatic stay provided for in Sec. 362 of the Bankruptcy Code and successfully petitioned to the High Court of England and Wales for partners in Ernst & Young to be appointed as provisional liquidators of Cenargo. The ultimate clash of jurisdictions was attained when Ernst & Young immediately obtained an injunction restraining Cenargo's directors from continuing the Chapter 11 case and Cenargo gained a similar injunction restraining Lombard and Ernst & Young from continuing the English insolvency proceedings.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 4 of 10

2004 NRTN-ASBL PT II § B                                                    Page 22
2004 Ann. Surv. of Bankr. Law Part II § B

Jurisdictional table tennis continued until the judges involved, Justice Lightman of the High Court of Justice in London and Judge Drain of the US Bankruptcy Court for the Southern District of New York, in a telephone conference held on April 14, 2003, ironed out the ramifications resulting from the bipolar contempt of court. Stressing the importance of harmony and comity in international cases, the judges eventually agreed that Cenargo's connections to the UK were overwhelming and, on the basis of a consensual petition, the partners of Ernst & Young were appointed as administrators by the English court, Chapter 11 proceedings suspended, and all of Cenargo's assets placed under the control of the English court.

Although the US court ultimately abstained from the case, Judge Drain was far from critical of the tenuous connections with the US needed for a debtor to seek bankruptcy protection in that jurisdiction, but stressed that US bankruptcy courts will carefully examine the appropriateness of the operation of the worldwide automatic stay if non-US companies file for bankruptcy under Chapter 11. Depending upon the circumstances, a request for deference to a foreign jurisdiction may be granted. Lombard was therefore criticized for breaching the automatic stay by presenting the petition to launch the provisional liquidation without first inviting the US court to defer.

The Cenargo case is definitely not the last transatlantic bankruptcy case to come. A general solution to avoid the waste of time and money spent in the first place on the allocation of the proper venue for a particular bankruptcy case could be the adoption of the approach taken by the Regulation, where main proceedings can only be opened in the jurisdiction were the debtor has its COMI. With Sec. 304 of the Bankruptcy Code, which highlights the equitable foundation of the bankruptcy laws, US judges definitely have the flexibility to grant appropriate relief.

This is even more so since Chapter 15, which is designed to ultimately repeal Sec. 304, in its Sec. 1502 (4) defines 'foreign main proceedings' as a foreign proceeding taking place in the country where the debtor has the center of its main interests. Hence, at least the text of the definition is entirely congruent with the definition of COMI under the Regulation. [See Norton Bankr. L. & Prac. 2d §§ 152:1 to 152:64.]

[FN1]. Lars Westpfahl is a partner in the Restructuring & Insolvency Group of Freshfields Bruckhaus Deringer. Jochen Wilkens is an associate in the Restructuring & Insolvency Group of Freshfields Bruckhaus Deringer.

[FN2]. U. S. Const. Art. I, § 8, cl. 4.

[FN3]. .

[FN4]. For an extended discussion of this project see Westbrook, The American Law Institute NAFTA Insolvency Project, 23 Brook. J. of Int'l L. 7 (Issue 1, 1997) and Westbrook, The Transnational Insolvency Project of the American Law Institute, 17 Conn. J. of Int'l L. 99 (Fall 2001).

[FN5]. OHADA is the abbreviation for "Organisation pour l.harmonisation en Afrique du droit des affaires."

[FN6]. Art. 247 through 256 of the "Uniform Act Organizing Collective Proceedings for Wiping Off Debts" deal with cross-border aspects of bankruptcy proceedings (visited October 22, 2004) http://www.ohada.com/textes.php?categorie=656.

[FN7]. Draft Model Legislative Provisions on Cross-Border Insolvency, adopted on May 30, 1997 by the UNCITRAL, U.N. GAOR, 52nd Sess., Supp. No. 17, U.N. Doc. A/52/17 (1997). For the contents of the draft see Fletcher, Bridges to the Future--Building Tomorrow's Solution for International Insolvency Problems, 4 Company Financial and Insolvency L. Rev. 161 (2000). A short discussion of the Model Law is also comprised in Westbrook, A Global Solution to Multinational Default, 98 Mich. L. Rev., 2276 (June 2000).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-11   Filed 06/30/2008   Page 5 of 10

