Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 1 of 12

2004 NRTN-ASBL PT II § B                                                    Page 29
2004 Ann. Surv. of Bankr. Law Part II § B

[FN68]. The latter case is explicitly considered in Art. 16 (1). To give an example, the reader may consider a French attorney who runs his law office in Hamburg/Germany, who is, according to applicable German law, regarded as insolvent and therefore a bankruptcy proceeding is instituted, France would have to recognize the procedure, although only merchants are eligible for bankruptcy proceedings under French law. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L .J. 485, 514 (Fall 1996)**.

[FN69]. The words 'main (insolvency) proceedings' appear in recitals (12), (16) through (20), (22) and (23) and in Arts. 3 (4), 27, 29 (a), 31, 32, 34, 35 and 37 of the Regulation.

[FN70]. Art. 16 (2) expressly provides that the recognition of the main proceedings shall not preclude the opening of secondary proceedings.

[FN71]. This term is defined in Art. 2 (c) to, basically, mean insolvency proceedings involving the liquidation of the assets of the debtor. But, once again, the definition is accompanied by a reference to Annex B where lists are provided, state-by-state, of the proceedings that are classified as 'winding up proceedings' for this purpose.

[FN72]. Art. 29 of the Regulation.

[FN73]. See recital (19).

[FN74]. Art. 27 of the Regulation.

[FN75]. Art. 3 (4) of the Regulation. These restrictions upon the right to request the opening of territorial proceedings are clearly aimed at preventing disruptive tactics on the part of creditors who do not have a close personal nexus with the jurisdiction in which the debtor's establishment is located. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 43 (2002).

[FN76]. Art. 37 of the Regulation.

[FN77]. The Regulation does not expressly provide whether main proceedings cover the assets and creditors of a particular debtor on a worldwide basis or only as far as the Member States are concerned. Recital (12) arguably points to the global approach by stating that "these proceedings have universal scope and aim at encompassing all of the debtor's assets." Less ambiguous are Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, in The EC Regulation on Insolvency Proceedings 263, 281 (G. Moss et. al. eds., 2002) on this issue. In para (73), they clearly indicate that main proceedings aim to reach all of the assets of a particular debtor on a worldwide basis and affecting all creditors, wherever located. Even though this universal approach can provoke serious conflicts with jurisdictions of Non-Member States, the Regulation does not provide any means to address and resolve such disputes. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L .J. 485, 507 (Fall 1996)**.

[FN78]. Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 43 (2002).

[FN79]. See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 71, in The EC Regulation on Insolvency Proceedings 263, 281 (G. Moss et. al. eds., 2002).

[FN80]. Art. 4 (1) refers to this state as the "State of the opening of proceedings." For brevity's sake, this will be referred to as the 'Opening State.'

[FN81]. These determined issues are in particular: (a) against which debtor insolvency proceedings may be brought

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC     Document 26-12     Filed 06/30/2008     Page 2 of 12

2004 NRTN-ASBL PT II § B                                                                                    Page 30
2004 Ann. Surv. of Bankr. Law Part II § B

on account of their capacity, (b) the assets which form part of the estate and the treatment of assets acquired by or devolving on the debtor after the opening of the insolvency proceedings, (c) the respective powers of the debtor and liquidator, (d) the conditions under which set-off may be invoked, (e) the effect of insolvency proceedings on current contracts to which the debtor is party, (f) the effect of the insolvency proceedings on proceedings brought by individual creditors, with the exception of pending lawsuits, (g) the claims which are to be lodged against the debtor's estate and the treatment of claims arising after the opening of insolvency proceedings, (h) the rules governing the lodging, verification and admission of claims, (i) the rules governing the distribution of proceeds from the realization of assets, the ranking of claims and the rights of creditors who have obtained partial satisfaction after the opening of insolvency proceedings by virtue of a right in rem or through a set-off, (j) the conditions for and the effect of closure of insolvency proceedings, in particular by composition, (k) creditors' rights after the closure of insolvency proceedings, (l) who is to bear the costs and expenses incurred in the insolvency proceedings, and (m) the rules relating to the voidness, voidability or unenforceability of legal acts detrimental to all the creditors.

[FN82]. This is, for example, true with regard to Art. 4 (2) subparagraph (a) since there is a wide diversity between the insolvency laws of the 24 Member States concerning the types of debtors to which the different kinds of insolvency proceedings are applicable.

[FN83]. 'Renvoi' (French: 'sending back') denotes the situation if one source of law refers a case to the law of a certain state and the conflict-of-laws rule law of this state refers the case back to the substantial law of another state.

[FN84]. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 507 (Fall 1996)**; Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 46 (2002).

[FN85]. These are third parties' rights in rem (Art. 5), set-off, (Art. 6), reservation of title (Art. 7), contracts relating to immovable property (Art. 8), payment systems and financial markets (Art. 9), contracts of employment (Art. 10), effects on rights subject to registration (Art. 11), community patents and trademarks (Art. 12), detrimental acts (Art. 13), protection of third party purchasers (Art. 14), effects on insolvency proceedings on lawsuits pending (Art. 15).