2004 NRTN-ASBL PT II § B                                                          Page 23
2004 Ann. Surv. of Bankr. Law Part II § B

[FN8]. The Model law has been 'adopted' in Eritrea, Japan, Mexico, Romania, South Africa, Serbia, and Montenegro. For an overview of the adoption process in Japan, see Matsushita, UNCITRAL Model Law and the Comprehensive Reform of the Japanese Insolvency Laws, in Legal Aspects of Globalisation 151 (Jurgen Basedow & Toshiyuki Kono eds., 2000). In the US, a new Chapter 15 of the Bankruptcy Code is pending which comprises 32 sections almost mirroring the Model Law. See Wessels, European Union Regulation on Insolvency Proceedings, 20 Am. Bankr. Inst. L. J. 24, 31 (Nov. 2001). As the legislation process of the bankruptcy reform is because of other issues in limbo, the undisputed chapter 15 has not yet been enacted. The desirable legislation on cross-border insolvency seems to be held hostage for the solution of the shattering questions concerning consumer insolvency. Cf. Oversight Hearing on the Need for Bankruptcy Reform Legislation - Hearing of the Judiciary Committee of the House of Representatives, March 4, 2003 at http:// www.house.gov/judiciary/miller030403.htm (last visited April 4, 2004).

[FN9]. Indeed, Art. 220 (4) of the Treaty Establishing the European Economic Community (EEC), signed in Rome on March 25, 1957, commonly known as the (first) Treaty of Rome, commits the Member States to negotiating a series of conventions for the benefit of their nationals, including one to secure 'the simplification of formalities governing the reciprocal recognition and enforcement of judgments of courts or tribunals and of arbitral awards'.

[FN10]. Among the Member States, there are differences, in approach, for example, to balancing the debtor's versus his creditors' interests, the relationship between the opportunities to restructure insolvent but principally viable business structures and optimal creditor protection, and the protection of labor versus economic efficiency. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 491 (Fall 1996)**.

[FN11]. This Convention would have found its legal basis in Article 220 of the Treaty of Rome.

[FN12]. Moss et al., The EC Regulation on Insolvency Proceedings 2-3 (2002).

[FN13]. The first Member States of the European Economic Community (EEC) and the signatories of the Treaty of Rome were Belgium, France, Germany, Italy, Luxembourg, and the Netherlands. The differences within the EEC grew even deeper in 1973 with the accession of the United Kingdom and the Republic of Ireland, two countries generally adhering to the common law system, and Denmark, whose law is part of the Scandinavian family of legal systems. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 491 (Fall 1996)**.

[FN14]. The Council of Europe, founded on May 5, 1949 and headquartered in Strasbourg, France, is an international organization that promotes the cooperation of European Countries, predominantly in the areas of human rights, justice, and cultural affairs. It should not be confused with the EU Council of Ministers. The latter is frequently referred to as the European Council.

[FN15]. Altogether, the concept of unity was abandoned and the principle of universality drastically reduced in scope. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 494 (Fall 1996)**.

[FN16]. Therefore, the Istanbul Convention was nicknamed a "Convention a la carte" during negotiations. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 494 (Fall 1996)**.

[FN17]. Usually, EEC/EU rules are drafted by the Commission and then passed on to the Council of Ministers as the law-making body of the Community. Deviating from this practice, the EEC Council of Ministers set up this working group itself that was, in addition, not chaired by a governmental official but a private practitioner, the German Mr. Manfred Balz.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 6 of 10

2004 NRTN-ASBL PT II § B                                                                Page 24
2004 Ann. Surv. of Bankr. Law Part II § B

[FN18]. The Convention was open to accession until May 23, 1996.

[FN19]. Community Conventions under Art. 220 of the Treaty of Rome (as originally numbered; now numbered as Art. 293 of the Consolidated EC Treaty) are negotiated by all existing members of the Community (now the EU) as at the time of their adoption, and require the ratification of all Member States in order to enter into force.

[FN20]. Council Regulation (EC) 1346/2000 of May 29, 2000 on insolvency proceedings, 2000 O.J. (L 160), 1-13.