[FN86]. If, as the case may be, the collateral is located in a Non-Member State, the choice of law provision of Art. 5 is inapplicable and it is the law of the 'Opening State' that determines the rights of any party which are amenable to the jurisdiction of the lex concursus. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 53 (2002).

[FN87]. Reservation of title is basically equated to a security interest for the purposes of the Regulation. See Art. 7 of the Regulation and Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L .J. 485, 509 (Fall 1996)**.

[FN88]. While some insolvency laws do not have a major impact on the legal position of secured creditors, other proceedings such as the French 'redressement judiciaire' tend to interfere with these rights by inflicting rather substantial losses on the creditors for the benefit of the debtor and his rehabilitation. See Balz, The **European Convention on Insolvency Proceedings, 70 Am. Bankr. L. J. 485, 509 (Fall 1996)**.

[FN89]. Art. 5 (4) and 4 (2) subparagraph (m) of the Regulation.

[FN90]. While the UK treats set-off as a mandatory process in an insolvency environment, which must be applied as a matter of policy, the majority of Member States following the civil law tradition perceive set-off as a severe encroachment on the condicio par creditorum. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 56 (2002).

[FN91]. The exception provided in Art. 6 (1) of the Regulation is generally meant to enhance the possibility of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 3 of 12

2004 NRTN-ASBL PT II § B                                                      Page 31
2004 Ann. Surv. of Bankr. Law Part II § B

setting-off cross-claims between two parties. Therefore, the provision operates as a 'one-way street' that can be solely utilized if the lex concursus declines the set-off but it does not allow a creditor to be denied the benefit of a set-off that is available in accordance with the rule in Art. 4 (2) subparagraph (m).

[FN92]. See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 108, in The EC Regulation on Insolvency Proceedings 263, 289 (G. Moss et. al. eds., 2002).

[FN93]. Art. 3 of the Rome Convention on the Law Applicable to Contractual Obligations 1998 O.J. (C 27) 1, to which all Members of the European Union are or, at least, are about to become contracting parties, explicitly allows for the reference to the laws of a third country. Art. 3 (2) even authorizes the contracting parties to subject their contract to a law other than that which previously governed it at any time.

[FN94]. Art. 6 (2), which refers to Art. 4 (2) subparagraph (m) of the Regulation.

[FN95]. While most European insolvency systems consider avoidance to be governed by the insolvency law of the Opening State, Germany and some other countries tend to apply the law governing the challenged transaction or legal act (lex causae).

[FN96]. Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency proceedings, para 90, in The EC Regulation on Insolvency Proceedings 263, 289 (G. Moss et. al. eds., 2002).

[FN97]. The location of assets belonging to the debtor is not only essential to the demarcation of the estates administered in main and secondary proceedings, but also for the purposes of applying the rule in Art. 5, which pertains to the applicability of either the lex concursus or the lex situs to security interests of third parties. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 52 (2002).

[FN98]. Therefore, the place of performance or the place at which the debtor expressly agreed to be sued in the case of non-performance are completely irrelevant to the determination of the claim's situs. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 52 (2002).

[FN99]. The contents of this notification are spelled out in Art. 40 (2). The individual notice shall in particular include time limits, penalties imposed if these time limits are not complied with, the body or authority empowered to accept the filing of claims, and it shall indicate whether secured creditors need to file their underlying claims. While the body of this notice is merely required to be written in the official language of the Opening State, the general heading 'invitation to lodge a claim' and 'time limits to be observed' is required to be composed in all 11 (currently) official languages of the EU. See Art. 42 (1) of the Regulation.

[FN100]. See Art. 32 (1) of the Regulation. According to Art. 42 (2), creditors may file in their own language but they may be required to provide a translation into the official language of the Opening State. Contents required for the filing documents are specified in Art. 41 of the Regulation.

[FN101]. It has been a long established precedent that the English public policy rule forbids the direct or indirect enforcement of foreign penal or revenue claims. See Government of India v. Taylor [1950] AC 491 (HL).

[FN102]. This mutual right of the liquidators avoids the need for the single creditor to file its claim in every pending proceeding to assure its equal participation in dividends distributed on a European-wide basis. The Regulation does not provide a clear solution if both the liquidator and the single creditor file in one proceeding identical or at least overlapping claims. Since the pari passu ranking of all (unsecured) creditors is one of the hallmarks of the Regulation, the claim can only be counted once. It is suggested that in those cases of double filing, it remains the creditor's claim and only the creditor can vote on it and receive dividends. See Gabriel Moss et al.,

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 4 of 12

2004 NRTN-ASBL PT II § B                                                                 Page 32
2004 Ann. Surv. of Bankr. Law Part II § B

The EC Regulation on Insolvency Proceedings 221 (2002).

[FN103]. The relevant part of Art. 20 (2) states that a creditor who has obtained a dividend on its claim in the course of an insolvency proceeding "shall share in distributions made in other proceedings only where creditors of the same ranking or category have, in those other proceedings, obtained an equivalent dividend."

[FN104]. See Art. 4 (2) subparagraph (i).