[FN21]. The last successful multi-national treaty on insolvency within Europe was the Nordic Convention on Bankruptcy for Denmark, Finland, Iceland, Sweden, and Norway, signed in Copenhagen, Denmark, on November 7, 1933. See 155 L.N.T.S. (League of Nations Treaty Series) 115. For its contents see Bogdan, The Nordic bankruptcy convention, in Current Developments in International and Comparative Corporate Insolvency Law, Chapter 31 (Jacob S. Ziegel ed.,1994).

[FN22]. Council Regulation (EC) 44/2001 of December 22, 2000 on jurisdiction and enforcement of judgments on civil and commercial matters, Jan. 16 , 2001 O.J. (L 12) 1-23.

[FN23]. See Andreas F. Lowenfeld, International Litigation and Arbitration, 52 and 95 (2nd ed., 2002). During the preparation of these documents, bankruptcy proceedings were seen as a special subject requiring separate treatment. See Wessels, European Union Regulation on Insolvency Proceedings, 20 Am. Bankr. Inst. L. J. 24 (Nov. 2001).

[FN24]. Art. 44 of the Regulation contains a comprehensive but still not exclusive list of nine bilateral conventions and treaties and two multilateral conventions superseded by the Regulation.

[FN25]. Arts. 1 to 42 were, with two specific exceptions in Art. 5 and 42, almost directly copied in the transformation from the Convention into the Regulation. The vast majority of changes in the concluding part of the Convention are due to the altered nature of the legal instrument itself. For example, while the Regulation does not need to contain any express provisions relating to its interpretation by the European Court of Justice (ECJ) since the authority flows automatically from the EC Treaty, the Convention had to specifically confer jurisdiction to the same court to ensure its unified interpretation. See Wessels, European Union Regulation on Insolvency Proceedings, 20 Am. Bankr. Inst. L. J. 24 (Nov. 2001). For a more comprehensive synopsis, see Gabriel Moss et al., The EC Regulation on Insolvency Proceedings, 12 (2002).

[FN26]. This change in legal form was feasible because the Treaty of Amsterdam, dated October 2, 1997, came into force in the meantime, which, in Art. 65, established the competence to regulate the area of judicial cooperation at the European level.

[FN27]. Hereinafter "Member States", the "European Union" or "EU" refer to all Member States of the European Union except Denmark, which in 2002, when the Regulation came into force, were Belgium, Germany, Greece, Spain, Sweden, France, Ireland, Italy, Luxembourg, the Netherlands, Austria, Portugal, the United Kingdom and Finland. In May 2004 the Regulation gained even more importance as ten more states joined the EU (Cyprus, the Czech Republic, Estonia, Hungary, Latvia, Lithuania, Malta, Poland, Slovakia and Slovenia), so the regulation today is in effect in 24 European countries.

[FN28]. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 42 (2002).

[FN29]. Ashton et al., When a Multinational Group of Companies is in Financial Difficulty, 30 Int'l Bus. L. 350 (September 2002).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 7 of 10

2004 NRTN-ASBL PT II § B                                                              Page 25
2004 Ann. Surv. of Bankr. Law Part II § B

[FN30].   The time limitation is stipulated in Art. 43 of the Regulation. Bankruptcy proceedings initiated before May 31, 2002 continue to be governed by the law applicable to them at the time they commenced. In the absence of a retrospective effect of the Regulation, the various national provisions on international bankruptcy law, as well as a variety of bilateral conventions between the Member States, are still good law for this category of cases.

[FN31].   See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 49c, in The EC Regulation on Insolvency Proceedings 263, 276 (G. Moss et. al. eds., 2002). This report was produced during the concluding phase of the negotiations for the Convention under the auspices of the Council of the European Union. The text was circulated in draft form among the Member States, and was revised in the light of resulting comments. It was never formally adopted or officially published by the EU Council. Because of the close identity in substance between the Convention and the Regulation, the Virgos-Schmit Report effectively operates as a commentary on the Regulation. It is authoritative but not binding.

[FN32].   Gabriel Moss et. al., The EC Regulation on Insolvency Proceedings, 37 (2002).

[FN33].   See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 48, in The EC Regulation on Insolvency Proceedings 263, 275 (G. Moss et. al. eds., 2002). Gabriel Moss et. al., The EC Regulation on Insolvency Proceedings 36 (2002).