[FN105]. Gabriel Moss et al., The EC Regulation on Insolvency Proceedings 219 (2002).

[FN106]. This provision seems to be incoherent with Art. 18 (3) because the latter obligates the main liquidator to comply with the local laws of that other Member State. Different views have evolved on how to reconcile these seemingly incompatible provisions. The preferred view suggests that it is not the local laws which actually determine the powers of the liquidator but that the manner in which a liquidator is to exercise his 'home' powers is to be determined by local law. Gabriel Moss, et al., The EC Regulation on Insolvency Proceedings 200 (2002).

[FN107]. This removal does not alter the rights of third parties obtained by means of a security right or a reservation of title according to Art. 5 and 7 respectively because the law applicable to such rights is determined by their physical location at the time the main proceedings are commenced.

[FN108]. Art. 18 (1) of the Regulation.

[FN109]. According to Art. 18 (2) of the Regulation, the secondary liquidator is entitled to claim, whether through the courts of any Member State or out of court, that movable property has been removed from the territorial scope of the secondary proceedings after their opening.

[FN110]. While this provision provides for a simple and inexpensive mode of proof of the appointment, there is no corresponding method of evidencing the powers conferred on the main liquidator under his 'home law.' Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 170, in The EC Regulation on Insolvency Proceedings 263, 300 (G. Moss et. al. eds., 2002) suggest that this proof may be established by an appropriate order of the court appointing the respective liquidator.

[FN111]. Art. 21 (1) of the Regulation.

[FN112]. Art. 22 (1) of the Regulation.

[FN113]. While the provision itself only refers to the progress made in filing and verifying and all measures aimed at the termination of the proceedings, Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 229, in The EC Regulation on Insolvency Proceedings 263, 312 (G. Moss et. al. eds., 2002) contains a more comprehensive but presumably still not exclusive list.

[FN114]. See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 240, in The EC Regulation on Insolvency Proceedings 263, 314 (G. Moss et. al. eds., 2002). Although it is apparent that the foreign liquidator is entitled to express his opinion in the course of the proceedings, the Regulation does not establish the specific contents of the liquidator's right of participation. Remarkably, the Regulation is even silent on the subject of whether the foreign liquidator is capable of voting the claims filed according to Art. 32 (3) on behalf of 'his' creditors.

[FN115]. This right may prove a valuable tool where the main liquidator is seeking to rescue, reorganize or sell the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 5 of 12

2004 NRTN-ASBL PT II § B                                                                Page 33
2004 Ann. Surv. of Bankr. Law Part II § B

business of the debtor as a whole and therefore needs to avoid any depletion of the debtor's estate in the secondary proceeding.

[FN116]. The protection may be afforded by any means the court deems appropriate to indemnify the creditors for their exposure to the deterioration of the assets or any losses incurred by means of lost interest. Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 244, in The EC Regulation on Insolvency Proceedings 263, 315 (G. Moss et. al. eds., 2002) solely suggest a guarantee.

[FN117]. While Art. 3 (3) of the Regulation confines the ultimate objective of secondary proceedings to the liquidation of the debtor's assets, Art. 34 (1) seems to open the back door if the rehabilitation of the particular debtor is feasible by allowing the secondary proceedings to pursue the general goal of reorganization if the main liquidator makes such a request and the local law permits this basic alteration.

[FN118]. See Wessels, *European Union Regulation on Insolvency Proceedings*, 20 Am. Bankr. Inst. L. J. 24, 31 (Nov. 2001).
   Just recently, the American Law Institute, in association with the International Insolvency Institute, published "Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases." The text of these guidelines is available under: http://www.iiiglobal.org/international/projects/ali.pdf (visited October 25, 2004).

[FN119]. A non-exhaustive list of cases decided under the governance of the Regulation is provided on the Internet: http://www.eir-database.com/various_options.asp (visited October 25, 2004).

[FN120]. One of the few instances where a court abstained from assuming jurisdiction based on the Regulation is the decision rendered by the German LG Wuppertal on August 14, 2002, 5 ZinsO (2002), 1099. The court clearly states that the domestic laws on jurisdiction are supplanted by the Regulation and held, therefore, the German courts incompetent to commence insolvency proceedings because the debtor had moved to Spain for good before.

[FN121]. This is one of the first cases that deal with the rebuttal of the presumption in favor of the registered office of a company contained in Art. 3 (1) of the Regulation. In this case, a creditor of a company incorporated in Spain petitioned for the opening of main proceedings in the UK. The court in London accepted evidence that, although the registered office was in Spain, the head office was in England, as the entire principal executive, strategic and administrative decisions in relation to the financials and activities of the company were conducted in London. Based on this evidence, the court determined the company's COMI to be in England and therefore decided it had jurisdiction to open administration proceeding in the form of main proceedings. In academic reviews, this decision was criticized because the court's approach to the determination of the debtor's COMI assesses too much weight to the strategic decision process while overlooking the factor of ascertainability by third parties.