[FN34].   The technique of listing all included subject-matter by name has been adapted from the Istanbul Convention and provides the advantage of eliminating any uncertainty regarding the types of proceedings, and the types of officeholders, to which the Regulation applies. The associated drawback, i.e. changes in national laws are not automatically incorporated, is mitigated by Art. 45 of the Regulation, which provides a simple procedure for amendment of the Annexes at any time.

[FN35].   See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 74, in The EC Regulation on Insolvency Proceedings 263, 281 (G. Moss et. al. eds., 2002). The laws of a number of Member States follow the tradition whereby insolvency proceedings cannot take place against the debtor who is not classified as a merchant. This is the case in Belgium, France, Greece, Italy, Luxembourg, Portugal and Spain.

[FN36].   Council Directive (EC) on the reorganization and winding up of insurance undertakings 2001 O.J. (L 110) 28-39 and Council Directive (EC) on the reorganization and winding up of credit institutions 2001 O.J. (L 125) 15-23. Council Directive (EC) on settlement finality in payment and security settlements systems, No. 998/26/EC of May 19, 1998 O.J. (L 166) 45.

[FN37].   See recital (14) of the Regulation. The recitals are not an integral part of the Regulation but serve as a preamble or statement of reasons. See Art. 253 EC Treaty.

[FN38].   This limitation is particularly significant because it can produce the effect that bankruptcy proceedings involving a debtor with quite substantial connections with one or more Member States will nevertheless be outside the scope of the Regulation, if the debtor's COMI happens to be outside the EU.

[FN39].   Illustrative on this issue is the case *Geveran Trading Co. Ltd. v Kjell Tore Skjevesland*, First instance: [2002] EWHC 2898 (Ch), [2003] BCC 209, on appeal: High Court 11 November 2002 [2003] BCC 391, regarding a debtor, who is a Norwegian citizen, domiciled in England for a period of three years prior to the proceedings, and also domiciled in Spain and in Switzerland. The debtor tried to defend himself against a creditor's petition for insolvency in the UK by asserting close ties with Spain and Switzerland. The competent High Court did not allocate his COMI in Spain, but in Switzerland. Since the latter is not a Member State, the Regulation was inapplicable and, as a consequence, the English court could apply its domestic jurisdiction based on sec. 265 Insolvency Act 1986.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 8 of 10

2004 NRTN-ASBL PT II § B                                                    Page 26
2004 Ann. Surv. of Bankr. Law Part II § B

[FN40]. In re BRAC Rent-A-Car International Inc, 24 ZIP 813 (2003), the English High Court of Justice Chancery Division Companies Court seems to indicate that there is no further requirement as the location of the debtor's COMI is within the boundaries of the Member States.

[FN41]. From the contents of recitals (2) and (3), it can be inferred that the Regulation is only designed to promote the efficiency of transnational insolvency proceedings, thereby excluding mere national settings from its scope. See also Henriette-Chrisitina Duursma-Kepplinger et al., Europaische Insolvenzordnung, Kommentar, 82-83 (2002).

[FN42]. From the conception of the Regulation it seems that it deals only with intra-community cooperation in insolvency matters and not with the cooperation of Member States with third countries, therefore demanding for a transnational relation of the debtor to another Member State. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 497 (Fall 1996)**; Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 11, in The EC Regulation on Insolvency Proceedings 263, 268 (G. Moss et. al. eds., 2002); Henriette-Christina Duursma-Kepplinger et al., Europaische Insolvenzordnung 83 (2002); Smid, Vier Entscheidungen englischer und deutscher Gerichte zur europaischen internationalen Zustandigkeit zur Eroffnung von Hauptinsolvenzverfahren, 13 DZWiR 397, 402 (October 2003). Opposing this restricted view Huber, Internationales Insolvenzrecht in Europa, 114 ZZP, 136, 138 (2001); Herchen, Scheinauslandsgesellschaften im Anwendungsbereich der Europaischen Insolvenzverordnung, 6 ZinsO 742, 747 (August 2003).

[FN43]. It should be realized that the jurisdictional rules in Art. 3 of the Regulation operate in an exclusive manner and do not merely generate an additional basis of jurisdiction to operate in parallel with national rules. Thus, the Regulation overrides any rule of national law whereby such a debtor might otherwise have been amenable to insolvency proceedings in that state. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 38 (2002).