[FN122]. In this case, the Court of Appeal The Hague had to decide whether the COMI be in the Netherlands or in the UK. The company claimed its seat to be in Cardiff, UK, while one of its creditors had claimed that the liquidation was opened under Dutch laws. Since both shareholders of the company lived in the Netherlands and the effective maintenance of a headquarter in Cardiff proved to be questionable at best, the court defeated the companies' motion to dismiss the instituted proceedings. The unpublished case is reported by Bob Wessels, The European Union Insolvency Regulation: It's First Year in Dutch Court Cases 4 (2003) http://www.iiiglobal.org/country/netherlands/IIIMay03.pdf (visited October 25, 2004).

[FN123]. AG Hamburg, ZIP 24 (2003), 1008.

[FN124]. Eurofood IFSC Ltd. is a subsidiary of Parmalat SpA, the major global food company incorporated in Italy which is entangled in bankruptcy proceedings after a major accounting fraud was revealed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 6 of 12

2004 NRTN-ASBL PT II § B                                                                                    Page 34
2004 Ann. Surv. of Bankr. Law Part II § B

[FN125]. AG Monchengladbach, ZIP 25 (2004), 1064. In this case the court held that the debtor's COMI was in Germany rather than in the UK just one day before the hearing would have taken place in the British court.

[FN126]. AG Munich, ZIP 25 (2004), 962. In its decision, the court assumed international jurisdiction over a subsidiary of a German debtor although the former had its registered office in Austria.

[FN127]. Municipality Court of Fejer/Skékesfehérvár (Hungary) assumed international jurisdiction over two subsidiaries of the Parmalat group. One of the entities was actually based and registered in Hungary while the other was registered in Slovenia. The commented decision is available under http://www.eir-database.com/word_doc/Judgments_47.pdf (visited October 25, 2004).

[FN128]. AG Duisburg, NJW-RR 18 (2003), 556.

[FN129]. Cases relating to the applicable law pertaining to lodging of claims, set-off, and transaction avoidance are reported by Bob Wessels, The European Union Insolvency Regulation: It's First Year in Dutch Court Cases 5 (2003) http://www.iiiglobal.org/country/netherlands/IIIMay03.pdf (visited October 25, 2004).

[FN130]. In this non-contentious liquidation proceeding, which did not arouse much attention in the legal community, the invoked English court answered the predominant question in the affirmative, e.g. applicability of the Regulation even if the debtor is incorporated in a Non-Member State.

[FN131]. High Court of Justice Chancery Division Companies Court [2003] EWHC 128; [2003] 1 WLR 1421.
The High Court of Justice Chancery Division Companies Court Leeds in the matter of Ci4NET.COM Inc. & DBP Holding Ltd., Case Nos. 556 and 557 of 2004 endorsed this notion. In these cases the debtors were incorporated in Delaware (Ci4 Net) and in Jersey (DBP Holdings). The background of the case is outlined in 42 Global Turnaround, issue July 2004, p. 1 and commented by Westpfahl/Wilkens, Art. 3 EuInsVO 8/04, 20 EWiR 847 (2004).

[FN132]. As indicated above, the financial services sector is, in large parts, excluded from the scope of the Regulation, Art. 1 (2).

[FN133]. See von Wilmowsky, Internationales Insolvenzrecht - Pladoyer fur eine Neuorientierung, 51 WM 1461, 1462 (August 1997). Companies in regulated industries, such as telecommunications or utilities, usually must organize subsidiaries in each jurisdiction where they operate in order to procure local licenses or satisfy local regulatory requirements. See Ashton et al., When a Multinational Group of Companies is in Financial Difficulty, 30 Int'l Bus. L. 350 (September 2002).

[FN134]. Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 76, in The EC Regulation on Insolvency Proceedings 263, 282 (G. Moss et. al. eds., 2002) state quite candidly that the Regulation does not offer any rule for groups of affiliated companies.

[FN135]. Ashton et al., When a Multinational Group of Companies is in Financial Difficulty, 30 Int'l Bus. L. 350 (September 2002); Balz, Das neue Europaische Insolvenzubereinkommen, 17 ZIP 948, 949 (May 1996).

[FN136]. A debtor's subsidiary incorporated in a different Member State - even if the debtor is a 100% shareholder or dominates the subsidiary in another way - can only be regarded as a (passive) asset not fulfilling the prerequisites of an 'establishment.' See Peter Gottwald, Grenzuberschreitende Insolvenzen 21 (1997). In the English case of Telia v. Hillcourt, the court denied the notion that the business premises of a UK subsidiary can qualify as an 'establishment' of the Swedish parent company for the purposes of Art. 3 (2) High Court of Justice Chancery Division, 16 October 2002, No 6394 of 2002, (2002) EWHC 2377. This decision is a clear indication that an

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 7 of 12

2004 NRTN-ASBL PT II § B                                                    Page 35
2004 Ann. Surv. of Bankr. Law Part II § B

economic activity of a subsidiary cannot be imputed on the parent company. Paulus, Anderungen des deutschen Insolvenzrechts durch die Europaische Insolvenzverordnung, 23 ZIP 729, 730 (April 2002). Following a different approach: AG Koln, ZIP 25 (2004), 471. This court did not hesitate to subsume a separate legal entity under the definition of establishment when approached to institute secondary proceedings according to Art. 3 (3) of the Regulation.