[FN44]. See recital (13) of the Regulation.

[FN45]. See Art. 3 (1) of the Regulation.
    This view was also taken by the Supreme Court of Ireland in re *Eurofood IFSC*, court docket number 147/04, decided on July 27, 2004; published in ZIP 25 (2004), 1969 and also available under http://www.eir-database.com/word_ doc/Judgments_28_c.pdf (visited October 25, 2004). The High Court of Justice Chancery Division Companies Court Leeds in the matter of Ci4NET.COM Inc. & DBP Holding Ltd., Case Nos. 556 and 557 of 2004, held, however, that the presumption in favor of the registered office is not a particularly strong one since the location of the registered office is merely one of the factors to be taken into account in reaching a conclusion as to the location of the COMI. This ruling is published in ZIP 25 (2004), 1769.

[FN46]. No further indication is given as to the nature or degree of proof required to overcome this presumption. At least, it can be hypothesized that the burden of proof will be upon any party wishing to displace the Regulation's conclusion as to the whereabouts of a COMI.

[FN47]. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 38 (2002). According to Mr. Balz, the chairman of the Working Group that drafted the Convention, the Regulation is generally more influenced by the civil law of the continent of Europe than by the common law systems of the UK and Ireland. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L.J. 485, 491 (Fall 1996)**

[FN48]. A more detailed discussion of this scenario will be provided in III. B. I, **infra**.

[FN49]. According to Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 75, in The EC Regulation on Insolvency Proceedings 263, 281 (G. Moss et. al. eds., 2002) the use of the term

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-11    Filed 06/30/2008    Page 9 of 10

2004 NRTN-ASBL PT II § B                                                    Page 27
2004 Ann. Surv. of Bankr. Law Part II § B

'interests' was intended 'to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to include the activities of private individuals (e.g. consumers)'.

[FN50]. See the UK case of *Geveran Trading Co. Ltd. v Kjell Tore Skjevesland*, First instance: [2002] EWHC 2898 (Ch), [2003] BCC 209, on appeal: High Court November 11, 2002 [2003] BCC 391. The understanding of the COMI concept in cases involving natural persons varies among the courts. In August 2002, the German LG Wuppertal, 5 ZinsO 1099 declined to assume jurisdiction over the estate of a natural person because 10 days before filing for insolvency protection she moved to Spain in order to live and work there. Seemingly irreconcilable with this result is a judgment rendered by the Court of Appeal Amsterdam, June 17, 2003, 2003 JOR 186, where the court maintained jurisdiction although the debtor had moved to France one year before and had ceased all professional activities conducted in the Netherlands at the same time.

[FN51]. Some of the principal factors that courts have looked to regarding the first limb of the recital definition are: Where are the company's head office functions carried out? Where are the senior officers based and where are their offices? Where do the company's board meetings take place?

[FN52]. The case of Enron Directo was argued before the High Court in London on July 4, 2002, roughly only one month after the Regulation had come into force. The company was incorporated in Spain with its immediate parent company also located in Spain. The 42 employees' contracts were written under Spanish law, all customers were based in Spain, the company's main bank account was maintained in Madrid, and two out of three directors were actually based in Spain. Despite all these ties to the country of incorporation, the English court assessed the debtor's COMI to be in the UK because administrative and treasury functions were carried out through a team located in London where, in addition, all human resource activities, as well as all compliance and regulatory matters relevant to a company active in the electricity industry were determined and reviewed.

[FN53]. Factors considered under the key point of ascertainability are: Where are the company's assets? From where does the company trade/operate? From where are significant operational contracts negotiated? What law governs the main contracts? Where is the company's primary banking relationship maintained? Where is treasury management undertaken? Where are the company's employees located, where are they hired, and what law governs the terms of their employment?

[FN54]. See Philip Smart, Cross-Border Insolvency, 162 (2nd ed., 1998).

[FN55]. For a more comprehensive discussion of the concomitant consequences to the practice of legal advisors see infra IV. B.

[FN56]. The national law of the Member State concerned determines which national court within the territory of that Member State that is. See recital (15) of the Regulation.

[FN57]. Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency proceedings, para 75, in The EC Regulation on Insolvency Proceedings 263, 281-282 (G. Moss et. al. eds., 2002).