[FN137]. The London High Court Chancery Division, order dated May 20, 2003 (unreported). A brief overview of the case is provided by Godfrey, Crisscross is first group Admin, 41 Global Turnaround 3 (June 2003).

[FN138]. High Court of Justice Leeds, ZIP 24 (2003), 1362.

[FN139]. The evidence presented to the court indicated that Bradford was the center of commercial activities under several aspects: the contracts with major suppliers as well as major customers were negotiated there, all senior management was recruited in consultation with the headquarters in Bradford, all information technology and support, as well as all corporate identity and branding are run by the headquarters, the Continental companies were required to carry out their business in accordance with a management strategy plan drawn up in Bradford and required approval to purchase anything in excess of Euro 5,000.

[FN140]. The assertion that the Leeds Court did not even mention the Regulation clearly is a misperception because, in fact, the English court made extensive reference to the Regulation and undertook a comprehensive effort to establish its international jurisdiction based on the COMI concept. This misunderstanding occurred presumably since the English court provided the reasoning for its decision only after a considerable period of time lapsed.

[FN141]. In France, the Tribunal de Commerce of Pontoise on May 26, 2003 declined to recognize the English court order as validly constituting main proceedings under the Regulation and put the French company ISA Daisytek SAS into 'redressement judiciaire' which is an Annex A proceeding under the Regulation and not a liquidation proceeding required in secondary proceedings. The apparent refusal to recognize the preceding court order was primarily based on the perception that the English court had erroneously assumed the amenability of a French legal entity to English court proceedings because the notion of 'group' does not have any legal bearing under the Regulation which strictly adheres to the concept of legal separateness of the affiliated members of the business group. On September 4, 2003, more than three months after the lower court's decision, the Appeal Court of Versailles refuted the legal reasoning of the court of first instance and, as a consequence, accepted the assumption of international jurisdiction of the English court under Art. 16 of the Regulation, which ultimately derogates the power of a 'second' court to commence main proceedings. Eventually, the lower court's order was overturned and the appointment of the Administrateur Judiciare nullified. The decision of the court of appeals is published in ZIP 25 (2004), 377.

[FN142]. Paulus, Zustandigkeitsfragen nach der Europaischen Insolvenzverordnung, 24 ZIP 1725 (September 2003); Paulus, Art. 3 EUInsVO, 2/03, High Court of Justice in Leeds (Companies Court), Beschl. v. 16.5.2003 - No. 861 - 876/03, 19 EWiR 709 (2003); Herchen, International-insolvenzrechtliche Kompetenzkonflikte in der Europaischen Gemeinschaft, 7 ZInsO 61 (February 2004). Critical to the first-in-time rule Mankowski, Art. 3 EuInsVO, 3/03, AG Dusseldorf, Beschl. v. 6.6.2003 - 502 IN 126/03, 19 EWiR 767 (2003).

[FN143]. AG Koln, ZIP 25 (2004), 471.

[FN144]. AG Munich, ZIP 25 (2004), 962. In In re Hettlage, the court assumed international jurisdiction over a subsidiary of a German debtor although the former had its registered office in Innsbruck, Austria. In In re Zenith Maschinenfabrik Austria the AG Siegen (Germany) assumed international jurisdiction for the opening of main insolvency proceedings also for an Austrian subsidiary; the court order is available under http://www.eir-database.com/word_doc/Judgments_46_1.pdf (visited October 25, 2004). In In re Aim Underwriting Agencies

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-12   Filed 06/30/2008   Page 8 of 12

2004 NRTN-ASBL PT II § B                                                                                      Page 36
2004 Ann. Surv. of Bankr. Law Part II § B

(Ireland) Limited, the UK High Court assumed jurisdiction over an Irish subsidiary based in Dublin; the court order dated July 2, 2004, is available under http://www.eir-database.com/word_doc/Judgments_46.pdf (visited October 25, 2004). See also Municipality Court of Fejer/Skékesfehérvár (Hungary) available under http://www.eir-database.com/word_doc/Judgments_47.pdf (visited October 25, 2004). The court assumed international jurisdiction over a subsidiary with registered office in Slovenia.

[FN145]. Landgericht Innsbruck, ZIP 25 (2004), 1721 (In re Hettlage) and Landgericht Klagenfurt (In re Zenith Maschinenfabrik Austria) available under http://www.eir-database.com/word_doc/Judgments_46_2.pdf (visited October 25, 2004).

[FN146]. The impact of the two sets of insolvency proceedings pending with regard to one debtor is expounded under IV.C.2., infra.