[FN58]. As a general rule, Art. 4 (1) of the Regulation stipulates that the law applicable to insolvency proceedings and their effects shall be that of the Member State whose courts instituted the proceedings in question.

[FN59]. Since the determination of the debtor's COMI is primarily a question of fact to be decided on a case by case base, it is essential to those who need to calculate commercial or financial risk by reference to the impact of insolvency law upon their rights and interests not to rely upon an investigation focused on the laws of the state of incorporation of the debtor company. If there are indications that the company's interests are administered from the territory of another state on a regular basis, the possibility that the presumption contained in Art. 3 (1) can be

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-11   Filed 06/30/2008   Page 10 of 10

2004 NRTN-ASBL PT II § B                                                                                           Page 28
2004 Ann. Surv. of Bankr. Law Part II § B

rebutted should be explored and any necessary precautions taken.

[FN60]. See Herchen, International-insolvenzrechtliche Kompetenzkonflikte in der Europaischen Gemeinschaft, 7 ZInsO 61, 62 (February 2004) and Gabriel Moss, et al., The EC Regulation on Insolvency Proceedings, 38 (2002).

[FN61]. Just recently, the German BGH, ZI P, 25 (2004), 94 invoked the European Court of Justice to decide a question relating to the international jurisdiction of a certain German court under the Regulation if, as in the case, preliminary insolvency proceedings are already opened with regard to a natural person in Germany but the 'preliminary debtor' moves to another Member State before formal insolvency proceedings are commenced.

[FN62]. See Herchen, International-insolvenzrechtliche Kompetenzkonflikte in der Europaischen Gemeinschaft, 7 ZInsO 61 (February 2004).

[FN63]. The relevant part of recital (22) of the Regulation states: "The decision of the first court to open proceedings should be recognized in the other Member States without those Member States having the power to scrutinize the court's decision."

[FN64]. This attitude is in alignment with Art. 35 (3) of the Council Regulation (EC) 44/2001 of December 22, 2000 on jurisdiction and enforcement of judgments on civil and commercial matters, Jan. 16, 2001 O.J. (L 12) 1, 10 pursuant to which Member States may not challenge the jurisdiction of another Member State where the judgment was rendered. Pointing in the same direction, the German legislator enacted Art. 102 § 3 EGInsO (Introductory Act to the Insolvency Act) that orders German courts to refrain from exercising their jurisdiction if a court in another Member State has already instituted a proceeding.

[FN65]. This provision only pertains to the court order formally commencing the insolvency proceedings. On the other hand, the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters does not only exclude the aforementioned court orders from its sphere but all judgments that derive directly from the bankruptcy or winding up and are closely connected with the insolvency proceedings. See also the decision of the Court of Justice of the European Communities Case 133/78, Gourdain v. Nadler, 1979 ECR 733. In order to avoid a perceived gap between those recognition and enforcement regimes, Art. 25 was implemented in the Regulation. This provision orders that all judgments or court orders which concern (1) the course and closure of insolvency proceedings, (2) compositions approved by the 'opening' court, (3) judgments deriving directly from the insolvency proceedings and which are closely linked with them, even if they are rendered by another court, and (4) judgments relating to preservation measures taken after a request for the opening of insolvency proceedings are recognized and enforced according to Art. 31 through 51 of the Brussels Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, 1990 O.J. (C 189) 1. This reference does not make the Convention applicable by itself but is simply incorporating the relevant sections of the Brussels Convention into the Regulation irrespective of the genuine inapplicability of the former. This mechanism is illustrated in Art. 25(2) of the Regulation which in respect of all other judgments refers to the Brussels Convention as well, provided that it is applicable. In any event, the reference to the Brussels Convention seems to be a mistake because it was superseded by the Regulation on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters on March 1, 2002 for all cases except those involving relations between Denmark and the other Member States. Therefore, it appears that the reference is targeting Art. 38 through 58 of the aforementioned Regulation.

[FN66]. See Art. 17 (1) of the Regulation. The local law of the court instituting the insolvency proceeding is referred to as the "lex concursus" or "lex fori concursus," see Wessels, European Union Regulation on Insolvency Proceedings, 20 Am. Bankr. Inst. L. J. 24, 25 (November 2001).

[FN67]. See Art. 26 of the Regulation.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.