[FN147]. In the case of Eurofood IFSC Ltd., the High Court of Dublin appointed a provisional liquidator on January 27, 2004. On February 19, 2004, a court located in Parma, Italy, commenced main proceedings under Art. 3 of the Regulation over the same company. The Italian court did not perceive the proceedings pending in Ireland as an obstacle because provisional proceedings are not a recognized proceeding under Annex A of the Regulation. The Irish court's reaction followed on March 23, 2004 when the court disregarded the Italian decision and opened (formal) main insolvency proceedings under the governance of Irish law.
   The Italian court ruling is published in ZIP 25 (2004), 1120 while the ruling of the High Court of Dublin is available under http://www.eir-database.com/word_doc/Judgments_28.pdf (visited October 25, 2004). On July 27, 2004, the Supreme Court of Ireland endorsed the opening of main proceedings in Ireland but submitted a catalogue of five questions pertaining to the allocation of international jurisdiction to the European Court of Justice for final and binding adjudication. The Supreme Court ruling is published in ZIP 25 (2004), 1969 and isbalso available under http://www.eir-database.com/word_doc/Judgments_28_c.pdf (visited October 25, 2004).

[FN148]. In favor of this argument Mankowski, Art. 3 EuInsVO, 3/03, AG Dusseldorf, Beschl. v. 6.6.2003 - 502 IN 126/03, 19 EWiR 767 (2003).

[FN149]. Balz, Das neue Europaische Insolvenzubereinkommen, 17 ZIP 948, 949 (1996); Huber, Internationales Insolvenzrecht in Europa, 114 ZZP, 133, 143-144 (2001); Kemper, Die Verordnung (EG) Nr. 1346/2000 uber Insolvenzverfahren, 22 ZIP 1609, 1613 (September 2001); Luke, Das europaische internationale Insolvenzrecht, 111 ZZP 275, 290 (1998).

[FN150]. The German legislator enacted Art. 102 § 3 (1) in the Introductory Act to the Insolvency Code ('Einfuhrungsgesetz zur Insolvenzordnung'). Pursuant to this provision any petition to open main proceedings in Germany is void if proceedings are already pending in another Member State. If proceedings are launched erroneously, they have to be closed. There is a clear precedent that German Courts lack the power to scrutinize the foreign decision; see BT-Drucks 715/02, 17.

[FN151]. This provision echoes Art. 34 (1) of the Council Regulation on Jurisdiction and Enforcement of Judgments in Civil and Commercial matters.

[FN152]. In In re Eurofood IFSC, both the High Court of Dublin and the Irish Supreme court denied recognition of the Italian court order, inter alia, based on the public policy reservation contained in Art. 26 of the Regulation because the liquidator appointed in Ireland was allegedly denied the fundamental rights of a fair process and a fair hearing in Italy.

[FN153]. See Gabriel Moss et al., The EC Regulation on Insolvency Proceedings, 212 (2002) and Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, para 202, in The EC Regulation on

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC    Document 26-12    Filed 06/30/2008    Page 9 of 12

2004 NRTN-ASBL PT II § B                                                                                                    Page 37
2004 Ann. Surv. of Bankr. Law Part II § B

Insolvency Proceedings 263, 307 (G. Moss et. al. eds., 2002). See also Herchen, International-insolvenzrechtliche Kompetenzkonflikte in der Europaischen Gemeinschaft, 7 ZinsO 61, 65 (February 2004) and Luke, Das europaische internationale Insolvenzrecht, 111 ZZP 275, 287 (1998).

[FN154]. Ashton et al., When a Multinational Group of Companies is in Financial Difficulty, 30 Int'l Bus. L. 350, 351 (September 2002).

[FN155]. The real seat theory generally applies the corporate laws of that country where the corporate entity effectively maintains its administrative headquarters. By contrast, the state of incorporation theory strictly refers to the corporate laws of the country of incorporation to determine the legal status of the company concerned. Since the real seat of a company is not necessarily congruent with a registered office but has more similarities with the debtor's COMI, the applicable corporate law as well as the insolvency laws applicable under Art. 4 (1) of the Regulation may be those of one single Member State. Although the real seat theory would provide some consistency regarding the interplay between the two areas of the law, it will also undermine the legal status of the foreign legal entity because its legal form will generally be disregarded. This is illustrated by a case decided in May 2003 by the AG Hamburg, ZIP 24 (2003), 1008. The court determined that an English limited liability company, with a share capital of 100 UK pounds, was amenable to German insolvency proceedings in accordance with Art. 3 of the Regulation, but simultaneously denied limited liability to the shareholders because a company incorporated abroad is not incorporated in accordance with the German corporate laws and is therefore, by and large, treated as a general partnership. However, due to a line of cases decided by the European Court of Justice, which culminated in the Inspire Art Ltd. case, the real seat theory had to accept several major setbacks so that, at least in some respects, the state of incorporation theory will prevail. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZinsO 396 (May 2004) and Bayer, Die Entscheidung "Inspire Art" und die deutsche GmbH im Wettbewerb der europaischen Rechtsordnungen, 58 BB 2357 (November 2003).

[FN156]. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZInsO 396, 398 (May 2004)

[FN157]. AG Hamburg, ZIP 24 (2003), 1008; Eberhard Braun, Insolvenzordnung, 2d, 103 (2004). Based on recent decisions of the ECJ this traditional view is rejected by some academics who favor the recognition of foreign incorporated entities as legal entities even if they lack the respective prerequisites under German law. See Muller, Insolvenz auslandischer Kapitalgesellschaften mit inlandischem Verwaltungssitz, 6 NZG 414, 416 (May 2003).

[FN158]. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZInsO 396, 399 (May 2004).

[FN159]. According to § 17 InsO (German Insolvency Act), illiquidity shall be a general reason for the institution of bankruptcy proceedings. As a general rule, a company will be considered illiquid if it cannot meet its payment obligations as they fall due and such inability is not merely of temporary nature.

[FN160]. As stated in § 18 (2) InsO (German Insolvency Act), the debtor is facing imminent illiquidity if it will probably be unable to honor its existing payment obligations when due. Imminent illiquidity is a valid basis for the institution of insolvency proceedings only in the case of a voluntary petition.

[FN161]. According to § 19 (2) InsO (German Insolvency Act), over-indebtedness is defined as a financial situation where the assets of a debtor are insufficient to cover all his liabilities in full.

[FN162]. See § 15 InsO (German Insolvency Act).

[FN163]. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZinsO

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC     Document 26-12     Filed 06/30/2008     Page 10 of 12

2004 NRTN-ASBL PT II § B                                                                Page 38
2004 Ann. Surv. of Bankr. Law Part II § B

396, 399 (May 2004) and Muller, Insolvenz auslandischer Kapitalgesellschaften mit inlandischem Verwaltungssitz, 6 NZG 414, 416 (May 2003).

[FN164]. Section 15 (1) InsO (German Insolvency Act).

[FN165]. Under German law, the directors of a limited liability company (Gesellschaft mit beschrankter Haftung; GmbH, basically the equivalent of the LLC) have the duty to file for bankruptcy under § 64 GmbHG (German Act on Limited Liability Companies) if the company is illiquid or over-indebted without undue delay but in any case no later than three weeks after the date on which they have become aware of the company's illiquidity or over-indebtedness. The same duty applies to members to the board of directors ('Mitglieder des Vorstands') of stock corporations ('Aktiengesellschaften) under the auspices of § 92 AktG (Aktiengesetz; German on Stock Companies Act).

[FN166]. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZInsO 396, 399 (May 2004).

[FN167]. Muller, Insolvenz auslandischer Kapitalgesellschaften mit inlandischem Verwaltungssitz, 6 NZG 414, 416 (May 2003) and Alexander Trunk, Internationales Insolvenzrecht 104 (1998).

[FN168]. See § 214 Insolvency Act (1986).

[FN169]. See § 401 (2) AktG (German Stock Companies Act) and § 84 (1) GmbHG (German Act on Limited Liability Companies).

[FN170]. See Mock & Schildt, Insolvenz auslandischer Kapitalgesellschaften mit Sitz in Deutschland, 7 ZInsO 396, 400 (May 2004).

[FN171]. Paulus, Anderungen des deutschen Insolvenzrechts durch die Europaische Insolvenzverordnung, 23 ZIP 729, 734 (April 2002); Muller, Insolvenz auslandischer Kapitalgesellschaften mit inlandischem Verwaltungssitz, 6 NZG 414, 417 (May 2003).

[FN172]. Ashton et al., When a Multinational Group of Companies is in Financial Difficulty, 30 Int'l Bus. L. 350, 354 (September 2002).

[FN173]. See § 174 (3) InsO (German Insolvency Act) in connection with § 39 (1) InsO (German Insolvency Act).

[FN174]. Section 135 InsO (German Insolvency Act) makes the collateralization and the repayment vulnerable to the avoidance powers if the corresponding acts occurred within ten years or one year before the filing for bankruptcy respectively.

[FN175]. Favoring the export of German law with regard to shareholder loans: Paulus, Anderungen des deutschen Insolvenzrechts durch die Europaische Insolvenzverordnung, 23 ZIP 729, 734 (April 2002); Haas, Der Normzweck des Eigenkapitalersatzrechts, 4 NZI 1, 9-10 (January 2001); Haas, Aktuelle Rechtsprechung zum Kapitalersatzrecht, 5 NZI 457, 465-466 (September 2002).

[FN176]. Muller, Insolvenz auslandischer Kapitalgesellschaften mit inlandischem Verwaltungssitz, 6 NZG 414, 417 (May 2003); Schucking, Kapitalersetzende Gesellschafterdarlehen im internationalen Privatrecht, 15 ZIP 1156 (August 1994).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-12   Filed 06/30/2008   Page 11 of 12

2004 NRTN-ASBL PT II § B                                                                                                        Page 39
2004 Ann. Surv. of Bankr. Law Part II § B

[FN177]. See recital (4) of the Regulation which states that "it is necessary for the proper functioning of the internal market to avoid incentives for the parties to transfer assets or judicial proceedings from one Member State to another, seeking to obtain a more favorable legal position (forum shopping)."

[FN178]. Perhaps only the impending criminal and civil sanctions for the omission of mandatory filing requirements usually applicable in Continental Europe and the legal uncertainty of their applicability if bankruptcy proceedings are instituted in the country of incorporation will presumably produce the need for the debtor to file for secondary proceedings in these countries if the COMI is arguably located in these countries.

[FN179]. Henriette-Christina Duursma-Kepplinger et al., Europaische Insolvenzordnung, Kommentar, 55 (2002).

[FN180]. Willcock, 'How Europe became the capital of Forum Shopping (and how London hopes to become the Delaware of Europe),' The Quarterly Journal of INSOL International, Third Quarter 2003, 8.

[FN181]. According to § 1 of the German Insolvency Act, which sets out the general objectives of the bankruptcy process, the liquidation and reorganization of the debtor are put on an equal footing.

[FN182]. This has the effect of considerably narrowing the range of options available, in terms of the types of proceedings that can be resorted to, because the definition of 'winding-up proceedings' supplied by Art. 2 (c) is limited to 'insolvency proceedings involving realizing the assets of the debtor.'

[FN183]. At least under German and English bankruptcy laws this conversion of the proceedings' ultimate goal from liquidation to reorganization is possible. With regard to the latter see Gabriel Moss et. al., The EC Regulation on Insolvency Proceedings 224 (2002).

[FN184]. If the creditors' assembly is the correct forum to vote on the proposal, the subsequent question emerges whether the administrator of the main proceedings is generally entitled to vote the claims filed in his proceeding in the other proceedings based on Art. 32 (3) of the Regulation. Although the Regulation is silent on this issue, the Schmit-Virgos report indicates that such a proposal was specifically rejected in the negotiations. See Miguel Virgos & Etienne Schmit, Report on the Convention on Insolvency Proceedings, § 240, in The EC Regulation on Insolvency Proceedings 263, 314 (G. Moss et. al. eds., 2002).

[FN185]. The bankruptcy procedures in Italy and France are also not attuned to the coordination of bankruptcy proceedings if an entire group of affiliated companies encounters financial distress. See Braun, 'The new European Pastime' globalturnaround, March 2004, 6 (7).
   In contrast, Spain enacted a new Insolvency Act ("Ley Concursal") on September 1, 2004, which grants jurisdiction to open insolvency proceedings for all (Spanish) subsidiaries to the court being competent for the parent company.

[FN186]. Ehricke, 'Zur gemeinschaftlichen Sanierung insolventer Unternehmen eines Konzerns', ZInsO 2002, 393-398. It should be noted, however, that the appointment of independent officeholders is sometimes necessary if, inter alia, conflicting interests of the involved companies are at stake.

[FN187]. This view was taken in the English case of Telia v. Hillcourt where the court denied the notion that the business premises of an UK subsidiary can qualify as an 'establishment' of the Swedish parent company for the purposes of Art. 3 (2). See High Court of Justice Chancery Division, 16 October 2002, No 6394 of 2002, (2002) EWHC 2377. See also Paulus, Anderungen des deutschen Insolvenzrechts durch die Europaische Insolvenzverordnung, 23 ZIP 2002, 729, 730 (April 2002); Peter Gottwald, Grenzuberschreitende Insolvenzen 21 (1997).; Gabriel Moss et. al., The EC Regulation on Insolvency Proceedings 166 (2002).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-07413-PKC   Document 26-12   Filed 06/30/2008   Page 12 of 12

2004 NRTN-ASBL PT II § B                                                                          Page 40
2004 Ann. Surv. of Bankr. Law Part II § B

[FN188].   This approach was taken in the decision of AG Koln, 25 ZIP (2004), 471 and indorsed by AG Dusseldorf, 25 ZIP (2004, 623 (625).

[FN189].   See Art. 3 (3) of the Regulation.

[FN190].   Sabel, Hauptsitz als Niederlassung im Sinne der EuInsVO?, 7 NZI 126, 127 (March 2004).

[FN191].   See Arts. 33 and 34 of the Regulation and supra II. D. 3.

[FN192].   The most prominent example was the bankruptcy case of Maxwell Communications Corp. where the debtor had substantial assets and subsidiaries both in the US and the UK and both jurisdictions opened bankruptcy proceedings covering all assets of the debtor. See In re Maxwell Communication Corp. plc, 170 B.R. 800, 25 Bankr. Ct. Dec. (CRR) 1567 (Bankr. S.D. N.Y. 1994), judgment aff'd, 186 B.R. 807, 34 Collier Bankr. Cas. 2d (MB) 1382, Bankr. L. Rep. (CCH) P 76681 (S.D. N.Y. 1995), order aff'd, 93 F.3d 1036, 29 Bankr. Ct. Dec. (CRR) 788 (2d Cir. 1996). An overview of the case is provided in Flaschen & Silverman, 'The Role of the Examiner as Facilitator and Harmonizer in the Maxwell Communication Corporation International Insolvency,' in Current Developments in International and Comparative Corporate Insolvency Law 621 (Jacob S. Ziegel ed.,1994).

[FN193].   The other case is the bankruptcy proceeding over the estate of Enron Finance and Energy Trading Corp. The case of Daisytek also had an ultimate US component since the parent company, Daisytek International Corp., had filed for bankruptcy protection in the US on May 7, 2003.

© 2006 Thomson/West

2004 NRTN-ASBL PT II § B
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.